1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  CHRISTOPHER J. WEI, State Bar No. 78958
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
7  Telephone: (415) 703-5867
   Fax: (415) 703-1234
8  Email: Christopher.Wei@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14
   HOA TRUNG KHUU,                          C 07-6351 SI (pr)
15
                            Petitioner,      **EXHIBIT 1 (part 1)**
16
              v.
17
   JOHN TILTON, CDCR Secretary,
18
                            Respondent.
19

20

21

22

23

24

25

26

27

28

Exhibit 1 (part 1)                              Khuu v. Tilton
                                               C 07-6351 SI (pr)

# EXHIBIT 1 (part 1)

## COURT OF APPEALS, STATE OF CALIFORNIA
## FIRST APPELLATE DISTRICT

THE PEOPLE OF THE STATE OF    }
CALIFORNIA    }
     Plaintiffs/Respondents    }

                       }     Superior Court No. SC056446 A

VS.    }

                       }     **DOCKETED**

HOA TRUNG KHUU,    }     SAN FRANCISCO
     Defendant/Appellant,    }
                       }     JAN 25 2005
                       }
                       }     By _____ P. MONTOYA
                       No. SF2005 DA 0077

### CLERK'S TRANSCRIPT ON APPEAL FROM THE JUDGEMENT OF THE SUPERIOR COURT, STATE OF CALIFORNIA, COUNTY OF SAN MATEO

HONORABLE  **John G. Schwartz**,  JUDGE

NOTICE OF APPEAL FILED  **November 19, 2004**

<u>APPEARANCES</u>

FOR  <u>PLAINTIFFS/RESPONDENTS</u>

                                               BILL LOCKYER
                                               ATTORNEY GENERAL
                                               STATE OF CALIFORNIA
                                               455 GOLDEN GATE AVE.
                                               SUITE 11000
                                               SAN FRANCISCO, CA 94102

FOR  <u>DEFENDANT/APPELLANT</u>

                                               FIRST DISTRICT
                                               APPELLATE PROJECT
                                               730 HARRISON STREET
                                               SUITE 201
                                               SAN FRANCISCO, CA 94107

VOLUME I OF I
Pages 1 Through 383

## CHRONOLOGICAL INDEX

AMENDED COMPLAINT .................................................. 1

PRELIMINARY HEARING FORM .................................................. 4

INFORMATION .................................................. 5

PRELIMINARY HEARING TRANSCRIPT .................................................. 9

MINUTE ORDER DATED 06/17/2004 .................................................. 120

MINUTE ORDER DATED 06/24/2004 .................................................. 121

MINUTE ORDER DATED 07/01/2004 .................................................. 122

MINUTE ORDER DATED 07/08/2004 .................................................. 123

MINUTE ORDER DATED 08/09/2004 .................................................. 124

MINUTE ORDER DATED 08/30/2004 .................................................. 125

MINUTE ORDER DATED 08/30/2004 .................................................. 126

PEOPLE'S PROPOSED WITNESS LIST .................................................. 128

EXHIBIT RECORD .................................................. 130

PEOPLE'S MOTION TO ADMIT EVIDENCE OF
FELONY CONVICTION FOR IMPEACHMENT
OF DEFENDANT .................................................. 133

TRIAL MOTION #1 .................................................. 139

PEOPLE'S MOTION TO EXCLUDE EVIDENCE
OF AND REFERENCE TO STRIKE
ALLEGATIONS AND CONSEQUENCES .................................................. 185

JURY INSTRUCTIONS .................................................. 188

PEOPLE'S RESPONSE TO DEFENDANT'S
MOTION TO EXCLUDE DEFENDANT'S
STATEMENT TO POLICE .................................................. 190

MINUTE ORDER DATED 08/31/2004 .................................................. 197

MINUTE ORDER DATED 09/01/2004 .................................................. 200

MINUTE ORDER DATED 09/02/2004 ................................................... 205

POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR MISTRIAL ................................................... 210

MINUTE ORDER DATED 09/03/2004 ................................................... 213

MINUTE ORDER DATED 09/07/2004 ................................................... 216

JURY INSTRUCTIONS REFUSED ................................................... 219

JURY INSTRUCTIONS WITHDRAWN ................................................... 221

JURY INSTRUCTIONS READ TO JURY AND
SENT INTO JURY ROOM ................................................... 227

JURY INSTRUCTIONS EDITED BY COURT AND
COUNSEL ................................................... 273

MINUTE ORDER DATED 09/08/2004 ................................................... 322

SIGNED VERDICT FORMS ................................................... 325

STIPULATION RE: MONEY TAKEN BY POLICE
FROM DEFENDANT ................................................... 331

UNSIGNED VERDICT FORMS ................................................... 332

MINUTE ORDER DATED 10/04/2004 ................................................... 338

MOTION TO WITHDRAW AS RETAINED
COUNSEL ................................................... 339

MINUTE ORDER DATED 10/29/2004 ................................................... 344

PEOPLE'S SENTENCING STATEMENT ................................................... 345

MOTION TO STRIKE PRIOR ................................................... 356

MINUTE ORDER DATED 11/18/2004 ................................................... 363

EXHIBIT RECORD ................................................... 366

ABSTRACT OF JUDGMENT ................................................... 367

PROBATION OFFICER'S REPORT AND
RECOMMENDATION ................................................... 369

NOTICE OF APPEAL ................................................... 380

APPLICATION FOR APPOINTED COUNSEL ON
APPEAL .............................................    381

NOTICE OF FILING OF APPEAL .............................................    383

001

```
 1  JAMES P FOX
    DISTRICT ATTORNEY
 2  SAN MATEO COUNTY
    STATE BAR NO. 45169
 3  BY: MARY L ALLHISER
    DEPUTY DISTRICT ATTORNEY
 4  400 COUNTY CENTER
    REDWOOD CITY, CA 94063
 5
    TELEPHONE: (650) 363-4677
 6
    ATTORNEYS FOR PLAINTIFF
 7
 8           IN AND FOR THE SUPERIOR COURT OF CALIFORNIA
 9                     COUNTY OF SAN MATEO
10  THE PEOPLE OF THE STATE OF CALIFORNIA, ) FC CASE
                                           ) DA CASE: COM 0292959
11                          PLAINTIFF,     ) (FELONY )
                                           ) AMENDED
12                  V.                     ) COMPLAINT
                                           )
13  *RYAN BRIAN BUI                        ) SF331893A
     1438 BALBOA ST                        )
14   SAN FRANCISCO, CA 94118               )
                                           )
15   AKA BRIAN VU                          )
     AKA BANG T BUI                        )
16   AKA RYAN B BUI                        )
     AKA DAVID VU                          )
17   AKA BRIAN BUI                         )
     AKA BRYAN BUI                         )
18                                         )
    *HOA TRUNG KHUU                        ) SF331893B
19   575 EDDY ST APT 306                   )
     SAN FRANCISCO, CA 94109               )
20                                         )
     AKA CHEY RUBIN                        )
21   AKA CHEYENNE RUBIN                    )
     AKA JAMES ROWE                        )
22   AKA TRUNH HOA KHUU                    )
                                           )
23                                         )
                          DEFENDANT(S).)
24  ------------------------------------------
```

FILED
SAN MATEO COUNTY

APR -- 2004

Clerk of the Superior Court
BY
DEPUTY CLERK

1.

1        I, THE UNDERSIGNED, SAY, ON INFORMATION AND BELIEF, THAT

2   IN THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA:

3

4        COUNT: 001, ON OR ABOUT 03/10/2004, RYAN BRIAN BUI AND HOA

5   TRUNG KHUU DID WILLFULLY AND UNLAWFULLY ENTER AN INHABITED

6   DWELLING HOUSE OR TRAILER COACH OR VESSEL OR FLOATING HOME OR

7   INHABITED PORTION OF A BUILDING LOCATED AT 361 BEACH PARK

8   BOULEVARD, FOSTER CITY WITH THE INTENT TO COMMIT LARCENY OR ANY

9   FELONY, IN VIOLATION OF PENAL CODE SECTION 460(A), A FELONY.

10

11       COUNT: 002, ON OR ABOUT 03/10/2004, RYAN BRIAN BUI AND HOA

12  TRUNG KHUU DID WILLFULLY AND UNLAWFULLY ATTEMPT TO ENTER AN

13  INHABITED DWELLING HOUSE OR TRAILER COACH OR VESSEL OR FLOATING

14  HOME OR INHABITED PORTION OF A BUILDING LOCATED AT 57 WILLIAMS

15  LANE, FOSTER CITY WITH THE INTENT TO COMMIT LARCENY OR ANY

16  FELONY, IN VIOLATION OF PENAL CODE SECTION 664/460(A), A FELONY.

17

18       COUNT: 003, ON AND BETWEEN 03/09/2004 AND 03/10/2004, RYAN

19  BRIAN BUI AND HOA TRUNG KHUU DID WILLFULLY AND UNLAWFULLY ENTER

20  AN INHABITED DWELLING HOUSE OR TRAILER COACH OR VESSEL OR

21  FLOATING HOME OR INHABITED PORTION OF A BUILDING LOCATED AT 1295

22  BEACH PARK BOULEVARD, FOSTER CITY, CALIFORNIA WITH THE INTENT TO

23  COMMIT LARCENY OR ANY FELONY, IN VIOLATION OF PENAL CODE SECTION

24  460(A), A FELONY.

2.

1    COUNT: 004, ON OR ABOUT 03/10/2004, RYAN BRIAN BUI AND HOA

2    TRUNG KHUU DID WILLFULLY AND UNLAWFULLY BUY, RECEIVE, CONCEAL,

3    SELL, WITHHOLD, OR AID IN CONCEALING, SELLING, OR WITHHOLDING

4    PROPERTY OF PAMELA AND GEORGE HUNG WHICH HAD BEEN STOLEN,

5    KNOWING THAT SAID PROPERTY HAD BEEN STOLEN, IN VIOLATION OF

6    PENAL CODE SECTION 496(A), A FELONY.

7

8    COUNT: 005, ON OR ABOUT 03/10/2004, HOA TRUNG KHUU DID

9    WILLFULLY AND UNLAWFULLY BUY, RECEIVE, CONCEAL, SELL, WITHHOLD,

10   OR AID IN CONCEALING, SELLING, OR WITHHOLDING PROPERTY OF SUSAN

11   AND YAO CHI WHICH HAD BEEN STOLEN, KNOWING THAT SAID PROPERTY

12   HAD BEEN STOLEN, IN VIOLATION OF PENAL CODE SECTION 496(A), A

13   FELONY.

14

15   I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS

16   TRUE AND CORRECT EXCEPT FOR THOSE THINGS STATED ON INFORMATION

17   AND BELIEF AND THOSE I BELIEVE TO BE TRUE.

18

19   EXECUTED ON  4/5/04      , AT REDWOOD CITY, CA  94063.

20

21

JMG                          COMPLAINANT

3.

LINE #    2

J2643C (AP)    SUPERIOR COURT SOUTHERN BRANCH    004

CASE NO.: __SF331893B__ AGENCY: __05/26/04__ DATE: ____ FC    TIME: __09:00__

PEOPLE VS.: __HOA TRUNG KHUU__    DOB: __12/04/1974__
ADDR.: 575 EDDY ST APT 306, SAN FRANCISCO, CA 94109
JUDGE: __THOMAS MCGINN SMITH , JUDGE__    CLERK: __LINDA MAKELA__

HEARING: HHPRL PRELIMINARY HEARING    _Vanuri_    (HH ___)
1. PC460(A); 2. PC664/460(A); 3. PC460(A); 4-5. PC496(A)    _Amend_

CHARGES: _____

| | | | |
|---|---|---|---|
| APWOC ☐ Deft Pres. w/out atty | _Bell_ | APFTA ☐ | No appr by or defendant: Revoke |
| APWAT ☑ w/atty | | | CSORR ☐O.R. PREVO ☐ Prob. PSIDD ☐ Div. |
| APAFD ☐ Deft not Pres; repres. by atty | | BBFO_ | Forfeit: B☐ S/Bond    C☐ Bail |
| APFCR ☐ Appeared for Attorney of Record | | | MIPDR ☐ PD Relieved    MIOFF ☐ Off Calendar |
| APLAT ☐ Deft. appr late | WWREB ☐ B/W recalled | | B/W: WWBWI ☐$_____ BBNBA ☐ No Bail |

**PRELIMINARY HEARING HELD**

MOXW.☐ _MiPHC_ ☑ Motion excluding witness granted w/investigating officer excepted. Motion made by: A ☑ Prosecution    B ☐ Defense
MOSU ☐ Motion to Supress pursuant to PC 1538.5 is:    A ☐ Granted as to Ct(s) _____
                                                        B ☐ Denied        C ☐ Submitted    _SC56446 Clar_

MIWIP ☑ Witnesses sworn and testified for the People:    _Peoples #1.1-4 photos Clar_
    _Um Sanda, FCPD_    _#6  Book in, Stat_
    _Martin Tigga, FCPD_    _Base Wit FPD_
MIWID ☐ Witnesses sworn and testified for the defense:    _Mark Lee FCPD_
    _Peter Monson_

MIEXL ☑ Exhibit list incorporated herein by reference.
CDHTA ☐ The Court finds sufficient cause to believe that the named defendant has committed the offense charged and orders the
    _CDHAC_  defendant held to answer in the Superior Court as to Count: _1, 2, 3, 4, 5_ at ___ in ___ Dept ___
SHFPH ☐ Further preliminary hearing continued to _____ at ___ in ___ Dept ___
SHASC ☑ Defendant set for arraignment in Superior Court on _6/11_ at _8:41_
MIXRT ☑ Upon stipulation of counsel, exhibit(s) _✓_    _Thm M M_  _5/26/04_
    returned to _FCPD_    Judge/Commissioner of the Municipal Court    Date

**PRELIMINARY HEARING WAIVED**    _NY Phil. Howe_

WHPHC ☐ Preliminary hearing waived by both parties.
SHASC ☐ Defendant set for arraignment in Superior Court on _____ at _____    _W TIME Phil_
                                                                                  _Only_

**PLEA OF GUILTY - CERTIFICATION**

PLWAA ☐ Defendant requests and is granted permission to withdraw previous not guilty plea and pleads guilty to
    Count _____, a violation of _____ pursuant to PC 859a.
CD859 ☐ The defendant, having entered a plea of guilty pursuant to PC 859a to count _____, is hereby certified to the
    Superior Court for sentencing. Referred to Probation Department for presentence report returnable on _____
    at _____ in Superior Court.
PL59 ☐ With the consent of the District Attorney, the defendant entered a plea to Count _____, violation of
    pursuant to PC 859a of:    A ☐ GUILTY    B ☐ Nolo Contendere - Court finds Defendant Guilty
CDFA_ ☐ Count _____ dismissed on motion of the prosecution. Reason:  .E ☐ Under Submission til Sentence
    A ☐ Interest of Justice    D ☐ Negotiated Plea  C ☐ Other _____
PRPSI ☐ Referred to Probation Department for presentence report returnable on _____ at _____ in Superior Court.
CDMSC ☐ Misdemeanor alleged in Count _____ certified to Superior Court.
MITSC ☑ Case Documents Transferred to Superior Court.

**CHARGES REDUCED TO MISDEMEANOR / FELONY ADDED**

AMAAA ☐ Complaint amended as to Count_____; misdemeanor pursuant to PC 17; violation of _____, upon
    motion of the prosecution.
AMABB ☐ Complaint amended to add Count _____; Felony, violation of _____, upon motion of the Prosecution.

**BAIL INFORMATION**

| Defendant: | | |
|---|---|---|
| APCUS ☑ In custody on this case | CSFRB ☐ Released on O.R. | BBSET ☑ Bail set at $ _300,000 —_ |
| CSFRA ☐ To remain in custody | CSFRK ☐ Remain on O.R./bail release | CSFRH ☐ _____ |
| BBCBT ☐ Cash Bail Ordered Transferred to County Clerk's Office. | | CSFRC ☐ Released Supvr. O.R.: _____ |
| BBSBT ☐ Surety Bond Transferred to County Clerk's Office. | | |

I Certify the foregoing is a true copy of the judgment rendered on the above date by the above named Judge.
CLERK OF THE ABOVE NAMED COURT    by _Makela_, Deputy

TO THE SHERIFF: The foregoing certified copy of judgment in the above entitled action is your authority for the execution thereof.
DEFENDANT: BEING RELEASED ON HIS OWN RECOGNIZANCE, AGREES THAT: (a) He will appear at all times and places as ordered by the Court
or magistrate releasing him and as ordered by any Court in which, or any magistrate before whom, the charge is subsequently pending. (b) If he fails to
so appear and is apprehended outside the State of California, he waives extradition. (c) Any Court or magistrate of competent jurisdiction may revoke the
order of release and either return him to custody or require that he give bail or other assurance of his appearance as provided in part 2, title 10, chapter
1, of the Penal Code. (d) FAILURE TO APPEAR CONSTITUTES A SEPARATE AND NEW FELONY.

WITNESSED BY:_____    EXECUTED ON_____    BY_____    DEFENDANT
    DISTRIBUTION: MW (white)    SUPERIOR COURT (green)    FILE (canary)    PROBATION (pink)    DEFENDANT (goldenrod)    10

005

```
 1  JAMES P FOX
    DISTRICT ATTORNEY
 2  SAN MATEO COUNTY
    STATE BAR NO. 45169
 3  BY: MARY L ALLHISER
    DEPUTY DISTRICT ATTORNEY
 4  400 COUNTY CENTER
    REDWOOD CITY, CA 94063
 5
    TELEPHONE: (650) 363-4636
 6
    ATTORNEYS FOR PLAINTIFF
 7
```

```
                            FILED
                      SAN MATEO COUNTY
                         JUN - 9 2004
                    Clerk of the Superior Court
                    By_____
                         DEPUTY CLERK
```

```
 8          IN AND FOR THE SUPERIOR COURT OF CALIFORNIA

 9                     COUNTY OF SAN MATEO

10  THE PEOPLE OF THE STATE OF CALIFORNIA,  )
                                            )  DA CASE: INF 0292959
11                          PLAINTIFF,      )  ( FELONY )
                                            )
12                     V.                   )  INFORMATION
                                            )
13  *HOA TRUNG KHUU                         )
     575 EDDY ST APT 306                    )
14   SAN FRANCISCO, CA 94109                )
                                            )  CMS  S C 5 6 4 4 6
15    AKA CHEY RUBIN                        )
      AKA CHEYENNE RUBIN                    )
16    AKA JAMES ROWE                        )
      AKA TRUNH HOA KHUU                    )
17    AKA HOA T KHUU                        )
                                            )
18                                          )
                              DEFENDANT(S).)
19  ----------------------------------------

20       THE SAID DEFENDANT(S) IS/ARE ACCUSED BY THE DISTRICT

21  ATTORNEY OF THE COUNTY OF SAN MATEO OF THE STATE OF CALIFORNIA,

22  BY THIS INFORMATION, OF THE FOLLOWING CRIME(S) IN SAN MATEO

23  COUNTY:

24
```

1.

1    COUNT: 001, ON OR ABOUT 03/10/2004, HOA TRUNG KHUU DID

2   WILLFULLY AND UNLAWFULLY ENTER AN INHABITED DWELLING HOUSE OR

3   TRAILER COACH OR VESSEL OR FLOATING HOME OR INHABITED PORTION OF

4   A BUILDING LOCATED AT 361 BEACH PARK BOULEVARD, FOSTER CITY WITH

5   THE INTENT TO COMMIT LARCENY OR ANY FELONY, IN VIOLATION OF

6   PENAL CODE SECTION 460(A), A FELONY.

7

8    COUNT: 002, ON OR ABOUT 03/10/2004, HOA TRUNG KHUU DID

9   WILLFULLY AND UNLAWFULLY ATTEMPT TO ENTER AN INHABITED DWELLING

10   HOUSE OR TRAILER COACH OR VESSEL OR FLOATING HOME OR INHABITED

11   PORTION OF A BUILDING LOCATED AT 57 WILLIAMS LANE, FOSTER CITY

12   WITH THE INTENT TO COMMIT LARCENY OR ANY FELONY, IN VIOLATION OF

13   PENAL CODE SECTION 664/460(A), A FELONY.

14

15    COUNT: 003, ON AND BETWEEN 03/09/2004 AND 03/10/2004, HOA

16   TRUNG KHUU DID WILLFULLY AND UNLAWFULLY ENTER AN INHABITED

17   DWELLING HOUSE OR TRAILER COACH OR VESSEL OR FLOATING HOME OR

18   INHABITED PORTION OF A BUILDING LOCATED AT 1295 BEACH PARK

19   BOULEVARD, FOSTER CITY, CALIFORNIA WITH THE INTENT TO COMMIT

20   LARCENY OR ANY FELONY, IN VIOLATION OF PENAL CODE SECTION

21   460(A), A FELONY.

22

23    COUNT: 004, ON OR ABOUT 03/10/2004, HOA TRUNG KHUU DID

24   WILLFULLY AND UNLAWFULLY BUY, RECEIVE, CONCEAL, SELL, WITHHOLD,

2.

007

1  OR AID IN CONCEALING, SELLING, OR WITHHOLDING PROPERTY OF PAMELA

2  AND GEORGE HUNG WHICH HAD BEEN STOLEN, KNOWING THAT SAID

3  PROPERTY HAD BEEN STOLEN, IN VIOLATION OF PENAL CODE SECTION

4  496(A), A FELONY.

5

6      COUNT: 005, ON OR ABOUT 03/10/2004, HOA TRUNG KHUU DID

7  WILLFULLY AND UNLAWFULLY BUY, RECEIVE, CONCEAL, SELL, WITHHOLD,

8  OR AID IN CONCEALING, SELLING, OR WITHHOLDING PROPERTY OF ~~SUSAN~~ Sharon

9  AND YAO CHI WHICH HAD BEEN STOLEN, KNOWING THAT SAID PROPERTY

10  HAD BEEN STOLEN, IN VIOLATION OF PENAL CODE SECTION 496(A), A

11  FELONY.

12      IT IS FURTHER ALLEGED THAT SAID DEFENDANT HOA TRUNG KHUU

13  WAS ON OR ABOUT      1994 IN THE NORTHERN DISTRICT- UNITED

14  STATES DISTRICT COURT OF THE STATE OF CALIFORNIA, CONVICTED OF

15  THE CRIME OF ROBBERY IN VIOLATION OF 18 UNITED STATES CODE

16  SECTION 1951, DOCKET NO. 94-30350-5 AND WAS ON PROBATION FOR

17  SAID FELONY OFFENSE AT THE TIME OF THE COMMISSION OF THE ABOVE

18  OFFENSE, WITHIN THE MEANING OF PENAL CODE SECTION 1203(K).

19      IT IS FURTHER ALLEGED THAT THE ABOVE DEFENDANT HOA TRUNG

20  KHUU, PRIOR TO THE COMMISSION OF THE ABOVE OFFENSE(S) DID SUFFER A

21  CONVICTION OR JUVENILE ADJUDICATION IN 1994, OF THE CRIME OF

22  ROBBERY IN VIOLATION OF 18 UNITED STATES CODE SECTION 1951, IN

23  THE NORTHERN DISTRICT - UNITED STATES DISTRICT COURT, STATE OF

24  CALIFORNIA, WITHIN THE MEANING OF PENAL CODE SECTION

*Mtn to amend Granted January 1/10+.*

3.

1 | 1170.12(C)(1).

2     IT IS FURTHER ALLEGED AS TO DEFENDANT HOA TRUNG KHUU, THAT

3 | SAID DEFENDANT IN 1994, IN THE NORTHERN DISTRICT - UNITED STATES

4 | DISTRICT COURT, STATE OF CALIFORNIA, CONVICTED OF ROBBERY IN

5 | VIOLATION OF 18 UNITED STATES CODE SECTION 1951, A SERIOUS

6 | FELONY, IN VIOLATION OF PENAL CODE SECTION 667(A).

7

8 | DATED: JUNE 07, 2004

        JAMES P FOX, DISTRICT ATTORNEY

9

10

11 | DLP

        MARY L ALLHISER
        DEPUTY DISTRICT ATTORNEY

4.

1

IN THE SUPERIOR COURT

**FILED**
SAN MATEO COUNTY

2

OF THE STATE OF CALIFORNIA
JUN - 9 2004

3

IN AND FOR THE COUNTY OF SAN MATEO
Clerk of the Superior Court
By_____

4

---oOo---
DEPUTY CLERK

5

PEOPLE OF THE STATE OF          )
CALIFORNIA,                     )

SC56446

6

Plaintiff,   )

**ORIGINAL**

                               )

7

vs.                      )   Case No. SF331893B
                               )

8

HOA TRUNG KHUU,                 )
          Defendant.   )

9

_____)

10

11

<u>PRELIMINARY HEARING</u>

12

BEFORE:  HON. THOMAS MCGINN SMITH, JUDGE

13

DEPARTMENT 41

14

MAY 26, 2004

15

16

A P P E A R A N C E S:

17

FOR THE PEOPLE:     JAMES P. FOX
                    DISTRICT ATTORNEY

18

BY:  MARY ALLHISER
                    DEPUTY DISTRICT ATTORNEY
                    DISTRICT ATTORNEY'S

19

OFFICE
                    400 COUNTY CENTER

20

REDWOOD CITY, CA 94063

21

FOR THE DEFENDANT: PRIVATE DEFENDER PROGRAM
                    FRANK BELL, ESQ.

22

333 BRADFORD STREET
                    REDWOOD CITY, CA  94063

23

24

DEFENDANT WAS PRESENT IN COURT

25

REPORTED BY:  DEBRA L. RAMIREZ, CSR NO. 7692
              OFFICIAL COURT REPORTER

26

---oOo---

# I N D E X

WITNESSES                                      PAGE

For the People:

**OFFICER WILLIAM SANDRI**
DIRECT EXAMINATION BY MS. ALLHISER    5
CROSS-EXAMINATION BY MR. BELL          19

**OFFICER MARTIN TICKIS**
DIRECT EXAMINATION BY MS. ALLHISER    32
CROSS-EXAMINATION BY MR. BELL          38

**JOE CAVALLERO**
DIRECT EXAMINATION BY MS. ALLHISER    46
CROSS-EXAMINATION BY MR. BELL          53

**OFFICER JOE BOUZA**
DIRECT EXAMINATION BY MS. ALLHISER    62
CROSS-EXAMINATION BY MR. BELL          68

**MARK LEE**
DIRECT EXAMINATION BY MS. ALLHISER    73

**OFFICER PIERRE MORRISON**
DIRECT EXAMINATION BY MS. ALLHISER    82
CROSS-EXAMINATION BY MR. BELL          96

--oOo--

1                    I N D E X

2                E X H I B I T S

3                              For
                               I.D.   Admitted

4

5    For the People:

6    1 - PHOTO                 18      105

7    2 - PHOTO                 48      105

8    3 - PHOTO                 48      105

9    4 - PHOTO                 67      105

10   5 - CERTIFIED BOOKING
         RECORDS OF RYAN BUI   84      105

11
12   6 - THREE-PAGE DOCUMENT   88      105

                    --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

4

012

```
1              P R O C E E D I N G S

2                 MAY 26, 2004

3

4          THE COURT:  All right.  In the

5    matter of People versus Khuu.

6          MR. BELL:  Good morning, Your Honor.

7    Frank Bell on behalf of Mr. Khuu.

8          He's present in custody and we're

9    prepared to proceed.

10         MS. ALLHISER:  Mary Allhiser for the

11   People.

12         We're ready, Your Honor.

13         THE COURT:  You may call your first

14   witness.

15         MS. ALLHISER:  Bill Sandri.

16         Would you walk to the witness stand.

17         MR. BELL:  For the record, Your

18   Honor, I need to make a motion to exclude

19   witnesses, and I understand what the

20   People's response will be, but I just need

21   to make that for the record.

22         THE COURT:  Your motion is granted.

23

24         OFFICER WILLIAM SANDRI,

25   was sworn to tell the truth,

26           testified as follows:
```

5.

013

```
1            THE WITNESS:  I do.

2            THE CLERK:  Would you please state

3    and spell your name for the record?

4            THE WITNESS:  William Sandri.

5            THE CLERK:  Spell it, please.

6            THE WITNESS:  S-a-n-d-r-i.

7            THE CLERK:  Thank you.

8            MS. ALLHISER:  Your Honor, I ask

9    that the People are exempt from the

10   exclusion order.  The investigating officer

11   is Pierre Morrison, M-o-r-r-i-s-o-n.

12           THE COURT:  Yes, he is by operation

13   of law.

14           MS. ALLHISER:  Thank you.

15

16              DIRECT EXAMINATION

17

18           BY MS. ALLHISER:  Q.  How are you

19   employed, sir?

20      A.    Foster City Police Department.

21      Q.    How long have you been a sworn peace

22   officer?

23      A.    October of 2003.

24      Q.    Did you take the Peace Officers

25   Standard and Training course that's called

26   Proposition 115 concerning interviewing
```

1    witnesses, writing police reports, and

2    testifying at preliminary hearings?

3       A.    Yes.

4       Q.    Did you complete that course?

5       A.    Yes.

6       Q.    Were you on duty on Wednesday,

7    March 10th, 2004, after 12:30 in the

8    afternoon?

9       A.    Yes.

10      Q.    Were you then in uniform, sir?

11      A.    Yes.

12      Q.    What kind of duty were you on?

13      A.    Patrol.

14      Q.    Are you familiar with a location in

15   the City of Foster City, San Mateo County of

16   the address 57 Williams Lane?

17      A.    Yes.

18      Q.    And on March 10th, 2004, in the

19   afternoon, were you called by a complaint

20   from 57 Williams Lane?

21      A.    Yes.

22      Q.    What information did you have in

23   terms of a crime that may have happened?

24          MR. BELL:   Your Honor, I object on

25   the grounds of relevance, his information,

26   if it's not firsthand, unless he's talked to

1    a witness, I think, is not relevant.

2         MS. ALLHISER:  Your Honor, it's

3    offered at this point for his state of mind

4    concerning what he was looking for and why

5    he engaged in a vehicle pursuit.

6         THE COURT:  All right.  For that

7    purpose the Court will allow him to testify.

8         MR. BELL:  All right.

9         THE WITNESS:  I was dispatched to an

10   attempted residential burglary which that

11   had just occurred.  The RP said that he had

12   heard someone ringing his doorbell.  When he

13   looked out the window he saw a black Range

14   Rover occupied by one light skinned man and

15   someone else was ringing the doorbell.  He

16   didn't feel comfortable with him ringing

17   the doorbell, so he just ignored it for

18   about 10 minutes.

19        Later he heard some noises at his

20   back door.  When he went downstairs he saw

21   two lighted skinned males attempting to pry

22   open his rear glass door.  He yelled at them

23   and they left.

24   Q.    Have you since in the course of this

25   spoken with that reporting party?

26   A.    No.

1    Q.    Well, that's the same day you did

2    talk to him?

3    A.    Yes, that same day.

4    Q.    What was his name?

5    A.    Tommy Hui.

6    Q.    H-u-i?

7    A.    I believe so.

8    Q.    And was that the resident at

9    57 Williams Lane who had made this complaint

10   to the Foster City Police?

11   A.    Yes.

12   Q.    What dispatch information did you

13   have about the suspect or vehicle?

14   A.    I was told that the suspect vehicle

15   was a black Range Rover occupied by two

16   light skinned males, possibly Hispanic.

17   Q.    Did dispatch give you information on

18   where that vehicle might be towed?

19   A.    No, they did not.

20   Q.    When you received the call, did you

21   head for 57 Williams Lane?

22   A.    Yes, I did.

23   Q.    And at a certain location did you

24   see something that you thought might be the

25   suspect vehicle?

26   A.    Yes, I did.

1    Q.    What did you see?

2    A.    I saw a black Range Rover at Port

3    Royal at Edgewater.  I saw a black Range

4    Rover at Port Royal and Edgewater Boulevard

5    that matched the suspect vehicle's

6    description.

7    Q.    Did you know the distance a car

8    would drive from Port Royal and Edgewater to

9    57 Williams Lane?

10    A.    Approximately a mile.

11    Q.    And at that time did you bear that

12    into account?

13    A.    Yes.

14    Q.    When you saw the black Range Rover,

15    where was it headed?

16    A.    It was attempting to turn left onto

17    Edgewater Boulevard heading northbound.

18    Q.    What did you do?

19    A.    I followed the vehicle and attempted

20    to initiate a traffic stop on the Edgewater

21    Plaza Shopping Center.

22    Q.    How?

23    A.    I turned on my red and blue lights.

24    Q.    Were you then in a marked police

25    car?

26    A.    Yes, I was.

1    Q.    It said "police"?

2    A.    Yes.

3    Q.    Did the black Range Rover respond to

4 your emergency lights?

5    A.    The vehicle sped down the north side

6 of the parking lot towards the lagoon, and

7 once it got to the bottom both occupants

8 fled the vehicle.

9    Q.    When the black Range Rover came to a

10 stop, how far were you?

11    A.    I was about two car lengths behind

12 it.

13    Q.    At that time could you clearly see

14 the passenger compartment?

15    A.    No.  I was stopped directly behind

16 it.

17    Q.    Could you see if anyone was inside?

18    A.    Yes.

19    Q.    How many people could you see at

20 that moment?

21    A.    Two.

22    Q.    Did you see them move?

23    A.    Yes.

24    Q.    Describe.

25    A.    The driver exited the driver's side

26 door and ran around heading southbound, and

11

019

1   the passenger exited the vehicle from the

2   passenger door and headed southbound as

3   well.

4        Q.   At that moment physically what place

5   were you in, can you describe a building or

6   street?

7        A.   I was behind Albertson's in the

8   north section of the parking lot right up

9   against the lagoon.

10       Q.   Did you take any action to stop the

11  driver or the passenger?

12       A.   I began a foot pursuit chase after

13  them through the parking center plaza.

14       Q.   Did you call yourself to their

15  attention?

16       A.   Yes.  When I caught up with them at

17  the south entrance exit of Edgewater

18  Boulevard, I identified myself as a police

19  officer and ordered them to get on the

20  ground.

21       Q.   At that moment how far were you from

22  the two?

23       A.   About 15 yards.

24       Q.   Could you see their faces?

25       A.   Yes.

26       Q.   Those two people, up to that time,

1    were you acquainted with them?

2       A.    No.

3       Q.    Do you now know as a result of this

4    investigation the names of those two people?

5       A.    Yes.

6       Q.    What are the names of those two

7    people?

8       A.    Hoa Khuu and Ryan Bui.

9       Q.    Is Hoa Khuu present in court today?

10      A.    Yes.

11      Q.    Where is he seated and what is he

12    wearing?

13      A.    He's seated at the defendant's chair

14    in an orange suit.

15            MS. ALLHISER:  Would the record

16    reflect this witness has identified the

17    defendant?

18            THE COURT:  Yes.

19            MS. ALLHISER:  Q.  The man you now

20    know as Hoa Khuu, did you see him, meaning

21    could you see his face inside the black

22    Range Rover?

23      A.    Not clearly.

24      Q.    When did you get the best view of

25    him?  The first best view.

26      A.    When I caught up with them at the

1    south entrance exit of the Edgewater Place.

2        Q.    At that time you could see his face?

3        A.    Yes.

4        Q.    Could you at that time tell if he

5    had been the driver or the passenger?

6        A.    I can't recall.

7        Q.    What did Hoa Khuu do when you

8    demanded they stop?

9        A.    He hopped the fence of the wall and

10    headed into the back yard of one thousand --

11    1001 Monterey Avenue.

12        Q.    Okay.  1001 Monterey, is that a

13    residence?

14        A.    Yes.

15        Q.    When you ordered the two to stop,

16    what did the other man, Ryan Bui, do?

17        A.    He also fled over the wall into the

18    back yard of the residence of 101 -- 1001

19    Monterey Avenue.

20        Q.    Did the two men go over the same

21    fence?

22        A.    Different parts of the same fence,

23    yes.

24        Q.    Did any police officer assist you in

25    locating either man?

26        A.    At that time Officer Lee arrived on

1    scene, and we began to search the back yard.

2    Q.    Did you later take any personal role

3    in the apprehension of Hoa Khuu?

4    A.    No.

5    Q.    Did you later take any personal role

6    in the apprehension of Ryan Bui?

7    A.    No.

8    Q.    The black Range Rover, did you

9    personally search it?

10    A.    No, I did not.

11    Q.    Do you know if anyone did?

12    A.    Yes.

13    Q.    Who was that?

14    A.    Our CSO Roger.

15        MR. BELL:  I object to his

16    testimony, unless it's of his personal

17    knowledge and of his own observation as

18    opposed to something he was told or learned

19    as a result of the investigation.

20        MS. ALLHISER:  Proposition 115, Your

21    Honor, permits a witness to testify as to

22    what another has told him.

23        MR. BELL:  There is no foundation

24    then because --

25        THE COURT:  The objection is

26    overruled.

1          You may continue.

2          MS. ALLHISER:   Q.   Did someone tell

3    you that he searched the black Range Rover?

4          A.    Yes.

5          Q.    Who was that?

6          A.    Our CSO Joe Cavallero.

7          Q.    C-a-v-a-l-l-e-r-o?

8          A.    I believe so.

9          Q.    As the investigation continued that

10   afternoon, did you go back and speak with

11   the resident of 57 Williams Lane in Foster

12   City?

13         A.    Yes, I did.

14         Q.    That was Tommy Hui, H-u-i?

15         A.    Yes.

16         Q.    What did you talk with Mr. Hui

17   about?

18         A.    He told me about what happened, the

19   same information he had dispatched about

20   seeing the black Range Rover and two males

21   through the window.

22         Q.    Did Mr. Hui describe for you the

23   time frame of these events?

24         A.    Yes, he did.

25         Q.    What did Mr. Hui tell you?

26         A.    He said it happened approximately 10

16

024

1  to 15 minutes after someone rang the

2  doorbell.

3      Q.    Did you and Mr. Hui examine the rear

4  sliding door?

5      A.    Yes, we did.

6      Q.    And what did you see?

7      A.    There was pry marks in the door --

8  several pry marks.

9      Q.    Did you observe a police officer

10  compare a tool to those pry marks?

11      A.    Yes, I did, on another date.

12      Q.    What did you see?

13          MR. BELL:  I'm going to object.  It

14  calls for an expert.  This is a subject of

15  expert testimony.  He's not qualified.

16          THE COURT:  The objection is

17  overruled.

18          MS. ALLHISER:  Q.  What did you see?

19      A.    The pry marks appeared consistent

20  with the tool.

21      Q.    What?  Describe the tool.

22          MR. BELL:  Move to strike.  Same

23  grounds, Your Honor.

24          THE COURT:  Same ruling.

25          MS. ALLHISER:  Q.  Describe the

26  tool.

1    A.    The tool was -- I believe it was a

2    12-inch screwdriver with a five-inch handle,

3    flat head screwdriver.

4    Q.    Describe now -- I'm talking about

5    what you were seeing.  Describe the

6    comparison.

7    A.    The length of the pry marks was

8    approximately the same length as the head of

9    the screwdriver.  It appeared that they

10    attempted to pry it open by pushing it from

11    left to right.

12         MR. BELL:  Objection.  Calls for a

13    conclusion.  Move to strike and also --

14         THE COURT:  Overruled.  The motion

15    is denied.

16         MR. BELL:  Thank you.

17         MS. ALLHISER:  Q.  Did Mr. Hui tell

18    you whether he ever got a good look at the

19    faces or one of the faces of these two men?

20    A.    No, he did not.

21    Q.    Did he describe either man to you?

22    A.    Yes.

23    Q.    What description did he give?

24    A.    He provided me with a description of

25    the medium build, medium height.  He wasn't

26    that specific.

1    Q.    And, otherwise, did he give you a

2    race or ethnic characteristic?

3    A.    He believed they may be Hispanic.

4    Q.    Did he say he thought they were

5    Hispanics?

6    A.    Because they were light skinned.

7    Q.    Did Mr. Hui describe age or anything

8    of that as to either one of these men?

9    A.    Nothing of -- besides I believe it

10   was 20's, or 30's of age.

11   Q.    Did Mr. Hui describe clothing on

12   either or both of the men?

13   A.    I don't recall.

14   MS. ALLHISER:  Your Honor, I ask

15   that be marked a single photograph.  It's an

16   enlarged digital photograph.  It shows the

17   back of a black Range Rover, License

18   42225NY.

19   THE COURT:  It will be marked

20   Plaintiff's 1.

21   (Whereupon, People's Exhibit 1 was

22   marked for identification.)

23   MS. ALLHISER:  Counsel has a copy of

24   the disk which includes these photographs.

25   Q.    Officer Sandri, this is called

26   People's 1, a photograph of a scene.  Can

1    you describe that scene?

2        A.    Yes.    That's where the black Range

3    Rover stopped at in the Edgewater Plaza

4    Shopping Center.    That's where it was left.

5        Q.    Is this the same Range Rover that

6    you chased from the area of Port Royal and

7    Edgewater to this point of rest?

8        A.    Yes.

9            MS. ALLHISER:    Those are my

10   questions.

11           THE COURT:    You may inquire.

12           MR. BELL:    Thank you, Your Honor.

13

14               CROSS-EXAMINATION

15

16           BY MR. BELL:    Q.    Officer Sandri,

17   you were asked by Miss Allhiser what

18   information you had as you initially

19   traveled to the area of 57 Williams Lane.

20   Do you recall that line of questioning?

21       A.    Yes.

22       Q.    You got that from dispatch?

23       A.    Yes.

24       Q.    Okay.    Dispatch told you that the

25   reporting person had described the persons

26   he had seen at his back door as possibly

1    Hispanic, correct?

2        A.    Yes.

3        Q.    Was that the only information

4    concerning race or national origin that was

5    included in the dispatch that you overheard?

6        A.    I believe so.

7        Q.    Okay.  Was there any information in

8    that dispatch regarding the clothing that

9    was worn by the suspects?

10       A.    I don't recall.

11       Q.    Is there anything that would help

12   you recall by reference to your report?

13   Would that help you recall that information?

14       A.    The dispatch tape might.  Other than

15   that I don't believe...  I know it's not in

16   my report.

17       Q.    Okay.  So as you sit there now, at

18   least there is nothing that you -- that you

19   know of that could refresh your recollection

20   about that?

21       A.    No.

22       Q.    Okay.  I mean, other than what you

23   described, the dispatch tape, if you had had

24   that, that might help you?

25       A.    Yes.

26       Q.    All right.  Now, what you mentioned,

1    that dispatch mentioned that the suspects or

2    the persons you were looking for were in a

3    vehicle which you described as a Range

4    Rover, black in color, correct?

5        A.    Yes.

6        Q.    Okay.  Now, you, as a police

7    officer, know that a Range Rover is a make

8    of vehicle, correct?

9        A.    Yes.

10       Q.    There are several different models

11   in the Range Rover line, correct?

12       A.    I believe so.

13       Q.    Okay.  Was any information given to

14   you about the model of Range Rover?

15       A.    I believe all I was given was a

16   black Range Rover.

17       Q.    Okay.  Do you have any knowledge as

18   you sit there now based upon your experience

19   as a police officer, approximately how many

20   models there were of Range Rovers that are

21   currently on the road?

22       A.    No, I do not.

23       Q.    Okay.  Would it be fair to say that

24   there is at least five different models of

25   Range Rovers?

26       A.    I don't know.

1    Q.    Okay.  How about anything about the

2    year, whether the vehicle was a new or older

3    model, was any information given to you

4    about that?

5    A.    I don't recall.

6    Q.    Okay.  So the information you had

7    with respect to this, you were looking for

8    two light skinned males, possibly Hispanic,

9    no information about clothing, driving a

10   black Range Rover vehicle --

11   A.    Yes.

12   Q.    -- correct?

13        Now, when you saw the vehicle that

14   you later attempted to stop, you were not

15   certain in your own mind that that was, in

16   fact, the car that had been seen by the

17   reported person, correct?

18   A.    I can't be sure.

19   Q.    Right.  You couldn't be sure at that

20   time, correct?

21   A.    Correct.

22   Q.    It was a possibility but not

23   something that was certain in your mind?

24   A.    Yes.

25   Q.    Okay.  But sufficient to permit you

26   to at least make a stop and investigate

1    further, correct?

2        A.    Yes.

3        Q.    When you saw that vehicle before you

4    attempted to stop it, were you able to

5    determine anything about the race of the

6    occupants of that vehicle?

7        A.    I could just see through the rear

8    view mirrors there was what appeared to be

9    two light skinned males.

10       Q.    Okay.  Did you come to any

11   conclusion about whether the race of those

12   males were that they were Asian?

13       A.    No, I could not.

14       Q.    Okay.  You observed that vehicle

15   traveling in what direction on Port Royal?

16       A.    At that point I believe it was

17   eastbound on Port Royal.

18       Q.    Okay.  And at the intersection of

19   Edgewater, that would be attempted to turn

20   left?

21       A.    Yes, left.

22       Q.    That would be -- would that -- would

23   that be generally traveling out of Foster

24   City where Foster City is where you try to

25   exit?

26       A.    Yes.

1    Q.    That would be the route they would

2    probably take off of Port Royal, correct?

3    A.    Yes.

4    Q.    Now, you were how far behind that

5    vehicle at the time you observed it turn

6    left on Edgewater?

7    A.    I believe it was -- I was behind

8    three other cars.

9    Q.    Okay.  And at that time did you have

10    any -- your emergency lights or sirens

11    activated?

12    A.    No, I did not.

13    Q.    Okay.  Did the car then make a left

14    turn?  By the way, was the car stopped at a

15    stoplight or stop sign at that point?

16    A.    It was stopped at the stop sign.

17    Q.    Okay.  And did it comply with

18    traffic regulations in terms of making the

19    left hand turn onto Edgewater?

20    A.    Yes.

21    Q.    Okay.  What then -- as you turned --

22    you turned onto Edgewater behind the

23    vehicle?

24    A.    I temporarily lost site of the

25    vehicle before finding, again, on Edgewater

26    Plaza Shopping Center.

1    Q.    Okay.  How far from the corner of

2    Point Royal is it to the Edgewater Shopping

3    Center where you saw it again?

4    A.    It's right across the street.

5    Q.    What was it that caused you to lose

6    visual contact with the vehicle?

7    A.    I was several car lengths behind the

8    vehicle.

9    Q.    Did you observe the vehicle turn

10    into the shopping center?

11    A.    No, I did not.

12    Q.    So as you were driving by the

13    shopping center, you saw what you thought

14    was -- by the way, let me go back a little

15    bit.

16         Did you note anything about, for

17    example, the license number of that vehicle

18    or anything else that would help you

19    identify it as the identical vehicle?

20    A.    Yes, I did.

21    Q.    What was that?

22    A.    I had saw the license plate at the

23    stop sign.

24    Q.    Okay.  And you verified that the

25    vehicle you saw in the shopping center had

26    the same license number?

1    A.    Yes.

2    Q.    Okay.  Now, in your direct testimony

3    you were asked by Miss Allhiser whether or

4    not you were able to identify the person

5    seated in the court with me here today,

6    Mr. Khuu, was either the driver or the

7    passenger.  I believe your answer was you

8    cannot recall.  Let me go to that.  Is it

9    that you cannot recall as you sit there now

10   whether he was the driver or passenger or

11   you were unable to determine that at the

12   time you made the apprehension or attempted

13   to apprehend them?

14   A.    I can't recall.  Everything happened

15   fast, and I can't be positive on it.

16   Q.    Okay.  So that's the point I'm

17   trying to make here.  You cannot -- even

18   then at that time you were uncertain as to

19   which of the two individuals that you later

20   attempted to apprehend was the driver and

21   which was the passenger in the vehicle?

22   A.    That's correct.

23   Q.    Okay.  I'm going to ask you about

24   your testimony concerning the tool mark.

25   What formal training courses have you taken

26   in the identification of tool marks?

27

1    A.    Just what they taught us at the

2    academy.

3    Q.    And what was that?

4    A.    Just basics.  I'm not -- I don't

5    know exactly what the course is.

6    Q.    Okay.  Do you have -- so this was

7    when you were POST qualified in roughly

8    October of 2003?

9    A.    I believe I graduated before that.

10    Q.    Okay.  Let me just ask you

11    generally, when was it that you took this

12    course at?

13    A.    2002.

14    Q.    2002.

15    And can you describe for us what

16    kind of a course it was and how long it

17    took?

18    A.    I don't recall.

19    Q.    Okay.  What was the subject matter

20    of the course?

21    A.    Evidence and evidence preservation.

22    Q.    Okay.  The basic thrust of the

23    course was if there was a possible piece of

24    evidence regarding tool marks, you were to

25    try to preserve that evidence, correct?

26    A.    Yes.

1    Q.    Did they give you specific training

2    in attempting to identify specific tools

3    that went to specific tool marks?

4    A.    Some of it.

5    Q.    Would you be prepared to say to

6    agree with me that that portion of the

7    course was very limited?

8         THE COURT:  Was what?

9         MR. BELL:  Very limited.

10        THE WITNESS:  Yes.

11        MR. BELL:  Q.  It was just intended

12   to give you some introduction as a police

13   officer to that area of investigation in

14   evidence?

15   A.    I believe so.

16   Q.    So that you would understand that it

17   would be important to attempt to preserve

18   that kind of evidence if you came across it?

19   A.    I believe so.

20   Q.    When you went back later to -- later

21   that date to talk to Mr. Hui or Hui at

22   57 Williams Lane, the reporting person, you

23   discussed again with him the possible race

24   of the suspects, correct?

25   A.    Yes, correct.

26   Q.    He repeated to you that they were

1    possibly Hispanic, correct?

2        A.    Yes.

3        Q.    He never told you that they were

4    possibly Asian, correct?

5        A.    I don't believe so.

6        Q.    And he was, in fact, Asian, himself,

7    correct?

8        A.    Correct.

9        Q.    Did he mention other than being

10    medium build and medium height and in their

11    20's or 30's, did he mention anything else

12    in terms of description of the suspects?

13        A.    Not that I can recall.

14        Q.    I think your testimony when you were

15    questioned by Miss Allhiser was that

16    regarding clothing worn by the suspects,

17    that you could not recall.  Now I just

18    wanted to go into that for a minute.  Is it

19    that you as you testified cannot recall what

20    he told you about the clothing or he could

21    not recall anything about the clothing worn

22    by the suspects?

23        A.    I don't believe that he provided me

24    with any information regarding clothing.

25        Q.    Okay.  And there was nothing

26    provided in the initial dispatch regarding

1   that either, was there?

2       A.    No, I don't believe so.

3       Q.    Okay.  Did you at some point remain

4   on the scene at the place where the vehicle

5   was stopped in the Edgewater Shopping

6   Center?

7       A.    No, I did not.

8       Q.    You did not actually participate in

9   the actual apprehension of either Mr. Khuu

10  or Mr. Bui, correct?

11      A.    No, I did not.

12      Q.    Did you have occasion to find out in

13  your investigation from talking to any of

14  the other officers involved as to whether or

15  not Mr. Khuu had a warrant outstanding for

16  his arrest?

17      A.    I learned that from dispatch.

18      Q.    Okay.  At what point did you learn

19  that?

20      A.    Prior to bringing him to the San

21  Mateo County Jail.

22      Q.    Okay.  And that was a warrant issued

23  by the United States District Court for a

24  violation of Federal Parole or supervised

25  release, correct?

26      A.    I believe so.  I'm not positive.

039

1    Q.    Were you able to ascertain whether

2    or not it was a Federal warrant of some

3    sort?

4    A.    I don't recall.

5    Q.    Okay.  But there was an active

6    warrant for his arrest, you are certain of

7    that?

8    A.    Yes, yes.

9         MR. BELL:  Could I have just a

10   moment?  I think that...  That's all my

11   questions.

12        Thank you very much, Officer.

13        THE COURT:  Have you any redirect,

14   Miss Allhiser?

15        MS. ALLHISER:  No, Your Honor.

16        THE COURT:  Thank you.  You may step

17   down.

18        MS. ALLHISER:  Is this witness

19   excused, Your Honor?

20        MR. BELL:  Yes, as far as I'm

21   concerned.

22        THE COURT:  Yes.

23        MS. ALLHISER:  Next witness, Your

24   Honor?

25        THE COURT:  Yes.

26        MS. ALLHISER:  Martin Tickis.

040

1    Would you walk up to the stand and

2    be sworn.

3

4        OFFICER MARTIN TICKIS.

5        was sworn to tell the truth,

6            testified as follows:

7    THE WITNESS:  Yes.

8        THE CLERK:  Would you please state

9    and spell your name for the record?

10        THE WITNESS:  My name is Martin.

11    First name M-a-r-t-i-n.  Last name is

12    Tickis, T-i-c-k-i-s.

13

14        DIRECT EXAMINATION

15

16        BY MS. ALLHISER:  Q.  How are you

17    employed, sir?

18    A.    I am a police officer with the

19    Foster City Police Department.

20    Q.    How long have you been a sworn peace

21    officer?

22    A.    Five years now.

23    Q.    Asking you now about March 12, 2004,

24    did you take a complaint from a resident at

25    1295 Beach Park Boulevard in the City of

26    Foster City, San Mateo County?

1    A.    Yes, I did.

2    Q.    Did you speak with an occupant at

3    that residence?

4    A.    Yes, I did.

5    Q.    Who did you talk to?

6    A.    I spoke with -- I forget.  Can I

7    refer to my report for the full name,

8    please?

9    Q.    Yes.  I'm going to ask you to spell

10    it.

11    A.    I spoke with Solomon Chi.

12    Q.    Spell the first and last.

13    A.    Solomon, S-o-l-o-m-o-n.  Chi is

14    spelled C-h-i.

15    Q.    Did Solomon Chi tell you that he

16    lived at 1295 Beach Park Boulevard?

17    A.    Yes, he did.

18    Q.    Did he tell you who else was there

19    at that -- or who else was resided at that

20    address?

21    A.    Yes, he did.

22    Q.    What did he say?

23    A.    He told me his father and mother

24    also lived there.

25    Q.    Did he name them?

26    A.    He named his father.

Q.    Spell it.

A.    His father's name was Yao Chi.

First name is spelled Y-a-o.  Chi is C-h-i.

Q.    Did you meet with Yao Chi as well?

A.    Yes, I did.

Q.    What language did Mr. Yao Chi speak?

A.    He spoke -- I specifically don't
remember.  He spoke in Asian dialect.  Asia.

Q.    Did Mr. Yao speak English at all?

A.    No.

Q.    Were you then communicating with
Solomon Chi?

A.    Yes, I was.

Q.    Did Solomon Chi tell you that he had
a crime to report?

A.    Yes.

Q.    What did Solomon Chi tell you?

A.    He told me he had wanted to report
the theft of some money.

Q.    Did Mr. Solomon Chi tell you or show
you where the money was stolen?

A.    Yes.  He took me to what he told me
was a master bedroom and showed me a small
file -- metal file cabinet and showed me the
money had been taken from the lower drawer.

Q.    Did you observe any damage to the

1 file cabinet?

2     A.    Yes, I did.  It looked like the

3 upper right hand corner if you are looking

4 at the drawers appeared to have been pried

5 open.

6     Q.    Did Mr. Solomon Chi tell you whose

7 money it was?

8     A.    He told me it was his father's.

9     Q.    Did Mr. Solomon Chi later show you

10 any other damage to the exterior of the

11 house?

12     A.    Yes.  Yes, he did.

13     MR. BELL:  Objection.  Can I object

14 on grounds on vagueness?  It's not clear

15 whether or not -- at least it's not clear

16 whether Solomon is interpreting for his

17 father or making his own independent report

18 of the events.

19     THE COURT:  I'm assuming it's an

20 independent report unless there is some

21 language that's qualifying.  There hadn't

22 been.

23     MR. BELL:  Thank you.

24     MS. ALLHISER:  Q.  To be clear, we,

25 in our questions, have been talking about

26 Solomon Chi, and I've been asking you what

1    did Solomon Chi tell you.  Have those been

2    your answers about what Solomon Chi told

3    you?

4        A.    Yes.

5        Q.    Did you also use Solomon Chi as an

6    interpreter to get additional information

7    from his father, Yao Chi?

8        A.    Yes.

9        Q.    But I'm only going to ask you what

10   Solomon Chi told you.

11       A.    Yes.

12       Q.    Meaning from his own mouth?

13       A.    Uh-huh?

14       Q.    Yes?

15       A.    Yes.

16       Q.    On a later date, March 17th, 2004,

17   did you return to 1295 Beach Park Boulevard

18   in the City of Foster City to meet with

19   Solomon Chi?

20       A.    Yes.

21       Q.    What happened then?

22       A.    He reported to me that they had

23   discovered, I guess, a window that had been

24   tampered with a screen had been removed.

25       Q.    Did Mr. Solomon Chi show you or tell

26   you which window it was?

1          A.    He showed me, yes, it was the

2    bathroom window.

3          Q.    And did you see any damage?

4          A.    What I saw was that the screen that

5    covers the window appeared to have been

6    tampered with.  It was somewhat twisted.

7          Q.    Did Mr. Solomon Chi tell you when he

8    personally had seen that damage?

9          A.    Yes, he told me he had seen it, I

10   believe, that day after they had reported

11   the theft.

12         Q.    Did Mr. Solomon Chi tell you if he

13   replaced the window or --

14              MR. BELL:  Sorry.  Could I ask that

15   last answer be read back?

16              THE COURT:  Yes.

17              MR. BELL:  Thank you.

18              Thank you.

19              MS. ALLHISER:  Q.  Did Mr. Solomon

20   Chi tell you whether he had replaced the

21   screen to the window -- what he had done

22   with it?

23         A.     He told me actually his father had

24   replaced the screen.

25              MS. ALLHISER:  Those are my

26   questions of this witness.

1      THE COURT:  You may inquire.

2      MR. BELL:  Thank you.

3

4               CROSS-EXAMINATION

5

6      BY MR. BELL:  Q.  Mr. Solomon Chi

7  reported to you on the 12th that his father

8  had put some cash in a lower drawer of a

9  file cabinet in the master bedroom, correct?

10     A.    Yes.

11     Q.    Did he tell you the amount of that

12  cash?

13     A.    $5,000.

14     Q.    Okay.  Did he give you any

15  information about the denomination?  First

16  of all, was this in the United States

17  currency?

18     A.    If I remember correctly, yes.

19     Q.    Okay.  Did he give you any

20  information as to what the denominations of

21  the currency was?

22     A.    No.

23     Q.    Did he indicate to you when it was

24  that his father had placed that currency in

25  the cabinet?

26     A.    I don't remember off the top of my

1    head.    If I can refer to my report I can

2    go --

3        Q.    Yes, please, if that helps you

4    refresh your memory.

5        A.    Yes.

6            MS. ALLHISER:  Your Honor, I'm going

7    to -- while the officer is looking, I'm

8    going to object and move to strike his

9    testimony.

10            THE COURT:  Wait.  Why don't we do

11    one thing at a time.

12            MR. BELL:  Thank you.

13            THE WITNESS:  Yes.

14            MR. BELL:  Q.  Okay.  And when was

15    it that he placed it in the drawer?

16        A.    It was placed on looks like

17    March 9th of 2004.

18        Q.    Okay.  Do you have information about

19    when on March 9th of 2004?

20        A.    That night, the night of March 9th.

21        Q.    Okay.  Now, I'm going to go make my

22    motion.  Based on the way I understand the

23    testimony is coming out, I'm moving to

24    strike it on the grounds of hearsay and lack

25    of personal knowledge on the part of the

26    reporting person Solomon.  If he was

048

1   translating for his father, that would be

2   one thing, but just simply making a report

3   about what his father did without any

4   showing that he had any personal knowledge

5   of that would make it hearsay, or at least

6   hearsay on hearsay, if he's reporting what

7   his father had told him.  So I'm moving to

8   strike all of the testimony regarding

9   Solomon Chi's report.

10          THE COURT:  I thought we went

11   through this before, Mr. Bell.  The witness

12   has testified what Solomon told him, not

13   what Solomon's father told him.

14          MR. BELL:  I understand that, and I

15   think that that's the defect in the

16   testimony since there is no showing that

17   actually Mr. Solomon Chi has any personal

18   knowledge of what his father did.  So,

19   that's the defect in the testimony which

20   makes it hearsay, he must have gotten, or

21   lack of personal knowledge.

22          THE COURT:  Okay.  Do you have any

23   comments, Miss Allhiser?

24          MS. ALLHISER:  No, Your Honor.  I

25   tried to clarify that issue with the officer

26   before.

41

049

```
1        THE COURT:  Yes.  The motion is
2   denied.
3        MR. BELL:  Q.  All right.  Did
4   Mr. Solomon Chi -- let me clarify that.
5        The only person you spoke to on the
6   12th was actually Solomon Chi, the son,
7   correct?
8    A.    Correct.
9    Q.    All right.  And did he tell you when
10  it was that they noticed that the money was
11  missing?
12   A.    Yeah.  He told -- he -- yeah, he did
13  tell me.
14   Q.    When was that?
15   A.    Can I refer to my report again?
16   Q.    Yes.
17   A.    Yes.  It was March 12th
18  approximately 2:00 p.m. in the afternoon.
19   Q.    Okay.  So that was on the date that
20  he made the report?
21   A.    Yes.
22   Q.    All right.  Was he able to provide
23  you with any information as to when between
24  March 9th in the evening, that it was placed
25  in the drawer, and March 12th, when it was
26  noticed missing as to when it might have
```

1    disappeared -- any information at all

2    concerning the timing of it?

3        A.    No.

4        Q.    What was that?

5        A.    No, he didn't.  He was not.

6        Q.    All right.  I'm sorry.

7              Thank you.

8        A.    No, he was not.

9        Q.    Did you personally attempt to look

10   for any latent fingerprints on the cabinet?

11       A.    Yes, I did.

12       Q.    Were you able to find any?

13       A.    No.

14       Q.    Did you do anything to preserve in

15   any way the evidence regarding the prying

16   open of the cabinet?

17       A.    Yes.

18       A.    I took digital photos.

19       Q.    Other than that did you do anything

20   further?

21       A.    No.

22       Q.    All right.  Now, you went back to

23   the premises on March the 17th and spoke

24   again with Solomon?

25       A.    Yes.

26       Q.    He indicated that the day after you

1    first spoke with him on the 13th, that they

2    had discovered a window screen that had

3    been, he believed, tampered with, correct?

4        A.    Correct.

5        Q.    Did you, in fact, see the screen

6    that he was referring to?

7        A.    Yes.

8        Q.    And the screen, however, had been

9    replaced on the window?

10       A.    Yes.

11       Q.    By Solomon's father?

12       A.    Yes.

13       Q.    And that would have been Yao Chi?

14       A.    Yes.

15       Q.    Was this -- when you spoke to

16   Solomon on the 17th, was it because he

17   called the department to report this or did

18   you go there for some other reason?

19       A.    He called -- he telephoned the

20   department.

21       Q.    Did you do anything to attempt to

22   preserve the evidence regarding the tampered

23   screen?  Did you photo it, for example?

24       A.    I believe I did.  Can I refer to my

25   report?

26       Q.    Sure.

1     A.    Yes, I did.  I took a digital image

2    of it.

3     Q.    Did you attempt to look for any

4    latent fingerprints on the screen or in the

5    area of the screen?

6     A.    No.

7     Q.    And other than the fingerprints that

8    you looked for on the 12th on the cabinet,

9    did you make any other examination of the

10    premises to see if you could discover any

11    latent fingerprints?

12     A.    No.

13     Q.    Did you speak to anyone else at

14    1295 Beach Park regarding anything to do

15    with the burglary in their premises?

16     A.    Just Mr. Yao Chi but he couldn't --

17    we couldn't converse because of the language

18    barrier.

19     Q.    Did you ever speak to a person by

20    the name of Susan Chi?

21     A.    No, I didn't.

22     Q.    Okay.  Did you speak to any other

23    Foster City police officers regarding a

24    report made by Susan Chi that she, herself,

25    was missing some cash from the residence?

26     A.    No.  Well, I'm sorry.  Yes, I was

1    informed she had submitted a follow-up

2    report indicating that there was some

3    additional items missing.

4        Q.    Who informed you of that?

5        A.    Detective Morrison.

6        Q.    Okay.  And the details of that was

7    that she reported that she was missing

8    certain cash from the residence as well,

9    correct?

10       A.    From my understanding, yes.

11           MR. BELL:  I have nothing further.

12   Thank you.

13           THE COURT:  Thank you.  You may step

14   down, sir.

15           MS. ALLHISER:  Next witness, Your

16   Honor, Joe Cavallero.

17           Would you walk to the stand and be

18   sworn.

19

20               JOE CAVALLERO,

21        was sworn to tell the truth,

22            testified as follows:

23

24           THE WITNESS:  I do.

25           THE CLERK:  Would you please state

26   and spell your name for the record?

46

1      THE WITNESS:  Joseph Cavallero.

2  C-a-v -- as in Victor -- a-l-l-e-r-o.

3      THE CLERK:  Thank you.  You may be

4  seated.

5

6              DIRECT EXAMINATION

7

8      BY MS. ALLHISER:  Q.  How are you

9  employed, sir?

10     A.    I'm a senior community service

11  officer for the Foster City Police

12  Department.

13     Q.    What is a community service officer?

14     A.    I do traffic and parking, and I

15  assist officers at crime scenes.

16     Q.    As part of your duties do you

17  photograph and seize objects to be retained

18  as evidence?

19     A.    Yes, I do.

20     Q.    And on March 10th, 2004, in the

21  afternoon, were you called to the parking

22  lot of Albertson's in the City of Foster

23  City, San Mateo County, to photograph and

24  later to search a black Range Rover?

25     A.    Yes, I was.

26     Q.    Have you looked at some pictures of

1    this car before you came to court?

2      A.    Yes, I have.

3      Q.    This is now labelled People's

4    Exhibit 1.  It's a photograph of a black

5    car.  Do you recognize that?

6      A.    Yes, I do.

7      Q.    What place is that, what area?

8      A.    That's to the rear of the

9    Albertson's store facing the lagoon off

10   Edgewater Boulevard.

11     Q.    That particular vehicle, can you see

12   the license plate as shown in the

13   photograph, People's 1, for identification?

14     A.    Yes, I can.

15     Q.    Is that the black Range Rover that

16   you saw?

17     A.    Yes, it is.

18     Q.    And what action did you take at the

19   parking lot?

20     A.    At the parking lot I photographed

21   the vehicle on the outside and the inside.

22     Q.    Did you later carefully search and

23   itemize the contents?

24     A.    Yes, I did.

25     Q.    Did you work with others to do that?

26     A.    Yes, I did.

1    MS. ALLHISER:  Your Honor, I ask

2    that be marked as People's Exhibit 2, for

3    identification, a photograph I have shown to

4    counsel.  It appears to be a back seat of a

5    car with dark interior and the contents

6    including a black carrier bag and a white

7    grocery bag, and as People's 3, for

8    identification, what appears to be the floor

9    board of a car, which shows a mat and what

10   appears to be a large screwdriver.

11          (Whereupon, People's Exhibits 2 and

12             3 were marked for identification.)

13   MS. ALLHISER:  Q.  Officer, this is

14   called People's Exhibit 2, a photograph.  Do

15   you recognize -- sorry -- I turned it upside

16   down.  Do you recognize that place?

17   A.    Yes, I do.

18   Q.    What is it?

19   A.    That's the rear seat of the vehicle

20   in question.

21   Q.    Describe a few of the larger objects

22   that show in the photograph, and that you

23   actually remember large containers.

24   A.    There was a white Sonoma Williams

25   (sic) bag contained a white paper bag and a

26   large black computer lap top type bag.

1    Q.    That white Williams-Sonoma bag, did

2    you later with the help of other people,

3    perhaps, carefully searching the contents?

4    A.    Yes, I did.

5    Q.    Now, just talking about the white

6    Williams-Sonoma bag and what was inside it,

7    describe generally, not every item,

8    generally what was inside the white

9    Williams-Sonoma bag?

10    A.    Inside the white Williams-Sonoma bag

11    was a brown bag and in the brown bag there

12    was foreign currency, U.S. currency, coins,

13    and a great deal of jewelry.

14    Q.    Okay.  When you say "a great deal,"

15    do you mean 10 pieces?  100 pieces?  Can you

16    give us an idea?

17    A.    I believe there was over a hundred

18    pieces of jewelry.

19    Q.    The U.S. currency, did you or other

20    officers count it?

21    A.    I counted the currency.

22    Q.    What was the total on the U.S.

23    currency from the white Williams-Sonoma?

24    A.    $4,979.

25    Q.    The black computer bag, did you

26    carefully search the contents later in this

1    investigation?

2    A.    No.  Officer Nick did.

3    Q.    Did you see what was inside the

4    black computer bag?

5    A.    Yes, I did.

6    Q.    From what you saw, what was inside

7    the black computer bag?

8    A.    There was a computer.  There was a

9    camera.  There was a Game Boy thing, and

10   that's all that I saw in the bag.

11   Q.    Those items from the black computer

12   bag, did another Foster City officer go

13   through and itemize each item?

14   A.    Yes, he did.

15   Q.    Asking you now about People's

16   Exhibit 3, appears to be the floor board of

17   a car.  Do you recognize that scene?

18   A.    Yes, I do.

19   Q.    Describe it, please.

20   A.    That's the floor board of the front

21   passenger seat of the black Range Rover,

22   that screwdriver or implement was underneath

23   the floor mat.

24   Q.    The photographs of the floor mat are

25   kind of rolled back and over away from the

26   carpet; is that true?

1    A.    Yes.

2    Q.    When you first saw, not the

3 photograph, but when you first saw the right

4 front floor board of the black Range Rover,

5 what did it look like?

6    A.    The mat that was covering the

7 screwdriver.

8    Q.    This photograph, People's Exhibit 3,

9 for identification, that was posted or

10 staged; is that true?

11    A.    Yes, it was.  The floor mat was

12 moved back in order to show the screwdriver

13 so the photo can be taken of the screwdriver

14 where it was located in the vehicle.

15    Q.    Okay.  Did you take the picture of

16 People's 3, for identification?

17    A.    Yes, I did.

18    Q.    Describe the screwdriver.

19    A.    It's a -- has a black handle with a

20 long shaft, and the actual blade of the

21 screwdriver is angled.  It's not straight.

22    Q.    Okay.  And by that you mean at the

23 end of the blade, rather than being straight

24 across, there is some diagonal tip to the

25 blade?

26    A.    No.  At the end of the shaft, where

1    the blade connects to the shaft, it's at an

2    angle.  The blade is not straight with the

3    shaft.

4        Q.    Okay.  I think I now understand.  So

5    where the handle connects to the metal

6    blade, that's where it's not in line.  It's

7    out of line?

8        A.    Where the blade connects to the

9    metal shaft?

10       Q.    Yes.

11       A.    In other words, a shaft comes this

12   way and the blade is angled up slightly.

13       Q.    Okay.  I am sorry.  If I made this

14   harder than it really is --

15       A.    No problem.

16       Q.    Okay.  The objects here, shown in

17   People's Exhibit 2, for identification, the

18   rear seat, People's 3, for identification,

19   where were the careful searches done and the

20   itemization of all of these items, where did

21   that happen?

22       A.    That happened at the Foster City

23   Police Department parking lot.

24       Q.    And were the objects from the inside

25   of the black Range Rover then seized and

26   itemized carefully by the Foster City

1    personnel and held as evidence?

2        A.    Yes, they were.

3            MS. ALLHISER:  Those are my

4    questions.

5            THE COURT:  You may inquire.

6            MR. BELL:  Thank you, Your Honor.

7

8                CROSS-EXAMINATION

9

10            BY MR. BELL:  Q.  Looking at the

11    photograph which is now marked People's

12    Exhibit 2, I don't know if you can see it

13    here, but would you agree that the

14    Williams-Sonoma bag was on the floor of the

15    rear passenger compartment on the driver's

16    side of the vehicle?

17        A.    Yes, it was.

18        Q.    The computer bag that you described

19    which also is shown in People's Exhibit 2

20    was on the back seat of the left passenger

21    side of the vehicle, correct?

22        A.    Yes, sir.

23        Q.    There were other items depicted in

24    this photograph.  For example, a pair of

25    Levi's that appears and some other personal

26    clothing.  What else did you find in the

54

062

1    vehicle besides the Williams-Sonoma bag with

2    the brown paper bag inside, and the computer

3    bag that you previously testified

4    concerning --

5        A.    Those were the items that I found in

6    the vehicle that I had removed from the

7    vehicle and cataloged.   Those were the only

8    items I removed from the vehicle and

9    cataloged.

10       Q.    I'm sorry.   I didn't mean to cut you

11   off.

12       A.    No problem.

13       Q.    Any other person besides yourself

14   engaged in the search of the vehicle or were

15   you the sole officer detailed to do that?

16       A.    No.   Senior Community Service

17   Officer Capadonno also assisted in the

18   search of the vehicle.   C-a-p-a-d-o-n-n-o.

19       Q.    Do you know Capadonno's first name?

20       A.    Daniel.

21       Q.    He's a former U.S. or parole or

22   probation officer?

23       A.    Yes, sir.

24       Q.    Do you know from having spoken to

25   him as to whether or not he found anything

26   of evidentiary value in the vehicle in his

1    search?

2       A.    In his search he found -- he found

3    the screwdriver.

4       Q.    I see.

5       A.    And he -- he -- and he is the one

6    that booked it into or retrieved it from the

7    vehicle.  He found cash in the center

8    console and some other items but exactly

9    what, I don't know.

10      Q.    Okay.  Was there -- was there

11   anything else in the Williams-Sonoma bag

12   depicted in People's No. 2, that was not

13   also inside of the brown paper bag?

14      A.    Yes, sir, there was.

15      Q.    Okay.  So there were things in the

16   brown paper bag inside the Williams-Sonoma

17   bag, and there were things that were not in

18   the brown paper bag inside?

19      A.    Yes, sir.

20      Q.    Okay.  What -- can you -- can you

21   tell us, you mentioned jewelry that you

22   found -- multiple pieces of jewelry.  I hope

23   I don't misstate this, but I think you said

24   maybe even a hundred pieces.

25      A.    Yes, sir.

26      Q.    Were they in the brown paper bag or

56

064

1    were they not in the brown paper bag?

2       A.    They were in the brown paper bag.

3       Q.    The currency you described, $4979,

4    was that also in the brown paper bag?

5       A.    Yes, sir.

6       Q.    Okay.  What -- and, of course, when

7    I say in the brown paper bag, I also mean

8    inside the Williams-Sonoma bag.

9       A.    Yes, sir.

10      Q.    That's the U.S. currency, that was

11   not in the brown paper bag, that was also in

12   Williams-Sonoma bag?

13      A.    There was three pack of Colgate

14   toothpaste, a roll of toilet paper, a

15   partially opened pack of Marlboro Light

16   cigarettes.

17      Q.    Okay.  So, in terms of what you

18   might describe as the loot, that was all in

19   the brown paper bag, the currency and the --

20      A.    Yes.

21      Q.    -- and the jewelry, correct?

22      A.    Yes, sir.

23      Q.    Anything else in the brown paper bag

24   besides the currency and the jewelry?

25      A.    Not that I remember, sir.

26      Q.    Okay.  Let's talk about the currency

1   for a minute.  Was this $4,979 found in

2   one -- how can I put this -- found in one

3   sort of bundle or place indicating that it

4   was altogether or was it loose and

5   throughout the bag?

6       A.    It was loose and in the bag, sir.

7       Q.    So, for example, it wasn't all tied

8   together with a rubber band or in an

9   envelope or anything that would indicate

10  that it all came from one place at one time?

11      A.    No, sir.

12      Q.    All right.  The jewelry that you

13  described, how was it?  In what condition

14  was it?  Was it loose jewelry in the bag, or

15  were they -- were they packaged

16  individually?  What can you tell us about

17  that?

18      A.    The jewelry was loose in the bag.

19      Q.    Okay.

20      A.    It took a while to untangle the

21  chains and everything.

22      Q.    Okay.  Now, going to the People's

23  No. 3, which is the photograph of the

24  screwdriver that was found in the vehicle,

25  where was this screwdriver located, in the

26  front passenger compartment or the rear

1  passenger compartment?

2      A.    The front passenger compartment.

3      Q.    And was this on the driver's side or

4  the passenger?  This was on the passenger

5  side of the front?

6      A.    Yes, sir.

7      Q.    The occupant compartment of the

8  vehicle?

9      A.    Yes.

10     Q.    Underneath the floor mat?

11     A.    Yes, sir.

12     Q.    You indicated, I think what you are

13  trying to say, at least as I understood it,

14  was that the shaft of the screwdriver was

15  bent maybe indicating that somebody had used

16  it as a pry tool?

17     A.    The shaft was straight and the tip

18  was at an angle.

19     Q.    Okay.  So the very end at the flat

20  part --

21     A.    Right.

22     Q.    -- was somewhat angled also perhaps

23  indicating that it had been used as some

24  sort of a pry tool, perhaps?

25     A.    Possible.

26     Q.    Did you attempt to preserve that

1    item, the screwdriver for possible

2    examination by a fingerprint expert?

3        A.    The screwdriver was recovered by

4    Officer Capadonno.

5        Q.    Okay.

6        A.    I did not touch the screwdriver.  I

7    left it where it lie and all I did was

8    photograph it.

9        Q.    Okay.  The Community Service

10   Officer, though, at least in Foster City

11   Police Department does also participate in

12   the search for latent fingerprints and

13   recovery of latent fingerprints.  Is that

14   one of your duties?

15       A.    Yes, sir.

16       Q.    But you -- having to do with the

17   screwdriver, you didn't -- you weren't

18   involved in that particular --

19       A.    No, I was not.

20       Q.    -- item of evidence?  How about any

21   other item evidence in the vehicle, did you

22   attempt to do a search for latent

23   fingerprints or any of the items you

24   described?

25       A.    No, I cannot, sir.

26       Q.    Okay.  Are you aware of any other

66

1  attempt to do so by anybody in your

2  department?

3      A.    Of items within the vehicle?

4      Q.    Yes.

5      A.    Not of items of the vehicle, no,

6  sir.

7      Q.    How about the vehicle, itself?

8      A.    Yes, sir.

9      Q.    Okay.  Where -- what portions of the

10  vehicle were examined -- did you do that

11  examination?

12      A.    No, I did not, sir.

13      Q.    Okay.  Do you know who did?

14      A.    Officer Capadonno.

15      Q.    Okay.  And were you observing him as

16  he did that?

17      A.    No, sir, I did not.

18      Q.    Did you speak to him later about his

19  examination of the vehicle for latent

20  fingerprints?

21      A.    Yes, I -- yes, sir.

22      Q.    What did he tell you?

23      A.    From what I recall, sir, I did find

24  a latent print, but I'm not exactly sure

25  where.

26      Q.    Okay.

```
1            MR. BELL:  I think that's all my
2    questions, Your Honor.
3            Thank you.
4            MS. ALLHISER:  No questions, Your
5    Honor.
6            THE COURT:  Thank you,
7    Mr. Cavallero.
8            You may step down.
9            MS. ALLHISER:  Next witness, Your
10   Honor?
11           THE COURT:  Yes.
12           MS. ALLHISER:  Joe Bouza.
13           Would you walk up to the witness
14   stand and be sworn.
15
16           OFFICER JOE BOUZA,
17       was sworn to tell the truth,
18          testified as follows:
19
20       THE WITNESS:  Yes, I do.
21           THE CLERK:  Would you please state
22   and spell your name for the record?
23           THE WITNESS:  Corporal Joe Bouza,
24   Foster City Police Department.
25           THE CLERK:  How do you spell that?
26           THE WITNESS:  B-o-u-z-a.
```

## DIRECT EXAMINATION

BY MS. ALLHISER:    Q.    Corporal
Bouza, how long have you been a sworn peace
officer?

A.    Approximately four years.

Q.    Did you take the Peace Officers
Standards and Training course, interviewing
witnesses, writing police reports and
testifying at preliminary hearings called
Proposition 115 training?

A.    Yes, I did.

Q.    Did you complete that course?

A.    Yes, I did.

Q.    Were you on duty on March 10th, 2004
in the afternoon?

A.    Yes, I was.

Q.    Were you part of an investigation
that began with the discovery of some
property in a black Range Rover in the
Albertson's lot in the City of Foster City,
San Mateo County?

A.    Yes, I was.

Q.    Did you speak with a property owner
by the name of George Hung, H-u-n-g,
concerning stolen property?

1    A.    Yes, I did.

2    Q.    Did you meet with Mr. Hung in

3    person?

4    A.    Yes, I did.

5    Q.    Did you meet at his residence?

6    A.    Yes, I did.

7    Q.    What was that place?

8    A.    That residence was located at

9    361 Beach Park Boulevard in Foster City.

10    Q.    And was that on the afternoon --

11    during the afternoon of March 10th, 2004?

12    A.    Yes, it was.

13    Q.    Did you seek out Mr. Hung?

14    A.    Yes, I did.

15    Q.    Why?

16    A.    I was called to the scene where some

17    property was located in the suspect's

18    vehicle.

19    Q.    Was that the black Range Rover?

20    A.    Yes, it was.

21    Q.    You saw the black Range Rover?

22    A.    Yes, I did.

23    Q.    Photograph, People's Exhibit 1, for

24    identification, is that the black Range

25    Rover that you saw that afternoon as part of

26    this investigation?

64

072

1    A.    Yes, it is.

2    Q.    And was it property from the black

3  Range Rover that caused you to meet with

4  George Hung?

5    A.    Yes.

6    Q.    How -- did you know how to find

7  Mr. George Hung?

8    A.    One of the items contained in the

9  suspect's vehicle was a black lap top case.

10  Upon opening the case, I located Mr. Hung's

11  business cards inside along with a lap top

12  computer and other items.

13    Q.    Did the business card include

14  Mr. George Hung's residence address?

15    A.    Yes, it did.

16    Q.    Did you then go to the residence 361

17  Beach Park in Foster City?

18    A.    I eventually went to the residence,

19  yes.

20    Q.    Eventually.

21        Did you meet then Mr. Hung at the

22  residence and ask him if he had suffered a

23  loss?

24    A.    Yes, I did.

25    Q.    Did you personally look for any

26  damage to an exterior door or an interior

1    door of that house?

2    A.    Yes, I did.

3    Q.    What did you see?

4    A.    I noticed that both the exterior

5    door and interior door leading up to the

6    residence from the garage was unlocked.

7    Mr. Hung stated that both doors were locked

8    upon his departure from his residence that

9    morning.

10    Q.    Did Mr. Hung tell you when he had

11    left his home on March 10th in the morning?

12    A.    Yes, he did.  He said that he left

13    the residence approximately eight o'clock in

14    the morning.

15    Q.    Did Mr. Hung indicate to his

16    knowledge if anyone was in the house when he

17    left or was it then left vacant?

18    A.    It was left vacant and locked at

19    that time.

20    Q.    Did you and Mr. Hung look at the

21    damage to the garage doors?

22    A.    Yes, we did.

23    Q.    Did you ask him about it?

24    A.    I noticed that some fresh scratch

25    marks on the -- strike that -- both doors,

26    the reason why I thought they were fresh,

because there was not any dirt present
inside of them as opposed to the other
scratches.

Q.    Did you ask Mr. Hung what about this
damage?

A.    Yes, I did, and he stated that he
could not recognize it as being new or old
damage because it was so minor.

Q.    Did you ask him specifically if he
knew that those doors had been locked when
he left at 8:00 a.m. that morning?

A.    Yes, I did.

Q.    Did Mr. Hung indicate yes, he knew
they were both locked?

A.    Yes, he did.

Q.    Did you in the course of this
investigation show property to Mr. Hung?

A.    Yes, I did.

Q.    Where did you do that?

A.    The property was placed on a table
at the Foster City Police Department for his
review.

Q.    That same afternoon?

A.    That same afternoon.

MS. ALLHISER:  People's Exhibit 4,
Your Honor, appears to be a photograph of a

1    table of a number of objects laid out

2    including what appears to be a lap top, some

3    CDs, electronic equipment, a watch, and

4    other items.

5             (Whereupon, People's Exhibit 4 was

6               marked for identification.)

7         MS. ALLHISER:  Q.   This is now

8    labelled People's 4, for identification.  Do

9    you recognize this scene?

10        A.    Yes, I do.

11        Q.    What is that place?

12        A.    This is located in our line-up room

13   at the police station.

14        Q.    What are those objects?

15        A.    The objects depicted here, a lap top

16   computer, some software, digital camera, a

17   watch, a black computer lap top bag, and

18   some other computer accessories.  Mr. Hung

19   viewed these items at our police station and

20   identified them as belonging to him.

21        Q.    Did Mr. Hung tell you where those

22   items had been what you see in People's 4,

23   for identification, as far as Mr. Hung knew,

24   where had they been?

25        A.    Yes, he did.

26        Q.    Where did he say?

1    A.    He stated that the property shown

2    here in this photograph were inside of his

3    locked residence earlier that day.

4    Q.    Okay.  At Beach Park Boulevard?

5    A.    Yes.

6    Q.    The objects are all obviously taken

7    a part and displayed what shows in the upper

8    corner what appears to be a black computer

9    bag.  Is this the object that you had

10   originally searched and found the business

11   card with the name and address of George

12   Hung?

13   A.    Yes.

14       MS. ALLHISER:  Those are my

15   questions.

16       THE COURT:  You may inquire,

17   Mr. Bell.

18       MR. BELL:  Thank you.

19

20             CROSS-EXAMINATION

21

22       BY MR. BELL:  Q.  Officer Bouza,

23   when you spoke with Mr. Hung on the 10th in

24   the afternoon, what time of day was it?

25   A.    Approximately 2:00 p.m.  Maybe a

26   little later.

1    Q.    Was he at the residence when you

2    went to that residence -- or, well, let me

3    go back a little bit.  Did you try to call

4    him and set up a meeting or did you go to

5    the residence?

6    A.    I telephoned him and asked him to

7    meet me at the police station.

8    Q.    Okay.  So, did -- he came to the

9    police station first, and then the two of

10    you went to his residence together?

11    A.    That's correct, but I was at the

12    residence prior to us initially meeting.

13    Q.    Okay.  So, I guess what I'm confused

14    with, but let me see if I can get myself

15    unconfused here.  Actually, did you -- did

16    once you discovered the items in the vehicle

17    and you found his business card, did you

18    make a telephone call to him at that point?

19    A.    Yes, we did.

20    Q.    Okay.  And where was he physically

21    located?

22    A.    For clarification I initially tried

23    calling the residence and received no

24    response at that time.  I went to the

25    residence, and I searched it with Sergeant

26    Archer.  We searched.  We found two unlocked

1    doors, made entry into the residence.  We

2    searched the interior residence and his

3    younger daughter was at home.

4        Q.    Okay.  And then somehow had you made

5    contact with him?

6        A.    Then I telephoned on his business

7    cell.  On my supplement after the telephone

8    we met at the police station.

9        Q.    Okay.  Then at the police station he

10   said that he observed the objects that you

11   just described that are depicted in

12   People's 4, the photograph?

13       A.    Yes.

14       Q.    Okay.  There are items not in that

15   photograph that he also told you were

16   missing from his home, correct?

17       A.    Correct.

18       Q.    Among that was a thousand dollars in

19   cash --

20       A.    Yes.

21       Q.    -- correct, in U.S. currency?  I

22   should be more clear.

23       A.    Yes.

24       Q.    Where did he say that those funds

25   were located?

26       A.    He told me they were located

1    throughout the residence.  He had told me

2    they were contained within several different

3    wallets throughout his bedroom and within

4    his briefcase.

5        Q.    Okay.  And he also described $2,000

6    in Taiwanese currency alleged to have been

7    missing as well, correct?

8        A.    Yes.

9        Q.    In terms of displaying for him the

10   objects depicted in People's 4, did you --

11   as far as you know, did he ever identify

12   anything found in the vehicle, the Range

13   Rover, as being the $2,000 of Taiwanese

14   currency he was missing?

15       A.    I don't recall if we showed him the

16   currency or not.

17       Q.    Okay.  What did he tell you was the

18   condition of the Taiwanese currency when he

19   last saw it?  By that I mean where was it

20   and how was it packaged, if at all?

21       A.    He told me that the currency was

22   located in several wallets that he

23   possessed, and that the wallets were

24   contained in his master bedroom.

25       Q.    Okay.  Did he find -- were any

26   wallets ever displayed to him for his,

1    perhaps, identification of them as being

2    missing from the home?

3        A.    I don't recall.

4        Q.    Okay.  Did he -- when he reported

5    the money missing, did he also tell you that

6    the wallets were left behind, and that only

7    the money was taken or did he tell you that

8    the wallet containing the money had been

9    taken?

10       A.    He -- both.  He stated that some

11    wallets were missing and some wallets were

12    left behind.

13       Q.    Okay.  To the best of your

14    knowledge, when you talked with other

15    officers about what to display to Mr. Hung,

16    did you ever ask whether or not they had

17    recovered any wallets with currency in them?

18       A.    No, because at the time we didn't

19    know what was missing.

20       Q.    Okay.  To the best of your

21    knowledge, were any of the wallets -- were

22    any wallets at all recovered from inside the

23    vehicle to your knowledge?

24       A.    I don't know.

25            MR. BELL:  Those are all of my

26    questions.

1    THE COURT:  Thank you.  You may step

2    down, sir.

3         Yes, we'll take a 10-minute recess.

4         (Whereupon, a break was taken.)

5    THE COURT:  The record will reflect

6    counsel and the defendant are present.

7         You may call your next witness.

8    MS. ALLHISER:  Mark Lee.

9         Would you walk up to the witness

10   stand and be sworn.

11

12              MARK LEE,

13   was sworn to tell the truth,

14         testified as follows:

15

16   THE WITNESS:  Yes.

17   THE CLERK:  Would you please state

18   and spell your name for the record?

19   THE WITNESS:  Mark Lee, M-a-r-k

20   L-e-e.

21   THE CLERK:  Thank you.

22

23         DIRECT EXAMINATION

24

25   BY MS. ALLHISER:  Q.  How are you

26   employed, sir?

74

082

```
 1      A.     I'm a police officer with Foster

 2   City.

 3      Q.     How long have you been a sworn peace

 4   officer?

 5      A.     I would say about one and a half

 6   years.

 7      Q.     I would like to ask you about

 8   Wednesday, March 10th, 2004, in the

 9   afternoon.  Were you then working?

10      A.     Yes, I was.

11      Q.     And were you in a marked police

12   uniform, badges, patch, such as you are

13   wearing today?

14      A.     Yes, I was.

15      Q.     Did you with other Foster City

16   police officers search for the occupants of

17   a black Range Rover coming from the

18   Albertson's Store or abandoned at

19   Albertson's in Foster City?

20      A.     Yes, I did.

21      Q.     Where did you go?

22      A.     I assisted a call that came in.   I

23   went to the 357 Williams Lane residence.

24      Q.     Ultimately, did you meet with

25   Officer Bill Sandri?

26      A.     Yes, I did.
```

1    Q.    Where was that?

2    A.    I met him at the one thousand block

3    of Monterey.

4    Q.    Where is the one thousand block of

5    Monterey as a person would travel on foot

6    from the Albertson's parking lot in Foster

7    City on Edgewater Boulevard?

8    A.    Directly next to the last place of

9    business, or rather, the entire shopping

10    center.  It's the first street.

11    Q.    Here is the store where the parking

12    lot.  The next street is Monterey?

13    A.    Correct.

14    Q.    And that's the thousand block?

15    A.    Yes.

16    Q.    Okay.  Did you search for someone?

17    A.    Yes, I did.

18    Q.    How?

19    A.    I searched on foot with Officer

20    Sandri initially.

21    Q.    Did you receive information on who

22    you were looking for?

23    A.    Yes, I did.

24    Q.    What was that?

25    A.    Two suspects in a black Range Rover,

26    via dispatch.  As soon as I arrived when I

1    first met with Officer Sandri, he told me

2    that he was on foot pursuit of two suspects,

3    and I pointed to the house that we initially

4    searched.

5        Q.    And this house was at the thousand

6    block of Monterey?

7        A.    Correct, it was the first house.

8        Q.    Okay.  Where did you go?

9        A.    Both of us went in the back yard.

10   Officer Sandri told me you have the -- you

11   go to the right.  I went right.  He went

12   left.

13       Q.    As you went to the right did you see

14   a person or persons?

15       A.    No, not initially.

16       Q.    What did you see as time wore out?

17       A.    As soon as we entered the back yard,

18   the fence like is low, being it's next to

19   the water.  I went to my right, and I saw

20   nearly five houses down suspect fleeing.

21       Q.    And when you say "fleeing," you mean

22   the person was running?

23       A.    Correct.

24       Q.    Could you tell if it was a man or

25   woman?

26       A.    I could tell it was a man

1  definitely.

2    Q.    And at that moment did you take any

3  action?

4    A.    I initially yelled out "stop," and

5  the person proceeded and I proceeded to run

6  after the suspect.

7    Q.    Did you close the distance between

8  the two of you?

9    A.    Eventually I would like to say I

10 was.

11   Q.    All right.  Was there some point in

12 time where you could clearly see the other

13 person?

14   A.    When I eventually caught up with him

15 or called him.

16   Q.    Where was that?

17   A.    1029 Monterey.

18   Q.    What was happening at 1029 Monterey?

19   A.    There was a resident outside, and at

20 that point I believed there was no way the

21 suspect could be any farther.  I looked

22 around.  There is nothing around except for

23 a boat -- a small boat, cover boat.

24   Q.    Covered boat?

25   A.    Covered boat.

26   Q.    Did you look inside the boat cover?

1    A.    Yes, I did, I shook the boat

2    initially.  That's when I heard a rumbling

3    going on inside.  I yelled out "Come out,"

4    and I heard a splash in the water.

5    Q.    Explain what you mean by the splash.

6    A.    A splash as one were to jump from

7    the boat into the lagoon.

8    Q.    Did you then see a person in the

9    lagoon?

10    A.    Yes, I did.

11    Q.    What did you do?

12    A.    I drew -- withdrew my duty weapon,

13    and told the suspect to come out of the

14    lagoon, stop, put his hands up.

15    Q.    Did this person respond?

16    A.    Yes, he did.

17    Q.    How?

18    A.    I responded with the explicit

19    language.

20    Q.    What did he say?

21    A.    He said:  "Fuck you.  Go ahead and

22    shoot me."  He said this numerous times.

23    Q.    To you?

24    A.    Correct.

25    Q.    And what happened then?

26    A.    Again, it was back and forth,

1    yelling "Come out.  Give it up.  There is

2    nowhere to go."

3          The suspect repeated "Fuck you, go

4    ahead and shoot me," until finally the

5    suspects followed my directions by coming on

6    shore or shoreline.

7    Q.    At that point could you tell if it

8    was the same person that you had seen

9    running five houses away from when you

10   entered that back yard in the thousand block

11   of Monterey?

12   A.    Yes.

13   Q.    It was the same person?

14   A.    Positive.

15   Q.    Now, did that person submit to you?

16   A.    At that point, no.

17   Q.    What happened?

18   A.    I told him to lay on the grass.  At

19   that point he was complying.  He lay on the

20   grass.  As soon as I approached him, he got

21   up and ran again, jumped to the next house

22   and fled again.

23   Q.    As time progressed did you later

24   find that man, the man who had run initially

25   from the back yard of one thousand block of

26   Monterey?

1    A.    Yes, I did.

2    Q.    Where did you finally locate him?

3    A.    I found him on Monterey. I can't

4 remember the exact address, but we found him

5 inside a garbage can with the lid closed

6 over him.

7    Q.    How long altogether were you looking

8 for this man?

9    A.    I would say approximately 30

10 minutes. A little more than 30 minutes.

11    Q.    At the end of the time describe

12 where he was, please.

13    A.    He was inside a closed garbage

14 can -- covered garbage can.

15    Q.    Inside someone's yard?

16    A.    Correct, on the side of someone's

17 yard. The gate was locked still and the

18 garbage can was directly behind that gate.

19    Q.    And where was this compared to where

20 you had first seen the man running?

21    A.    Are you referring to running from

22 the one thousand block of Monterey?

23    Q.    Yes.

24    A.    I would say about 200 yards.

25    Q.    That man -- the man you finally

26 found in the garbage can, was it the same

1    man you had seen initially running from the

2    one thousand block of Monterey?

3        A.    Yes.

4        Q.    Is he in court?

5        A.    Yes.

6        Q.    Where was he seated?

7        A.    Seated in front of me wearing

8    orange.

9             MS. ALLHISER:  Would the record

10   reflect the witness has identified the

11   defendant, Mr. Khuu?

12            THE COURT:  Yes.

13            MS. ALLHISER:  Those are my

14   questions.

15            MR. BELL:  I have no questions of

16   this witness, Your Honor.

17            THE COURT:  Thank you.  You may step

18   down.

19            MS. ALLHISER:  Last witness, Your

20   Honor, Pierre Morrison.

21            Would you walk up to the stand and

22   be sworn.

23

24            OFFICER PIERRE MORRISON,

25        was sworn to tell the truth,

26            testified as follows:

1     THE WITNESS:  I do.

2     THE CLERK:  Would you please state

3  and spell your name for the record?

4     THE WITNESS:  Pierre Morrison,

5  P-i-e-r-r-e M-o-r-r-i-s-o-n.

6     THE CLERK:  Thank you.

7     You may be seated.

8

9       DIRECT EXAMINATION

10

11    BY MS. ALLHISER:  Q.  How are you

12  employed, sir?

13   A.  Foster City Police Department

14  Detective.

15   Q.  How long have you been a sworn peace

16  officer?

17   A.  Approximately two years.

18   Q.  Have you been a peace officer in

19  other capacities?

20   A.  As patrol.  I'm detective now.  I

21  was in patrol prior to that.

22   Q.  In California did you take the Peace

23  Officers Standards and Training course --

24  it's called Proposition 115 in interviewing

25  witnesses, writing police reports and

26  testifying at preliminary hearings?

83

091

1    A.    Yes, I did.

2    Q.    Did you complete that course, sir?

3    A.    Yes, I did.

4    Q.    Are you responsible for the

5    investigation of a series of crimes in

6    Foster City that included an attempted

7    residential burglary at 57 Williams Lane in

8    the City of Foster City?

9    A.    Yes.

10    Q.    And that investigation expanded to

11    the investigation of a residential burglary

12    at 361 Beach Park Boulevard in Foster City?

13    A.    Yes.

14    Q.    And expanded as well as to a

15    resident burglary at 1295 Beach Park

16    Boulevard in Foster City?

17    A.    Yes.

18    Q.    Do you know someone by the name of

19    Ryan Bui?

20    A.    Yes.

21    Q.    And were you present when Ryan Bui

22    was in custody in Foster City by March 10th,

23    2004?

24    A.    Yes, I was.

25         MS. ALLHISER:  Your Honor, People's

26    Exhibit 5, I offer as a certified copy of

1    the records of the San Mateo County

2    Sheriff's of the booking of Ryan Bui on

3    March 10th of 2004.

4              Counsel has seen this.

5              (Whereupon, People's Exhibit 5 was

6               marked for identification.)

7              MR. BELL:  I have no objection, Your

8    Honor.

9              THE COURT:  All right.  Plaintiff's

10    5.

11             MS. ALLHISER:  Q.  Detective

12    Morrison, People's 5, it's a booking photo.

13    Is this the man you know as Ryan Bui?

14        A.    Yes, it is.

15        Q.    Where did you first see him?

16        A.    I saw him outside of 505 Bristol

17    Lane or Court.

18        Q.    Bristol, B-r-i-s-t-o-l?

19        A.    Yes.

20        Q.    And is that in Foster City?

21        A.    Yes, it is.

22        Q.    At that point was he under arrest?

23        A.    Yes, he was.

24        Q.    And can you now visualize the

25    location where you saw him, in what place?

26        A.    It was just outside of the fence of

85

093

1    505 Bristol Lane.

2    Q.    And he was then with a Foster City

3    police officer in custody?

4    A.    He was with Corporal Michael Hart

5    and Officer Arian.

6    Q.    Mr. Bui was then in custody; is that

7    true?

8    A.    Yes.

9    Q.    And then at about what time did you

10    personally see Mr. Bui in the presence of

11    these Foster City officers at 505 Bristol?

12    A.    Approximately 1:15 p.m.

13    Q.    In the course of your investigation

14    did you speak with Mary Elkington,

15    E-l-k-i-n-g-t-o-n?

16    A.    Yes, I did.

17    Q.    Did you also speak briefly with her

18    husband, John Elkington?

19    A.    Yes, I did.

20    Q.    Did they tell you their residence

21    address?

22    A.    Yes.

23    Q.    What was that?

24    A.    500 Bristol Court.

25    Q.    Are 505 Bristol and 500 Bristol

26    close to each other?

1    A.    Very close.

2    Q.    Did Mary Elkington tell you whether

3    she had seen anything unusual in the

4    afternoon of March 10th, 2004?

5    A.    Yes, she did.

6    Q.    What did Mary Elkington tell you?

7    A.    She said at approximately 1:00 p.m.

8    in the afternoon she was outside of her home

9    and she saw an Asian male approximately

10    5'7", 160 pounds, stooping near her fence.

11    Q.    Did Mrs. Elkington tell you whether

12    at that moment she knew the man?

13    A.    She said she did not know him.

14    Q.    Did Mrs. Elkington tell you whether

15    she had interaction with the man?

16    A.    She eventually did because the --

17    she said the man kneeled down near her

18    bushes which was situated just to the right

19    of the fence.

20    Q.    Okay.  Did Mrs. Elkington tell you

21    whether she spoke to this man?

22    A.    Yes, she did.  She said, well, when

23    she first looked at him, he kneeled down and

24    gestured, put his finger up to his mouth,

25    and looked up at her as if to be quiet, is

26    the way she put it.

095

1    Q.    You made gestures with your index

2    finger across the lips?

3    A.    Across the lips, yes.

4    Q.    As if to shush someone?

5    A.    Yes.

6    Q.    Did she tell you what happened with

7    that man?

8    A.    She told him to get out of there,

9    and he got up from a kneeling position and

10   got up and ran and jumped across the fence.

11   Q.    Did you some days later speak with

12   John Elkington?

13   A.    Yes, I did.

14   Q.    Had you received something from Mary

15   Elkington from her yard?

16   A.    Yes.  It was a piece of paper with a

17   list of names and addresses with phone

18   numbers.

19   Q.    Okay.  And did you seize those for

20   police evidence?

21   A.    Yes, I did.

22   Q.    Before coming into court today, have

23   you looked at some photocopies of the papers

24   that Mary Elkington gave you?

25   A.    Yes, I did.

26          MS. ALLHISER:  Your Honor, People's

1    Exhibit 6, three pages stapled together.

2    Counsel has a copy of this, actually, and

3    I've shown it to him as well.

4          (Whereupon, People's Exhibit 6 was

5          marked for identification.)

6          MS. ALLHISER:  First page, a list of

7    addresses, phone numbers and names with

8    other writing.  Second page, some

9    handwriting and the third page what is

10   labelled "Interim driver's license, Ryan

11   Brian Bui."

12         Officer, this is called People's

13   Exhibit 6, for identification.  Those three

14   pages appear to be photocopies of something.

15   They're all just stapled together.  Did you

16   see the originals of those?

17      A.    Yes, I did.

18      Q.    And who gave them to you?

19      A.    Mary Elkington.

20      Q.    Did Mary Elkington tell you if she

21   found the originals of those objects which

22   are now copied in People's 6, for

23   identification?

24      A.    She said her husband found them.

25      Q.    Did you speak with John Elkington at

26   some point to determine what the

1    circumstances were for his finding those

2    objects?

3        A.    Yes.  He said he was outside with

4    Mary just outside of the fence line by the

5    bushes on the east side of her home, and

6    that's when her husband came out, and he

7    pointed to where he found the papers.

8        Q.    Where Mr. John Elkington pointed to,

9    that place, how far was that from where you

10   had seen Ryan Bui under arrest on

11   March 10th?

12       A.    That was approximately 50 yards,

13   maybe.

14       Q.    On People's Exhibit 6, for

15   identification, those three pages stapled

16   together, would you look at the top page

17   first?  Do you see what appeared to be a

18   series of addresses?

19       A.    Yes.

20       Q.    And are there one or more addresses

21   with a line drawn through?

22       A.    Yes, there is.

23       Q.    Read throw slowly the addresses with

24   the line drawn through.

25       A.    361 Beach Park, there is a name next

26   to it.

90

098

```
1     Q.     What's the name?

2     A.     Last of Hung, first of G-e-o.  The

3     second address with the line drawn through

4     is 1295 Beach Park.  The last name to the

5     right of that is Chi, C-h-i.  First of

6     Sharon, and next to each of them is an N

7     slash A.  N, as in Nancy, A, as in apple.

8     Q.     N forward slash A?

9     A.     A, yeah.

10    Q.     How many addresss total are there,

11    can you tell?

12    A.     I believe it's about 35.  There are

13    some -- the second sheet is a photocopy of

14    what was on the back of the original.

15    Q.     The flip side of the top page?

16    A.     Yes.

17    Q.     Okay.  And what is the third page?

18    A.     The third page is an interim --

19    well, a copy of the interim driver's license

20    in the name of Ryan Brian Bui.

21    Q.     Did you learn from your

22    conversations with the Elkingtons where the

23    single piece of paper with all the

24    addresses, the names and the two lines drawn

25    through, where that piece of paper was found

26    in relation to where the interim driver's
```

1    license was found?

2       A.    Yes.

3       Q.    What did you learn?

4       A.    It was within a foot a part.

5       Q.    The two pieces of paper?

6       A.    The two pieces, yes.

7       Q.    And that location is what Mr. John

8    Elkington pointed out to you, so you could

9    see where he was talking about?

10      A.    Yes.

11      Q.    In the course of this investigation

12   did you meet with Susan Chi, C-h-i?

13      A.    Yes, I did.

14      Q.    And on March 22nd, 2004, did you ask

15   her about her husband's complaint of a

16   residential burglary, 1295 Beach Park

17   Boulevard in Foster City?

18      A.    Yes, I did.

19      Q.    Did Mrs. Chi tell you whether she

20   had some money hidden in her residence

21   before March 10th?

22      A.    Yes, she did.

23      Q.    Did Mrs. Chi tell you when she hid

24   the money?

25      A.    She said just prior to a trip

26   overseas on the 9th of March she put the

1    money in the file cabinet.

2        Q.    Did Mrs. Susan Chi tell you how much

3    money and where it was placed specifically?

4        A.    She said the last money that she put

5    in was approximately $3,000 in U.S.

6    currency, and the second was, I believe,

7    1640.  $1640 was already in the file

8    cabinet.

9        Q.    Did Mrs. Susan Chi tell you how long

10   she was out of the country?

11       A.    She was out of the country until the

12   21st of March --

13       Q.    And you spoke with her?

14       A.    -- 2004.

15       Q.    The next day, March 22nd?

16       A.    Yes.

17       Q.    Okay.  Did you ask Mrs. Susan Chi

18   whether she had personally discovered any

19   items missing when she returned from her

20   home on March 21st?

21       A.    Yes, I did.

22       Q.    What did Mrs. Chi tell you?

23       A.    She said she has approximately 30

24   pieces of jewelry.

25       Q.    Did she tell you where these items

26   had been the last she knew?

1      A.    Yes, she did.  She said to the right

2   of her bed or to the right of the bed on the

3   night stand in the second drawer.  I believe

4   second and third drawer of the night stand

5   she had jewelry there, as well as her

6   medicine cabinet in the bathroom of the

7   master bedroom.

8      Q.    Did she indicate that these

9   locations she described were both in the

10  master bedroom at 1295 Beach Park Boulevard?

11     A.    Yes, they were.

12     Q.    Did you show Susan Chi items of

13  jewelry which had been seized by Foster City

14  police and community services officers from

15  the black Range Rover abandoned at

16  Albertson's on March 10th, 2004?

17     A.    Yes, I did.

18     Q.    How did you do that?

19     A.    She came to the Foster City Police

20  Department on the 23rd, I believe, and

21  she -- we took the items out of the property

22  lockers and placed them in an interview room

23  in the station on a table.

24     Q.    Were you present when Mrs. Susan Chi

25  looked at these items of jewelry that had

26  been seized in this burglary investigation?

1    A.    Yes, I was.

2    Q.    What happened?

3    A.    She looked at each of the items and

4    she positively ID'd approximately 29 pieces

5    of jewelry.

6    Q.    Did you do something to memorialize

7    how she had identified each piece?

8    A.    Yes.  We separated it by in

9    plastic -- in a plastic container and

10    initialled her first and last initials.

11    Q.    Were there any items of apparent

12    unusual value that you saw in that

13    Mr. Susan Chi identified?

14    A.    Yes.  She identified a Rolex watch

15    which was an expensive piece, I believe.  I

16    don't remember the exact value.

17    Q.    Did Mrs. Susan Chi tell you that

18    that watch belonged to her?

19    A.    Her husband.

20    Q.    Did she indicate where the Rolex

21    watch had been the last she had knew?

22    A.    I believe it was in one of the

23    drawers as well.  I'm not sure.

24    Q.    Did you speak with Susan Chi about

25    telephone calls that she had received at her

26    residence at 1295 Beach Park Boulevard

1    before she went on a trip March 9th?

2        A.    Yes, I did.

3        Q.    What did Miss Susan Chi tell you?

4        A.    She said prior to her trip she

5    received numerous telephone calls to her

6    phone and from her words, she said an

7    oriental accent.  A man with an oriental

8    accent asked her if this is Mrs. Chi.  She

9    said "yes," and the person would hang up.

10       Q.    Did Mrs. Chi indicate whether she

11   received several such calls?

12       A.    Yes.  She said numerous calls.

13       Q.    Just of the same nature as you

14   described?

15       A.    Yes, exactly.  She said it would

16   happen the same way each time.

17       Q.    And in this investigation did you

18   speak with her husband Yao, Y-a-o, Chi?

19       A.    Yes.

20       Q.    Were you able to communicate with

21   him in English?

22       A.    Yes.  He did speak some English.

23       Q.    Explain how you were able to

24   communicate.

25       A.    Well, it was -- it was in a somewhat

26   of a strong accent, but I was able to

1    understand him.

2        Q.    Did Mr. Yao Chi tell you whether he

3    had observed any unusual people around his

4    residence before this claim of theft or

5    burglary?

6        A.    Yes, he did.  He said in November

7    and December on two separate occasions once

8    as he looked outside his front door he saw a

9    van.  He couldn't remember the color or make

10   but the van made a U-turn on Beach Park.

11   He described Beach Park.  It's a wide street

12   going in the south and northern direction.

13   The guy made a U-turn across the street.  He

14   got out of his van, and he took a photo of

15   their home.

16       Q.    Did Mr. Yao Chi tell you whether he

17   knew who this man was?

18       A.    He said he did not know.

19           MS. ALLHISER:  Those are my

20   questions.

21           THE COURT:  Mr. Bell.

22           MR. BELL:  Thank you, Your Honor.

23

24              CROSS-EXAMINATION

25

26       BY MR. BELL:  Q.   Detective

1    Morrison, you have been with the Foster City

2    Police Department for two years, correct?

3        A.    Approximately, yes.

4        Q.    All right.  Did you have law

5    enforcement work before joining the Foster

6    City Police Department?

7        A.    No, I did not.

8        Q.    Okay.  You are in charge as a

9    detective of the investigation of the three

10    residences involved in this case, correct?

11        A.    Yes.

12        Q.    All right.  The item that you

13    identified, People's Exhibit 6, has a pair

14    of handwriting on the paper.  You noted

15    that, I'm sure?

16        A.    Yes, there is handwriting that would

17    have, I believe, on the front and on the --

18    what would have been the backside of that

19    first sheet.

20        Q.    Right.  Have you as the

21    investigative detective submitted that

22    handwriting to any sort of expert to

23    determine whether or not a handwriting -- it

24    would form the basis of a

25    handwriting comparison with anybody else's

26    handwriting -- unknown handwriting, for

1    example?

2        A.    No.

3        Q.    Did you have to take any handwriting

4    exemplars from Mr. Khuu or Mr. Bui who was

5    also arrested in connection with this case?

6        A.    No.

7        Q.    Did you -- we heard some testimony

8    earlier today about latent fingerprints.

9    Are you aware of whether or not latent

10   fingerprints were developed at any one of

11   the three residences which are the subject

12   of this prosecution?

13       A.    No, not to my knowledge.

14       Q.    Okay.  We heard some testimony about

15   a latent fingerprint that was discovered on

16   the black Range Rover vehicle that was being

17   driven by the suspects.  Are you aware of

18   whether that there was, in fact, a latent

19   fingerprint developed on that vehicle?

20       A.    If there was a result that was --

21   that came back from the lab, is that the

22   question?

23       Q.    Well, first of all, are you aware

24   there was a latent print lifted from the van

25   or from the Range Rover?

26       A.    I would have to look at that report.

1     Q.   All right.  You don't know of any

2    lab report comparing any latent fingerprint

3    found in this matter with that of either one

4    of the defendants charged in this case?

5     A.   Not in the result of any lab work.

6     Q.   Okay.  You know of no incriminating

7    statement that was made by Mr. Khuu by

8    anyone other than the fact he made a false

9    statement at the time he was arrested; is

10    that right?

11     A.   Yes.

12     Q.   As to Mr. Bui, he didn't make any

13    statement indicating his involvement in this

14    matter, correct?

15     A.   No, he did not.

16     Q.   There was testimony that Mr. Hung,

17    who was the resident at 361 Beach Park,

18    report that approximately $2,000 worth of

19    Taiwanese currency was taken from his home.

20    Are you aware of whether any Taiwanese

21    currency was, in fact, recovered at any time

22    in this matter?

23     A.   There was -- there was foreign

24    currency not confirmed to be Taiwanese

25    currency.

26     Q.   Okay.  So, as you sit there now, as

1  the detective, you cannot confirm that the

2  foreign currency that was testified to by

3  Community Services Officer Cavallero was, in

4  fact, Taiwanese currency?

5      A.    Not at this time.

6      Q.    Okay.  Apparently, also, Mr. Hung

7  reported to Officer Bouza that there were

8  wallets and other items missing from his

9  home at the time he discovered the missing

10  $1,000 in U.S. currency and the two thousand

11  Taiwanese currency.  Were you present during

12  Officer Bouza's testimony in that regard?

13      A.    Yes, I was.

14      Q.    Did you ever locate any wallets, for

15  example, that, that matched the descriptions

16  of items that Mr. Hung reported missing

17  along with the money?

18      A.    No, we did not.

19      Q.    There were other items discovered in

20  the black Range Rover that have not been

21  mentioned in the evidence here today; is

22  that correct?

23      A.    Yes.

24      Q.    Can you tell us what those were?

25      A.    I would have to look at the list.

26  There are a couple items.

101

1    Q.    Without -- do you have a list?

2    A.    No, I don't have it in front of me,

3    no.

4    Q.    Do you know where that would be?

5    Would that be the list that was prepared

6    by -- who would have prepared that list?

7    Would it have been Community Service Officer

8    Cavallero?

9    A.    Cavallero and Capadonno were the

10    community service officers that booked the

11    property.

12    Q.    To the best of my knowledge, I only

13    have one by Cavallero.  Do you have your

14    report in court at all?

15    A.    Yes, I have my supplement here that

16    I have of my investigation.

17    Q.    What I'm hoping to do, and it

18    doesn't have to be totally -- it doesn't

19    have to be completed.  I want to find out

20    from you today what other items were

21    discovered in the vehicle that were not

22    mentioned in the evidence here today and

23    have not been identified by any of the

24    alleged victims in the present

25    investigation.

26    A.    There are a couple of pieces jewelry

1    that both the Hung family looked at and

2    Chi -- I can't be specific to what they are.

3    I believe it was a pair of earrings and a

4    couple of the other items.   There was, I

5    believe, a Louis Vuitton wallet that was

6    found that was not claimed.   So there were

7    several pieces that were booked into

8    evidence that were not claimed but --

9        Q.    Okay.

10       A.    In upwards of maybe five to six

11   pieces of jewelry, with the exception of

12   that wallet.

13       Q.    And this was -- these items were

14   found in the brown paper bag inside of the

15   Williams-Sonoma bag?

16       A.    Yes.

17       Q.    All right.   And you have in your

18   investigation not been able to determine who

19   they belong to or when they were -- when

20   they went missing or anything regarding --

21       A.    No.   Those were the few items we

22   weren't able to determine who they belonged

23   to.

24       Q.    Okay.   To the best of your knowledge

25   in terms of the three residences under

26   investigation in this particular

1    prosecution, 57 Williams Lane, 361 Beach

2    Park and 1295 Beach Park, how much U.S.

3    currency, total, was reported missing by the

4    victims?

5        A.    Let's see.  I believe approximately

6    $5,000.  Maybe a little more.  I would have

7    to look at the exact numbers.

8        Q.    All right.  Now, I'm confused

9    because I thought that Officer -- I'm sorry.

10   Let me go back to my notes.  I thought that

11   Officer Ticas -- Martin Ticas reported that

12   Solomon Chi said that his father put

13   approximately $5,000 into a cabinet before

14   he left on a trip.

15       A.    I think that was just maybe a

16   misinterpretation.  It was actually Mrs. Chi

17   that actually put the money in.

18       Q.    Well, let me -- you will agree with

19   me that Officer Ticas did testify today that

20   Solomon told him that it was his father that

21   put $5,000 into a cabinet on the night of

22   March, correct --

23       A.    -- yes, 9th.

24       Q.    That's what was reported and that's

25   what he testified to, correct?

26       A.    Well, that's -- that's what was told

1    to him, but I think in the confusion of the

2    crime that had occurred, possibly he's a

3    kid, and, you know, maybe he didn't quite

4    understand but when I -- I did confirm with

5    Mrs. Chi that she was the one that actually

6    put the money in the cabinet.

7           MR. BELL:  I'm going to move to

8    strike all of that latter part.

9           THE COURT:  Counsel, what are we

10   doing?  What difference does it make?

11          MR. BELL:  There is a big difference

12   between recovering 5,000 if 10,000 is

13   reported stolen.

14          THE COURT:  He's told you what they

15   recovered, counsel.

16          MR. BELL:  I understand that but --

17          THE COURT:  Your motion is denied.

18          MR. BELL:  I want to make my record

19   here.

20     Q.    In fact, how old is he?

21     A.    I think he's 15, 16.  Could be

22   older.  I'm not sure.  I would have to

23   check.

24     Q.    Later on when you talked to Susan

25   Chi, she told you she had placed

26   approximately $4600 and some dollars in the

1    cabinet, correct?

2        A.    Yes.

3        Q.    How -- you never actually got

4    Mr. and Mrs. Chi together to say exactly how

5    much money was in that cabinet, correct?

6        A.    Not necessarily, no.  They were

7    together when I talked to Mrs. Chi, but I

8    mean, Mrs. Chi, because her English is

9    better, did the talking.

10       Q.    But later when she talked to you it

11   was her claim that she, in fact, was the

12   person that placed the money in the cabinet.

13   Do I have that correct?

14       A.    Yes.

15            MR. BELL:  I have nothing further.

16            THE COURT:  Thank you.  You may step

17   down.

18            MS. ALLHISER:  No questions, Your

19   Honor.

20            I offer People's Exhibits 1 through

21   6.

22            MR. BELL:  I have no objection, Your

23   Honor.

24            THE COURT:  All right.  People's 1

25   through 6 will be received in evidence.

26            (Whereupon, People's Exhibits 1

1          through 6 were received into

2          evidence.)

3          THE COURT:   Insofar as Count 6,

4   what are you relying upon, the misdemeanor

5   on the 148?

6          MS. ALLHISER:  Your Honor, does the

7   Court see an amended information filed

8   April 5th?

9          THE COURT:  No.

10          That will answer probably.

11          Yes, I do.  Here it is.

12          Okay.  Now you have the right

13   address on Williams?

14          MS. ALLHISER:  Yes.

15          THE COURT:  And you added 361 Beach

16   Park?

17          MS. ALLHISER:  That's true.

18          THE COURT:  And there is no longer

19   148 or --

20          MS. ALLHISER:  That's true.

21          THE COURT:  You got rid of the

22   misdemeanor of 602?

23          MS. ALLHISER:  That's true.

24          THE COURT:  148.

25          MS. ALLHISER:  Yes.

26          THE COURT:  Okay.  That makes more

115

1  sense.

2          All right.  Is the matter submitted?

3          MR. BELL:  I would like to make a

4  brief statement, Your Honor.

5          THE COURT:  Go ahead.

6          MR. BELL:  I think there is

7  insufficient evidence to hold Mr. Khuu on

8  the burglary charges.  I would point out

9  that there is no physical identification of

10  him as being one of the suspects, even

11  though one of the alleged victims claim to

12  have seen a person at his back door.  He was

13  never identified as being that person.

14  There were no fingerprints.  There is no

15  handwriting.  There is no statement of

16  guilt.

17          At best this is a purely

18  circumstantial evidence case.  He was in a

19  vehicle.  It's not even clear from the

20  evidence as to whether he was driving the

21  vehicle, or was a passenger in that vehicle

22  in which stolen property was recovered.  We

23  know that some of the property came from the

24  residences involved in this case, but there

25  were other stolen items involved in that

26  paper bag.

1    The point is it seems clear that

2    somebody else committed the burglaries, and

3    that they were in a position at most of

4    property stolen from those residences, but

5    there is no evidence that he or anyone else

6    involved with him was directly involved in

7    the burglary.  I don't -- I submit that

8    there is not even sufficient evidence to

9    show that he was aware of the existence of

10   the stolen property in the vehicle.  He

11   ran -- which would ordinarily be guilty

12   knowledge, but for the fact he knew he had a

13   Federal warrant out for him and his running

14   is explained by the fact he was trying to

15   avoid being arrested on the Federal warrant.

16   So I submit that there is insufficient

17   evidence to hold him to answer for any of

18   the charges in this case, specifically, the

19   burglaries, but if the Court feels that

20   there is evidence to hold him to answer, it

21   should be only on the possession of stolen

22   goods.

23            I submit it on that.

24            THE COURT:  Is the matter submitted,

25   Miss Allhiser?

26            MS. ALLHISER:  Yes, Your Honor.

1      THE COURT:  All right.

2          Mr. Khuu, I find there is reasonable

3    and probable cause to believe that each of

4    the offenses set forth in the complaint,

5    specifically a violation of Section 460(A)

6    of the Penal Code as set forth in Count 1,

7    attempted 460(A) as set forth in Count 2, a

8    460(A) as set forth in Count 3, a violation

9    of Section 496 set forth in Count 4, and

10   another violation of Section 496 as set

11   forth in Count 5, have, in fact, occurred,

12   and that there is reasonable and probable

13   cause to believe that you are guilty of said

14   offense.   Thus, I order you be held to

15   answer thereto.

16          You will appear before the Presiding

17   Judge of the Criminal Division of this Court

18   for arraignment...

19          THE CLERK:  June 11th at 8:45.

20          THE COURT:  On June 11 at 8:45.

21          Is that date agreeable, Mr. Bell?

22          MR. BELL:  Your Honor, I'm actually

23   planning on not being here on June 11th.  I

24   have a prepaid trip paid for -- I'm

25   wondering if Mr. Khuu would be willing to

26   waive time until the 17th of June.

1        Would you be willing to waive time

2   until June 17th?

3        THE DEFENDANT:  Yes.

4        MR. BELL:  Could I ask for June 17?

5        THE COURT:  Mr. Khuu, you are

6   entitled to an arraignment within 10 Court

7   days of today's date.  Are you willing to

8   waive that time requirement and continue the

9   matter until June 17th for arraignment?

10       THE DEFENDANT:  Yes, sir.

11       THE COURT:  All right.  That will be

12  the Court's order.

13       Bail is heretofore set in the sum of

14  $300,000 and will remain in that amount

15  unless modified by the Court.

16       Thank you.

17       Plaintiff's 1 through 5 -- or 6,

18  rather, will be returned to the Foster City

19  Police Department.

20       MS. ALLHISER:  Yes.

21       (Whereupon, proceedings concluded.)

22

23              --o0o--

24

25

26

119

STATE OF CALIFORNIA    )
                       )        ss.
COUNTY OF SAN MATEO    )

        I, DEBRA L. RAMIREZ, hereby certify:

        That I am a Certified Shorthand

Reporter of the State of California;

        That in pursuance of my duties as

such, I attended the proceedings in the

foregoing matter and reported all of the

proceedings and testimony taken therein;

        That the foregoing is a full, true

and correct transcript of my shorthand notes

so taken.


                        June 4, 2004




        _____
        DEBRA L. RAMIREZ, CSR 7692