1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  CHRISTOPHER J. WEI, State Bar No. 78958
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5867
    Fax: (415) 703-1234
8   Email: Christopher.Wei@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **HOA TRUNG KHUU,** | C 07-6351 SI (pr) |
| Petitioner, | **EXHIBIT 9 (part 1)** |
| v. | |
| **JOHN TILTON, CDCR Secretary,** | |
| Respondent. | |

Exhibit 9 (part 1)

Khuu v. Tilton
C 07-6351 SI (pr)

# EXHIBIT 9 (part 1)

COURT OF APPEAL, STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

RECEIVED

JAN 0 3 2005

CLERK OF THE SUPERIOR COURT
SAN MATEO COUNTY

THE PEOPLE OF THE STATE
OF CALIFORNIA,

      PLAINTIFF AND
      RESPONDENT,

      VS.

HOA TRUNG KHUU,

      DEFENDANT AND
      APPELLANT.

)
)
)
)
)
)
)
)
)
)
)
)
)

COPY

SAN MATEO COUNTY
SUPERIOR COURT
NO.  SC056446

APPEAL FROM THE SUPERIOR COURT OF SAN MATEO COUNTY

HONORABLE JOHN G. SCHWARTZ, JUDGE PRESIDING

REPORTER'S TRANSCRIPT ON APPEAL

A P P E A R A N C E S:

FOR THE PLAINTIFF AND
RESPONDENT:

             WILLIAM LOCKYER,
             ATTORNEY GENERAL
             50 FREMONT STREET, SUITE 300
             SAN FRANCSICO, CA 94105

FOR THE DEFENDANT AND
APPELLANT:

             IN PROPRIA PERSONA

VOLUME 1, PAGES 1 THROUGH 219
AUGUST 30, 31 AND SEPTEMBER 1, 2004

1            SUPERIOR COURT, STATE OF CALIFORNIA

2                    COUNTY OF SAN MATEO

3

4   THE PEOPLE OF THE STATE OF        )
    CALIFORNIA,                       )
5                                     )
                        PLAINTIFF,    )
6                                     )
                VS.                   )        NO. SC056446
7                                     )
    HOA TRUNG KHUU,                   )
8                                     )
                        DEFENDANT.    )
9   _____  )

10

11           REPORTER'S TRANSCRIPT OF THE PROCEEDINGS

12          BEFORE:  HON. JOHN G. SCHWARTZ, JUDGE

13            DEPARTMENT NO. 18, COURTROOM 8D

14          August 30, 31 and September 1, 2004

15

16

17  A P P E A R A N C E S:

18  FOR THE PEOPLE:          JAMES P. FOX, DISTRICT ATTORNEY
                             BY:  MARY ALLHISER, Deputy
19                           400 County Center
                             Redwood City, CA  94063
20

21

22  FOR THE DEFENDANT:       FRANK BELL, Esquire
                             303 Bradford Street, Suite C
23                           Redwood City, CA  94063

24

25

26  REPORTED BY:             KATHRYN LEZCHUK, C.S.R. No. 2302

1                    W I T N E S S    I N D E X

2                       September 1, 2004

3

4    For the People:                          Volume/Page

5    HUI, TOMMY
     Direct Examination by Ms. Allhiser ........... 1/69
6    Cross-Examination by Mr. Bell ................ 1/91

7

8    SANDRI, WILLIAM
     Direct Examination by Ms. Allhiser ........... 1/103

9

10   ELKINGTON, MARY
     Direct Examination by Ms. Allhiser ........... 1/119

11

12   ELKINGTON, JOHN
     Direct Examination by Ms. Allhiser ........... 1/127

13

14   SANDRI, WILLIAM
     Direct Examination by Ms. Allhiser (Cont'd) ... 1/129
15   Cross-Examination by Mr. Bell ................ 1/147

16   LEE, MARK
     Direct Examination by Ms. Allhiser ........... 1/162
17   Cross-Examination by Mr. Bell ................ 1/176

18

19   CAPODANNO, DANIEL
     Direct Examination by Ms. Allhiser ........... 1/179
     Cross-Examination by Mr. Bell ................ 1/193
20   Redirect Examination by Ms. Allhiser ......... 1/199
     Recross Examination by Mr. Bell .............. 1/205
21   Further Redirect Examination by Ms. Allhiser .. 1/206

22

23   EGAN, ERIC
     Direct Examination by Ms. Allhiser ........... 1/208

24

25

26

1          E X H I B I T   I N D E X

2              September 1, 2004

3

| For the People: | For Identification Volume/Page | In Evidence Volume/Page |
|---|---|---|
| Motion Exhibit No. 1 - Six-hour videotape | 1/19 | |
| 1 - Poster Board with Photographs A through J | 1/70 | |
| 2 - Colored Neighborhood Street Map | 1/91 | |
| 3 - Poster Board with Photographs A through L | 1/134 | |
| 4 - Enlargement of Neighborhod #8 On Exhibit 2 | 1/140 | |
| 5 - Poster Board with Photographs A through J | 1/142 | |
| 6 - Photocopy of Temporary CDL | 1/124 | |
| 7 - Two-page docment, List of Addresses | 1/125 | |
| 8 - Certified Copy of Booking photo of Khuu | 1/133 | |
| 9 - Screwdriver with Black Handle | 1/187 | |
| 10 - Photocopy of Currency Tally | 1/191 | |
| 11 - Posterboard with Photographs A through H | 1/192 | |
| 12 - Evidence Envelope Containing Wallet And Cell Phone | 1/214 | |

1

E X H I B I T   I N D E X

2

September 1, 2004

3

| For the Defendant: | For Identification Volume/Page | In Evidence Volume/Page |
|---|---|---|
| A – Photograph of Face of Defendant | 1/176 | |
| B – Evidence Envelope Containing Tool Imprints | 1/197 | |
| C – Evidence Envelope Containing Photographs and Negatives of Tool Markings | 1/198 | |

6

P r o c e e d i n g s

| | |
|---|---|
| 1 | |
| 2 | Redwood City, California |
| 3 | Afternoon Session      Monday, August 30, 2004 |
| 4 | ---oOo--- |

5       THE COURT:  People versus -- is it Khuu?

6       MR. BELL:  Yes.

7       THE COURT:  Pronounced Khuu?

8       MR. BELL:  Yes.

9       THE COURT:  Appearances, please.

10       MR. BELL:  Frank Bell on behalf of Mr. Khuu.  He

11 is present in custody and in court.

12       MS. ALLHISER:  Mary Allhiser for the People,

13 Your Honor.

14       THE COURT:  All right.  And go ahead, Mr. Bell.

15       MR. BELL:  Well, Your Honor, I had some in

16 limine matters, all of which, with one exception, have been

17 agreed to by the People, and I would like to just put them

18 on the record.

19    No. 1, the Information in the case has one, two,

20 three, four, five AKAs, which I would move the Court to

21 strike, and I believe there's no objection to that.  I think

22 that -- the basis of my motion is that listing the AKAs has

23 no relevance to this proceeding, and he has identified

24 himself by his true name, Hoa Trung Khuu, and it is

25 prejudicial to address him or allow the jury to hear that

26 there may be other identities that he may have had at some

Kathryn M. Lezchuk, C.S.R. No. 2302

1    time in the past.

2            THE COURT:  Okay.  You just don't want them read

3    to the jury.

4            MR. BELL:  Correct.

5            THE COURT:  Sure.

6            MR. BELL:  Have them struck for the purposes of

7    the trial and for the purposes of the jury.

8            THE COURT:  Right.  They may have some -- if

9    there were a conviction, they may have some relevance to law

10   enforcement later but, no, certainly we wouldn't read

11   those -- we never do -- to the jury.

12           MR. BELL:  As the Court is aware, in the

13   Information there are allegations of a prior felony

14   conviction, specifically, on page 3 of the Information,

15   beginning at line 12 and continuing through line 6 on page

16   4, and I'd like to -- as the Court knows, the jury has to

17   make a finding on those, if requested, and I'm asking that

18   the trial as to the priors be bifurcated so the jury does

19   not become aware of those issues unless and until they have

20   returned a verdict of guilty as to the other counts.

21           THE COURT:  There is no opposition to that, I

22   assume.

23           MS. ALLHISER:  No, Your Honor.

24           THE COURT:  That's granted as well.

25           MR. BELL:  Third, I believe the People agree

26   that they are in a position to attempt to prove that the

8

1    defendant was convicted of the prior alleged, but they will

2    not make any -- in light of that bifurcation, there would be

3    no use of the defendant's Federal prior convictions in the

4    case in chief, and then that leaves the issue of what might

5    happen if the defendant were to testify and whether or not

6    they could be used in impeachment.

7         I believe -- I'm going to submit the Castro issue to

8    the Court based on the People's authorities.  I really don't

9    have any specific response to it at the moment, but I would

10   like the opportunity, if I do discover some new authority or

11   some new theory why it should not be admitted.  The only

12   thing, obviously, is the age of the priors, from 1994, and

13   that does make it -- well, I guess the offense took place in

14   '94.  The conviction, I believe, in '96, actually, but it is

15   pretty close to ten years old.  To the extent that the Court

16   would consider that, I would urge the Court not to allow

17   them to use it for impeachment, but other than that I have

18   nothing.

19         MS. ALLHISER:  Your Honor, Mr. Bell and I had

20   discussed this, and I realize there is a potential detour on

21   this subject which he and I had not discussed, and that is,

22   the People will attempt to prove at trial that Mr. Khuu ran

23   from the police, actually jumped in the lagoon, invited the

24   police to shoot him, and things like this, was later found

25   hiding in a trash can, gave a false name.  The impression

26   that the defense might want to use the fact that there was a

Kathryn M. Lezchuk, C.S.R. No. 2302

9

1   no-bail warrant out of the Federal system pending for

2   Mr. Khuu's arrest as the reason why he fled from the police,

3   in other words, kind of to use that prior in an affirmative

4   way.

5         Now, what I would need is some guidance from the

6   Court.  I understand that the facts of the Federal Hobbs,

7   H-o-b-b-s, Act violation would not be material in the

8   People's case in chief.  I understand that.  I mean what

9   happened on those days when those offenses were committed,

10  but my question now is, what are the rulings from the Court

11  about how either party can use the fact that the defendant

12  was on a no-bail warrant.

13         MR. BELL:  I would tell the Court, since the

14  prosecutor raises it, I probably do intend to elicit from

15  the officers that they discovered that he -- and in fact

16  arrested him in part based on this Federal warrant that was

17  outstanding for him.  He was arrested both on suspicion of

18  the burglary, at that point the only one they were aware of,

19  the attempted burglary at 57 Williams in Foster City, but

20  also he was taken in custody on a Federal warrant which was

21  outstanding for him, and I would intend to elicit just the

22  fact that he was taken into custody on a Federal warrant.

23  Beyond that I wouldn't intend to go, but I still think that

24  that -- the facts of the prior conviction are not admissible

25  otherwise in the People's case, nor do I intend to attempt

26  to elicit anything more about that.

10

1          THE COURT:  Well, what was the prior conviction

2    for?

3          MS. ALLHISER:  Your Honor, it's 18 USC 1951,

4    which is known familiarly as the Hobbs Act.  Essentially

5    it's referred to as racketeering under the Federal system.

6    It was actually a sting operation by the Federal government,

7    and the crime that was conspired by the defendant and his

8    accomplices was to rob a truck driver for Intel, I-n-t-e-l,

9    Corporation of the computer chips that had been shipped in

10   from Ireland.  This was set up.  There were some five

11   accomplices.  There were Federal agents who were brought

12   in.  It was a sting operation, and ultimately the crime was

13   not committed, could not have been committed because it was

14   a sting operation, but Mr. Khuu, on his plea of guilty or no

15   contest, was found guilty of 18 USC 1951, which is -- in the

16   Federal language, it's aiding and abetting a conspiracy to

17   obstruct interstate commerce.  Well, that's the Hobbs Act

18   but sort of the long Federal version of the racketeering

19   offense.

20          MR. BELL:  You know, I actually don't think I

21   agree with counsel that it's a racketeering offense, but

22   beyond that everything else that she said was essentially

23   correct.  I think that RICO is really what she is thinking

24   about.  Sometimes that is confused with the Hobbs Act, but

25   separate and apart from those -- that distinction, I think

26   it is a Hobbs Act conviction which is either robbery or

11

1    extortion to interfere with the interstate commerce -- with

2    the intent to interfere with the interstate commerce.

3          THE COURT:  I'm a little taken aback by the --

4    something I'm missing here.  I should think that you would

5    want to tell -- you probably don't want to say the word

6    "robbery," but, I mean, if they just hear that he had a

7    no-bail Federal warrant for his arrest, God only knows what

8    they think if we don't explain it to them.  They'll think

9    he's a terrorist or something.  If he's guilty of a

10   conspiracy to obstruct interstate commerce, that's a lot

11   better than being a terrorist.

12         MR. BELL:  I'm glad the Court brought it out,

13   because I think it's important to put on the record I have

14   made a tactical decision -- I have made a tactical decision,

15   rather than inform the jury the exact nature of what the

16   conviction was, which was essentially aiding and abetting a

17   conspiracy to rob an interstate commerce, I just want to say

18   he had a Federal warrant on which he was arrested, and I

19   don't even want the jury to know what the underlying facts

20   were.  That's a tactical decision I made.  I understand

21   counsel might disagree.  I understand the Court has

22   legitimately --

23         THE COURT:  That's the name of the crime,

24   conspiracy to commit robbery?

25         MR. BELL:  Robbery or extortion in interstate

26   commerce.

Kathryn M. Lezchuk, C.S.R. No. 2302

12

1           THE COURT:  Why aren't you perfectly happy with

2  that?

3           MS. ALLHISER:  One other issue --

4           THE COURT:  Let's get back to the first issue.

5           MS. ALLHISER:  I'm trying to come at it from

6  another side, Your Honor.

7           THE COURT:  All right.

8           MS. ALLHISER:  There are lots of Federal

9  warrants.  One of them could be an INS warrant,

10  Immigration-Naturalization-Service-type warrant.  It wasn't,

11  Your Honor.  This was a criminal warrant.  So part of what

12  counsel is doing in making this choice, that it's just some

13  kind of no-bail warrant, is leading the jury to speculate

14  that he is an illegal immigrant, and I don't think that's

15  actually anything to do with this particular case, the state

16  crime.

17           MR. BELL:  That's not my intention.  I just want

18  them to know there was a reason why somebody might run if

19  being stopped by the police other than the fact -- for the

20  reason the police might be arresting him.

21           THE COURT:  Flight-after-a-crime-type thing.

22           MR. BELL:  I don't -- I think if the Court wants

23  to give the jury a limiting instruction, say, you're not to

24  speculate as to what the basis for the warrant was, I would

25  not object to that.  I don't intend to imply that he is an

26  illegal alien or here illegally or anything else.  I just

13

1   want them to know there was a warrant, which might give

2   someone a basis for fleeing rather than avoiding prosecution

3   or apprehension for the crime.

4        I want to say before we forget.  This all a came up

5   within the Castro argument, as well; that there is a

6   separate argument that his participation in that conspiracy

7   was so minor, essentially what he agreed -- and what we know

8   about it is in the plea agreement that he signed and that

9   the People would offer at the time of attempting to prove

10  the prior, is that he apparently admitted to stealing a car

11  which he knew would be used in the robbery the next day

12  apparently; and, secondly, he showed up at a meeting where

13  the details of the robbery were going to be discussed.

14       And when the question was asked, did he understand

15  what was going on, he apparently said yes, and he -- and

16  then the question was asked:  Who brought the tape?  And he

17  indicated, I did.

18       But there is no -- there is nothing in the plea

19  agreement which said that he specifically was going to

20  involve himself -- and there was a discussion of holding the

21  gun to somebody's head, but there was no direct admission in

22  the plea agreement that he was going to be directly involved

23  in it other than what he directly admitted doing:  That he

24  took the car; that he did steal the car; that he did bring

25  the tape; that he understood what was going on, what was

26  being discussed.

14

1        So within the <u>Castro</u> context, given the age of it, and

2    the -- and his admissions and the nature of his rather minor

3    role in the offense, I think the Court could find that it is

4    not -- it would not be appropriate to allow it to be used

5    for impeachment purposes.  So that's my argument about the

6    <u>Castro</u> aspect of the prior but, again, I'm asking -- I think

7    the government -- the People agree that they don't intend to

8    use the facts of the Federal prior in their case in chief.

9            THE COURT:  Right.  We're only talking now if he

10   testifies.

11       I think that what I better do before I rule on the

12   <u>Castro</u> motion is read the People's brief entitled Trial

13   Motion No. 1, People's Evidence Code 455 offer of evidence

14   to support special allegations of prior Federal conviction,

15   just so that I get to read the plea agreement that I think

16   is in there somewhere.

17           MS. ALLHISER:  It is, Your Honor.

18           THE COURT:  There it is.  I saw it before.  I'll

19   do that.  Let's take this up in the morning, because I think

20   I better read a little more about it.

21           MR. BELL:  Other than the final issue --

22           THE COURT:  I'm sorry, Mr. Bell.  You and I are

23   about the same age.  I've got to say things before I forget

24   them, too.  How do you plan to prove that he ran not because

25   he was fleeing from a crime but because he had this felony

26   warrant without having him testify?  I don't see how you're

1  going to do that.

2          MR. BELL:  I can't -- first of all, I can't

3  prove that as to what was in his mind, other than if he

4  should take the stand and testify.

5          THE COURT:  Right.

6          MR. BELL:  But I don't think that that's

7  absolutely necessary, so long as there is in the evidence a

8  reasonable basis for a jury to infer that he may have run

9  for a different reason.  Actually, I don't think I need to

10  -- well, I think on that issue I need some evidence to show

11  that there may have been another reason why he may have ran.

12          THE COURT:  You would have to put some sort of

13  law inforcement person or records person on the stand.

14          MR. BELL:  Well, it depends on how vehemently

15  the People object.

16          THE COURT:  I think they're going to be pretty

17  vehement.  I don't know.  If you ask their officer, you

18  mean?

19          MR. BELL:  If I asked their officer, You

20  arrested him for a Federal warrant that was outstanding.  If

21  the People don't object and the answer is yes, I think that

22  might be sufficient.  I might try to go at it a different

23  way if the People object.

24          THE COURT:  Okay.  Let me read this before I

25  rule on that.

26          MR. BELL:  We still have the final issue that

16

1  the Court is about ready to hear on the exclusion of his

2  statements.  Apparently, after he was arrested, he was in

3  custody, and he was questioned by Foster City Police

4  Department; and as I understand it, the People intend to use

5  certain things he said during that interrogation at the

6  trial, and I know that the People, based on our discussions

7  off the record this morning, are ready to play a

8  tape-recording that they have of the -- of what happened and

9  what was said, and I'm asking the Court to review that with

10  an eye to determining what -- what statements he made on

11  that tape would be admissible.

12      I know at some point he did state or at least make a

13  statement which is like an invocation of the right to

14  counsel, like, Wouldn't it be better if I had a lawyer?  And

15  I think the matters leading up to that I think the Court

16  needs to review in determining whether or not anything he

17  said prior to that should be admitted.

18          THE COURT:  And for the record, Miss Allhiser,

19  there was a cutoff point past which you did not care to go,

20  as I understand.  I don't need to pay attention to something

21  after what was said?

22          MR. BELL:  We have agreed, by the way; and if

23  Ms. Allhiser wants to make a statement on the record about

24  what's not -- everything is on the original tape, but what

25  we propose to play to the Court is a truncated version of

26  that.

17

1          THE COURT:  It stops where you want to stop and

2     starts where you want to start?

3          MS. ALLHISER:  Right.  Your Honor, I have the

4     entire two-hour tape here.  What I've done is cued it up to

5     a point that is about an hour and 14 minutes or so from the

6     very beginning when it starts counting on your video player.

7     Your Honor, it's going to be 0000, but in fact it's about

8     one hour and 14 minutes into the tape.

9          Mr. Bell and I have agreed that that portion of the

10     tape prior to then is not material to your decision.  It

11     will run from about, Oh, in the neighborhood of 11 minutes,

12     and then I will stop it.  I think it might be useful for

13     review, if that ever becomes necessary, to have the entire

14     tape in the record; however, the part that is being offered

15     is the part that I've summarized in the brief that I just

16     filed this afternoon, running from about one hour and 15

17     minutes up to about one hour and 26 minutes.

18          I had never intended to play the videotape for the

19     jury, Your Honor.  That's why there's no transcript.  There

20     is a question right in the middle of this very brief

21     interview about the defendant's criminal history.  Have you

22     ever been arrested?  And the defendant said, I possessed a

23     stolen car.  I had never any intention of using that as

24     evidence against the defendant.

25          I also know that at the point in time where, in my

26     view, he invokes his right to an attorney, that part

1  wouldn't be in evidence, or at least my choice is not to try

2  to offer it in evidence and everything that followed.  So at

3  around one hour and 26 minutes into the exact -- into the

4  actual tape, the defendant says something to the effect of:

5  Don't I have to have a lawyer with me before I talk to you?

6  words to that effect.  Detective Morrison's answer was words

7  to the effect, It's up to you.  You can do whatever you

8  want.  And then without really waiting for a response from

9  the defendant, Detective Morrison said, Can I just tell you

10  what we have?  The defendant said yes, and then Morrison

11  starts basically listing all of the evidence that Foster

12  City police had.

13       I believe that would be construed as a further

14  interrogation without clearing the ambiguity about whether

15  the defendant wanted an attorney right there and then, so my

16  proposal would be to play it through to that point, turn the

17  tape off; and if Mr. Bell has any concerns about the section

18  that I played, I'm sure he will raise them on the record.

19            THE COURT:  What use do you plan to make of this

20  at trial, the part we're in between?

21            MS. ALLHISER:  I was going to put an officer on

22  the witness stand, ask about the context and do question and

23  answer for the parts which I believe or hope the Court will

24  find admissible.

25            THE COURT:  And if you decide to play the

26  truncated portion of the tape, or if I allow it, then we

1   will have a transcript then?

2             MS. ALLHISER:  Absolutely.

3             THE COURT:  Okay.  All right.  Play it.

4              (People's Motion Exhibit No. 1, Six-hour

5              Videotape, marked for Identification only.)

6             MS. ALLHISER:  Your Honor, I ask there be marked

7   as People's Motion Exhibit 1, a six-hour videotape.  Counsel

8   has a copy of this.  It's labeled on the tab:  Foster City

9   Police Department, 2004 dash 0504 S period, meaning suspect,

10   Khuu, K-h-u-u, and the word "copy."  I have cued this up to

11   about one hour and 14 minutes into the entire two-hour

12   tape.  After two hours it goes blank, and I would like

13   ultimately to call Detective Morrison to authenticate it.

14   This is a copy of the original.  And also ask him some

15   additional questions about the context.

16             THE COURT:  Okay.  And can I ask Mr. Bell, How

17   do you pronounce your client's first and middle name?  Is it

18   Hoa Trung Khuu; is that right?

19             THE DEFENDANT:  Yes.

20             THE COURT:  And he does not require an

21   interpreter for the trial?

22             MR. BELL:  No.  He has not had an interpreter

23   during the great majority of the appearances in the case.

24      Do you feel like you need an interpreter?

25             THE DEFENDANT:  No.

26             MR. BELL:  No.  Would you tell the Court that

20

1   you're satisfied with the proceedings being held in English,

2   and you don't need an interpreter.

3          THE DEFENDANT:  No.

4          THE COURT:  If it comes to the point where you

5   think you are not understanding things, let us know that,

6   we'll get an interpreter.  It will cause a delay.  I can't

7   get just -- what, Vietnamese?

8          THE DEFENDANT:  Vietnamese.

9          THE COURT:  We can't just get one of those off

10  the third floor.  It will take a little bit of time.  If

11  you're at all uncomfortable with it.  You hear the lawyers

12  talking when they're voir diring the jurors, they're asking

13  questions of the jury.

14      Have you lived here practically all your life or all

15  your life?

16          THE DEFENDANT:  Here?

17          THE COURT:  Yes.

18          THE DEFENDANT:  Twenty years.

19          THE COURT:  Two years?

20          THE DEFENDANT:  Twenty years.

21          THE COURT:  Let us know if there is a problem.

22  But if there is, let us know.

23          MS. ALLHISER:  Your Honor, depending on how you

24  tell me, I'll do it either/or, either Detective Morrison or

25  the tape first.

26          THE COURT:  Let's go ahead and do the tape.

21

1          MS. ALLHISER:  Is there a remote, Deputy?  I can

2    just push buttons.

3          THE COURT:  There is, but it really doesn't work

4    with that one very well.

5          MS. ALLHISER:  Okay.

6          THE COURT:  It's one of those universal

7    remotes.

8          MS. ALLHISER:  Your Honor, there is a

9    stipulation between counsel that the court reporter need not

10   attempt to report the portion of the videotape that is being

11   played; is that true?

12         MR. BELL:  Yes, I will stipulate.

13         THE COURT:  Okay.

14      (Portion of videotape played, not reported.)

15         THE COURT:  I'm not hearing part of what the

16   defendant is saying on that tape.  Do you have a transcript

17   now?

18         MS. ALLHISER:  No, Your Honor.  I wasn't aware

19   the defendant was going to move to exclude any portion of

20   the statement; therefore, knowing that I wasn't going to

21   play it -- I wasn't going to play the videotape to the jury,

22   I did not have a transcript.  It may be hard to hear in this

23   room, Your Honor.  Respectfully, the courtroom does --

24         THE COURT:  It's hard to hear all the time for

25   me.

26         MS. ALLHISER:  I was able to -- it's my view,

22

1   because I am the proponent, I was able to sit in a room and

2   play it and hear what the defendant was saying.

3           THE COURT:  Why don't we do this:  I don't need

4   to detain you folks to do it.  I will take it in chambers

5   and listen to it with the ability to rewind it if I miss

6   something.  How is that?

7           MS. ALLHISER:  Yes.

8           THE COURT:  I can put it right in front of my

9   desk.  I'll just wind it back to the point where the

10  officers come in.  And then I know where you want to stop.

11  It's about 15, 16 minutes, you say.

12          MS. ALLHISER:  According to my count, it's about

13  11 minutes from the first time you hear Detective Morrison's

14  voice until the defendant says, Don't I need a lawyer?

15          THE COURT:  All right.  Why don't we do that?

16  And then I think I can be better prepared to talk about the

17  motions.  I was thinking, so that you will be prepared to

18  discuss this issue tomorrow, I understand the rationale for

19  trying to prove that there was a no-bail Federal warrant out

20  for his arrest, and that's fine, to show that possibly in

21  his mind that was the reason he was running away rather than

22  having just committed a crime.  The vice in telling what the

23  crime was would be, of course, that you would be using it

24  as, what, 1101, it would be sort of 1101 evidence without

25  him testifying.  You can use it as impeachment if he did

26  testify.

23

1      The vice on the other side, from the defense

2   standpoint, in not telling, of course, they could speculate

3   it would be something much worse possibly than it could be

4   described as, so just bear that in mind for tomorrow when we

5   talk about it begin.  When I was thinking about that it

6   began to seem to me the limiting instruction would be the

7   appropriate way to do it, to tell the jury they are not to

8   speculate about what it was for, but I can be persuaded the

9   other way, too.  That's what I was thinking about when you

10  were talking about that.  And like Mr. Bell, if you don't

11  remind me of it, I will forget.

12          MR. BELL:  What's your schedule tomorrow in

13  terms of when the jury is going to be here and what time you

14  want us, because we have jury selection potentially tomorrow

15  morning.

16          THE COURT:  Right.  We'll get into hardship

17  sometime in the morning.  Why don't we meet at 9:00 or is

18  9:30 better?

19          MR. BELL:  9:00 is fine with me because I don't

20  have anything else to do in the morning.  I have a pre-trial

21  in the afternoon that shouldn't take very long.  I don't

22  know if you start at 2:00 or 1:30.

23          THE COURT:  Usually 1:30.

24          MR. BELL:  I think probably during a break I

25  could make arrangements to do it.

26          THE COURT:  Oh, it's in the afternoon.

24

1              MR. BELL:  It's a felony pre-trial.  It was

2   continued once before.  It's an in-custody, and there is a

3   trial date coming up, so I would like to try to make it if I

4   can, but it shouldn't take very long.

5              THE COURT:  I don't like to bring in the jurors

6   in the morning and then take a two-hour lunch break.

7              MR. BELL:  That's fine.

8              THE COURT:  Okay.  Well, then, I will go listen

9   to the tape, and I will be able to read your papers, and

10  we'll start first thing in the morning, dispose of these

11  motions, argue and dispose of them and then bring up the

12  jurors.

13             MR. BELL:  All right.

14             THE COURT:  We are going to take the numbers

15  Ms. Allhiser requested on her instruction list, which I

16  assume you got.

17             MR. BELL:  Yes.

18             THE COURT:  And start typing on them because

19  counsel advised me that there weren't really that many

20  witnesses in this case, and once we get the jury selected it

21  should move pretty quickly.

22       If in looking at that, Mr. Bell, you see some that you

23  have left out you want to ask for, give us the numbers, and

24  we'll type those up as well.

25             MR. BELL:  Okay.

26             THE COURT:  I know one thing we can dispose of

Kathryn M. Lezchuk, C.S.R. No. 2302

25

1  tomorrow is the introductory things I need to say to the

2  jury, so let me get that out right now.

3      Now, let's see. Tomorrow is going to be -- no.

4  Tomorrow is August 31st.

5          MR. BELL: Correct.

6          THE COURT: So we have the Labor Day weekend. I

7  am going to tell them they are going to take Friday afternoon

8  off, in case somebody is planning to get out of here early

9  for the Labor Day weekend. And then would I be safe in

10  telling them we would anticipate having the case in their

11  hands early in the week of -- starting Tuesday, the 7th?

12          MR. BELL: I think at the latest.

13          MS. ALLHISER: At the latest, yes.

14          THE COURT: You were talking about one or two --

15  three is probably more realistic. That would get us exactly

16  to Friday, so we would slop over into the next week anyway,

17  so I'll tell them as soon as we get back from the Labor Day

18  we expect to have the case in their hands and then however

19  long deliberations take. We can't estimate that. Okay,

20  Friday p.m. off.

21          MS. ALLHISER: And the priors are bifurcated. I

22  understand there is a possibility the defendant may choose

23  to waive jury on the priors. Whether he does or does not,

24  that would be a pretty quick process of proving the prior to

25  the jury.

26          THE COURT: If that would be a jury trial, as

26

1    soon as there was a verdict -- as soon as there was a

2    verdict, we will go ahead and carry on that very day.

3         Now, the charges are two counts of residential

4    burglary.

5              MS. ALLHISER:  Yes, Your Honor.

6              THE COURT:  There was nobody home on either of

7    those two.

8              MS. ALLHISER:  That's true.

9              THE COURT:  And one count of attempted

10   residential burglary.

11             MS. ALLHISER:  Yes.

12             THE COURT:  Okay.

13             MS. ALLHISER:  And two related counts, same

14   evidence, same victims, of receiving stolen property.

15             THE COURT:  Right.  Two counts receiving stolen

16   property?

17             MR. BELL:  Yes.  3 and 4.

18        I'm sorry.  She just said 3 and 4.  I meant 4 and 5.

19             THE COURT:  Right.  Mr. Bell, your office is in

20   Redwood City?

21             MR. BELL:  Yes.

22             THE COURT:  Okay.  I'll go look at the tape and

23   see you folks at 9:00 tomorrow.

24             MR. BELL:  Thank you very much, Your Honor.

25             MS. ALLHISER:  Thank you, Your Honor.

26                  (Court stood in recess.)

P r o c e e d i n g s

Redwood City, California

Morning Session                  Tuesday, August 31, 2004

---o0o---

THE COURT:  Okay.  The People versus Khuu.
Both counsel, the defendant are present.

I have viewed the videotape and gone through all the
motions, so I guess let's take the easiest one first, the
People's motion to exclude reference to strike allegations
and consequences.

Any objection to my granting that?

MR. BELL:  No.

THE COURT:  All right.  That will be granted.

Next, the defendant's motion to exclude the
defendant's statement to the police, that portion of it
which the People have designated as what they want to play
or read to the jury.

Any comments on that, Mr. Bell?

MR. BELL:  No, Your Honor.  I wanted the Court
to review it.  I would say that it might be helpful now to
have -- I just said no comment, and here I am.

THE COURT:  Well --

MR. BELL:  It might be helpful to have
Ms. Allhiser state for the record specifically what portion
of that tape that she intends to elicit through Detective
Morrison, because there were certain things on the tape that

Kathryn M. Lezchuk, C.S.R. No. 2302

1   I think prior to the invoking that would be a problem

2   admitting them.

3           THE COURT:  Prior to the invoke.  Okay.  I

4   started when the two officers walk into the room.

5           MR. BELL:  Right.

6           THE COURT:  And then it would stop just before

7   the defendant said, "Shouldn't I have a lawyer before I talk

8   to you?"  That part would not be played, but that would be

9   the end of it.

10      So in between those two, what specifically?

11          MR. BELL:  I know there is a reference to

12  whether or not he has any prior convictions.

13          THE COURT:  Yes.  She already said she wasn't

14  going to use that.

15          MS. ALLHISER:  Yes.

16          MR. BELL:  I think it would be helpful if the

17  Court -- if Ms. Allhiser could state on the record exactly

18  what she intends to elicit, and I can respond to those

19  particulars.

20          THE COURT:  Okay.

21          MS. ALLHISER:  Your Honor, to be begin with, to

22  frame the issue, counsel and I have some agreements which

23  have actually not been stated on the record first.  For the

24  purpose of this motion only, counsel is prepared to

25  stipulate to the accuracy of the summary of evidence of the

26  alleged offenses which appears in my Section A of People's

1   response to defendant's motion to exclude defendant's

2   statement to police.

3        Is that true?

4            MR. BELL:   That is correct.

5            MS. ALLHISER:   That just sets the factual basis,

6   Your Honor, and includes the defendant's date of birth and

7   his criminal history.

8        As to the offer of proof, Your Honor, as I explained

9   yesterday, I did not know the defendant was going to move to

10  exclude the statement.   I did not plan to play the videotape

11  to the jury.   I was going to do it in question-and-answer

12  form with Detective Morrison at the time of trial.   That was

13  my plan.   I understand he has raised the issue of

14  admissibility, and that's fine.   We are somewhat at a loss

15  because we don't have a transcript.   I did not prepare one.

16       Counsel has had the tape.   I have -- neither one of us

17  transcribed it.   The offer of proof is essentially the same

18  as appears in my brief and response to the motion, the oral

19  motion to exclude statement, beginning at page 3, at line

20  14, which is the section where the officers come in the

21  room, ask the defendant:   What's your name?   How do you say

22  your name?   And then _Miranda_.   The questions and answers

23  that come up to the point where the defendant says something

24  like:   Don't I have to talk to a lawyer before I talk to

25  you?   And from that section the People would voluntarily

26  exclude Detective Morrison's question:   Do you have a

1   criminal history?  Have you been arrested?  And the

2   defendant's answer, I've been arrested once before for

3   possessing a stolen car.

4        I'm voluntarily excluding that, besides which, I think

5   that's the Court's order about excluding priors; and,

6   secondly, because Ryan Bui, B-u-i, is not present, is not

7   part of this trial.  There is one section where Officer

8   Sandri, S-a-n-d-r-i, says to the defendant about the black

9   Range Rover -- he said, it was your car, you picked him up;

10  and in the question in context, it's evident that what

11  Sandri was talking about was Ryan Bui, who was at that point

12  actually in custody but in a different interview room.

13  They're all talking about him, and they're all referring to

14  the same guy.  This is Ryan Bui.  I would exclude Sandri's

15  reference to what Bui said to Sandri, and therefore, would

16  exclude the question that Sandri asked Khuu.  I'm doing that

17  because he is not here.

18              THE COURT:  Which one, about whose car is it?

19              MS. ALLHISER:  Yes.

20              THE COURT:  You're excluding that?

21              MS. ALLHISER:  No, sir.  Let me try to be

22  clear.  The officers asked, Whose car is that?  The

23  defendant answers, I don't know.  It's his car, as if he's

24  gesturing as if to the other guy, the other guy in the other

25  interview.

26              THE COURT:  You want that part to go in?

1          MS. ALLHISER:  In.  Yes, Your Honor.  I believe

2  that's material, and it's admissible.

3       Officer Sandri followed with a question that I am

4  willing to exclude, and the next question from Sandri was:

5  He said it was your car.

6          THE COURT:  Correct.

7          MS. ALLHISER:  I'm willing to exclude that.

8          THE COURT:  Yes.  Okay.

9       Is that what you wanted?

10          MR. BELL:  Basically, I think she -- well, I

11  understand what she doesn't intend to do.

12          THE COURT:  The rest is what she intends to do.

13  From when they walk into the room.

14          MR. BELL:  Well, I think my only concern is it

15  had to do with really only basically two subjects.  One is

16  name, and I think she intends to elicit that he gave a false

17  name, which she is entitled to do.

18          THE COURT:  Right.

19          MR. BELL:  He asked about a cell phone, and he

20  identified it as his.  That's potentially relevant evidence

21  because it was found in the vehicle, so that she would be

22  entitled to elicit that to show it was -- he was in the

23  vehicle.

24          MS. ALLHISER:  It was found in the path of the

25  flight.

26          MR. BELL:  Not in the vehicle, then.  Also, his

32

1    statement was it belonged to him, meaning Ryan Bui, but

2    other than that, I don't know of anything else she intends

3    to elicit, and that's specifically --

4              THE COURT:  The rest of it.

5              MS. ALLHISER:  The rest of it.

6              THE COURT:  Any word he says, she wants to put

7    in as an admission.

8              MR. BELL:  I guess my concern is, What's the

9    relevance of the rest of it?  That's the only three things I

10   see as relevant.

11             MS. ALLHISER:  Your Honor, routine booking

12   questions are really not even a Miranda issue.  That's one

13   thing.

14             MR. BELL:  They have to be relevant for some

15   purpose in the trial.

16             MS. ALLHISER:  Your Honor, this is around noon

17   in Foster City, which the Court knows from the geography of

18   the Bay Area, is on the ocean side of the Bay.  He lives,

19   according to his statement, with his mother in Oakland.

20   What is he doing in Foster City at noon if he's unemployed

21   and doesn't live here?  I think he was burglarizing houses,

22   Your Honor, and that is the inference that I would draw from

23   the fact that he is an Oakland resident who is present in

24   Foster City in the middle of the day.

25        He is unemployed.  He is single.  He has been in the

26   country for 20 years.  The fact that he's been in the

33

1   country for 20 years is material because it goes to his

2   level of comprehension of the officer's questions of him and

3   his comprehension of the circumstances of being chased by

4   the police.  This is not a sort of a person who was so

5   culturally separated that he didn't know where he was or

6   what was happening to him.

7          MR. BELL:  I submit that asking him about his

8   place of residence or whether he's employed is -- employment

9   issue I think is somewhat prejudicial in that it might imply

10  that because he was not employed he would be more likely to

11  commit a theft, which I think -- I think the Court -- the

12  cases hold is not a proper inference for the jury to draw

13  from the lack of employment, that he is more likely to

14  commit theft.  So that might require the Court to give some

15  sort of limiting instruction as to that, but if they want to

16  show that he lived in Oakland, which was not in this

17  particular area, I think is relevant.

18         THE COURT:  They probably also want to show he

19  wasn't employed, so he couldn't very well have been working

20  over here.

21         MS. ALLHISER:  That's true.  That's true.

22         THE COURT:  For the same purpose.  If you want a

23  limiting instruction that suggests to them they can't infer

24  that he's committing burglaries because he is unemployed,

25  I'll give it to you, but, frankly, I think I'm not so sure

26  the jury is going to draw -- that's not the first thought

Kathryn M. Lezchuk, C.S.R. No. 2302

1    that came to my mind.  I'm not sure it would either.  You

2    might be emphasizing something.  But that's up to you.  If

3    you want to offer one, that's fine, sure.

4         MR. BELL:  I take it so far we have those two:

5    He is living in Oakland, and he is unemployed.

6         MS. ALLHISER:  And there's more.  He knows who

7    the other guy is.  He refers to him both by his Vietnamese

8    name and by his American name.  Certainly it makes a

9    difference.  You're in the car with somebody, and you know

10   who he is, as opposed to being a hitchhiker.

11        MR. BELL:  Right.  I'm just asking for the

12   People to state the relevance, because I couldn't understand

13   what the theory was behind wanting those things into

14   evidence, but I understand them now.

15        THE COURT:  Okay.

16   All right.  Then is this motion submitted?

17        MR. BELL:  Yes.

18        THE COURT:  To that extent and subject to those

19   conditions, I will allow the defendant's statement to the

20   police to be placed in evidence.

21   People -- the Castro motion, People's motion to admit

22   evidence of felony conviction for impeachment of defendant,

23   one thing I wanted to do yesterday was read the trial motion

24   No. 1, mainly for the arguments about how the Federal crime

25   was similar, included all the elements of some State crime.

26   We don't really need to get into that motion right now.

1    That comes more, I guess, at the bifurcated, if there's a

2    conviction, trial necessitated by the reasons of the Supreme

3    Court case.  Well, it really -- well, I don't know if it

4    is.  Was the reason the recent Supreme Court case, in your

5    minds, because what you're really talking about is, Does

6    this fit within 667(a) for 1170.12?

7                    MS. ALLHISER:  Is the Court asking?

8                    THE COURT:  This is not an aggravating factor.

9                    MS. ALLHISER:  Well, yes or no.

10                   THE COURT:  It is, but it's not subject to the

11   Supreme Court.

12                   MS. ALLHISER:  The Court is talking about

13   Blakely, B-l-a-k-e-l-y, versus Washington?

14                   THE COURT:  I knew that.  I just wanted to see

15   if you remembered.

16                   MS. ALLHISER:  I just was wondering if the Court

17   reporter knew how to spell it.  The case, Your Honor, says

18   the defendant has a right to jury findings or finder-of-fact

19   findings as to aggravating factors.  The 667(a) and the

20   1170.12(c)(1) are in fact facts that would enhance a

21   sentence, but they are prior convictions which is the one

22   thing that is taken explicitly out of <u>Blakely vs.</u>

23   <u>Washington.</u>

24        Under California law, State statute, the defendant has

25   a right to a jury trial under 1170.12(c)(1).  And the Court

26   has already ruled.

36

1          THE COURT:  667(a), can both of them be three

2     strikes?

3          MS. ALLHISER:  The 667(a), Your Honor, is the

4     five-year enhancement.  The 1170.12(c)(1) is based on the

5     same conviction, but it has the effect of doubling.

6          THE COURT:  What was the first three strikes?  I

7     guess it was the initiative first.

8          MS. ALLHISER:  Yes.

9          THE COURT:  Was there a 600 series?

10         MS. ALLHISER:  Yes.

11         THE COURT:  What was that?

12         MS. ALLHISER:  There are a number of cases that

13    say that the 667 sub (d), sub (e), sub (f) were essentially

14    made over into the 1170.12(c).  It's the same law, Your

15    Honor.

16         THE COURT:  Okay.  All right.  So this is a

17    standard Castro motion.

18      For the record, I was also -- with regard to Trial

19    Motion No. 1, I have read the plea agreement and the

20    judgment of the Federal court.

21      Back to the Castro issue, I know the Castro factors,

22    and I know my obligations under 352.

23      What is your argument with respect to this, Mr. Bell?

24         MR. BELL:  The two points I would like to make

25    is the remoteness of the conviction, which, the acts which

26    took place which form the basis of the conviction took place

Kathryn M. Lezchuk, C.S.R. No. 2302

1    in 1994, which were almost ten years ago.  Secondly, the

2    defendant played a very minor role in that matter, as

3    revealed by the plea agreement, and it seems to me that --

4            THE COURT:  Wait a minute.  He stole a car that

5    was going to be used in the robbery.

6            MR. BELL:  Correct.

7            THE COURT:  He brought tape to tape up the

8    driver of the Intel truck, I guess it was.

9            MR. BELL:  Well, he did acknowledge in response

10    to a question that he -- Who brought the tape? was the

11    question, and he said, I did.

12            THE COURT:  Okay.

13            MR. BELL:  There was nothing more that he

14    acknowledged that he was going to do with regard to the

15    Intel driver.  He simply said --

16            THE COURT:  I didn't say he was going to tie him

17    up.  He brought some of the materials, and he was going to

18    go along.

19            MR. BELL:  That part is not clear from the plea

20    agreement; that he was going to actually be physically

21    present during the robbery.

22            MS. ALLHISER:  Your Honor, there are six pair of

23    surgical gloves found in one of the cars that was driven by

24    the co-conspirators.  I think it is reasonable to conclude

25    that these people were going to act together, and they

26    didn't want to leave fingerprints.

38

1          MR. BELL:  Well, again, the fact that he might

2    have worn gloves doesn't mean that he was going to be

3    physically present during the actual robbery.

4          THE COURT:  Let me ask on that point,

5    Ms. Allhiser, was there anything in these materials

6    regarding whether he was going to go on the robbery except

7    the fact that you had six pairs of gloves and only five

8    people, if you don't count him?

9          MS. ALLHISER:  No, Your Honor.  The way the plea

10    agreement describes it, the arrest signal is given as the

11    meeting is dissolving, so there is no opportunity to say,

12    Well, did he drive to the location?  That never happened.

13          THE COURT:  That's not what I am saying.  Was

14    there a plan he would go along on the robbery reflected in

15    any of the plea agreement or the judgment or any other

16    material that I'm allowed to look at?

17          MS. ALLHISER:  Your Honor, the way I read the

18    plea agreement, the answer would be no.

19          THE COURT:  Okay.  I had -- I don't know where I

20    got this.  This is the only document that I had to look at,

21    but I thought that one of the undercover people asked who

22    was going, but maybe that was referring to the fellow who

23    was outside in the -- I think it was the Jeep, who never

24    came in.

25          MS. ALLHISER:  I think there's an implication,

26    if the Court were to look in the plea agreement at page 3,

Kathryn M. Lezchuk, C.S.R. No. 2302

1    beginning at around line 2, and I quote:  The agents asked

2    if anyone else had come along beyond the four individuals

3    who were present in the restaurant.  And then there's

4    reference to another person, Your Honor, so it sounds like

5    it's about to go forward with all of those people to commit

6    the crime, but I don't think it's explicitly stated.

7            THE COURT:  Okay.  All right.  Go ahead,

8    Mr. Bell.

9            MR. BELL:  So for those reasons, Your Honor, I

10   submit that it would be unduly prejudicial to allow the

11   People to impeach my client with that conviction because it

12   was too remote and because it was a minor role.  The

13   prejudicial value of the -- that the prejudice of that

14   outweighs its probative value in terms of its credibility,

15   and I submit they should not be allowed to impeach him

16   should he testify.

17           THE COURT:  First of all, I do not believe it is

18   too remote.  Secondly, subtracting for purposes of the

19   argument the factor that it looked like he was going to go

20   along, the fact that he was at the meeting, brought -- he

21   stole a car to facilitate the robbery which was going to be

22   used in the robbery, and he also brought the tape to bind

23   the Intel truck driver, whether he was going to personally

24   do it or not, I don't know, and the fact that he brought the

25   gloves, which were inferentially going to be used in the

26   robbery, indicates to me that he is not a minor player in

Kathryn M. Lezchuk, C.S.R. No. 2302

1    that case or in that crime.

2         So, therefore, having weighed the various factors

3    under 352, I am going to grant the People's motion to allow

4    impeachment of the defendant with that conviction in the

5    event the defendant testifies.

6              MS. ALLHISER:  Thank you, Your Honor.

7              THE COURT:  Trial Motion No. 1, I think, can

8    wait.

9         Will it be your position if we're going to have a jury

10   trial on phase two that the jury has some decision to make

11   with regard to 1170.12(c)(1)?

12             MS. ALLHISER:  My belief is they have no role to

13   play, Your Honor.

14             THE COURT:  Just 667(a).

15             MS. ALLHISER:  Not even that.  May I explain my

16   answer?

17        I think that under 1025 of the Penal Code the jury's

18   role in a priors trial, and that's both the five-year 667(a)

19   and the 1170.12(c)(1), both of those, it's a single

20   conviction out of the Federal court, you know, single case

21   number.  Under 1025 of the Penal Code the jury's role is

22   limited to, Did the defendant suffer the conviction?

23             THE COURT:  Yes.

24             MS. ALLHISER:  Whether he is the same person,

25   identity is for the Court; whether it's a serious felony is

26   a matter of law for the Court; whether 667(a) applies is for

1   the Court; whether 1170.12(c)(2) -- (c)(1) applies is for

2   the Court.  The only thing left for the jury to decide is,

3   Are these documents forged?  Has it been reversed on

4   appeal?  It's down to:  Did the defendant suffer the

5   conviction?

6              THE COURT:  So the answer was yes, they do have

7   a role to play, Did he suffer a conviction?

8              MS. ALLHISER:  Yes.

9              THE COURT:  And that would go both for 1170.12

10  and 667(a).  In other words, from there on it's a matter of

11  law or matter of whether he's the fellow who was subject to

12  the conviction.  Okay.

13       What we will do with regard to a jury selection, first

14  phase, of course, is hardship, and I really don't tell them

15  anything other than how long it will last, and we start

16  taking the people claiming hardship into chambers

17  individually with the court reporter and everyone else

18  present, both counsel and the defendant, and interview them

19  separately, strictly on the question of hardship claim.

20       Did you find out how many people they have ready for

21  us?

22              THE CLERK:  No.  Did they call?

23              THE BAILIFF:  They just called wanting to know

24  how many we needed and when.

25              THE COURT:  Didn't we tell them that yesterday?

26              THE BAILIFF:  Yes.  Same amount?

42

1          THE COURT:  Same amount as yesterday.

2          THE BAILIFF:  She said, I need to know how many

3     do you need and when do you want them?  I told her 50 and

4     soon.

5          THE COURT:  Okay.  Why don't you call down and

6     let's see what the answer is this time.

7          This would be a good time -- if anybody needs to go to

8     the restroom, defendant, anyone else, this will be a good

9     time to do it, because it will take at least 15 minutes to

10    get up here.

11         (Brief recess.)

12         (The prospective jurors entered the courtroom.  Jury

13    voir dire proceedings commenced, reported but not

14    transcribed herein.)

15         (A jury of twelve and one alternate was selected.)

16              (Court stood in recess.)

17                   ---oOo---

18

19

20

21

22

23

24

25

26

Kathryn M. Lezchuk, C.S.R. No. 2302

43

<u>P r o c e e d i n g s</u>

Redwood City, California

Morning Session                    Wednesday, September 1, 2004

---oOo---

1  THE COURT:  Good morning, ladies and

2  gentlemen.  I am sorry that we kept you waiting, but I was

3  assigned a matter after you left last night.  You probably

4  saw a bunch of people coming out of the courtroom.  That's

5  what we've been doing.

6  All right.  I am now going to give you a pre-trial

7  admonition, and then we are going to have you take the oath

8  after you have heard this, and the clerk will read the

9  charges to you.

10  Members and alternate member of our jury, you have

11  been selected and sworn as jurors and alternate juror, or

12  you will be at the end of this admonition.  I will now

13  instruct you as to your basic functions, duties and conduct.

14  At the conclusion of the case, I will give you further

15  instructions on the law.  All of the Court's instructions,

16  whether given before during or after the taking of testimony

17  are of equal importance.

18  You must base the decisions you make on the facts and

19  the law.  First, you must determine the facts from the

20  evidence received in this trial and not from any other

21  source.  A fact is something proved by the evidence or by a

22  stipulation.  A stipulation is an agreement between the

Kathryn M. Lezchuk, C.S.R. No. 2302

44

1    attorneys regarding the facts.

2        Second, you must apply the law as I state it to you to

3    the facts as you determine them and in this way arrive at

4    your verdict.  You must accept and follow the law as I state

5    it to you whether or not you agree with the law.

6        If anything concerning the law said by the attorneys

7    in their arguments or at any other time during the trial

8    conflicts with my instructions on the law, you must follow

9    my instructions.  You must not be influenced by pity for a

10   defendant or prejudice against him.  You must not be biased

11   against the defendant because he has been arrested for this

12   offense, charged with a crime or brought to trial.  None of

13   these circumstances is evidence of guilt and you must not

14   infer or assume from any or all of them he is more likely to

15   be guilty than not guilty.

16       You must not be influenced by mere sentiment,

17   conjecture, sympathy, passion, prejudice, public opinion or

18   public feeling.  Both the People and the defendant have a

19   right to expect that you will conscientiously consider and

20   weigh the evidence, apply the law and reach a just verdict,

21   regardless of the consequences.

22       During the course of the trial, statements made by the

23   attorneys are not evidence.  However, if the attorneys

24   stipulate or agree to a fact, you must regard that fact as

25   proven.

26       With regard to objections, if an objection is

45

1   sustained to a question, do not guess what the answer might

2   have been.  Do not speculate as to the reasons for the

3   objection.

4        Do not assume to be true any insinuation suggested by

5   a question asked a witness.  A question is not evidence and

6   may be considered only as it helps you understand the

7   answer.

8        Do not consider for any purpose any offer of evidence

9   that is rejected or any evidence that is stricken by the

10  court.  Treat it as though you had never heard of it.

11       Another very important rule is that you must not

12  independently investigate the facts or the law or consider

13  or discuss facts as to which there was no evidence.

14       This means, for example, that you must not on your own

15  visit the scene, conduct experiments or consult reference

16  works or persons for additional information.

17       You must not converse amongst yourselves or with

18  anyone else on any subject connected with the trial until

19  you have heard all of the evidence, the arguments and my

20  instructions on the law, and then only when you are in the

21  jury room with all twelve jurors present.

22        I don't expect that there will be any news media

23  accounts regarding this trial but if there are you must not

24  read or listen to them in the newspaper or other news media,

25  including radio or television.

26       Now, you have been given notebooks and pencils.  You

1    will be able to take them with you into the jury room when
2    you deliberate, but a word of caution.  You may take notes,
3    however, you should not permit note-taking to distract you
4    from the ongoing proceeding.  Remember, you are the judges
5    of the believability of the witnesses.

6         Notes are only an aid to memory and should not take
7    precedence over recollection.  A juror who does not take
8    notes should rely on his or her recollection of the evidence
9    and not be influenced by the fact that other jurors do take
10   notes.  Notes are for the note-taker's own personal use in
11   refreshing his or her recollection of the evidence.

12        Finally, should a discrepancy exist between a juror's
13   recollection of the evidence and a juror's notes, or between
14   a juror's recollection and that of another, you may request
15   the reporter read back the relevant testimony, which must
16   prevail.

17        Of course, you will be permitted to separate at the
18   recesses.  You must return at the end of the recesses.
19   During recesses, you must not discuss with anyone any
20   subject connected with this trial.

21        As for our alternate juror, you are bound by all of
22   these admonitions as well, of course.

23        During the course of this trial and before you begin
24   your deliberations, you must keep an open mind in this case
25   and upon all of the issues that you will be asked to
26   decide.  In other words, you must not form or express any

1    opinions in this case until the matter is finally submitted

2    to you.

3         At this time, then, if you would please stand and

4    raise your right hands, the clerk will administer the oath.

5              THE CLERK:  Do you and each of you understand

6    and agree that you will well and truly try the cause now

7    pending before this court and a true verdict render

8    according only to the evidence presented to you and to the

9    instructions of the court?

10        If you so agree, please answer, "I do."

11             JURORS IN UNISON:  I do.

12        THE CLERK:  Thank you.  You may have a seat.

13             THE COURT:  I will now ask the clerk to read the

14   Information.

15        Let me tell you, ladies and gentlemen, the Information

16   is the charging document.  It is not evidence.  It is

17   prepared in the District Attorney's office, but it sets

18   forth the charges in legal terms so that someone will know

19   what they are required to defend against, and we are

20   required to read it to you at the beginning of the case.

21             THE CLERK:  In and for the Superior Court of

22   California, County of San Mateo.  The People of the State of

23   California, plaintiff, versus Hoa Trung Khuu, defendant.

24        The said defendant is accused by the District

25   Attorney of the County of San Mateo, the State of

26   California, by this Information of the following crimes in

Kathryn M. Lezchuk, C.S.R. No. 2302

48

San Mateo County:

Count 1.  On or about March 10, 2004, Hoa Trung Khuu did willfully and unlawfully enter an inhabited dwelling house, or trailer coach, or vessel, or floating home, or inhabited portion of a building located at 361 Beach Park, Foster City, with the intent to commit larceny or any felony, in violation of Penal Code Section 460(a), a felony.

Count 2.  On or about March 10, 2004, Hoa Trung Khuu did willfully and unlawfully attempt to enter an inhabited dwelling house, or trailer coach, or vessel, or floating home, or inhabited portion of a building located at 57 Williams, Foster City with the intent to commit larceny or any felony, in violation of Penal Code Section 664/460, subdivision (a), a felony.

Count 3.  On or about March 9th, 2004, and March 10th, 2004, Hoa Trung Khuu did willfully and unlawfully enter an inhabited dwelling house, or trailer coach, or vessel, or floating home, or inhabited portion of a building located at 1295 Beach Park Boulevard, Foster City, California, with the intent to commit larceny, or any felony, in violation of Penal Code Section 460, subdivision (a), a felony.

Count 4.  On or about March 10, 2004, Hoa Trung Khuu did willfully and unlawfully buy, receive, conceal or sell, withhold, or aid in concealing, selling, or withholding property of Pam and George Hung, which had been stolen, knowing that said property had been stolen, in violation of

49

1    Penal Code Section 496(a), a felony.

2        Count 5.  On or about March 10, 2004, Hoa Trung Khuu

3    did willfully and unlawfully buy, conceal, steal, sell,

4    withhold, or aid in concealing, selling, or withholding

5    property of Sharon and Yao Chi, which had been stolen,

6    knowing said property had been stolen, in violation of Penal

7    Code Section 496(a), a felony.

8        And to these charges, the defendant has pled not

9    guilty.

10        THE COURT:  All right.  Ladies and gentlemen,

11    at this time counsel are going to have the opportunity to

12    give you what we call an opening statement.

13        Now, an opening statement, like all other statements

14    by counsel, are not evidence and is not evidence in this

15    case.  Neither is it an argument.  Counsel are not permitted

16    to argue the case at this point in the proceedings.

17        An opening statement is simply an outline by counsel

18    of what he or she believes or expects the evidence to show

19    in this trial.  Its sole purpose is to assist you in

20    understanding the case as it's presented to you.  As a

21    practical matter, we can't always get the witnesses in here

22    in exact chronological order, so counsel are given the

23    opportunity to give you an outline of the case so that you

24    will understand where each of the witnesses may fit in, even

25    though they might not be in chronological order.

26        And we begin for that purpose with Ms. Allhiser.

Kathryn M. Lezchuk, C.S.R. No. 2302

1          MS. ALLHISER:  Thank you, Your Honor.

2

3          OPENING STATEMENT ON BEHALF OF THE PEOPLE

4          MS. ALLHISER:  Foster City is a residential

5     suburb.  Some people would call it a bedroom community.

6     There's some industry there, high-tech, but by and large

7     people live there.  And it's set on a series of artificially

8     created, man-made lagoons.  The City goes in and out and in

9     and out.

10         In the morning and up to about noon on March 10th,

11    2004, a lot of people were at work or at school.  A few

12    people were at home.  Some folks work at home these days.

13    One of them is Tommy Hui.  Tommy Hui was at home at 57

14    Williams Lane in Foster City.

15         Some time after noon, he wasn't expecting anyone, and

16    there was a persistent ringing at his doorbell.  He ignored

17    it.  He wasn't expecting anyone, wasn't looking for anyone.

18    He ignored it, but he noticed there was a man, somebody

19    ringing his bell, and there was a black Range Rover, with

20    somebody sitting in the driver's seat.  He didn't know the

21    car.  He didn't know these people.  He ignored them.

22         A little bit of time passed.  Now it's closer to 3:40

23    -- I'm sorry, I misspoke, 12:40, just after noon.  And he

24    heard a sound at his rear sliding door.  Went around back,

25    glass door, and he heard a racket there.  There's a window

26    covering, a curtain sort of thing over that rear sliding

door.  He looked through it -- not through the glass but
through the covering, and he saw one man prying with some
heavy object at his rear sliding door and a second man
standing right behind him.

Mr. Hui didn't know these guys, wasn't sure what they
looked like, because he was looking through a covering,
curtain, but he sure as heck knew he didn't want anybody
breaking in his house.  He hollered, and he called the
police.

The police received the call at around 12:41.  They
had police officers with instructions, go there, within
about two minutes, at 12:43.

The police officers were told, look for a black Range
Rover, because when Mr. Hui yelled, these guys beat it out,
jumped in the black Range Rover, and the two of them drove
off.

Bill Sandri is a Foster City Police Officer.  He knew
where 57 Williams Lane was, he knew where he was, and he was
heading roughly in that direction to see if he could find
that black Range Rover, stop them, figure out what these
guys were doing, trying to pry their way into a house.

Bill Sandri was on one of these streets that goes
around in Foster City.  He was on or in the area of Port
Royal Avenue, which takes this big loop in Foster City.
When Bill Sandri in a police car -- he's got his eyes out.
He's looking, looking.  He sees a black Range Rover.  The

1  black Range Rover was in the area of Edgewater, which is a

2  major street in Foster City.  There's a large shopping

3  center at Edgewater.  It's called Edgewater Place.  There's

4  an Albertsons grocery store there.  A lot of people know the

5  Chevy's Mexican restaurant there.

6       Bill Sandri headed in the direction of the black Range

7  Rover.  He saw people inside but of course he wasn't close

8  enough to see who they were, but when he turned on his

9  lights, the black Range Rover took off.

10      Driver of the black Range Rover, made a mistake.  He

11 got himself into a you-can't-get-out-of-here situation in

12 Edgewater Place.

13      Bill Sandri lost track of this car for a while.  There

14 were other cars between them.  There's stores; there's

15 businesses.  Sandri had seen the black Range Rover, then

16 lost sight of it.  Sandri went into the Edgewater Plaza,

17 looking, looking, looking.  He saw the black Range Rover,

18 evidently having gotten itself into a dead-end situation,

19 coming back out.  Sandri turned himself around.  The black

20 Range Rover is now boxed in.

21      Behind the Albertsons grocery store it's kind of a

22 loading area where the trucks would pull up.  There's

23 nowhere to go except the lagoon, the water, and of course

24 Bill Sandri knew that.  He jumped out of his car.  The two

25 guys jumped out of the black Range Rover.  Sandri is trying

26 to stop them, and the two guys are running.

1       They had the police officer behind them, the lagoon in

2  front of them.  They had no choice but to run along the

3  board walk which runs in Edgewater Place from Albertsons all

4  the way down to the Chevy's at the other side and eventually

5  into residential.  When they did that, they had a lot of

6  people watching them, because this was, you know, 12:50 or

7  so in the afternoon, and here's a uniformed police officer

8  running after two guys.

9       It just so happened that a man was at the Portofino

10  Grill, which is right along that board walk, between

11  Albertsons and Chevy's.  The man, his name is Kevin

12  Taliaferro, saw two guys running, saw a police officer

13  chasing, and Mr. Taliaferro noticed that one of them dropped

14  his cell phone.  Mr. Taliaferro, a good citizen, picked up

15  the cell phone.

16       Well, the chase is still on.  These guys are still

17  running, and without stopping for the police, of course,

18  they jumped a wall.  Both of them jumped a wall that led

19  into the residence -- the yard of the residence at 101

20  Monterey.  As you can imagine, the Foster City police

21  officers are talking to each other on police radio, they're

22  describing what's going on, this car, these two guys

23  running, where they are, and Foster City police officers

24  descend, a lot of cops coming from different areas, and they

25  close off the area very quickly.

26       Police talk, this is called a perimeter, which is,

Kathryn M. Lezchuk, C.S.R. No. 2302

54

1  basically, put a circle around it so there's nowhere to go.

2  They also requested help from San Mateo County Sheriff's

3  deputies, and a police dog was brought out for the chase --

4  for the continued pursuit, because it took a while.

5      What happened was, another Foster City police officer,

6  his name is Mark Lee, saw Hoa Khuu, this guy.  He was hiding

7  underneath a boat cover in somebody's yard.  Police officer,

8  of course, said, Get out of there, and Mr. Hoa Khuu jumped

9  into the lagoon as if he was going to swim away.

10      The police officer waited.  Of course, he's yelling at

11  him.  Mr. Hoa Khuu said to the police officer, Go ahead.

12  Shoot me.  Well, the police officer didn't shoot him.

13  Police officer waited.  Eventually Mr. Hoa Khuu climbed out

14  of the water.  Police officer told him to get on the

15  ground.  Mr. Khuu did.

16      He evidently changed his mind and got up and ran.  The

17  police officer did not shoot him.  And the chase was on.

18  You've got houses and fences and yards, and the chase was on

19  again.

20      I mentioned that Sheriff's deputies had come,

21  including with the police dog.  The police dog has the

22  ability to trace and do scents and such.  The police officer

23  actually didn't find anybody in the case, but the dog was

24  out there.  The dog handler is the one who found Hoa Khuu.

25      His name is Ken Kammuller, Sheriff's Deputy.  He was

26  the one with the dog.  He thought, well, let's try this

1    yard.   Let's try this place, and he lifted up the lid of a

2    trash can.   There was Hoa Khuu inside the trash can.   The

3    Sheriff's Deputy put the lid back down on the trash can and

4    called Foster City police, because it was their case.

5         Mark Lee, the one who had chased this guy, watched him

6    swimming around in the lagoon, came to that location and

7    said, This is the guy.   It was Hoa Khuu.   Of course, he's

8    dripping wet.   He's been in the lagoon.

9         It took another 36 minutes for the police to find the

10   other guy.   Now, he actually hadn't gotten very far.   He was

11   still in this neighborhood, very, very close to the end of

12   Edgewater Plaza.   He was in the area of Bristol Court.

13   Police are all over the place.   A lady who lives in that

14   area, her name is Mary Elkington, happened to see this

15   guy -- this is the second one -- crouching down in some

16   bushes on the other side of her house.   And Miss Elkington

17   knew the police were all over the place.   The man is

18   crouching down in the bushes, has his finger up to his lips

19   as if, shush, quiet.

20        Well, Miss Elkington, when you meet her, you will see

21   she's taking none of that, and she said, Get out of here.

22   The second man was then sort of shooed away from that

23   particular location, but very close by he was later found by

24   Foster City police officers.   His name is Ryan Bui.   He is

25   not here today.   He's not on trial today.

26        The police, of course, went back to the black Range

56

1    Rover.  And they found a great big screwdriver, which would

2    work nicely as a pry tool, underneath the right front

3    floorboard.  The tip is actually bent.  And they found loads

4    of property.  Cash in the center console, a great big

5    shopping bag, like you get from this particular store,

6    Williams Sonoma, big shopping bag with handles, $49 in U.S.

7    currency, $1100 in Taiwanese new dollars.  They found a

8    laptop case.  The laptop case had -- had a laptop in it,

9    Sony, as well as, there's a digital camera, Game Boy, lots

10   of things; and, among other things, lots and lots of

11   jewelry, lots of jewelry and, luckily, a business card, a

12   business card for George Hung, a resident of 361 Beach Park

13   Boulevard.

14        Mr. George Hung lives with his wife Pamela Hung.

15   Those folks left the house maybe eight o'clock that

16   morning.  This is still March 10th, 2004.  The house was in

17   order, nothing was broken into, and their daughter got home

18   from school, you know, some time afternoon, but she didn't

19   know there had been a break-in.  After the police have been

20   chasing Mr. Khuu through the lagoon and all this and they

21   find him and they find Mr. Bui, they're also looking through

22   the black Range Rover, and they find the business card for

23   George Hung, which gives his address, 361 Beach Park

24   Boulevard.

25        The police get ahold of Mr. Hung.  They go to his

26   residence and, sure enough, the house has been broken into.

57

1   His laptop is missing, Game Boy, digital camera, jewelry,

2   cash.   Evidently an exterior garage door had been pried

3   open, and then into the interior garage door pried open to

4   the laundry room and into the house, so this was an

5   undiscovered residential burglary.

6        The police continue their investigation with, What

7   about all of this other property?  And there's lots of it in

8   the black Range Rover.  And at that point they didn't know

9   who those owners were.  It took two days for the police to

10  figure out who those owners were, and it was the family of

11  Yao and Sharon Chi at 1295 Beach Park.  That family didn't

12  realize that their house had been broken into.  The way they

13  found out was Mr. Yao Chi, the father of the family,

14  realized on March 12th -- I mean, this is two days later --

15  that a filing cabinet where his wife stored currency had

16  been broken into, and there was almost $5,000 U.S. cash

17  missing.

18       They eventually figured it out.  A window screen

19  apparently had been pried off the bathroom window but, see,

20  that wasn't discovered right away.  The Foster City police

21  showed this massive amount of loot to the George Hung family

22  and to the Yao Chi family.  Miss Pamela Hung identified

23  various pieces of jewelry as hers.  Mr. George Hung said,

24  That's my laptop.  That's my Game Boy.  That's my digital

25  camera.  There was a gift certificate for Pamela Hung from

26  Stanford for good work she had done there, so those folks

1    could identify a certain amount of that stolen property.

2        The lady Sharon Chi actually was overseas during this

3    period of time.  It wasn't until she came back that it was

4    all put together in terms of which was her jewelry.  She was

5    able to say, These are items of jewelry that came from my

6    nightstand and the master bathroom, and she could identify

7    various items.

8        Okay.  Let's get back to March 10th.  Hoa Khuu is in

9    custody, but he didn't say he was Hoa Khuu.  He gave his

10   brother's name.  And Ryan Bui was in custody.

11       Interesting thing happened.  On March 13th, three days

12   after the whole chase with the black Range Rover and all the

13   rest of it, Mary Elkington came to the Foster City Police

14   Department and said, You know, we found something.  Mary

15   Elkington was the lady who had seen the man crouching in the

16   bushes, like, shush, and told the guy to get out of there.

17       Turns out her husband happened to be in that area

18   doing yard work a couple of days later, and he found two

19   pieces of paper.  One was a paper, temporary driver's

20   license, in the name Ryan Bui.  The second was a typed-up

21   list with some handwriting, as well, of more than 30

22   residences.  Address, names for most of them, phone numbers

23   for most of them.  On that list, among many others, was 1295

24   Beach Park Boulevard.  On that list, among many others, was

25   361 Beach Park Boulevard, and a line had been written

26   through 1295, and a line had been written through 361, as

59

1   if, job done.

2       If Tommy Hui hadn't been home after about noon on

3   March 10th, 2004, we wouldn't be talking to you.  By calling

4   the police, police did their job, here we are.

5       This is the trial of Hoa Khuu.  He is the only one who

6   is here today.  We have charged Hoa Khuu not only with

7   trying to break into 57 Williams Lane, which is the

8   residence of Tommy Hui -- remember, they didn't get into

9   that one.  That was just the prying.  That's what caused Hui

10  to call the police, and the chase is on.  We have also

11  charged this man, Hoa Khuu, with the source of the loot that

12  was in the black Range Rover, a burglary that had just

13  happened at 1295 Beach Park Boulevard, a burglary that had

14  just happened at 361 Beach Park Boulevard.  Those residents

15  didn't even know they had been burglarized, that property

16  was so hot.

17      The evidence is very straightforward.  There aren't

18  many witnesses.  I've almost summarized the whole case for

19  you.  Please, the evidence will come quickly.  Pay

20  attention.  You're not going to hear the same thing twice.

21  Please give this your attention now.  You can see it's

22  important.

23      Thank you.

24          THE COURT:  Mr. Bell.

25          MR. BELL:  Thank you, Your Honor.

26  ///                                                    ///

60

1          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

2          MR. BELL:  Good morning, ladies and gentlemen.

3    My opening statement is in the same vein as the prosecutor's

4    opening statement, but it's at the same time different

5    because of our different roles in the case.

6          Basically, I want to give you a bird's-eye view of

7    some of the evidence, some of the issues that you will have

8    to decide in terms of rendering your verdict in this case.

9    At the same time, I want to remind you of some of the things

10   that we discussed during the voir dire process, and you've

11   already been instructed by the Court that there is no

12   obligation on the part of a defendant to offer any evidence

13   or any testimony of any witness.  We can simply rely on the

14   state of the evidence, close the case without calling a

15   single witness, without offering any evidence whatsoever.

16         At the same time, certain evidence that you hear in

17   the case may come in that is favorable to a defendant, and,

18   again, we're not permitted to argue the case, but I will get

19   to the facts in a minute, might come from a prosecution

20   witness.  Somebody who is called to the stand by the

21   prosecutor and on direct examination by the prosecutor may

22   give a piece of evidence that the defendant might find

23   helpful to his or her case, or during cross-examination of

24   that same witness a defense attorney can ask that witness

25   questions which might elicit evidence that might be

26   favorable to a defendant in a case.

61

1          So without calling any witnesses, without putting on

2     any independent evidence of his or her own, a defendant can

3     attempt to develop facts and theories from the prosecution's

4     own witnesses.

5          In this connection, I just want to say one additional

6     thing.  Since His Honor instructed you, and this instruction

7     is given in every case, that it is not the insinuation of a

8     question that is the evidence, it is the answer given by the

9     witness to that question that is the evidence, and the

10    purpose of the question is only so that you understand the

11    answer.  That doesn't mean, as some people have told me, Oh,

12    I thought that meant I can sort of ignore

13    cross-examinations.  It doesn't mean that at all.  You have

14    to ignore the questions that were asked and consider them

15    only so that you understand the answers that were given by a

16    witness, but testimony on cross-examination is just as much

17    testimony and evidence in a case as if the question -- as if

18    the evidence was elicited on direct examination by that same

19    person.  So there is no difference between cross-examination

20    and direct examination, as far as that's concerned, in the

21    trial.

22         Now, some of what I am going to say is in response to

23    some of the things the prosecutor just said as far as the

24    evidence is concerned.  You will hear from Mr. Hui, who

25    lives at 57 Williams Lane.  The prosecutor told you that the

26    evidence will be that he was looking through the curtain in

1    the back of his house and couldn't really see who it was at

2    his door.

3        I submit to you that the evidence will in fact show

4    when Mr. Hui testifies, that he was -- whether he was

5    looking through the curtain or not, he was able to tell the

6    police certain things about those individuals.  No. 1, he

7    gave a description of clothing that one or the other of

8    those individuals was wearing.  So I -- so he was able to

9    see well enough.  Again, I can't argue the case, but there

10   is a fine line to what I might say would be argument, so I

11   am going to leave that fact alone until the end of the

12   case.

13       You will also find out that he was able to describe

14   the skin color of the individuals he saw at his back door.

15   You will also learn from the evidence that Mr. Hui told the

16   police that the men at his back door were Hispanic males or

17   perhaps possibly Hispanic males.  Mr. Hui is Asian, as you

18   can see in the courtroom.  Mr. Khuu is Asian.

19       Mr. Hui will tell you there was a person -- there must

20   have been a person -- again, this is an inference that you

21   draw when you hear your doorbell ring.  The inference you

22   draw is that somebody is standing there ringing your

23   doorbell.  That's pretty simple.  We know that somebody was

24   ringing his doorbell.  Mr. Hui will tell you he never saw

25   the person on his front porch ringing the doorbell.  He

26   described clothing of people that he saw -- the people that

1    he saw were at his back door.

2         He will also tell you that he saw at the time the

3    doorbell was ringing a black SUV, which he described as a

4    Range Rover.  However, he will tell you that he only saw it

5    momentarily.  It was not parked next to the curb directly

6    but somewhat out in the street.  There was one person in the

7    car that he could not identify, and that was it.

8         He cannot -- there will be no evidence that he saw

9    somebody walking from his front door, getting into the Range

10   Rover; that the Range Rover -- there will be no evidence --

11   direct evidence, based on his testimony that the Range Rover

12   had actually anything to do with the burglary.  He didn't

13   see people running out of his back yard, jumping into the

14   Range Rover.  There will be no evidence with regard to

15   that.  Secondly, he will tell you that he saw the Range

16   Rover only from the side, because it was out in front of his

17   house.

18        Mr. Hui apparently told the police, which we think you

19   will hear in evidence, that he saw the men at his back door

20   using a large pry tool.  Ms. Allhiser in her opening

21   statement told you that a large screwdriver with a bent tip

22   was found in the car.  Mr. Hui never identified that

23   screwdriver as being consistent or similar with the large

24   pry tool he told the police he saw in the hands of the

25   people at his door.

26        When the -- obviously we know from the facts, at least

64

1    we anticipate from our opening statement of the prosecutor,

2    and I anticipate that is correct, there will be no evidence

3    anything was taken from Mr. Hui's property at 57 Williams

4    because no entry in fact was effected; however, there will

5    be evidence that people reported entries at 361 Beach Park

6    and 1295 Beach Park.

7         We will not know from the evidence exactly when those

8    entries took place.  They will be framed by evidence about

9    what time people left the house that morning, what the

10   condition of the house was.  In other words, I would expect

11   them to say they locked the house when they left it at eight

12   o'clock in the morning, somebody came back to the house

13   later at 12:30, one o'clock in the afternoon that day.  So

14   that would help you understand approximately when these

15   burglaries took place.

16        And let's not make any bones about it.  Obviously

17   those houses were burglarized and the police asked them what

18   was missing from their houses, and they gave in many cases

19   an accurate and extensive explanation of what they found

20   missing.  I ask you to pay careful attention to that and

21   then look at the evidence of what was recovered.

22        It is in fact the case that a great majority of what

23   was reported missing was recovered from the black Range

24   Rover that was stopped by the police in the Edgewater Place

25   shopping center, but the evidence will show that not

26   everything in those burglaries was recovered.  For example,

1  the evidence will show, as I understand what the evidence

2  will be, that Mr. Yao Chi, who lives at 1295 Beach Park,

3  told the police that he had put $5,000 worth of U.S.

4  currency into a file cabinet, and that it was later

5  discovered missing.  His wife, Mrs. Chi, will -- told the

6  police, and I assume will testify, that she put $3,000 worth

7  of cash into a file drawer, and that there was an additional

8  $1640 worth of cash in that file drawer, and my quick

9  addition, which -- I have to explain one of the reasons I

10  am in law is because I wasn't that good in math.  But it

11  pretty quickly adds up to $9,640 that was supposedly, as I

12  understand what the evidence will show, missing from 1295

13  Beach Park.

14      They also reported numerous items of jewelry.  I ask

15  you to pay careful attention to whether or not all of the

16  items of jewelry that they reported missing were in fact

17  recovered from the black Range Rover.

18      Let's go to 361 Beach Park.  There was reported

19  missing there, along with the computer and some other items,

20  $1,000 in U.S. currency, which by my calculation brings the

21  total up to over $10,640 in United States currency which was

22  missing from the two residences and $2,000 of Taiwanese

23  currency, which was alleged to have been taken from 361

24  Beach Park.

25      I ask you to pay careful attention to the evidence,

26  and at the end of the case I will speak to you about the

1    meaning of that evidence in terms of the innocence of

2    Mr. Khuu.

3        Ms. Allhiser told you that there was a list found that

4    had a list of addresses, names of the apparent residences

5    and so on, all of which appear to be from Foster City, and

6    that there were two houses crossed off on that list, 361

7    Beach Park, 1295 Beach Park.  What wasn't mentioned was that

8    the address 57 Williams Lane is not in fact on that piece of

9    paper as one of the residences that -- well, it just was not

10   on that piece of paper.  Whatever the evidence might be as

11   to what that piece of paper means, the evidence will show --

12   of course, you will be able to see that piece of paper.  I

13   anticipate the address 57 Williams Lane is not on that piece

14   of paper.

15       So, this is a case -- well, there will also be perhaps

16   some evidence of fingerprints which were found that were

17   comparable.  The evidence will show that the way the police

18   try to develop fingerprints is, they go to a scene or they

19   take a piece of evidence, and they use a scientific process

20   to try to bring out fingerprints if in fact they exist.

21   They're not always able to recover fingerprints or partial

22   fingerprints, and sometimes when they are, what they're able

23   to recover is not enough of a print in order to do an

24   analysis of it.

25       I think there will be evidence, I submit, it's my

26   understanding of the case, that at least on a -- on at least

1    one item of evidence, I think it's the piece of paper that

2    counsel has referred to, some identifiable fingerprints were

3    developed.   There may be evidence that on another item of

4    evidence identifiable fingerprints were developed.

5        There will be no evidence that the fingerprints of Hoa

6    Khuu appeared on either one of those items, nor was there

7    any evidence that the fingerprints of Mr. Bui, the other

8    person who has been mentioned in the evidence, appeared on

9    that evidence.

10       . There will be evidence that the police observed on all

11   three residences, at 57 Williams Lane and 361 Beach Park and

12   1295 Beach Park, the point of entry, including damage done

13   at the point of entry which shows how the entry was made,

14   maybe perhaps by some sort of tool; however, there will be

15   no evidence in the case concerning a scientific examination

16   that was done of that to develop any tool mark

17   identification evidence to show exactly what tool was used,

18   to see whether or not some piece of evidence was found,

19   whether or not it was in fact the tool that made that mark

20   on the property.   Ladies and gentlemen, I don't think that

21   there is really any argument about that.   If there is, we

22   will hear it in a second from Ms. Allhiser.

23       This is what is called a circumstantial evidence

24   case.   I cannot argue that, but that is what it means.

25   There's no direct evidence.   There is only evidence of

26   circumstances from which the People will ask you to conclude

68

1    at the end of the case that the circumstantial evidence,

2    which of course you may consider, and you are required to

3    consider, and it is certainly admissible, lawful evidence,

4    that the circumstantial evidence proves guilt beyond a

5    reasonable doubt.

6         Ladies and gentlemen, I submit to you that at the

7    conclusion of the case, if you follow the rules of the Court

8    with regard to how you are to consider circumstantial

9    evidence in this case, and if you follow the instructions of

10   the Court with regard to your duty as jurors in this case,

11   you will come to the inescapable conclusion that the

12   evidence in this case does not prove guilt beyond a

13   reasonable doubt, and that there is a reasonable explanation

14   permitted by the circumstantial evidence that leads to the

15   conclusion of innocence of Mr. Khuu, which is a conclusion

16   under the law that you will be required to develop and to

17   vote upon and to return in your verdict.

18        Ladies and gentlemen, at the end of this case, we will

19   ask you to return a verdict of not guilty as to Mr. Khuu as

20   to each and every count in the charges against him.

21        Thank you very much.

22             THE COURT:  All right, ladies and gentlemen, we

23   now begin the evidence.

24        Ms. Allhiser.

25             MS. ALLHISER:  Tommy Hui.

26        Mr. Hui, would you come all the way forward, sir.

69

1  Will you stand, please, on the platform;  face the clerk.

2           THE CLERK:  Please raise your right hand.

3                       TOMMY HUI,

4  called as a witness by the People, after being first duly

5  sworn, was examined and testified as follows:

6           THE CLERK:  Thank you.  Please have a seat.

7        Please state and spell your name for the record.

8           THE WITNESS:  My name's Tommy Hui.  It's spelled

9  T-o-m-m-y; last name is Hui, H-u-i.

10                  DIRECT EXAMINATION

11  BY MS. ALLHISER:

12      Q    Thank you for waiting, sir.

13      What kind of work do you do?

14      A    I'm a software engineer.  I work in San

15  Francisco.

16      Q    In March, 2004, what was your family's residence

17  address?

18      A    57 Williams Lane in Foster City, California,

19  94004.

20      Q    That a single family, sir?

21      A    Yes, it is.

22      Q    On March 10th, 2004, in the noon hour --

23      A    Yes.

24      Q    -- do you remember that time?

25      A    Yes, I do.

26      Q    Where were you?

1      A      I was sitting at home working.  I had called in

2   sick earlier that day because I wasn't feeling well in the

3   morning, and I was sitting in the -- in our entertainment

4   room watching TV at that time.

5      Q      Did you expect anyone to visit you, sir?

6      A      No, I did not.

7      Q      Or a delivery?

8      A      No, not anything of that sort.

9      Q      Did you notice anything at your front door?

10     A      I didn't notice anything at my front door.  What

11  had actually happened is, if you look at the pictures in my

12  house, which is up here, I was sitting in the entertainment

13  room, which is the window right behind the window that you

14  see in the front, and that's the walkway to my front door.

15  I was sitting there, and the blinds were closed, but I had

16  heard someone walking by.

17             (People's Exhibit No. 1, Poster Board with

18              Photographs A through J, having been pre-marked

19              for Identification only.)

20             MS. ALLHISER:    Q     Let me ask you to do this,

21  sir.  This has been pre-marked as People's Exhibit 1 by the

22  clerk.  See the photographs are labeled A through J?

23     A      Yes.

24     Q      Were you referring to these photographs of the

25  exterior of your home, sir?

26     A      Yes, I am.  In particular in the picture marked

1    as B, if you see, there is the window right in the middle of

2    the picture, sitting in that room.

3       Q    I'm going to ask you to stand up, sir.  These

4    are paper copies.  Will you take my blue pen and make a big

5    circle around that window directly on the photograph B.

6       And you have written a circle around what happens to

7    be the center of the photograph, People's Exhibit 1B; is

8    that true?

9       A    Correct.

10      Q    Would you have a seat.

11      You heard someone walk by?

12      A    Yes.

13      Q    Could you tell how many people?

14      A    I heard only one set of footsteps.

15      Q    And then what?

16      A    And then at that point, about maybe a second or

17   two later, my doorbell rang.  And at that point, since I was

18   not expecting anyone, I decided -- and I didn't really feel

19   like answering the door at the time.  I did not answer the

20   door.

21      Q    How many times did the doorbell ring?

22      A    It rang probably around three or four times.

23   Someone was quite persistent, in the fact that it sounded

24   like someone was really trying to find out if we were home

25   or not.

26          MR. BELL:  Your Honor, excuse me.  I object and

72

1    move to strike that as not responsive and also calling for a

2    conclusion.

3            THE COURT:   Yes.   That last part about, ladies

4    and gentlemen, what it seemed to be like is stricken.   You

5    are admonished to disregard it.

6            MS. ALLHISER:      Q      Let me ask you to use

7    description, sir.

8        A    Okay.

9        Q    When the bell rings does it make a consistent

10   sound if you hold pressure against the bell?

11       A    No, it does not.   It only rings;  it goes

12   ding-dong.

13       Q    If you wanted the bell -- I'm asking about how

14   your bell works.   If you want the bell to ring over and over

15   and over again, how do you make it work?

16       A    You would have to press the bell multiple times.

17       Q    Okay.   Is that what happened that day?

18       A    Yes, it did.

19       Q    And in that time, did you stay in the

20   entertainment room?

21       A    For the most part I did, and at one point I had

22   actually gone behind the door, just kind of to kind of take

23   a peek a little bit, but I didn't really see the person at

24   all.   I just wanted to make sure they had gone away.

25       Q    When you took the peek, was the person gone?

26       A    Yes, they were.

73

```
1        Q     Could you see where the person went?
2        A     They must have gone out to --
3              MR. BELL:  Objection, Your Honor, to "must
4    have."
5              THE COURT:  Sustained.  Just answer the
6    question.  We'll start with yes or no.
7              THE WITNESS:  Okay.
8              MS. ALLHISER:     Q     Could you see where the
9    person went?
10       A     No, I did not.
11       Q     At this time frame, with the doorbell ringing,
12   did you notice any cars outside your place?
13       A     Actually, even before that, what had happened
14   was, as I heard someone walking by, I had taken a quick peek
15   just to see kind of who it was, whether I knew that person
16   or not.
17       Q     Mr. Hui, you speak very rapidly.
18       A     Sorry.  A little nervous here.
19       Q     Of course, I understand.  What happens is,
20   though, every single syllable gets written down.
21       A     Okay.
22       Q     And we need to slow the pace.
23       A     All right.
24       Q     When you first saw -- I'm sorry.  When you first
25   heard someone walking by, that's when you peeked outside?
26       A     Correct.
```

Kathryn M. Lezchuk, C.S.R. No. 2302

74

1     Q    What did you see?

2     A    What I saw was a black Range Rover parked

3 outside my driveway, parking space in the front of my house.

4     Q    At that moment could you see anyone inside the

5 Range Rover?

6     A    Yes, I did.  I saw the driver.  But it was more

7 of a glance of the driver, just to see if I had recognized

8 the car from previous, you know -- if it were someone I

9 know, but it was not.

10    Q    From what you knew of the car, the car was

11 unknown to you, sir?

12    A    Correct.

13    Q    And you couldn't tell who that person was?

14    A    Correct.

15    A    But one thing I did notice was the fact that,

16 you know, the car was parked a good six to seven feet away

17 from the curb, and it was not actually in my driveway or --

18 it was parked away from the curb, about six to seven feet

19 away.

20    Q    Now, when you saw the Range Rover, it was at

21 rest, sir?

22    A    Correct.

23    Q    You're talking about it being parked way far

24 from where it belongs?

25    A    Correct.

26    Q    When the bell ringing stopped, did you hear

1  someone walking away?

2      A      Yes, I did.

3      Q      Is that when you peeked to see if there was

4  someone at your door?

5      A      Yes.

6      Q      No one was there at that time?

7      A      Correct.  No one was there.

8      Q      Okay.  Now, you heard the person walking away.

9  Did you check at that moment to see the black Range Rover?

10     A      I did not see the black Range Rover, because I

11 was more glad that they were not at the door anymore.

12     Q      You did not look for it?

13     A      I did not look for it, no.

14     Q      What was the next event?

15     A      The next event that happened was, I thought,

16 okay, they were gone.  So at that point I went upstairs to

17 work on my computer.  And about -- I would say about three

18 or four minutes later, I started hearing noises on the side

19 of my house.  At first I thought it was the gardener

20 because, you know, usually we have a gardener comes by, and

21 I didn't think anything of it, but then I heard more metal

22 noises, and things sounded different and weird.

23     Q      When you heard the metal noises, sir, did you

24 remain upstairs?

25     A      I did.

26     Q      Could you look out anywhere to see where the

1   noise was coming from?

2        A    No.   But from the sound and so forth, I can kind

3   of figure it was from the side of the house.

4        Q    So the sound led you to believe that the noise

5   was at the side?

6        A    Correct.

7        Q    Not what you saw?

8        A    Correct.

9        Q    All right.   Then what?

10        A    Then what I thought was, let me just go and

11   investigate.   So I started walking down the stairs, and at

12   that point I was able to look outside the side of the house,

13   and, you know, we have a sliding-glass door.

14        Q    Is the sliding-glass door shown in one of the

15   photographs People's 1 for identification?

16        A    Yes, it is.   It's marked in the picture D, D as

17   in dog.

18        Q    And is what you're calling the side of the house

19   shown in the photograph C?

20        A    Yes, it is.   That's the gate that is -- that

21   leads to the side of the house, and so behind that gate is

22   actually the door that you see, the sliding-glass door in D.

23        Q    So the photograph People's Exhibit 1C, this

24   would be -- you see trees in the back.   That's your front?

25        A    No.   That's actually the back.

26        Q    I see.

77

1    A    The garbage can that you see out front, that's

2    actually the front of the house.  That leads to the front.

3    Q    But the sliding-glass door runs to the side of

4    the house as opposed to your front door, meaning right

5    angles?

6    A    Correct.

7    Q    Now, how close did you get to the side

8    sliding-glass door?

9    A    Towards the top of the stairs, and so it would

10    have been about maybe 15 feet or so.

11    Q    At that point, was there anything covering the

12    glass at the sliding door?

13    A    Yes, there was a very thin blind.

14    Q    Could you see anything?

15    A    What I saw was one person, what looked like

16    holding an instrument of some sort and trying to pry open

17    the side of the -- the sliding-glass door.

18    Q    Could you tell what that instrument was?

19    A    I mean, all I could see was the fact that it was

20    straight and thin, and the person appeared to have been

21    using two hands to apply force to it.

22    Q    So you're describing whoever that guy, man or

23    woman, person is, two hands on the tool?

24    A    Correct.

25    Q    Did you get any closer?

26    A    Everything happened so quickly, and I did not

78

1    get any closer when I realized what was going on; that was

2    someone trying to break in.  At that point I was yelling at

3    them, saying, Hey, what are you doing?  And then, so, as I

4    started to yell at the top of my voice to try to scare them

5    away, but in terms of what I saw, I saw, you know, that they

6    had heard me, and they decided to run at that point.

7           Q      Now, you used the word "they"?

8           A      Yes, correct.  There were two people.  One was

9    the person who was actually trying to pry open the door, and

10   there was another person standing right behind him.

11          Q      When you were looking through the sheer

12   curtains --

13          A      Yes.

14          Q      -- toward the glass, toward the outside of your

15   house, you saw two people?

16          A      Yes, I did.

17          Q      All right.  Could there have been three?

18          A      Not that I could have seen, no.

19          Q      Four?

20          A      No.

21          Q      Either one of those people, was there anything

22   about their appearance that made you think, Oh, I know that

23   guy?

24          A      No.  They were -- as far as I knew, they were

25   complete strangers.  I had never seen them before; and as

26   far as I know, they had no reason to be there.


Kathryn M. Lezchuk, C.S.R. No. 2302

1       Q       As far as you could judge, what was the age of

2   these persons?

3       A       I couldn't really be from behind the curtains.

4   They appeared to be younger.  I mean, it's not someone I

5   would say is older than 40, for example.

6       Q       Could you tell from what you could see if it was

7   a man or a woman?

8       A       From what I could see, they were male.  I mean,

9   I took a very quick, brief glance at them.  But it was

10  definitely male.

11      Q       Did you notice anything about the height or

12  build of either man?

13      A       They were -- they appeared to be around my

14  height, which is around five-ten.  They appeared to be

15  darker-skinned.  At first I thought they were Latinos, and

16  that's what I told the police officers, but they -- but that

17  was just very -- you know, that's my opinion about it.

18      Q       When you say that you are five-ten, sir, did you

19  ever stand at a level ground with those two guys in your --

20  in other words, I'm talking --

21      A       No.

22      Q       -- in your house?

23      A       Because at the top of the stairs from what I

24  could see I was at a different angle, so I was never on a

25  same level with them.

26      Q       Okay.  You were looking down?

1      A      Yes.

2      Q      Okay.  Now, you say darker skin, might have been

3  Latino?

4      A      Correct.

5      Q      Are you unsure?

6      A      I was unsure, but I was only sure of the fact

7  that they had darker skin.

8      Q      Did you notice clothing, sir?

9      A      Yes, I did.  One person was wearing a very dark,

10  heavy coat.  And then also wearing blue jeans.  And another

11  person, the person behind, appeared to have dark, almost

12  like a ski mask, but it was rolled up to the top of the

13  head.

14      Q      So although you say "ski mask," the face was not

15  covered?

16      A      The face was not covered, correct.

17      Q      More like, I guess, you would say, a beanie

18  maybe?

19      A      I don't know how to best describe it, but I

20  guess it's kind of like a yarn -- made out of yarn almost

21  and rolled up.  I don't know how to best describe it.  I

22  don't know what it's call exactly.

23      Q      Did you notice anything about the coloring of

24  either man's clothes?

25      A      The only thing I remember distinctly was the

26  color of the jacket was dark, like a black, and it was blue

81

1    jeans, and the cap was also a dark color.

2        Q    Okay.  When you were yelling, you were cursing

3    at them?

4        A    Yes.

5        Q    You were yelling loud?

6        A    Yes.

7        Q    Could you see their reaction?

8        A    Other than the fact that they ran away, I did

9    not see any facial changes or anything like that, no.

10       Q    When you say "they ran away," was it the two

11   together or separate?

12       A    They ran together.  As soon as I started

13   yelling, they both ran; and from what I could see, they ran

14   toward -- they ran through the gate.  They ran through the

15   gate, and that's where they went.

16       Q    After that moment, did you see either person in

17   your yard or near your house?

18       A    No.  Because it took me a while to actually open

19   the sliding-glass door, because we do have -- not only is it

20   locked on the side, but there's also another kind of lock on

21   the bottom of the sliding-glass door, as well, so it took me

22   a while to run after that.  By the time I had actually

23   gotten out there, they were already gone.

24       Q    When you got out there, did you go out to the

25   public street?

26       A    Yes, I did.

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Q    Did you see the black Range Rover?

2    A    No, I did not.

3    Q    Did you consider the timing between when you had

4  first seen the black Range Rover and the noises at the door?

5    A    So --

6        MR. BELL:  Your Honor, I'm going to object that

7  that question as vague, "did he consider the timing."  If

8  she's asking how much time elapsed, that's a different

9  question.

10        THE COURT:  Sustained.

11        MS. ALLHISER:    Q    When you noticed the

12  black Range Rover kind of in the middle of the street and

13  until the doorbell rang, how long?

14    A    Okay.  Let me see if I understand that question.

15    Q    I'm going to the beginning.

16    A    Okay.  So when I first saw the car and how long

17  between seeing the car and doorbell?  It would have been,

18  like, maybe five seconds, because I heard the footsteps, I

19  peeked out, and then shortly after that the doorbell rang.

20    Q    From when you heard the person ringing the bell

21  but then walk away --

22    A    Uh-huh.

23    Q    -- peeked out, nobody's there?

24    A    Right.

25    Q    That point in time until you heard the

26  metal-on-metal sounds at your back door, how long?

83

1    A    Would have been, like, maybe three, four

2    minutes.

3        Q    And from that point until you actually got

4    yourself to the stairs and were looking down those 15 feet,

5    how long?

6        A    It took a while -- it took about maybe 20

7    seconds once I started hearing the noises for me to get up

8    there, because at first I thought it was the gardener, so I

9    didn't have anything to worry about, but then the noise

10   became more persistent, and that's when I started going --

11   started to look out on -- walk down the stairs and look.

12       Q    Let me bring you ahead again.  From the point at

13   which you were able to get your rear door opened, you had

14   one lock and the other lock, and you cleared it, and you're

15   outside?

16       A    Yes.

17       Q    From that moment in time until you got to a

18   point where you could see the front of your house, and by

19   that I mean the public street, how long?

20       A    Maybe 40 seconds.

21       Q    When you got out there, you're now at the public

22   street, could you see the black Range Rover even in the

23   distance?

24       A    No.

25       Q    It was gone?

26       A    It was gone.

84

1    Q     All right.  What about the two men?

2    A     The two men were also gone.  I could not see

3  them either.

4    Q     Did you look for someone running?

5    A     Yes, I did.  Our street is -- we live in a kind

6  of community area.  There's only one street in or out of

7  that, because we live in a kind of closed loop, so there's

8  only one street that goes into it, and we live kind of close

9  to that, I would say like maybe 400 or 500 feet away from

10 that entrance way, so I looked in that direction because

11 that's the only way anyone could have come in or out, and I

12 did not see anything.

13    Q     So you saw neither a man nor a Range Rover?

14    A     Correct.

15    Q     Did you then call the police?

16    A     I did.  At that point I -- you know, when I

17 first ran out, I was really angry about what had happened,

18 so I wanted to go out and confront; and then once I came

19 back to my senses, I thought, Okay.  Now I call the police.

20 So I went back inside, and I looked up the phone number of

21 the Foster City police and called them at that point.

22    Q     How do you know that it was a Range Rover?

23    A     When I looked outside the window, and I saw the

24 vehicle, it was at an angle where I could actually read the

25 letters "Range Rover" on the car.

26    Q     Sir, the police investigation -- as time is

85

1   going on here, the police investigation resulted in your

2   being asked to look at somebody, right?

3          A     Correct, yes.

4          Q     What were the circumstances?

5          A     Once I had called the police and the police

6   officer finally came by, I was asked to go look at suspects.

7          Q     How many?

8          A     There were two.  One was -- one was actually at

9   the police station, and that was the one that we saw first;

10  and the circumstances that were after that, Officer Sandri

11  gave me a ride and in the car he read me the normal

12  disclaimer of, you know, saying that just because the police

13  had someone in custody doesn't mean they're guilty and so

14  forth, and all I was asked to do was just see if I can

15  identify or recognize the person that they had.

16         Q     How much time had passed when you were taken to

17  the police station from when you had originally called the

18  police?

19         A     I would say about an hour and a half maybe or

20  so.

21         Q     And in that hour and a half, had you been

22  thinking about this?

23         A     I have, because if something like that usually

24  happens to you and you kind of not forget it, you kind of

25  think about other things that led up to that and so forth.

26  So, yes, I was thinking about it.

1      Q      When you got to the Foster City Police

2  Department you were shown a single person?

3      A      Correct.  There was a single person.

4      Q      Did you recognize him?

5      A      As I told the police officer then, I did not see

6  that person closely well enough to recognize the person.  I

7  could not positively identify the person, no.

8      Q      Let me ask it this way:  That single person at

9  the Foster City Police Department, how was that person,

10 then, clothed at the station?  Do you remember?

11     A      I do not recall, no.

12     Q      Did you see clothing that you thought looked

13 familiar or not familiar on the man at the police station?

14     A      The man at the police station, it did not look

15 familiar to me.

16     Q      How about the age of the man at the police

17 station, was it within the correct range?

18     A      It was in the correct range.  It was someone who

19 is younger, did not appear any older than 40.  It also

20 appeared to be someone of slender build as well, so it did

21 kind of look like it could have been the person.

22     Q      And how about the skin tone of the person you

23 saw at the police station?

24     A      It definitely was within the range.

25     Q      Later you saw a second person?

26     A      Correct.

87

1      Q       What were the circumstances?

2      A       The circumstances there was, we had driven away

3   from the police station, and they had a person near the

4   Albertsons plaza that is on Edgewater, and there was a

5   community area behind that, and they had the person there,

6   standing in the middle of the -- on the side of the street,

7   on the corner.

8      Q       When you saw that person, did you recognize him?

9      A       Well, I recognized the skin color.  It was

10   within the range, and the build and the height as well, but

11   the person who was there did not have the shirt on, and he

12   was wearing blue jeans.

13      Q       And was that significant to you?

14      A       It was significant only in that I recognized the

15   blue jeans in terms of the color and so forth and in terms

16   of, you know, the person was around the right height and the

17   right skin color and so forth, but as I told the officer

18   then, I did not see the face clearly, so I couldn't

19   positively identify the face, but I did recognize the

20   colors.

21      Q       I'm going to ask it this way, sir.

22      A       Okay.

23      Q       Obviously you're taking this seriously.  You

24   mentioned you're nervous today, but part of this is to try

25   to give your best answer.

26              Could you exclude the man that you saw at the Foster

88

1    City Police Department, could not have been one of the guys

2    at your door? Could you exclude him?

3        A    No, I could not.

4        Q    Could you exclude the man that you saw near

5    Albertsons at the community center?

6        A    No, I could not.

7        Q    In the course of the investigation -- let me ask

8    you to look at some pictures here.  People's Exhibit 1, the

9    photographs E through J, did you look at them before you

10   came to court?

11       A    Yes, I did.

12       Q    What is shown in E through J?

13       A    What is shown is my sliding-glass door on the

14   side of the house, and that's the point where they had tried

15   to come into the house.

16       Q    You see someone has added a ruler --

17       A    Yeah.

18       Q    -- to give a scale?

19       Is what appears to be a variation in the metal damage,

20   whatever, was that new?

21       A    That is correct.  That is new.

22       Q    So before this event, around noontime, March

23   10th, 2004, your metal door was -- sliding door was intact?

24       A    Correct.  Intact and without indents whatsoever.

25       Q    The indents, scrape marks, whatever, in E

26   through J, those are all new, sir?

Kathryn M. Lezchuk, C.S.R. No. 2302

1       A       Correct.

2       Q       Did you notice the police officer checking

3   something against those dents?

4       A       At which point?  At what point is that?

5       Q       Later on, in the course of investigation?

6       A       I did not actually see them doing it.

7       Q       That's fine.

8       A       Okay.

9       Q       That's fine.

10      When the sliding-glass door made that noise, you know,

11  you said it was a metal noise, can't be the gardener?

12      A       Right.

13      Q       Could you tell from the sound alone which door

14  it was?

15      A       Which door it was?  Yeah.  I mean, from the top

16  of the stairs I could have heard, and it did not come from

17  the front because there's -- you know, on the front of the

18  house is a wooden door; and if it were in the back sliding

19  -- back side of the house, I would not have been able to

20  hear it as clearly.

21      Q       So you're confident from the noise that it had

22  to be the rear sliding door?

23      A       The side sliding door.

24      Q       I'm sorry.  I keep saying that.  The side

25  sliding door?

26      A       Yes.

1      Q      Mr. Hui, did you have any valuable property

2  inside your house that day?

3      A      Yes.  I consider all my property valuable but,

4  yes, I would say yes.

5      Q      Something that could be converted to cash?

6      A      Sure.  I had --

7             THE COURT:  Hang on.  Are we going into a new

8  area?

9             MS. ALLHISER:  No.  I'm done.  That's my last

10  question.

11            THE COURT:  Okay.  I'm sorry.

12            THE WITNESS:  Yeah.  I have computers at home.

13  I have laptops.  My wife has jewelry.  You know, cameras,

14  electronic goods.

15            MS. ALLHISER:  Those are my questions, Your

16  Honor.

17            THE COURT:  Thank you.

18      Ladies and gentlemen, we will take our morning recess

19  at this point.  Remember the admonition.

20      (Brief recess.)

21            THE COURT:  Ladies and gentlemen, one of our

22  jurors asked a question.  I think you got a little confused

23  by my pretrial admonition.  Asked the bailiff, So, is it

24  okay if we talk about the case?  I said it 16 times.  You

25  may not talk about the case with each other or anyone else.

26      What I said in the pretrial admonition was you can