1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   CHRISTOPHER J. WEI, State Bar No. 78958
    Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
7   Telephone: (415) 703-5867
    Fax: (415) 703-1234
8   Email: Christopher.Wei@doj.ca.gov

9   Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14
    **HOA TRUNG KHUU,**                      C 07-6351 SI (pr)
15
                              Petitioner,    **EXHIBIT 9 (part 2)**
16
              **v.**
17
    **JOHN TILTON, CDCR Secretary,**
18
                              Respondent.
19

20

21

22

23

24

25

26

27

28

Exhibit 9 (part 2)                                    Khuu v. Tilton
                                                      C 07-6351 SI (pr)

# EXHIBIT 9 (part 2)

1    talk about it only when all 12 jurors are in the jury room

2    deliberating, after the arguments, after the instructions,

3    and we send you back to deliberate.  Okay.  Thanks.

4        All right.  Mr. Bell.

5            MR. BELL:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. BELL:

8        Q    Good morning, Mr. Hui.

9        A    Good morning.

10       Q    My name is Frank Bell.  I am the attorney for

11   Mr. Khuu, who is on trial here in this case.

12           You and I have never met before?

13       A    No.

14       Q    We've never even talked over the telephone?

15       A    Correct.

16       Q    I want you to know I am going to try to make

17   this as easy for you as possible.

18       A    Thank you.

19       Q    I hope you don't feel threatened by me in any

20   way.

21       A    No.

22       Q    I'm going to ask you some questions.  That is

23   simply part of my job as counsel in the case.

24       A    Okay.

25       Q    Now, I think -- in the beginning let's try to

26   deal with some sort of housekeeping issues.

1     A      Okay.

2            (People's Exhibit No. 2, Colored Neighborhood

3            Street Map, having been pre-marked for

4            Identification only.)

5            MR. BELL:    Q    I'm going to ask you to turn

6      around and look over your left shoulder at the map that's

7      pinned on the board behind you.   Do you see that?

8      A      The point -- which?

9      Q      First of all, you see it's there, correct?

10     A      Which figure are you referring to?

11     Q      The one that's marked with the purple card,

12     Exhibit 2, which is just a map of the area.   In a moment

13     I'll ask you some questions about it.

14     A      Are you referring to this?

15     Q      Correct.   I'm talking about the big map.

16     A      Yes, I do see the map.   I thought you meant a

17     specific point on the map.

18     Q      Do you think -- can you find your address on

19     that map pretty quickly, do you think, or do you want some

20     help in trying the locate it?

21     A      No.   I think I can find it.

22     Q      It's sort of -- it's actually circled, by

23     agreement with the prosecutor.

24     A      (Indicating.)

25     Q      Do you find it?

26     A      Uh-huh, yes, sir.

1       Q       That's 57 Williams, correct?

2       A       Yes.

3       Q       And there's a little circle around that area?

4       A       Yes.

5       Q       Now, you told the jury in your testimony before

6    that Williams Lane is actually -- it's a little loop that is

7    within an area called Williams Landing?

8       A       Correct.

9       Q       And you come off of Port Royal onto the

10   beginning of Williams Lane, correct?

11      A       Yes.   You're referring to this (indicating)?

12      Q       Yes.

13      A       Yes.

14      Q       And that's the only entrance and exit to that

15   development, correct?

16      A       Correct.   By vehicle, yes.

17      Q       Right.

18      A       As far as I know.

19      Q       Good.   I'm glad you make those distinctions.

20   It's important if I say something.   It is true it is the

21   only entrance and exit by vehicle?

22      A       Correct.

23      Q       Now, if you were coming in off of Port Royal on

24   Williams Lane, you would make a left turn to get to your

25   property, correct?

26      A       When you're coming in here, you have to make a

1    left, or you could make a roundabout way.

2         Q    Fair enough.  I can see why you're good at what

3    you do.  But the most direct route would be making a left

4    turn to get to 57 Williams?

5         A    Correct, yes.

6         Q    And there are four -- let's see how I would

7    describe them.  They're sort of -- these are townhouses that

8    are sort of grouped together?

9         A    Yes, correct.

10        Q    So 57 Williams is actually part of also three

11   other residences.  Are they sort of back-to-back or

12   connected in some way?

13        A    We do share one wall with one of our neighbors,

14   which is our garage against their garage, but that's the

15   only connection that we have.

16        Q    Okay.

17        A    If you're coming from the street, there's only

18   -- as you're driving by, you see our house.  As you can see

19   by a picture, it is in the front.

20        Q    Correct.  So there are three of these other

21   groups or maybe there are four.  Maybe you can tell better

22   from looking.  Between where you make the left turn onto the

23   loop and where your house is located, it is three or four of

24   those groups of townhouses?

25        A    There are two other ones before you get to ours,

26   but we are the third one, from this map.

95

1      Q     So the distance from 57 Williams to the

2    beginning of the loop of 57 Williams, that's around 150

3    feet, isn't it?

4      A     I never measured it exactly.  My wife and I walk

5    on it, but we don't know exactly how many feet they are.  It

6    doesn't take a long time if you're going by foot.

7      Q     Now, of course, another way you can go, you can

8    go all the way around the loop and go out and come back onto

9    Port Royal, correct?

10     A     Correct.

11     Q     All right.  Now, if you were driving past your

12   house, let's assume you're driving off of Port Royal, you

13   make a left turn onto Williams Lane?

14     A     Okay.

15     Q     You go maybe five or six houses, and it loops

16   around again.  So that if somebody was around the loop a

17   little bit, around the corner, you won't be able to see that

18   car from your residence?

19     A     I see what you're saying.  If I were outside of

20   my house, if I was looking right, that would be the

21   entranceway to our area.  If I were to look left, how far

22   could I see.  Is that ultimately what you're asking?

23     Q     Yes.

24     A     If I were to look left, we're kind of at the

25   corner, so we can see both directions fairly well.

26     Q     Right.

96

1      A      If there was a car parked there, I can see about

2   the same distance to the entrance, as well as what I can see

3   in that direction as well.

4      Q      Right.  You see about to the intersection of

5   where you make the left turn.  It's about 150 feet.  It

6   would be about the same if you were looking to your left?

7      A      Correct.

8      Q      And standing in front of your house, looking to

9   your right, to where Williams Lane comes in from Port Royal,

10  if a person made a right turn onto portion of Williams Lane?

11     A      I won't be able to see it.

12     Q      You wouldn't be able to see it?

13     A      Correct.

14     Q      Likewise, if a person was around the corner 150

15  feet to your left, you wouldn't be able to see the person

16  there either?

17     A      Yes.

18     Q      Now, correct me if I'm wrong, but I understand

19  that you only saw the vehicle you described as a Range Rover

20  one time, correct?

21     A      Correct.

22     Q      It was after you heard the footsteps, before you

23  heard the doorbell, you peeked out the window, and you saw

24  this black SUV you've described as a Range Rover, correct?

25     A      Correct.

26     Q      And would you say it was about a one-second

1    observation, if that?

2        A    No.  I would say it was a little longer than a

3    second.

4        Q    Can you tell me, was it more or less than five

5    seconds?

6        A    I would say it would be about five seconds, so

7    somewhere around there, because I was able to read the

8    back -- fact that it was a Range Rover on the back.

9        Q    All right.  Now, which direction on Port

10   Royal -- as you're standing in the front of your house,

11   looking out towards the street, which direction was the

12   vehicle facing?

13       A    It was facing towards the exit.  So, if I was

14   looking to the right, what I was looking at was actually the

15   passenger side.  I guess that's probably the best way to

16   describe.  I was looking at the passenger side, and it was

17   facing towards the exit.

18       Q    Passenger side would have been towards your

19   house?

20       A    Correct.

21       Q    But if the car was six feet out into the street?

22       A    Correct.

23       Q    Not next to the curb?

24       A    Correct.

25       Q    I know your testimony here today was that you

26   didn't see anyone in the vehicle?

98

1       A    No.  I did.

2       Q    Oh, you did see someone.  That's what I was

3   going to ask you about.

4       A    I did see someone in the vehicle.  I did see the

5   driver.

6       Q    Okay.  And you described that to the police that

7   you saw the driver of the vehicle in the vehicle?

8       A    Yes.

9       Q    Somebody in the driver's seat?

10      A    Correct, yes.

11      Q    Did you describe that person as a light-skinned

12  individual?  Do you remember that?

13      A    I would have described it to them when I was

14  talking to them on the phone at that time.  That's probably

15  when I had mentioned it to them.

16      Q    Well, during that, after you made the telephone

17  call and after some period of time expired, a Foster City

18  police officer came to your home?

19      A    Uh-huh.

20      Q    Matter of fact, you described part of that,

21  because they took you from your home down to the police

22  station to view a suspect, correct?

23      A    Correct.

24      Q    You remember that was an officer by the name of

25  Office Sandri?

26      A    Yes.

1    Q    Did you see Officer Sandri seated in the hallway
2    here this morning outside the courtroom?

3    A    I did see him, yes.

4    Q    Do you remember Officer Sandri asking you when
5    he came to the house to actually tell you what you had
6    observed?  He questioned you about your observations at that
7    time?

8    A    Yes.

9    Q    And at that time, you told him that you saw the
10   driver of the vehicle, and he was a light-skinned male?

11   A    Yes.

12   Q    Do you remember that?

13   A    Um-hmm.

14   Q    Now, let's go to the photographs that you've
15   identified there on the exhibit which is marked People's
16   Exhibit 1.

17   A    Okay.

18   Q    Those photographs you know were actually taken
19   yesterday; isn't that right?

20   A    From what I understand, some of them were taken
21   yesterday.

22   Q    The police came out to your house yesterday and
23   took those photographs?

24   A    Yes.

25   Q    I think in all fairness to you, you can't say
26   those are actually the photographs that were taken

1    yesterday, but you saw them there taking photographs

2    yesterday?

3        A    Yes, yes.

4        Q    Now, let me go to this black SUV that you

5    observed.  Are you familiar generally-speaking with a make

6    of vehicle called Land Rover?

7        A    Yes, somewhat.

8        Q    Okay.  You know that Land Rover makes several

9    models of SUV.  Would you agree with me with that?

10       A    Sure.

11       Q    Okay.  And one of those models of Land Rover is

12   a Range Rover?

13       A    Okay.

14       Q    Correct.  Would you agree with that?

15       A    If I were to recall right now, can I absolutely

16   hundred percent tell you yes, they do make one, I can't.

17       Q    That's fair.  I'm not asking you to agree with

18   me unless in fact you agree with me.

19       A    Okay.

20       Q    If you don't know, it's perfectly okay for you

21   to say, I don't know.

22       A    Okay.

23       Q    But let me go back a little bit.  Do you know

24   that there is a make of vehicle called Land Rover?

25       A    Yes, I do.

26       Q    Okay.  And do you agree that Range Rover is one

1    of the models of SUV made by Land Rover?

2        A    Okay.

3        Q    You said okay, but I don't want to put words in

4    your mouth unless you really know that from your own

5    personal experience.

6        A    I do not know that.

7        Q    Now, when you looked out in front of your house

8    and you saw that black vehicle, you saw the word "Rover" on

9    that vehicle, correct?

10       A    No.  I saw the whole, entire word.  It said

11   "Range Rover" in gold color.

12       Q    Would you have known the difference -- in gold

13   color?

14       A    Yes.

15       Q    Would you have known the difference immediately

16   if it had said Land Rover as opposed to Range Rover?  Would

17   that have made a difference to you?

18       A    I'm sorry.  Can you repeat the question.  I'm

19   not sure I understand it.

20       Q    Would you have been able to notice really the

21   difference between a car that said Land Rover as opposed to

22   one that said Range Rover on it?

23       A    Yes, I believe I would have.

24       Q    All right.  Now, I know that you saw enough of

25   either the -- and these letters, let me go back and strike

26   what I just sort of mumbled.

Kathryn M. Lezchuk, C.S.R. No. 2302

1    The letters that you saw were either on the front or

2  the back end of the vehicle, correct?

3    A    Correct.

4    Q    Which were they, the back or the front, if you

5  recall?

6    A    I recall it was the back side.

7    Q    Okay.  Now, when you called the police

8  department, you remember that you spoke to a woman there who

9  answered the phone at the Foster City Police Department?

10    A    Yes, I do.

11    Q    Now, you told her that you had seen a black

12  Range Rover, correct?

13    A    Correct.

14    Q    And you also told her that you felt that two men

15  had been trying to pry open your door?

16    A    Correct.

17    Q    You gave her a description of that?

18    A    Uh-huh.

19    Q    You did not give her any license plate number

20  connected with the Range Rover, did you?

21    A    Correct.  I did not see the license plate, and I

22  did not recall reading the letters off of it or the numbers.

23        MR. BELL:  Okay.  I have nothing further.  Thank

24  you very much.

25        THE WITNESS:  Okay.

26        THE COURT:  Anything?

1      MS. ALLHISER:  No, Your Honor.

2      THE COURT:  Okay.  You can step down.  Thank

3  you.

4      MS. ALLHISER:  May this witness be excused, Your

5  Honor?

6      MR. BELL:  Yes.

7      THE COURT:  May he be excused?

8      MR. BELL:  Yes.

9      THE COURT:  You are excused.

10     MS. ALLHISER:  Next witness, Your Honor?

11     THE COURT:  Yes.

12     MS. ALLHISER:  Bill Sandri.  Officer Sandri,

13  would you take the stand and be sworn.

14     THE CLERK:  Please raise your right hand.

15                  WILLIAM SANDRI,

16  called as a witness by the People, after being first duly

17  sworn, was examined and testified as follows:

18     THE CLERK:  Thank you.  Please have a seat.

19     Please state and spell your name for the record.

20     THE WITNESS:  William Sandri, S-a-n-d-r-i.

21     MS. ALLHISER:  May I proceed, Your Honor?

22     THE COURT:  Yes.  Don't wait for me.

23     MS. ALLHISER:  Okay.  Thank you.

24                  DIRECT EXAMINATION

25  BY MS. ALLHISER:

26     Q     How are you employed, sir?

104

1       A       I'm a police officer with the Foster City Police

2  Department.

3       Q       How long have you been a sworn peace officer?

4       A       Since October of 2003.

5       Q       How long with Foster City?

6       A       I've been with them since, for over a year.

7       Q       As a police officer, by March 10th, 2004, I

8  guess you'd been working about six months?

9       A       Approximately.

10       Q       Had you become familiar with the streets,

11  businesses in Foster City?

12       A       Yes.

13       Q       Is it part of your job as a patrol officer to

14  know where you are and where you are in relation to other

15  places in your town?

16       A       Yes.

17       Q       Why is that important?

18       A       So you know where you are and know where you're

19  going.

20       Q       If you receive a call to go to, say, you know, a

21  Shell Gas Station at a certain address, as a police officer

22  is it important to know how to get there the best way?

23       A       Yes.

24       Q       On March 10th, 2004, after twelve o'clock, were

25  you then on duty?

26       A       Yes.

105

1    Q    What type of assignment?

2    A    I was on patrol.

3    Q    Were you in a patrol car?

4    A    Yes.   In a marked patrol car.

5    Q    Does that say "police" on the doors?

6    A    Yes.

7    Q    And does it have emergency equipment?

8    A    Yes, it does.

9    Q    Describe.

10    A    It has red and blue lights on the top and

11   equipped with a siren.

12    Q    Were you personally in uniform?

13    A    Yes, I was.

14    Q    And did your uniform say "police," and did you

15   wear a badge?

16    A    Yes, I did.

17    Q    Were you able to communicate both with your

18   office, with communications and with other Foster City

19   police officers?

20    A    Yes, I could.

21    Q    How?

22    A    By my radio.

23    Q    Is the radio something in your car?

24    A    I have a radio on my person and in the car.

25    Q    So you literally wear it as part of your

26   uniform?

106

1       A       Yes, I do.

2       Q       At 12:43 on March 10th, 2004, did you receive a

3    call of an attempted burglary?

4       A       Yes, I did.

5       Q       Where was the call coming from?  What was the

6    source of the call?

7       A       The call came from dispatch, told me that an

8    attempted residential burglary at 57 Williams Lane had

9    occurred.

10      Q       At that moment, sir, you were in your car?

11      A       Yes.

12      Q       And at that moment, in terms of the geography of

13   Foster City, did you know where you were in relation to 57

14   Williams Lane?

15      A       Yes, I did.

16      Q       Where did you head?

17      A       I headed east on Beach Park Boulevard from Shell

18   Boulevard, heading towards Edgewater Boulevard.

19      Q       And in terms of your estimate of time, if you

20   had traveled to 57 Williams, meaning if you had completed

21   your route, how long would it have taken you to get to 57

22   Williams Lane?

23      A       Including traffic signs and lights, possibly

24   four to five minutes.

25      Q       As you were traveling, sir, were you traveling

26   at the speed zone, or were you going at a high rate?

Kathryn M. Lezchuk, C.S.R. No. 2302

1       A       I wasn't driving Code 3.

2       Q       What does that mean, "Code 3"?

3       A       I wasn't in an emergency -- I wasn't operating

4   the vehicle in an emergency status.   I was going around the

5   speed limit and obeying the rules of the road.

6       Q       If you had, from when you heard at 12:43, just

7   driven straight on in the most direct route, following the

8   speed limit, you could have been there in what, under five

9   minutes?

10      A       Yes.

11      Q       Did you get all the way to 57 Williams Lane?

12      A       No, I did not.

13      Q       As you were driving toward this call, 57

14  Williams Lane, had you had information, a description of a

15  person, persons or vehicle?

16      A       Yes, I did.

17      Q       Was that from your police communications center?

18      A       Yes, it was.

19      Q       What information had you been told when you were

20  heading for 57 Williams Lane?

21              MR. BELL:   Well, I think I object to this on

22  grounds of hearsay and relevance.   There is not an issue as

23  to whether he had a right to stop the vehicle, so I can't

24  see any relevance other than that.

25              THE COURT:   I can see the relevance.   What's the

26  hearsay?   Answer the hearsay objection.

1          MS. ALLHISER:  Answer to the hearsay, Your

2     Honor, it's not offered for the truth of the matter

3     asserted.  Rather, it explains this officer's state of mind,

4     his ability to perceive the area around him, how many people

5     he was looking for.  Whether he had, for example, been

6     looking for a red car, he would testify differently and say,

7     you know:  I saw this.  I went there.  This explains what he

8     was looking for, his heightened degree of attention and

9     explains his conduct.

10          MR. BELL:  I'll withdraw my objection.

11          THE COURT:  Okay.

12          MS. ALLHISER:      Q      What had you heard in

13     terms of suspect or vehicle description?

14     A      I was told the possible suspects would be two,

15     light-skinned males in a black Range Rover.

16     Q      Were you looking for such persons?

17     A      Yes, I was.

18     Q      Did you see something like that?

19     A      Yes, I did.

20     Q      How far were you, as best you can estimate, from

21     the black Range Rover when you first noticed it?

22     A      I was approximately 100 yards.

23     Q      And at that time, could you tell if the Range

24     Rover was in motion?

25     A      Yes, it was at the stop sign on Edgewater and

26     Port Royal.

1    Q    Did you take any action?

2    A    Yes, I did.

3    Q    What was that?

4    A    I pulled up behind the vehicle, provided the

5    license plate to dispatch over my radio, and then I was

6    still several cars -- about three cars behind it, and then I

7    followed it to initiate a traffic stop.

8    Q    I'm going to ask you, Officer Sandri to use some

9    color pens and mark on the exhibit, People's Exhibit 2 --

10   first, if you will stand up.  I will be very clear what I'm

11   asking for here.

12        People's Exhibit 2 appears to be a map of some city

13   streets, including the lagoon area of Foster City; is that

14   fair?

15   A    Yes.

16   Q    And have you looked at this before you came to

17   court today?

18   A    Yes.

19   Q    Does this fairly represent the layout of this

20   section of Foster City on March 10th, 2004?

21   A    Yes, it does.

22   Q    And from this map, I'm going to ask you to

23   follow sort of a color-coded system.  I am going to make you

24   blue.  Here is a blue pen; and on People's Exhibit 2, I'm

25   going to ask you to put your initials.  That would be -- you

26   use?

110

1      A    WS.

2      Q    Put WS at your location -- your location when

3  you first saw the Range Rover.  Mark it on the map.

4      A    I was at Jamaica and Port Royal.

5      Q    At Jamaica and Port Royal you've marked WS?

6      A    Yes.

7      Q    I am now going to ask you to use a fine black

8  pen, and I'm going to ask you to write in -- I know this is

9  small, but try, RR1 for Range Rover where you first saw it,

10  where it was.

11      Now, use words to describe the position RR1?

12      A    It was stopped facing eastbound on Port Royal at

13  the Edgewater intersection, attempting to turn left onto

14  Edgewater.

15      Q    If we're going to get directions, we better get

16  a north, so on People's Exhibit 2, would you indicate a

17  north with a directional arrow.

18      A    The map goes -- on this --

19      Q    You've indicated a black N with an arrow which

20  runs along the right column of the way we've laid out this

21  map; is that true?

22      A    Yes.

23      Q    Why don't you do one more thing.  Use your blue

24  pen and write your name, William Sandri, in the open white

25  space so we will remember who made these marks.

26      And in blue you have printed out William Sandri; is

111

1    that true?

2         A      Yes.

3         Q      On People's Exhibit 2 for identification, at the

4    position RR1 was the black Range Rover.   Did you ever see it

5    again?

6         A      Yes, I did.

7         Q      Where was it the next time you saw it?

8         A      It was in the Edgewater shopping center in front

9    of 901.

10        Q      Would you write in RR2 for the place that you

11   next saw the Range Rover.

12        Now, use words to describe why you couldn't see it

13   between RR1 and RR2?

14        A      I was several car lengths behind the Range

15   Rover, so after making a left turn, I had to wait for the

16   other vehicles to make the left turn or wherever they were

17   going onto Edgewater; and as I pulled out, I turned left,

18   heading north on Edgewater, and because of the red light,

19   the vehicle wasn't there.  I pulled in to search the

20   Edgewater center parking lot.

21        Q      What were the circumstances of your locating the

22   Range Rover at RR2?

23        A      When I was traveling in front of 901, the black

24   Range Rover passed me, and I recognized the license plates

25   and saw the two males inside of it.

26        Q      When had first noticed the license plate?

Kathryn M. Lezchuk, C.S.R. No. 2302

1    A    I first noticed the license plate when they were

2    at Port Royal/Edgewater.

3    Q    Did you call the license plate number in to your

4    communications center?

5    A    Yes, I did.

6    Q    Why?

7    A    To find out if the vehicle was stolen, also to

8    let them know that the vehicle I was following and planning

9    on stopping.

10    Q    When you called in the license plate number, did

11    you give them, as best you could, exactly what you were

12    looking at in terms of numbers and digits on that plate?

13    A    Yes, I did.

14    Q    In the parking lot at the point RR2, did you

15    lose sight of the Range Rover after that?

16    A    No, I did not.

17    Q    Where did you see the range water traveling --

18    Range Rover traveling after RR2?

19    A    It was traveling north in front of 901.  That's

20    why I made a quick U-turn and got right behind it.

21    Q    You passed it?

22    A    I passed it.  It was coming at me.  I drove by

23    it, and I spun around.

24    Q    Where was it coming from?

25    A    It was coming from south in the parking lot.

26    Q    What's there?

Kathryn M. Lezchuk, C.S.R. No. 2302

113

1      A      Shops, stores, Albertsons, large parking lot for

2   the shopping center.

3      Q      It was coming back toward you on Edgewater?

4      A      Inside the parking lot, it was heading north.

5      Q      The position where you saw RR2, where you picked

6   it up at RR2 --

7      A      Yes.

8      Q      -- could you use a thin, black line and show the

9   point of rest of the Range Rover?

10     A      Okay.

11     Q      And then mark RR2 -- I'm sorry, RR3 as the

12   point of rest.

13     Now, use words to describe what is at RR3.

14     A      RR3 is the north side of the parking lot where

15   some of the trucks go to unload for Albertsons.  It runs

16   back down to the lagoon and then ends there with no exit.

17     Q      How far were you from the Range Rover when it

18   stopped at RR3?

19     A      Possibly two car lengths.

20     Q      What obstructed your view of the Range Rover at

21   RR3 when it stopped?

22     A      There was -- I was directly behind it.

23     Q      No cars between you?

24     A      No cars between us.

25     Q      What point in time could you tell how many

26   people were inside the Range Rover?

Kathryn M. Lezchuk, C.S.R. No. 2302

114

1      A    I saw -- at RR2, I saw there was the two inside

2  there.  I clearly saw the two in the front; and, then, when

3  I was behind them, I saw the two bodies in the car.

4      Q    What did the people inside the car do at RR3

5  where it stopped?

6      A    The driver and the passenger exited the vehicle

7  and fled southbound along the boardwalk.

8      Q    Up to that time, up to RR3, had you done

9  anything to draw attention to yourself?

10     A    At RR2, after I turned around and got behind

11  them, I activated my red and blue lights.

12     Q    What did the Range Rover do in response from

13  RR2?

14     A    The vehicle accelerated rapidly down that back

15  alleyway into the lagoon, when it came to a stop.

16     Q    Officer Sandri, did you know there was no way

17  out at that point?

18     A    Yes, I did.

19     Q    At RR3, you were car-length's distance back.

20  Did you see people actually getting out of the car?

21     A    Yes, I did.

22     Q    At that moment, could you tell precisely how

23  many people got out?

24     A    Yes.

25     Q    How many?

26     A    Two.

1       Q       Where did they go?

2       A       They fled southbound along the lagoon on the

3   boardwalk.

4       Q       What's there at the boardwalk?

5       A       It goes up to businesses.  There's some tables,

6   restaurants along the waterway.

7       Q       Do you know a business called Portofino Grill?

8       A       Yes, I do.

9       Q       Did you see whether the two people from the

10  Range Rover were there?

11      A       I saw them flee in that direction.

12      Q       Now, did you stay in your car?

13      A       No, I did not.

14      Q       What did you do?

15      A       I got out and began pursuing them.

16      Q       And as you pursued on foot, did you make your

17  position known to any other police officer?

18      A       Yes, I did.

19      Q       Did you see any other police officers at that

20  moment?

21      A       No, I did not.

22      Q       Did you know if police officers were en route?

23      A       Yes, they were.

24      Q       Was there a point in time when you caught sight

25  -- they're on foot and you're on foot, when you caught sight

26  of the two from the Range Rover?

116

1      A      Yes, I did.

2      Q      Where were you when you caught sight of them?

3      A      When I exited the south entrance of the

4   Edgewater Plaza onto Port Royal.

5      Q      I'm going to ask you just to make two black Xs

6   to approximate the position where you could physically see

7   the two men on foot.

8      A      Where I was?

9      Q      I'm sorry.  I'm now trying to get their

10  positions; two black Xs for their position when you could

11  see them?

12     A      Okay.

13     Q      Now use words to describe what is at the two

14  black Xs.

15     A      They were at the far east side of Port Royal

16  right up against the lagoon, and the residence right behind

17  them was 1001 Monterey Ave.

18     Q      You hadn't seen the two on foot since they left

19  the Range Rover?

20     A      No.

21     Q      Why not?

22     A      They were a lot -- wearing a lot less gear than

23  I was.

24     Q      And how do you know it was the same two guys?

25     A      Because I recognized them from when they got out

26  of the vehicle.

1      Q    At the point with the two black Xs, how far were

2  you from them?

3      A    I was across the street approximately 15 yards.

4      Q    Were there any police officers with you?

5      A    No.

6      Q    Did any police officers come to help?

7      A    Yes, they did.

8      Q    A lot of them?

9      A    Right after this, one showed up immediately.

10     Q    Who was that?

11     A    That was Officer Mark lee.

12          MS. ALLHISER:  And would you have your seat,

13  sir.

14          THE COURT:  This might be a good breaking

15  point.

16          MS. ALLHISER:  It would, Your Honor.

17          THE COURT:  All right.  Ladies and gentlemen,

18  we'll take our noon recess until 1:30.  Please remember the

19  admonitions.

20              (Court stood in recess.)

21               ---o0o---

22

23

24

25

26

118

```
1   Afternoon session              Wednesday, September 1, 2004

2                        ---oOo---

3        (The following proceedings were held in open court,

4   out of the presence of the jury.)

5             THE COURT:  We're on the record outside the

6   presence of the jurors, and?

7             MR. BELL:  Your Honor, maybe I can start it.

8        I don't know if you noticed or not, but in reading the

9   Information to the jury, your clerk actually read a name

10  which was different than the name of the victim, but that

11  was by prearrangement, because Ms. Allhiser gave it, so I

12  thought maybe now we ought to put it on the record.

13            THE COURT:  Right now I've got a jury out there

14  waiting to get started.

15       I noticed that, and we need to do that sooner or

16  later.

17            MS. ALLHISER:  Unrelated, with the permission of

18  the Court and counsel, I have two civilian witnesses who

19  would be very brief.  I would like to stop the direct of

20  Sandri and put the civilians on.

21            MR. BELL:  No objection.

22            MS. ALLHISER:  Mary Elkington and John.

23            THE COURT:  Thanks.  Remind me at the end of the

24  day.

25       (The following proceedings were held in open court,

26  in the presence of the jury.)
```

Kathryn M. Lezchuk, C.S.R. No. 2302

119

1    THE COURT:  All right, ladies and gentlemen.
2    What we're going to do at this point, for scheduling
3    convenience of witnesses, we have a couple of civilian
4    witnesses who are not going to take very long, so we are
5    going to stop the officer's direct right now, put these two
6    witnesses on so they can get out of here, and we will bring
7    back the officer.
8    MS. ALLHISER:  I appreciate that, Your Honor.
9    Mary Elkington.  Ms. Elkington, will you walk to the
10   top of that platform where you see the microphone and stand
11   there, please.
12   THE CLERK:  Will you please raise your right
13   hand.
14                    MARY ELKINGTON,
15   called as a witness by the People, after being first duly
16   sworn, was examined and testified as follows:
17   THE CLERK:  Thank you.  Please have a seat.
18   Please state and spell your name for the record.
19   THE WITNESS:  My name is Mary Elkington,
20   E-l-k-i-n-g-t-o-n.
21                   DIRECT EXAMINATION
22   BY MS. ALLHISER:
23   Q    Ms. Elkington, I would like to ask you about --
24   well, it's a while ago now, about six months ago, March
25   10th, 2004.  And I'm asking about around one o'clock in the
26   afternoon.

Kathryn M. Lezchuk, C.S.R. No. 2302

120

1          Was there a time that you saw a stranger near your

2    house?

3          A     Yes, I did.

4          Q     Where did you notice the stranger?

5          A     When you're facing the house, it would be on the

6    left side, near the gate that goes into the back yard, right

7    in front of it, as a matter of fact.

8          Q     Was the stranger on your property or next to

9    your property?

10         A     Our property.

11         Q     And did you know this person?

12         A     No.

13         Q     What was the stranger doing?

14         A     Just standing there.

15         Q     Could you tell where he came from or why he was

16   there?

17         A     Huh-uh.

18         Q     No?

19         A     No.   I saw policemen at the beginning of the

20   court, and for a minute I thought he was a policeman and

21   then instantly realized he was not.

22         Q     He was not wearing, say, a delivery uniform or

23   anything like that?

24         A     Huh-uh.

25         Q     No?

26         A     No.   He had on khaki pants and a white T-shirt.

Kathryn M. Lezchuk, C.S.R. No. 2302

```
 1         Q     Now that person, how far were you from him when
 2    you first noticed him?
 3         A     I'm not very good at judging distance, but maybe
 4    25 -- 20 feet maybe.
 5         Q     Could you clearly see him?
 6         A     Yes.
 7         Q     Did you call yourself to his attention?
 8         A     Uh-huh.
 9         Q     Yes?
10         A     I said to him, What are you doing on our
11    property?
12         Q     Did the man reply?
13         A     No.
14         Q     Did he gesture?
15         A     Well, after that, he ran down the walkway, and
16    there's huge kind of trees and bushes there, and squatted
17    down behind one of the -- it's those oleanders, what they
18    call freeway trees, behind one of those; and at that point,
19    he was trying to peek through, and I realized then that
20    there were police at the end of the court, so I knew.  So I
21    just hollered at him again, "Get off our property," and he
22    turned to me, and he went like this at me.
23         Q     You just made a gesture.
24         A     Uh-huh.
25         Q     You raised your index finger?
26         A     He raised his index finger and put it over
```

Kathryn M. Lezchuk, C.S.R. No. 2302

1    his -- yeah.

2        Q     How did you interpret that gesture?

3        A     He wanted me to be quiet.

4        Q     What happened?

5        A     Within a couple of minutes, he jumped up and ran

6    around the other side of the house.  And we have a wall

7    behind our house which is between our house and Edgewater

8    Boulevard, and he must have gone over the wall, because

9    immediately I heard people screaming out on Edgewater, and I

10   was assuming it was the police were out there, too.

11       Q     Was there a time that you saw the police holding

12   someone?

13       A     No.

14       Q     You just heard this yelling or screaming?

15       A     Yeah.  And at first when I came outside I came

16   out to the front, I didn't realize what was going -- that

17   anything was going on except that I thought I heard a

18   scuffle next to our house or the yard, and I came out, and I

19   said to my husband, "What's the matter?  Is something going

20   on out here?"  And he says, "No."

21       Q     So that when you went out, the man was simply

22   standing there?

23       A     Uh-huh.

24       Q     Yes?

25       A     Uh-huh, yes.  I'm sorry.  Yes.

26       Q     Because we need to fix the location where you

1  saw this man, I need to ask your residence address.

2      A     500 Bristol Court in Foster City.

3      Q     And how far from your house to Edgewater Place,

4  the shopping center?

5      A     Well, it's out of the court and just into.  It

6  might be the distance of a half of a normal block.

7      Q     That man, had you ever seen him before?

8      A     No.

9      Q     Did a time come when your husband found

10  something and gave it to you to deliver?

11      A     Yes, he did.  The next day.

12      Q     What did your husband find?

13      A     He found two pieces of paper shoved under the --

14  I mentioned the bushes before that were up by the gate.  He

15  was starting to clean leaves out of there, and he found the

16  two pieces of paper under the bush there.

17      Q     Did your husband give you those pieces of paper?

18      A     Yeah.  Not right then.  He just said to me,

19  "Look what I found under the bush," and I just kind of half

20  looked, because I was doing something, and I said -- I

21  realized it was something.  I saw a list of names on the top

22  paper, and I said, "Oh, throw it on the work bench.  I'll

23  look at it later."  And he did, and I went back later in the

24  afternoon and picked them up and realized that they might be

25  something, and my neighbor came home, and I called her over.

26  And she said, "Gee, I think I would take those to the

124

1    police," and that's what I said I thought I was going to do

2    with them and subsequently did that day right away.

3         Q     As that happened, did you actually touch these

4    pieces of paper?

5         A     Yes.  Both of them.

6         Q     And did your neighbor lady touch those pieces of

7    paper?

8         A     Yes, she did.

9         Q     Did you deliver the originals of those pieces of

10   paper to the police?

11        A     Yes.

12                   (People's Exhibit No. 6, Copy of Interim

13                   Driver's License, having been pre-marked for

14                   Identification only.)

15        MS. ALLHISER:     Q     I'm going to show you

16   photocopies of something and ask you if you recognize this

17   as a copy of something you have seen.

18        Your Honor, pre-marked as People's Exhibit 6, what

19   appears to be a photocopy of something.  It's labeled

20   Interim Driver's License.

21        Do you see the photocopy?

22        A     Uh-huh, yes.

23        Q     And is that a copy of what you gave to the

24   police in this case?

25        A     Yes, it is.

26        Q     Okay.  And is that something you touched?

Kathryn M. Lezchuk, C.S.R. No. 2302

125

1       A       Yes.

2               (People's Exhibit No. 7, Two-page Copy of List

3               of Addresses, having been pre-marked for

4               Identification only.)

5       MS. ALLHISER:    Q    I'm asking you now to

6   look at what has been pre-marked as People's Exhibit 7.  As

7   you can see, it's stapled together, front and back.  Do you

8   recognize that as something that you originally saw that

9   your husband gave you?

10      A       Yes, it is.

11      Q       How do you remember?

12      A       Well, I instinctively -- when I saw the street

13  names and the telephone numbers and all, because by that

14  time I knew that these people had been trying to burgle

15  houses --

16      Q       Had you added anything in handwriting?

17              MR. BELL:  I have to move to strike that last

18  remark as being a conclusion and unsupported by evidence.

19              MS. ALLHISER:  Unsupported by evidence?

20              MR. BELL:  Yes.  Unsupported by any evidence

21  that these people had been burglarizing houses.  There is no

22  evidence at this point.

23              THE COURT:  I don't even know who these people

24  are, so sustained.

25          Stricken, ladies and gentlemen.  You are admonished to

26  disregard it.

Kathryn M. Lezchuk, C.S.R. No. 2302

126

1          MS. ALLHISER:     Q      Did you add anything

2   in handwriting or typewriting to that 8-and-a-half-by-11

3   piece of paper?

4          A     No, I did not, no.

5          Q     To your knowledge did anyone else?

6          A     No.   Because I took them straight to the police

7   department.  We never saw them or touched them again.

8          Q     So you didn't add anything to the paper?

9          A     No.

10         Q     Other than touching it?

11         A     That's right.

12         Q     And as part of the investigation, did you allow

13  your fingerprints to be taken by the police?

14         A     Yes.   Multiple times.

15         MS. ALLHISER:   These are my questions, Your

16  Honor.

17         MR. BELL:   I have no questions.   Thank you.

18         THE COURT:  Okay.  May this witness be excused?

19         MR. BELL:   Yes.

20         THE COURT:  You're excused.   Thank you.

21         THE WITNESS:   Thank you.

22         MS. ALLHISER:  John Elkington.

23     Mr. Elkington, would you walk to the platform and

24  stand on top of the platform next to the microphone.   To

25  your right, sir.  If you will go to your right.

26         THE CLERK:  Please raise your right hand.

Kathryn M. Lezchuk, C.S.R. No. 2302

127

1                          JOHN ELKINGTON,

2    called as a witness by the People, after being first duly

3    sworn, was examined and testified as follows:

4                   THE CLERK:  Thank you.  Please have a seat.

5         Please state and spell your name for the record.

6                   THE WITNESS:  John Elkington.

7                   THE CLERK:  Can you please that, please.

8                   THE WITNESS:  E-l-k-i-n-g-t-o-n.

9                        DIRECT EXAMINATION

10   BY MS. ALLHISER:

11        Q     Mr. Elkington, are you now employed?

12        A     No, I'm not.  Retired.

13        Q     Are you retired, sir?

14        A     Yeah.

15        Q     I would like to ask you about March 10th,

16   2004 --

17        A     Uh-huh.

18        Q     -- and something which you found near your

19   place.

20        A     Yes.

21        Q     Would you explain?

22        A     It's a piece of paper with names and addresses

23   of the Asian people and a temporary license.

24        Q     Where did you first see those objects, sir?

25        A     I was out picking up leaves one day, and I saw

26   it when I was picking up the leaves by the corner of the

1    house next to my next-door neighbors, and I picked them up,

2    looked at them.   I was wondering what they were first.   I

3    figured I better hold onto them and then finally approached

4    the police with them, and they were very glad to get them.

5         Q     Did you touch these papers with your bare hands?

6         A     Yes, I did.   I picked them up from the outside.

7         Q     Sir, I would like to show you some photocopies

8    and ask if you had seen the originals.

9         Sir, this is marked People's Exhibit 6.   Obviously it

10    is a copy of something.   Did you see the original of that?

11        A     Yes, I did.

12        Q     Is that one of the pieces of paper that you

13    found near your property?

14        A     Yes.

15        Q     And turned over to the police?

16        A     Uh-huh, yes.

17        Q     This now, sir, is obviously a photocopy, front

18    and back, so it's two pages.   Did you see the original of

19    that piece of paper?

20        A     Yes, I did.

21        Q     And how do you recall it?

22        A     Well, I just found it, yeah.   Just found it on

23    the ground.

24        Q     Did you or anyone, to your knowledge, add any

25    handwriting to the original of that list?

26        A     No, no.   Just handed it over to the police.

1        Q    Or typewriting, did you add anything?

2        A    No.  We didn't add anything, no.

3        Q    Other than touching it, you did nothing to

4    change it?

5        A    Nothing to change it.

6             MS. ALLHISER:  Those are my questions.

7             MR. BELL:  I have no questions, Your Honor.

8             THE COURT:  May the witness be excused?

9             MR. BELL:  Yes.

10            MS. ALLHISER:  Yes, Your Honor.

11            THE COURT:  All right.  You are excused, sir.

12   Thank you.

13            MS. ALLHISER:  Your Honor, I would like to go

14   back to Bill Sandri.

15                     WILLIAM SANDRI,

16   having been previously duly sworn, resumed the stand and

17   testified further as follows:

18            THE COURT:  And we're still on direct.

19            MS. ALLHISER:  Yes, sir.

20        Officer Sandri, would you take the stand.

21               DIRECT EXAMINATION (Continued)

22   BY MS. ALLHISER:

23        Q    Officer Sandri, we are resuming where we broke

24   at noontime, and I would like to bring you up to that point

25   in time, then go forward.

26        On People's Exhibit 2 for identification, the last

Kathryn M. Lezchuk, C.S.R. No. 2302

130

```
 1   thing you marked were two black Xs at one border of

 2   Edgewater Place; is that true?

 3        A    That's correct.

 4        Q    And the closest residence address to those two

 5   black Xs, what is that?

 6        A    1001 Monterey.

 7        Q    When you last saw the two men from the black

 8   Range Rover, were they physically close to each other, or

 9   were they separated?

10        A    They were physically close to each other.

11        Q    How close?

12        A    Within five or six feet of each other.

13        Q    At that moment, were you sure it was the same

14   two men from the Range Rover?

15        A    Yes, I was.

16        Q    Positive?

17        A    Yes.

18        Q    What did you see either of the men do?  Describe

19   one, and then I'll ask for the other.

20        A    They were both -- seemed like they were bent

21   over, breathing heavily, resting.

22        Q    Near the wall?

23        A    Yes.

24        Q    And then what?

25        A    And then I identified myself as a police officer

26   and ordered them to get on the ground.
```

Kathryn M. Lezchuk, C.S.R. No. 2302

1     Q     Were you loud?

2     A     Yes, I was.

3     Q     What did they do?

4     A     Both of them hopped the fence into the back yard

5   of 1001 Monterey, different sections of it.

6     Q     How tall is that fence?

7     A     Fence is approximately maybe five and a half

8   feet.  I'm not positive.

9     Q     What did you do, sir?

10     A     At that point Officer Lee arrived on scene, and

11   he and I both began going into the back yard of 1001

12   Monterey.

13     Q     Did you request additional help from other

14   police officers to close off the area?

15     A     Yes.  Other units were responding at that point

16   as well.

17     Q     Did you personally locate -- I mean hands on,

18   did you personally locate either of those men that

19   afternoon?

20     A     No, I did not.

21     Q     Did you later that same day, in the course of

22   the day, see either of the men?

23     A     Yes, I did.

24     Q     Did you see both of them?

25     A     Yes, I did.

26     Q     Where did you see them?

1      A     After they were in custody.

2      Q     Do you see a man in court today who had been in

3 the Range Rover, the one who jumped the fence at 1001

4 Monterey?

5      A     Yes, I do.

6      Q     Where is he seated; what is he wearing?

7      A     He's seated over there in the gray shirt and the

8 black pants.

9      MS. ALLHISER:  Would the record reflect the

10 witness has identified the defendant Khuu?

11      THE COURT:  Yes.

12      MS. ALLHISER:    Q    When you saw Mr. Khuu,

13 he was already at the police station?

14      A     No.  I saw him in front of the residence where

15 they took him into custody.

16      Q     Ah, okay.  You weren't the one who found him?

17      A     No, I was not.

18      Q     The other person from the Range Rover, do you

19 now know his name?

20      A     Yes, I do.

21      Q     What is his name?

22      A     His name is Ryan Bui.

23      Q     Can you spell it?

24      A     Last name is B-u-i.

25      Q     First name Ryan?

26      A     It is Ryan, yes.

1      Q      That day, to your knowledge, was Mr. Hoa Khuu

2  taken and booked into County Jail?

3      A      Yes, he was.

4            MS. ALLHISER:   Your Honor, I ask the Court to

5  receive as People's next in order, certified record from San

6  Mateo County Sheriff's Office, a booking photo of Hoa Trung

7  Khuu, booking date March 10th, 2004.  I have shown this to

8  counsel.

9            MR. BELL:  No objection.

10            THE CLERK:  Marking People's Exhibit 8.

11            (People's Exhibit No. 8, Copy of Booking

12            Photograph of Khuu, marked for Identification

13            only.)

14            MS. ALLHISER:     Q      Officer Sandri, I

15  would like to show you People's Exhibit 8.  You see a

16  photograph of a person, sort of shoulders up.

17      Do you recognize that person?

18      A      Yes, I do.

19      Q      Who is it?

20      A      It's that person seated right over there.

21      Q      In the gray shirt?

22      A      Yes.

23      Q      Is this a fair representation of the way he

24  looked when you saw him after he'd been arrested in Foster

25  City?

26      A      Yes.

134

1      Q      Officer Sandri, I would like to ask you about

2   some photographs which were prepared for this trial

3   concerning what you saw on March 10th, 2004, when you were

4   looking for the Range Rover and then you were looking for

5   the two men.

6      A      Okay.

7             (People's Exhibit No. 3, Poster Board with

8              Photographs A through L, having been pre-marked

9              for Identification only.)

10            MS. ALLHISER:    Q      Referring you to People's

11   Exhibit 3 for identification, have you examined those

12   photographs before you came to court?

13     A      Yes, I did.

14     Q      Those photographs are A through L.  What I'm

15   going to ask you to do, sir, is please stand, keep your

16   voice loud, all right, and I'm going to ask you photo by

17   photo, what does this photo represent, but, first, are these

18   photographs, even though taken a different day, a fair

19   representation of the streets and buildings generally as

20   they appeared on March 10th, 2004?

21     A      Yes.

22     Q      Asking you now about People's Exhibit 3, the

23   photograph A.  Were you present when it was taken?

24     A      Yes, I was.

25     Q      And all of them, A through L?

26     A      Yes.

135

1    Q    What is the photograph A?

2    A    Photograph A is when I came down Jamaica and

3    stopped at Port Royal and when I could see the suspect

4    vehicle to my left.  That was the intersection of where I

5    first stopped.

6    Q    You were at the stop sign, then, looking toward

7    the background of the picture; is that fair?

8    A    Looking towards the left of the picture.

9    Q    To the left.

10    What is the photograph B?

11    A    Photograph B is a view, if you look left from

12    the stop sign, that's looking down Edgewater -- looking down

13    Port Royal towards Edgewater Boulevard.

14    Q    And do you see the location the same as RR1 that

15    you had marked on the map People's Exhibit 2 where you first

16    saw the Range Rover?

17    A    Yes, I do.

18    Q    Describe it in words.

19    A    It's off in the distance.  You can see the stop

20    sign, and it was right near that stop sign.

21    Q    I'm going to give you a black felt pen; and on

22    People's Exhibit 3 for identification B, circle the stop

23    sign where you first saw the Range Rover?

24    Now, describe in distance, what does that show from

25    what you saw from -- from the distance of that stop sign, is

26    that a mile, is it a block, what is it?

Kathryn M. Lezchuk, C.S.R. No. 2302

1    A    I would say it's 100 yards.

2    Q    What is photograph C?

3    A    Photograph C is a picture of the intersection

4  where the vehicle was stopped when I saw it, Port Royal and

5  Edgewater Boulevard.  They were attempting to make a left

6  and head that way.

7    Q    Head to their left, which would be a what?

8    A    Northbound.

9    Q    Northbound?

10    A    Yes.

11    Q    What is photograph D?

12    A    Photograph D is the entrance into Edgewater

13  Plaza where I turned in after I didn't see them at the stop

14  light.

15    Q    How far had the Range Rover traveled from that

16  location, Edgewater and Port Royal, to the place where you

17  turned into the shopping center shown in D?

18    A    That would -- 100 yards, if that.

19    Q    You couldn't see the black Range Rover?

20    A    No.  Because I was two vehicles back from it,

21  after it made the turn, I have to wait to go, too.  I lost

22  sight of it then.

23    Q    What is the photograph People's E for

24  identification?

25    A    Photograph E is the north alleyway that the

26  vehicle sped down after I activated my red and blue

Kathryn M. Lezchuk, C.S.R. No. 2302

137

1  emergency lights.

2      Q     Is that the same as RR2 that you marked on the

3  map, People's Exhibit 2?

4      A     RR2 would be right in front of there.

5      Q     Okay.  Why don't you mark RR2 on the photograph

6  D.

7      That place where you saw the license plate, could

8  read the license plate, does that show up on any of these

9  pictures?

10     A     It's right in here.  I pulled in here and made a

11 left in that part of the parking lot.  I made a U-turn to

12 come back the other way, and that's when the black Range

13 Rover passed me, made a right down that same alley past me,

14 and I saw the front license plate and the two men in the

15 front seat.

16     Q     You have then described People's Exhibit 3, the

17 photograph D.  That's where you made your U-turn and saw the

18 plate?

19     A     Yes.

20     Q     Okay.  What is the photograph E?

21     A     That's after I activated my red and blue lights,

22 this is the alleyway that they went down, the north alley,

23 sped down that way.

24     Q     And as they sped into sort of the background of

25 the picture, how far behind were you?

26     A     I was close behind, a couple car lengths.

138

1      Q      Did you have your lights on?

2      A      Yes, I did.

3      Q      Red and blue?

4      A      Red and blue rotators.

5      Q      What is in photograph F?

6      A      This is where the Range Rover came to rest down

7    here at the bottom where there is no outlet.

8      Q      Will you mark in approximately the location

9    where the Range Rover came to rest, mark it RR3?

10      At People's Exhibit 3 next in order, which is G, what

11    happened there?

12      A      That's the way they began running.  You can see

13    the boardwalk begin here, and that's where both subjects

14    took off running.

15      Q      And G is part of that boardwalk?

16      A      Yes, it is.

17      Q      What is H?

18      A      H is a continuation of the path that I took.  It

19    goes out along the water again.

20      Q      Do you recognize the building in the photograph

21    People's Exhibit 3H?

22      A      H?  Yes, I do.

23      Q      What is that?

24      A      It's Portofino restaurant.

25      Q      When you were chasing, when you were at that

26    area, the Portofino restaurant, could you see the two men?

139

1    A    No, I could not.

2    Q    How did you know where to go?

3    A    There's only one way to go along the boardwalk

4    there, and people were yelling, "They went that way."

5    Q    Citizens?

6    A    Yes.

7    Q    What is in the photograph I?

8    A    This is another portion of the boardwalk,

9    coming up near Chevy's, the restaurant on the other end of

10    Edgewater Place.

11    Q    And at Chevy's, could you see the two men?

12    A    No, I could not.

13    Q    Were there any indications where they had gone?

14    Could you hear them?

15    A    There were several other people saying, "They

16    went that way."  I didn't see them in the restaurant, so I

17    continued to run around on the boardwalk.

18    Q    And next the photograph I -- I'm sorry, J.

19    A    This is just another portion of Chili's.  This

20    is where the boardwalk ends, and it goes out back to the

21    south exit of the parking lot.

22    Q    What's the name of the restaurant?

23    A    Sorry.  Chevy's.

24    Q    Chevy's.  And then what?  What is K?

25    A    This is the exit, the south exit.  This is where

26    I came out.  I exited.  I saw the two subjects over on the

Kathryn M. Lezchuk, C.S.R. No. 2302

1    other side on the curb there, bent over breathing.

2         Q    Will you mark on People's Exhibit 3 for

3    identification K with two black Xs their approximate

4    location.

5         And what is the photograph People's Exhibit 3K?

6         A    That's the portion of the wall where they jumped

7    over, hopped the wall.

8         Q    And if you can approximate it, put the two black

9    Xs on photograph L as well.

10        At People's Exhibit 3L, could you see over the fence?

11        A    I couldn't get a clear view over the fence.

12        Q    Could you hear what was happening on the other

13   side of the fence?

14        A    No, I couldn't.

15        Q    Would you have your seat again.

16        How did the search progress?

17        A    Officer Lee and I went into the back yards of

18   1001 Monterey.  At that point other units were arriving.

19   Officer Lee began a foot pursuit of one of the suspects, and

20   I was told to set up a perimeter.

21        Q    What is a perimeter?

22        A    An area to keep -- so the suspects wouldn't be

23   able to get out.

24                (People's Exhibit No. 4, Enlargement map of

25                Neighborhood #8 on Exhibit 2, having been

26                pre-marked for Identification only.)

Kathryn M. Lezchuk, C.S.R. No. 2302

1          MS. ALLHISER:    Q    All right.  Officer, I am

2   going to show you an enlarged map.  It's Foster City, but

3   it's much closer and broader, I should say, in detail.

4          Have you looked at another enlarged map before you

5   came to court?

6          A    Yes, I did.

7          Q    Previously marked for identification as People's

8   Exhibit 4, this appears to be a smaller section, a smaller

9   number of blocks than is represented in People's Exhibit 2;

10  is that true?

11         A    Yes.

12         Q    And do you see Edgewater Place, the shopping

13  center?

14         A    Yes, I do.

15         Q    Can you use the black pen to approximate on this

16  more enlarged version the position RR3 where the Range Rover

17  came to a rest and you started running?

18         A    Yes.

19         Q    From RR3 along what looks to be a blue pathway,

20  is that the lagoon?

21         A    Lagoon.  This is the lagoon along there.

22         Q    Write in the word "lagoon," right in the middle

23  of it.

24         And now can you, on People's Exhibit 4 for

25  identification, mark with two black Xs that wall or fence

26  that the two men jumped.

142

1    And you have now marked on People's Exhibit 4 at what

2   place?  Use words to describe.

3        A    On the north side of 1001 Monterey Ave.

4        Q    Can you from the map show us 500 Bristol?

5        A    500 Bristol is right here.

6        Q    Will you make a block around the number 500.

7   Thank you.  And if you would have your seat.

8   Do you remember the Range Rover?

9        A    Yes, I do.

10              (People's Exhibit No. 5, Poster Board with

11              Photographs A through J, having been pre-marked

12              for Identification only.)

13          MS. ALLHISER:  Your Honor, People's Exhibit next

14  in order, People's Exhibit 5, previously marked, photographs

15  A through J.

16       Q    I think I will have you stand up.

17  People's Exhibit 5, A through J, did you look at those

18  pictures before you came to court?

19       A    Yes, I did.

20       Q    What is the vehicle -- the black vehicle shown

21  in photograph A?

22       A    It's the suspect vehicle that I attempted to

23  stop.

24       Q    Can you from the photograph read the license

25  plate number?

26       A    Yes, I can.

Kathryn M. Lezchuk, C.S.R. No. 2302

143

| | | |
|---|---|---|
| 1 | Q | I would like you to read it slowly. |
| 2 | A | 42225NY. |
| 3 | Q | Is that the license plate that you called out to |

the Foster City police when you saw it in the parking lot?

| 5 | A | Yes, it is. |
| 6 | Q | The photographs B and C, are they the same car? |
| 7 | A | Yes, it is. |
| 8 | Q | Did you take any personal role in searching the |

contents of the black Range Rover?

| 10 | A | No, I did not. |
| 11 | Q | To your knowledge, were other people assigned to |

that duty?

| 13 | A | Yes, they were. |
| 14 | Q | Foster City officers? |
| 15 | A | Yes.  Our Community Service Officers. |
| 16 | Q | When you last saw the black Range Rover there at |

the Albertsons lot, was it at rest or was the motor running?

| 18 | A | I believe it was at rest. |
| 19 | Q | As far as you know -- |
| 20 | A | As far as I know. |
| 21 | Q | -- the engine is off? |
| 22 | A | Yes. |
| 23 | Q | Would you have your seat again. |

As part of your duties, did you investigate the
complaint of an attempted burglary at 57 Williams Lane?

| 26 | A | Yes, I did. |

Kathryn M. Lezchuk, C.S.R. No. 2302

1       Q     Did you personally go to 57 Williams Lane?

2       A     Yes, I did.

3       Q     Did you meet with the resident?

4       A     Yes, I did.

5       Q     Was it the same day or later?

6       A     It was the same day.

7       Q     Same afternoon?

8       A     Yes.

9       Q     Did you look for evidence of damage, possible

10  point of entry?

11      A     Yes, I did.

12      Q     Did you find something?

13      A     Yes, I did.

14      Q     What was that?

15      A     Pry marks on one of the rear sliding-glass

16  doors.

17      Q     Officer, would you stand again.

18      People's Exhibit 1 for identification, photographs A

19  through J.  Let me ask you to begin with the front of the

20  house, A and B.  Do you recognize that place?

21      A     Yes, I do.

22      Q     And is that 57 Williams?

23      A     Yes, it is.

24      Q     Do you recognize the photograph D?

25      A     Yes, I do.

26      Q     What is that?

145

1        A      This is the rear sliding-glass door of 57

2   Williams Lane where we located the pry marks.

3        Q      Now, would you take a close look at the small

4   snapshots E, F, G, H, I, J.  Were you present when those

5   pictures were taken?

6        A      Yes, I was.

7        Q      Was it that same afternoon?

8        A      No, it was not.

9        Q      When were the pictures taken?

10       A      I believe it was taken about three days after.

11       Q      And so, we're talking about a couple days later

12   in March?

13       A      Yes.

14       Q      All right.  Fine.  It looks like a ruler, like a

15   six-inch ruler.  Do you know what that's all about?

16       A      That's to measure the pry marks.

17       Q      Did you look at them?

18       A      I looked at them.  I didn't take these.

19       Q      Didn't take the pictures?

20       A      No, I did not.

21       Q      When you looked at the pry marks, could you see

22   the clear impression of the tool which produced the pry

23   marks?

24       A      Yes.

25       Q      What kind of tool?

26       A      It appeared --

Kathryn M. Lezchuk, C.S.R. No. 2302

1          MR. BELL:  Objection.  I think that calls for

2     expert testimony.

3          THE COURT:  It would sound like that.

4          MS. ALLHISER:  I'm sorry?

5          THE COURT:  Sounds like that.

6          MS. ALLHISER:  Well, respectfully, Your Honor,

7     if it was the shape of the letter A, he could say, I saw the

8     letter A.

9          THE COURT:  Is that what he's going to say?

10          MS. ALLHISER:  I don't think he's going to say

11     that.

12          THE COURT:  No.  Sustained.  If you have a

13     picture of it --

14          MS. ALLHISER:  Yes.

15          THE COURT:  -- close enough for a juror to make

16     judgments on their own.  They will get to see it.

17          MS. ALLHISER:  Yes.  Thank you.

18     Q     Could you see -- let me ask you this way:

19     Could you see some deformity to the, I guess you could say,

20     surface of the metal?  Could you see it yourself?

21     A     Yes, I could.

22     Q     Is that shown in some of the pictures?

23     A     Yes, it is.

24     Q     Give us an example of what picture shows that

25     deformity.

26     A     It shows on G, as well as on H you can roughly

1    make it out, on F as well.

2        Q    Where was the deformity in the metal compared to

3    a handle you would normally use to open and close that door?

4        A    It was located about an inch and a half below

5    the handle.

6        Q    Now use words to describe the handle.  What does

7    it actually look like?

8        A    A black pull handle.

9        Q    And would you have a seat.

10    Other than going to 57 Williams, meeting with the

11    resident there, looking at that sliding door, were you

12    personally involved in any other evidence collection?

13        A    No, I was not.

14        MS. ALLHISER:  Those are my questions.

15                    CROSS-EXAMINATION

16    BY MR. BELL:

17        Q    Officer Sandri, you recognize me from previous

18    proceedings in the case?

19        A    Yes, I do.

20        Q    You know I'm the attorney for Mr. Khuu?

21        A    Yes, I do.

22        Q    Now, I'm going to ask you about People's Exhibit

23    No. 8 that you were shown.  Do you need to look at it if I

24    ask you questions about it?

25        A    No.

26        Q    Okay.  The information -- you were asked by the