1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | CHRISTOPHER J. WEI, State Bar No. 78958
Deputy Attorney General
6 |  455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7 |  Telephone:  (415) 703-5867
Fax:  (415) 703-1234
8 |  Email:  Christopher.Wei@doj.ca.gov

9 | Attorneys for Respondent

10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

15 | **HOA TRUNG KHUU,**

Petitioner,

16

17 | v.

18 | **JOHN TILTON, CDCR Secretary,**

Respondent.

19

C 07-6351 SI (pr)

**EXHIBIT 9 (part 3)**

20

21

22

23

24

25

26

27

28

Exhibit 9 (part 3)

Khuu v. Tilton
C 07-6351 SI (pr)

# EXHIBIT 9 (part 3)

148

1    prosecutor whether or not the photograph of Mr. Khuu

2    represents the condition that you observed him in at the

3    time of his arrest on March the 10th?

4        A    Yes.

5        Q    Is that correct, it does?

6        A    Yes.

7        Q    How about the other identifying information on

8    here, for example, that his height was five-foot-three

9    inches.  Did you personally observe that to be the case?

10       A    I did not personally measure him.

11       Q    Somebody must have measured him for the purpose

12   of this photograph?

13       A    Not in my department.

14       Q    Let me ask you, when you surrender -- you're

15   familiar with how a booking photograph works, correct?

16       A    Yes.

17       Q    They take identifying information based on

18   observation and sometimes --

19       A    Yes.

20       Q    You have no reason to dispute the fact that it

21   says his height was five-foot-three-inches tall.  You have

22   no basis to dispute that, do you?

23       A    No.  I --

24       Q    Were you actually physically in Mr. Khuu's

25   presence when he was standing?

26       A    Yes, I was.

149

```
1        Q      How tall are you?

2        A      I'm six-foot-one.

3        Q      Were you close enough to him to be able to judge

4   his height?

5        A      Just that he was a lot shorter than I was.

6        Q      And quite likely he was five-foot-three-inches

7   tall, as indicated in the photograph?

8        A      Yes.

9        Q      Now, when you received the dispatch -- the radio

10  dispatch about an attempted burglary at 57 Williams Lane --

11  you may have answered this question, but I don't think I got

12  it clear -- where were you physically located in your patrol

13  vehicle?

14       A      I was located Shell Boulevard at Beach Park

15  Boulevard.

16       Q      Okay.  Now I do recall you did say that.

17       Can you indicate on People's Exhibit 2, which is the

18  multi-colored map behind you, the larger one, exactly where

19  that is on that map?

20       A      Okay.

21       Q      I don't think we have that on People's

22  Exhibit 2?

23       A      It's right in this area.

24       Q      We need to mark that X with some initials.

25  Have you used the initials WS?  Is your first name William?

26       A      Yes.
```

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Q    Have you used those initials, WS?

2    A    Yes, I used them down here.

3    Q    Maybe let's make it -- are you a patrolman --

4    A    Yes.

5    Q    -- is that your designation?

6    How about PS for Patrolman Sandri, just so we can

7    distinguish the initials.    PS1.

8    All right.    And your purpose once you heard that

9    announcement was to go to 57 Williams; is that what you were

10   intending to do?

11   A    Yes, I was.

12   Q    What was the most direct route?

13   A    The most direct route would be down Beach Park,

14   and depending whether or not you had the light on Edgewater,

15   to go left.    If you didn't, to go straight to Jamaica.

16   Q    Did you have the light on Edgewater?

17   A    No, I did not.

18   Q    When you said when you had the light to make,

19   you mean -- if you had the light to make a left turn, you

20   would have turned left on Edgewater, correct?

21   A    Yes.

22   Q    But you didn't, so you went straight through the

23   intersection and then onto Beach Park, continued on Beach

24   Park?

25   A    Yes.

26   Q    To Jamaica Street?

1     A     Yes.

2     Q     And then went --

3     Down is in a southerly direction, correct?

4     A     Correct.

5     Q     -- to the corner of Jamaica and Port Royal,

6     correct?

7     A     Correct.

8     Q     And I think you made your first mark on that

9     map -- there is a mark there, and your initials -- are there

10    some initials there?

11    A     Yes, WS.

12    Q     And what is that mark?

13    A     That marks where I was when I first saw the

14    Range Rover.

15    Q     And what are the initials next to that mark?

16    A     W -- just WS, William Sandri.

17    Q     All right.  Now, at that intersection, of course

18    as you're traveling that way, you're looking out for some

19    sort of vehicle that might meet the description, correct?

20    A     Yes.

21    Q     So when you reach that intersection, you're

22    looking around, and you looked to your left, and you see at

23    the intersection of Edgewater and Port Royal what you've

24    told us is a black Range Rover, correct?

25    A     Yes.

26    Q     Now, in fact, there's several blocks, based on

152

1      that map, between the intersection of Jamaica and Port Royal

2      and Port Royal and Edgewater, correct?

3           How many blocks is it on that map?

4           A    On this map, it's actually all in the same

5      block.  It's just broken up with the different streets.

6      It's the 400 block.

7           Q    Okay.  So the numbers are the same?

8           A    Yeah.

9           Q    But the distance between that point, point

10     Royal and -- Jamaica and Port Royal and Edgewater, there are

11     several streets which intersect Port Royal before you get to

12     Edgewater, correct?

13          A    Yes.

14          Q    How many streets?

15          A    Laguna Circle twice and Hatteras.

16          Q    I think you told the jury that you think it was

17     only 100 yards between that point at Jamaica and Port Royal

18     to the corner of Edgewater and Port Royal, and yet there are

19     three streets in that hundred-yard stretch, three

20     intersections?

21          A    Well, there's only two intersections, and the

22     space in between them isn't that large.

23          Q    All right.  We have a photograph -- well, before

24     I go to the photograph -- I'll get to the photograph in just

25     a minute.

26          There was nothing obscuring your vision of the Range

153

1    Rover -- the black Range Rover between you at the corner of

2    Jamaica and Port Royal and the Range Rover at the

3    intersection of Port Royal and Edgewood (sic).

4        Do I have that correct?

5        A    I believe so.

6        Q    There were no cars in between you and that car.

7    It was the only car between you and the street of Edgewater

8    and Port Royal?

9        A    There may have been another car there, but it

10   didn't block the Range Rover.

11       Q    Was it behind the Range Rover or in front of it?

12       A    Behind it.

13       Q    So the Range Rover was already at that

14   intersection before you even saw it, correct?

15       A    It was on its way to the intersection.   It was

16   right there, stopped.

17       Q    It was right there at the intersection as you

18   indicated in your report?

19       A    Yes.

20       Q    And there's no stop light there; there's only a

21   stop sign, correct?

22       A    Correct.

23       Q    So assuming that the traffic is clear, a person

24   is permitted to proceed into the intersection and make a

25   left turn as soon as they're able and the traffic permits

26   them to do that, correct?

Kathryn M. Lezchuk, C.S.R. No. 2302

154

1     A    Correct.

2     Q    As soon as you saw it, you turned on your lights

3  and siren, correct?

4     A    No.

5     Q    Did you know at the time you first saw it that

6  it was a black Range Rover?

7     A    Yes, I did.

8     Q    And the reason you didn't turn on your lights

9  and siren was you couldn't see who -- well, obviously

10  somebody must be in it because it was in the street

11  traveling, but you couldn't tell anything about the

12  occupants of the vehicle, correct?

13     A    True.  Yes.

14     Q    You were looking for a black Range Rover with

15  two people in it; isn't that correct?

16     A    Yes.

17     Q    That's what you had been told by dispatch?

18     A    Yes.

19     Q    Now, you're aware now, are you not, that nobody

20  actually saw a black Range Rover with two people in it,

21  correct?

22     A    Correct.

23     Q    Mr. Hui actually saw a black Range Rover with

24  only one person in it?

25     A    Correct.

26     Q    Nonetheless, dispatch told you to be on the

1    lookout for a black Range Rover with two people in it,

2    correct?

3         A    That's correct.

4         Q    So you didn't turn -- you went in the direction

5    of the Range Rover until you could observe how many people

6    were in it, correct?

7         A    Correct.

8         Q    You actually drove down Port Royal to a point

9    immediately behind the Range Rover, and the Range Rover was

10   still at the intersection, correct?

11        A    I wasn't immediately behind it.

12        Q    How many cars were you?

13        A    Approximately two.

14        Q    So there were -- when you say you were two, does

15   that mean there was one car in between the two of you or

16   two?

17        A    Two, I go -- two, yes.

18        Q    It was two;  the Range Rover, two additional

19   cars and then your vehicle?

20        A    Yes.

21        Q    Okay.  It was still at that stop sign, correct?

22        A    Yes.

23        Q    And it was observing the traffic laws.  In other

24   words, it wasn't speeding at that point, correct?

25        A    No.

26        Q    It was waiting for traffic to clear, correct?

156

1  A  Correct.

2  Q  And then you saw two people in the vehicle.  Was

3 it at that time that you activated your emergency lights?

4  A  No, it was not.

5  Q  Was it after the car made the left turn that you

6 activated your emergency lights?

7  A  Yes.  It was after.

8  Q  And did you at any time activate your siren?

9  A  No, I did not.

10  Q  Now, I know this isn't -- well, maybe you need

11 to stand up for just a second.

12   I am going to ask you to look at People's 3B again.

13 It's the second picture in from the left on the top row.

14 Already identified that as what you could observe from the

15 intersection of Port Royal and Jamaica as you looked to the

16 left towards Edgewater, correct?

17  A  Correct.

18  Q  I think you've drawn a circle around --

19  A  The stop sign.

20  Q  -- where the stop sign is?

21  A  Yes.

22  Q  As you look at that photograph, does it fairly

23 represent how well you could see what was at that

24 intersection when you looked to your left?

25  A  Yes.

26  Q  Do you think if in that photograph there was a

1    black Range Rover at that intersection at the time the

2    photograph would have been taken you would be able to tell

3    that from looking at that photograph?

4         A    Possibly.   There's two other vehicles there that

5    I saw.

6         Q    All right.   Now, you can take your seat.   Thank

7    you.

8         The only description you were given were of two men in

9    a black Range Rover, correct?

10        A    No, they weren't.   I was told they were

11   light-skinned male adults.

12        Q    Two light-skinned male adults in a Range Rover?

13        A    Possibly Hispanic.

14        Q    Where did the "possibly" come from?   Do you

15   know?   Did the word "possibly" come from dispatch, or is

16   that your recollection of --

17        A    That's my recollection of the information that I

18   received from dispatch.

19        Q    Okay.   You weren't given any information about

20   vehicle license plate, were you?

21        A    No, I was not.

22        Q    You didn't observe or have any information about

23   a vehicle license plate until you got close to the vehicle

24   at the intersection of Port Royal and Edgewood?

25        A    Correct.

26        Q    And it was at that point that you noted the

158

1    license number and called it in to dispatch?

2         A    Correct.

3         Q    And what was your purpose in calling it in to

4    dispatch at that point?

5         A    To let the other units know that I had a

6    possible suspect vehicle and to find out information on the

7    vehicle.

8         Q    Okay.  And based on your experience as a police

9    officer, if dispatch, who gave you the information about the

10   vehicle that you were looking for, had a license number, you

11   would have expected that to be announced on the radio so

12   you'd know precisely what vehicle you were looking for,

13   correct?

14        A    Correct.

15        Q    You remember who was on dispatch that day?  Do

16   you remember anybody at all?

17        A    Yes, I do.

18        Q    Was it Sharon Derris?

19        A    Yes.

20        Q    Was that person -- did you recognize her voice

21   as being the person who was giving the radio broadcast about

22   the black Range Rover?

23        A    Yes, I do.

24        Q    Now, I know you identified Mr. Khuu in court as

25   being the person you saw that day running from the black

26   Range Rover.  Was Mr. Khuu the person who was driving that

159

1    black Range Rover.

2    A    I can't be positive.

3    Q    You don't know in fact; is that correct?

4    A    I don't know.

5    Q    You don't know whether it was Mr. Khuu or

6    Mr. Bui who was driving the Range Rover?

7    A    Correct.

8    Q    How far were you from the black Range Rover when

9    you saw the two men?

10    A    Possibly two car lengths.

11    Q    And that was in the area behind the Albertsons

12    where the vehicle was already stopped, correct?

13    A    Correct.

14    Q    I take it that the two men -- I'm trying to

15    figure out a way to ask a fairly simple question.

16        But one of the men got out of the driver's side, and

17    the other got out of the passenger side of the vehicle,

18    correct?

19    A    Correct.

20    Q    You're just unable to identify for us which one

21    was which?

22    A    Correct.

23    Q    Now, later on -- I'm not asking you to get into

24    the subject matter of it, because I think there will be

25    additional evidence about it, but later that afternoon,

26    after Mr. Khuu was in custody and was at the Foster City

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Police Department, did you participate, along with Detective

2    Morrison, in some questioning of Mr. Khuu?

3         A    Yes, I did.

4         Q    Okay.  And then also you participated in

5    attempts to identify Mr. Khuu?

6         A    Yes, I did.

7         Q    Among other things, I guess fingerprints were

8    processed, and he was identified through his fingerprints as

9    being Hoa Khuu, correct?

10        A    Yes.

11        Q    Also, among the information about him you got

12   was he was wanted on a Federal warrant by U.S. Marshalls?

13        A    Correct.

14             MR. BELL:  Those are all my questions.  Thank

15   you very much, Officer.

16             MS. ALLHISER:  No questions, Your Honor.

17             THE COURT:  All right.  May this witness be

18   excused?

19             MR. BELL:  Yes.

20             MS. ALLHISER:  Yes, Your Honor.

21             THE COURT:  Thank you.  You may step down.

22             MS. ALLHISER:  Next witness, Your Honor?

23             THE COURT:  Yes.  Oh, no.  Hang on.  It's time

24   for our first afternoon recess, so we'll take a recess for

25   ten minutes, ladies and gentlemen.  Remember the admonition.

26        (The following proceedings were held in open court,

161

1  out of the presence of the jury.)

2         THE COURT:  Why don't we take care of the

3  amendment now.

4      Outside the presence of the jurors, and you are going

5  to amend the Information to state the first name of one of

6  the homeowners.

7         MS. ALLHISER:  Yes, Your Honor.  It was my

8  mistake.  The correct name is Sharon, S-h-a-r-o-n, Chi, and

9  that appears in Count 5, which is on page 3, line 8.  It

10  should be Sharon Chi.

11         MR. BELL:  Just so the record is complete,

12  Ms. Allhiser realized that was an error.  She asked me if I

13  had any objection and I said no, and we agreed it should be

14  amended to reflect the proper name.

15         THE COURT:  All right.  Thank you very much.

16  Motion is granted.

17      (Brief recess.)

18         THE COURT:  Do you have another witness to

19  call?

20         MS. ALLHISER:  I do, Your Honor.  Mark Lee.

21      Officer Lee, would you stand here, please, and be

22  sworn.

23                    MARK LEE,

24  called as a witness by the People, after being first duly

25  sworn, was examined and testified as follows:

26         THE CLERK:  Thank you.  Please have a seat.

Kathryn M. Lezchuk, C.S.R. No. 2302

162

1          Please state and spell your name for the record.

2                 THE WITNESS:  Mark Lee, M-a-r-k  L-e-e.

3                        DIRECT EXAMINATION

4   BY MS. ALLHISER:

5          Q     How are you employed, sir?

6          A     I'm a police officer with Foster City.

7          Q     How long have you been a sworn peace officer?

8          A     Approximately two years now.

9          Q     With Foster City the whole time?

10         A     Yes.

11         Q     I would like to direct your attention to a

12  particular time, March 10th, 2004, at around 12:43.  Were

13  you then on duty?

14         A     Yes, I was.

15         Q     Were you in uniform, sir?

16         A     Yes.

17         Q     Were you in a marked police car?

18         A     Yes, I was.

19         Q     Did you receive a police communication through

20  your central dispatch concerning the complaint of an

21  attempted residential burglary at 57 Williams in your town?

22         A     Yes, I did.

23         Q     When you heard that, sir, did you respond?

24         A     Yes.

25         Q     Where did you go?

26         A     I went directly to the 57 Williams Lane address.

1       Q       Did you get all the way to 57 Williams Lane?

2       A       Yes, I did.

3       Q       In the course of this few minutes right around

4   the dispatch, were you redirected?

5       A       I went directly straight to 57 Williams Lane.

6   At that point, another dispatch came on from Officer

7   Sandri.   That's when I left.

8       Q       Where did you go?

9       A       I met him at the corner of Port Royal and

10  Monterey.

11      Q       Are you familiar with the Edgewater Place

12  Shopping Center?

13      A       Yes, I am.

14      Q       Where did you meet Officer Sandri compared to a

15  business in that shopping center?

16      A       Directly south of Chevy's, which is the last

17  corner business at Edgewater Place.

18      Q       Would you take a look at People's Exhibit 3 for

19  identification.   I'm going to get this out of the way in a

20  moment, but would you stand up, and would you look at the

21  photographs, People's Exhibit 3 for identification,

22  particularly, J, K and L.

23          Do you see a place you recognize?

24      A       Yes, I do.

25      Q       What is that area of J, K and L?

26      A       This is -- right here is Chevy's.

1      Q      That's K?

2      A      Directly south of it would be the first house on

3  Monterey.  This would be right south, directly from Chevy's,

4  exactly, this being the first house on Monterey, 1001,

5  Chevy's being directly right here.

6      Q      So as the photographs progress, J, K, L, you're

7  going slightly south, slightly south?

8      A      Correct.

9      Q      Do you see what looks like a fence or gate, I

10  guess fence, in People's Exhibit 3L?

11      A      Yes, I do.

12      Q      Did you go to that place particularly?

13      A      No, I did not go to this place.  I went to the

14  front of the house.

15      Q      Now, I am going to get this out of the way, and

16  I'm going to ask you to look at a map right behind you,

17  People's Exhibit 4.  Take a minute, please, to orient

18  yourself to Edgewater Shopping Center and Monterey.  Are you

19  familiar with -- rather, on March 10th, 2004, were you

20  familiar with the streets and businesses in Foster City?

21      A      Yes.

22      Q      Asking you now about People's 4 for

23  identification.  Do you see the residence 1001 Monterey?

24      A      Yes, I do.

25      Q      This particular day, March 10th, 2004, were you

26  involved in a search?

1     A     Yes, I was.

2     Q     You know what, it actually is going to work if

3   you -- try to be thin, but --

4         THE COURT:  There's a pointer down on the ledge

5   if you want to use it.

6         MS. ALLHISER:  Yes, thank you.

7     Q     If you can, kind of keep your back against the

8   wall so the Judge has a chance to see.

9     People's Exhibit 4 for identification, will you point

10  and use words to describe where 1001 Monterey is?

11    A     1001 is right here.  It's directly south of

12  Chevy's, would be this corner business here.  It would be a

13  little parking area, 20-minute parking area here, and this

14  being 1001, first house.

15    Q     I am going to ask you to mark on People's

16  Exhibit 4 for identification.  It's just paper.  You can

17  draw right on it.  Would you begin by marking the word

18  "Chevy's" to show where the restaurant is in blue?

19    A     You want me to write out Chevy's?

20    Q     Spell it out.

21    Now, on People's Exhibit 4, stay with the blue pen,

22  sir, and will you box out the plot there for 1001 Monterey.

23  Just box around it in blue.

24    And I'm going to keep you on your feet for another

25  minute, sir.

26    I'm going to ask about where you were and where

1    you went, okay?  And you're blue in this particular case.

2          A     Okay.

3          Q     From the front of 1001 Monterey, where did you

4    go?

5          A     I met Officer Sandri right here.  Officer Sandri

6    proceeded to go this way.  I went on this side of the house,

7    and that's when I saw suspect running down.

8          Q     Here's the way I would like you to do that.

9    Where you were showing us going along the bottom side of the

10   house in our map, where you travel along there, use your

11   initials, ML, at the starting point.  And is the arrow now

12   that leads from ML along that side of the house where you

13   went?

14         A     Yes.

15         Q     It's going to be necessary for me to keep things

16   clear, so I am going to give you a red.  Make a red X where

17   you first saw this man you were chasing, where he was.

18         A     Where he was.  I'd say approximately right here.

19         Q     And now use words to describe the position?

20         A     He was approximately at 1011, five houses down

21   from me, running southbound along the water's edge.

22         Q     As he was running along the water's edge, was he

23   encountering fences or gates?

24         A     Yes, low fence line so as to not block the view

25   of the houses of the water.  There's numerous boats, some of

26   them parked on deck, so you would have to jump over the boat

167

1   as well to get over to the next property.

2        Q    Would it be correct, then, when you were at the

3   lagoon at that bottom edge of 1001 Monterey where you have

4   shown us, that is where you turned and saw the man at the

5   red X?

6        A    Yes.

7        Q    I'm asking now where he went, so stay with red.

8   Did he move from that spot?

9        A    Yes.

10        Q    Where did he go?

11        A    He continued southbound on the water's edge.

12        Q    Would you give us, by following with the red

13   pen, where he went?

14        A    Running down here, as I yelled for him to stop,

15   and eventually ended up right here.

16        Q    And that second position, use words now to

17   describe?

18        A    That would be 1029 Monterey, the residence, in

19   the back yard.

20        Q    When he had gotten that far to 1029, where were

21   you?

22        A    I was -- I was gaining ground eventually.

23        Q    Don't use the red pen.

24        A    Eventually, I would say when he stopped I was

25   roughly around the 1021, 1023 address.

26        Q    At around 1023 you could see him at 1029?

168

1      A      At that point, exactly right there, I could not

2  see him.

3      Q      What happened?

4      A      There was a resident out here actually wondering

5  what was going on, and I lost sight of him, so eventually

6  when I got to 1029 he was nowhere to be found.  I figured I

7  had a clear sight line.  There's nowhere else he could be.

8  And then these houses had boats or anything like that.  I

9  asked the resident if he saw anything.  He said no.

10     That's when I figured out, if there's only a boat --

11  there was a parked boat that belonged to the resident at

12  1029, a covered boat that was leashed to this residence.  It

13  was floating in the water, so I figured this is the only

14  place he could be, in the boat or somewhere in the lagoon.

15     Q      Would you make a long red line with the tip of

16  the arrow at the end of that line being the position of the

17  boat.

18     And now write in above it in an open space "boat."

19     Q      What happened at the boat?

20     A      The boat -- I approached the boat.  It being

21  covered, for officer safety reasons, with my left hand I

22  shook the boat and immediately could hear footsteps

23  throughout the boat as if someone was trying to keep their

24  balance, scattering around.  At that point I yelled, "Come

25  out with your hands up.  Come out with your hands up."  And

26  nothing.

Kathryn M. Lezchuk, C.S.R. No. 2302

1       Q       Eventually did you see a person?

2       A       Yes, I did.

3       Q       What were the circumstances?

4       A       This being Chevy's, there's an open terrace

5  there.  I don't know, 20, 30 people were all watching us.

6  All of them were also pointing, He's at the water.  Went to

7  the side.  I saw him crouched in the lagoon, right next to

8  the boat, trying to hide from me.

9       Q       Did you get close enough so that not only could

10 you see him but you were in his line of sight as well?

11      A       Yes.

12      Q       What happened then?

13      A       Again, I told him to come out with his hands up,

14 to give up.  At that point he refused to.  He attempted to

15 actually swim across the lagoon away from me.

16      Q       What did you do?

17      A       To which I said, There's no reason to swim.  You

18 know, Stand up, the lagoon being shallow.

19      Q       You said that?

20      A       I said that.  He stood up and stopped swimming.

21 Just give up now.  We have you surrounded.  He told me,

22 explicit language, Go ahead and fucking shoot me.  Go ahead

23 and fucking shoot me.  And at that point, told him to come

24 to the shore, to give up.  Eventually, after going back and

25 forth, he did come to the shore.

26      Q       Now, as he came to the shore, had you fired your

1   weapon?

2       A       No.

3       Q       Did he come too close to your position at the

4   shore?

5       A       Yes.

6       Q       What happened there?

7       A       Being that these houses are right on the water

8   line, there is a small ledge, and then a fence that blocks

9   the back yard from the water, so if you were to have a young

10  child it wouldn't be able to just go over.  I had to go over

11  the fence so that if you were to come up to me, you couldn't

12  pull me in; and being alone now still, I backed up.

13  Eventually he got out, went over the fence and then laid on

14  the grass.

15      Q       At your direction?

16      A       Yes.

17      Q       Did you have your gun out?

18      A       Yes, I did.

19      Q       Did he stay on the ground?

20      A       No, he did not.

21      Q       Were you still at 1029?

22      A       Yes.  I believe I was.

23      Q       All right.  And what were you telling him to do?

24      A       I told him to get on the ground, put his hands

25  out for a high-risk handcuffing technique that we learned.

26      Q       So you were giving him directions, and you were

1   going to handcuff him?

2        A    Exactly.

3        Q    What happened next?

4        A    At that point he got up.  He looked around and

5   saw that no one was coming.  I believe he did see one of my

6   other officers.

7              MR. BELL:  I'm going to object to no foundation

8   as to what he could see.  He testified he believed he could

9   see certain things.

10             THE COURT:  Hang on just a second.

11        That will be granted.

12        Ladies and gentlemen, I'll strike the words, "I

13   believe he did see one of my other officers."  Please

14   disregard that.

15             MS. ALLHISER:    Q    In terms of what you

16   saw this fellow in the water do, not trying to read his

17   mind --

18        A    Okay.

19        Q    -- but what you saw him do, what did he do next?

20        A    He got up, looked around completely, and then he

21   proceeded to go around the fence, the fence at 1027, which

22   is blocked from me.

23        Q    Could you watch him?

24        A    As soon as he went around the fence, I lost

25   sight of him.

26        Q    Later on, in the course of time, did you find

172

1    him?

2          A    Yes, I did.

3          Q    How much later?

4          A    I would say approximately 25 minutes later.

5          Q    From when he went over at 1027 until you saw him

6    again, this was 20 minutes later?

7          A    Approximately 20, 25 minutes later.

8          Q    And how is it that he was found after 20, 25

9    minutes?

10         A    He was crouched behind a fence.  Someone's

11   residence, on the side of their house in their garbage can.

12         Q    Which house?

13         A    I think it was 1016 Monterey.

14         Q    Okay.

15         A    1022. I'm sorry.

16         Q    Will you make -- let's use S for suspect.  Would

17   you make an S at 1022 Monterey?

18         Were there other police officers or law enforcement

19   present when the suspect was at 1022?

20         A    Yes.

21         Q    Who were they?

22         A    Officer Egan of the Foster City Police

23   Department, and I believe three other Sheriff's deputies.

24         Q    When you arrived, the other police were already

25   there?

26         A    Yes.

1      Q      This guy in the trash can, did you look at him?

2      A      Yes, I did.

3      Q      Did you recognize him as someone you had seen

4   before?

5      A      Yes.

6      Q      Who was he?

7      A      He was suspect who I saw in the water at 1029.

8      Q      The man in the trash can, was he then arrested?

9      A      Yes, he was.

10     Q      Do you now know his name?

11     A      Yes, I do.

12     Q      What is his name?

13     A      Suspect Hoa Khuu.

14     Q      And in court today, do you see him?

15     A      Yes, I do.

16     Q      What is he wearing in court today?

17     A      Button-down, long-sleeved shirt.

18     Q      Color?

19     A      Gray, dark, kind of greenish.

20            MS. ALLHISER:  Will the record reflect this

21   witness has identified the defendant?

22            THE COURT:  Yes.

23            MS. ALLHISER:  Would you have your seat again,

24   Officer Lee.

25     Q      Okay.  The guy in the trash can, do you know

26   how he got into the trash can?

174

1      A      No.

2      Q      What kind of shape was he in?

3      A      He was definitely covered with water all over

4   him.  He was dirty, cold, but he was crouched pretty small

5   in that garbage can.

6      Q      Were you present when he was actually taken into

7   custody?

8      A      Yes, I was.

9      Q      Officer Lee, do you know from the records of

10  your police department at what time Mr. Khuu was taken into

11  custody at 1022 Monterey?

12     A      I believe it was 13 -- one o'clock, close to one

13  o'clock.

14     Q      I'm sorry.  Some time around one o'clock?

15     A      Yes, right.

16     Q      When Mr. Khuu was arrested, was it your personal

17  duty to search his person?

18     A      It was one of the officers there.  I did not

19  search him myself.

20     Q      Let me ask you this:  In your presence, were any

21  objects taken from Mr. Khuu's person, such as pockets,

22  whatever?

23     A      Yes.

24     Q      Things were taken from him?

25     A      Yes.

26     Q      And to your knowledge, who seized those things?

Kathryn M. Lezchuk, C.S.R. No. 2302

1      A    I believe it was Officer Egan.

2      Q    In this process of searching for the man in the

3  lagoon, were you speaking English to him, telling him, you

4  know, Stand up, You don't have to swim, and things like

5  that?

6      A    Yes.

7      Q    And his words to you, were they always in

8  English?

9      A    Yes.

10     Q    Did the man ever speak a language you didn't

11  understand?

12     A    No.

13     Q    Do you know any other languages?

14     A    No.

15     Q    So you were talking to him in English; he was

16  replying in English?

17     A    Yes.

18     Q    Did you have any trouble understanding him?

19     A    No.

20     Q    He said, "Go ahead and fucking shoot me"?

21     A    Correct.

22     Q    That's a quote?

23     A    Direct, exact quote.

24          MS. ALLHISER:  Those are my questions.

25          MR. BELL:  Okay.  Officer Lee --

26     Can I just have a minute, please.

Kathryn M. Lezchuk, C.S.R. No. 2302

1          (Unreported discussion between DA and defense

2     counsel.)

3          MR. BELL:  Could I ask to have this marked,

4     Your Honor please, defense first.

5               (Defendant's Exhibit A, Photograph of Face of

6               Defendant, marked for Identification only.)

7               THE CLERK:  Marking defense Exhibit A.

8                     CROSS-EXAMINATION

9     BY MR. BELL:

10         Q    Did you -- after you found Mr. Khuu in the

11    garbage can, did you actually take physical custody of him?

12         A    I handcuffed him, if that's what you're saying.

13         Q    Did you actually transport him to the Foster

14    City Police Department?

15         A    No, I did not.

16         Q    Who did that?

17         A    I believe it was Officer Nix.

18         Q    Did you actually see him at the Foster City

19    Police Department?

20         A    Yes.

21         Q    Was he -- at the time you saw him, was he

22    wearing the same clothes that he was at the time you found

23    him in the garbage can?

24         A    Yes, he was.

25              MR. BELL:  May I approach the witness, Your

26    Honor?

177

1          THE COURT:  Yes.

2          MR. BELL:    Q    I would ask you to take a

3    look at Defendant's Exhibit A and ask you if you recognize

4    that photograph and what it depicts?

5          A    Yes, I do.

6          Q    Okay.  Can you tell us what that is?

7          A    It is a picture of the suspect.

8          Q    Okay.  And does that appear to be taken at the

9    Foster City Police Department?

10         A    Yes, it does.

11         Q    After his arrest on March the 10th?

12         A    Yes.

13         Q    And is that the clothing that he was wearing

14   when you saw him in the garbage can?

15         A    Yes, it is.

16         Q    Okay.  And the same clothing that he was wearing

17   when you saw him at the police department, correct?

18         A    Yes.

19         Q    Okay.  You were present when Officer Egan

20   searched Mr. Khuu after he was taken into custody, correct?

21         A    Yes.

22         Q    And you saw a number of items taken from

23   Mr. Khuu?

24         A    Yes.

25         Q    You recall what some of those items were?

26         A    The only item I remember is the wallet, a

178

1  wallet.

2        Q    A wallet, and with some form of identification?

3        A    I believe so.

4        Q    Okay.  You may or may not recall.  Do you

5  remember whether or not the identification is in the name of

6  Hoa Khuu or in some other name?

7        A    I can't remember.  I'm sorry.

8        Q    If you cannot recall the details of it, can you

9  tell us how many items that you saw taken from him?

10       A    Like, I only remember the wallet.  That's all I

11 remember.

12       Q    Was there any currency, if you recall?  I just

13 realize you said you couldn't remember, but I'm trying to

14 draw on your recollection.  If you don't recall, that's

15 fine.

16       A    No.  Sorry.

17            MR. BELL:  May I have just a minute again, Your

18 Honor?

19            THE COURT:  Sure.

20            MR. BELL:  Okay.  I have nothing further.

21 Thank you.

22            THE COURT:  Anything further, Ms. Allhiser?

23            MS. ALLHISER:  No, Your Honor.

24            THE COURT:  May this witness be excused?

25            MS. ALLHISER:  Yes, Your Honor.

26            MR. BELL:  Yes.

1          THE COURT:  You're excused.  Thank you.

2          MS. ALLHISER:  I think Defendant's A.

3      Next witness, Your Honor?

4          THE COURT:  Yes.

5          MS. ALLHISER:  Daniel Capodanno.

6      Would you walk to the witness stand and be sworn.

7          THE CLERK:  Please raise your right hand.

8                    DANIEL CAPODANNO,

9  called as a witness by the People, after being first duly

10  sworn, was examined and testified as follows:

11          THE CLERK:  Thank you.  Please have a seat.

12      Please state and spell your name for the record.

13          THE WITNESS:  My name is Daniel J. Capodanno,

14  spelled C-a-p, as in Paul, o-d, as in David, a-n-n-o.

15                    DIRECT EXAMINATION

16  BY MS. ALLHISER:

17      Q    What kind of work do you now do, sir?

18      A    I'm now a senior Community Service Officer with

19  the Foster City Police Department.

20      Q    Will you describe your duties generally?

21      A    Well, generally it's to assist the officers in

22  various aspects, traffic control, parking enforcement,

23  towing of vehicles, and then I have an additional assignment

24  as a Field Evidence Technician.

25      Q    What is a Field Evidence Technician?

26      A    A Field Evidence Technician is one who arrives

180

1   on the scene and assists the officer in gathering evidence,

2   potential evidence, looking at a crime scene, looking for

3   fingerprints, taking pictures, finding objects, things of

4   that nature.

5        Q    Are you experienced in processing scenes and

6   objects to preserve any existing fingerprints?

7        A    Yes, I am.

8        Q    Generally how do you do that?

9        A    Well, for property, when you find a piece of

10  property, you take a picture of it, where it was found, then

11  you put it into a bag or some kind of a carrying object to

12  bring it back to the police department; and then, once it's

13  back there, if it's something that can be checked for

14  fingerprints, then we bring it into our Field Evidence

15  Technician Laboratory where we dust it with fingerprint

16  powder or other ways and see if we can find fingerprints;

17  and then it's packaged, sealed and dropped into the property

18  room for safekeeping.

19       Q    How do you avoid adding your fingerprints to

20  that property you're interested in?

21       A    It's a common practice for a Field Evidence

22  Technician, once you come upon a crime scene, the first

23  thing you do is put on rubber latex, various kinds of

24  gloves, so you don't transfer any of your fingerprints to

25  any object that you touch.

26       Q    In the course of the crime scene investigation

1    if you personally seize an object -- let's say the object is

2    a paint brush -- I just made that up -- do you have some

3    process of logging what you found and making sure there will

4    be an inventory later?

5        A    Well, the first thing I do is write down in my

6    own personal notebook that I carry with me saying where it

7    was found.  By taking of the picture, that also refreshes in

8    my mind where it was found and exactly the location.   In

9    some instances, when necessary, we actually do a sketch.

10   That helps refresh our memory at a later date; and then when

11   we come back to the department, we then write our actual

12   report; and in the report, we go into great detail to try to

13   establish exactly where it was found, why it was taken, and

14   where it is, how it was processed.

15       Q    Sir, were you called as part of a Foster City

16   police response to a black Range Rover in the loading area

17   of Albertsons, Edgewater Place, in Foster City, San Mateo

18   County, on March 10th, 2004, at about 1:15?

19       A    I was.

20       Q    When you arrived, sir, was there any other law

21   enforcement around that black Range Rover?

22       A    Yes, there was.  I was specifically detailed to

23   that location to relieve a San Mateo County Sheriff's

24   Deputy, a sergeant who was there keeping an eye on the

25   vehicle, and I was to relieve him so that he could do

26   something else.

182

1       Q       When you arrived, sir, was the black Range Rover

2   then your responsibility to preserve it?

3       A       Yes.

4       Q       In the course of the day, did other people

5   assist you?

6       A       Yes.

7       Q       How did that go?

8       A       One of our lieutenants came down and looked at

9   it.  My watch commander, a sergeant, came down and looked at

10  it.  Another fellow CSO came down.  In fact, I asked him to

11  take some pictures for me.  And various officers would come

12  by at various times to see just how things were going and

13  what was going on and maybe to update us on what was

14  happening.

15      Q       Before you came to court today, sir, did you

16  review your report in this case?

17      A       I did.

18      Q       And did you also review some photographs of what

19  was actually out there before objects were removed and

20  inventoried?

21      A       Yes.

22      Q       Would you stand, please.  There's actually a

23  marker here which might allow you to kind of, if you can,

24  kind of make yourself into a corner there and step back so

25  the Judge can see.

26      People's Exhibit 5 for identification, a series of

Kathryn M. Lezchuk, C.S.R. No. 2302

183

1    photographs A through J.  Are you familiar with that -- what

2    is shown there?

3         A    Yes, I am.

4         Q    Did you either take those pictures or were you

5    present when this series of pictures were taken?

6         A    I was present when this series of pictures were

7    taken.

8         Q    And do these pictures, A through J, fairly

9    represent what you saw in the course of this investigation?

10        A    Yes.  In fact, I believe I actually took this

11   picture.

12        Q    The photograph which is labeled --

13        A    G.

14        Q    -- G.  Asking you just one by one.  Is it the

15   same car in A, B and C?

16        A    Yes, it is.

17        Q    Do you recognize the area which is shown in the

18   photograph D?

19        A    Yes, I do.

20        Q    What is that, please?

21        A    It's the floor area of the right front passenger

22   seat of the Range Rover.

23        Q    When you first carefully looked at the right

24   front floorboard, did you notice anything unusual?

25        A    Yes.  I noticed that there seemed to be an

26   object or something causing the mat to be up higher than it

Kathryn M. Lezchuk, C.S.R. No. 2302

184

1    should be, and I was looking for keys at the time.

2        Q    As you look at the photographs E and F, are they

3    generally the same area, although perhaps a little closer?

4        A    Yes.    That's correct.

5        Q    Now, what is the photograph F?   Describe that

6    one.

7        A    F is the floorboard and front of the right front

8    passenger seat with the mat pulled back, disclosing a rather

9    long screwdriver.

10        Q    How is it that the mat was pulled back?

11        A    I pulled it back so that the other CSO could

12    take a picture for me to show exactly where that was before

13    it was moved and taken into custody.

14        Q    In a sense, you posed the picture by moving the

15    mat?

16        A    Correct.

17        Q    What is the photograph next in order, G?

18        A    G is a picture of the console between the driver

19    and the front passenger seat.   I took that picture because I

20    saw what looked like a large amount of money, a cell phone,

21    a set of keys, and I thought that might be important, so

22    before I disturbed it, I took the picture.

23        Q    Keep moving, please.   What is H, if you know?

24        A    I couldn't describe what that is, other than

25    it's a plastic bag, and it's someone pointing to it with a

26    pair of gloves on.   I'm not familiar with that picture.

1      Q      Did another person take pictures of the same car

2  and contents?

3      A      Yes.

4      Q      Who was that?

5      A      Senior CSO Joseph Cavallero.

6      Q      What is the photograph I, if you know?

7      A      That's the rear -- left rear passenger side of

8  the Range Rover.

9      Q      Please describe -- I know there are many things

10  there, but please describe some of the larger objects which

11  are shown in the photograph People's 5I?

12      A      This is a paper bag.

13      Q      What color?

14      A      It's a brown paper bag, and there is a white

15  shopping bag, and then there's a computer case.

16      Q      Color of the computer case?

17      A      A black computer case.

18      Q      Now, that's just the larger objects?

19      A      The larger.

20      Q      The final photograph in People's Exhibit 5

21  that's labeled J?

22      A      J.

23      Q      What does that show?

24      A      Well, now shows the brown bag open, and you can

25  see green currency in there.

26      Q      Would you have your seat for a moment, sir.

186

1       The screwdriver that appears in People's Exhibit 5

2    where the mat is folded out, F, did you seize that for

3    evidence?

4        A    I did.

5        Q    Do you have it with you now?

6        A    I do.

7        Q    Is it in some protected case?

8        A    Yes, it is.

9        Q    How is it protected?

10       A    It's wrapped up in a special corrugated

11   cardboard so that it won't be destroyed or tampered with or

12   anything removed.  It's fairly thick and allows for great

13   protection.

14       Q    Did you originally case that up?  Did you

15   yourself?

16       A    I packaged this myself, yes.

17       Q    Can you open it, or do you need a tool?

18       A    Well, let me see.

19       Would you like me to take it out?

20       Q    Yes.

21       Your Honor, I forgot to ask the bailiff about a glove,

22   but I'll do it now.

23           THE COURT:  What's the exhibit number on this?

24           MS. ALLHISER:  Your Honor, this is People's next

25   in order.

26           THE CLERK:  9, People's 9.

1      THE COURT:  We don't have it marked.

2          (People's Exhibit No. 9, Screwdriver with Black

3          Handle, marked for Identification only.)

4      MS. ALLHISER:    Q    Your Honor, I have a red

5   adhesive tag, People's Exhibit 9, which, let's see, I think

6   I will put it on the white paper tag which you affixed.   Is

7   that right, sir?

8      A    I did.

9      Q    And then there is a purple tag we will put on

10  the cardboard later.

11     Let me give you some gloves.

12     A    You wouldn't happen to have some larger ones

13  would you?  These are mighty small.

14     Q    I'm not going to ask you to handle it very

15  much.  Can you get by?

16     A    It's going to be tough.

17     Q    All I really need you to do, sir, is just kind

18  of hold up the screwdriver.  I'm not going to ask you to

19  manipulate it.

20     A    Okay.  Good.

21     Q    This is now called People's 9 for

22  identification; and as you hold it, sir, use words to

23  describe what is in your hand.  What have you taken out of

24  that cardboard case?

25     A    I took out the long screwdriver that has an

26  overall length of approximately 17 inches.  The handle is

1    about five-inches long. The metal part is about 12-inches

2    long.  It's black handle.  It's a Noeres tool, N-o-e-r-e-s,

3    tool made in the USA, and it has a flathead at the end of

4    the screwdriver, and it's made in such a way that it angles

5    at the end.

6         Q    Now, when you say "at the end," do you mean the

7    end of the metal part?

8         A    The blade.  The actual blade bends over.  It's

9    -- yeah.

10        Q    The object that you have in your hands, is that

11   the same as is shown when the mat was folded back in

12   People's Exhibit 5 for identification, F?

13        A    Correct.

14        Q    Okay.  Now, is that angle part of the tool -- or

15   does it appear to be deformed in some way?

16             MR. BELL:  Objection.  I think that's been

17   asked and answered.  He testified it was made in that

18   fashion.  I believe if the Court reviews --

19             THE COURT:  I didn't hear that.  Let me look at

20   it.

21        (Pause.)

22             THE COURT:  All I see him saying here is the

23   actual blade bends over.  Did you say it was made in that --

24   manufactured in that --

25             THE WITNESS:  I don't recall saying it that way.

26             THE COURT:  You do or don't?  I was talking at

189

1    the same time you were.

2            THE WITNESS:  I don't recall making that

3    statement.

4            THE COURT:  Very well.  We could look it up.

5            MS. ALLHISER:      Q      From what you could see

6    in the object in your hand, which is now People's 9 for

7    identification, does it appear to be deformed or tooled to

8    that shape?

9        A      No.  It's tooled to that shape.  It doesn't

10   appear to be deformed.

11       Q      Would you put that object back together, and

12   I'll give it to the bailiff.  We'll wrap it up carefully

13   later, but just sort of get it back in the cardboard, if you

14   would.

15           THE COURT:  I didn't mean to create any

16   confusion.  So you are now saying it was manufactured in

17   that state?

18           THE WITNESS:  Yes.

19           MS. ALLHISER:      Q      In addition to

20   People's Exhibit 9 for identification, the screwdriver, did

21   you seize any object -- any other object from the black

22   Range Rover?

23       A      Yes, I did.  There was a Louis Vuitton wallet

24   that was in a box in the back seat on the right side.  I

25   seized cash, currency, as shown in G.  I think that was it.

26       Q      About this wallet, now, you say it was in a box?

Kathryn M. Lezchuk, C.S.R. No. 2302

190

1    A    Yes.

2    Q    Did it appear to be new or used?

3    A    It appeared to be brand new.

4    Q    Do you recall any contents in the wallet?

5    A    I looked at it at the time I took it into my

6    possession, and there were no contents except a Louis

7    Vuitton tag on the inside.

8    Q    As if it had perhaps been purchased?

9    A    Yes.  It still had the little felt or cloth

10   pouch that was inside.  It just never looked like it had

11   ever been used.  It was very stiff.  The leather was very

12   clean.  It just looked brand new.

13   Q    The money from the center console which is shown

14   somewhat in the picture 5 for identification, G, did you

15   carefully count that?

16   A    Yes, I did.

17   Q    And did you log the denominations, literally

18   count by count, denomination by denomination and mark it to

19   preserve this currency?

20   A    I didn't mark the currency, but I counted it

21   accurately, noted it on a money envelope and also had

22   another sergeant verify the amount with me.

23        MS. ALLHISER:  Your Honor, there is an agreement

24   between counsel that the People can use a photocopy.  I

25   would like this to be marked as People's next in order.

26   This is the cover of the evidence envelope completed by

1    Community Service Officer Capodanno.

2                  THE CLERK:  Marking People's Exhibit 10.

3                     (People's Exhibit No. 10, Photcopy of Currency

4                     Tally, marked for Identification only.)

5                  MS. ALLHISER:        Q        Sir, this is a

6    photocopy.  It's labeled People's Exhibit 10 now.

7          Do you recognize what is copied there?

8          A       Yes, I do.

9          Q       What is it?

10         A       It's a representation of the plastic see-through

11   money envelope I used to book in the cash that I retrieved

12   from the Range Rover.

13         Q       Now, did you take money from one location or

14   more than one location?

15         A       I took money only from the console.

16         Q       Just what we see a corner of here in People's

17   Exhibit 5G?

18         A       Correct.

19         Q       What was the denomination breakdown?

20         A       There were 15 $20 bills, for a total of $300;

21   and ten one-dollar bills for ten dollars, making a total of

22   $310.

23         Q       Do you remember when you seized that money, was

24   it in one clump, was it separated into multiple clumps; can

25   you describe the shape of these various bills?

26         A       I recall, and the picture refreshes my memory.

Kathryn M. Lezchuk, C.S.R. No. 2302

192

1    It was in one wad.

2        Q    Folded somehow?

3        A    Folded in half.

4        Q    So when you seized it, you took one handful of

5    money?

6        A    Correct.

7        Q    I'm going to show you in a moment a photograph

8    and ask you about the Louis Vuitton wallet?

9        A    Thank you.

10        MS. ALLHISER:  Your Honor, I ask there be

11    marked for identification a photo board with photographs A

12    through H, which appear to be of jewelry, coins, a laptop,

13    watches, wallets, Game Boy, digital camera.  I will have

14    them described individually.

15        THE CLERK:  Marking People's Exhibit 11.

16        MS. ALLHISER:  Counsel has copies of all of

17    these.

18            (People's Exhibit No. 11, Poster Board with

19            Photographs A through H, marked for

20            Identification only.)

21        MS. ALLHISER:    Q    Sir, People's Exhibit

22    11 for identification, do you see a photograph of the Louis

23    Vuitton wallet?

24        A    I do.  It's picture E.

25        Q    Did you separate the wallet from its box?

26        A    It's a common practice that when we photograph

Kathryn M. Lezchuk, C.S.R. No. 2302

1   things, once we've noted how it was packaged, then we want

2   to open it up to see the actual item itself.  Since the box

3   wasn't the critical thing, it was what was inside, so it was

4   taken out for display purposes and for ease of showing

5   someone, rather than actually having the wallet in their

6   hands.

7            MS. ALLHISER:  Those are my questions of this

8   witness.

9            MR. BELL:  Is this a good time for a break, Your

10  Honor?

11           THE COURT:  Sure.  We'll take a ten-minute

12  recess, ladies and gentlemen.  Please remember the

13  admonition.

14       (Brief recess.)

15           THE COURT:  Okay.

16           MR. BELL:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18  BY MR. BELL:

19       Q    Mr. Capodanno, actually you and I go back a few

20  years, don't we?

21       A    We do.

22       Q    I think I first met you when you were working

23  for the Federal Bureau of Prisons.  Did you work for that?

24       A    I worked for the Federal Government not the

25  Bureau of Prisons.

26       Q    Then you became a probation officer?

194

1      A     That's correct.

2      Q     Nice to see you again, by the way.

3      A     Same here.

4      Q     I think we can both represent we're in the

5 senior category.

6      A     Yes.

7      Q     One of the things you did in connection with

8 your work as a Community Services Officer was to attempt to

9 recover latent fingerprints from the screwdriver that you

10 have just identified in evidence, correct?

11     A     Correct.

12     Q     And I know you understand the importance of

13 recovering possible fingerprints involving a crime.  You

14 attempted to do that in as careful a manner as possible?

15     A     Correct.

16     Q     And were unable to recover any from the

17 screwdriver, correct?

18     A     That's correct.

19     Q     Anything you would consider usable for the

20 purposes of identification?

21     A     As being involved in a crime?

22     Q     Yes.

23     A     Yes.  I could find nothing.

24     Q     Next thing you did, or at least one of the other

25 things you did, was to attempt to discover latent

26 fingerprints from within the vehicle itself, a black Range

195

1    Rover, correct?

2        A    Correct.

3        Q    Now, and you did discover some partial latent

4    fingerprints that you thought might be helpful in terms of

5    identifying the persons who left those fingerprints; is that

6    correct?

7        A    That's correct.

8        Q    And you did preserve those lifts that you took

9    from the vehicle?

10       A    I did.

11       Q    Okay.  Also, in connection with that, one of the

12   things you wanted to determine was who might be an owner of

13   that vehicle who might be expected to have left the

14   fingerprints in the vehicle, correct?

15       A    That's correct.

16       Q    So you did some research, and you found out that

17   a person by the name of Jenni Bui was the registered owner

18   of that vehicle, correct?

19       A    Correct.

20       Q    One of the things was to see if you could locate

21   her to take a set of fingerprints for the purpose of

22   eliminating her as the possible person who had left those

23   fingerprints.  Do I have that basically correct?

24       A    Basically correct.

25       Q    Now, one of the things you testified about was a

26   photograph -- I'm going to put it back on the stand for a

196

1   minute, and I think I have this right, but I may have

2   misunderstood.  This is People's Exhibit 5, and I believe it

3   was photograph H at the bottom one in from the left-hand

4   side as we're looking at that; is that correct?

5        A     Correct.

6        Q     And what you said was that it looks -- there was

7   a set of gloves that was in that plastic bag that is shown

8   in that photograph.  Do I have that correct?

9        A     No.  What I said was it looked like a hand with

10  plastic glove pointing to the plastic bag.

11       Q     Then I did totally misunderstand.

12       What's in the plastic bag?

13       A     I'm not sure.  I didn't take that as evidence.

14       Q     Did you at any time find a pair of gloves in

15  connection with any of the items taken from within the

16  vehicle?

17       A     I did not find any gloves.

18       Q     I'm going to ask you now about some other

19  photographs that are also on the board, but they're obscured

20  by People's 5, so let me move this and ask you to look at

21  People's 11.  Did you take the photographs in People's 11,

22  if you recall?

23       A     No, I did not.

24       Q     Okay.  Were you present when they were taken?

25       A     The -- when the wallet was, when that picture

26  was taken, since I had that in my possession.

Kathryn M. Lezchuk, C.S.R. No. 2302

1      Q    So only the wallet shown in 11E -- I don't want
2   to say that incorrectly.  You did take the picture of the
3   wallet in 11E.
4        Did you take any of the other photographs on that
5   board?
6      A    No, I did not.
7      Q    Okay.  Now, I'm not going to ask you to open
8   these, so you don't have to worry about putting gloves on.
9   In fact, things have changed.  We used to handle evidence
10  without gloves, right?
11     A    Yes.
12             (Defendant's Exhibit B, Evidence Envelope
13             Containing Tool Imprints, marked for
14             Identification only.)
15             MR. BELL:    Q    I'm going to hand you what
16  has been marked as Defendant's Exhibit B and ask you to look
17  at the packaging for a minute and see if you recognize that?
18     A    Yes, I do.
19     Q    Can you tell us what that is from the packaging
20  that you see?
21     A    From the packaging and the wording that's on
22  this package, they are tool mark impressions that I took
23  from a rear sliding door and a rear sliding-door frame at 57
24  Williams Lane in Foster City.
25     Q    Let me ask you about that.  You were the person
26  who actually took the impressions from the area of the door

1   that you have just described, correct?

2       A    Correct.

3       Q    And your purpose in doing that was to preserve

4   that so that they could be examined in a more scientific

5   fashion to determine perhaps what tool might have actually

6   made those marks on the door, correct?

7       A    Correct.

8       Q    And you -- after you took those impressions, you

9   preserved them, packaged them as evidence, and that's in

10  fact what you have in front of you, Defendant's Exhibit B,

11  correct?

12      A    Correct.

13              (Defendant's Exhibit C, Evidence Envelope

14              Containing Photographs and Negatives of Tool

15              Markings, marked for Identification only.)

16          MR. BELL:    Q    Now, I'm going to ask you if

17  you will look at Defendant's Exhibit C.  Tell me if you

18  recognize that?

19      A    Yes, I do.

20      Q    Can you tell me what that is, please?

21      A    These are ten photographs, as well as the

22  negatives, of the tool mark impressions that I saw at 57

23  Williams Lane on the door and the frame.

24      Q    Okay.  So are they photographs of the actual

25  marks in the door, or are they photographs of the items that

26  are in Defendant's B?

1          Do you understand the distinction I'm trying to make?

2          A      Yes.   These are photographs of the actual

3    marks.   I did not take any photographs of the tool

4    impressions that I created and packaged separately.

5          Q      All right.   You also, did you not, when you were

6    at 57 Williams, attempted to locate latent fingerprints

7    around the area where it appeared there had been a point of

8    attempted entry, correct?

9          A      Correct.

10         Q      Were you able to uncover any latent fingerprints

11   at that location?

12         A      I was not.

13              MR. BELL:   Thank you.   I have nothing further.

14                       REDIRECT EXAMINATION

15   BY MS. ALLHISER:

16         Q      Will you open those exhibits.

17         A      I have C here.

18         Q      And would you open Defendant's C, please.   Do

19   you need a scissors, sir?

20         A      I think it makes it easier.

21         Thank you.

22         Q      Defendant's C now, would you take a look at

23   those pictures.

24         How many total, sir?

25         A      Ten.

26         Q      And then negatives; is that true?

200

1     A     The negatives.

2     Q     Are these pictures you took, sir?

3     A     I did.

4     Q     At 57 Williams Lane, that sliding door?

5     A     Correct.

6     Q     Now look at People's Exhibit 1 for

7 identification, the series of photographs E through J.  Are

8 these the same or different as five of those?

9     A     They're the same five or six, I guess.

10     Q     And the ruler here, a little six-inch ruler, did

11 you put that there for scale?

12     A     It's adhesive and it sticks.  We have that

13 because it makes it easier than trying to hold it in place

14 or keep it in place.  It has adhesive.  It's a small piece

15 of paper with adhesive to give perspective to the markings.

16     Q     When you took these pictures, were you aware of

17 the screwdriver underneath the mat in the black Range Rover?

18     A     Yes, I was.

19     Q     Did you compare, I mean physically bring the

20 screwdriver, which is now People's 9 for identification, to

21 what you saw at 57 Williams Lane on the sliding door?

22     A     It was present at the time I took the pictures.

23 I didn't have it in my possession.  Officer Sandri had, and

24 I did not personally make any comparison with the markings.

25     Q     How did you create Defense Exhibit B?  Please

26 open that.

201

1       I'll put C back together.

2       A     Thank you.

3       Q     Have you opened up, now, Defendant's B?

4       A     I have.

5       Q     And will you tell the jury and show them, if

6    it's possible to raise it up, how you created that?

7       A     There is a substance called Microseal.  It is

8    mixed two parts.  One is a hardener.  It creates a thick

9    type of substance.  You place it on the mark.  You let it

10   dry for a short time, and then you put an index card on the

11   back so it will stick on the index card so that you can pull

12   off the impression.  This is the original index card with my

13   writing on the back saying where it was, the date it was

14   done and the case number; and then attached to it, marked

15   top and bottom, is the actual piece of Microseal that

16   contains the impression that was taken, this one from the

17   rear sliding door, and this one from the rear sliding-door

18   frame.

19      Q     And by "door," you mean the movable part?

20      A     Correct.  The movable part.

21      Q     Okay.  Could you see a shape in that impression,

22   or can you now?

23      A     Yes, you can.

24      Q     What shape?

25      A     Well, the one on the -- I believe this is the

26   sliding door.  Yes.

202

1          MR. BELL:  Your Honor, excuse me.  If the
2   question calls for identifying it as some specific tool
3   mark, I object on the grounds there's no foundation for his
4   expertise which would be required to make that kind of
5   comparison.
6          THE COURT:  I'm looking at the question.
7      Sustained.
8          MS. ALLHISER:  May I ask additional questions,
9   Your Honor?
10          THE COURT:  Yes.
11          MS. ALLHISER:    Q      How were you trained to
12   be a Field Evidence Technician?
13      A     I attended a two-week school down at the Police
14   Academy down in south San Jose.
15      Q     How were you trained to do those particular
16   impressions?
17      A     By doing it, actually mixing it, putting it on
18   samples and taking it off and then preserving it.
19          MR. BELL:  Your Honor, I mean, to save time, I'm
20   prepared to stipulate that he has expertise at taking the
21   impressions.  What I'm objecting to is conclusions that he
22   might try to testify concerning the nature of the tool which
23   made the impressions.
24          THE COURT:  That's what I'm sustaining.
25          MS. ALLHISER:  I actually didn't ask that
26   question, Your Honor.

1          THE COURT:  Before?

2          MS. ALLHISER:  No, sir, I didn't.

3          THE COURT:  I couldn't tell what it was, it was

4    so vague and general.  What shape was it is what you said.

5          MS. ALLHISER:  That's what I asked.

6          THE COURT:  That sounded to me like the

7    question, but that's why I sustained it.  I guess we're

8    stipulating that he is qualified to take tool mark

9    impressions.

10         MR. BELL:  Correct.

11         THE COURT:  Okay.

12         MS. ALLHISER:     Q     How do you prevent the

13   tool mark impressions from breaking up over time?

14      A     Well, substance will remain intact as long as

15   it's not crushed, bruised, pushed upon, and so that's why I

16   created a very thick cardboard-type collar around it so that

17   nothing would squeeze it from the top, in addition to

18   marking the envelope, "Do not crush"; and as you could see,

19   it was even marked "Keep on the top," which is all the more

20   reason why it should last, and it won't deteriorate over

21   time, to the best of my knowledge.

22      Q     You, in fact, took no photographs of these

23   impressions.  That's not what you did?

24      A     Correct.

25      Q     Do you remember whether the appearance of

26   People's -- of Defendant's Exhibit B, these two casts, the

1  same or different as it was on March 10th, 2004?

2      A    To my best recollection, they're undisturbed.

3      Q    Is that true for both?

4      A    Yes.  And they're packaged exactly the way I put

5  them in there.

6      Q    Have those been held by the Foster City Police

7  Department?

8      A    Yes.  According to the chain of custody, we've

9  had it in our custody until it came down here.

10     Q    And by that you mean it never left the Foster

11 City Police Department from March 10th, 2004, when you

12 seized them and packaged them until this moment when I asked

13 you to open it up?

14     A    I didn't do it until March the 18th; and since

15 others actually had it in their possession, I couldn't tell

16 whether it actually left the City or not.

17     Q    Explain what you mean by others having

18 possession?

19     A    Well, on May the 25th the property officer

20 handed this envelope over to Detective Morrison, and it was

21 out for a short period of time and then was returned to

22 property, and then just yesterday it was transported down

23 here by Detective Morrison, so I can't tell whether -- what

24 he did with it.

25     Q    Can you tell by looking at the envelope, the

26 seal that you just cut, whether it had been previously

205

1   opened?

2       A    It had not been previously opened.  My original

3   markings were still on there.

4       Q    Would you put it back together.

5       There were no fingerprints on the sliding-glass door

6   or on the frame that you found on March 10th -- was it March

7   18th?

8       A    March 18th.

9       Q    At 57 Williams Lane?

10      A    There were none that I could find.

11          MS. ALLHISER:  Those are my questions.

12          MR. BELL:  I just have a few questions on that.

13                   RECROSS EXAMINATION

14  BY MR. BELL:

15      Q    Officer Capodanno, you know that the -- based

16  on your experience that the experts in tool mark

17  identification are with the San Mateo County Crime Lab,

18  correct?

19      A    Yes.

20      Q    Were those impressions ever submitted to the San

21  Mateo County Crime Lab for any sort of expert review of the

22  impressions that you made?

23      A    I would have to say no, since the package was

24  never opened.

25      Q    And there's no -- and on the chain of custody,

26  on the envelope it doesn't show it was ever taken to the

206

1    crime lab, correct, unless Officer Morrison himself took it?

2        A    Correct.

3            MR. BELL:  Nothing further.  Thank you.

4            FURTHER REDIRECT EXAMINATION

5    BY MS. ALLHISER:

6        Q    Anything to indicate that attorney Frank Bell or

7    his representative examined the tool mark impressions?

8            MR. BELL:  I would object to that.  It

9    implicates my client's Fifth Amendment right.  I have no

10   obligation to present any evidence or to do anything in this

11   court of law, in fact, taking it to examine it.  I have no

12   obligation to do that.  To imply I have some obligation to

13   offer some evidence of this sort is in violation of my

14   client's Fifth Amendment rights.

15           THE COURT:  Overruled.

16           MS. ALLHISER:    Q    Is there any indication

17   those impressions you obtained from 57 Williams Lane were

18   released to a representative of the defense?

19       A    I have no way of knowing that it was.

20       Q    Unless it was released by Pierre Morrison,

21   right?

22       A    Well, assuming that he would mark the envelope

23   that someone else had it, but I can't say that.  All I can

24   say is -- I'm sorry.

25       Q    Let's get back to maybe the basic question.

26   From when you sealed that envelope, is there any physical

Kathryn M. Lezchuk, C.S.R. No. 2302

1    evidence to you that it's been opened before you did just

2    now in front of the jury?

3        A    No.

4            MS. ALLHISER:  No questions.

5            MR. BELL:  Nothing furnish then.

6            THE COURT:  Okay.  You can step down then.

7    Thank you.

8        May he be excused?

9            MR. BELL:  Yes.

10            MS. ALLHISER:  Thank you, Your Honor.

11            THE COURT:  That's your own report?

12            THE WITNESS:  These are my own.

13            THE COURT:  So it's not marked.

14            MR. BELL:  I just need to make a brief record

15    that I have a motion to make that I would like to make

16    outside the presence of the jury at the appropriate time.

17            THE COURT:  Do you have another witness now?

18            MS. ALLHISER:  I have two witnesses, Your

19    Honor.

20            THE COURT:  Okay.

21            MS. ALLHISER:  One that we can certainly finish

22    before 4:30, Your Honor.

23            THE COURT:  Right.  I'm just -- yes.  Before

24    4:30.  That's fine.  Let's take that one.

25            MS. ALLHISER:  Let me just make sure.

26            THE COURT:  Okay.

1          (Pause.)

2                    MS. ALLHISER:  Eric Egan.

3          Would you walk to the stand and be sworn.

4                    THE CLERK:  Please raise your right hand.

5                              ERIC EGAN,

6     called as a witness by the People, after being first duly

7     sworn, was examined and testified as follows:

8                    THE CLERK:  Thank you.  Please have a seat.

9          Please state and spell your name for the record.

10                   THE WITNESS:  Eric Egan.  Eric, E-r-i-c; last

11    name Egan, E-g-a-n.

12                         DIRECT EXAMINATION

13    BY MS. ALLHISER:

14         Q    What do you do, sir?

15         A    I am police officer with the Foster City Police

16    Department.

17         Q    How long have you been a sworn peace officer?

18         A    For three years.

19         Q    Were you involved in March 10th, 2004, in the

20    search for two suspects?

21         A    Yes.

22         Q    Were you personally involved in the arrest of

23    someone now known to us as Ryan Bui?

24         A    Yes.

25         Q    Where were you searching and eventually found

26    Ryan Bui?

209

1      A      In the neighborhood, Monterey area in Foster

2 City.  He was hiding inside of a trash can on the side of a

3 residence.

4      Q      Okay.  There's a guy in the trash can, and

5 there's another guy, right?

6      A      Correct.

7      Q      Let me start first with the other guy.

8      A      Okay.

9      Q      All right.  You're looking for two people,

10 right?

11      A      Sure.

12      Q      As you were searching in the area of Monterey,

13 one person was found in a trash can, right?

14      A      Correct.

15      Q      Did you find him --

16      A      No, I did not.

17      Q      -- personally?

18      A      No.

19      Q      I'm now going to go to the guy where you're

20 personally involved in finding him.  Okay?

21      A      Okay.

22      Q      Now, that guy, where were you looking for him?

23      A      I was looking in -- if I can refer to my report

24 I can give you the address, but I was looking in the back

25 yard.

26      Q      Did you write a report?

1          A       I wrote a supplement.

2          Q       I guess I haven't seen that and neither has

3    Mr. Bell, so let's see what we have.

4          A       Okay.

5                  MS. ALLHISER:   I'm sorry.  Maybe I do have it.

6    I'm sorry, Mr. Bell.

7          We were reading someone else's name.  I apologize.

8          Q       All right.  When you were searching, sir, in

9    the area of Monterey, were you also in the area of Bristol?

10         A       I believe so.

11         Q       Okay.  At the point in time when you were able

12   to apprehend the suspect, how were you drawn to that

13   person's location?

14         A       At that point, we were going yard by yard and

15   searching each particular yard, and at that point we were

16   also checking recycle -- recycled garbage cans as possible

17   hiding places along the bushes and so forth.

18         Q       Was there a time when someone had to kick down a

19   fence?

20         A       Yes.

21         Q       That's the time I'm talking about.

22         A       Okay.

23         Q       The circumstances that led to an officer kicking

24   down the fence, would you start with that?

25         A       Okay.  Responded to the area to assist in the

26   search for the two subjects.  When I arrived, I contacted

1   another officer that was there that was doing a yard-to-yard

2   search.  I went into one of the yards by going over the

3   fence and started searching in the area.  As I was getting

4   ready to leave, I noticed a group of bushes located in the

5   corner of the yard.  I -- as I looked through the bushes, I

6   noticed there was a person underneath all the bushes inside,

7   attempting to appear -- what appeared to be hiding from us.

8       Q     So you crawled over a fence to get to that

9   place?

10      A     Correct.

11      Q     Then what happened?

12      A     As I noticed the person under the bushes, I

13  commanded him to come out.  At that point, he crawled out

14  from under the bushes.  I ordered him to lay down on the

15  ground.  At that point he started to lower himself towards

16  the ground.  He then started running.

17      I informed Officer Morrison that he was running.

18  Corporal Hart, who was also on scene, was attempting to come

19  around the front of the house and encountered a locked

20  fence.  At that point, the suspect and I were running

21  towards that fence along the side of the house.  As we got

22  close to the fence, Corporal Hart ended up kicking down the

23  fence, and the suspect tried to go the other direction; and

24  at that point, Corporal Hart and I took him to the ground

25  and placed him in handcuffs.

26      Q     Now, that person, do you now know that person's

212

1    name?

2         A    No, I don't.

3         Q    Let me ask it this way.  Was Pierre Morrison

4    part of this search team?

5         A    Yes, he was.

6         Q    So the person that you and Hart -- is it

7    H-a-r-t?

8         A    Correct.

9         Q    The person that you and Hart seized, was Pierre

10   Morrison follow-up detective in that case?

11        A    Yes, he was.

12        Q    Now let's talk about the guy in the trash can.

13   As Foster City officers were searching, was there another

14   agency helping them?

15        A    The San Mateo County Sheriff's Department.

16        Q    And in that process, were Foster City officers

17   cooperating with the Sheriffs -- knew where the other was?

18        A    Correct.

19        Q    Was there a time that Sheriff's deputy called

20   your attention; they thought they found someone?

21        A    Yes.

22        Q    How did that happen?

23        A    As we were approaching the side of the yard, we

24   were just walking up to the side of the yard, the Sheriff

25   deputy was basically in front of us.  As he entered the

26   yard, he opened the lid and noticed somebody else hiding

Kathryn M. Lezchuk, C.S.R. No. 2302

1    inside of the trash can.

2         Q    Were Foster City officers, including yourself,

3    then called to the trash can?

4         A    Correct.

5         Q    What did you see?

6         A    We saw a subject sitting inside the garbage

7    can.  At that point I believe he brought his hands up.  We

8    took a hold of his hands and pulled him out of the garbage

9    can and placed him in handcuffs.

10        Q    Were other Foster City officers with you at that

11   very moment?

12        A    At that particular time Officer Lee was the only

13   other Foster City officer there at that particular time.

14        Q    Mark Lee?

15        A    Correct.

16        Q    Did you find a wallet on the man in the trash

17   can?

18        A    To the best of my recollection, I believe I

19   found his wallet in his right rear pocket.

20        Q    Pants' pocket?

21        A    Pants' pocket.

22        Q    Was it significant to you as a police officer to

23   try to identify this man in the trash can?

24        A    Yes.

25             MS. ALLHISER:  Your Honor, there's a stipulation

26   between counsel that the wallet that was seized by Detective

1   Egan from the man in the trash can was -- as previously

2   described by Mark Lee as Hoa Khuu.   That wallet was seized

3   and is part of the evidence which counsel and I just opened

4   and looked at before we went on the record, is evidence:

5   cell phone and wallet that was actually booked into evidence

6   by Bill Sandri.   This is People's Exhibit, Your Honor, next

7   in order.   I would ask for a group exhibit, People's 12.

8                    (People's Exhibit 12, Evidence Envelope

9                    Containing Black Wallet and Cell Phone,

10                   marked for Identification only.)

11              THE CLERK:   People's 12.

12              THE COURT:   What's the stipulation?

13              MS. ALLHISER:   Your Honor, that this Officer

14   Egan is not the one who booked the wallet.   It was Sandri

15   who booked the wallet.

16              THE COURT:   So the stipulation is this wallet

17   and there's a cell phone.

18              MS. ALLHISER:   Yes.   I will explain the cell

19   phone separately.   I have another witness who will identify

20   the cell phone.

21              THE COURT:   What is the stipulation, the wallet

22   was seized?

23              MS. ALLHISER:   Yes, Your Honor.   People's 12 for

24   identification is an envelope, currently contains basically

25   two objects, what appears to be a black wallet with a

26   driver's license and some various paper receipts.

215

1          Counsel and I just looked at those.

2          Also a cell phone, brand name Vorisan, V-o-r-i-s-a-n.

3    I will not ask the witness about the cell phone.

4          I am referring in my stipulation only to Exhibit 12 as

5    it relates to the wallet and contents, and that is that the

6    wallet and contents were seized by Eric Egan from the man in

7    the trash can, but the wallet was booked into Foster City

8    police evidence by Bill Sandri, who was the primary

9    reporting officer.

10              THE COURT:  So getting back to my question, the

11   stipulation is the wallet was seized by this officer from

12   the man in the garbage can?

13              MS. ALLHISER:  Yes.

14              THE COURT:  Thank you.

15              MR. BELL:  And turned over to Officer Sandri,

16   who thereafter booked it into property.

17              MS. ALLHISER:  Yes.

18              THE COURT:  Thank you.

19              MR. BELL:  I will so stipulate.

20              MS. ALLHISER:  Those are my questions.

21              MR. BELL:  I have no questions.

22              THE COURT:  May he be excused?

23              MR. BELL:  Yes.

24              MS. ALLHISER:  Thank you, Your Honor.

25              THE COURT:  Yes.  You are excused.  Thank you.

26              THE WITNESS:  Thank you.

216

1          MS. ALLHISER:  Your Honor, I do have a witness

2    available.

3          THE COURT:  Well, how long is the person going

4    to take?  We have to handle this motion.

5        TRJ01.XXXX has a phone interview, but that's not until

6    5:00, right?

7          JUROR NO. 1:  Right.

8          MS. ALLHISER:  This is the other Community

9    Service Officer who processed the Range Rover.

10         THE COURT:  We might be able to do that in 20

11    minutes.

12         MS. ALLHISER:  It's possible.

13         MR. BELL:  I don't have a lot of questions, I

14    don't anticipate, but we could get part way through his

15    testimony.

16         THE COURT:  Well, then, let's start him

17    tomorrow.

18       All right, ladies and gentlemen, I will let you folks

19    go tonight until 9:30 tomorrow morning.  And everyone,

20    please remember the admonition.

21       (The following proceedings were held in open court,

22    out of the presence of the jury.)

23         THE COURT:  We're on the record outside the

24    presence of any jurors, and your motion is what?

25         MR. BELL:  Yes, Your Honor.

26       I feel that I have to make a motion for mistrial.  I

1    believe, although I cannot cite the Court any specific

2    authority, but the prosecution's implication I had some

3    obligation to take evidence out to be examined by an expert

4    and put on any evidence at this trial regarding that item

5    implicates my client's Fifth Amendment rights.

6         In other words, its comment -- it was as if they

7    commented on his failure to produce evidence or to testify,

8    because first of all, I can state for the record, although I

9    stand to be corrected, that I don't ever recall being

10   informed or seeing the tool mark impressions that were

11   actually taken.

12        I was given an opportunity to review the evidence at

13   Foster City Police Department, and it may have in fact been

14   present at that time, but I don't recall seeing it or being

15   made aware of it, but that's a separate issue.

16        Having seen it here in court and being told about it

17   by the prosecutor here, my recollection was for the first

18   time, I still feel that it was improper for her to suggest

19   that I had any obligation to have it examined by my own

20   expert and produce any evidence regarding it, and I am

21   entitled to bring out from the People the fact that they

22   didn't have it examined to see if they could compare the

23   screwdriver, which they are obviously going to argue was the

24   tool and the tool mark impressions that have been in their

25   possession all of this time.

26        THE COURT:  The point was, as far as I was

218

1    concerned, you were criticizing them for not having taken it

2    to a tool mark examiner, and they were pointing out you

3    didn't do it either.

4        Be that as it may, I don't remember the Fifth

5    Amendment talking about anything other than failure to

6    testify, and what you need to do is find some authority, and

7    I'll consider it.

8            MR. BELL:   I'll look for it; and if I can find

9    some authority, I'll present it to the Court.

10           THE COURT:  If you find some authority, I'll

11   consider it.  If it means I have to strike it, I will strike

12   it.

13           MS. ALLHISER:   Thank you, Your Honor.

14           THE COURT:  And I'll see everybody at 9:30

15   tomorrow morning.

16           MS. ALLHISER:   Yes, Your Honor.

17           THE COURT:  I'm sorry.  I forgot to tell

18   everybody.

19       I need -- the best I can tell, nobody requested

20   defendant-testifying and defendant-not-testifying

21   instructions.

22           MR. BELL:   I haven't actually reviewed them yet,

23   so I haven't made any requests, but I would request that the

24   Court at least have those two instructions ready, depending

25   on which way we go.

26           THE COURT:  Does anybody know the numbers?

219

1              MS. ALLHISER:   2.60, 2.61, 2.62 are the ones in

2    that subject matter.

3              THE COURT:   Okay. We'll get them typed up.

4              MR. BELL:   Thank you.

5                   (Court stood in recess.)

6                        ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1       SUPERIOR COURT, STATE OF CALIFORNIA

2              COUNTY OF SAN MATEO

3

4   THE PEOPLE OF THE STATE OF      )
    CALIFORNIA,                     )
5                                   )
                   PLAINTIFF,       )
6                                   )
         VS.                        )        NO. SC056446A
7                                   )        Reporter's Certificate
    HOA TRUNG KHUU,                 )
8                                   )
                   DEFENDANT.       )
9   _____)

10

11  STATE OF CALIFORNIA  )
                         )      SS.
12  COUNTY OF SAN MATEO  )

13

14       I, Kathryn Lezchuk, Certified Shorthand Reporter and

15  Official Reporter of the Superior Court of the State of

16  California, County of San Mateo, do hereby certify that the

17  foregoing, Volume 1, pages 1 through 219, comprise a full,

18  true and correct computer-aided transcription of the

19  proceedings held in the matter of the above-entitled cause.

20       Dated this 19th day of December, 2004.

21

22

23

24  _____
        /S/
25  Kathryn M. Lezchuk, C.S.R. No. 2302
        Official Reporter, Superior Court

26