1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  CHRISTOPHER J. WEI, State Bar No. 78958
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5867
    Fax:  (415) 703-1234
8   Email:  Christopher.Wei@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12         FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **HOA TRUNG KHUU,** | C 07-6351 SI (pr) |
| Petitioner, | **EXHIBIT 9 (part 4)** |
| v. | |
| **JOHN TILTON, CDCR Secretary,** | |
| Respondent. | |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 9 (part 4)                                          Khuu v. Tilton
                                                           C 07-6351 SI (pr)

# EXHIBIT 9 (part 4)

1       COURT OF APPEAL, STATE OF CALIFORNIA **RECEIVED**

2          FIRST APPELLATE DISTRICT     JAN 0 3 2005

3                                  CLERK OF THE SUPERIOR COURT
                                       SAN MATEO COUNTY

4  THE PEOPLE OF THE STATE     )
    OF CALIFORNIA,           )

5                             )
         PLAINTIFF AND      )

6         RESPONDENT,        )
                           )   SAN MATEO COUNTY

7         VS.               )    SUPERIOR COURT
                           )     NO.  SC056446

8  HOA TRUNG KHUU,         )
                           )

9         DEFENDANT AND      )
         APPELLANT.         )

10 _____)

11

12     APPEAL FROM THE SUPERIOR COURT OF SAN MATEO COUNTY

13     HONORABLE JOHN G. SCHWARTZ, JUDGE PRESIDING

14           <u>REPORTER'S TRANSCRIPT ON APPEAL</u>

15

16

17  <u>A P P E A R A N C E S</u>:

18  FOR THE PLAINTIFF AND        WILLIAM LOCKYER,
    RESPONDENT:                ATTORNEY GENERAL

19                           50 FREMONT STREET, SUITE 300
                           SAN FRANCSICO, CA 94105

20

21

22  FOR THE DEFENDANT AND        IN PROPRIA PERSONA
    APPELLANT:

23

24

25             VOLUME 2, PAGES 220 THROUGH 396

26                SEPTEMBER 2, 2004

COPY

1             SUPERIOR COURT, STATE OF CALIFORNIA

2                COUNTY OF SAN MATEO

3

4  THE PEOPLE OF THE STATE OF     )
    CALIFORNIA,                   )

5                        )
               PLAINTIFF,   )

6                        )
          VS.           )      NO. SC056446

7                        )
    HOA TRUNG KHUU,           )

8                        )
               DEFENDANT.   )

9  _____)

10

11        REPORTER'S TRANSCRIPT OF THE PROCEEDINGS

12     BEFORE:  HON. JOHN G. SCHWARTZ, JUDGE

13       DEPARTMENT NO. 18, COURTROOM 8D

14           September 2, 2004

15

16

17  A P P E A R A N C E S:

18  FOR THE PEOPLE:         JAMES P. FOX, DISTRICT ATTORNEY
                      BY:  MARY ALLHISER, Deputy

19                     400 County Center
                     Redwood City, CA  94063

20

21

22  FOR THE DEFENDANT:      FRANK BELL, Esquire
                     303 Bradford Street, Suite C

23                     Redwood City, CA  94063

24

25

26  REPORTED BY:            KATHRYN LEZCHUK, C.S.R. No. 2302

1

# W I T N E S S    I N D E X

2        September 2, 2004

3

4    For the People:                              Volume/Page

5    TALIAFERRO, KEVIN
     Direct Examination by Ms. Allhiser ........... 2/231
6
     BONIFACIO, WILLIAM
7    Direct Examination by Ms. Allhiser ........... 2/241

8    CHI, SHARON
     Direct Examination by Ms. Allhiser ........... 2/247
9    Cross-Examination by Mr. Bell ................ 2/258
     Redirect Examination by Ms. Allhiser ......... 2/264
10   Recross Examination by Mr. Bell .............. 2/265

11   CHI, YAO
     Direct Examination by Ms. Allhiser ........... 2/266
12   Cross-Examination by Mr. Bell ................ 2/274

13   CHI, SOLOMON
     Direct Examination by Ms. Allhiser ........... 2/281
14   Cross-Examination by Mr. Bell ................ 2/288

15   KAMMULLER, KENNETH
     Direct Examination by Ms. Allhiser ........... 2/295
16
     HUNG, GEORGE
17   Direct Examination by Ms. Allhiser ........... 2/300
     Cross-Examination by Mr. Bell ................ 2/313
18   Redirect Examination by Ms. Allhiser ......... 2/322

19   HUNG, PAMELA
     Direct Examination by Ms. Allhiser ........... 2/326
20   Cross-Examination by Mr. Bell ................ 2/334

21   CAVALLERO, JOE
     Direct Examination by Ms. Allhiser ........... 2/338
22
     DERRIS, SHARON
23   Direct Examination by Ms. Allhiser ........... 2/352
     Cross-Examination by Mr. Bell ................ 2/367
24   Further Direct Examination by Ms. Allhiser .... 2/378

25   BOUZA, JOEL
     Direct Examination by Ms. Allhiser ........... 2/380
26   Cross-Examination by Mr. Bell ................ 2/388

E X H I B I T   I N D E X

September 2, 2004

| For the People: | For Identification Volume/Page | In Evidence Volume/Page |
|---|---|---|
| 13 – Poster Board with Photographs A through G | 2/251 | |
| 14 – Poster Board with Photographs A through I | 2/308 | |
| 15 – Two Color Photocopies of Taiwanese Dollars | 2/323 | |
| 16 – Plastic Envelope Containing $100 Gift Certificate | 2/327 | |
| 17 – Color Photograph of Ryan Bui | 2/333 | |
| 18 – Certified Copy of DMV Vehicle Registration | 2/341 | |
| 19 – Brown Bag Containing Two Fabric Gloves | 2/347 | |
| 20 – Photocopy of Plastic Bag Containing Currency and Tally | 2/349 | |
| 21 – Four-page Color Photocopy of US Currency | 2/349 | |
| 22 – Four-page CLETS Printout | 2/360 | |
| 23 – Three-page CAD Prinout | 2/360 | |

224

P r o c e e d i n g s

Redwood City, California

Morning session                    Thursday, September 2, 2004

---oOo---

(The following proceedings were held in open court,
out of the presence of the jury.)

THE COURT:  We're on the record outside the
presence of the jurors.

Couple of things.  First of all, I believe you folks
have on your table the copies of 2.60, 2.61 and 2.62, and
this morning I was given defendant's request for limiting
instructions.  I'll look over that, talk about it when we
discuss instructions, which brings up the next point.

Am I interrupting you, Ms. Allhiser?

MS. ALLHISER:  No, Your Honor.  I'm dealing with
the fact that there's a motion for mistrial, and my file is
downstairs.  I'm sorry.

THE COURT:  Well, you don't need the file.

The next matter is before we get to that motion for
mistrial.  Is there a chance that we can finish witnesses
today?

MS. ALLHISER:  It is possible.  There is one
brand new development that I just explained to Mr. Bell, and
it's part of the reason that I apologize I was late.  I was
waiting for something from the crime lab.

THE COURT:  Your secretary said your printer

225

1    broke down.

2            MS. ALLHISER:  I wasn't getting the fax.

3            THE COURT:  Oh, fax.

4            MS. ALLHISER:  So we had to use another fax and

5    do it over again.

6            THE COURT:  Okay.

7            MS. ALLHISER:  So that's been resolved now, and

8    I just handed it to Mr. Bell, explained the fingerprint

9    report to him.  There is a single identified print that came

10   from the window of the Range Rover.  It comes back to

11   someone by the name of Gerald Thomas Lahane, L-a-h-a-n-e,

12   appears to be a Caucasian man.  We have his photograph, and

13   he's 48 years old.

14       A DA Inspector is trying right now to find him.  The

15   man has a minimal traffic-type history, so he's probably the

16   sort of guy who is at a job and can be found.  If the DA

17   Inspector locates him today, and I'm optimistic, it would be

18   my intention to, first of all, tell Mr. Bell what the

19   witness would say and offer the witness to Mr. Bell; and if

20   it's a matter of contest, in other words, where we feel this

21   needs to be resolved at trial, we would serve him with a

22   subpoena for tomorrow morning.

23           THE COURT:  Okay.  We'll just have to see how it

24   goes.  The reason I ask is, when does your flight leave?

25           MS. ALLHISER:  Your Honor, at 1:50, one five

26   zero.

Kathryn M. Lezchuk, C.S.R. No. 2302

226

1        THE COURT:  Okay.  Well, we'll have to see where

2    we stand at the end of the day, I guess, because what I

3    wanted to do -- obviously, I would prefer to be able to edit

4    the instructions sometime tomorrow before noon.  If that's

5    not possible, I guess, we'll just have to bring the jury in

6    a little later on Monday than usual and do it Monday

7    morning.

8        MS. ALLHISER:  The holiday.

9        THE COURT:  I mean Tuesday.

10       MS. ALLHISER:  Right.

11       THE COURT:  I have done the easy stuff, so it

12   should go pretty fast.

13       MS. ALLHISER:  I honestly am not anticipating

14   issues in the jury instructions.

15       THE COURT:  I don't either.  I just need some

16   help filling in a few blanks.

17       Now, Mr. Bell filed or will file it today, new points

18   and authorities in support of his motion for mistrial

19   yesterday, citing People vs. Bradford, which, frankly, I

20   think, Mr. Bell, supports the ruling, so the motion for

21   mistrial is denied.

22       If you say that you would request I admonish the jury

23   that the prosecution has the burden of proof of the

24   defendant's guilt, I have already told them that about 20

25   times in voir dire, and the defendant has no obligation to

26   call any witnesses, produce any evidence nor his burden to.

Kathryn M. Lezchuk, C.S.R. No. 2302

1  He may rely on the prosecution's failure to prove guilt

2  beyond a reasonable doubt.

3       With regard to the first point, I also told them that

4  in voir dire; and with regard to the second, I will be

5  telling them that again a number of occasions in the

6  instructions.  You've made that statement, too.  Nobody has

7  disputed it; and if you want to argue it, you can argue it,

8  but I think there's a distinction to be made between when

9  you criticize them not giving the imprints to an expert, I

10  think it's fair game for them to answer, You didn't think

11  you were going to gain anything by it either.  I'm not even

12  sure an expert is necessary.  I didn't see the imprints.

13       What do you call them?

14            MS. ALLHISER:  Tool mark.

15            THE COURT:  I mean the Plaster of Paris,

16  whatever it is.

17            MS. ALLHISER:  It's one of those brand names,

18  it's like Microseal.

19            THE COURT:  I didn't see them up close, and I

20  didn't ask for them, because I didn't want to be the one --

21  he was talking about how they're kind of fragile, and I

22  didn't want to be the one to drop them and break them, but

23  if a lay person can look at the screwdriver and look at the

24  imprint and they look the same, then that depends on the

25  nature of the imprint, so you wouldn't even need an expert

26  in that situation.  I doubt that it's the case.

228

1          MS. ALLHISER:  I really thought -- respectfully,

2   Your Honor, I thought this was not a tool mark case, because

3   when I looked at those markings -- I've had tool mark cases

4   that have been case arrested -- it's ballistic really.  I

5   had a bolt-cutter case.  I had some others where the tool

6   marks give you that quality you get in ballistic.  These are

7   a mess, and it's consistent with what is described, you

8   know, two hands on a heavy object working against an

9   aluminum door.  You're not going to get a good imprint, Your

10  Honor, and I'm going to ask the jury to look at those

11  imprints because I don't think they're going to see the

12  imprints of a tool.

13          THE COURT:  Okay.

14          MR. BELL:  The only thing I want to make clear

15  is that I am asking the Court specifically to admonish the

16  jury at this point, given the fact it just happened late

17  yesterday, about the burden of proof.  I know you have told

18  them about that, you will tell them again, but I'm asking

19  you admonish them again now that there is no burden of proof

20  on the defendant, that the prosecution has the burden of

21  proof, and that the defendant has no obligation to call any

22  witnesses, produce any evidence or a duty or burden to prove

23  his innocence.

24          I think that that -- in the case -- the only case I

25  could find, which is why I cited it, I agree with Your

26  Honor.  It does appear to support the prosecution's theory,

229

1  except it was in argument and not a matter that came up

2  during evidence.  So I think it's distinguishable to that

3  extent, but the Court did point out that the court

4  immediately advised -- the trial court did immediately

5  admonish the jury with regard to that, as I understand the

6  decision, and so I'm asking you to do that to cure any

7  potential error.

8         MS. ALLHISER:  Your Honor, I was not aware

9  counsel was going to file a written motion.

10        I did the research last night.  I found a case called

11 People vs. Hughes, which is 2002, Cal. 4th.  I don't

12 remember the citation.  I think it's 27, 427, but I didn't

13 get it.  I can either send my investigator to pick up the

14 file, I can provide you the cite for People vs. Hughes,

15 which I believe is very close to the issue.

16        THE COURT:  Let me see.  I can Look at the Table

17 of Contents.  27 C. 4th 427.

18        MS. ALLHISER:  That's my guess.  I could have

19 transposed every one of those numbers, Judge.

20        THE COURT:  Okay.  Well, maybe he can -- maybe

21 he can get it.

22        Let me see.  Do we have all the jurors now?

23        THE BAILIFF:  No.

24        THE COURT:  Still missing one?

25        THE BAILIFF:  Yes.

26        THE COURT:  Let me see if I can find it.  Be

Kathryn M. Lezchuk, C.S.R. No. 2302

230

1    right back.

2         (Pause in the proceedings.)

3              THE COURT:  Okay.  Well, that was pretty good.

4    It's 287, instead of 427, but everything else was right,

5    which for people of Mr. Bell and my age is a pretty

6    impressive feat.

7              MR. BELL:  I think so.

8              THE BAILIFF:  We have all the jurors.

9              THE COURT:  Okay.  Why don't you bring them in,

10   and I will read this case.

11             THE BAILIFF:  All right.  Bringing in the

12   jurors.

13        (The following proceedings were held in open court, in

14   the presence of the jury.)

15             THE COURT:  Good morning, ladies and gentlemen.

16        All the jurors are present.  Both counsel and the

17   defendant are present.

18        Next witness, Ms. Allhiser.

19             MS. ALLHISER:  Call Kevin Taliaferro.

20        Would you walk to the platform, sir, stay to your

21   right, please, and stand on the platform.  Yes, sir.

22             THE CLERK:  Please raise your right hand.

23             KEVIN TALIAFERRO,

24   called as a witness by the People, after being first duly

25   sworn, was examined and testified as follows:

26             THE CLERK:  Please have a seat.  Please state

231

1    and spell your name for the record.

2           THE WITNESS:  Kevin, K-e-v-i-n, Michael,

3    M-i-c-h-a-e L, Taliaferro.  That's T-a-l-i-a-f-e-r-r-o.

4                    DIRECT EXAMINATION

5    BY MS. ALLHISER:

6           Q    Sir, what kind of work do you do?

7           A    I'm in the restaurant business.

8           Q    Sir, I would like to ask you about a particular

9    early afternoon, sunny day, March 10th, 2004, around 1:00

10   p.m.  Do you recall an unusual event at that time?

11          A    Yes, I do.

12          Q    Before there was some event, what were you

13   doing?

14          A    I was actually -- it's very unusual weather

15   pattern at that time of the year.  It was a couple of weeks

16   worth of 80- or 90-degree weather.  I have an outside deck

17   on the restaurant on the water and I happened to be sitting

18   outside, which is unusual because it is March, but if that

19   helps you, it was really unusual weather.  So I had a lot of

20   people sitting outside.  So I was sitting out there

21   conversing with a client of mine or customer.

22          Q    As you were talking, did some thing or some

23   person grab your attention?

24          A    Yeah.  What I found was very unusual, because

25   it's a walkway, and there's signs posted, you know, no

26   running, no biking, no roller blades, none of that.  It's

232

1    enforced by the City pretty heavily and also all of the

2    operators of the businesses.   As I was sitting there,

3    someone came around the corner full sprint.

4         Q     Was it a man or a woman?

5         A     It was a man.

6         Q     And did you happen to recognize that man?

7    (Cell phone rang.)

8         A     Hold on one sec.   Sorry.

9         I had it shut off.   It must have turned on when I sat

10   down.   Pardon me.

11        Q     Did you recognize the face of that man as

12   someone you knew?

13        A     No.

14        Q     Was the man moving quickly?

15        A     Yes.

16        Q     Where was the man headed?

17        A     If I -- as I sit on the water, I was facing

18   north.   He was running south, as he's running towards me,

19   and I was facing him directly.

20        Q     Was the man on the boardwalk?

21        A     Yes.

22        Q     All right.   And did you see anyone else?

23        A     Well, consequently, that really rose my

24   attention, because we're all pretty protective about people

25   running and passing by like that, so I said, Whoa, first

26   thing, but he was kind of quickly by me.   It's only a

233

1    twenty-yard run, and it -- he was on a full run, but then,

2    you know, five, ten seconds later another guy, same thing

3    happened, a full sprint, running right by. That's when I

4    stopped, I said, Hey, hey, hey. Slow down.

5         Q    That second man, did you recognize him as

6    someone you knew?

7         A    No.

8         Q    Describe any way you can age, size, coloring,

9    the first man?

10        A    To the best of my recollection, all I can tell

11   you is because of how he was running, obviously he was an

12   Asian male, okay, thin. I would say somewhere between 25

13   and 30, but, you know, that's about the best I could do on

14   that. That's simply -- that's how quick it happened.

15        Q    The first man, can you describe any clothing

16   that you recall?

17        A    No.

18        Q    The second man -- now, you know, make a mental

19   picture. The second man, please describe as best you can?

20        A    Once again, it's going to be very generic. It's

21   another Asian male, probably the same age bracket. He

22   seemed to be a little medium build, not quite as thin as the

23   first one, but that's about all I could say. No clothing.

24        Q    Did the first man reply to you when you were

25   sort of directing him, slow down?

26        A    No.

234

1      Q      Did the second man reply to you when you were

2   trying to slow him down?

3      A      No, ma'am.

4      Q      Did you hear any words spoken by either man?

5      A      No.   'Cause by the time the first guy was by me

6   he was already kind of around the corner, and the second guy

7   was coming, so they probably were at that point of distance

8   where one kind of made a little turn.   They couldn't even

9   see each other.   They were running in the same direction,

10  just the way -- how the building is shaped.

11     Q      Now, you heard no words spoken, not by the first

12  man?

13     A      No, ma'am.

14     Q      Not a word, not a word from the second man?

15     A      No, ma'am.

16     Q      Did you see a police officer?

17     A      That's -- then I knew we had something going on.

18  You know, five, eight seconds right after the second,

19  gentleman had ran by me, after I stood up, here comes a -- I

20  don't know.   It was a police officer.   I would think it

21  would be Foster City police.   I believe it was.   Was in a

22  full sprint.   I mean, very concerning to me.   And he was in

23  a full sprint to me.

24     Q      As you saw the police officer coming, did you

25  remain there, or did you move?

26     A      I moved.   As soon as --

Kathryn M. Lezchuk, C.S.R. No. 2302

235

1    Q    Where did you go?

2    A    As soon as he went by, I knew something was up.

3    I said, Can you wait a moment?  I got up, because that's

4    just how I am.  I know how the mall runs.  I ran straight

5    after him, and the mall kind of jig jags and runs out in the

6    residence area at the end of the mall.

7    Q    Now, slow down.

8    A    Okay.

9    Q    The lady gets every syllable you speak but not

10   at that rate.

11   A    Okay.

12   Q    You went in toward the center of the parking

13   lot.  Did you see something?

14   A    Yes, I did.  Actually, I ran out towards the

15   center of the parking lot.  And I got a visual, and I was

16   standing over by halfway between the parking lot and the

17   bank, and I got a visual as they came out that went into the

18   residential neighborhood, and the police couldn't see him

19   because there was a couple of turns.

20   Q    Let me ask you this --

21   A    Okay.

22   Q    -- you say when they came out?

23   A    Both.

24   Q    Together?

25   A    No.  One was after the other one, but they kind

26   of went out in the neighborhood, and they were over -- going

1    down the street of the neighborhood, and I saw them.

2         Q    Do you know where Chevy's restaurant is?

3         A    Yes, I do.

4         Q    Where did you see these two men in relation to

5    Chevy's?

6         A    Yes.  The mall jig jags.  They came right out

7    before Chevy's, ran into the residential neighborhood.

8         Q    As these two men were running, did you see

9    either one drop something?

10        A    Well, prior -- we have to go backwards now.

11        Q    Where did you see that?

12        A    The first gentleman that ran by me -- well, it

13   was where it is.  There's a phone that came out, spun out on

14   my deck, went underneath my table, and I mentioned to him.

15   Leave that phone there.  I said it to the people that was

16   sitting there.  That was the only thing I ever saw drop.

17        Q    Now, you say a phone spun out from the deck?

18        A    You know it kind of spins on the deck.  It fell

19   out of his pocket or fell out of his belt, shirt.  I

20   don't -- carrying -- I didn't know what he was doing.  I

21   didn't really see it visually where that phone was at.

22        Q    Are you sure it was the first man who came

23   running toward you on the boardwalk with the cell phone?

24        A    It happened so quickly, I couldn't identify

25   that, but it was one of those two.  That's correct.

26        Q    You confident it was from one of those two?

1       A       Oh, definitely.

2       Q       Now, you mentioned the folks around you.  Don't

3   touch that.  Leave it.

4       A       Yes.

5       Q       All right.  And I am going to ask you about what

6   happened later, but let me get to the cell phone.  The thing

7   spun out, you told people around you, Don't touch it.  Did

8   you ever come back to the cell phone?

9       A       That's what I did.  When I went out to the

10  parking lot, I pointed out to where I thought these guys are

11  running; and at that time, there was six or eight police

12  cars, so they had everything under control.  So I went back

13  to the Portofino business that I'm in, in the restaurant

14  business, went back, acted like I wanted to make it

15  low-key.  I went into the kitchen, got a kitchen glove and

16  picked up the cell phone with the glove.

17      Q       Did you eventually turn the cell phone over to a

18  police officer?

19      A       Yes, I did.

20      Q       Do you now know who that is?

21      A       The police officer?

22      Q       Yes.

23      A       Yeah.

24      Q       Is he the gentleman in court today?

25      A       Can I see behind you -- I don't see him right

26  here right now.

238

1      Q      Did you see him in the hall?

2      A      Yes, I did.

3      Q      Do you know his name?

4      A      I think it's Bill.

5      Q      All right.  When you saw this police officer,

6  what did you tell him about the cell phone?

7      A      Really simply that it came out, it came out from

8  their body, and that was it.

9      Q      You figured, let the police deal with it?

10      A      That's correct.  I stay out of it.

11      Q      Let me just totally finish the thought here

12  about what you were doing.  You went into the center; you

13  saw the one guy running; the other guy running; there were

14  police around; you pointed?

15      A      That's correct.

16      Q      Was that the end of your story?

17      A      That's it.

18      Q      The man who ran by you, could you tell if he was

19  carrying anything else?

20      A      No, I couldn't.  I couldn't recollect that at

21  all.  It just happened so quickly that, you know, really

22  what caught my attention is they ran, first.  Second thing

23  that really caught my attention was the police officer.

24  That was it.  I couldn't tell you what they were wearing,

25  because it was just (snaps fingers) very quick.

26      Q      Let me ask you to stop in your mind's eye and

Kathryn M. Lezchuk, C.S.R. No. 2302

239

1  see -- on the first man, did you see a backpack, a

2  briefcase, a package, a bag?  Can you visualize that first

3  man carrying or holding anything?

4            MR. BELL:  Your Honor --

5            THE WITNESS:  No, I can't.

6            MR. BELL:  Your Honor, I hate to object, but I

7  think the question has already been asked and answered.  He

8  said he doesn't remember seeing him carrying anything.

9            THE COURT:  Sorry.  I didn't turn the transcript

10  on this morning.  Hold on a second.

11       Let me hear the question again, please.

12            MS. ALLHISER:    Q    Stop and visualize in your

13  mind the appearance of the first man coming running towards

14  you those 20 yards.  Do you see him carrying or holding

15  something like a backpack or a briefcase or a paper bag,

16  anything of that?

17       A    I don't recall.

18       Q    The second man -- just trying to jog your

19  memory.  The second man, stop in your mind's eye, just him.

20  Now, was he carrying or holding a bag, a suitcase, anything

21  of that nature?

22       A    I don't recall.

23       Q    Could he have been?

24       A    Very much so.

25            MR. BELL:  Objection, Your Honor.

26            THE COURT:  Sustained.

1              MS. ALLHISER:      Q       Did you recover any

2    other object --

3              THE COURT:  I'm sorry.  There was an answer that

4    got covered up by my statement.  The answer is stricken,

5    ladies and gentlemen.  You are admonished to disregard it.

6              MS. ALLHISER:  Pardon, Your Honor.

7         Q     Did you recover any other object from either the

8    first or the second man's pack?

9         A     No, ma'am.

10        Q     Just the cell phone?

11        A     (Nods head.)

12        Q     Yes?

13        A     That's correct.

14             MS. ALLHISER:  Those are my questions.

15             MR. BELL:  I have no questions, Judge.

16             THE COURT:  Okay.  May this witness be excused?

17             MR. BELL:  Yes.

18             MS. ALLHISER:  Yes, Your Honor.

19             THE COURT:  Thank you.  You're excused.

20             MS. ALLHISER:  Bill Bonifacio.

21        Bill Bonifacio, will you take the stand and be sworn.

22                   WILLIAM BONIFACIO,

23    called as a witness by the People, after being first duly

24    sworn, was examined and testified as follows:

25             THE CLERK:  Thank you.  Please have a seat.

26        Please state and spell your name for the record.

241

1          THE WITNESS:  William Bonifacio,

2     B-o-n-i-f-a-c-i-o.

3                    DIRECT EXAMINATION

4     BY MS. ALLHISER:

5          Q     How are you employed, sir?

6          A     I'm a Sheriff's sergeant with the San Mateo

7     County Sheriff's Office.

8          Q     How long have you been in law enforcement, sir?

9          A     Twenty-one years.

10         Q     Asking you now about March 10th, 2004, in the

11    early afternoon.  Were you then on duty, sir?

12         A     Yes.

13         Q     And as part of San Mateo County Sheriff's

14    response to a request for help from Foster City, did you go

15    to the area of Edgewater Place, the shopping center?

16         A     Yes, I did.

17         Q     Were there any other Sheriff's deputies with

18    you?

19         A     Yes.

20         Q     Who were they?

21         A     Deputy Ken Kammuller.

22         Q     Spell.

23         A     K-a-m-m-u-e-l-l-e-r.

24         Q     The other?

25         A     And John Corkery, C-o-r-k-e-r-y.

26         Q     What was your personal function in going to the

242

1    area of Edgewater Place?

2         A    Personally for me, I was to go and oversee the

3    activities of the two deputies from the Sheriff's Office

4    that were responding.

5         Q    What were those deputies to do?

6         A    They were providing assistance to Foster City,

7    as one of them had a K-9 or a police dog.

8         Q    Did you know in the Edgewater Place the area of

9    Albertsons, specifically the loading zone near the lagoon?

10        A    Yes.

11        Q    Did you go to that place?

12        A    Yes.

13        Q    Did you see a vehicle?

14        A    Yes.

15        Q    What kind?

16        A    It was a black SUV or a truck.

17        Q    That black SUV, at the moment that you arrived,

18   were there any other persons in or around it?

19        A    No.

20        Q    Specifically, any other police in the vicinity

21   of that black car?

22        A    I recall an unoccupied police car in the

23   vicinity of that black truck.

24        Q    An empty police car?

25        A    I'm sorry?

26        Q    An empty police car?

243

1      A      Yes.

2      Q      At the black car, did you take responsibility to

3  search it?

4      A      No, I did not.

5      Q      What did you do?

6      A      I stood by, as nobody else was around.  It was

7  clear to me that this was the vehicle in the incident that

8  was taking place.  I basically stood by and waited until

9  Foster City police officer arrived.

10     Q      Did you touch the black car?

11     A      No.

12     Q      Did you turn it on or off?

13     A      No.

14     Q      Was there a reason you took no action with the

15  black car?

16     A      Well, because, again, this was a case that was

17  being handled by the Foster City Police Department, and I

18  was not going to do anything to jeopardize their

19  investigation or participate in what they were doing without

20  knowing the details of it.

21     Q      Did you allow any civilian to touch or enter the

22  black car?

23     A      No.

24     Q      Did you have law enforcement to relieve you?

25     A      Yes.

26     Q      How did that work?

244

1       A       I asked our communications center to have a

2    representative from the Foster City Police Department

3    respond to where I was so they can take over the security of

4    the scene so that I can depart and go back to my deputies

5    who were elsewhere.

6       Q       Did that happen, sir?

7       A       Yes.

8       Q       And who was it; do you know?

9       A       I don't know the name, but it was a Community

10   Service Officer from Foster City Police Department.

11      Q       Up to that point in time from when you arrived,

12   had anyone entered or touched the black range -- pardon me,

13   the black car until the CSO arrived?

14      A       Nobody.

15      Q       As you were there out in the Albertsons loading,

16   did you receive an object from a civilian?

17      A       Yes.

18      Q       What was that?

19      A       A cell phone.

20      Q       The man who just testified, do you know him?

21      A       From that day.  I don't know him personally.

22      Q       Okay.  That man indicated he gave a cell phone

23   to someone called Bill.  Is that you?

24      A       Yes.

25      Q       And what did you do with the cell phone?

26      A       I kept it until I was relieved by the Community

Kathryn M. Lezchuk, C.S.R. No. 2302

245

1   Service Officer from Foster City, and then I passed it on to

2   him.

3           Q       Did you open the cell phone to examine it?

4           A       No.

5           Q       Did you try to determine the ownership in some

6   way on that cell phone?

7           A       I just asked the person who gave it to me where

8   he got it, where it came from, and he said he picked it up.

9   He says it was a part of the incident between the Foster

10  City police and the people they were chasing, and that was

11  it.

12          Q       To this day, do you know whose cell phone it is?

13          A       No.

14          Q       Other than giving it to the Community Service

15  Officer, did you have any other role to play with that cell

16  phone?

17          A       None.

18                  MS. ALLHISER:   Those are my questions.

19                  MR. BELL:   I have no questions, Your Honor.

20                  THE COURT:   Witness be excused?

21                  MR. BELL:   Yes.

22                  MS. ALLHISER:   Yes, Your Honor.

23                  THE COURT:   You are excused.   Thank you.

24                  MS. ALLHISER:   Your Honor, the People's next two

25  witnesses require the service of a certified Mandarin

26  interpreter, who is present in court.

1           THE COURT:  Okay.

2           MS. ALLHISER:  The first witness Sharon,

3    S-h-a-r-o-n, Chi, and I will go get her.

4       Call Sharon Chi.

5       Will you walk to the witness stand and be sworn.

6           THE COURT:  What is the interpreter's name for

7    the record.

8           THE INTERPRETER:  Mary Ma, M-a-

9       Please raise your right hand.

10                  SHARON CHI,

11   called as a witness by the People, after being first duly

12   sworn, was examined and testified through the Registered

13   Mandarin Interpreter as follows:

14          THE CLERK:  Thank you.  Please have a seat.

15          THE COURT:  And for the record, Ms. Ma, the

16   interpreter, is a certified interpreter?

17          THE INTERPRETER:  Registered interpreter.  There

18   is no certification for Mandarin yet.

19          THE CLERK:  Can I have the witness please state

20   and spell her name for the record.

21          THE WITNESS:  (In English)  The name is Sharon

22   Chi, S-h-a-r-o-n, with Chi is, C-h-i.

23          THE INTERPRETER:  My name is Sharon Chi,

24   S-h-a-r-o-n  C-h-i.

25          THE COURT:  Also, for the record, you have an

26   oath on file with the court?

1          THE INTERPRETER:  I'm sorry?

2          THE COURT:  Do you have an oath on file with the

3    court?

4          THE INTERPRETER:  Yes, I do.

5                    DIRECT EXAMINATION

6    BY MS. ALLHISER:

7          Q     Thank you for waiting, Miss Chi.

8          Which languages do you speak?

9          A     Mandarin.

10         Q     Do you speak some English?

11         A     A little bit.

12         Q     In court today would you prefer we speak with

13   you and receive your answers in Mandarin or English?

14         A     Mandarin, please.

15         Q     How long have you lived in the United States?

16         A     About 23 years.

17         Q     What kind of business are you in?

18         A     I have a restaurant.

19         Q     Are you married, ma'am?

20         A     Yes, I do.

21         Q     What is your husband's name?

22         A     Yao Chi.

23         Q     On his passport does it say Yao, Y-a-o, last

24   name Chi, C-h-i?

25         A     Yes.

26         Q     Do you have children?

248

1       A       One.

2       Q       What is your child's name?

3       A       Solomon.

4       Q       S-o-l-o-m-o-n?

5       A       Right.

6       Q       How old is Solomon?

7       A       Eighteen.

8       Q       In March of this year, 2004, what was your

9  family's residence address?

10      A       1295 Beach Park Boulevard, Foster City.

11      Q       Is that a single-family residence?

12      A       Yes.

13      Q       I would like to ask you about March 9th, 2004.

14 Did you have a trip out of the country that day?

15      A       Yes.

16      Q       Where did you travel?

17      A       Taiwan.

18      Q       How long were you in Taiwan?

19      A       Twelve days.

20      Q       When you left for Taiwan, was it from San

21 Francisco Airport?

22      A       Yes.

23      Q       Did you take any United States currency with you

24 to Taiwan?

25      A       Yes.

26      Q       How much United States currency did you take

249

1   with you to the airport before you got on the plane?

2          A       First I took $500, and I realized that I didn't

3   bring enough, so I asked my husband to bring 1,100 more;

4   therefore, I had 1,600 all together.

5          Q       When you were at the airport, is that when you

6   discovered you didn't have enough U.S. money?

7          A       Yes.

8          Q       Do you know where the money had been kept in

9   your house, this U.S. money?

10         A       Yes.  It's in a steel cabinet, at the bottom

11  drawer.

12         Q       If you recall, when did you put the United

13  States currency, the first time, into that cabinet?

14         A       I often put money in there.

15         Q       So you would add money over time?

16         A       Right.

17         Q       Before you left for Taiwan on March 9th, did you

18  check yourself to see how much U.S. currency was in the file

19  cabinet?

20         A       Yes.

21         Q       Did you count it?

22         A       Yes.

23         Q       Before you left for the airport, how much money

24  was in the file cabinet?

25         A       5,150.

26         Q       When you left for the airport, you took with you

1    only $500; is that right?

2        A    Right.

3        Q    Then your husband brought you another $1100 to

4    the airport; is that right?

5        A    Right.

6        Q    Did you carry any Taiwanese new dollars with you

7    on your trip?

8        A    Yes.

9        Q    How many Taiwanese new dollars, if you know, did

10    you take to Taiwan.

11        A    About 10,000 new dollar.

12        Q    What was the exchange rate between Taiwanese new

13    dollars and U.S. dollars then, if you know?

14        A    34 new dollar -- Taiwan new dollar to one

15    dollar U.S.

16        Q    When you left for Taiwan, you're on the plane,

17    and you returned to the United States, did you bring any

18    United States currency back with you at the end of the trip?

19        A    Yes.

20        Q    Do you remember how much U.S. currency you

21    brought back with you from Taiwan?

22        A    1100.

23        MS. ALLHISER:    Your Honor, I ask there be marked

24    for identification a series of photographs, A through G.    I

25    offered counsel copies of these.    Appears to be the

26    residence at 1295 Beach Park Boulevard and the interior of a

251

1    bedroom.

2                    THE CLERK:   Marking People's Exhibit 13.

3                    (People's Exhibit No. 13, Poster Board with

4                    photographs A through G, marked for

5                    Identification only.)

6                    MS. ALLHISER:      Q      I would like to show

7    you something, and then I will get out of the way so the

8    jury can see.

9         This board is called Exhibit 13.   These are

10   photographs.   They are labeled with an alphabet, A through

11   G.   Do you see?

12        A     (Nods head.)

13        Q     Do you recognize the house in A, B and C?

14        A     Yes.

15        Q     Whose house?

16        A     Mine.

17        Q     Is this the way your house looked when you left

18   for Taiwan on March 9th, 2004?

19        A     Yes.

20        Q     Do you see a room in photograph D?

21        A     Yes.

22        Q     What room is that?

23        A     Master bedroom, my bedroom.

24        Q     Is the metal cabinet where you had stored United

25   States currency shown in the photograph D?

26        A     Yes.

252

1   Q    Will you describe where it is?

2   A    It's on the right side of my bed.

3   Q    So if you were in bed, it would be to your

4   right-hand side?

5   A    Yes.

6   Q    Is it sort of a blue-gray color two-drawer?

7   A    Yes.

8   Q    Was all of your United States currency stored in

9   one place in the file cabinet?

10   A    Yes.

11   Q    Did you store any collection of money in any

12   other place?

13   A    Yes.  I collected two-dollar bills in a

14   different place.

15   Q    Where did you store your collected two-dollar

16   bills?

17   A    On my left-hand side.  There's drawers.  I store

18   in there.

19   Q    And those drawers, is it like a dresser for

20   clothing?

21   A    Yes.

22   Q    When you left for Taiwan, did you leave behind

23   in your home any valuable jewelry?

24   A    Yes.

25   Q    Where did you leave it in your house?

26   A    I put it in the wooden lamp stand.

Kathryn M. Lezchuk, C.S.R. No. 2302

253

1  Q Lamp stand?

2  A Lamp stand on the right-hand side.

3  Q We also use -- sometimes use the word

4 "nightstand," a small, wooden cabinet.  Is that what you

5 mean, and it is brown?

6  A Right.

7  Q In this picture, photograph 13D, the nightstand

8 where you kept your jewelry was between your bed and the

9 file cabinet; is that right?

10  A Right.

11  Q Did you keep your valuable jewelry in any other

12 place other than the nightstand?

13  A Also I hid them with the two-dollar bills.

14  Q In the dresser to the left of your bed?

15  A Yes.

16  Q What kind of jewelry, can you use words to

17 describe, that you left behind when you went to Taiwan?

18  A Earrings, rings, necklace, necklaces.

19  Q Were any of these items of substantial dollar

20 value, expensive?

21  A This room, I lost those jewelries, but there

22 were watch -- I had a watch lost in a different room.

23  Q Where was the watch from?

24  A The third bedroom.

25  Q Inside the third bedroom did you have one watch,

26 more than one watch?

254

1      A     One watch.

2      Q     What type?

3      A     Rolex.

4      Q     And the value of that Rolex watch?

5      A     About $9,000.

6      Q     On an ordinary day, did you keep the metal file

7  cabinet locked or unlocked?

8      A     Locked.

9      Q     Who had keys to open the locked metal cabinet?

10     A     My husband and I.

11     Q     Were there spare keys anywhere else in the

12  house?

13     A     No.

14     Q     And to your knowledge, did any family or friends

15  have a spare key to that metal cabinet?

16     A     No.

17     Q     When you returned from Taiwan, did you check to

18  see if any of your U.S. currency was missing?

19     A     It's already gone, all gone.

20     Q     All gone?

21     A     Yeah, all gone.

22     Q     All of the money from the metal cabinet?

23     A     Yes.

24     Q     All of the two-dollar collection from the

25  dresser?

26     A     Yes.

255

1     Q    All of them?

2     A    All gone.

3     Q    Did you find your Rolex watch in the third

4  bedroom?

5     A    That -- on the day of the incident my husband

6  realized the Rolex watch was also gone.

7     Q    Now, I'm just asking about you, though.  When

8  you got back from Taiwan, was the Rolex watch missing?

9     A    Missing.

10     Q    And when you returned from Taiwan, did the

11  police show you some jewelry?

12     A    They showed me some photos of jewelries.

13     Q    And did you recognize anything that belonged to

14  you?

15     A    Yes.

16     Q    Did the police ask you to mark or initial the

17  bags of jewelry that belonged to you?

18     A    Yes.

19     Q    I would like to show you another picture.  This

20  is called Exhibit 11.

21     Do you see a picture of what you marked identifying

22  your jewelry here?

23     A    This one.

24     Q    F?

25     A    F.

26     Q    And how did you recognize your jewelry?

256

1        A       Because I wear it all the time.

2        Q       Were some of these items of jewelry purchased

3   out of the United States?

4        A       Yes.

5        Q       And were some of the items of jewelry unique?

6        A       I think so, because I bought them so I can

7   recognize them.

8        Q       The items that you recognized, did you mark them

9   some way or the police?

10       A       Yes.

11       Q       This gentleman sitting with me, the man in the

12  suit, blue tie, do you recognize him as a Foster City

13  detective?

14       A       Yes.

15       Q       And was he one of the people who was showing you

16  these various photographs of jewelry?

17       A       Yes.

18       Q       Were there other items of jewelry the police had

19  that were not yours?

20       Do you need to see the pictures?  I'll show you

21  People's Exhibit 11.

22       A       In these two pictures some of them, the

23  jewelries, are mine and some are not.

24       Q       So you were referring to the photographs in A

25  and B, they're just laid out, and you're saying some of it

26  was yours, some of it wasn't?

257

1          A       That's right.

2          Q       And you selected the ones that belonged to you

3    and separated them out?

4          A       And then we put them in bags.

5          Q       And that's what shows in F?

6          A       Yes.

7          Q       The Rolex watch, the one from your third

8    bedroom, did the police show that to you?

9          A       Yes.

10         Q       Miss Chi, there is a man sitting here in sort of

11   a green-gray-colored shirt, a business shirt.  Do you see

12   the man I'm pointing to?

13         A       Yes, that Asian man.

14         Q       Do you know him?

15         A       No, I don't.

16         Q       Do you know someone by the name Hoa Trung Khuu?

17         A       No.

18         Q       Does that man, the man I pointed to, the Asian

19   man in the sort of greenish-colored shirt, does he have the

20   right to enter your house?

21         A       No.

22         Q       You need to speak, though.

23         A       He can't enter my home.

24         Q       That man, did he have the right to possess your

25   cash or your jewelry or your watch?

26         A       No.

258

1              MS. ALLHISER:  Your Honor, in my questions,

2    would the record reflect that I was referring to the

3    defendant, Mr. Hoa Trung Khuu?

4              THE COURT:  Yes.

5              MS. ALLHISER:  Those are my questions.

6              MR. BELL:  Thank you.

7                        CROSS-EXAMINATION

8    BY MR. BELL:

9         Q    Mrs. Chi, I'm one of the lawyers in the case.

10        I'd like to ask you a few questions about your home

11   and the things that you were missing.  Do you have any

12   objection to that?

13        A    No.

14        Q    You told us that prior to leaving for the

15   airport for your trip to Taiwan on March 9th you placed some

16   money in a file cabinet in your home.

17        Can you tell us what time of day it was that you

18   placed the money in the drawer?

19        A    Around 3:00 p.m., March the 9th.

20        Q    Okay.  And your flight was scheduled to leave at

21   what time?

22        A    Early morning, March 10th.

23        Q    At what time did you leave for the airport?

24        A    Ten o'clock, ten o'clock.  March 9th, evening,

25   ten o'clock, I went to the airport.

26        Q    All right.  When you put the money in the

259

1    drawer, how much money total was there in the drawer?

2        A    $5,150.

3        Q    And then you asked your husband to bring you

4    some additional money?

5        A    Right.

6        Q    Which was 1100 dollars?

7        A    Right.

8        Q    Which would have left how much of your money in

9    U.S. currency in the drawer?

10            THE INTERPRETER:    Sorry.    What did you say?

11            MR. BELL:    Q    How much U.S. currency of

12    your money would have been left in the drawer when your

13    husband brought you the additional $1100?

14        A    3,550.

15        Q    When you put the money in the drawer on March

16    the 9th, were you by yourself?

17        A    Yes.

18        Q    After you returned from your trip to Taiwan,

19    which was on -- well, let me ask you.    Did you return from

20    your trip to Taiwan on the 25th of March?

21        A    Yes.

22        Q    Did you then meet with the police on the next

23    day, on March 22nd, about the missing money?

24        A    That's right.

25        Q    Did the police come to your home?

26        A    Yeah.

Kathryn M. Lezchuk, C.S.R. No. 2302

260

1     Q    The person who came to your home was Detective

2  Morrison, who is seated here in court today?

3     A    Yes.

4     Q    Later that day you went to the police station to

5  examine jewelry that the police had in their possession?

6     A    Yes.

7     Q    Has the jewelry that the police had in their

8  possession already been returned to you, or do the police

9  still have the jewelry?

10    A    They have not returned.  They still in the

11 police possession.

12    Q    You discovered when you returned home several

13 items of missing jewelry?

14    A    Yes.

15    Q    But when you went to the police station, all of

16 the jewelry that you were missing was not there, was it?

17    A    Correct.

18    Q    There is still jewelry missing from your home

19 that is unaccounted for, correct?

20    A    Correct.

21    Q    Did the police ask you to look at any U.S.

22 currency that they had in their possession?

23    A    No.

24    Q    Has any of the money that you reported as

25 missing from your home been returned to you by the police?

26    A    No.

261

1      Q     Has it been returned to you by anybody else?

2      A     No.

3      Q     Referring again to the pictures which are on the

4 display easel to your left, which is marked People's 13, you

5 indicated that the picture A shows your home as it was on

6 March the 9th of this year; is that correct?

7      A     Right.

8      Q     Is that also true of the picture in B?

9      A     Yes.

10     Q     I want you to look at pictures A and B, and do

11 you see in those pictures some sort of sign that indicates a

12 burglar alarm for the property?

13     A     Yes, a little bit, but I install it after the

14 incident.

15     Q     That was my question.  Was your house equipped

16 with a burglar alarm on March the 9th?

17     A     No.

18     Q     The burglar alarm was installed after the loss

19 you have testified about, correct?

20     A     Yes.

21     Q     Now, when you returned to the United States on

22 the 21st of March and you met with officer or Detective

23 Morrison at your home on the 22nd, do you recall that

24 Detective Morrison asked you some questions about the same

25 subject as the subject of your testimony here today?

26     A     Yes.

1      Q    Did you speak to Detective Morrison in English?

2      A    Yes.

3      Q    Was there anyone present to translate for you or

4    to translate for Detective Morrison?

5      A    No.

6      Q    Did you tell Detective Morrison on the 22nd how

7    much money was missing from your nightstand?

8           THE INTERPRETER:  Nightstand?

9           MS. ALLHISER:    Q    Yes.  From the night

10    table.

11      A    I told him $6,000 I lost.

12      Q    All right.  I may have misspoke.  I said missing

13    from your nightstand, but did you simply tell Detective

14    Morrison how much money U.S. currency was missing from your

15    home?

16      A    Yes.  I was -- because I was very nervous when I

17    returned home, and I roughly estimated was $6,000 that I

18    lost, and later on had time to think back what money I had

19    in there.  Then it was a better calculation.

20      Q    So what you're saying, that what you told

21    Detective Morrison on the 22nd was inaccurate and not true,

22    correct?

23      A    It's not incorrect, but I was nervous, and it

24    was an estimate.

25      Q    So did you overestimate the amount of money that

26    was missing from your home when you spoke to Detective

```
 1   Morrison on March 22nd?

 2        A     Yes.

 3        Q     Detective Morrison actually asked you to break

 4   down the denominations of the money that you were missing,

 5   correct?

 6        A     Yes.  Yeah, I thought about it.

 7        Q     And you told him that there were 36, $100 bills

 8   missing.

 9        A     Because I did not include the 1,100 my husband

10   already gave me.

11        Q     Okay.  In fact, you didn't say anything to

12   Detective Morrison on the 22nd of March about the $1100 that

13   you have testified here today your husband brought you to

14   the airport, correct?

15        A     Correct.  Right.  I mentioned that my husband

16   deliver some money to me to the airport, because

17   Mr. Morrison asked me why did I keep so much cash at home.

18   I told him that I kept it there as wanting to take it to

19   Taiwan with me, but I did not mention the amount that my

20   husband delivered to me to the airport.

21        Q     So let me see if I understand.  It's your

22   testimony here today that you told Detective Morrison on

23   March the 22nd when you talked to him at your home that your

24   husband had brought money to you at the airport?

25        A     Did I say that?  I can't remember.

26        Q     In fact, Mrs. Chi, you never said anything to
```

264

1    Detective Morrison on March the 22nd when he talked to you

2    in your home about your husband bringing you any money to

3    the airport?

4        A    I can't remember.

5        Q    Okay.  At any later date, before today here in

6    court in your testimony, did you ever tell Detective

7    Morrison about you asking your husband to bring you an

8    additional $1100 to the airport on March 9th before you left

9    for Taiwan?

10        A    No.

11            MR. BELL:  I have nothing further.

12            THE COURT:  Ms. Allhiser.

13            MS. ALLHISER:  Briefly, Your Honor.

14                    REDIRECT EXAMINATION

15    BY MS. ALLHISER:

16        Q    Did you say you knew the denominations of the

17    two-dollar bills?

18            THE INTERPRETER:  Two-dollar bills?

19            MS. ALLHISER:    Q    Did you know the count of

20    the two-dollar bills?

21        A    About 20.

22        Q    And how is it you know the number of two-dollar

23    bills you had stored in your dresser?

24        A    I collected the two-dollar bills for 20 years.

25    Of course I know the numbers.

26        Q    How many pieces of jewelry are still missing the

265

1   police did not show you?

2       A    One pair of sapphire earring and sapphire

3   necklace.

4       Q    Was that a matched set?

5       A    Not matching.  They are both sapphires.  That's

6   all.

7       Q    Did you store -- before there was any trouble,

8   did you store the sapphire earrings and the sapphire

9   necklace in the same place?

10      A    Should be.

11           MS. ALLHISER:  No questions.

12                   RECROSS EXAMINATION

13  BY MR. BELL:

14      Q    Mrs. Chi, besides the sapphire earrings and

15  necklace, there are still other items that were missing from

16  your home that were never recovered, correct?

17      A    That's all.  Only the two items missing.

18      Q    There were not even any lesser expensive items

19  that are still missing and not recovered?

20      A    No.

21           MR. BELL:  Okay.  Nothing further.

22           MS. ALLHISER:  No questions, Your Honor.

23           THE COURT:  May she be excused?

24           MS. ALLHISER:  Yes, Your Honor.

25           THE COURT:  All right.  You're excused.  Thank

26  you.

Kathryn M. Lezchuk, C.S.R. No. 2302

1   Why don't we take our morning recess at this time,

2   ladies and gentlemen.   15 minutes.

3       Please remember the admonition.

4       (Brief recess.)

5           MS. ALLHISER:   Yao Chi.   This man needs a

6   Mandarin interpreter, Your Honor.

7           THE COURT:   And for the record, we will use the

8   same interpreter.

9           THE CLERK:   Please remain standing and raise

10  your right hand.

11                  YAO CHI,

12  called as a witness by the People, after being first duly

13  sworn, was examined and testified through the Registered

14  Mandarin Interpreter as follows:

15          THE CLERK:   Thank you.   Please have a seat.

16      Please state and spell your name for the record.

17          THE WITNESS:   Y-a-o   C-h-i.

18              DIRECT EXAMINATION

19  BY MS. ALLHISER:

20      Q    Thank you for waiting, Mr. Chi.

21      A    You're welcome.

22      Q    Which languages do you speak?

23      A    Mostly Chinese.

24      Q    A specific language?

25      A    Mandarin.

26      Q    Do you speak some English, sir?

1    A    Simple English.

2    Q    In court today, do you prefer to use Mandarin?

3    A    Mandarin.

4    Q    On March 9th, 2004, do you remember your wife

5  traveling by air to Taiwan?

6    A    Yes, I do.

7    Q    Did you take her to the airport?

8    A    I think she took a shuttle bus from the hotel.

9    Q    She stayed at a hotel that night?

10    A    She took a shuttle bus after finishing her work

11  that night.

12    Q    When she finished work that night on March 9th,

13  she took a shuttle to the airport, but did you ever go to

14  the airport that night?

15    A    That night she telephoned me and told me she did

16  not bring enough money.  Then I took some money and

17  delivered to her.

18    Q    From what place did you take the money to

19  deliver to your wife?

20    A    In the steel cabinet.

21    Q    What room is the steel cabinet in?

22    A    In the bedroom.

23    Q    How much money did you take to your wife at the

24  airport?

25    A    Totally I gave her one to $2,000, because that

26  day I took a little over $1,000 from the steel cabinet.

268

1    Then I gave her another 1000 from my wallet, around that.

2         Q    Do you remember -- it's okay if you don't.  Do

3    you remember the exact amount you gave your wife?

4         A    I'm not sure.

5         Q    Sir, when you took some money from the metal

6    cabinet, did you leave money behind still in the cabinet?

7         A    The majority of it.

8         Q    Do you know exactly how much money you left

9    behind in the steel cabinet?

10         A    I'm not sure, but from the look of it, I think

11    it's around $5,000, but later on my wife told me there were

12    a stack of -- a stack of one-dollar bills at the bottom.

13         Q    Not asking you, sir, about what your wife told

14    you but what you know yourself.

15         Do you know, for your own knowledge, how much money

16    you left behind in the steel cabinet?

17         A    I did not count it.  But I know there's a lot of

18    money in there.

19         Q    The night that your wife went to the airport,

20    flew to Taiwan, the very next day, do you remember that very

21    next day, March 10th?

22         A    On that day I went to work.

23         Q    At what time did you go to work?

24         A    Eight o'clock in the morning.

25         Q    When you left work, was there anyone still at

26    home that morning, March 10th?

269

1      A      No.

2      Q      Your son is Solomon, right?

3      A      Yes.

4      Q      When you left for work, was Solomon already

5  gone?

6      A      That day, I think he was already gone.

7      Q      When you left for work that day, March 10th, did

8  you close and lock your doors?

9      A      No.

10     Q      Which doors did you leave open?

11     A      The garage.

12     Q      Did the garage have a lock to the door?

13     A      I did not lock the door between the garage and

14  the outside and the garage to the inside -- interior of the

15  house.

16     Q      Okay.  Let me see if I understand.  If you drove

17  the car into your garage, would there be a door leading into

18  your house inside the garage?

19     A      Yes.  Is on the left.

20     Q      And when you left, when you went to work at 8:00

21  a.m., did you drive your car out of the garage?

22     A      Yes.

23     Q      Did you close the garage door to the ground?

24     A      Yes.

25     Q      Was there anything to lock the whole garage door

26  closed?

270

1       A       I don't know.

2       Q       Does your garage door operate by a remote

3   control?

4       A       Yes.

5       Q       When you drove to work, do you use your remote

6   to close the garage -- the car door?

7       A       Yes.

8       Q       Do you know if your front door was locked when

9   you left for work at 8:00 a.m.?

10      A       Yes.

11      Q       Are there any side or rear doors to your house?

12      A       In the bedroom there is a door.

13      Q       When you left for work on March 10th in the

14  morning, was the bedroom door open or closed?

15      A       Open.  It's closed but unlocked.

16      Q       So the surface was sealed but you could open the

17  door; is that true?

18      A       Yes.  I closed it but not locked.

19      Q       The windows to your home, were they closed when

20  you left in the morning on March 10th?

21      A       Yes, closed, not locked.

22      Q       When did you return to your home on March 10th?

23      A       Around 9:30 to ten o'clock in the evening.

24      Q       At that time, 9:30 or ten o'clock, did you know

25  if anything was missing, stolen from your house?

26      A       No.

271

1    Q      You didn't know?

2    A      After I return home, I prepared for bed -- going

3    to bed. I have a shower. I did not notice anything.

4    Q      While your wife was on her trip to Taiwan, was

5    there a time that you did check the steel cabinet to see

6    about the money?

7    A      No.

8    Q      Was there a time that you decided to put some

9    money into the bank?

10   A      That was 11th, in the afternoon.

11   Q      What did you do on the 11th in the afternoon?

12   A      A little after 3:00 I went to open the steel

13   cabinet, and I noticed the cabinet was slightly open.

14   Q      Why did you go to open the steel cabinet?

15   A      Because I wanted to deposit the money in the

16   bank.

17   Q      I would ask you to look at a couple of

18   photographs here. This is an exhibit, People's 13.

19          Are A, B and C pictures of your house, sir?

20   A      Yes.

21   Q      And do you see a picture of the steel cabinet on

22   People's Exhibit 13?

23   A      Yes.

24   Q      Do you see a letter associated with the photo of

25   the steel cabinet?

26   A      (Nods head.)

272

1      Q     Which one?

2      A     D, E, F.

3      Q     D, E and F show the steel cabinet, sir?

4      A     Yes.

5      Q     On the photograph F, you see this is a close-up.

6  Do you see any damage to the steel cabinet in the photograph

7  F?

8      A     That's what I saw, the F picture.

9      Q     Describe it in words.  What was the damage?

10     A     I saw that the cabinet was forced open.

11     Q     Okay.  Did you look for your money?

12     A     When I opened it, it was all empty.

13     Q     What did you do?

14     A     I got very upset.

15     Q     Did you call the police?

16     A     Because it was almost four o'clock, I have to go

17  to the restaurant and open it up.

18     Q     And then what did you do?

19     A     Around 4:30 I waited for the waitresses to

20  arrive.  Then I telephoned my son to come back home.

21     Q     And did your son call the police?

22     A     Yes, because my English is not good enough, so I

23  asked him to call the police.

24     Q     Later did you speak with the police officer?

25     A     Through my son's interpreting.

26     Q     Your son would speak Mandarin to you and then

273

1    English to the police?

2         A    Yes.

3         Q    Did you try to explain for your son to translate

4    how you found the steel cabinet broken and the money gone?

5         A    Yes.

6         Q    Mr. Chi, before you found the broken steel

7    cabinet, did you know where your wife's jewelry was?

8         A    Some of them.

9         Q    Did you ever check when you found the steel

10   cabinet broken to see if the jewelry was missing?

11        A    Yes, I did.

12        Q    Did you notice if jewelry was missing?

13        A    I was not very certain of how my wife put away

14   her stuff, so I was not sure what was missing of her stuff.

15        Q    Was -- did you have any jewelry of your own,

16   sir?  Some men wear a gold chain or a watch.  Did you have

17   any jewelry of your own that you stored in your bedroom?

18        A    After -- two days later I realized one of my

19   watch was missing.

20        Q    Where had the watch been?

21        A    Should have been on top of a desk in a different

22   bedroom.

23        Q    Sir, I ask you to look at this man, the man

24   wearing a long-sleeved shirt here today.  It's sort of a

25   green-gray color.  Please look at him.

26        Do you know him?

274

1       A       I've never seen him before.

2       Q       Do you have knowledge of the name, Hoa Trung

3   Khuu?

4       A       I have never heard of it.

5       Q       This man, the man you see in court wearing the

6   green long-sleeved shirt, did he have permission to enter

7   your home at any time?

8       A       No.

9       Q       Did he have permission to possess any of your

10   money, your wife's jewelry, your watch or anything from

11   inside your house?

12       A       (Shakes head.)

13       Q       Please speak.

14       A       He don't, huh-uh.

15       Q       Did this man have your permission to have any

16   property from inside your house?

17       A       I don't know him.  Is impossible for me to let

18   him to my house.

19               MS. ALLHISER:  I understand.

20       Your Honor, would the record reflect that as I was

21   referring to the man in the green shirt I was referring to

22   the defendant Hoa Trung Khuu?

23               THE COURT:  Yes.

24               MS. ALLHISER:  Those are my questions.

25                      CROSS-EXAMINATION

26   BY MR. BELL:      Q      Mr. Chi, I'm one of the lawyers in

275

1    the case.

2        A    Okay.

3        Q    I need to ask you some questions.

4        A    Okay.

5        Q    First I need to ask you a little bit about your

6    understanding of language.  After you discovered money

7    missing from the house, the police came to your house to

8    talk to you about that; is that correct?

9        A    Yes.

10       Q    Okay.  Do you remember the name of the police

11   officer with whom you spoke?

12       A    At that time I knew what his name was, now I do

13   not remember.

14       Q    Okay.  Did he give you a business card or some

15   sort of identification card so that you knew who he was?

16       A    Because my son was the one that contacted them.

17       Q    Okay.  If I told you that the officer's name was

18   Officer Ticas, Martin Ticas, would that refresh your

19   recollection?

20       A    Yes.

21       Q    Now, Officer Ticas explained that he did not

22   speak English, correct?  I'm sorry, that he did not speak

23   Chinese, correct?

24       A    Yes.

25       Q    And you found it easier to talk with him through

26   your son Solomon?

Kathryn M. Lezchuk, C.S.R. No. 2302

276

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Solomon understands and speaks Mandarin? |
| 3 | A | Yes. |
| 4 | Q | And English? |
| 5 | A | Yes. |
| 6 | Q | Was Solomon born here in the United States? |
| 7 | A | Yes. |
| 8 | Q | He is fluent in both languages? |
| 9 | A | He can speak Chinese, but he cannot write or |

10   read Chinese.

11       Q    But he can speak it and understand spoken

12   Mandarin well, correct?

13       A    Yes.

14       Q    And as a matter of fact, in your family you

15   converse mostly in Mandarin with him, correct?

16       A    Yes.

17       Q    Now, Solomon has gone to school here in the

18   United States for several years, correct?

19       A    He's in high school.  Now he's in college.

20       Q    He's 18?

21       A    Yes.

22       Q    Okay.  Now, how long have you lived in the

23   United States?

24       A    I came here in 1977.

25       Q    Okay.  Are you a U.S. citizen now?

26       A    Yes.

277

1    Q    And so you have some understanding of English,

2  correct?

3    A    Yes.

4    Q    It's just that you prefer, to be absolutely

5  accurate, to have it translated into Mandarin, which you

6  understand better than English; is that a fair statement?

7    A    Correct.

8    Q    Okay.  So that when Officer Ticas came to your

9  house -- by the way, that was on March the 12th; is that

10  correct?

11    A    I think it's on a Friday, Friday afternoon.

12    Q    All right.  In any event, whenever Officer Ticas

13  came to your house, the officer asked you to explain about

14  the missing money?

15    A    Yes.

16    Q    Do you remember telling Officer Ticas that day

17  that you placed $5,000 cash in U.S. currency into the file

18  cabinet located next to the nightstand in the bedroom?

19    A    I did not put the money myself.  It's my

20  estimation.

21    Q    Do you remember telling Officer Ticas on the day

22  he came to see you at the house as you found the money

23  missing that you placed $5,000 cash in U.S. currency into

24  the file cabinet?

25    A    I did not put them.  My wife placed them there.

26    Q    Do you remember telling Officer Ticas, whatever

278

1    -- whoever placed it there, do you remember telling Officer

2    Ticas that it was you who placed it in the file cabinet, and

3    that the amount you placed in the cabinet was $5,000?

4         A    I said roughly.

5         Q    Do you remember telling Officer Ticas that you

6    were alone when you placed the money into the file cabinet?

7         A    I don't understand what you're saying.

8         Q    Okay.  Again, I'll ask you, do you remember

9    telling Officer Ticas when he came to your house after you

10   noticed the money missing that you were alone when you

11   placed $5,000 into the file cabinet -- $5,000 in U.S.

12   currency, in cash, into the file cabinet?

13        A    My wife has always been taking care of the money

14   at home, putting in and taking it out.  It was my estimation

15   it will be over $5,000 that was there.

16        Q    Do you remember telling Officer Ticas that you

17   do not recall exactly what time, but that it was some time

18   on the evening of March the 9th that you placed the money

19   into the file cabinet?

20        A    On March 9th my wife withdraw over $3,000, and

21   then I send -- I delivered a little over 1000 to her.  I

22   don't know the exact amount.  After my wife returned and she

23   counted, she told me at the bottom there were one-dollar

24   bills.

25        Q    Do you remember telling Officer Ticas when you

26   talked to him, after you noticed the money missing, that you

279

1    did not notice it missing until March the 12th at about 3:45

2    in the afternoon?

3         A    Is the 12th a Friday?

4         Q    I don't know, sir.  I'm sorry.  I don't have a

5    calendar, so I can't help you here.

6              THE COURT:  I do.  Hang on just a second.

7         March 12th, 2004, was a Friday.

8              MR. BELL:  Okay.

9         Q    So you did notice it was missing on Friday, in

10   the afternoon?

11        A    Yes.

12        Q    Okay.  What you told Officer Ticas was that you

13   came home from work at about two o'clock in the afternoon,

14   you took a nap, and then after you awoke from your nap that

15   afternoon you noticed it missing.  Is that -- do you

16   remember telling Officer Ticas that?

17        A    Right.

18        Q    And that's -- that is actually what happened;

19   isn't that correct?

20        A    Yes.

21        Q    And you asked Solomon to call the police that

22   same day, correct?

23        A    Yes.

24        Q    And the police came to your house that same day,

25   correct?

26        A    Yes.

280

1      Q    Did you ever tell Officer Ticas that after

2  putting money in the drawer that you took money out of the

3  drawer and delivered it to your wife at the airport?

4      A    Maybe not.

5      Q    Did you tell Officer Ticas anything about

6  delivering money from the cash drawer to your wife at the

7  airport before she left on her trip to Taiwan?

8      A    I don't think so.

9           MR. BELL:  Those are my questions.  Thank you.

10          MS. ALLHISER:  No, Your Honor.

11          THE COURT:  All right.  May the witness be

12  excused?

13          MS. ALLHISER:  Yes, Your Honor.

14          MR. BELL:  Yes.

15          THE COURT:  All right.  The witness is excused.

16  May the interpreter be excused?

17          MR. BELL:  Yes.

18          MS. ALLHISER:  Yes.

19     Solomon Chi.

20     Mr. Chi, walk up, please, to where you see the

21  microphone and stand there, sir.

22          THE CLERK:  Please raise your right hand.

23                    SOLOMON CHI,

24  called as a witness by the People, after being first duly

25  sworn, was examined and testified as follows:

26          THE CLERK:  Thank you.  Please have a seat.

1          Please state and spell your name for the record.

2                    THE WITNESS:  Solomon Chi, S-o-l-o-m-o-n  C-h-i.

3                         DIRECT EXAMINATION

4    BY MS. ALLHISER:

5          Q    How old are you, sir?

6          A    Eighteen.

7          Q    Are you in school?

8          A    Yeah.

9          Q    Your folks Sharon and Yao Chi just testified; is

10   that right?

11         A    Uh-huh.

12         Q    Yes?

13         A    Yes.

14         Q    How long have you lived in Foster City?

15         A    About almost a year.

16         Q    Asking you now about March 10th, 2004, the day

17   after your mom flew to Taiwan.  Are you with me?

18         A    Yeah.

19         Q    On March 10th, 2004, is a Wednesday.  Did you

20   leave home that day?

21         A    Yes, I did.

22         Q    What time?

23         A    About 7:30.

24         Q    Was your dad still at home?

25         A    No.  He had already left for work.

26         Q    Were you the last one out?

1      A      Yes, I was.

2      Q      When you left the house, do you know if any of

3  the doors were locked?

4      A      They should all be locked 'cause I lock them

5  before I left the house.

6      Q      Which doors did you lock before you left the

7  house?

8      A      Front door, side doors, except for the one that

9  leads into the garage.

10      Q      So once you're into the garage, you can turn a

11  knob and enter the home; is that correct?

12      A      Yes.

13      Q      And that one you guys don't lock?

14      A      No.

15      Q      Is there a sliding door to your parents'

16  bedroom?

17      A      Yes, there is.

18      Q      Do you know if that was locked on March 10th?

19      A      I don't know.

20      Q      You don't know?

21      A      That's my parents' thing.

22      Q      You don't go in?

23      A      No.

24      Q      What time of day did you next return to your

25  home on March 10th?

26      A      About twelve o'clock, so I could go grab my

283

1    lunch.

2        Q    When you got home at twelve o'clock, was there

3    anyone at home?

4        A    No.

5        Q    How did you get in?

6        A    A key.

7        Q    Did you notice that anything was broken,

8    disturbed, missing?

9        A    No.  I just went in to grab a lunch, and I left

10    right away.

11        Q    Before you came to court, did you look at some

12    pictures?

13        A    Yeah.

14        Q    On March 10th did you know that there was a

15    metal filing cabinet in your parents' room?

16        A    I seen it before.

17        Q    Do you have a key to it?

18        A    No.

19        Q    Before you came to court, you looked at some of

20    these pictures, though, right, People's Exhibit 13?

21        A    Uh-huh.

22        Q    Yes?

23        A    Yeah.

24        Q    Do you recognize the photograph D as your

25    parents' room?

26        A    Yes.

284

1     Q     And do you see this metal cabinet?

2     A     Yes.

3     Q     At some point on March 10th, 2004, did you enter

4  your parents' room?

5     A     No.

6     Q     The next day, March 11th, that would be a

7  Thursday, did you enter your parents' room?

8     A     No.

9     Q     I'm getting now to the next day, March 12th,

10 Friday.  Did you enter your parents' room?

11    A     No.

12    Q     Did you ever call the police to report a crime?

13    A     Yes.

14    Q     When the police came, did you go into your

15 parents' room?

16    A     Yes.

17    Q     And I'm asking you now to look at the

18 photographs, specifically F, G and H.  Have you had a chance

19 to look at that?

20    A     Yes.

21    Q     When the police were there, did you go into your

22 parents' room and look at the steel cabinet with the police?

23    A     Yes.

24    Q     Did you personally notice any damage to the

25 steel cabinet?

26    A     Yes.

1    Q    What was that?

2    A    Just it looked like it was pried open, lots of

3  scratches.

4    Q    Up to that moment where the police were with you

5  in your parents' room had you ever noticed that damage

6  before?

7    A    No.

8    Q    I'm asking you now to look at the photographs A,

9  B and C.   Is that the outside of your house?

10   A    Yes.

11   Q    And is there a window shown in these photographs

12  somewhere, A, B and C, a bathroom window but basically at

13  the front of your house?

14   A    Yes.

15   Q    Which is the best picture?

16   A    C.

17   Q    The photograph C, that's actually the front of

18  your house facing the street; is that true?

19   A    Yes.

20   Q    That particular window, is it -- this is back in

21  March.  That particular window, is it kept closed with a

22  screen?

23   A    Yes.

24   Q    Was there a time that you noticed damage to the

25  screen to that bathroom window?

26   A    No, I didn't notice any damage.

Kathryn M. Lezchuk, C.S.R. No. 2302

286

1      Q      After the police were there, and some days

2   passed, eventually did you look at that screen?

3      A      Yeah, on Sunday.

4      Q      And on Sunday what did you see?

5      A      Just that the screen looked like it had been

6   pried open, a little bent.

7      Q      Did you try to get the screen out yourself?

8      A      No.  I just told my dad, and he tried to get it

9   out and tried to fix it, and then he was all like, Oh,

10  that's not right.  Did someone break in again?

11     Q      You thought that that this might be a second time you

12  had been broken into?

13     A      Yeah.

14     Q      After you called the police on the steel

15  cabinet?

16     A      Yeah.

17     Q      Now, on March 10th, 2004, this is the day after

18  your mom flies to Taiwan, did you have any idea that someone

19  had been in your house without permission?

20     A      No.

21     Q      Until you saw the metal steel cabinet on that

22  Friday afternoon with the police, did you have any idea that

23  someone had been without permission in your parents' room?

24     A      No.

25     Q      Did you ever store anything in that metal

26  cabinet, anything of yours?

1     A     No.

2     Q     Do you have -- do you own any jewelry?

3     A     No.

4     Q     Do you ever keep sums of cash in your home?

5     A     No.

6     Q     So up to the time that the police and you were

7  there and you saw these items of damage on People's Exhibit

8  13 shown there in E, F and G, had you ever seen what was

9  inside the metal cabinet?

10    A     I just know there's papers, documents about

11  housing or cars and stuff -- or stuff like that.

12    Q     Now, how did you know that?

13    A     My mom told me.

14    Q     Had you ever seen it?

15    A     Yeah.

16    Q     When?

17    A     When we just moved in.

18    Q     And when would that have been compared to March

19  10th?

20    A     Do you mean when we moved?

21    Q     Yes.

22    A     We moved in in October, the end -- the middle of

23  October.

24    Q     So the middle of October, 2003, your mom told

25  you that there were documents, items about the house and the

26  car, in that metal cabinet in their bedroom?

288

1       A       Yeah.

2       Q       Did you know that your mother kept cash in that

3   metal cabinet?

4       A       No.

5               MS. ALLHISER:  No questions.

6                       CROSS-EXAMINATION

7   BY MR. BELL:

8       Q       Mr. Chi, I feel a little funny calling you

9   Mr. Chi.  You remind me of my son.  But that's the way we do

10  things here.

11          I'm one of the attorneys in the case, and I have a few

12  questions I have to ask you.

13      A       Okay.

14      Q       We know that the police came to the house on

15  Friday, March the 12th from previous evidence.  Would you

16  agree with that?

17      A       Yes.

18      Q       Then a few days later, actually five days later,

19  on March the 17th you call the police again, correct?

20      A       Yes.

21      Q       And that was because you and your father noticed

22  that there were some things missing besides the money in the

23  drawer; is that right?

24      A       Yes.

25      Q       And so the police came out to the house again,

26  and it was the same officer who was there on the 12th; is

Kathryn M. Lezchuk, C.S.R. No. 2302

289

1    that right?

2         A      That's correct.

3         Q      Do you remember that officer's name?

4         A      Mr. Ticas, Officer Ticas.

5         Q      So Officer Ticas was the officer that was there

6    on the 12th and the one who came back on the 17th?

7         A      That's correct.

8         Q      On the 17th you pointed out to Officer Ticas

9    that the screen on the window in picture C on Exhibit 13,

10   People's 13, had been bent as if it was pried -- had been

11   pried?

12        A      That's true.

13        Q      Was it on the 17th that you actually first

14   noticed that?

15        A      That's correct.

16        Q      Had you had occasion to look at that window

17   before?

18        A      No.

19        Q      Do you know whether or not on March the 12th

20   that screen had been pried?

21        A      No.

22        Q      But did you think that someone had tried to come

23   into the house again between March 12th when you reported it

24   the first time and March 17th when you called the officer

25   out a second time?

26        A      The 12th I didn't think anybody could fit

290

1   through that window, so that's why I assumed there was

2   another break-in.

3       Q    Okay.  Was that the only reason?

4       A    Yeah.

5       Q    Well, let me ask you:  Did you go into the

6   bathroom and look at the items in the bathroom --

7       I'm sorry.  Did Your Honor -- I misunderstood.  I

8   thought you were trying to get my attention.

9       On the 17th when you noticed that the screen was bent,

10  did you look in the bathroom to see if everything looked

11  normal there?

12      A    Everything looked fine.

13      Q    Was there a time when you did look in the

14  bathroom and things appeared to be in somewhat disarray?

15      A    No.  Everything seemed fine.  There's nothing

16  blocking that window, so there couldn't be any drastic

17  things that I noticed that it was not right.

18      Q    Well, let me ask you, do you remember telling

19  Officer Ticas on the 17th when you talked to him that you

20  remember the bathroom appeared to be in disarray but you

21  didn't consider it unusual until after you discovered the

22  money missing.  Do you remember telling the officer that?

23      A    Usually our bathroom is in disarray because I

24  use it.  I'm not very clean about stuff, so I -- tell you

25  the truth, be organized, or else you won't know.  So I

26  didn't notice anything in disarray.  I just thought it

1    looked normal to me.

2         Q    Let me go back to the first time Officer Ticas

3    came to the house.  You didn't have any personal knowledge

4    about missing money, correct?

5         A    No.

6         Q    The only one that presumably knows anything

7    about that would be your mother or your father?

8         A    That's correct.

9         Q    When you called the police for your father, the

10   police wanted to talk to your father about the missing

11   money, correct?

12        A    Yes.

13        Q    He preferred to have you interpret for him for

14   the police, correct?

15        A    That's correct.

16        Q    Obviously, it's pretty fair you speak excellent

17   English, correct?

18        A    That's correct.

19        Q    We also know you also speak Mandarin in the

20   house?

21        A    That's correct.

22        Q    So you speak and understand Mandarin very well

23   as well, correct?

24        A    Yeah.

25        Q    So you translated between the police and your

26   father, correct?

1       A       Yes.

2       Q       Now, I'm going to ask --

3               THE COURT:  Let me ask you, is this going to

4       take a little bit?

5               MR. BELL:  I can get it done in just a couple of

6       minutes, Your Honor, if that's the question.

7               THE COURT:  Okay.

8               MR. BELL:    Q       Do you have a recollection of

9       that discussion that your father was having with the officer

10      with you translating?

11      A       Somewhat.

12      Q       Okay.  Do you remember telling Officer Ticas,

13      because your father told you in Mandarin, that he had put

14      $5,000 in cash into that metal cabinet himself at some time

15      on March the 9th?

16      A       No, I don't remember that.

17      Q       You don't remember that.  Okay.

18      If Officer Ticas were to testify that you told him

19      that your father told you that, you wouldn't dispute that,

20      would you?

21      A       No.

22      Q       Okay.  And you were translating as best you knew

23      how from Mandarin, which you also speak, into English for

24      the officer, correct?

25      A       Yes.

26      Q       You didn't have any trouble understanding your

293

1  father speaking to you in Mandarin?

2      A    He was a little shook up, but I understood

3  everything.

4      Q    All right.  Do you remember him saying that he

5  was alone when he placed the money into the file cabinet?

6      A    I don't remember that.

7      Q    You don't remember?

8      A    No.

9      Q    Again, if Officer Ticas were to come in to court

10  and testify that that's what you said your father had just

11  told you, you wouldn't dispute that, would you?

12      A    No.

13      Q    And what happened was, the first knowledge you

14  had that there was missing money was when your father told

15  you that same day, on the 12th, that he found -- that he

16  thought money was missing, and he asked you to call the

17  police, correct?

18      A    Yes.

19      Q    And that was after he woke -- got home from

20  work, he woke up from his nap and discovered it missing,

21  correct?

22      A    Yeah.

23      Q    And then you called the police, and they came to

24  the house almost immediately, correct?

25      A    Yes.

26      Q    Were you missing any property from any sort of

Kathryn M. Lezchuk, C.S.R. No. 2302

294

1    crime that was committed in your house on or about the 9th

2    or the 10th of March?

3         A    No.

4             MR. BELL:  Okay.  I have nothing further.  Thank

5    you very much.

6             MS. ALLHISER:  May this witness be excused, Your

7    Honor?

8             THE COURT:  You have no more?

9             MS. ALLHISER:  No, Your Honor.

10            THE COURT:  May he be excused?

11            MR. BELL:  Yes.

12            THE COURT:  You're excused.  Thank you.

13       All right, ladies and gentlemen, we will take our noon

14   recess until 1:30.  Please remember the admonition.

15            (Recess taken until 1:30 p.m. of the same date.)

16                            ---o0o---

17

18

19

20

21

22

23

24

25

26

Kathryn M. Lezchuk, C.S.R. No. 2302