1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | CHRISTOPHER J. WEI, State Bar No. 78958
Deputy Attorney General
6 |  455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7 | Telephone:  (415) 703-5867
Fax:  (415) 703-1234
8 | Email:  Christopher.Wei@doj.ca.gov

9 | Attorneys for Respondent

10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **HOA TRUNG KHUU,** | C 07-6351 SI (pr) |
| Petitioner, | **EXHIBIT 9 (part 5)** |
| v. | |
| **JOHN TILTON, CDCR Secretary,** | |
| Respondent. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 9 (part 5)                                                                 Khuu v. Tilton
                                                                                    C 07-6351 SI (pr)

# EXHIBIT 9 (part 5)

295

1    Afternoon Session          Thursday, September 2, 2004

2                  ---oOo---

3          THE COURT:  All right.  Ms. Allhiser, next

4    witness.

5          MS. ALLHISER:  Thank you, Your Honor.  Ken

6    Kammuller.

7       Deputy, would you walk to the stand to be sworn.

8          THE CLERK:  Please raise your right hand.

9                KENNETH KAMMULLER,

10   called as a witness by the People, after being first duly

11   sworn, was examined and testified as follows:

12         THE CLERK:  Thank you.  Please have a seat.

13     Please state and spell your name for the record.

14         THE WITNESS:  Kenneth Kammuller.  Last name

15   K-a-m-m-u-l-l-e-r; first name Kenneth, K-e-n-n-e-t-h.

16            DIRECT EXAMINATION

17   BY MS. ALLHISER:

18     Q    How are you employed, sir?

19     A    San Mateo County Sheriff's Office as a Deputy

20   Sheriff.

21     Q    How long have you been in law enforcement?

22     A    I've been with the office for ten years, a

23   Deputy Sheriff for the last six years.

24     Q    In March of 2004, did you have a special duty

25   with the Sheriff?

26     A    I was working patrol that day.

1      Q      Asking you now about March 10th, 2004, at and

2   after about 1:00 p.m., were you then on duty, sir?

3      A      Yes.

4      Q      And were you in uniform?

5      A      Yes.

6      Q      With other Sheriff's personnel were you called

7   to assist Foster City in the area below the residential area

8   below the Edgewater Place Shopping Center?

9      A      Yes.

10     Q      Did you have information that you were looking

11  for certain people?

12     A      Yes.

13     Q      Were you given a description?

14     A      I was.

15     Q      Do you recall the description?

16     A      I don't recollect as far as the clothing

17  description other than an Asian male.

18     Q      And did you know how many you were looking for?

19     A      I believe they were looking for two, but one, I

20  thought, was in custody, and we were looking for one at that

21  point in time.

22     Q      Have you had a chance maybe just this morning to

23  look at a map which is now labeled People's 4 for

24  identification?

25     A      Yes.

26     Q      This appears to be an enlarged area with just a

1    few streets, Edgewater being the main street, running top to

2    bottom, and then the large orange section here labeled

3    Edgewater Shopping Center.  This is called Chevy's.  It's

4    been written in.  Are you generally familiar with that area,

5    sir?

6         A    A little bit from that day.  Other than that,

7    no.

8         Q    On that day, March 10th, 2004, did you enter

9    into any of these streets or courts looking for the suspect?

10        A    Yes.

11        Q    Where did you go?

12        A    I was directed into this area, Newport Court and

13   Monterey; and as I approached, I remember there was a Foster

14   City officer here -- guess it would be Avalon Avenue and

15   Monterey.  I left my patrol car.  Between 1022 and 1000

16   Monterey, right in this area here.

17        Q    How did you proceed to look?

18        A    At that point, Foster City had some information

19   that the suspect had been running down in this direction.

20        Q    Toward what?

21        A    He was last seen from Monterey towards Avalon,

22   and they weren't sure if it was Newport, but in this area,

23   so I took my -- another partner with me, Deputy Korkery, who

24   also came to the area, and there was a Foster City officer

25   with me, and we started doing K-9 searches.

26        Q    What is a K-9 search?

1    A    I have a Sheriff's K-9 -- K-9: dog -- who was

2    looking for the suspect, and we started doing yard searches

3    here in Newport Court, and we did yard searches, 1006, and I

4    guess that would be an Avalon address, but this 1006, 502

5    Newport Court, 500, 501, 504, 505, and 1002, and 1000, which

6    again, I guess, are Avalon addresses, and lastly we went

7    into 1022.

8    Q    Is 1022 a residence?

9    A    Yes.

10    Q    And at 1022, did you find something?

11    A    I did.  Deputy Korkery and I went into the --

12    this sort of -- I guess it would be the south side of the

13    residence, through the side gate there; and just after

14    entering the gate, there was a garbage can; and as I passed

15    the garbage can, I had the dog with me, but no longer was he

16    off lead, because this resident was out in front.  So

17    anyway, the dog was on lead.

18        As we were going by the garbage can, I lifted up the

19    garbage can to make sure no one was in it.  There was a

20    person inside.  Immediately put the top back on, said, He's

21    in here.  My partner, Deputy Korkery, and I, as I was

22    holding the top he had his service revolver drawn, and two

23    Foster City officers came over and took the lid off and took

24    custody of the person inside the garbage can.

25    Q    Did you personally search the person who had

26    been in the garbage again?

299

1       A       No.

2       Q       Did you personally seize any evidence from

3  the -- from that vicinity?

4       A       No.

5       Q       Your role was the search, as you described the

6  search?

7       A       Yes.

8       Q       Did the Foster City officers take physical

9  custody of the man in the trash can?

10      A       Yes.

11      Q       So he was handcuffed?

12      A       Yeah.  He was taken into custody by -- like I

13  said, two Foster City officers came in, and Deputy Korkery

14  and I, other than that we were there, and they took him into

15  custody.

16      Q       That ended your involvement.

17      A       That was it.  Got in my patrol car, went back to

18  duty.

19              MS. ALLHISER:  Those are my questions.

20              MR. BELL:  I have no questions, Your Honor.

21              THE COURT:  All right.  May he be excused?

22              MR. BELL:  Yes.

23              MS. ALLHISER:  Yes, Your Honor.

24              THE COURT:  Thank you.

25              MS. ALLHISER:  George Hung.

26          Mr. Hung, would you walk up to the platform and stand

300

1    next to the black chair.  The clerk will swear you in.

2              THE CLERK:  Please raise your right hand and

3    remain standing.

4                        GEORGE HUNG,

5    called as a witness by the People, after being first duly

6    sworn, was examined and testified as follows:

7              THE CLERK:  Thank you.  Have a seat.

8         Please state and spell your name for the record.

9              THE WITNESS:  My name is George Hung.

10             THE CLERK:  Can you spell that, please.

11             THE WITNESS:  G-e-o-r-g-e  H-u-n-g.

12                   DIRECT EXAMINATION

13   BY MS. ALLHISER:

14        Q    What kind of work do you do, sir?

15        A    I'm a loan officer with -- working with Bay

16   CalFed, and also I have a business with GHI.  It's my own

17   business.

18        Q    GHI?

19        A    Yeah, that's right.

20        Q    In March, 2004, what was your residence address?

21        A    361 Beach Park Boulevard, Foster City,

22   California, 94404.

23        Q    How long have you lived at that residence?

24        A    Since year 2000, April, four years.

25        Q    In March, 2004, did others live with you at that

26   residence?

301

1        A        Yes.  My wife and my kids.

2        Q        What is your wife's name?

3        A        Pamela Hung, P-a-m-e-l-a.  Are your children

4    school age?

5        A        Yeah, they are school.

6        Q        Sir, I want to ask you now about March 10th,

7    2004.  It was a Wednesday.  With that day in mind, do you

8    remember leaving your house for work?

9        A        Yes.

10       Q        At about what time?

11       A        Eight o'clock.

12       Q        When you left, were there any other persons

13   still at home?

14       A        No.

15       Q        When you left, do you know if your doors and

16   windows were closed and locked?

17       A        Closed.

18       Q        Do you know that?

19       A        Yeah, I know it is closed.

20       Q        Is there a door from the outside of your house

21   but on the side of your house?

22       A        I'm sorry.  Can you repeat again.

23       Q        You have a front door, sir?

24       A        Uh-huh.

25       Q        Yes?

26       A        Yes, ma'am.

302

1      Q      You also have a door on the side of your house?

2      A      Right, a garage.

3      Q      Do you know if your side door was locked when

4   you left at 8:00 a.m. on March 10th?

5      A      Yes, is locked.

6      Q      Did you have any valuable property inside your

7   home when you left for work?

8      A      Yes, I do have.

9      Q      What kinds of things?

10      A      My computer, laptops, and my watch and my wife's

11   jewelry, and my cash.

12      Q      Mr. Hung, as best you can, will you tell us --

13   well, let's do an easy one first.

14      Where was your laptop when you left for work on March

15   10th?

16      A      It's beside my bed, in my bedroom.

17      Q      And do you know where your wife's jewelry was

18   kept?

19      A      I'm not sure where she kept, but mostly in our

20   bedroom, the master bedroom.

21      Q      You mentioned cash.  Was this U.S. money?

22      A      U.S. money and Taiwan money.

23      Q      As best as you can recall, where was the U.S.

24   money inside your house when you left for work on March

25   10th?

26      A      Normally I put it in -- I have several wallet.

1    Put it in drawer.  One -- some wallet is in my bedroom, my

2    master bedroom, and then I have several wallet that's put in

3    my study room.

4        Q    Do you know how much money, U.S. currency, was

5    in those wallets on March 10th when you left for work?

6        A    I don't remember exactly how much the money, but

7    that's around -- some is 100, some is in 20s.  Could be

8    around 1,000 to $2,000.

9        Q    So you would estimate you had between 1,000 and

10   $2,000 dollars in U.S. currency in wallets in your master

11   bedroom and study?

12       A    Right.

13       Q    Do you know where the Taiwanese currency was

14   when you left to go to work on March 10th?

15       A    They also in one of the wallet, and then again,

16   I don't remember how much is that -- it was, but is some in

17   the Taiwan, $1,000, and then some is in the hundred dollars.

18       Q    Do you have an estimate of the number of

19   Taiwanese dollars that were in your home when you left for

20   work on March 10th?

21       A    An estimate, I believe around 2,000 to 4,000.

22       Q    Had you had occasion to use the Taiwanese money

23   recently?

24       A    No.  I used that only when I travel back to

25   Taiwan.

26       Q    And did you expect to need Taiwanese money soon?

1      A     No.   Unless I travel, yeah.   I travel very

2    frequently.   Almost every year I travel.

3      Q     You mentioned a watch.   Was it a special watch?

4      A     Yes.   I have Rolex watch.

5      Q     And where had it been when you left for work on

6    March 10th?

7      A     It was in my -- on my bed -- on the -- on the

8    back of my bed, my master room, the bed, on the side, the

9    drawer, on the drawer.

10     Q     I want to make sure I understand.   It was in the

11   master bedroom?

12     A     Yes.

13     Q     In the back?

14     A     On the back of my bed, my sleeping bed.

15     Q     On the back of your bed?

16     A     Right.

17     Q     All right.   Would you call that a head stand?

18     A     The head stand, yeah, on the head stand.

19     Q     When you left for work on March 10th, when were

20   you expecting to come back to work -- I'm sorry, expecting

21   to come back home?

22     A     I expecting coming back between 12:00 to 12:30.

23     Q     And on this day, Wednesday, March 10th, 2004,

24   were you expecting your children to be at home during the

25   day?

26     A     My daughter would be off the school at 12:30, so

305

1  normally I go pick her up, but that day I was -- I be late,

2  but I know I be home by 12:30.

3       Q    So in an ordinary day you would pick up your

4  daughter, take her home?

5       A    Right.

6       Q    Over noon?

7       A    Over noon, right.

8       Q    March 10th was not an ordinary day, though,

9  right?

10      A    Uh-huh.

11      Q    Did you get a call from the police?

12      A    Yeah.  I got a call from the police.

13      Q    When you heard from the police, did they ask you

14 to come home?

15      A    Yes.  They told me.

16      Q    Did you do that?

17      A    Yes.  I went home immediately.

18      Q    When you got home, did you notice anything

19 missing?

20      A    Yes.  The first thing I know my laptop -- my

21 Sony laptop was missing.

22      Q    The laptop that had been in your bedroom was

23 gone?

24      A    Right.

25      Q    Anything else?

26      A    And my digital camera, I just bought a camera;

1   digital camera was gone.

2       Q    Where had the digital camera been before there

3   was a problem?

4       A    That digital camera was -- as I remember, it was

5   in my study room on the desk.

6       Q    Did you look for your wallets to see about your

7   U.S. and Taiwanese money?

8       A    Yes.  I check all my wallets.  I have several

9   wallets, but they are no money in there.

10      Q    The wallets were there but the money was gone?

11      A    Right.

12      Q    Did you check your wife's jewelry?

13      A    Not -- no.  Because I'm not sure where my wife

14  put her jewelry.  Normally she put our master bedroom and

15  also on the bathroom, the bathroom drawer.  I check couple

16  of them.  I know they are missing.  Especially I notice one

17  of the boxes still there but the jewelry inside was missing.

18      Q    Was there a briefcase belonging to you left

19  inside your home at 361 Beach Park that you saw when the

20  police called you?

21      A    Yeah.  That one was -- the key lock -- the key

22  that was -- was opened.

23      Q    How had you left that briefcase; was it locked?

24      A    It was locked, yeah.

25      Q    What was -- rather, what had been -- what used

26  to be inside that briefcase?

1      A      I put some -- my information, my travel, and

2   then some currencies, some money.

3      Q      U.S. or Taiwanese?

4      A      U.S.

5      Q      Do you know how much U.S. money was in your

6   briefcase?

7      A      It was a roundabout four, 600.

8      Q      Do you know for sure?

9      A      I'm not quite sure, but I know I kept something

10  in there.

11     Q      And inside your briefcase, had you also kept

12  Taiwanese money?

13     A      I don't remember, but maybe, because I kept

14  money -- I kept money everywhere, so I don't remember.

15     Q      When you left for work on Wednesday, March 10th,

16  where had your briefcase been?

17     A      It was my master bedroom, the closet.

18     Q      In the closet, sir?

19     A      In the closet.

20     Q      When you came home, when the police called,

21  where was the briefcase?

22     A      It was in a closet, the same place.

23     Q      It was where it belonged?

24     A      It was where it was belonged, right.

25     Q      But you noticed a difference?

26     A      No.   They -- the only difference was the lock

308

1    was broken.

2         Q    Did you show that to the police?

3         A    Yes, I did show the police.

4         Q    And did you look for the way that someone got

5    into your house?  Did you try to find how they broke in?

6         A    Yes.  I tried to figure out how they broke in.

7    Looks like they get from my garage side door and then

8    through my house to garage door.

9         Q    Did you show the police officer where you

10   thought the break-in happened at the garage door?

11        A    Yes.

12        Q    And before you came to court this afternoon, did

13   you look at some pictures?

14        A    Yeah, the pictures, uh-huh.

15             MS. ALLHISER:  Your Honor, I ask that there be

16   marked for identification a posterboard labeled A through I,

17   361 Beach Park Boulevard.  Counsel has copies of these.

18                  (People's Exhibit No. 14, Posterboard with

19                  Photographs A through I, marked for

20                  Identification only.)

21             THE CLERK:  Marking People's Exhibit 14.

22             MS. ALLHISER:    Q    So this is now called

23   an exhibit.  It's Exhibit No. 14.

24        These photographs, A through I, did you look at them

25   before you came to court just now?

26        A    Yeah.

309

1    Q    All right.  Are the photographs A through I

2    pictures of your house?

3    A    Correct.

4    Q    And asking you now, the photograph B looks like

5    a gate.  Where is that gate?

6    A    It's beside my garage.

7    Q    What is on the other side of the gate?

8    A    This is my garage door.

9    Q    Do you see your garage door in one of the

10   pictures?

11   A    Yes, number C.

12   Q    This garage door in the photograph 14C, you know

13   that it was locked when you left for work on March 10th,

14   sir?

15   A    Correct, yes.

16   Q    And was the door shut or open when you came back

17   with the police?

18   A    It was closed.  It was -- it was -- it was

19   closed, yes.

20   Q    Was it locked?

21   A    I don't remember.

22   Q    Did you personally look at the door knobs on

23   these doors that connect from your garage?

24   A    I'm sorry.  Say again.

25   Q    Did you yourself look at the door knobs with the

26   police, the doors that connect from your garage into the

Kathryn M. Lezchuk, C.S.R. No. 2302

1    house?

2        A    Yes.    The police.

3        Q    Did you notice anything about that?

4        A    It has been broke in with the doorknob -- the

5    police showed, yeah.   It was broken.

6        Q    And down in the last photograph, which is

7    labeled I, appears to be a briefcase?

8        A    Yeah, that's my briefcase.

9        Q    Is that the one you're talking about?

10       A    Right.

11       Q    This looks like it might be sitting on a bed; is

12   that true?

13       A    No.   The police officer took it on the bed and

14   took a picture and put it back closet.

15       Q    When you came home, it had been left in the

16   closet but the key was broken?

17       A    Correct.

18       Q    And the money was gone?

19       A    Right.

20       Q    Did you have any business cards with your name,

21   address and phone number on any of the things that were

22   missing?

23       A    Yeah.   I kept my business card in the -- in a

24   briefcase, and also my laptop briefcase had my business card

25   in there.

26       Q    Does that include the address 361 Beach Park

311

1    Boulevard?

2        A    Right.

3        Q    Did the police ask you to look at some property

4    which they had seized?

5        A    Yes.

6        Q    This is called People's Exhibit 11.

7        Do you see on any photograph property that was missing

8    from your house on March 10th that the police showed you?

9        A    Number D and then number H, I recognize those.

10        Q    What is in D that was yours?

11        A    That's my laptop and my watch, my digital camera

12    and my Game Boy.  I just bought it for my son.  Then also

13    the disk, the CD, those like that, and the case, they are

14    all mine.

15        Q    The case -- when you left your laptop, before

16    you went to work was the laptop inside the case?

17        A    No.  It's out -- the laptop was outside the

18    case.

19        Q    On the photograph H, do you see other property,

20    or is that the same?

21        A    Yeah.  Yeah.  This my, and they all the same.

22    They all mine, yeah.

23        Q    Photograph H kind of repeats some of the things

24    in D?

25        A    Right.  D and H.

26        Q    Now, how are you so sure that this was your

Kathryn M. Lezchuk, C.S.R. No. 2302

312

1  laptop?

2      A    Oh, yeah.  When you open -- when you turn it on,

3  they have my name, George Hung, on, showing on top of that.

4      Q    So when you sign on it says George Hung?

5      A    George Hung, yeah, the user, and I have all the

6  receipt I bought it.

7      Q    Mr. Hung, I would like you to look at this man,

8  the man who is sitting here in the chair, the long-sleeved

9  green shirt.

10     Do you see the man I mean?

11     A    Uh-huh.

12     Q    Yes?

13     A    I don't know him, yeah.

14     Q    Do you know the name, though?

15     A    No.

16     Q    Do you know Hoa Trung Khuu?

17     A    No.  Never in my life.

18     Q    This man have permission to be inside your home

19  on March 10th, 2004?

20     A    No.

21     Q    Did he have permission to be in possession of

22  any of your property, the laptop, the watch, Game Boy,

23  camera, any of that?

24     A    No.

25         MS. ALLHISER:  Those are my questions.

26  ///                                                ///

Kathryn M. Lezchuk, C.S.R. No. 2302

313

CROSS-EXAMINATION

BY MR. BELL:

    Q    Mr. Hung, I'm one of the attorneys in the case, and I need to ask you some questions.

    Please, if you don't understand my question, please let me know and I will try to rephrase it.

    A    Sure.

    Q    When the police called you, what day was it that you were called?

    A    On March 10.

    Q    March 10th?

    A    Yeah.

    Q    Okay.  And you remember what time that day you received a call from the police?

    A    Around noontime.

    Q    Okay.  And what did the police tell you, that they had some of your property they wanted to see whether you could identify?

    A    Yeah.  The police called me to say, Do you recognize your house has been broken or something.  I say I don't know.

    Q    So did they meet you at the house?

    A    They meet at the house, yeah.

    Q    At the house.  So you met the police the first time that day at your house at 361 Beach Park, correct?

    A    Correct.

314

1        Q        Now, there was a specific police officer that
2    you talked to that day, right?
3        A        Right.
4        Q        Officer Bouza.  Do you remember that name?
5        A        I don't remember the name.
6        Q        Okay.  Did he give you any sort of
7    identification about who he was?
8        A        Yeah, he told me he is a police officer from
9    Foster City.
10       Q        Okay.
11       A        So, yeah, and he told me my house might be
12   burgled.
13       Q        Can you describe the police officer that you
14   talked to?
15       A        He's young, handsome.  Young, good police
16   officer, I can see, yeah.
17       Q        And he was asking you questions about things
18   that might be missing or things that were out of order in
19   your house, correct?
20       A        Correct.
21       Q        And you were trying to give him as accurate
22   information as you could at that time about those things,
23   correct?
24       A        Correct.
25       Q        Do you remember telling Officer Bouza -- well,
26   first of all, one of the things you noticed was the

315

1    briefcase that had been broken into, correct?

2         A    Uh-huh, yes.

3         Q    And you showed him how it had been broken into,

4    correct?

5         A    Right.  It was -- the key was broken, right, the

6    lock.

7         Q    And you told him that you were missing some

8    United States currency from your briefcase; is that correct

9    so far?

10        A    Right.

11        Q    And you told him that there was $1,000 of U.S.

12   currency in your briefcase?

13        A    No.

14        Q    Do you remember telling him that?

15        A    No.  Taiwan, Taiwan dollars.

16        Q    Let me see if I understand.  You are now saying

17   that the currency in your briefcase was Taiwanese currency?

18        A    No.  Okay.  The 1,000 currency was Taiwan 1,000

19   currency.

20        Q    Let me go back for a minute.  Do you remember

21   telling Officer Bouza that you had $1,000 in United States

22   currency in the briefcase that was missing and no longer

23   there?

24        A    No.  I did not tell him that.  I told him I have

25   some money in there, but I don't remember what the amount is

26   at.

316

1    Q    Okay.  Did you tell him that in addition to the
2  United States currency there was at least $2,000 of
3  Taiwanese currency in the briefcase?
4    A    No.  Not Tai -- okay.  I put my money all
5  everywhere in my wallets and in the briefcase, so I don't
6  remember exactly amount, how much it was, but I do have
7  those currency.  It was Taiwan money and U.S. money currency
8  in there.
9    Q    Your testimony today is that you don't -- and
10  correct me if I'm wrong.  You don't remember where the
11  Taiwanese currency was, but you knew you had it in the house
12  someplace?
13    A    Right, exactly.
14    Q    And that there was at least $2,000 and maybe as
15  much as $4,000 of Taiwanese currency in the house that was
16  now missing.  That's what you told him?
17    A    Right.
18    Q    You told him that you also had a thousand
19  dollars of U.S. currency in the briefcase?
20    A    No, I did not say that.
21    Q    Did you tell him that you had at least $600 U.S.
22  currency in the briefcase?
23    A    Yeah.  I remember I say that.
24    Q    Okay.  At least $600 and maybe more than $600 of
25  U.S. currency in the briefcase, correct?
26    A    Uh-huh.

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Q    Okay.  Maybe as much as $1,000 in the briefcase

2  in U.S. currency?

3    A    I don't know exactly what's that.

4    Q    Okay.  You also told him that you had other U.S.

5  currency in addition to what had been in the briefcase in

6  several wallets in your house, correct?

7    A    Correct.

8    Q    And you estimated that there were several

9  thousand dollars of additional currency located in your

10  various wallets in various parts of the house that was now

11  missing, correct?

12    A    No.  I say several thousand of the Taiwan

13  dollars.

14    Q    You didn't tell Officer Bouza when he talked to

15  you at your house that you had also noticed that several

16  thousands of dollars in U.S. currency was missing from

17  different wallets in your master bedroom.  You did not tell

18  Officer Bouza that that day?

19    A    I told him I have -- I have some currency in my

20  master bedroom in a wallet that's been missing, so I did not

21  tell him -- I don't remember how much.

22    Q    Okay.  So let's look at it in a different way.

23  As you sit there now, how much U.S. currency, altogether, no

24  matter where it was located in your house, did you have that

25  was missing when you returned home on March the 10th?  How

26  much U.S. currency altogether would you estimate?

1       A       I would say is about one to 2,000.

2       Q       One to $2,000?

3       A       One to 2,000, yes.

4       Q       And how much -- between two and $4,000 worth of

5   Taiwanese currency, correct?

6       A       Uh-huh, correct.

7       Q       I'm going to go to something else.  I know you

8   mentioned some other things, like your briefcase and your

9   laptop, et cetera.

10      There were other things that were missing from your

11  house that day, "that day" meaning March the 10th, that were

12  not present at the police station when you went to the

13  police station to look at the property, correct?

14      A       Say it again, please.

15      Q       Okay.  There were other things that were missing

16  from your house on March the 10th, 2004, that were not at

17  the police station when you looked -- when you went to look

18  at the property the police had, right?

19      A       Right.  That's other things is my wife's

20  jewelry, other things.

21      Q       Right.

22      A       Yeah.

23      Q       So, okay, let's leave your wife's jewelry aside

24  for a minute.  Besides your wife's jewelry, there were other

25  personal items of yours that were missing from the house

26  that you didn't see at the police department when you went

1    there to try to identify your property; isn't that correct?

2        A    No.   Most of the things I see is in police

3    station.   They are in the pictures.   Those are mine.   I

4    recognize most of them.   Most of them, but not all of them.

5        Q    Maybe I'm not making myself clear.   Let me try

6    again.

7        There were other things missing from your house on

8    March the 10th that you did not see at the police department

9    when you went there to identify your property.

10       Do you understand my question?

11       A    They might have some other things I don't

12   recognize as being missing; is what you trying to ask?

13       Q    No.   I'm asking you:   You know in your own mind

14   there were things missing from your house that you hoped to

15   see when you went to the police department that day, but

16   they weren't there.

17       A    No.

18       Q    That's not true?

19       A    Not true.

20       Q    So everything -- what your testimony today is

21   that everything that was yours that you discovered missing

22   from your house that day you saw at the police department.

23   In other words, they recovered all of your missing property?

24       A    Correct.

25       Q    All right.   Were you asked at the police

26   department to identify any United States or Taiwanese

1    currency as money that was missing from your home at 361

2    Beach Park?

3         A     Yes.  I told him I had money missing.

4         Q     I know.  I'm not asking the question properly, I

5    think.

6         When you got to the police department, after you left

7    your home -- well, let me ask this:  You did go from your

8    home to the police department that same day, on the 10th?

9         A     Right.

10        Q     When you got to the police department, did the

11   police ask you to look at money that they had at the police

12   department and see whether some of this money was yours that

13   was missing from your house?

14        A     I -- they show me the watch, my laptop, my

15   things, but the money, I don't -- I don't recall they show

16   me the money I missing from the house.

17        Q     You ever remember being shown any money that

18   might have been money --

19        A     I remember.  I remember.  I saw some Taiwan

20   money there.  Right, I have Taiwan money there.

21        Q     But the Taiwanese money you counted at the

22   police department was less than the Taiwanese money that you

23   had had in your house that day, right?

24        A     Right.  Less.  Not all mine, no.  I think I

25   don't have that much Taiwanese money.

26        Q     In addition to your even personal items, there

1    was some jewelry missing that belonged to your wife?

2         A    Correct.

3         Q    Did your wife come home to 361 Beach Park with

4    you when you were talking with the police?

5         A    Yes.  My wife came home right away, and then she

6    went to the police officer later on, after me.

7         Q    Okay.  She stayed home, you went to the police

8    department, and then she later that day went to the police

9    department?

10        A    Correct.

11        Q    Was that because of childcare issues with your

12   children?

13        A    Right, right.

14        Q    And so you came back, stayed with the children

15   while she went to the police department?

16        A    Right.

17        Q    Have you -- has any of the property that you

18   lost that day, that was missing that day, the laptop, your

19   digital camera, any of that, has any of that been returned

20   to you?

21        A    Only the laptop.  I was asking to give me back

22   my laptop.

23        Q    Okay.

24        A    Right.  Every other thing was stay in police

25   station.

26        Q    How about the money that you claimed to be lost,

322

1    have you received any of that back from the --

2        A    No, no.

3        Q    Did you speak to your wife about the jewelry

4    items that she was missing?

5        A    Not at all, because I do not recognize my wife's

6    jewelry.  She has her own, and then -- I did not mention

7    that, yeah.

8        Q    Did the police, when you went to the police

9    station, show you any of the jewelry that they had

10   recovered?

11       A    Right.

12       Q    Did they show that to you?

13       A    Yeah, they showed that to me, but I say I don't

14   recognize.  My wife have recognize that.

15            MR. BELL:    Thank you.  I have nothing further.

16   Thank you very much.

17            THE WITNESS:    Okay.

18                    REDIRECT EXAMINATION

19   BY MS. ALLHISER:

20       Q    Mr. Hung, the Taiwanese new dollars that you

21   kept at home for your travels, had you marked them in any

22   way?

23       A    No.  You mean write on the top of currency?  No,

24   no.  I don't write anything, no.

25       Q    If I showed you copies of some Taiwanese bills,

26   could you say for sure if they were or were not yours?

323

1      A     No, no, no.  The money is the money.  I never

2  mark, no.

3      Q     Let me just make sure we're talking about the

4  right currency.

5      Your Honor, two pages stapled together as a group

6  exhibit.  One contains five bills, the other contains two

7  bills.  They were photographed on a desk.  Counsel has a

8  copy.

9           THE CLERK:  Marking People's Exhibit 15.

10               (People's Exhibit No. 15, Copies of Taiwanese

11               Currency, marked for Identification only.)

12           MS. ALLHISER:     Q     Mr. Hung, these are

13  just photocopies, but they're fairly clear.  This is called

14  People's Exhibit 15.  Would you look at both pages.

15      A     Yeah.

16      Q     Do you recognize the type of currency shown in

17  these one, two, three, four, five, six, seven bills, what

18  type of currency?

19      A     The type is the hundred dollars, Taiwan dollar.

20  That what you mean by "the type"?

21      Q     Is this money valid currency, as you know it, in

22  Taiwan?

23      A     Right, right.  It's current right now.  We using

24  Taiwan type.

25      Q     So the appearance of these bills, the way

26  they're marked, the way the printing is, this is money which

Kathryn M. Lezchuk, C.S.R. No. 2302

324

1    is good right now in Taiwan?

2        A    Correct.

3        Q    So there are one, two, three, four, five, six

4    $100 Taiwanese bills and one $500 Taiwanese bill; is that

5    right?

6        A    No.  That $500 is not.  We don't using that $500

7    in Taiwan.  I don't know that.  Let me see.

8        Q    It's not the right kind of currency?

9        A    No.  No.  The $500 is no.  The other four and

10    then these two there we are using in Taiwan.

11        Q    So the $100 bills that you're showing me in

12    People's 15, those $100 bills are good currency, usable in

13    Taiwan.

14        Do you recognize that, what this 500 is?

15        A    No.  This not belong to me, no.

16        Q    Not yours?

17        A    Not my, 500 is not mine.

18        Q    Are you familiar with the type of currency?

19        A    No.  We never use that.  That's not -- I think

20    that's not -- no, I don't recognize this one.  That's not

21    mine.

22        Q    Can you think of any reason why this $500 bill

23    would be in your wallet?

24        A    It's very hard to say, because when I travel to

25    Taiwan I give them $1,000.  They change me 500 or 100.  I

26    just put it in the wallet, but I just don't recognize this

1    500 is popular there.

2          Q     It's not the right kind of currency then?

3          A     No, no.

4          Q     So if it was in your wallet, you didn't know it?

5          A     If it is on my wallet, I don't recognize that,

6    no.

7                MS. ALLHISER:  Thank you.

8          No other questions, Your Honor.

9                MR. BELL:  No questions, Your Honor.

10               THE COURT:  Excused?

11               MR. BELL:  Yes.

12               THE COURT:  Okay.  You're excused.  Thank you,

13   sir.

14               THE WITNESS:  Oh, thank you.

15               MS. ALLHISER:  Pamela Hung.

16         Pamela Hung, would you walk to the top of the

17   platform, please, and stand there next to the microphone.

18               THE CLERK:  Please raise your right hand.

19                         PAMELA HUNG,

20   called as a witness by the People, after being first duly

21   sworn, was examined and testified as follows:

22               THE CLERK:  Thank you.  Please have a seat.

23         Please state and spell your name for the record and

24   speak into the microphone.

25               THE WITNESS:  My name is Pamela Hung.

26               THE CLERK:  Can you spell that, please.

326

1          THE WITNESS:  Oh, P-a-m-e-l-a;  last name

2   H-u-n-g.

3                    DIRECT EXAMINATION

4   BY MS. ALLHISER:

5          Q     Ms. Hung, what kind of work do you do?

6          A     I'm the Administrative Associate at Stanford

7   University.

8          Q     Did you receive a gift certificate for $100?

9          A     Yes.

10         Q     What was that for?

11         A     That's award from our chair for -- because

12  Stanford University has changed the database system, and we

13  will be working very hard, so the department chair kind of

14  like give us an award.  I mean reward.  Sorry.

15         Q     Where did you keep your hundred-dollar gift

16  certificate?

17         A     It's in the desk drawer in my bedroom.

18         Q     Your residence address, please, is what?

19         A     Yes, in my house.

20         Q     What house, what address?

21         A     361 Beach Park Boulevard.

22                MS. ALLHISER:  Your Honor, I ask there be marked

23  a plastic bag, which is sealed.  It contains a

24  folded-in-half $100 gift certificate to Stanford Shopping

25  Center.  Counsel has a copy of it.

26                THE COURT:  To Stanford Hospital?

Kathryn M. Lezchuk, C.S.R. No. 2302

327

1          MS. ALLHISER:   Issued by Stanford Hospital, a

2     hundred dollars you could use.

3          THE CLERK:   Marking People's Exhibit 16.

4          (People's Exhibit No. 16, $100 Gift

5          Certificate, marked for Identification only.)

6          MS. ALLHISER:    Q    Ms. Hung, this plastic

7     bag and its contents are now called People's Exhibit 16.   Do

8     you see in here a gift certificate?

9          A     Uh-huh.

10         Q     Yes?

11         A     Yes.

12         Q     How do you know if it's yours?

13         A     Because I have -- at home -- the gift

14     certificate was keep in envelope of Stanford Shopping Center

15     envelope; and so when I realize my house got burglarized and

16     I found out -- I mean, I went to the police station, and I

17     showed this, and so I went home, open my drawer, and I show

18     the detective the envelope, and in the envelope I have my

19     chair, Bob Simone (phonetic) -- you know, some kind of

20     award, like to explain why we get this reward.

21         Q     This gift certificate actually is blank, right.

22     It says "A Gift For," and then it's blank, right?

23         A     Yes.

24         Q     But you believe it's yours?

25         A     Yeah, it is mine.

26         Q     It's dated February -- where's the date?   Here.

1    There's the stamp, February 26, 2004.

2         A    Yes.

3         Q    Is that when you got it?

4         A    I don't know -- yes.  I don't really know what

5    is the day I got it from our department manager, yeah.

6         Q    But this is yours?

7         A    That's mine.

8         Q    On March 10th, 2004, did you leave your home for

9    work?

10        A    Yes.  I was -- yeah.  I was working.

11        Q    At what time?

12        A    I left -- routinely I leave my -- for work 7:20.

13        Q    When would you normally have returned home?

14        A    Between 4:30 to 5:15.

15        Q    And on Wednesday, March 10th, 2004, when did you

16   go home?

17        A    I actually had a dentist -- I mean, orthodontist

18   appointment with Dr. Landucci in San Mateo office, and then

19   I was in the treatment, and then my cell phone ring, and

20   that's from my husband George.  He says he just got back

21   from the police station because police found the laptop, his

22   business card.  He says, Pam, our house got burglarized;

23   come home.  I need you to come home.  So I kind of finished

24   with Dr. Landucci and then I went home.

25        Q    Did you arrive home that same afternoon?  Did

26   you get home that afternoon?

329

1      A      Yeah.

2      Q      Before 4:30?

3      A      Yes, yes.  I think -- my appointment was around

4   3:00, and I got a phone call from my husband.

5      Q      Did you notice when you arrived home on

6   Wednesday, March 10th, 2004, if any of your property was

7   missing or disturbed?

8      A      I noticed curtain was closed.

9      Q      Which curtain?

10     A      The curtain into the living room.

11     Q      And had you left it that way?

12     A      No.  In the morning, the first thing, we always

13  open the curtain.

14     Q      Was there anything else in your home missing or

15  disturbed that you noticed right away?

16     A      If my husband didn't tell me we got burglarized,

17  usually I open my jewelry drawer in my bathroom in the

18  morning when I go to work; or when I come home, I have to

19  put down my jewelry back to my jewelry box; that I would

20  know everything's gone.

21     Q      Did you look in that place to see if your

22  jewelry was there?

23     A      Yeah.  Because I got the phone call from my

24  husband, I went home from Dr. Landucci's office. The first

25  thing I checked my jewelry box.  Nothing's there.

26     Q      All gone?

330

1    A    All gone.

2    Q    Did you later go to the Foster City Police

3  Department to look at all kinds of things laid out?

4    A    I did.

5    Q    And before you came to court this afternoon, did

6  you look at some pictures of that?

7    A    (Nods head.)

8    Q    Yes?

9    A    Yes.

10    Q    People's Exhibit 11 for identification, you see

11  this is a board with photographs A through H.  Does this

12  look like some of the things that were laid out for you to

13  examine at Foster City Police Department?

14    A    Yes.

15    Q    And in any of these pictures do you quickly see

16  something that you recognize as your own property?

17    A    This -- everything in this picture.

18    Q    In D?

19    A    Yeah.  Yes.

20    Q    How about all the things laid out in A and B?

21    A    They're all mine.  I mean, yes.

22    Q    Are there some items which you have looked at at

23  Foster City but you said, no, those aren't mine?

24    A    Yes.  There are some, like the earring and the

25  ring.

26    Q    So photographs A and B include a lot of your

1    jewelry but there's also pieces that don't belong to you?

2        A    Exactly.

3        Q    And did you make it clear to Foster City:  This

4    is mine.  This is not.  Did you go through all of them?

5        A    Yes.

6        Q    What kinds of things were stolen?

7        A    Most of my -- from my -- the drawer in my

8    bathroom that I put all my earring, jewelry, necklace.

9        Q    Was this valuable jewelry or inexpensive

10   jewelry?

11       A    I think most expensive one exceed 3,000 U.S.

12   dollar.

13       Q    How did you know it was your jewelry, not

14   somebody else's?

15       A    Because I wear them most of the time, and most

16   of them I bought them, so -- and some of them from my

17   mother, and so my mother wore them and give it to me.  I

18   will never forget or mix up.

19       Q    On March 10th, 2004, did you know someone by the

20   name Hoa Trung Khuu?

21       A    I don't know this person.  I don't know this

22   name.

23       Q    I'm going to ask you to look at the man who is

24   sitting here in sort of a green-gray-colored long shirt.  Do

25   you see this man sitting there?

26       A    Yes.

332

1    Q    Do you know this man?

2    A    I know, but I don't know him.

3        MS. ALLHISER:  Your Honor, for my question I

4    referred to the defendant Mr. Khuu.

5        THE COURT:  Yes.

6        MS. ALLHISER:    Q    This man have any right

7    to be inside your house on March 10th, 2004?

8    A    No.

9        MS. ALLHISER:  Mr. Khuu.

10        (Unidentified voice in foreign language.)

11        THE WITNESS:  Shall I continue?

12        MS. ALLHISER:  Wait.

13        THE COURT:  Go ahead.

14        MS. ALLHISER:  Thank you.

15        THE COURT:  I was just wondering whether I am

16    going to punch the alarm to get some help for her, but she

17    probably doesn't need it.

18        MS. ALLHISER:  This man, the man in the green

19    shirt, the man we have called Mr. Khuu, did he have any

20    right to be in your home, 361 Beach Park Boulevard, on March

21    10th, 2004?

22    A    No.

23    Q    Did he have the right to possess your jewelry,

24    your mother's jewelry or anything from inside your house?

25    A    No.

26    Q    Do you know someone by the name of Ryan Bui,

333

1    B-u-i?

2           A      No.

3           Q      That name means nothing to you?

4           A      No.

5                  MS. ALLHISER:  Let me ask you to look at a

6    person.

7                  THE CLERK:  Marking People's Exhibit 17.

8                        (People's Exhibit No. 17, Photograph of Ryan

9                        Bui, marked for Identification only.)

10                 MS. ALLHISER:    Q      Miss Hung, this is a

11   photograph of a man.  He actually isn't wearing a shirt,

12   apparently just wearing pants, but do you see the face and

13   chest, shoulders, waist up of a man?

14          A      I don't know him.

15          Q      This person, as far as you know, you've never

16   seen him before?

17          A      No.

18                 MS. ALLHISER:  Your Honor, I will identify the

19   person in the photograph later.

20                 MR. BELL:  I will stipulate that's a picture of

21   Ryan Bui that was taken on March the 10 just after his

22   arrest.

23                 THE COURT:  Thank you.  And that's People's 17?

24                 MS. ALLHISER:  Yes, Your Honor.

25                 THE COURT:  Did we mark that before?  I thought

26   we had somewhere.  Have you used that before?

334

1          MS. ALLHISER:  Not that I'm aware of.

2          THE CLERK:  No.  16 was the last one we marked.

3          MS. ALLHISER:  Those are my questions of this

4    witness.

                        CROSS-EXAMINATION

6    BY MR. BELL:

7          Q     Miss Hung, I'm one of the lawyers in the case.

8    I need to ask you some questions.  On March 10th of this

9    year, you came home and noticed a lot of your jewelry

10   missing, correct?

11         A     Correct.

12         Q     You've told us about looking in your jewelry box

13   where your jewelry was kept?

14         A     (Nods head.)

15         Q     Was the box still there and the jewelry missing,

16   or was the box taken as well?

17         A     In that drawer, the stuff almost all mine, and I

18   kept my necklace and earring in different boxes, okay.  I

19   have this little box, a longer box.  They are all in one

20   drawer, and they are all nicely closed, and but when I

21   opened them, there's specifically one box with velvet that I

22   put most expensive jewelry.  Are empty.  Is empty.  And then

23   other, like, little, little -- can be sealed box or paper

24   box, I put earring stuff, so most of they are gone.  So when

25   I got to the police station, so I was like relieved, see,

26   you know.  I still see my jewelry, even though I'm in there

                Kathryn M. Lezchuk, C.S.R. No. 2302

335

1    in the police station, but, yeah.

2        Q    Now, Mrs. Hung, you have not actually gotten any

3    of that back from the police as of today, correct?

4        A    No, I haven't got any back yet.

5        Q    Have you been to the police station more than

6    one time to identify jewelry?

7        A    Yes.

8        Q    How many times?

9        A    Two times.

10       Q    Okay.  Now, the second time you went, it was

11   because you were looking for things that you didn't notice

12   the first time, correct?

13       A    Yes.

14       Q    So there were things -- and you didn't see them

15   the second time you went to the police department, did you?

16       A    I'm sorry.  Can you repeat.

17       Q    What I'm getting at is:  You know there are

18   things that were missing from your house on March the 10th

19   that were not recovered by the police and were not at the

20   police station when you went to look for them, correct?

21       A    You mean I don't find in my house, so I go back

22   to the police station to look for again?

23       Q    Right.

24       A    Yes.

25       Q    You didn't see them at the police station the

26   second time, did you?

1    A    I think I seen them all, but they got a lot of

2  stuff, so if some of the stuff I don't really wear it

3  everyday, so I need to go back to see it again.

4    Q    Right.  But what I'm getting at is, there are

5  items that were taken from your house on March the 10th that

6  you have never seen again at the police station or anywhere

7  else?

8    A    No, no, no.  They are all in the police station.

9    Q    They're all there?

10    A    Yes, yes.

11    Q    Everything?

12    A    The second time I went back, because there's

13  maybe one or two items I wasn't -- I didn't tell the

14  detective is -- it was the other people's.  So that's the

15  second time.

16    Q    I'm sorry.  I didn't understand.  Can you repeat

17  your answer.

18    A    I guess the second time there was an earring, a

19  necklace, I don't remember, because the first time I didn't

20  tell -- I didn't single it out, out of my pile, so second

21  time I confirm, they are not mine.  I take it off.

22    Q    Okay.  So I think what you're saying is, and

23  correct me if I'm wrong, you thought perhaps something you

24  said initially was yours, on reflection you realized it

25  wasn't yours, it belonged to someone else; is that correct?

26    A    I didn't say it was mine.  I was just -- didn't

1   take it out -- maybe I overlooked it the first time.

2        Q    Okay.  So just so I can be clear, you're

3   satisfied that everything that was missing from your house

4   in terms of your jewelry is at the police department in

5   Foster City, and nothing is missing.  Everything was

6   recovered.  Is that what you're saying?

7        A    Yes, is correct.

8        Q    No possibility that something you don't remember

9   that you had is lost or gone?

10       A    No.

11            MR. BELL:  Okay.  Nothing further.

12            MS. ALLHISER:  No questions, Your Honor.

13            THE COURT:  All right.  Ladies and gentlemen,

14   before we take a recess, I want to see what's going on out

15   there to see if I want to send the jurors out there, so I'll

16   be right back.

17       (Pause.)

18            THE COURT:  Okay, ladies and gentlemen, let's

19   recess for ten minutes.  Please remember the admonitions.

20       This witness is excused, right?

21            MS. ALLHISER:  Yes.

22            MR. BELL:  Yes.

23       (Brief recess.)

24            THE COURT:  All right.  Next witness,

25   Ms. Allhiser.

26            MS. ALLHISER:  Next witness, Your Honor, Joe

Kathryn M. Lezchuk, C.S.R. No. 2302

338

1    Cavallero.

2         Would you walk to the stand and be sworn.

3              THE CLERK:  Please raise your right hand.

4                   JOSEPH CAVALLERO,

5    called as a witness by the People, after being first duly

6    sworn, was examined and testified as follows:

7              THE CLERK:  Thank you.  Please have a seat.

8         Please state and spell your name for the record.

9              THE WITNESS:  My name is Joseph Cavallero,

10   C-a-v, as in Victor, a-l-l-e-r-o.

11                   DIRECT EXAMINATION

12   BY MS. ALLHISER:

13        Q    What do you do, sir?

14        A    I'm a Community Service Officer for the Foster

15   City Police Department.

16        Q    And actually, I'm having trouble seeing your

17   eyes.

18        A    I'm sorry.

19        Q    Thank you.  It's hard for me to look at you when

20   I can't quite see you.  Thank you.

21        On March 10th, 2004, in the afternoon, were you called

22   to the area of the Edgewater Place Shopping Center to assist

23   in the search and recovery of property from a black Range

24   Rover?

25        A    Yes, I was.

26        Q    As part of your duties, did you take some

339

1    photographs?

2        A    Yes, I did.

3        Q    The items which you eventually seized and logged

4    into evidence at Foster City Police Department, are some of

5    those photographs sort of laid out for display -- some of

6    those objects laid out for display at Foster City Police

7    Department?

8        A    Yes, they were.

9        Q    Did you take some of these pictures?

10       A    Yes, I did.

11       Q    Did you count sums of currency in terms of their

12   denominations and make a record of that?

13       A    Yes, I did.

14       Q    Currency taken from the Range Rover?

15       A    Yes.

16       Q    Let me ask you to, if you can, try to stay

17   seated so we're not blocking people.  I'm going to move the

18   easel closer to you and give you a pointer.

19       All right.  If you need to get up, it's fine, but then

20   we're going to try to keep you out of the way.  All right?

21       A    Okay.

22       Q    Let me show you first People's Exhibit 5 for

23   identification, photographs labeled A through J.  Are you

24   familiar with what -- with what this shows?

25       A    Yes, I am.

26       Q    Did you take any of these pictures?

1        A      Yes, I did.

2        Q      Were you involved in searching the Range Rover

3    with somebody else?

4        A      Yes, I was.

5        Q      Who was that?

6        A      Officer Capodanno.

7        Q      In the course of the search, were you careful to

8    wear gloves?

9        A      Yes, I was.

10       Q      Were you careful to take photographs of things

11   before you moved them?

12       A      Yes, I did.

13       Q      Maybe if you slide a little bit this way, and

14   then I'm going to ask you to start with People's Exhibit 5.

15   And the photograph A, can you see or is this too hard?

16       A      No, no.  This is fine.

17       Q      What is the photograph A?

18       A      Photograph A is the rear of the vehicle where I

19   was parked behind the Albertsons store on Edgewater

20   Boulevard.

21       Q      Slowly read the license plate.

22       A      42225NY.

23              MS. ALLHISER:  Your Honor, I ask the Court to

24   receive the certified records of the Department of Motor

25   Vehicles concerning license plate No. 42225NY.  Counsel has

26   a copy of this.

1          It shows the registered owner as Jenni, J-e-n-n-i,

2     Bui, B-u-i, 1438 Balboa Street, San Francisco.

3                    THE CLERK:  Marking People's Exhibit 18.

4                    (People's Exhibit No. 18, DMV Records, marked

5                    for Identification only.)

6                    MS. ALLHISER:     Q      People's 5, the

7     photograph B, please describe?

8          A      That's the same Range Rover, taken from the

9     front.

10          Q      When you arrived, were other police officers

11     already around that car?

12          A      Yes, there were.

13          Q      When you arrived, how many doors were open to

14     the car?

15          A      I believe all four doors were open.

16          Q      Had CSO Dan Capodanno already been there before

17     you?

18          A      Yes, he had.

19          Q      What is the photograph C, part of People's 5?

20          A      That would be the driver's side of the vehicle.

21          Q      And who is leaning in there?

22          A      That would be Officer Capodanno.

23          Q      You recognize his legs?

24          A      He's the only one who wears shorts.

25          Q      What is the photograph D?

26          A      Photograph D is the inside of the front

342

1    passenger compartment of the vehicle.

2        Q      Did you personally notice anything unusual about

3    the inside of the front passenger car?

4        A      The floor mat was raised slightly.

5        Q      The photograph E?

6        A      Is a closer photograph of the same location.

7        Q      And F?

8        A      And photograph F, we had moved -- the floor mat

9    had been moved, and the utensil that was under it was

10    photographed.

11       Q      What was that thing?

12       A      It appeared to be a long screwdriver-type tool.

13       Q      Will you describe the orientation, meaning,

14    which end was where as you first saw it in the Range Rover?

15       A      The handle was toward the front of the vehicle

16    of the floorboard and the tipped end was toward the seat.

17       Q      What is the photograph G?

18       A      Photograph G is the console between the two

19    front seats.

20       Q      When you first saw the inside of the black Range

21    Rover, was this counsel -- pardon me, console open for view,

22    or did you have to flip something up or turn something over

23    to see what was in the console?

24       A      When I arrived, the console was closed.

25       Q      The photograph shows the console open?

26       A      Yes, it does.

343

1      Q      Now, use words to describe the objects, and

2   please be as specific as you can.   What is in that

3   photograph, People's Exhibit 5G?

4      A      There's a cell phone, two packs of Marlboro

5   Light cigarettes, some cash, stamps, some small plastic

6   containers, and a package of zigzag papers.

7      Q      The cash, did you personally count it?

8      A      No, I did not.

9      Q      Who did; do you know?

10     A      Officer Capodanno.

11     Q      In terms of the objects you can see in the

12   photograph G, have you covered it?

13     A      Pardon me?

14     Q      Have you covered the objects that you could see

15   in the photograph?

16     A      Yes, I have.

17     Q      Now, People's 5 for identification, H, what does

18   that show?

19     A      That shows the door pocket on the driver's side,

20   front driver's side door.

21     Q      What was inside the door pocket?

22     A      I believe that was a bag containing coins.

23     Q      Did you take the picture?

24     A      Yes, I did.

25     Q      The photograph I, part of People's 5?

26     A      I is the rear seat behind the driver.

344

1      Q      Be as specific as you can to describe what you

2    can see in that photograph that you recall?

3      A      There was a white shopping bag with a brown

4    paper bag inside.  There was what appeared to be a laptop

5    computer case.  There were some clothes.

6      Q      Describe the clothes?

7      A      There was a pair of blue jeans.

8      Q      Did you see a jacket?

9      A      I don't recall.

10     Q      Inside the white paper bag there's a brown paper

11   bag, right?

12     A      Yes, there is.

13     Q      Is that shown, but closer and sort of overhead,

14   bird's eye, in J?

15     A      Yes, it is.

16     Q      What does the photograph in J specifically

17   contain?

18     A      It contains the white paper bag with the brown

19   paper bag inside.  You can see the cash and jewelry was also

20   in the bag.

21     Q      In People's Exhibit 5 for identification,

22   describe the currency of the cash you can see, what

23   denominations?

24     A      It shows a five-dollar bill.

25     Q      Do you also see a two-dollar bill?  Maybe when

26   you're thinking of the five upside-down.  Do you see what I

345

1    mean?

2         A    Yes, yes.

3         Q    Is it a five or a two?

4         A    It's a two-dollar bill.

5         Q    All right.  After these photographs were taken,

6    how did you go about processing the car, breaking out the

7    items you were going to seize and book into evidence?

8         A    The items that I recovered I took out of the

9    vehicle, brought into the Foster City Police Department and

10   began to process by filling out property receipts,

11   photographing and cataloging all the items.

12        Q    You were wearing gloves in this whole process?

13        A    Yes, I was.

14        Q    I am going to switch now to People's Exhibit 11,

15   photographs A through H.  Do you recognize the objects shown

16   in the photographs shown in A through H or any of them?

17        A    Yes, I do.

18        Q    All of them?

19        A    Yes, I do.

20        Q    Where were these pictures taken?

21        A    Pictures A, B, C, D and E and H were taken in

22   the Foster City Police Department lineup room where the

23   items were displayed.

24        Q    Now, you left something out of that list?

25        A    I left out F.

26        Q    What is F?

1      A      F is after I had cataloged the items and booked

2   them into the property room, someone else had taken them

3   out, put them in individual bags, and I did not take that

4   photo, and I don't know where the photo was taken at.

5      Q      Otherwise you're familiar with the objects in

6   People's Exhibit 11 for identification?

7      A      Yes, I am.

8      Q      Now, I think I am going to ask you to stand to

9   do this because you have to get close.  Will you describe

10   what's in the photograph A, if you know?

11      A      In photograph A there is a gift certificate from

12   Stanford, assorted rings, chains, a watch, green stone

13   attached to a red string, earrings, and at the very top of

14   the photo you can see one of the black gloves, and off to

15   the side there were assorted disks of either coins or

16   jewelry.

17      Q      Let me just ask you while we have just talked

18   about this.  People's Exhibit 16, do you know what this is?

19      A      Yes, I do.

20      Q      What is it?

21      A      It's the Stanford shopping certificate for 100.

22      Q      Where did you first find it?

23      A      I first found this in the brown paper bag that

24   was inside the white paper bag that was in the back seat of

25   the Range Rover.

26      Q      What is in the photograph B, part of People's

1   11?

2        A    There is more jewelry, mostly chains. There's

3   one round disk on a red string, and there's a green stone

4   attached to a red string. There's earrings and regular

5   rings and a pair of black gloves.

6        MS. ALLHISER: Your Honor, I ask there be marked

7   for identification a piece of brown paper which is used to

8   wrap around two black fabric gloves. I have shown these to

9   counsel. As a group exhibit, Your Honor.

10       THE CLERK: Marking People's Exhibit 19.

11           (People's Exhibit No. 19, Two Black Gloves,

12           marked for Identification only.)

13       MS. ALLHISER:    Q    I opened this up so I

14  could show the clerk what I was doing, but let me open it up

15  in front of you. People's Exhibit 19 for identification,

16  it's this brown wrapping. Did you do that packaging?

17       A    Yes, I did.

18       Q    What is inside?

19       A    A pair of black fabric gloves.

20       Q    Where did you first see them?

21       A    Those gloves were in the brown paper bag that

22  was inside the white paper bag that was in the rear of the

23  Range Rover.

24       Q    What is in the photograph People's 11 for

25  identification C?

26       A    Those are coins.

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Q    Is that the bag of coins you were talking about?

2    A    Yes, it is.

3    Q    That had been in the driver's pocket?

4    A    Yes.

5    Q    What kind of coins?

6    A    They are United States currency.

7    Q    The photograph D, please?

8    A    In D there is the laptop computer, CD disks,

9    digital camera, a Rolex watch, black computer bag, cords

10   that go with the computer, and a Game Boy.

11   Q    The photograph E?

12   A    Photograph E is a box that says Louis Vuitton

13   with a wallet that was inside the box.

14   Q    The photograph F is the one you did not take and

15   had no participation in, right?

16   A    No, I did not take that photo.

17   Q    Now, what about -- skipped a letter.  The normal

18   sequence would be F and then G, but there is no G, so how

19   about H?

20   A    H is a repeat of these items up here.  It's the

21   same items, with the Game Boy opened up so you can actually

22   see the inside of it.

23   Q    And would you have your seat, sir.

24       In your searching through the Range Rover, did you

25   find any U.S. currency?

26   A    Yes, I did.