1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  CHRISTOPHER J. WEI, State Bar No. 78958
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7  Telephone:  (415) 703-5867
   Fax:  (415) 703-1234
8  Email:  Christopher.Wei@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **HOA TRUNG KHUU,** | C 07-6351 SI (pr) |
| Petitioner, | **EXHIBIT 9 (part 6)** |
| v. | |
| **JOHN TILTON, CDCR Secretary,** | |
| Respondent. | |

20

21

22

23

24

25

26

27

28

Exhibit 9 (part 6)                                              Khuu v. Tilton
                                                              C 07-6351 SI (pr)

# EXHIBIT 9 (part 6)

349

1    Q    Did you carefully count it?

2    A    Yes, I did.

3         MS. ALLHISER:  I ask there be marked for

4    identification a photocopy.  It's the face of an evidence

5    envelope indicating a breakdown by denominations.  Under

6    "officer counting money," indicates Cavallero,

7    C-a-v-a-l-l-e-r-o.  Counsel has a copy of this.

8              THE CLERK:  Marking People's Exhibit 20.

9              (People's Exhibit No. 20, Evidence Envelope,

10             Denomination Breakdown, marked for

11             Identification only.)

12        MS. ALLHISER:    Q    Did you also lay out

13   the U.S. currency by denomination and take some digital

14   pictures?

15   A    Yes, I did.

16        MS. ALLHISER:  Your Honor, next in order, four

17   pages stapled together.  Counsel has seen these.  Stacks of

18   money by hundreds, twenties, tens, fives, twos and single

19   dollar bills.

20             THE CLERK:  Marking People's Exhibit 21.

21             (People's Exhibit No. 21, Four-page Document,

22             Copies of Currency, marked for Identification

23             only.)

24        MS. ALLHISER:    Q    Showing you a

25   photocopy.  It's labeled People's Exhibit 20.  What is that

26   a copy of?

350

1       A       It's a copy of a plastic bag with the currency

2   inside and a breakdown of the denominations of the currency.

3       Q       Are those your markings, sir?

4       A       Yes, they are.

5       Q       Where did you originally find -- I'm talking

6   just about the money you counted, not what somebody else

7   did, just your counting.  Where did you originally find that

8   U.S. currency?

9       A       I found it in the brown bag that was inside the

10  white bag in the back -- in the rear of the Range Rover.

11      Q       Will you slowly read the denominations by

12  number?

13      A       Certainly.  There was 45 $100 bills, there was

14  18 $20 bills, there was three $10 bills, there was one $5

15  bill, there was 25 $2 bills, and there was 34 $1 bills.

16      Q       What is the total?

17      A       $4,979.

18      Q       Showing you now these series of digital

19  photographs stapled together, People's 21 for

20  identification, what is that?

21      A       Before the money was packaged, it was laid out

22  and photographed, and these are the photos of the money that

23  was recovered after it was laid out.

24      Q       You took those pictures?

25      A       Yes, I did.

26      Q       You found foreign currency, sir?

351

1    A    Yes, I did.

2    Q    Where?

3    A    In the same brown bag that was inside the white

4    bag inside the Range Rover.

5    Q    Was the foreign currency together, meaning

6    foreign currency kept in one set, separated from the United

7    States currency, or was the currencies blended?

8    A    It was separate from the U.S. currency.  In the

9    same bag but not mixed in with it.

10    Q    Showing you People's Exhibit 15, two pages

11    stapled together.  Do you recognize these objects?

12    A    Yes.  These appear to be the money that I found

13    in the rear of the car.

14    Q    Okay.  So they are labeled 100?

15    A    Correct, and one 500.

16    Q    So, one, two, three, four, five, six

17    hundred-dollar bills;  one 500?

18    A    Yes.

19    Q    The only wallet was that Louis Vuitton wallet

20    that you took -- you personally took out of the Range Rover?

21    A    That was the only one.

22    Q    Did you notice any person's name on the laptop

23    or laptop bag indicating whose it was?

24    A    There were business cards inside the laptop bag.

25    Q    Do you remember the name?

26    A    No, I do not.

352

1        MS. ALLHISER:  Those are my questions.

2        MR. BELL:  I have no questions, Your Honor.

3        THE COURT:  All right.  May he be excused?

4        MS. ALLHISER:  Yes, Your Honor.

5        THE COURT:  All right.  Thank you.

6        MS. ALLHISER:  Sharon Derris.

7        THE COURT:  Mr. Bell, do you have those three

8   instructions I gave you this morning?  Can I borrow them?  I

9   misplaced them.

10       Go ahead.

11       MS. ALLHISER:  Miss Derris, would you walk to

12  the platform and stand next to the microphone.

13       THE CLERK:  Please raise your right hand and

14  remain standing.

15                   SHARON DERRIS,

16  called as a witness by the People, after being first duly

17  sworn, was examined and testified as follows:

18       THE CLERK:  Thank you.  Please have a seat.

19       Please state and spell your name for the record.

20       THE WITNESS:  My name is Sharon Derris,

21  S-h-a-r-o-n  D-e-r-r-i-s.

22                 DIRECT EXAMINATION

23  BY MS. ALLHISER:

24       Q    What kind of work do you do?

25       A    I'm a dispatcher for the Foster City Police

26  Department.

Kathryn M. Lezchuk, C.S.R. No. 2302

353

1    Q    Will you describe what you do.

2    A    I answer emergency and non-emergency calls for

3    the police department, which includes medical, crimes in

4    progress, barking dogs.

5    Q    And do you have access to the records which are

6    maintained by dispatch and communications?

7    A    Yes.

8    Q    How do police officers out in the field

9    communicate with you?

10   A    Over the radio and sometimes phones.

11   Q    Can you broadcast to every single working police

12   officer in Foster City?

13   A    Yes.

14   Q    And can every single working police officer

15   communicate with you?

16   A    Yes.

17   Q    Can you reach outside agencies?

18   A    Yes.

19   Q    Asking you now about emergency calls, 9-1-1?

20   A    Uh-huh.

21   Q    What is the drill for your receiving a 9-1-1

22   call?

23   A    Could you clarify that for me a little bit?

24   Q    Do you have a process of recording the time or

25   the place or the nature of the complaint?  Do you have a

26   habit and custom there?

354

1      A      Every phone call and piece of radio traffic in

2  the communications center is taped 24 hours a day, seven

3  days a week.

4      Q      Do you also make some handwritten entries?

5      A      Yes.

6      Q      Under what circumstances would you make

7  handwritten entries on an emergency call?

8      A      Any circumstance that I deem necessary.

9  Anything that may be more convoluted, that may require me to

10  write down information as people are talking and I'm

11  listening to other conversations between the officers, I may

12  need to make notes in order to put that information out at a

13  later time.

14      Q      When you receive calls on your business line and

15  it turns out someone's complaining about a crime, do you

16  treat it differently than a 9-1-1 call?

17      A      Slightly, but not really.

18      Q      Would you explain.

19      A      9-1-1 calls, of course, get answered first

20  because they are in theory more like life-and-death

21  emergencies, although, emergency calls have been known to

22  come in on emergency lines and business lines.  Once you

23  answer the phone and get the general gist of what the person

24  is trying to report, then you process the information based

25  on prioritization, whether that phone call or maybe a

26  different phone call, the crime itself or the incident

1   itself is more important than the other.

2        Q    Does it get pretty hectic?

3        A    It can.

4        Q    When a police officer wants to know who John

5   Smith is, do you have the ability to determine who people

6   are if you have their full names and dates of birth?

7        A    Yes.

8        Q    How do you do that?

9        A    I have full access to the California Law

10  Enforcement Telecommunications System, which allows me to

11  check warrants, DMV records, Sheriff's records, things like

12  that.

13       Q    If a police officer has a person's driver's

14  license, you know, the actual license with the number on it,

15  do you have some way of confirming if it's a real license

16  issued to that person?

17       A    I would run the driver's license, cross-check

18  with the officer out on the street who has the license in

19  his possession with the information I'm showing on my screen

20  and what he or she is holding in their hand.

21       Q    Things like height and weight?

22       A    Height, weight, hair, eyes, addresses, things

23  like that.

24       Q    Do you also have access to means of checking

25  license plate numbers?

26       A    Yes.

356

1    Q    How do you do that?

2    A    Same communications, Teletype system, access to

3    DMV records, license plates included in that.

4    Q    When a police officer calls in to your center

5    and says, I want to know about license plate 1234, how long

6    does it take, assuming California -- California plate?  How

7    long does it take to get an answer back from DMV as to the

8    registration, type of vehicle, things like that?

9    A    Usually it's just a matter of seconds.

10    Q    And how do you communicate the information back

11    to the officer?

12    A    I would then get on the radio and inform the

13    officer that there's no wants associated to the vehicle,

14    it's not stolen, and return of the complete registration,

15    including the registration month, year, type vehicle, year,

16    who owns it, where they lived.

17    Q    You used, I think in all of that, just one word

18    that may not be familiar to people.  You said there were "no

19    wants."  What does that mean?

20    A    Meaning no warrants associated to the vehicle.

21    No one driving the vehicle has any warrants associated to

22    them from in the past.

23    Q    So if John Smith, certain date of birth, was

24    driving a certain car, that John Smith's warrants would

25    somehow hook up to the license plate number?

26    A    It can, yes.

Kathryn M. Lezchuk, C.S.R. No. 2302

357

1      Q      How long have you been in this line of work?

2      A      Almost 14 years.

3      Q      How long for Foster City?

4      A      Almost 14 years.

5      Q      Do you remember talking with Tommy Hui on March

6   10th, 2004?

7      A      Yes.

8      Q      How do you remember that?

9      A      I remember bits and pieces of a lot of the calls

10  I've handled over the years.

11     Q      Did you, in preparation for your testimony

12  today, review the handwritten records from your

13  communications center concerning Tommy Hui's complaint and

14  the subsequent actions of the Foster City police chase and

15  things of that nature?

16     A      Yes.

17     Q      What is a CLETS, C-L-E-T-S, Computer Inquiry

18  Log?

19     A      That is a sheet that the Foster City Police

20  Department uses for the California Law Enforcement

21  Telecommunications System -- that's CLETS -- where the

22  dispatchers write down information that the officers have

23  asked us to inquire into the CLETS system on their behalf.

24     Q      What types of things do you include in this

25  particular form?

26     A      I use it for logging that information, as well

Kathryn M. Lezchuk, C.S.R. No. 2302

358

1    as often writing my own notes regarding people that call,

2    incidents, things I need to do later that someone has asked

3    me to do, things like that.

4         Q    And you retain these logs?

5         A    Yes.

6         Q    On March 10th, 2004, when Tommy Hui called you,

7    was he calling on a 9-1-1?

8         A    No.

9         Q    How did he make his call to the department?

10        A    He called in on the business line.

11        Q    You remember that?

12        A    Uh-huh.

13        Q    Yes?

14        A    Yes.

15        Q    Okay.  Were there other persons working in the

16   dispatch center or were you alone?

17        A    I had one partner.

18        Q    Who was that?

19        A    Cindy Talcott.

20        Q    Spell it.

21        A    C-i-n-d-y  T-a-l-c-o-t-t.

22        Q    When this business-line call came in, do you

23   have a way of knowing when the call is received?

24        A    Based on either the tape or on the approximate

25   time that's noted in the CAD log will indicate the time.

26        Q    What does CAD stand for?

Kathryn M. Lezchuk, C.S.R. No. 2302

359

1          A       Computer-Aided Dispatch.

2          Q       How, in terms of record keeping, is the Tommy

3   Hui call isolated from all the other calls that Foster City

4   got for whatever, barking dogs, that day?

5          A       Every new call or incident that I enter into

6   that computer system is automatically generated a

7   complaint-type incident number.  I can't remember what they

8   call it now.  I think it's an incident number.  I would have

9   to look at the form to remember.

10         Q       And that number is unique to the police action,

11  response to a single person's complaint?

12         A       Correct.

13         Q       Have you reviewed the CLETS Computer Inquiry Log

14  for March 10th, 2004, for yourself and your partner?

15         A       Yes.

16         Q       And are you familiar with the CAD operations

17  report for this particular call?

18         A       Vaguely.

19                 MS. ALLHISER:  Counsel has copies of these.

20         Your Honor, People's exhibit next in order, People's

21  Exhibit 22, Your Honor, for identification, four pages

22  stapled together, which is labeled CLETS Computer Inquiry

23  Log, dated March 10th, 2004; and CAD, C-A-D, Operations

24  Report, call No. 2004 031055.

25                 THE COURT:  What was the first word in that

26  title of 22?

Kathryn M. Lezchuk, C.S.R. No. 2302

1          MS. ALLHISER:   Your Honor's it's an acronym,

2     CLETS, C-L-E-T-S.

3               THE COURT:   Thank you.

4                    (People's Exhibit No. 22, Four-Page CLETS

5                    Computer Inquiry Log, marked for Identification

6                    only.)

7               THE CLERK:   Marking People's Exhibit 23.

8               MS. ALLHISER:   And 23, Your Honor, is three

9     pages stapled together, labeled CAD Operations Report.

10                   (People's Exhibit No. 23, Three-Page CAD

11                   Operations Report, marked for Identification

12                   only.)

13              MS. ALLHISER:    Q    Miss Derris, first

14    People's 22 for identification.   It's several pages stapled

15    together.  Would you take a look at each of the pages.

16         Do you recognize the form, first?

17         A    Yes.

18         Q    And do you recognize some of your own

19    handwriting?

20         A    Yes.

21         Q    On People's Exhibit 22 there are sections which

22    have been blacked out, can't see what's written there.   What

23    are those sections which have been blacked out?

24         A    This is information that I have in the first

25    page case that I have written down during the course of the

26    day, inquiries that officers have requested that don't have

                    Kathryn M. Lezchuk, C.S.R. No. 2302

1   anything to do with this particular incident.

2          Q      Is there, however, something that has to do with

3   the Tommy Hui call as part of People's 22?

4          A      Yes.

5          Q      Where is that?

6          A      That's on page 2 for my logs.

7          Q      On page 2 is that your handwriting?

8          A      Yes.

9          Q      And would you continue through the pages and see

10  if there's anything else that relates to the Tommy Hui call?

11         A      Yes.   There are notes on my partner's logs as

12  well.

13         Q      Asking you first about your notes.  Can you read

14  all of your notes?

15         A      Most of them.

16         Q      You have some difficulty reading them?

17         A      When I'm extremely busy I tend to write a little

18  more messily, so sometimes they are hard to decipher at a

19  later time.

20         Q      As you remember the phone call with Mr. Hui,

21  forgetting what you wrote down, just for now what you

22  remember, what did he tell you?

23         A      He told me that someone tried to pry open his

24  sliding door to his residence; that he had seen a black

25  Range Rover just prior to that occurring that may have

26  something to do with it.

362

```
1       Q      Do you remember him giving you any suspect
2   description?
3       A      I believe so, but I can't be a hundred percent
4   sure.
5       Q      Now let's get to your notes, People's Exhibit 22
6   for identification.  Do your notes provide any more details
7   about information that Mr. Hui gave you?
8       A      Yes.
9       Q      What's that?
10          MR. BELL:  I am going to object to her testimony
11  about her notes.  The notes are hearsay, and she hasn't
12  indicated yet that she needs to refresh her recollection by
13  reference to the notes.
14          THE COURT:  Well, both objections are sustained.
15          MS. ALLHISER:     Q      Do you remember
16  everything that Tommy Hui told you?
17      A      No.
18      Q      Did he provide you with suspect description,
19  vehicle description, details that you then dispatched, sent
20  out, communicated to Foster City police?
21      A      Yes.
22      Q      When you made those notes, did you realize they
23  would be retained as a record by the Foster City Police
24  Department?
25      A      Yes.
26      Q      And at the time, did you make them as accurate
```

1    and complete as you could, given the pressure of time?

2        A    Yes.

3        Q    Are you now able to remember the details that

4    appear in your handwriting?

5        A    Yes.

6        Q    By looking at your handwriting, it refreshes

7    your memory?

8        A    Yes.

9            MS. ALLHISER:  May I continue?

10           THE COURT:  Yes.

11           MR. BELL:  I was going to make the same

12   objection, Your Honor.  Also, they're prepared for the

13   purposes of litigation.

14           THE COURT:  Well, the objections are overruled

15   on that.

16           MS. ALLHISER:    Q    Having been refreshed

17   by your notes, what else did Mr. Hui tell you?

18       A    He indicated at least one suspect.  In my notes

19   I have written Hispanic male, my abbreviation for such.  I

20   have a clothing description, sweatshirt, red and gray;  blue

21   jeans, dark jacket.  I do have a license plate number

22   written down.

23       Q    Read it please, slowly?

24       A    422 -- for my handwriting, this normally looks

25   like an SNY.

26       Q    Did Mr. Hui tell you, as you are remembering it,

364

1    that there was just one person?

2         A    No.  I think he said there were two.

3         Q    Did he describe what the two were doing?

4         A    He indicated to me, to the best of my

5    recollection, that someone was trying to pry open his

6    sliding-glass door.  I believe he said something about a

7    second person.  I, unfortunately, can't recall exactly what.

8         Q    From People's Exhibit 23, which is labeled CAD

9    Operations Form, can you, based on your record-keeping

10   process at Foster City Police Department, tell us at what

11   time Mr. Hui called -- Mr. Hui's call came in on the

12   business line?

13        A    At approximately 12:41 p.m.

14        Q    And can you tell by looking at the

15   computer-assisted dispatch form, based on your

16   record-keeping process, at what time you communicated with

17   Foster City Police Department officers and told them what to

18   look for and where to go?

19        A    Approximately 12:43.

20        Q    Is there a record in People's Exhibit 22 of

21   Officer Bill Sandri asking communications to run a license

22   plate?

23        A    Yes.

24        Q    Where is it?

25        A    It's on page 3 of -- page in here of my partner

26   -- on my partner's log.

365

1      Q      How do you know it was Sandri who requested the

2   license plate?

3      A      We log both the time and the officer's badge

4   numbers with the items next to them they are inquiring on.

5      Q      What is Sandri's badge number?

6      A      48.

7      Q      At what time did that officer ask for the

8   license plate number to be run?

9      A      12:49.

10     Q      I'm sorry?

11     A      12:49.

12     Q      What license plate number is written down?

13     A      4222, looks like a 5, NY.

14     Q      Do you remember from Mr. Tommy Hui's business

15   line call where -- well, first, I'm sorry, the business line

16   call, does it give you the residence or business from which

17   the call is coming?

18     A      No, it does not.

19     Q      Do you recall or did you note the location from

20   which Mr. Hui made his call?

21     A      I asked him for that information.

22     Q      And what was that?

23     A      No. 57 Williams Lane.

24     Q      Do you remember Mr. Hui telling you, if he did,

25   the direction of travel of these suspects away from his

26   residence?

Kathryn M. Lezchuk, C.S.R. No. 2302

366

1       A       No.

2       Q       Did you know when you talked to him where 57

3   Williams Lane was?

4       A       General area.

5       Q       And as a dispatcher did you know where you

6   needed to send the police officers?

7       A       Yes.

8       Q       How, how did you know that?

9       A       Our computer automatically gives me the

10  responsible -- the officer that's responsible for that area,

11  tells me who goes first; and just by the process of our

12  procedures, they automatically -- you have a primary unit,

13  which was Officer Sandri, and any cover units that I choose

14  to assign, and in this case it was basically the entire

15  shift.

16      Q       How many people are on that shift?

17      A       Normally about five or six.  I don't know if we

18  were fully staffed that day or not.  I can't remember.

19      Q       So in that moment it's your choice how many

20  people you send on the call?

21      A       Yes.

22      Q       And you sent them all?

23      A       Yes.

24      MS. ALLHISER:  Those are my questions.

25      THE COURT:  Mr. Bell.

26      MR. BELL:  Is this a good time for a break, or

Kathryn M. Lezchuk, C.S.R. No. 2302

367

1    do you want me to proceed?

2                    THE COURT:  Why don't you go ahead.

3                    CROSS-EXAMINATION

4    BY MR. BELL:

5        Q    Miss Derris, you have been with Foster City now

6    for 14 years?

7        A    Yes.

8        Q    Fourteen years as a dispatcher?

9        A    Yes, sir.

10       Q    Are you the most senior dispatcher at Foster

11   City?

12       A    No, sir.

13       Q    What's the next most experienced dispatcher?

14       A    Next in line would have been my partner, I

15   believe.  She's almost at 16.

16       Q    Okay.  Now, you indicated that every incoming

17   telephone call to the Foster City Police Department is

18   tape-recorded; is that correct?

19       A    Yes.

20       Q    Therefore, the tape of Mr. Hui's call was

21   tape-recorded?

22       A    Yes.

23       Q    Have you ever listened, to prepare for your

24   testimony here today, to the call of Mr. Hui?

25       A    No.

26       Q    Why is that?

1      A      That tape is inaccessible to us at the moment.

2  The physical tape is available.  The process with which to

3  play it is not.

4      Q      The physical tape is available but the process

5  to play it is not.  That means that the call has been

6  preserved in some way, correct?

7      A      Correct.

8      Q      But there's no way of accessing it?

9      A      No, sir.

10     Q      Is that because there's something wrong with the

11 machinery?

12     A      That is correct.

13     Q      And has any effort been made to repair the

14 machinery so we could actually hear the call to Mr. Hui?

15     A      The department was already in the process of

16 purchasing a new system due to the cost of the repairing the

17 old system, so they were not going to repair it.

18     Q      What was the cost, if you know?

19     A      Approximately $3500, I believe.

20     Q      So Mr. Hui here is on trial.  There's a very

21 important issue, and it wasn't worth $3500 to Foster City so

22 we could hear the actual call of Mr. Hui, is that what

23 you're telling me?

24          MS. ALLHISER:  Objection.  Argumentative.

25          THE COURT:  Sustained.  I'll note again,

26 counsel, I think you could have subpoenaed the tape and sent

369

1    it out for a playing if you really wanted to hear it.

2              MR. BELL:   It's not possible, Your Honor.   We

3    have requested it, and we've been denied on the grounds that

4    Foster City doesn't want to pay the money necessary.

5              THE COURT:   No.   If you had subpoenaed the tape

6    and sent it to an expert to have it played yourself if you

7    want.

8              MR. BELL:   I'm told that's impossible.   There is

9    only one machine.   Because it's coded in a certain way there

10   is only one machine that can replay it, and that's the

11   machine it has been recorded on in Foster City, so it's

12   unavailable to me as well.

13             THE COURT:   If you want to prove that, go ahead.

14             MR. BELL:   Let me ask that.

15             THE COURT:   The comments of counsel, ladies and

16   gentlemen, are not evidence.   Okay.

17             MR. BELL:   Q   Miss Derris, can the tape be

18   played -- the tape that you're talking about be played on

19   any other machine?

20        A    It is my understanding that, no, it cannot.

21        Q    Is that because it has been coded in a certain

22   way so it can only be replayed on a machine it is presently

23   on in Foster City?

24        A    That is my understanding.

25        Q    Actually, there is another police agency in the

26   area that has similar kind of equipment, but because of the

Kathryn M. Lezchuk, C.S.R. No. 2302

370

1   coding it can't actually be played on that other machine,

2   correct?

3          A      Again, my understanding.

4          Q      Now, as a dispatcher, when you are giving

5   information to a police officer about a crime in progress or

6   that has just occurred, you're trying to give him as much

7   information as possible that that officer -- might be useful

8   to that officer; is that correct?

9          A      Correct.

10         Q      Now, I believe you're aware that Officer Sandri

11  has testified that when he received the dispatch from you

12  about a black Range Rover, he was not given a license plate

13  by you attached to the black Range Rover.  Did you actually

14  dispatch or call out to Officer Sandri the license number

15  that you say you got from Mr. Hui?

16         A      I don't recall.

17         Q      If you had that license number at the time you

18  sent the dispatch to Officer Sandri, would you not have

19  routinely included that in the dispatch call so that Officer

20  Sandri would have known the exact license number of the

21  vehicle that was being looked for?

22         A      Yes.

23         Q      Now, it is true that what you have written down

24  in your notes from this day is only a partial license

25  number, correct?

26         A      Correct.

371

1      Q      But what we have just said applies to a partial

2    as well as a full license number.  You would have given the

3    officer whatever partial you had, correct?

4      A      Correct.

5      Q      And if Officer Sandri says that he never

6    received that, that makes it fairly likely that you didn't

7    have it at that time that you gave that dispatch; isn't that

8    correct?

9      A      It's possible.

10     Q      You also know, do you not, that Mr. Hui has

11   testified that he never saw the license plate of the Range

12   Rover that he saw in front of his house on that day.  You're

13   aware of that, aren't you?

14     A      Yes.

15            MR. BELL:  May I approach, Your Honor?

16            THE COURT:  Sure.

17            MR. BELL:  Let me just take a second.  I'm

18   looking for --

19            MS. ALLHISER:  Her exhibits?

20            MR. BELL:  Yes.

21            MS. ALLHISER:  She has them.

22            MR. BELL:  Great.  Could I see the two

23   exhibits?  Thank you.

24        Thank you.

25     Q      On People's No. 23, which is labeled the CAD

26   Operations Report, can you tell the jury what People's 23 is

372

1    beyond what it's entitled, CAD Operations Report?

2         A    It's a printout of all of the times and notes

3    and press-release board that our CAD computer holds.  It

4    also indicates the officers and their responses and times

5    and so forth.

6         Q    All right.  The form indicates that on 3/10,

7    2004, 12:43:51 S Derris, that is -- seems to be a date, time

8    and an indication that you were somehow connected with this

9    entry; is that correct?

10        A    That means I'm the one that typed in the entry.

11        Q    Okay.  This would have been your entry about the

12   time you received the call from Mr. Hui, correct?

13        A    That would have been the time I dispatched it.

14        Q    All right.  I'm sorry.  All right.  You

15   dispatched it.

16        If you included information in the dispatch -- by the

17   way, when you say dispatched it, you mean to Officer Sandri,

18   correct?

19        A    Yes.

20        Q    If you had included the license number that you

21   dispatched to Officer Sandri, it should have been recorded

22   in this CAD Operations Report as information you dispatched

23   to the officer, correct?

24        A    Not necessarily.

25        Q    It should have been, according to the procedures

26   in your department?

Kathryn M. Lezchuk, C.S.R. No. 2302

373

1      A       No.

2      Q       Well, let me just ask you, what information did

3    you include in the dispatch to Officer Sandri about the make

4    and model and description of the vehicle, according to the

5    CAD Operations Report?

6      A       According to the CAD Operations Report, I gave

7    him the information on a black Range Rover.

8           Do you want the rest of what's written here?

9      Q       Let me just ask.   There is no reference to a

10   license number?

11     A       No.

12     Q       Or a partial license number, correct?

13     A       Correct.

14     Q       Let me go on to a different subject.

15          I think your testimony was that Mr. Hui identified one

16   Hispanic male.   Is that your present recollection?   He

17   talked about two people, but he said something about a

18   single Hispanic male?

19     A       My recollection is only in this case based on

20   'cause now I'm reading the CAD report.   I typed two Hispanic

21   males, so my recollection may be off.

22     Q       Okay.   So your CAD report indicated two HMs,

23   which means two Hispanic males, correct?

24     A       Correct.

25     Q       And then it says "five ago," meaning five

26   minutes ago?

374

1       A       Correct.

2       Q       So that does that mean that Mr. Hui told you

3   that five minutes before his call that he saw the men, two

4   Hispanic males or five minutes before your dispatch?

5       A       It was approximately -- five minutes prior is

6   when he saw them.

7       Q       So what he meant, it was five minutes before he

8   actually phoned the police department, correct?

9       A       Correct.

10      Q       Other than that telephone call that you had with

11  Mr. Hui that day, have you ever had any other contact with

12  Mr. Hui that you're aware of?

13      A       Are you talking personal or in writing?

14      Q       Have you ever had any face-to-face contact or

15  meetings with him?

16      A       No, sir.

17      Q       Now, when Mr. Hui called Foster City Police

18  Department that day to make this report, you didn't just

19  take the report and then hang up the phone, did you?

20      A       No.

21      Q       Matter of fact, your practice is to -- in a

22  situation where somebody, for example, has -- is complaining

23  about a burglary or something where there may be personal

24  safety involved, you would keep that person on the line

25  until an officer actually responds to the premises that he's

26  calling from, correct?

Kathryn M. Lezchuk, C.S.R. No. 2302

375

1     A     Correct.

2     Q     In other words, you want to make sure that the

3   person making the report is safe, and you want to know what

4   is happening there so that if there's something else that

5   happens you can tell -- you can dispatch that information to

6   officers responding to the scene, correct?

7     A     That's part of it, yes.

8     Q     So it's not only for the safety of the person

9   calling but even potentially for the safety of the officer

10  responding, correct?

11    A     Correct.

12    Q     You had Mr. Hui on the line for a fair amount of

13  time while you were listening to radio traffic about the

14  matter, correct?

15    A     Correct.

16    Q     Actually, do you have any note as to when the

17  first officer actually responded to 57 Williams Lane?   Can

18  you tell that from your notes or from your recollection?

19    A     From the CAD Operations Report, it indicates

20  that Officer Lee was the first officer actually on scene at

21  that location at 12:46.

22    Q     I just had that.  Give me just a chance here.

23         That would be Officer Lee's unit 46; is that correct?

24    A     Correct.

25    Q     So he got there within three or four minutes?

26    A     Correct.

376

1       Q     I'm sorry, what time did you say he arrived

2   there?

3       A     12:46.

4       Q     So I have the wrong entry.  12:46.  So that

5   would be approximately three minutes or so?

6       A     Correct.

7       Q     Right?

8       And it was during that three minutes that Officer

9   Sandri called dispatch to ask dispatch to run the license

10  plate; isn't that correct?

11      A     I believe so.

12      Q     And Officer Sandri gave dispatch the license

13  number that he said he was looking at on a black Range Rover

14  that he was observing, let's put it that way, correct?

15      A     Again, I believe so.

16      Q     And you heard that radio traffic with your

17  partner?

18      A     My partner was more in tune to the radio traffic

19  because I was still talking to the victim on the phone.

20      Q     Okay.  After Officer Lee arrived at the premises

21  at 12:46 did you continue to keep Mr. Hui on the telephone

22  for even some additional time?

23      A     I believe so.

24      Q     That was because Officer Lee actually arrived

25  there but then was immediately dispatched to another place

26  and never actually made contact with Mr. Hui, correct?

377

1      A      Correct.

2      Q      When -- can you tell from your records when the

3  first officer actually made contact with Mr. Hui at 57

4  Williams Lane?

5      A      I'm not actually sure.  It may have been Officer

6  Nix.  I don't actually remember which officer made contact

7  with him first due to all the other things that were

8  occurring at the time.

9      Q      But it appears that actually, if I'm reading

10  this correctly, that at least three different officers

11  responded to 57 Williams Lane and actually announced that

12  they had arrived there at about 12:50, correct?

13      A      Not necessarily.

14      Q      I guess I don't know how to read these as well

15  as you do.

16      A      No, sir.  You are actually reading it correctly,

17  but the location may or may not have been 57 Williams at

18  that time.

19      Q      I guess the comments section is more in

20  reference to what the call was about rather than where the

21  location of the officer was at that time?

22      A      Correct.

23      Q      But it's your recollection that it was probably

24  around 12:50 when the officers actually arrived there and

25  made contact?

26      A      To the best of my knowledge, yeah.

378

1      Q      And then you had Mr. Hui on the phone all that

2   period of time from the time he originally called, which

3   would be about seven minutes or so?

4      A      Correct.

5             MR. BELL:  I have nothing further.  Thank you

6   very much.

7             MS. ALLHISER:  Your Honor, permission to

8   reopen.  I neglected to ask a few questions.

9             THE COURT:  Sure.

10                  FURTHER DIRECT EXAMINATION

11  BY MS. ALLHISER:

12     Q      Miss Derris, the exhibit which is labeled 22,

13  the CLETS log inquiry, the numbers 10-15.  What does that

14  mean?

15     A      10-15 is the ten code we use for an officer

16  taking a suspect into custody.

17     Q      I ask you now to take a look at the -- it's

18  People's 22.  Look at the CLETS computer entry by your

19  co-worker at 1300 hours, at 1:00 p.m.  Is there an

20  indication of an arrest?

21     A      Yes.

22     Q      And what is the code that makes you understand

23  that?

24     A      She has the code written 10-15.

25     Q      And going down just one line, is there another

26  10-15?

Kathryn M. Lezchuk, C.S.R. No. 2302

379

1    A    Yes.

2    Q    And at what time?

3    A    That says at 1336.

4    Q    When a police officer takes a person into
5    custody, you call it a 10-15?

6    A    Correct.

7    Q    And if there are two people or three people you
8    would just call them S-1, S-2, S-3?

9    A    Or for us 1, 2, 3.  Either way.

10    Q    Why do you keep track of the time that an
11    individual is taken into custody?

12    A    That's part of our normal process of doing --
13    keeping track of things.  We always log what time an officer
14    takes a suspect into custody.

15            MS. ALLHISER:  Those are my questions.

16            MR. BELL:  Nothing further, Your Honor.

17            THE COURT:  Okay.  May this witness be excused?

18            MS. ALLHISER:  Yes, Your Honor.

19            THE COURT:  Okay.  You're excused.  Thank you.

20    All right, ladies and gentlemen, we'll take our
21    afternoon recess for ten minutes.  Please remember the
22    admonition.

23    You have another witness, I assume?

24            MS. ALLHISER:  I do.

25        (Brief recess.)

26            THE COURT:  Next witness.

Kathryn M. Lezchuk, C.S.R. No. 2302

380

1          MS. ALLHISER:  Joel Bouza.  Would you go ahead
2    and be sworn, please.
3          THE CLERK:  Please raise your right hand.
4                   JOEL BOUZA,
5    called as a witness by the People, after being first duly
6    sworn, was examined and testified as follows:
7          THE CLERK:  Thank you.  Please have a seat.
8       Please state and spell your name for the record.
9          THE WITNESS:  Joel Bouza, J-o-e-l, last
10   B-o-u-z-a.
11                 DIRECT EXAMINATION
12   BY MS. ALLHISER:
13        Q     Is it Corporal?
14        A     Yes.
15        Q     Corporal Bouza, with which department do you
16   work?
17        A     Foster City Police Department.
18        Q     How long have you been a sworn peace officer?
19        A     Approximately four years.
20        Q     I'd like to ask you about Wednesday, March 10th,
21   2004, after about 1:00 p.m.  Were you then on duty, sir?
22        A     Yes, I was.
23        Q     With other Foster City police officers were you
24   dealing with an investigation involving a black Range Rover?
25        A     Yes, I was.
26        Q     Did you ever see the black Range Rover?

381

1    A    Yes, I did.

2    Q    In the course of the investigation, did you

3  attempt to locate a George Hung, H-u-n-g?

4    A    Yes, I did.

5    Q    Why were you looking for him?

6    A    I had located some property inside the black

7  Range Rover that had Mr. Hung's name on it.

8    Q    How did you find him by just the name?

9    A    There was a business card.

10   Q    Okay.

11   A    Several business cards.

12   Q    Was there an address as well?

13   A    Yes, there was.

14   Q    Corporal Bouza, did you go to Mr. Hung?  Did you

15  have him come to you?  How did it work?

16   A    Upon finding Mr. Hung's address on several

17  business cards in the black Range Rover, I went to the

18  residence.

19   Q    Was there anyone then at home?

20   A    After conducting a search of the residence, I

21  did locate someone inside the home.

22   Q    Man, woman or child?

23   A    Child.

24   Q    Was it a child of that family?

25   A    Yes, it was.

26   Q    Why did you search the residence?

Kathryn M. Lezchuk, C.S.R. No. 2302

382

1        A      Upon finding Mr. Hung's property inside of the

2    vehicle, we wanted to make sure that Mr. Hung knew where his

3    property was.

4        Q      Did you locate any suspects at 361 Beach Park

5    Boulevard, the residence of George Hung?

6        A      No, I did not.

7        Q      Did you try to determine the point of entry of

8    whoever had gotten hold of his property?

9        A      Yes, I did.

10       Q      Where were you looking, sir?

11       A      I initially checked the front doors and windows

12   of the residence.

13       Q      Did you ultimately find a location where someone

14   may have made entry unlawfully?

15       A      Yes, I did.

16       Q      Where was that?

17       A      It was the side garage door on the west side of

18   the residence.

19       Q      And what did you see that made you think that

20   was the point of entry?

21       A      There were fresh pry marks on the wooden door

22   frame.

23       Q      You say "fresh."  Why?

24       A      The indentations on the wood were not discolored

25   as aged wood usually discolors.  There was not any dirt

26   inside these pry marks either.

Kathryn M. Lezchuk, C.S.R. No. 2302

383

1      Q      That door, the side garage door, to what place

2  did it lead?

3      A      It led directly into the garage.

4      Q      And from the garage could you travel into the

5  home?

6      A      Yes, I could.

7      Q      Was it necessary to break a lock or somehow

8  force your way in?

9      A      There were additional pry marks on the door

10  leading into the residence from the garage.

11      Q      So two sets of doors?

12      A      That's correct.

13      Q      Did you ultimately find Mr. George Hung?

14      A      Yes, I did.

15      Q      How did that work?

16      A      After conducting a search of the residence and

17  locating a juvenile inside, I then telephoned Mr. Hung on

18  his cell phone.

19      Q      And how did you know the cell phone?

20      A      The cell phone number was indicated on the

21  business card.

22      Q      Did you eventually -- I know this took some

23  time, but did you eventually go with Mr. George Hung through

24  his residence?

25      A      Yes, I did.

26      Q      How did you go about that?

Kathryn M. Lezchuk, C.S.R. No. 2302

384

1        A        After searching the residence, I had Mr. Hung

2    meet with me at the Foster City police station to examine

3    some of the property.

4        Q        What did he look at at the Foster City Police

5    Department?

6        A        He looked at his laptop computer bag.  He also

7    looked at a digital camera.

8        Q        Corporal Bouza, there are some photographs

9    here.  Let's start with these, and then I will ask you about

10   the property.

11       People's Exhibit 14 for identification, do you

12   recognize the residence shown in the photograph A?

13       A        Yes, I do.

14       Q        And there appear to be some photographs --

15   actually, they're quite enlarged, F, G, H.  Are you familiar

16   with those pictures?

17       A        Yes, I am.

18       Q        Did you take them?

19       A        I believe I did, yes.

20       Q        And why did you take these photographs H -- I'm

21   sorry, F, G and H?

22       A        Those were the areas that I determined to be the

23   points of entry to the residence.

24       Q        Do you recognize the photograph I?

25       A        Yes, I do.

26       Q        What is that?

385

1      A    That is a photograph of Mr. Hung's briefcase

2 that was located inside of his master bedroom.

3      Q    Why did you take -- or did you take photograph

4 I?

5      A    Yes, I did.

6      Q    Why?

7      A    Mr. Hung stated that his briefcase had been

8 forced open.

9      Q    Now, some of these pictures, not all, have a

10 date stamp on them of March 11th.  Did you go back the next

11 day as well?

12      A    Yes, I did.

13      THE COURT:  I'm sorry.  What was that last one,

14 14?

15      MS. ALLHISER:  Yes.

16      THE COURT:  Okay.  Thanks.

17      MS. ALLHISER:    Q    This series of pictures

18 is labeled People's Exhibit 11.  Do you see the laptop that

19 you had George Hung examine at the Foster City Police

20 Department?

21      A    Yes, I do.

22      Q    In which picture?

23      A    In photograph D.

24      Q    Do you see any other object that you showed to

25 Mr. Hung at Foster City P.D.?

26      A    Yes, I do.

1      Q      What object?

2      A      There were some computer software, CD-ROMs.

3    There's also a watch and some other various electronic

4    items.

5      Q      These items that you just were pointing to, I

6    guess they're shown best in People's Exhibit 11 for

7    identification D, how did Mr. George Hung identify them?

8      A      He saw them and told me that they were his.

9      Q      Did you ever see the laptop turned on?

10      A      No, I did not.

11      Q      The point in your investigation when you were

12    talking with Mr. Hung, you know, What was in your house?

13    What's been disturbed?  What's missing?  Do you recall that

14    time frame?

15      A      Yes, I do.

16      Q      Do you remember talking with him about any cash

17    that he was missing?

18      A      Yes, I do.

19      Q      What did he say?

20      A      He stated that he had both U.S. and Taiwanese

21    currency located in various wallets throughout his

22    residence.

23      Q      Do you remember how much time you spent with

24    George Hung discussing the subject of missing cash?

25      A      Just the subject of missing cash, approximately

26    five to ten minutes.

387

1          Q      How did you do that?  Did you sit him down and
2     ask him a series of questions?  Did he volunteer?

3          A      He volunteered the information to me.

4          Q      Did Mr. Hung show you where in his home his cash
5     had been?

6          A      He showed me where the cash was originally
7     placed.

8          Q      When you met with Mr. Hung at the Foster City
9     Police Department, did he appear to be in a calm state?

10         A      Relatively calm, yes.

11         Q      Why do you say "relatively"?

12         A      Well, because if it had been me, I would have
13    been a little bit more upset.  My property was not at the
14    police station.

15         Q      You thought he was more calm than you would have
16    been in his shoes?

17         A      Absolutely.

18         Q      At his home was Mr. George Hung in a calm state,
19    speaking with you rationally and clear?

20         A      Yes, he was.

21         Q      Did you have any difficulty understanding him?

22         A      Not at all.

23         Q      Was Mr. Hung attempting, from what you could
24    tell, to cooperate with your investigation?

25         A      Yes, he was.

26                MS. ALLHISER:  Those are my questions.

Kathryn M. Lezchuk, C.S.R. No. 2302

388

1          THE COURT:  Mr. Bell.

2          MR. BELL:  Thank you.

3                    CROSS-EXAMINATION

4    BY MR. BELL:

5          Q     Officer Bouza, actually you called Mr. Hung from

6    Foster City Police Department, correct?

7          A     I initially spoke with him from my cell phone

8    out in the field.

9          Q     Okay.  But you asked him to respond to the

10   Foster City Police Department to look at some items that you

11   had or had been recovered in an investigation, correct?

12         A     Correct.

13         Q     And so he did that, actually came directly to

14   the police station from his location?

15         A     Correct.

16         Q     What time was it, if you recall, that you

17   actually called him on the telephone?

18         A     I don't recall the time.

19         Q     Some time in the afternoon hours, I take it?

20         A     Yes.

21         Q     Now, did this take place on the 10th or on the

22   11th, March 10th or March 11th?

23         A     I believe it was March 10th.

24         Q     Okay.  You know why I'm asking, because your

25   report indicates that this took place on the 11th?

26         A     Can I take a moment to look at my report?

Kathryn M. Lezchuk, C.S.R. No. 2302

389

1       Q       Yes.

2       A       Oh, yes, I see that here in the first sentence.

3       Q       So is that an error?  It actually took place on

4    the 10th, the day the items were recovered, or did it take

5    place the next day, on the 11th?

6       A       This incident took place on March 10th, as noted

7    in the fifth paragraph.

8       Q       Starting out on 3/11/04 that's an error in your

9    report?

10      A       That's correct.

11      Q       He came directly to the Foster City Police

12   Department and looked at the items, correct?

13      A       That's correct.

14      Q       At that time, he hadn't actually been to his

15   house to see what was missing if anything, correct?

16      A       Correct.

17      Q       And then you asked him -- he identified the

18   laptop computer and the Game Boy and the digital -- digital

19   camera and some associated items as being missing from his

20   house and there at the police department, correct?

21      A       Yes.

22      Q       So, then, when you asked him if he is missing

23   any cash, he said he'd have to go home and take a look,

24   correct?

25      A       Are you asking me if I asked him that question

26   at the police station?

390

1      Q      Yes.

2      A      I don't recall if I asked him that at the police

3   station.

4      Q      Okay.  Didn't he tell you in response to

5   questioning that he would need to return to his residence to

6   see if he was missing any cash?

7      A      I don't recall if I asked him or if he wanted to

8   return to his residence.  I believe I asked him to.

9      Q      In any event, you went back to the residence

10   with him then?

11      A      Correct.

12      Q      And while you were there at the residence with

13   him, he asked his wife to go to the police station and look

14   at property there at the station; is that right?

15      A      I asked his wife.

16      Q      You did?

17      A      I asked his wife, yes.  I had him relay the

18   message to her.

19      Q      Well, let me ask you, are you absolutely certain

20   of that?  It may not be an important point, but I just want

21   to ask you, in your report you indicate:  I escorted Hung to

22   his residence.  He told his wife Pamela to go to the Foster

23   City Police Department to examine recovered jewelry.

24      Is that correct, that he, meaning Mr. Hung, told his

25   wife Pamela to go to the police department to look at the

26   jewelry?

Kathryn M. Lezchuk, C.S.R. No. 2302

1      A      Right.   That was a message that I had him relate

2   to his wife.

3      Q      Okay.  I see.  So when he told his wife to go to

4   the police department, that was because you gave him those

5   instructions to do that?

6      A      That's correct.

7      Q      All right.  Now, in any event, you then walked

8   around with Mr. Hung inside the residence to see what was

9   missing, correct?

10     A      Yes.

11     Q      And he indicated to you that there were things

12  missing from the house that he hadn't seen at the

13  department, correct?

14     A      Yes.

15     Q      And that was things other than money.  There

16  were physical items, as well as money, that were missing

17  from the house that he hadn't seen at the department,

18  correct?

19     A      Correct.

20     Q      Now, you asked him what kinds of money was

21  missing from the house, and he showed you a briefcase that

22  had been pried open and said that money had been taken from

23  within the briefcase, correct?

24     A      Correct.

25     Q      And when you asked him what amount, he said that

26  missing from the briefcase was $1,000 in U.S. currency and

1    $2,000 in Taiwanese currency, correct?

2         A    Correct.

3         Q    So this was the very day of the incident, and he

4    was specific about the $1,000 cash, U.S. cash, in the

5    briefcase, as well as 2,000 Taiwanese currency that was in

6    the briefcase and was now missing, correct?

7         A    Correct.

8         Q    And he also looked around the house, and were

9    you following him around?

10        A    Yes.

11        Q    Okay.  And he was looking in various wallets

12   that he had in various places in the house, correct?

13        A    Correct.

14        Q    Looking to see if money was missing from those

15   wallets?

16        A    Correct.

17        Q    And he discovered that -- he told you that

18   several thousands of dollars in U.S. currency was missing

19   from the various different wallets that he had at various

20   places in his house, correct?

21        A    Correct.

22        Q    In addition to the thousand dollars in cash that

23   he had in cash in the briefcase and the $2,000 of Taiwanese

24   currency, correct?

25        A    Correct.

26        Q    Did you eventually meet up with Mrs. Hung at the

393

1    Foster City Police Department for the purpose of allowing

2    her to examine jewelry found in connection with the

3    investigation?

4         A    No, I did not.

5         Q    Did you ever have any discussions with Mrs. Hung

6    about that?

7         A    No, I did not.

8         Q    Did you interview Mrs. Hung about anything

9    concerning the case?

10        A    No, I did not.

11             MR. BELL:  Thank you.  I have nothing further.

12             THE COURT:  Anything further?

13             MS. ALLHISER:  No, Your Honor.

14             THE COURT:  Witness be excused?

15             MS. ALLHISER:  Yes, please.

16             MR. BELL:  Yes.

17             THE COURT:  Okay.  Thank you.

18        All right, ladies and gentlemen, that will do it for

19    today.

20        Tomorrow morning I have an 8:00 a.m. dentist

21    appointment, and usually I get back here by 9:00 or 9:15, so

22    with the hope that I don't impose upon you by making you

23    wait, I'll bring you back at 9:30 tomorrow morning and do my

24    level best to get here by then.  I usually do.  Sometimes it

25    will be 15 minutes later, but we'll take a chance tomorrow.

26        Okay.  Have a good evening.  Please remember the

1  admonitions.  We'll see you at 9:30 tomorrow morning.

2  Tomorrow is Friday, so you are only going to work until

3  noon, at the latest.

4      (The following proceedings were held in open court,

5  out of the presence of the jury.)

6      MR. BELL:  Your Honor, do you want his father

7  not to come back to the court, because if so he will call

8  his father tonight and tell him not to come back.

9      THE COURT:  His father went over and was

10  disturbing the peace at another official building.  He may

11  find him in jail when he gets back to the jail.  I don't

12  know if he got arrested or not, but he's over at the 455

13  office building yelling at those people.  I do not want him

14  back in the courtroom.

15      This is -- for the record, this is the gentleman

16  who -- I assume it's his father.  The gentleman stood up and

17  said in a foreign language, which has been translated, This

18  is all bullshit, said it a couple times out in the hall and

19  got in a tussle with the bailiff, and she had to put him in

20  a wristlock and escort him out of the building, and she had

21  to escort him out of the building.  The people had to.  He

22  went across the side of the court and started creating a

23  ruckus in the other building, so I don't know if he is in

24  custody or not.

25      MR. BELL:  He should not be in this courthouse

26  building.

Kathryn M. Lezchuk, C.S.R. No. 2302

1          THE COURT:   They're not going to let him back in

2     the building.

3          MR. BELL:   All right.   You need to tell him

4     that.

5          THE COURT:   All right.   See you tomorrow at

6     9:30.

7                    (Court stood in recess. )

8                         ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1          SUPERIOR COURT, STATE OF CALIFORNIA

2                  COUNTY OF SAN MATEO

3

4    THE PEOPLE OF THE STATE OF        )
     CALIFORNIA,                       )
5                                      )
                     PLAINTIFF,        )
6                                      )
            VS.                        )        NO. SC056446A
7                                      )        Reporter's Certificate
     HOA TRUNG KHUU,                   )
8                                      )
                     DEFENDANT.        )
9    _____)

10

11   STATE OF CALIFORNIA   )
                           )        SS.
12   COUNTY OF SAN MATEO   )

13

14        I, Kathryn Lezchuk, Certified Shorthand Reporter and

15   Official Reporter of the Superior Court of the State of

16   California, County of San Mateo, do hereby certify that the

17   foregoing, Volume 2, pages 220 through 396, comprise a full,

18   true and correct computer-aided transcription of the

19   proceedings held in the matter of the above-entitled cause.

20        Dated this 22nd day of December, 2004.

21

22

23

24                                   /S/
                           _____
25                         Kathryn M. Lezchuk, C.S.R. No. 2302
                           Official Reporter, Superior Court

26