1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  CHRISTOPHER J. WEI, State Bar No. 78958
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
7    Telephone: (415) 703-5867
     Fax: (415) 703-1234
8    Email: Christopher.Wei@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12         FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

|  |  |
|---|---|
| **HOA TRUNG KHUU,** | C 07-6351 SI (pr) |
| Petitioner, | **EXHIBIT 9 (part 7)** |
| **v.** | |
| **JOHN TILTON, CDCR Secretary,** | |
| Respondent. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 9 (part 7)                                    Khuu v. Tilton
                                                      C 07-6351 SI (pr)

# EXHIBIT 9 (part 7)

RECEIVED

1          COURT OF APPEAL, STATE OF CALIFORNIA   JAN 0 3 2005

2               FIRST APPELLATE DISTRICT          CLERK OF THE SUPERIOR COURT
                                                  SAN MATEO COUNTY

3

4   THE PEOPLE OF THE STATE        )
    OF CALIFORNIA,                 )              COPY
5                                  )
              PLAINTIFF AND        )
6             RESPONDENT,          )
                                   )         SAN MATEO COUNTY
7   VS.                            )          SUPERIOR COURT
                                   )           NO.  SC056446
8   HOA TRUNG KHUU,                )
                                   )
9             DEFENDANT AND        )
              APPELLANT.           )
10  _____)

11

12      APPEAL FROM THE SUPERIOR COURT OF SAN MATEO COUNTY

13      HONORABLE JOHN G. SCHWARTZ, JUDGE PRESIDING

14              REPORTER'S TRANSCRIPT ON APPEAL

15

16

17  A P P E A R A N C E S:

18  FOR THE PLAINTIFF AND         WILLIAM LOCKYER,
    RESPONDENT:                   ATTORNEY GENERAL
19                                50 FREMONT STREET, SUITE 300
                                  SAN FRANCSICO, CA 94105
20

21

22  FOR THE DEFENDANT AND         IN PROPRIA PERSONA
    APPELLANT:
23

24

25          VOLUME 3, PAGES 397 THROUGH 620
               SEPTEMBER 3, 7 AND 8, 2004
26        OCTOBER 4, 29 AND NOVEMBER 18, 2004

1             SUPERIOR COURT, STATE OF CALIFORNIA

2                COUNTY OF SAN MATEO

3

4    THE PEOPLE OF THE STATE OF      )
     CALIFORNIA,                     )

5                             )
                   PLAINTIFF,    )

6                             )
             VS.               )      NO. SC056446

7                             )
     HOA TRUNG KHUU,              )

8                             )
                   DEFENDANT.    )

9    _____)

10

11         REPORTER'S TRANSCRIPT OF THE PROCEEDINGS

12       BEFORE:  HON. JOHN G. SCHWARTZ, JUDGE

13        DEPARTMENT NO. 18, COURTROOM 8D

14          September 3, 7 and 8, 2004
        October 4, 20 and November 18, 2004

15

16

17    A P P E A R A N C E S:

18    FOR THE PEOPLE:         JAMES P. FOX, DISTRICT ATTORNEY
     (10/4)              BY:  MORLEY PITT, Assistant

19    (9/3, 7, 8; 10/29)    MARY ALLHISER, Deputy
     (11/18)           JACK GRANDSAERT, Deputy

20                      400 County Center
                      Redwood City, CA  94063

21

22

23    FOR THE DEFENDANT:     FRANK BELL, Esquire
                      177 Bovet Road, Suite 600

24                      San Mateo, CA  94402

25

26    REPORTED BY:           KATHRYN LEZCHUK, C.S.R. No. 2302

1

# W I T N E S S    I N D E X

2

September 3, 2004

3

4

For the People:                              Volume/Page

5

TICAS, MARTIN
Direct Examination by Ms. Allhiser ........... 3/405

6

Cross-Examination by Mr. Bell ................ 3/410

7

TOENSING, ANNE-MARIE

8

Direct Examination by Ms. Allhiser ........... 3/414

Cross-Examination by Mr. Bell ................ 3/438

9

10

MORRISON, PIERRE
Direct Examination by Ms. Allhiser ........... 3/439

11

Cross-Examination by Mr. Bell ................ 3/465

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

E X H I B I T   I N D E X

September 3 and 7, 2004

| For the People: | For Identification Volume/Page | In Evidence Volume/Page |
|---|---|---|
| 1 - Poster Board with Photographs A through J | 1/70 | 3/482 |
| 2 - Colored Neighborhood Street Map | 1/91 | 3/490 |
| 3 - Poster Board with Photographs A through L | 1/134 | 3/483 |
| 4 - Enlargement of Neighborhood #8 On Exhibit 2 | 1/140 | 3/483 |
| 5 - Poster Board with Photographs A through J | 1/142 | 3/483 |
| 6 - Photocopy of Temporary CDL | 1/124 | 3/483 |
| 7 - Two-page document, List of Addresses | 1/125 | 3/483 |
| 8 - Certified Copy of Booking photo of Khuu | 1/133 | 3/483 |
| 9 - Screwdriver with Black Handle | 1/187 | 3/484 |
| 10 - Photocopy of Currency Tally | 1/191 | 3/484 |
| 11 - Posterboard with Photographs A through H | 1/192 | 3/485 |
| 12 - Evidence Envelope Containing Wallet And Cell Phone | 1/214 | 3/485 |
| 13 - Poster Board with Photographs A through G | 2/251 | 3/485 |

1

E X H I B I T   I N D E X

2

September 3 and 7, 2004

3

| For the People: | For Identification Volume/Page | In Evidence Volume/Page |
|---|---|---|
| 14 – Poster Board with Photographs A through I | 2/308 | 3/485 |
| 15 – Two Color Photocopies of Taiwanese Dollars | 2/323 | 3/485 |
| 16 – Plastic Envelope Containing $100 Gift Certificate | 2/327 | 3/485 |
| 17 – Color Photograph of Ryan Bui | 2/333 | 3/486 |
| 18 – Certified Copy of DMV Vehicle Registration | 2/341 | 3/486 |
| 19 – Brown Bag Containing Two Fabric Gloves | 2/347 | 3/486 |
| 20 – Photocopy of Plastic Bag Containing Currency and Tally | 2/349 | 3/487 |
| 21 – Four-page Color Photocopy of US Currency | 2/349 | 3/487 |
| 22 – Four-page CLETS Printout | 2/360 | 3/487 |
| 23 – Three-page CAD Printout | 2/360 | 3/487 |
| 24 – Evidence Envelope Containing Sheet of Paper with Addresses and names | 3/424 | 3/488 |
| 25 – Evidence Envelope Containing Print Cards, Latent print lift | 3/434 | 3/488 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

E X H I B I T   I N D E X

2

September 3 and 7, 2004
November 18, 2004

3

| For the People: | For Identification Volume/Page | In Evidence Volume/Page |
|---|---|---|
| 26 - Evidence Envelope Containing Negative; Black and White Photograph of Latent Print | 3/433 | 3/488 |
| 27 - Copy of Booking Photograph of Ryan Bui | 3/445 | 3/490 |
| 28 - Copy of CDL of Hoa Trung Khuu | 3/449 | 3/490 |
| 29 - Judgment of Federal Court | 3/603 | 3/604 |
| 30 - Plea Agreement | 3/603 | 3/604 |
| 31 - Jail Property Slip, Booking Photograph of Hoa Khuu | 3/603 | 3/604 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                          E X H I B I T   I N D E X

2                          September 3 and 7, 2004

3
                                              For                    In
4        For the Defendant:            Identification            Evidence
                                       Volume/Page              Volume/Page
5
         A - Photograph of                1/176                   3/482
6            Face of Defendant

7        B - Evidence Envelope            1/197                   3/482
             Containing Tool Imprints
8
         C - Evidence Envelope            1/198                   3/482
9            Containing Photographs
             and Negatives of
10           Tool Markings

11       D - Copy of CDL                  3/465                   3/482
             of Ryan Bui
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

404

1                    P r o c e e d i n g s

2                              Redwood City, California

3    Morning Session              Friday, September 3, 2004

4                        ---o0o---

5         THE COURT:  Good morning, ladies and

6    gentlemen.  Let me give you a little scheduling here.  I was

7    talking with counsel a few minutes ago.

8         We are going to have how many witnesses today, three

9    this morning?

10         MS. ALLHISER:  Yes.

11         THE COURT:  Three.  Counsel have -- are reaching

12    a stipulation --

13         MS. ALLHISER:  Yes.

14         THE COURT:  -- with regard to eliminating one

15    whole witness, just to tell you.  They're working on that,

16    and we'll tell you what the stipulation is when we get to

17    it.  So we'll have three relatively short witnesses, and my

18    goal is to get you out of here by 11:30.  We can do that

19    without taking any breaks, but if somebody needs a break,

20    let me know, we'll take a short one.

21         The next thing that we have to do, counsel, myself,

22    is on Tuesday we have to work on the instructions and get

23    them edited and then redone so that you have clean copies in

24    the jury room.  So when we bring you in Tuesday at 2:00 for

25    closing arguments and instructions, don't come in Tuesday

26    morning because we're going to be working on the

1    instructions, and they have to be ready to go before I can

2    send them into the jury room with you.  So our alternate

3    will be on telephone standby after closing arguments and

4    instructions.

5           ALTERNATE JUROR NO. 1:    Okay.

6           THE COURT:  We will need all the numbers we need

7    to find you if we had to in a hurry.  Of course, if you come

8    in on Tuesday morning and somebody has gotten sick over the

9    holidays, then you're with us for the duration.  We'll see.

10          Okay.  Does that answer for everybody?  Okay.

11          Your witness.

12          MS. ALLHISER:  Thank you.  Martin Ticas, could

13   you walk to the stand and be sworn.

14          THE CLERK:  Raise your right right hand.

15                    MARTIN TICAS,

16   called as a witness by the People, after being first duly

17   sworn, was examined and testified as follows:

18          THE CLERK:  Thank you.  Please have a seat.

19          Please state and spell your name for the record.

20          THE WITNESS:  My name is Martin Ticas.  First

21   name is spelled M-a-r-t-i-n;  last name is spelled

22   T-i-c-a-s.

23                  DIRECT EXAMINATION

24   BY MS. ALLHISER:

25     Q    What kind of work do you do, sir?

26     A    I'm a police officer with the city of Foster

406

1   City.

2         Q    How long have you been a sworn peace officer?

3         A    Five years now.

4         Q    All that with Foster City?

5         A    Yes.

6         Q    Were you on duty in -- on March 12th, 2004, in

7   the afternoon?

8         A    Yes, I was.

9         Q    I believe we've already agreed that was a

10  Friday.

11        Did you go to 1295 Beach Park Boulevard, Foster City?

12        A    Yes, I did.

13        Q    Did you meet with someone there?

14        A    Yes.

15        Q    Who was that?

16        A    Solomon Chi.

17        Q    First name Solomon, S-o-l-o-m-o-n?

18        A    Yes.

19        Q    Last name Chi, C-h-i?

20        A    Yes.

21        Q    A young man?

22        A    Yes.

23        Q    What language did you speak with Solomon Chi?

24        A    English.

25        Q    Did you have any difficulty understanding his

26  English?

Kathryn M. Lezchuk, C.S.R. No. 2302

407

1      A     No.

2      Q     At 1295 Beach Park Boulevard did you meet Yao,

3   Y-a-o, Chi, C-h-i?

4      A     Yes.

5      Q     Did you speak with Mr. Yao Chi?

6      A     I tried, yes.

7      Q     Explain.

8      A     Well, there was a language barrier.  His primary

9   language, if I'm correct, was some sort of Asian dialect

10   which I didn't know, and so I ended up speaking with Solomon

11   mostly.

12      Q     Was there a time when the three of you, meaning

13   Yao, Solomon and you, were inside 1295 Beach Park Boulevard

14   looking at things, going through the area?

15      A     Yes.

16      Q     How did that play out?

17      A     Mostly by Solomon directing me to show me the

18   areas where -- the areas of the house where the theft of the

19   money had occurred from, that sort of thing.

20      Q     As part of your investigation, did you take some

21   pictures?

22      A     Yes, I did.

23      Q     This is People's Exhibit 13.  There's a

24   photograph of the front of the house, would that be fair, A,

25   B, C?

26      A     Yes.

408

1       Q       And do you see some pictures that you took?

2       A       Yes, I did.

3       Q       Which ones?

4       A       I would say D, E, F and G.

5       Q       Will you now describe what's in D; what is that

6    area?

7       A       That's the master bedroom of the residence.

8       Q       There appears to be a blue- or grayish-colored

9    two-drawer metal cabinet; is that true?

10      A       Yes, there is.

11      Q       Did you take a close look at that?

12      A       Yes.

13      Q       The photograph E, is that a close-up further of

14   the cabinet?

15      A       Yes, it is.

16      Q       And F, what's that specifically?

17      A       That's the lower cabinet door with what appeared

18   to be some pry marks.

19      Q       What is G?

20      A       A side view of that same door where the pry mark

21   was at.

22      Q       F and G are different views of the same spot?

23      A       Exactly.

24      Q       Did you ask Yao Chi what had been stolen from

25   the house?

26      A       Actually, I asked Solomon, because he was the

Kathryn M. Lezchuk, C.S.R. No. 2302

1    only one who was able to communicate with me.

2         Q    But you posed the question to Solomon.   Did

3    Solomon then speak in a language you didn't understand to

4    Yao?

5         A    Yeah.   Yes, he did.

6         Q    And then Solomon gave you some answer in

7    English?

8         A    Yes.

9         Q    Did they show you parts of the house, other than

10   just that bedroom?

11        A    Yes, they did.   We did a walk-through of the

12   entire residence.

13        Q    Could you determine a point of entry for someone

14   to have broken into the house?

15        A    Not on March 12th, no.

16        Q    Did you learn something later?

17        A    Yes, I did.

18        Q    What was that?

19        A    That a screen had been replaced.

20        Q    Explain when you found out about that?

21        A    I received a phone call.   I forget the date.

22   May I refer to my report?

23        Q    Yes.   Please check it to give us that detail.

24        A    Yeah.   On March 17th I received a voice mail at

25   work at the police station from Solomon with further

26   information regarding items that were taken, and then I went

Kathryn M. Lezchuk, C.S.R. No. 2302

410

1    back out to the residence to speak with Solomon.

2        Q      When you returned to 1295 Beach Park Boulevard,

3    was it just Solomon or were there others present?

4        A      That particular day just Solomon.

5        Q      Did Solomon show you something?

6        A      Yeah.  He showed me a screen that had been

7    replaced.  The screen was located on the outside of the

8    window that leads into the bathroom.

9        Q      Did you notice any unusual shape or condition of

10   that screen?

11       A      Yeah.  The screen appeared to have been tampered

12   with in some manner.

13       Q      Did you ask Solomon Chi why he hadn't mentioned

14   the screen to you on that Friday?

15       A      Yes, I did, and he basically told me that it --

16   I guess Yao had replaced it, and it didn't appear to them

17   that it was related.

18       Q      I'm sorry.  It was or was not?

19       A      It was not related.

20       Q      In their minds, it was some different problem?

21       A      Yeah, basically.

22              MR. ALLHISER:  Those are my questions.

23              MR. BELL:  Thank you.

24                       CROSS-EXAMINATION

25   BY MR. BELL:

26       Q      Officer Ticas, you're Prop 115 qualified, are

Kathryn M. Lezchuk, C.S.R. No. 2302

411

1    you?

2         A    Yes.

3         Q    How long have you been Foster City P.D.?

4         A    Five years.

5         Q    So I'm going to ask you first, based on your

6    experience and training, about police reports.  You know the

7    importance of police reports, correct?

8         A    Yes.

9         Q    There are at least three very important reasons

10   why you would want to be as accurate as possible in a police

11   report.  The first is if you should be called as a witness,

12   as you have been here today, you might want to go back and

13   refresh your recollection about what happened by looking at

14   your report.

15        A    Yes.

16        Q    So you would want to make that report as

17   accurate as possible so that if you went back and looked at

18   it you could rely on what you wrote in the report?

19        A    Yes.

20        Q    Secondly, it's really the police department's

21   official record of that investigation in the case?

22        A    Yes.

23        Q    And third, if someone else, for example, some

24   other person is assigned to the case, like, for example,

25   Detective Morrison, he could go back and look at those

26   reports and know that he could rely on them as being

412

1    accurate -- as accurate as possible, correct?

2        A    Yes.

3        Q    Okay.  Now, you did, as you already indicated,

4    interview Yao Chi, the father, through Solomon Chi, on March

5    the 12th at 1295 Beach Park, correct?

6        A    Correct.

7        Q    Now, when you talked to Solomon Chi, who in turn

8    was posing questions to his father and then answering in

9    English, Mr. Yao Chi told you that on the night of March the

10   9th he, Yao Chi, had placed $5,000 in U.S. currency into the

11   bottom drawer of the file cabinet that's shown in those

12   pictures, correct?

13       A    That's correct, yes.

14       Q    He didn't remember exactly what time it was on

15   that evening?

16       A    Correct.

17       Q    He told you that when he placed the money in the

18   file cabinet that he was alone; there was nobody else with

19   him at that time, correct?

20       A    Correct.

21       Q    He told you that that very day that you were

22   interviewing him on the 12th, the Friday, the 12th, that he

23   had come home from work and taken a nap and that after

24   waking up from his nap at about 1400 hours or -- I have that

25   correctly, at about 1545.  I'm thinking that's like 3:45.

26   He woke up, and it was at that point that he discovered that

Kathryn M. Lezchuk, C.S.R. No. 2302

1    the money was gone and that the cabinet had been tampered

2    with, correct?

3        A    Correct.

4        Q    And then he asked his son Solomon to call the

5    police, and you responded to that call?

6        A    Correct.

7        Q    Did Yao Chi mention anything to you about his

8    wife placing any money into that cabinet?

9        A    No.

10       Q    Did Yao Chi -- and, again, I'm talking about the

11   interview that you had with him on the 12th.  Did he tell

12   you about delivering any money to his wife at the airport?

13       A    No.

14       Q    You actually talked to Yao Chi a second time, I

15   think you've indicated, on the 17th of March, through

16   Solomon?

17       A    Actually, I only spoke with Solomon that day.

18       Q    Was Yao around there that day?

19       A    No.

20       Q    Did you actually -- I think you testified you

21   did go to the residence that day?

22       A    Yes, I did.

23            MR. BELL:  Those are my questions.  Thank you.

24            THE COURT:  Anything further of this witness?

25            MS. ALLHISER:  No, Your Honor.

26            THE COURT:  May he be excused?

Kathryn M. Lezchuk, C.S.R. No. 2302

414

1          MS. ALLHISER:  Yes, Your Honor.

2          MR. BELL:  Yes.

3          THE COURT:  Thank you, sir.  You are excused.

4          THE WITNESS:  Thank you, Your Honor.

5          MS. ALLHISER:  Anne-Marie Toensing.

6      Miss Toensing, would you talk to the stand and be

7  sworn.

8          THE CLERK:  Please raise your right hand.

9                  ANNE-MARIE TOENSING,

10  called as a witness by the People, after being first duly

11  sworn, was examined and testified as follows:

12          THE CLERK:  Thank you.  Please have a seat.

13      Please state and spell your name for the record.

14          THE WITNESS:  My name is Anne-Marie Toensing,

15  A-n-n-e, dash, M-a-r-i-e  T-o-e-n-s-i-n-g.

16                  DIRECT EXAMINATION

17  BY MS. ALLHISER:

18      Q     How are you employed?

19      A     I'm employed by the San Mateo County Sheriff's

20  Office, Forensic Laboratory.

21      Q     How long have you worked for San Mateo County

22  Forensics Laboratory?

23      A     Since May, 2002.

24      Q     Before that were you in some other line of work?

25      A     Same line of work, but in a different agency.

26      Q     What was that?

415

1      A      I used to work for the Illinois State Police.

2      Q      What type of work do you do now?

3      A      I'm a Forensic Specialist.

4      Q      Will you explain what that means?

5      A      Sure.  I process evidence at crime scenes -- or

6  I process crime scenes for evidence.  I process evidence at

7  the lab for the development of latent impressions.  I

8  conduct comparisons between latent impressions and ink

9  standards.  I search the Automated Fingerprint

10 Identification System.  I write reports, and I testify

11 when -- testify when necessary.

12     Q      I'm going to go back and ask you to define a

13 couple of those terms but the basics first.

14     A      I have a Bachelor's of Science Degree from John

15 Jay College of Criminal Justice, with a major in criminal

16 science, and a Master of Science degree from the University

17 of Illinois in Chicago, also in criminal science.

18     Q      Your training for the type of work, and I'm

19 going to ask you to focus on trying to find fingerprints and

20 match fingerprints and exclude fingerprints, that section of

21 your experience.  What kind of work have you done in that

22 area?

23     A      When I was employed with the Illinois State

24 Police, I was enrolled in the latent print training program

25 for about three years.  And that involved history,

26 processing techniques, comparison experiences, AFIS

416

1    searches, learning how to write reports, testifying.

2        Q    Let's get that one defined first.  What's an

3    AFIS, A-F-I-S?

4        A    Yes.  AFIS is the Automated Fingerprint

5    Identification System, and it's basically a database that

6    contains fingerprints for an enormous amount of individuals.

7        Q    Millions?

8        A    Millions, yes.

9        Q    Do you know where those fingerprints come from?

10        A    There are several different databases.  One is

11    school -- applicants for, you know, government jobs.  One is

12    criminals, people like bus drivers, teachers.  I'm in

13    there.  That's what kind of fingerprints are in that

14    database.

15        Q    Just so we can stay on this topic and finish it,

16    can you give a lay person's explanation, you know, so that

17    we're going to get it, how does AFIS work?

18        A    What it does is, AFIS searches for two types of

19    characteristics, bifurcations and friction -- excuse me, and

20    ridges.  And a bifurcation is one ridge that flows and forks

21    into two ridges, and an ending ridge is a ridge that flows

22    and comes to an abrupt stop, and it calculates an

23    interrelationship among all the ridges that are of that type

24    and gives you a list of however many requests.

25        So if you request the top 20 candidates, it will rank

26    them from one to 300, and it will only give you the top 20.

Kathryn M. Lezchuk, C.S.R. No. 2302

417

1    So when you go to evaluate it, you sit against the screen

2    and evaluate the prints you put into the print that it

3    thinks could be a possible match, and you sit there one by

4    one going through the list you requested.

5        Q    At my request did you bring an illustration to

6    show the concept of what you talked, for example,

7    bifurcations, ending ridges.  Could you show that?

8        A    I did bring one, and it's not one that I

9    created, but it's strictly for illustration purposes.  May

10    I?

11            THE COURT:  Sure.

12            THE WITNESS:  This is an inked fingerprint; and

13    if you look at right here and right here and right here on

14    this chart, you can see that the ridges flow and come to an

15    abrupt stop.  That's an ending ridge; and if you look here,

16    here and here, these are ridges that flow and fork into two,

17    and those are bifurcations; and if you look right here, you

18    can see a dot, I'm sorry, and that's the third type of

19    minutia detail, and a dot is a ridge that is as long as it

20    is wide, and those are the kinds of ridges or the minutia

21    that we are looking for.

22            MS. ALLHISER:    Q    Obviously this is greatly

23    enlarged, right?

24        A    Yes.

25        Q    And that was for illustration purposes.

26            The concept of AFIS, just let's maybe finish that.  So

Kathryn M. Lezchuk, C.S.R. No. 2302

418

1  the machine searches for those types of shapes and

2  relationships, one to the other, like in a mathematical way?

3      A.    Yes.   It's an algorithm, that I don't know what

4  it is, that the computer has in the system, and that's how

5  it ranks, you know, the individuals that it ranks so that

6  actually the fingerprints that it does.

7      Q    When the machine has finished its work and given

8  its list of candidates, you, as latent-print examiner, now

9  use human judgment to decide how accurate the machine's

10 listing is?

11     A     Yes.   It's never the computer that just

12 automatically gives you an identification.   A human being

13 has to sit at the computer terminal and determine visually

14 whether or not a possible identification is effected.   If

15 you do think that it is effected, then you would call, in

16 this case, DOJ, or San Mateo Sheriff's Records office and

17 request a fingerprint card for that particular number that

18 the system provides for you.

19     Q    Now, DOJ, Department of Justice?

20     A     Yes.   I'm sorry.

21     Q     So every human fingerprint in these databases

22 has been assigned a number?

23     A     That's correct.   It's a State ID number.

24     Q     Let's take one further step back in terms of

25 understanding, please.

26     Now, are fingerprints -- a human fingerprint unique in

Kathryn M. Lezchuk, C.S.R. No. 2302

419

1    the world?

2         A    Yes.   That's one of the premises that

3    fingerprint identification is based on, that fingerprints

4    are formed during fetal life, and they remain unchanged

5    throughout a person's lifetime, and that fingerprints are

6    unique, they differ from person to person, hand to hand and

7    finger to finger.

8         Q    My ten fingers have ten different prints?

9         A    That's correct.

10        Q    If I had an identical twin, is my identical

11   twin's right index fingerprint print tip identical to mine?

12        A    No, it is not.   Everybody has different

13   fingerprints, even on different fingers of their own hands.

14        Q    Even identical twins?

15        A    Even identical twins.

16        Q    Now, how has that been established?

17        A    Through history and through genetic studies and

18   scientific journal articles.   It's all scientifically based,

19   that people do have -- various factors, I should have said,

20   affect the formation of fingerprint formation; and while

21   you're in the womb, everybody has different environmental

22   factors that affect their formation.

23        Q    Another fundamental concept, the concept of a

24   latent print.   Now "latent" has a special meaning.   It's

25   perhaps not ordinary English.   Could you define it?

26        A    A latent print is a chance depression that is

Kathryn M. Lezchuk, C.S.R. No. 2302

420

1    deposited onto a surface.  It is made when the ridge

2    structure, which is found on your palms of your hands and

3    the soles of your feet comes into contact with an object.

4    They are often barely visible and require some means of

5    enhancement to reveal them.

6        Q    Are all objects touched by a human -- say the

7    end of that wooden bar here in front of the jury, are all

8    objects touched by a human capable of leaving a chance

9    print?

10       A    They are all capable, but depending on what

11   happens to the object before, during and after it was

12   touched is -- depends on whether or not I will be able to

13   develop suitable latent impressions.

14       Q    Are there some surfaces which are particularly

15   good, and by that I mean clear, easy-to-find chance prints?

16       A    Yes.  Surfaces that are clean, dry and smooth

17   are the best type of surfaces to develop and to -- excuse

18   me, to develop and to lay latent fingerprints on.

19       Q    If the object touched has been wet, would that

20   matter?

21       A    It would in how I would proceed in processing

22   that item.

23       Q    If an object has been dirty, say subject to

24   dust, charcoal, whatever, would that make a difference?

25       A    Yes, it would.

26       Q    How?

Kathryn M. Lezchuk, C.S.R. No. 2302

1     A     Well, it all depends on the factors that affect

2   whether or not a latent print can be developed.   If

3   something's left out in the environment, there is a greater

4   chance of losing that latent impression than if it was in a

5   secured area, right after it was touched and not being moved

6   after that, not being touched after that prior to

7   development.

8     Q     I think a lot of people have some experience

9   with fingerprints.  You know, you touch a clear water glass,

10   you rest your hands against a jewelry case that is glass,

11   now those are all going to be identifiable prints, aren't

12   they?

13     A     Not necessarily.  Suitable latent impressions

14   are not always found on items of evidence, because, again,

15   it depends what happens to the item before, during and after

16   it was touched.

17     Q     If a clean piece of auto glass, a window, clean,

18   is touched carefully by a human being and that human being

19   then steps away and you immediately rush in with your best

20   techniques, can you identify the person that touched that

21   clean glass?

22     A     Again, not necessarily, because it depends on

23   what his hands -- the condition of his hands or her hands,

24   whether or not they were wearing gloves, whether or not

25   their hands were cleaned and dried and wiped right before

26   touching it.  All these various factors affect whether or

422

1    not a latent print can be developed.

2         Q    In a situation in which you know, because you

3    see it, you know, I hand you a piece of paper, and happening

4    in front of you, and this is a fairly calm environment, it's

5    not raining in here, on a piece of paper, wouldn't you find

6    both my prints and your prints most of the time?

7         A    Not necessarily.  Again, it depends on the

8    situation of how you're handling it, what condition your

9    hands are in, what condition the paper was in before you

10   picked it up.

11        Q    Your line of work must be frustrating, isn't it?

12        A    Sometimes.

13        Q    So you don't find that many chance prints in

14   your line of work?

15        A    Well, again, it depends on the item itself.  I

16   can't really answer that question until I process a certain

17   piece of evidence.  I don't know.

18        Q    How many times have you been asked, here is a

19   questioned item, a piece of paper, a glass, a bloody knife,

20   whatever; how many times have you been presented with an

21   object and said, It's part of your job, find me a

22   fingerprint?

23        A    Thousands.

24        Q    And how many times have you or percentage have

25   you found chance fingerprints?

26        A    I couldn't tell you that.  I don't know off the

1    top of my head.

2        Q    Are you graded somehow?  Is your employment

3    dependent on finding fingerprints on pieces of evidence?

4        A    No, it is not.

5        Q    So, if you were submitted 100 objects and you

6    didn't find a single usable fingerprint, your job would not

7    be in jeopardy?

8        A    In that case, it would be because then someone

9    would say it would be -- that's 100 items, something maybe

10   is wrong with your processing techniques, and I would be

11   evaluated, but it's not theoretically impossible for that to

12   happen.

13       Q    Now, let's talk about that.  How are you

14   evaluated over time?  Is there anybody checking our

15   accuracy?

16       A    Yes.  When I make an identification, before I

17   write it up in a report, my identification, as lab policy,

18   is verified by a second examiner.

19       Q    Are you ever tested?

20       A    Yes.  We are tested yearly with external and

21   internal proficiency tests.

22       Q    Are you now in good standing with the San Mateo

23   County Forensics Lab?

24       A    Yes, I am.

25       Q    And have you testified before as an expert in

26   examining items for chance fingerprints and identifying or

1    attempting to identify known persons?

2        A    Yes, I have.

3            MS. ALLHISER:  Your Honor, I offer this witness

4    as an expert as a latent print examiner and identification.

5            MR. BELL:  No objection, Your Honor.

6            THE COURT:  Okay.  She is so designated.

7            MS. ALLHISER:  On -- I won't ask you about the

8    date.  I should hand you things before I start asking you.

9        Your Honor, I ask that there be marked for

10   identification first an evidence envelope which is labeled

11   with a tracking No. 200786, and further labeled with a case

12   No. 20040504, which appears to contain piece of paper and

13   which has writing and typewriting on it that appears to be

14   discolored, and there is something in the lower right-hand

15   corner in a blue ink pen, August 18, '04, as a group

16   exhibit.

17           THE CLERK:  Marking People's Exhibit 24.

18               (People's Exhibit No. 24, Evidence Envelope

19               Containing Piece of Paper, marked for

20               Identification only.)

21           MS. ALLHISER:      Q      Ms. Toensing, I am

22   going to have some other exhibits for you, but let me give

23   you some gloves and ask you to take a look at the inside and

24   outside of People's Exhibit 24 for identification.

25       Do you recognize the envelope and contents?

26       A    I do.

425

1       Q       What is it?

2       A       The contents are one piece of paper, and the

3    envelope is a San Mateo County Sheriff's Office evidence

4    envelope.

5       Q       Did you personally examine the contents of the

6    envelope?

7       A       I did.

8       Q       There's some color to what looked -- to what

9    might have been a white piece of paper at some time; is that

10   true?

11      A       Yes, it is.

12      Q       Do you know how that happened?

13      A       I did it.

14      Q       Explain?

15      A       I processed this paper using a technique we call

16   physical developer, and all that is is free silver floating

17   in equilibrium, and I immersed the paper in the solution,

18   and the free silver gets deposited onto the fatty

19   substances, and that's where you see kind of black-gray

20   markings on the paper.

21      Q       What is the significance to the black-gray

22   markings?

23      A       That means that there was some sort of fatty

24   substance on the paper itself.

25      Q       Now, make the connection.  What is this fatty

26   substance?

426

1      A      Sorry.  Fatty substances are residues that are

2    in your hair, in foods, as contaminants on stuff you touch,

3    and it's also found, obviously, on your friction ridge

4    structure of your hands.  For example, if you wipe your oily

5    face or your greasy hair, and you touch a paper that's part

6    of the residue.

7      Q      So, what is a discoloration -- a black-gray

8    discoloration, that's a fatty substance touching that paper?

9      A      Yes.

10     Q      Did a human being touch that paper?

11     A      Yes.

12     Q      How do you know?

13     A      I see friction ridge detail actually right here.

14   I kind of put little crescent shapes over them, and there's

15   other areas as well.

16     Q      How many human beings touched that piece of

17   paper?

18     A      I couldn't tell you that.

19     Q      Can you tell from your careful examination of

20   that paper any single human being's prints on the paper?

21     A      I could tell you that someone did touch it.  I

22   couldn't tell you who it was.

23     Q      Will you break it down and explain why you can't

24   do that for this particular object -- particular piece of

25   paper?

26     A      Yes.  When I examine an item, I'm looking for

Kathryn M. Lezchuk, C.S.R. No. 2302

427

1    latent impressions that are suitable for comparison, and by

2    that I mean there's enough detail in the friction ridges

3    that allow me to conduct a comparison.  Once that is

4    determined, I further examine the evidence and determine

5    whether or not the latent impressions are suitable for

6    identification, and that is -- if there is enough detail in

7    those suitable for comparison impressions to conduct an

8    identification.

9        Q    Maybe we should continue that part of it.  Okay,

10   you're talking about an identification.

11       So if you were given the carefully prepared -- you

12   call them inked prints or rolled prints -- they do that

13   electronically too, right?

14       A    Yes.

15       Q    If you've got a careful impression of the ten

16   fingers of a person's hand, and if I tell you that person

17   touched that piece of paper, which is now People's 24, just

18   assuming it, okay, you've got the careful impressions, now,

19   how do you go about try to find, yes, right there it shows

20   that's the chance fingerprint left by that person whose

21   careful ten prints I've got?

22       A    If it was carefully touched on the paper and

23   there's suitable latent on the paper, I conduct a comparison

24   which is, I evaluate the latent impression and I examine it

25   side-by-side to the inked standard, and that's how I do a

26   comparison.

Kathryn M. Lezchuk, C.S.R. No. 2302

428

1      Q      You're looking at it or you're using a machine?

2      A      No.   I am looking at it myself.   I might use

3   magnifiers which enlarged the latent and the inked five

4   times.

5      Q      What's good enough to say that set of chance

6   prints is John Smith's right index finger?

7      A      There must be enough detail that would allow me

8   to conduct a comparison, and that varies from individual to

9   individual depending on training and experience.

10      Q      If you, as a latent print examiner, say, I've

11   made an identification, that's the right index tip, you

12   know, of John Smith and here are his prints, should it be

13   possible for someone to check your work?

14      A      Yes.   Someone does check my work when I make an

15   identification.

16      Q      How do they do it?

17      A      The same way I do it.   They do a side-by-side

18   examination of the latent print to the inked print.

19      Q      And have you ever been shown wrong?

20      A      Say that again.

21      Q      Have you ever been shown wrong, you made an

22   identification and another examiner said, "No.   You're

23   wrong"?

24      A      No.

25      Q      Never?

26      A      Never.

429

1    Q    How is that possible?

2    A    Because when you make an identification, you

3 have to be one-hundred-percent sure, and mistakes do

4 happen.  I'm sure we've all heard.  But you just have to be

5 a hundred-percent sure.  It's not a percentage.  It's

6 either, yes, it is, or, no, it's not.

7    Q    In the same way as if you had a suitable chance

8 print and you had good quality ink prints, could you say,

9 all right, I've looked at this.  I don't know whose it is,

10 but it's not John Smith.  Can you exclude people?

11    A    Yes, you can.

12    Q    How do you do that?

13    A    Same way, by doing a side-by-side examination

14 between the latent print and the inked standard.

15    Q    This object, People's 24 for identification, the

16 piece of paper in there, there's some chance prints, true?

17    A    That's correct.

18    Q    Were there any suitable for comparison?

19    A    Yes, there were.

20    Q    Did you compare those chance prints to the known

21 inked prints of Hoa Trung Khuu?

22    A    I did.

23    Q    Are any of the prints on that piece of paper,

24 People's 24 for identification, his?

25    A    No, they are not.

26    Q    You have excluded him?

430

1    A    Yes, I have.

2    Q    Have you compared the suitable print from the

3  8-and-a-half-by-11 piece of paper to Ryan Brian Bui's known

4  inked fingerprints?

5    A    Yes, I have.

6    Q    Is anything on that paper evidence that he

7  touched it, Bui touched it?

8    A    No, there is not.

9    Q    Have you compared the fingerprints of Mary

10  Elkington?

11    A    Yes, I have.

12    Q    Are they her prints?

13    A    I couldn't tell you that.

14    Q    Explain.

15    A    The prints that I have on this paper are

16  suitable for comparison but they are not suitable for

17  identification, which means that I couldn't make an

18  identification to anybody with these latent impressions.

19    Q    Are you one-hundred-percent confident that

20  People's Exhibit 24 does not contain a suitable, comparable

21  print of Hoa Trung Khuu?

22    A    Yes.

23    Q    Are you one-hundred-percent sure about Ryan Bui,

24  it's not his print?

25    A    Yes.

26    Q    Are you aware of any other means that you could

431

1    use to determine whose prints are on that piece of paper

2    which is People's 24?

3         A    At this time, no, I do not.

4         Q    Did you try John Elkington?

5         A    Yes, I did.

6         Q    Was it him?

7         A    May I refer to my notes?

8         Q    Please.

9         A    I couldn't tell you.

10        Q    Okay.  The AFIS system, A-F-I-S, that you told

11   us about, this computer, did you try to show the computer,

12   however you make the demonstration to the computer, the

13   prints, the suitable prints you found on People's 24 for

14   identification?

15        A    No, I did not.

16        Q    Explain.

17        A    They were not suitable for searching them

18   through the AFIS system.

19        Q    Will you amplify?

20        A    When I say suitable for comparison, that's the

21   broadest range.  Then I get suitable for identification and

22   suitable for AFIS, and I need more detail in order for me to

23   pursue that further.  So there wasn't enough detail in these

24   latent prints that allowed me to make an identification or

25   to search them through the AFIS system.

26        Q    Did you also look at a latent print card taken

1    on March 10th, 2004, by Capodanno, C-a-p-o-d-a-n-n-o, from a

2    2001 Land Rover, right rear door, top right of window?

3        A    May I see that?

4        Q    Did you make any identifications in this entire

5    case?

6        A    Yes, I did.

7        MS. ALLHISER:  People's Exhibit 25, Your Honor,

8    it's an evidence envelope with a tracking No. 200784.  It

9    appears to contain three objects, one a latent print card,

10    the one I just described from Capodanno, and two search

11    comparison and elimination records, one in the name of Jeni,

12    J-e-n-i, Bui, the other in the name of Sergeant Lynne,

13    L-y-n-n-e, Archer, A-r-c-h-e-r, as a group exhibit, Your

14    Honor.

15        THE CLERK:  Marking People's Exhibit 25.

16            (People's Exhibit No. 25, Evidence Envelope

17            Containing Inked and Latent Print Cards, marked

18            for Identification only.)

19        MS. ALLHISER:  And I neglected to show you

20    something that is related to the eight-and-a-half piece of

21    paper, People's 24.

22        People's next in order, an evidence envelope with the

23    tracking No. 20115, which appears to contain a paper sleeve,

24    and inside the paper sleeve it looked to be a photograph

25    negative and a snapshot, black and white, which includes a

26    ruler, as a group exhibit, Your Honor.

433

1          THE CLERK:  Marking People's Exhibit 26.

2              (People's Exhibit No. 26, Photograph and

3              Negative of Latent Prints, marked for

4              Identification only.)

5          MS. ALLHISER:  I'm going to go to 26 first.  I

6   would like to get back in order here.

7      Q      Would you look at 26 and tell the jury if you

8   recognize it?

9      A      I do.

10     Q      What is that?

11     A      It is the photograph and the negative that I

12  took of the latent impressions that were on the piece of

13  paper that we were speaking of.

14     Q      People's 24?

15     A      Yes.

16     Q      Okay.  Now, have you done something to enhance

17  or augment the appearance of the latent print demonstrated

18  in that snapshot or negative, People's 26 for

19  identification?

20     A      Other than processing the item itself, no, I

21  have not.

22     Q      Is that your best record of what you would see

23  if you carefully examine the piece of paper in that section,

24  People's 24 for identification?

25     A      Yes, I hope so.

26     Q      Accuracy is important, right?

Kathryn M. Lezchuk, C.S.R. No. 2302

434

1      A    Yes.

2      Q    All right.  People's 25 for identification, an

3  envelope and contents.  Please examine.

4      Do you recognize?

5      A    Yes, I do.

6      Q    What -- first, what is it, and then I'll ask you

7  what you did with it.

8      A    There are two inked fingerprint cards and one

9  latent print lift.

10     Q    Please say what a latent lift print is.

11     A    Well, in this case the item, which according to

12  the back of the card was a window of a vehicle, was dusted,

13  a piece of tape was placed over what was dusted, the tape

14  was lifted and placed onto this backing.

15     Q    Did that process that you have just described,

16  the dusting and card, produce a chance print suitable for

17  identification?

18     A    It did.

19     Q    That particular latent print card -- I'm sorry.

20  That particular latent print from the car, was it a

21  fingerprint of Hoa Trung Khuu?

22     A    No, it was not.

23     Q    He is excluded?

24     A    He is.

25     Q    Was it a fingerprint of Ryan Brian Bui?

26     A    No, it was not.

1      Q    Excluded?

2      A    Yes.

3      Q    Did you use the AFIS system to find out whose

4  fingerprint that was?

5      A    Yes, I did.

6      Q    Did you get a result?

7      A    Yes, I did.

8      Q    Explain.

9      A    I ran the fingerprint through the Automated

10  Fingerprint Identification System and requested 20

11  candidates.  Top 20 candidates were listed, and I sat in

12  front of the computer and conducted a side-by-side

13  examination of what I had entered to what the computer

14  generated.  At candidate No. 4 I wasn't -- that's incorrect

15  statement.  At candidate No. 4 I had enough information on

16  that image that I needed to request the fingerprint card

17  from the Department of Justice.

18      Once that card was received into the laboratory, I

19  conducted a side-by-side examination of the inked print to

20  the latent print and determined that the latent print was

21  made by the person whose fingerprints appear on the copy of

22  the fingerprint card marked Gerald Thomas Lehane.

23      Q    Will you spell the name.

24      A    Gerald, G-e-r-a-l-d, Thomas, T-h-o-m-a-s,

25  Lehane, L-e-h-a-n-e.

26      Q    The chance print from the right rear window of

1  the Rover taken by Capodanno on March 10th, 2004, in your

2  opinion is a print made by Gerald Thomas Lehane?

3      A     Made by the person whose fingerprints appear on

4  the card marked Gerald Thomas Lehane.

5      Q     So -- sorry.  Fingerprints on the card marked

6  Gerald Thomas Lehane?

7      A     Yes.

8          MS. ALLHISER:  Your Honor, there is a

9  stipulation between counsel for the purpose of this hearing

10 that Gerald Thomas Lehane is a white, male adult, 48 years

11 old.  He was not in Foster City on March 10th, 2004.  He

12 works for an auto glass installer in San Francisco.  He may

13 have touched the glass in working on the Range Rover.

14     Is that our stipulation?

15         MR. BELL:  Yes.  That's so stipulated, Your

16 Honor.

17         THE COURT:  All right.  Ladies and gentlemen, as

18 I had indicated to you earlier, when counsel agree on

19 something to eliminate a witness to save time, it is binding

20 on you.  No one is going to offer you any more proof on

21 that.  Just accept that as true.

22         MS. ALLHISER:    Q     Part of People's

23 Exhibit 25 was a card with the name Jeni, J-e-n-i, Bui,

24 B-u-i.  These are what you called inked prints, right?

25     A     Yes.

26     Q     All ten fingers?

437

1       A       Yes.

2       Q       Are you confident that the print which,

3   according to your statement, is the print of Gerald Thomas

4   Lehane isn't the fingerprint of Jeni Bui?

5       A       Yes, once I make an identification of one

6   person, it could not have been made by another individual.

7       Q       You exclude Jeni Bui?

8       A       Yes.

9       Q       Now, assume for the purposes of this question

10  that Jeni Bui is the registered owner of the Range Rover

11  that was examined by Capodanno; that print was placed on the

12  card; she's the registered owner.  Now, that is not her

13  fingerprint?

14      A       That's correct.

15      Q       No doubt about it?

16      A       No doubt about it.

17      Q       Were there any other chance fingerprints in this

18  case that you have identified to a person?

19      A       No, there were not.

20      Q       Are there any that could be, through some

21  process known to you, identified?

22      A       Through my training and experience, no, there

23  could not be.

24              MS. ALLHISER:   Those are my questions of this

25  witness.

26              THE COURT:  Mr. Bell.

Kathryn M. Lezchuk, C.S.R. No. 2302

1          MR. BELL:  I just may have one or two questions.

2                    CROSS-EXAMINATION

3   BY MR. BELL:

4       Q      When was it that you did the analysis of the

5   evidence concerning the fingerprints?

6       A      May I?

7              THE COURT:  Sure.

8              THE WITNESS:  I received the items on the 18th

9   of August, and the last time I looked at them was the 2nd of

10  September.

11             MR. BELL:    Q      So the actual -- when you

12  say -- let me just ask you this:  Can you say when the first

13  time you looked at them was?

14      A      I can.  May I look at my notes?

15             THE COURT:  Sure.

16             MR. BELL:  Sure.

17             THE WITNESS:  I started this case on the 18th

18  of August.

19             MR. BELL:    Q      So the period between August

20  18th and your conclusions -- your final conclusions on

21  September 2nd was the examination?

22      A      That's correct.

23      Q      Thank you.  Could you have testified to what you

24  testified to here today prior to September 2nd?

25      A      Not completely, no.

26             MR. BELL:  All right.  Thank you.  I have

439

1  nothing further.

2            THE COURT:  Thank you.  Ms. Allhiser?

3            MS. ALLHISER:  No, Your Honor.

4            THE COURT:  May the witness be excused?

5            MR. BELL:  Yes, Your Honor.

6            MS. ALLHISER:  Yes.

7            THE COURT:  You are excused.  Thank you.

8            MS. ALLHISER:  Are you ready for the People's

9  last witness?

10           THE COURT:  I thought you said she's the last

11 witness.

12           MS. ALLHISER:  No.

13           THE COURT:  Anybody need a break?

14     No.  Okay.

15           MS. ALLHISER:  Pierre Morrison.

16           THE CLERK:  Please raise your right hand.

17                 PIERRE MORRISON,

18 called as a witness by the People, after being first duly

19 sworn, was examined and testified as follows:

20           THE CLERK:  Thank you.  Please have a seat.

21     Please state and spell your name for the record.

22           THE WITNESS:  Pierre Morrison, P-i-e-r-r-e

23 M-o-r-r-i-s-o-n.

24                 DIRECT EXAMINATION

25 BY MS. ALLHISER:

26     Q    What do you do, sir?

Kathryn M. Lezchuk, C.S.R. No. 2302

440

1          A       Detective with the Foster City Police
2    Department.
3          Q       How long have you been a police officer?
4          A       For approximately two and a half years.
5          Q       What did you do before you were a police
6    officer, sir?
7          A       Customer service with United Airlines,
8    International.
9          Q       Did you have exposure to a lot of people in that
10   job?
11         A       Oh, yes.  Everyday.
12         Q       Did you have exposure to people who spoke a lot
13   of languages?
14         A       Yes, we did.  Yes, I did.  Sorry.
15         Q       How about people from the areas of the world
16   where folks speak Cantonese, Mandarin, have you had a lot of
17   exposures to those speakers?
18         A       Yes, yes.  We had flights to Hong Kong, Taipei,
19   Beijing, Shanghai.
20         Q       Did you learn the Cantonese language?
21         A       No, I did not.
22         Q       Or Mandarin?
23         A       No, I did not.
24         Q       Vietnamese?
25         A       No.
26         Q       What language do you speak?

441

1          A       English.

2          Q       Have you, in your experience with people from

3     all over the world, learned how to communicate, even if you

4     don't share the same language?

5          A       Yes.

6          Q       Detective Morrison, on March 10th, 2004, were

7     you part of Foster City police response to the complaint of

8     an attempted residential burglary at 57 Williams Lane in

9     Foster City?

10         A       Yes.

11         Q       I'm asking now about your personal role.   What

12    did you do?

13         A       I maintained a perimeter right behind 505

14    Bristol Court.

15         Q       There's a map behind you, People's Exhibit 4 for

16    identification.

17         Maybe -- let me bring you to the enlarged one,

18    People's 4.

19         A       Okay.

20         Q       Do you see 505 Bristol?

21         A       Yes, I do.

22         Q       Would you take a blue marker and make a circle

23    around the house at -- not the house, the number 505.

24         When you got to 505 Bristol, were there other police

25    officers around?

26         A       Oh, yes.

Kathryn M. Lezchuk, C.S.R. No. 2302

442

1     Q     Could you hear what other police officers were

2  doing?

3     A     Yes.

4     Q     Okay.  And you can have your seat again, sir.

5     Did a time come when a police officer gave you radio

6  information that there was a suspect close?

7     A     Yes.

8     Q     What were the circumstances?

9     A     Officer Egan was doing a yard-to-yard search on

10  Bristol Court from, I believe, 5 -- no.  501 to 505.  He was

11  actually going from yard to yard, going over the fence and

12  searching each yard because of a witness -- actually,

13  Sergeant Archer saw someone hop over the fence from

14  Edgewater.

15     Q     That's Sergeant Lynne Archer?

16     A     Lynne Archer, yes.

17     Q     So at that point, you thought somebody's coming

18  close, right?

19     A     Yes.

20     Q     What did you see or hear yourself of what

21  happened next?

22     A     Well, Officer Egan said he had someone in a back

23  yard, and at one point he said he had someone at gun point,

24  and then he said:  I'm on a foot pursuit.  The guy got up

25  running.  And he called to me, because he knew I was behind.

26     Q     How far were you from Egan right then?

443

1      A      If I could go through that fence I would have

2   been a couple of feet, but I had to go around that

3   particular high wall, so -- can I show you exactly.

4      Q      Yes.

5      A      I was here, and I ran around to the front here

6   because the gate opening is actually right there.

7      Q      You're kind of showing with your finger that you

8   went around toward the public street on Monterey?

9      A      Yes.  This is Monterey, and this is Bristol

10  Court, and the entrance, the gate, is right there.

11     Q      Just off Monterey?

12     A      Uh-huh.

13     Q      At Bristol Court?

14     A      Yes.

15     Q      Now, were you hearing what was going on?

16     A      Oh, yeah.

17     Q      Do you know if any other officer got there

18  before you did?

19     A      Yes.

20     Q      What do you know?

21     A      Corporal Hart got there before.

22     Q      How did he get there?

23     A      Well, he was on foot, and he was positioned a

24  little -- he was positioned right on Monterey, and so he was

25  able to get to that door first, so I'm right behind him.

26     Q      At the point in time when Egan and Hart are

444

1    close to a suspect, how far away were you?

2         A    Oh, just a few feet.

3         Q    And did you see the suspect?

4         A    Yes.

5         Q    You now know that person's name?

6         A    Yes, I do.

7         Q    What is that name?

8         A    Ryan Bui.

9         Q    Did you meet Ryan Bui?

10        A    Yes, I did.

11        Q    When you first saw him, can you visualize the

12   clothes he was wearing?

13        A    He didn't have a shirt on.

14        Q    Did or didn't?

15        A    Did not.  And he was wearing, I believe, a pair

16   of jeans.

17        Q    Let me show you a photograph and ask you if this

18   is the person and this is the way you saw at least his upper

19   body, People's 17 for identification.

20        A    Yes, this is him.

21        Q    This is Ryan Bui, shows him bare-chested?

22        A    Yes.

23        Q    When you first saw him with the police officer

24   was he carrying a jacket?

25        A    No.

26        Q    A shirt?

1    A    Nothing.

2    Q    Or a sweatshirt?

3    A    Nothing.

4    Q    The only clothes on the man's body were pants?

5    A    Pants.

6    Q    And shoes?

7    A    Shoes.  He had shoes.

8    Q    Was Ryan Bui eventually arrested for crimes,

9    including the attempted residential burglary?

10    A    Yes, he was.

11    Q    And was he booked in the San Mateo County Jail?

12    A    Yes, he was.

13         MS. ALLHISER:  Your Honor, I ask the Court

14    receive the certified records of San Mateo County Jail.

15    This purports to be a booking photo of Ryan Bui, giving his

16    date of birth, height, weight and other identifiers.  I have

17    shown this to counsel.

18         I just need to look at it again after it's marked.

19              (People's Exhibit No. 27 Booking Photograph of

20              Ryan Bui, marked for Identification only.)

21         THE CLERK:  Marking People's Exhibit 27.

22         MS. ALLHISER:    Q    Detective Morrison,

23    this is People's 27 now.  Do you see photograph of the

24    person you know?

25    A    Yes.

26    Q    And who is this?

Kathryn M. Lezchuk, C.S.R. No. 2302

446

1      A      That's Ryan Bui.

2      Q      The description of his race as Vietnamese, did

3   that appear accurate to you?

4      A      Yes.

5      Q      And the skin tone, the coloring that's shown in

6   the picture, is that a fair representation of the skin tone

7   of the man you actually saw there at Bristol Court?

8      A      Yes.

9      Q      The description as five-foot-eight inches, 150

10  pounds, black hair, brown eyes, from what you saw of the

11  man, is that description accurate?

12     A      Yes.

13     Q      And the age is given as April 14th, 1972.  From

14  what you saw of him, did that appear to be the age?

15     A      Yes.

16     Q      When Mr. Ryan Bui was arrested, do you know if

17  he had any form of identification on him, a driver's

18  license, something with his name on it?

19     A      He did not.

20     Q      Nothing at all?

21     A      (Shakes head.)

22     Q      No?

23     A      No.  Sorry.

24     Q      Nothing in his pockets?

25     A      No.  Nothing.

26     Q      Not even a quarter in his pockets?

Kathryn M. Lezchuk, C.S.R. No. 2302

447

1       A       Nothing.

2       Q       Empty?

3       A       Empty.

4       Q       If you recall, when was Ryan Bui actually placed

5   into custody?

6       A       Approximately 1300 hours on the 10th of March.

7       Q       1:00 p.m.?

8       A       Yes.

9       Q       After that time, were you aware that Foster City

10  police were continuing to search for a second man?

11      A       Yes, I was.

12      Q       Were you physically present to see that second

13  man when he was under arrest?

14      A       Yes, yes.  I was on the other side of Edgewater,

15  and then I heard that they had one in custody at 1022

16  Monterey.

17      Q       Did you go to 1022 Monterey?

18      A       Yes, I did.

19      Q       Who did you see in police custody at 1022

20  Monterey?

21      A       Hoa Khuu.

22      Q       Is he in court today?

23      A       Yes, he is.

24      Q       Where is he seated;  what is he wearing?

25      A       He's wearing a gray shirt and black slacks.  Is

26  that gray or black?

448

1          MS. ALLHISER:  May the record reflect this

2     witness has referred to the defendant?

3          THE COURT:  Yes.

4          MS. ALLHISER:     Q     Do you know who this

5     person is, and I'll spell it for you.  H-i-e-u, middle of

6     T-r-u-n-g, last of T-h-i?

7          A     I don't know who he is, but we had his

8     identification in the wallet from Mr. Khuu.

9          Q     The wallet taken from Mr. Khuu, let me show you

10    People's 12 for identification.  It's an envelope here, and

11    the contents, a wallet, and a Vorisan cell phone.

12         Does the wallet contain what appears to be a

13    California driver's license?

14         A     Yes.

15         Q     Will you spell the name on the California

16    driver's license?

17         A     The last name?

18         Q     The whole thing.

19         A     Oh.  H-i-e-u, middle of T-r-u-n-g, last of

20    T-h-i.

21         Q     When the man was arrested at 1022 Monterey and

22    this wallet was taken, did you think that's who he was,

23    someone by the first name H-i-e-u?

24         A     Yes.

25         MS. ALLHISER:  Your Honor, I ask the Court to

26    receive the certified records of the Department of

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Corrections concerning the California driver's license

2    issued to H-o-a, middle name T-r-u-n-g, last name K-h-u-u.

3    Contains a photograph, signature and physical identifiers.

4    I have shown this to counsel.

5              THE COURT:   You said Department of Corrections;

6    you mean DMV?

7              MS. ALLHISER:   I misspoke, Your Honor.   I

8    apologize.   It's a driver's license, Department of Motor

9    Vehicles.   Careless on my part.   I'm sorry.

10             (People's Exhibit No. 28, DMV Records of Hoa

11             Khuu, marked for Identification only.)

12             MS. ALLHISER:    Q     Detective Morrison,

13   People's Exhibit 28 appears to be what we call a Soundex,

14   right?

15        A     Right.

16        Q     Of a photograph and a description of a person.

17   Do you recognize the person in the photograph?

18        A     Yes, I do.

19        Q     Who is that?

20        A     That's Hoa Khuu.

21        Q     Is that the person who was in police custody at

22   1022 Monterey in Foster City that afternoon?

23        A     Yes, it is.

24        Q     The physical description, including height,

25   five-three; weight, 140; hair, black; eyes, brown, did that

26   appear to you to be the man that you saw on March 10th in

1   the afternoon at 1022 Monterey in police custody?

2       A    Yes.

3       Q    Did you spend some time with Mr. Khuu after

4   that?

5       A    Yes, I did.

6       Q    Did you know his name then?

7       A    No.  I knew him -- well, he told us he was the

8   other guy, Thi, T-h-i.

9       Q    First name H-i-e-u?

10      A    Yeah.

11      Q    That's who you thought you were dealing with?

12      A    Yes.

13      Q    Let me ask you to go back.  Where you were at

14  505 Bristol, you circled it there on People's Exhibit 4 for

15  identification, do you know where that place is in relation

16  to the residence of Mary and John Elkington?

17      A    Oh, I would say about maybe 50 yards.

18      Q    You heard the testimony of Mary and John

19  Elkington in this case?

20      A    I was out of the courtroom.

21      Q    Ah, sorry.  Have you spoken to them?

22      A    Yes, I have spoken to them.

23      Q    So you know that they live at --

24      A    500 Bristol Court.

25      Q    -- 500 Bristol?

26      A    Uh-huh, yes.

451

1      Q      Did you know as part of your investigation that

2   John Elkington found an 8-and-a-half-by-11 piece of paper

3   with numbers, phone numbers and addresses on it and an

4   interim driver's license in the name Ryan Brian Bui?

5      A      Yes.

6      Q      Those objects, the 8-and-a-half-11 list of

7   addresses and phone numbers and the interim driver's

8   license, were they seized for police evidence?

9      A      Yes, they were.

10      Q      Did you ever go back to the Elkingtons' and ask

11   them to point out for you where John Elkington found those

12   two pieces of paper?

13      A      Yes, I did.

14      Q      You literally went with them?

15      A      Yes.  We went outside, we walked outside, and

16   she pointed -- he pointed exactly where.

17      Q      Compare where John Elkington pointed out to you

18   as the spot where he found that list of names and addresses

19   and the interim driver's license in the name Ryan Bui,

20   compare that spot to the spot where Mr. Ryan Bui was

21   arrested by Egan and Hart?

22      A      That's about 50 yards.  Right across the court

23   because there -- if I may show you.

24      Q      Go ahead.

25      A      500 is here, sort of in the corner here, and

26   Ryan Bui was arrested here at 505.  So if you go across the

452

1    court, it may be approximately 50 yards or so.

2         Q    Now, what separates those two locations?  Is

3    there a house, a wall, a fence?

4         A    There are two houses, 501 and 503.

5         Q    This black Range Rover with the license plate

6    42225NY, and showing the photograph A part of People's

7    Exhibit 5, do you know who the registered owner of that

8    Range Rover is?

9         A    Yes, I do.

10        Q    Who is it?

11        A    Jeni Bui.

12        Q    Jeni spelled?

13        A    J-e-n-i.

14        Q    Last name?

15        A    Bui, B-u-i.

16        Q    Do you know if the Foster City police released

17   the Range Rover to Jeni Bui after the arrests?

18        A    Yes, they did.  The next day.

19        Q    Another detail here about the car.  People's

20   Exhibit 5 for identification, in the photograph labeled G,

21   one of the Community Service Officers described that this

22   was a picture of a center console of a black Range Rover.

23        Do you recall that?

24        A    Yes.

25        Q    There's a cell phone there, right?

26        A    Yes, it is.

Kathryn M. Lezchuk, C.S.R. No. 2302

453

1    Q    Whose cell phone is that?

2    A    Well, we don't know, because when the car was

3    returned, the cell phone was left in the car, so we were

4    never able to retrieve it.

5    Q    Okay.  In preparation for this trial, have you

6    gone to these locations, measured distances and driving

7    times at normal speed of travel in a car in Foster City,

8    1295 Beach Park Boulevard, 361 Beach Park Boulevard, 57

9    Williams Lane and the area of a loading dock at Albertsons

10   at Edgewater Place?

11   A    Yes, I have.

12   Q    Would you stand, please, and maybe the marker

13   would be the best way to do it.  I'm going to ask you to

14   back away a little bit so the Judge can see as well.  Kind

15   of get yourself in a corner and show the jury first.  I know

16   that's something you'll have to take a minute to look at,

17   but do you see 1295 Beach Park Boulevard?

18   A    Yes, I do.

19   Q    Point to it.

20   A    That's up here.

21   Q    And is there a box written around it?

22   A    Yes, there is.  There's a green box.

23   Q    Do you see -- I'm sorry.  Whose residence is

24   1295?

25   A    That would be the Chi residence.

26   Q    Do you know where the residence of Pamela and

454

1    George Hung is?

2         A      Yes.  361 Beach Park.

3         Q      Can you find that on People's Exhibit 2?

4         A      Right down here; 361 is right here.

5         Q      And is there also a box around the number 361?

6         A      Yes, there's a green box.

7         Q      Do you know the residence of Tommy Hui?

8         A      Yes, I do.  57 Williams Lane.

9         Q      Can you see that on People's 2 for

10   identification?

11        A      Okay.

12        Q      Off Port Royal.  Does that help?

13        A      Well, I'm looking at Port Royal.  Down to --

14   down here.  Didn't go far enough.

15        Q      Is 57 marked with a box?

16        A      Yes, it is.  Green.

17        Q      And are you personally familiar with the

18   location of the Albertsons loading dock, kind of right at

19   the lagoon at Edgewater Place?

20        A      That's right there.

21        Q      Now, slowly, how far is it in distance from 1295

22   to 361 Beach Park Boulevard?

23        A      From 1295 here to 361 is approximately, by me

24   driving it was -- my odometer in the detective car was 1.9

25   miles, approximately.

26        Q      Did you drive it at the speed limit?

455

1    A    Yes.  Posted speed limit was 35 miles an hour.

2    Q    How long did it take you to drive?

3    A    It took, with the stoplight at Edgewater, four

4  and a half minutes.

5    Q    How far is it from 361 Beach Park to 57 Williams

6  Lane?

7    A    To get from 361 to 57 is approximately 1.2

8  miles.

9    Q    And at the speed limit, how long to drive?

10   A    That was about two and a half minutes.  There

11  are no stop lights.  You just follow Port Royal all the way

12  around.  Well, actually, I went Jamaica, made a right on

13  Port Royal and followed all the way to 57.

14   Q    As I have asked you about these distances, did

15  you take the most efficient route?

16   A    Yes.

17   Q    And how far from 57 Williams Lane to the area of

18  the loading dock at Albertsons at Edgewater Place?

19   A    Now that's approximately 1.5 miles, taking the

20  route -- I took this route because this is where William

21  Sandri -- Officer Sandri saw the vehicle.  That's not the

22  most common route, though.  The most common route would have

23  been, because it's right at Edgewater, just to go this way.

24   Q    Use words on the "common route," and then I'm

25  going to ask you the way you went.

26   A    The way I went was Port Royal all the way

Kathryn M. Lezchuk, C.S.R. No. 2302

1    around, and then it goes right to Edgewater here and then

2    left on Edgewater to there.  That's approximately 1.5 miles.

3        Q    If you take the route where Officer Sandri

4    testifies that he saw the black Range Rover, he saw it, I

5    believe, intersection of Edgewater and Port Royal?

6        A    Right here, uh-huh.

7        Q    So the most efficient route, in your opinion,

8    from 57 Williams Lane, going through Port Royal, and

9    Edgewater is how far to Albertsons?

10       A    Going the way I went, this way?

11       Q    The way you went.

12       A    Is approximately 1.5 miles.

13       Q    And how long to drive?

14       A    And that took about two and a half minutes.

15       Q    Would you have your seat, please.

16       A    Three minutes.  I'm sorry, because the other one

17   was two and a half.

18       Q    And have your seat, please.

19       On March 10th, 2004, were you present in an interview

20   room with Officer Bill Sandri and the defendant we now know

21   is Hoa Trung Khuu?

22       A    Yes, I was.

23       Q    Did you listen carefully to what Officer Sandri

24   was saying?

25       A    Yes, I did.

26       Q    Did you listen carefully to what Hoa Trung Khuu

457

1   was saying?

2       A       Yes, I did.

3       Q       In your presence did Officer Sandri read what

4   are called the Miranda rights?

5       A       Yes, he did.

6       Q       Do you have the ability to exactly state for the

7   jury what Bill Sandri told Mr. Khuu?

8       A       Yes.

9       Q       How can you do that?

10      A       From department-issue Miranda card.

11      Q       Read to the jury the same words that Bill Sandri

12  read Hoa Khuu on March 10th.

13      A       (Reading:)

14  You have the right to remain silent.

15  Anything you say may be used against you in court.

16  You have the right to the presence of an attorney

17  before and during any questioning.

18  If you cannot afford an attorney, one will be

19  appointed for you free of charge before any questions if you

20  want.

21  Do you understand these rights that I have read to

22  you?

23      Q       Did Bill Sandri say to Mr. Khuu, "Do you

24  understand these rights I have read to you?"

25      A       Yes.

26      Q       Did you hear Mr. Khuu's response?

458

1          A          He said, "Yes, sir."

2          Q          On March 10th, 2004, where did you meet with

3     Mr. -- the man you now know is Mr. Khuu?

4          A          In the adult interview room in the Foster City

5     Police Department.

6          Q          Is that a locked room?

7          A          Yes.

8          Q          When you first saw Mr. Khuu in the interview

9     room, was he under arrest?

10          A          Yes, he was.

11          Q          Was he handcuffed?

12          A          Yes, he was.

13          Q          In the course of your interview, did you take or

14     did someone take the handcuffs off?

15          A          Officer Sandri took the handcuffs off.

16          Q          In the course of your conversation with Hoa

17     Trung Khuu, did you make any promises to him to get him to

18     talk to you?

19          A          No.

20          Q          Make any threats against him to get him to talk

21     to you?

22          A          No.

23          Q          Use any force to get him to talk to you?

24          A          No.

25          Q          Did it appear to you that he was alert and

26     oriented to his surroundings?

459

1      A     Yes.

2      Q     Was he awake?

3      A     Yes.

4      Q     Were his words rational?  Did he make sense to

5 you?

6      A     Yes.

7      Q     Did he appear to be under the influence of an

8 alcoholic beverage or a drug?

9      A     No.

10     Q     Did he appear to be experiencing any pain or

11 injury?

12     A     No.

13     Q     What was he wearing in the interview room?

14     A     He was wearing jeans, a T-shirt and a light-blue

15 shirt, opened.

16     Q     No jacket?

17     A     No jacket.

18     Q     No sweatshirt?

19     A     No sweatshirt.

20     Q     This is called Defendant's Exhibit A.  It's a

21 photograph of a person.  Do you recognize this person?

22     A     Yes.

23     Q     Who is that?

24     A     Mr. Khuu.

25     Q     And the clothing that you see here, it's sort of

26 mid chest up, are those the clothes he was wearing?

460

1         A      Yes.

2         Q      So this is what you're describing as the

3    clothing on his upper body?

4         A      Uh-huh.

5         Q      Yes?

6         A      Yes.

7         Q      And, what, jeans?

8         A      Yeah.  Wearing jeans.

9         Q      At 1022 Monterey when you got there, was Mr. --

10   the man we now know as Mr. Hoa Khuu, was he under arrest?

11        A      Yes.

12        Q      Was he in the same clothes as you later saw him

13   in the interview room, or was there a change?

14        A      Same clothes.

15        Q      As you speak with the man we now know is

16   Mr. Khuu, what language did you speak?

17        A      English.

18        Q      Only English?

19        A      Yes.

20        Q      At that time was Ryan Brian Bui also in the

21   Foster City Police Department somewhere?

22        A      Yes, he was.

23        Q      Same room?

24        A      No.  He was in another interview room.

25        Q      Close by?

26        A      It's on the other side, but the walls are

461

1   adjoining, so he was in the -- we only have two interview

2   rooms, and he was in the interview room on the east side of

3   the department.

4        Q    From inside the interview room that you were in

5   with Sandri, can you hear someone in the other interview

6   room?

7        A    You could.  If you tried to listen, you can

8   hear, and I talk loud, so, I mean -- people tell me that.

9   Sorry.

10       Q    It's a good thing for courtrooms.

11           This is People's Exhibit 12 for identification.  I

12  showed you the wallet before, black wallet with a driver's

13  license in the name -- first name Hieu, H-i-e-u.  The other

14  object here is a Vorisan cell phone.

15           In the interview room on March 10th, 2004, did Officer

16  Sandri show that Vorisan cell phone to the man we now know

17  is Khuu?

18       A    Yes, he did.

19       Q    How did that occur?

20       A    Well, he asked him, Is this yours?  And at first

21  he said, Yes, and then he said, No.  That's my mother's

22  phone.

23       Q    Is this -- I don't know what the term for it,

24  but the kind of thing that holds photographs?

25       A    Yes.

26       Q    Did Bill Sandri show photographs from the cell

462

1    phone to the man we now know is Khuu?

2        A    Yes.

3        Q    How did that go?

4        A    Well, he asked him, Whose photo is this?  And

5    Mr. Khuu said, Well, that's my girlfriend's photo, and, I

6    believe, a little girl.  He said that's his daughter.   And

7    he showed him another photo, and he said that's his

8    ex-wife's photo.

9        Q    Did Mr. -- the man we now know is Mr. Khuu give

10   you the phone number which corresponds to this Vorisan cell

11   phone?

12       A    Did he give us the phone number?  No.  I think

13   we retrieved it from the phone itself.

14       Q    Did you ask Mr. -- the man we now know is

15   Mr. Khuu some questions?

16       A    Yes.

17       Q    Background questions?

18       A    Uh-huh.  Yes.

19       Q    First, did you ask him what his name was?

20       A    Yes.  I asked him if his name was Ken.

21       Q    Ken?

22       A    Ken, K-e-n.  He told me that's his -- that's his

23   American name.

24       Q    Did you ask him where he stayed, what his

25   residence was?

26       A    He said he stayed in Oakland with his mother.

463

| | | |
|---|---|---|
| 1 | Q | Did he give an address? |
| 2 | A | Yes.  It was on 16th Avenue, but I'm not sure |

the exact address.

| | | |
|---|---|---|
| 4 | Q | In Oakland? |
| 5 | A | In Oakland. |
| 6 | Q | Did you ask him for the residence phone number? |
| 7 | A | No.  We didn't get the residence phone number. |
| 8 | Q | Did you ask him if he was employed? |
| 9 | A | Yes, I did. |
| 10 | Q | What did he say? |
| 11 | A | He said he was unemployed. |
| 12 | Q | Did you ask him if he was married? |
| 13 | A | Yes, I did. |
| 14 | Q | What did he say? |
| 15 | A | He said he was divorced. |
| 16 | Q | Did you ask him when he came to the United |

States?

| | | |
|---|---|---|
| 18 | A | Yes, I did. |
| 19 | Q | What did he say? |
| 20 | A | He said between 1984 and 1985. |
| 21 | Q | Did you know about the black Range Rover before |

you talked to this man on March 10th?  Were you aware of

that being supposedly involved in this investigation?

| | | |
|---|---|---|
| 24 | A | Oh, yes. |
| 25 | Q | Did you ask the man we now know as Mr. Khuu, |

"Whose car is that?"

464

1    A    Yes, we did.

2    Q    What did he answer?

3    A    He first said, "I don't know."  And then he

4  stated, "It's his," as if to gesture next-door.

5    Q    So using his head as a gesture?

6    A    Yeah.

7    Q    Who was next-door?

8    A    Ryan Bui.

9    Q    Did you ask the man we now know is Khuu what the

10  name of the other guy was?

11    A    Yes.

12    Q    What did he say?

13    A    He said, "Brian."  I asked him, "As in

14  B-r-i-a-n?"  He said, "Yes."  And I asked him, "What's his

15  Vietnamese name?"  And I believe he said Vee-zoo.

16    Q    It sounded to you like Vee-zoo?

17    A    Yes.

18    MS. ALLHISER:  Those are my questions, Your

19  Honor.

20    MR. BELL:  I don't think I have -- I think we

21  could finish without a break if the jury is not

22  inconvenienced.  I just have a few questions.

23    THE COURT:  Anyone need a break, including the

24  court reporter?

25    No?

26    MR. BELL:  May I have this marked?

Kathryn M. Lezchuk, C.S.R. No. 2302