1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  CHRISTOPHER J. WEI, State Bar No. 78958
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
7  Telephone:  (415) 703-5867
   Fax:  (415) 703-1234
8  Email:  Christopher.Wei@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14
    **HOA TRUNG KHUU,**                      C 07-6351 SI (pr)
15
                          Petitioner,        **EXHIBIT 9 (part 8)**
16
            v.
17
    **JOHN TILTON, CDCR Secretary,**
18
                          Respondent.
19

20

21

22

23

24

25

26

27

28

    Exhibit 9 (part 8)                        Khuu v. Tilton
                                              C 07-6351 SI (pr)

# EXHIBIT 9 (part 8)

465

1          THE CLERK:  Marking Defense Exhibit D

2              (Defendant's Exhibit D, DMV Photograph of Ryan

3              Bui, marked for Identification only.)

4                      CROSS-EXAMINATION

5    BY MR. BELL:

6          Q      I'm going to show you what has been marked as

7    defense Exhibit D, ask if you recognize it, please?

8          A      Yes.  Ryan Bui.

9          Q      What is that?

10         A      That's California driver's license Soundex.

11         Q      So in other words, People's Exhibit 28, which

12   you've already identified, was a Soundex of the driver's

13   license of Hoa Khuu.  That new exhibit that you're looking

14   at was obtained in the same way as you obtained Mr. Khuu's

15   Soundex, correct?

16         A      Correct.

17         Q      From the Department of Motor Vehicles?

18         A      Yes.

19              MR. BELL:  This is D.

20              THE COURT:  Defense D?

21              MR. BELL:  Defense D, yes.

22         Q      Detective Morrison, are you familiar with a

23   location in Foster City called Boothbay Park?

24         A      Yes.

25         Q      Could you show us where that is on the map --

26   I'm sorry, People's Exhibit 2, which is the -- I think it

466

1    only shows in People's Exhibit 2?

2        A    In this one?

3        Q    Yes.

4        A    It's right off of Edgewater.  Boothbay Park is

5    right here.

6        Q    Is there also a location on that map called Port

7    Royal Park?

8        A    That would be right -- it's a small park right

9    over here, yeah.

10       Q    Port Royal Park is somewhat south from 57

11   Williams?

12       A    Well, it borders it practically.

13       Q    Okay.

14       A    At least according to the diagram.

15       Q    I'm going to go back to a different subject

16   now.  You may take your seat.

17            Do you have your case reports with you?

18       A    Yes.

19       Q    I want to ask you about an interview that you

20   had with Sue -- I'm sorry, Sharon Chi, the wife of Yao Chi,

21   concerning any money, U.S. currency that might have been

22   missing from her residence.  The Chi residence was 1295

23   Beach Park.  Do you remember that interview that you had

24   with her?

25       A    Yes, I do.

26       Q    You interviewed her on the 22nd of March after

467

1   she returned from Taiwan?

2       A    Yes, I did.

3       Q    Do you remember specifically that she told you

4   that prior to her leaving for her overseas trip to Taiwan

5   that she placed $3,000 in U.S. currency in the metal file

6   cabinet in the east side of the master bedroom next to her

7   nightstand?

8       A    Yes.

9       Q    Do you remember her telling you that she, prior

10  to that, had placed approximately $1640 of U.S. currency

11  into that same metal cabinet?

12      A    Yes.

13      Q    Actually, initially when you talked about the

14  amount of money that she had placed in the cabinet, she gave

15  you a higher figure than the $4600, correct?

16      A    Initially, yes.

17      Q    Initially she said she had placed $6,000 into

18  the --

19      A    Yes.

20      Q    -- file cabinet, correct?

21      But later on corrected that?

22      A    Yes, she did.

23      Q    Did she ever tell you anything about asking her

24  husband to bring her U.S. currency at the airport before she

25  left for Taiwan?

26      A    No, she did not.

Kathryn M. Lezchuk, C.S.R. No. 2302

468

1          Q      Finally, in the interview that you and

2    Mr. Sandri -- Officer Sandri had of Mr. Khuu, Mr. Khuu

3    denied any involvement in any of the burglaries with which

4    he is charged; isn't that correct?

5                  MS. ALLHISER:  Your Honor, may we approach?

6                  THE COURT:  Yes.

7          (Unreported discussion in the hall.)

8                  THE COURT:  Matter of fact, let's go back

9    outside for a second.

10         (Unreported discussion in the hall.)

11                 THE COURT:  The objection, ladies and

12   gentlemen, is sustained.

13                 MR. BELL:  I have no further questions.

14                 MS. ALLHISER:  Move to strike the question, Your

15   Honor.

16                 THE COURT:  I don't think there was an answer.

17         Let me look.

18         You're moving to strike the question?

19                 MS. ALLHISER:  Moving to strike the question.  I

20   don't think there was an answer.

21                 THE COURT:  There was no answer.

22                 MS. ALLHISER:  Moving to strike the question.

23   It's as if it didn't happen.

24                 THE COURT:  I don't know if we should strike the

25   question.  The question is not evidence.

26                 MS. ALLHISER:  I'm not being clear.  Objection

Kathryn M. Lezchuk, C.S.R. No. 2302

1    to the question.  I understand the objection is sustained.

2    Enough said.

3              THE COURT:  Correct.

4              MS. ALLHISER:  Thank you.

5              MR. BELL:  I have no further questions.

6              THE COURT:  Okay.  You can step down.

7         Any further witnesses for the People?

8              MS. ALLHISER:  No, Your Honor.

9              THE COURT:  People rest?

10             MS. ALLHISER:  People rest.  We're simply

11   offering the People's exhibits.

12             THE COURT:  We'll do that when we go over

13   instructions.

14             MR. BELL:  We have no evidence or witnesses,

15   other than to offer the -- our own exhibits.

16             THE COURT:  Okay.

17        So both sides rest, correct?

18             MS. ALLHISER:  Correct.

19             MR. BELL:  Yes.

20             THE COURT:  All right, ladies and gentlemen,

21   that is the conclusion of the evidentiary portion of the

22   trial, and what we will do is, I'll excuse you now until

23   2:00 p.m. on Tuesday.  2:00 p.m. on Tuesday, okay.

24        Once again, we need our alternate to come at least

25   until we're finished.

26        So, have a good weekend, a good holiday, and we will

470

1    see you at 2:00 p.m. on Tuesday.

2        (The following proceedings were held in open court,

3    out of the presence of the jury.)

4        Okay, folks.  See you Tuesday.  Why don't we say --

5        I don't have anything else Tuesday morning?

6            THE CLERK:  Let me double-check.

7            THE COURT:  Is nine o'clock okay?

8            MR. BELL:  Yes, Your Honor.

9            MS. ALLHISER:  Yes.

10           THE COURT:  Nine o'clock Tuesday morning.

11           MR. BELL:  Your Honor, maybe we should put this

12   on the record.  I have discussed with my client.  He has no

13   objection to, obviously, not being present during the

14   instructions.  I forgot --

15           THE COURT:  You understand, Mr. Khuu, you have a

16   right to be here in the morning session when counsel and I

17   have been editing instructions.

18           THE DEFENDANT:  Uh-huh.

19           THE COURT:  I know it's more comfortable to stay

20   over in the jail and not be dressed up, be isolated and that

21   kind of thing, so if you want to waive your right to be here

22   Tuesday morning, then we'll do it without you.  You will get

23   to see the final instructions.

24           THE DEFENDANT:  Okay.

25           THE COURT:  You want to do that?

26           MR. BELL:  You don't need to be here.

Kathryn M. Lezchuk, C.S.R. No. 2302

471

1          THE DEFENDANT:  No, I don't want.

2          MR. BELL:  He's just indicated to me he does not

3   mind not being here and waives his right to be here.

4          THE COURT:  Is that correct?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.  So we'll see him at two

7   o'clock on Tuesday, dressed.

8        The other thing we're doing, we're going over

9   evidence.  I think we better have him.  I think we better

10  have him.

11         MR. BELL:  Keep him in the holding cell, I

12  guess.

13         THE COURT:  Would it be easier not to have him

14  dressed in the morning?

15         THE DEPUTY:  It doesn't matter.  Just as easy to

16  dress him in the morning as dress him in the afternoon.

17         THE COURT:  I think we need him because we may

18  get back into talking about this motion for mistrial.  There

19  was another case that was cited.  I want to put something on

20  the record about it.

21         MR. BELL:  Okay.

22              (Court stood in recess.)

23              ---o0o---

24

25

26

Kathryn M. Lezchuk, C.S.R. No. 2302

472

1                        P r o c e e d i n g s

2                                    Redwood City, California

3       Morning Session               Tuesday, September 7, 2004

4                             ---o0o---

5              THE COURT:  All right.  Both counsel and the

6       defendant are present.  There are no jurors present until

7       this afternoon.  And we're going to work on instructions

8       this morning, but there are a couple of matters to take care

9       of first.

10             I have had -- on the issue of defendant's motion for

11      mistrial, my recollection is that we did put comments on the

12      record regarding People vs. Bradford, cited by the defendant

13      in their points and authorities of September 2nd, 2004.

14             Ms. Allhiser, I believe, cited People vs. Hughes, and

15      I have had the book sitting here on the bench ever since

16      then because I read it, but we never got to put any comments

17      on the record.

18             Referring to People vs. Hughes, January, 2002, case,

19      California Supreme Court at 27 Cal. 4th at 287 at 372, the

20      Supreme Court comments that ". . . a prosecutor may commit

21      Griffin error if he or she argues to the jury that certain

22      testimony or evidence is uncontradicted, if such

23      contradiction or denial could be provided only by the

24      defendant who, therefore would be required to take the

25      witness stand."

26             Supreme Court also points out that they suggested in

Kathryn M. Lezchuk, C.S.R. No. 2302

473

1    <u>Murtishaw</u>, M-u-r-t-i-s-h-a-w, ". . . that it is error for

2    the prosecution to refer to the absence of evidence that

3    only the defendant's testimony could provide," and they

4    conclude that paragraph by saying:  "But although '<u>Griffin</u>

5    forbids either direct or indirect comment upon the failure

6    of the defendant to take the witness stand,' the

7    'prohibition does not extend to comments on the state of the

8    evidence or on the failure of the defense to introduce

9    material evidence or call logical witnesses.'"

10          And that's <u>People vs. Hovey</u>, 44 Cal.3d 543.

11          What we're talking about with regard to the motion for

12    mistrial was the prosecution being allowed, over objection,

13    to answer contention by the defense that the People had

14    never submitted the tool mark impressions to an expert for

15    examination.  I allowed the prosecution to elicit testimony

16    over defendant's objection that no request had been made for

17    release of the same evidence for the purpose of having it

18    examined by defense experts.

19          According to <u>People vs. Hughes</u> and the authority

20    stated therein, that is not <u>Griffin</u> error to allow that

21    because it is not a referral to an absence of evidence that

22    only defendant's testimony could provide.  In the particular

23    instance the defendant would have nothing to say about it

24    because he is not a tool mark expert, and so therefore, the

25    motion for mistrial is denied on that ground as well.

26          Anybody want to add any comments about that case?

474

1              MR. BELL:  No, Your Honor.

2              MS. ALLHISER:  No, Your Honor.

3              THE COURT:  Next for the record, this is one of

4    those lazy hot days in Redwood City where it's going to get

5    over 100; and as is usual when everybody comes in in the

6    morning after a weekend and turns on their air-conditioning

7    on high, the air conditioner doesn't work all that well in

8    the courtroom.  My chambers are a lot cooler, so what I

9    would like to do is do the things we need to do in the

10   presence of the defendant; and then if he wishes to go back

11   over across the street to the jail where it might be cooler,

12   he can do that, and we'll bring him back at two o'clock for

13   closing arguments and instructions.

14        In other words, as we stated on Friday or he decided

15   on Friday, I guess, he just as soon waive his presence for

16   the discussion on instructions.  We can then do it in

17   chambers where it will be a lot cooler for us, too.

18        Let's next, at least before I forget, put on the

19   record what you folks wanted to memorialize with regard to

20   our side bar conference which was not reported.  Maybe let's

21   see, Ms. Allhiser, why don't you state the issue if you

22   want.

23             MS. ALLHISER:  If I may, Your Honor.

24             THE COURT:  So we have a record.  Sure.

25             MS. ALLHISER:  I had asked Detective Morrison

26   certain questions.  Did you provide <u>Miranda</u> rights to the

1    defendant?  Did he agree to talk to you?  Where did he live?

2    How many years in this country?  Certain sort of background

3    questions, and then I did ask two questions which get a bit

4    closer to the heart of the issues in this case.

5        I asked him about the cell phone.  Now, this was the

6    cell phone that Kevin Taliaferro recovered when these two

7    men came racing by him as he's sitting outside of the

8    Portofino grill.  He described the cell phone as spinning

9    off.  Mr. Taliaferro was the owner of Portofino, didn't know

10   what it was about, and suddenly a police officer comes

11   racing by.

12       Mr. Taliaferro realized the cell phone might have some

13   significance, tried to preserve it, and Mr. Taliaferro gave

14   the cell phone to Bonifacio of the Sheriff's Department.

15   Bonifacio turned it over to Foster City.

16       In the course of the Mirandized taped statement of

17   this defendant, Pierre Morrison and Officer Bill Sandri --

18   Bill Sandri opens the cell phone.  Now, the jury didn't

19   actually see the videotape, but what he was actually doing

20   was showing the defendant -- Sandri was showing photographs

21   that are on the cell phone to the defendant, This yours?

22   Who are these people?  And the defendant was identifying the

23   women who were in the photographs in the cell phone.

24       That cell-phone connects the defendant to being the

25   person who was running from the black Range Rover, and

26   therefore, indirectly connects him to the stolen loot and

476

1    indirectly connects him to the burglaries and the attempted

2    burglary.

3         The other thing I asked Detective Morrison was this

4    sequence of events.  The police officer said, is that your

5    car, or whose car is it, or something along those lines.  No

6    one said black Range Rover, but in context that was the car

7    they were talking about.  The defendant's answer was, I

8    don't know, and then said, It was his car, as if nodding

9    with the gesture in the direction of the other defendant,

10   who was actually being held in a separate interview.  His

11   name is Ryan, R-y-a-n, Bui, B-u-i.

12        The jury heard those questions and answers, the

13   background questions and answers.  They heard the questions

14   about, Is this your cell phone? and heard the question

15   about, Is it your car? and the defendant's answer

16   referencing him, meaning it's the other guy's car.  At that

17   exact moment in time you are on the videotape, the defendant

18   said -- this is after he said, I don't know whose car it is,

19   and then he says, It's his.

20        At that break, right there, the defendant began with

21   what sounded like an invocation and turned into an

22   invocation of attorney.  The jury doesn't know that.  The

23   Court does because we did a 402 on this subject, and it was

24   on the videotape, but that moment the defendant said, Don't

25   I have to have a lawyer present with me before I talk to

26   you? or words to that effect.  Detective Pierre Morrison's

477

1    answer was, You can do anything you want.  It's up to you,

2    words of that effect, and then Pierre Morrison said, But

3    can't I just tell you what we have?  Defendant answered yes.

4        At that point Detective Morrison started detailing the

5    evidence:  We've got witnesses, pry tool; we've got loot in

6    the car.  I'm not being precise, but that is roughly what he

7    was saying.  He started confronting to the defendant.  The

8    defendant's answer was, I need a lawyer.  Basically, that's

9    the end of the conversation, Your Honor.

10       I have listened carefully, and Detective Morrison and

11   I have both kind of confirmed this through each other that

12   of the entire tape, there's more than an hour and 13 minutes

13   when the defendant is essentially alone in the interview

14   room, literally nothing much is happening, and then at about

15   an hour and 15 minutes Sandri and Morrison come in, they

16   have this little discussion I mentioned, the <u>Miranda</u>, a

17   couple of exchanges of words, and then the defendant says,

18   Don't I have to talk to a lawyer before I talk to you? and

19   ultimately defendant says, I need a lawyer.

20       The evidence that I offered in testimony before this

21   jury -- they have not seen the videotape, but where I ended

22   was, we talked about the cell phone, talked about whose car

23   is that -- and actually, I'm sorry, I forgot.  I asked one

24   other subject matter.

25       The police said, What's his name?  They're talking

26   about the other guy, and the defendant said, Brian.

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Morrison spelled it B-r-i-a-n, and the defendant

2    acknowledged, yeah, Brian; that's his American name.

3    Morrison said, Well, what's his Vietnamese name?  And the

4    defendant answered something that Morrison understood to

5    sound like Vee-zoo.  That actually was the absolute break,

6    and then the defendant said, Don't I have to have a lawyer

7    to talk to you?  That's the way I put in the defendant's

8    statement to the Foster City police in front of the jury.

9    They never heard the invocation.  They never heard the

10   question about, Don't I have to talk to my lawyer?

11         During Mr. Bell's cross-examination of Detective

12   Morrison about the defendant's statements, he said --

13   Mr. Bell asked the question something like, And isn't it

14   true that Mr. Khuu denied the burglaries?  There was no

15   answer from the witness.  I stood up, asked to approach the

16   bench; we went out into the hallway.

17         I believe that Mr. Bell thought that there was an

18   explicit denial of the burglaries.  I'm not really

19   questioning his good faith at all, but my review of this

20   tape, which continued after the invocation of attorney, the

21   defendant is still kind of waiting in there, ultimately

22   starts talking about who he really is, and he is really

23   still using his brother's identity, but there is no

24   substance, no discussion about an attempted burglary, an

25   attempted -- pardon me, an attempted burglary, two completed

26   burglaries or possession of stolen property.  The defendant

1  never denies it; it didn't happen.

2        And that's my assertion, that it didn't happen, and my

3  objection is simply that the insinuation of that question,

4  that the defendant denied the burglaries, even though I

5  believe it was a mistake on Mr. Bell's part, is factually

6  not true; and if the jury were to hear that, the answer

7  actually probably would have been no, but the answer could

8  have been yes, because in context he did deny by asking for

9  a lawyer.  In context it had the effect of a denial.

10        And my concern when I popped up, Your Honor, and tried

11  to stop the question was that I might be getting into a

12  situation where the Court really ought to allow me in

13  rebuttal to say, Well, you know, so he didn't admit the

14  burglaries.  What did he do?  And the correct answer would

15  be, He invoked his right to a lawyer, and I would then be

16  comenting on the defendant's exercise of his privilege

17  against self-incrimination, the presence of a lawyer.  I

18  didn't think I wanted to be in that position of forcing the

19  issue, and that's why I attempted to object in a timely

20  fashion.

21        THE COURT:  Well, but the conversation that took

22  place in the back hall, at side bar on Friday, did not

23  include this information that the defendant in fact,

24  apparently, according to the videotape, never did deny it.

25        Okay.  Mr. Bell, says he thought he did, and I accept

26  that at face value.  The argument we had on Friday, which

1    was different than what we're talking about now, had to do

2    with Mr. Bell's contention that because you had put in part

3    of the statement he could put in what he wanted, and that

4    clearly is not the law.

5         You put in portions of the statement regarding the

6    cell phone, ownership of the Range Rover and the name of

7    Mr. Bui.

8              MS. ALLHISER:  That's true.

9              THE COURT:  Okay.  Nothing about, Did you commit

10   this crime?  Or crimes.  Unless the part of the statement

11   that the other side wants to put in is relevant or somehow

12   answers the parts that the opponent put in, then, no, just

13   because somebody puts in these subjects from an hour and a

14   half tape doesn't mean we get to play the whole tape for

15   them.  So that was the basis of the ruling on Friday.

16             MS. ALLHISER:  Yes, Your Honor.

17             THE COURT:  Now we have a different set of facts

18   where you contend that he didn't deny it, and Mr. Bell

19   thought he had, but I accept both of those contentions at

20   face value.

21        Mr. Bell, anything you want to add --

22             MR. BELL:  No.  I'll submit it.

23             THE COURT:  -- add beyond that?

24        The objection, I believe, was properly maintained --

25   properly sustained on Friday; and given this new

26   information, I would, of course, sustain it again, because

481

1    the only alternative would be to let the prosecution play

2    the tape to show that, no, he never did deny it, when the

3    fact was he was never asked about it.

4                MS. ALLHISER:  That's true.

5                THE COURT:  Okay.  Now, exhibits.

6           Is the prosecution offering all of their exhibits?

7                MS. ALLHISER:  Yes, Your Honor.

8                THE COURT:  Mr. Bell, let me describe what I

9    have.

10          Did you give them an exhibit list?

11               THE CLERK:  No.  Didn't give them one.  I can

12   print it out right now.

13               THE COURT:  Could you.

14          We'll give you an exhibit list, make it easier.

15               MS. ALLHISER:  Great.  Thank you.

16               THE COURT:  While she is doing that,

17   Ms. Allhiser, are you offering all of your defense exhibits?

18               MR. BELL:  Yes.

19               THE COURT:  Any objection to those,

20   Ms. Allhiser?

21               MS. ALLHISER:  No, Your Honor.

22               THE COURT:  I have through D for the defense; is

23   that right?

24               THE CLERK:  Yes.

25               THE COURT:  A through D, those will be admitted

26   for the defense.

Kathryn M. Lezchuk, C.S.R. No. 2302

482

1          (Defendant's Exhibit A through D, previously

2              marked for Identification, received in

3              Evidence.)

4          THE COURT:  Okay.  Both counsel have been given

5    an exhibit list.

6       Mr. Bell, People's 1, A through J, is a photo board,

7    photos of Mr. Bui's home.  Any objection to that?

8          MR. BELL:  No.

9          THE COURT:  It may be admitted.

10          (People's Exhibit No. 1, previously marked for

11              Identification, received in Evidence.)

12          THE COURT:  These are not necessarily -- I have

13    them down in the order that they were offered or

14    identified.  Next one I have down in that order would be

15    People's 6, photocopy of an interim driver's license found

16    under a bush.

17          MR. BELL:  No.

18          THE COURT:  No objection to that?

19          MR. BELL:  No.

20          THE COURT:  People's 7 is a list of addresses

21    from under the bush.

22          MR. BELL:  No objection.

23          MS. ALLHISER:  That is actually the copy, if I

24    may, Your Honor.  That is just the photocopy, No. 7.  The

25    original was introduced later through the crime lab.

26          THE COURT:  People's 7 is admitted.

Kathryn M. Lezchuk, C.S.R. No. 2302

483

1              (People's Exhibit Nos. 6 and 7, previously

2              marked for Identification, received in

3              Evidence.)

4         THE COURT:  People's 8 is a booking photo of the

5    defendant on March 10th.  Any objection to that?

6         MR. BELL:  No.

7         THE COURT:  No.  May be admitted.

8              (People's Exhibit No. 8, previously marked for

9              Identification, received in Evidence.)

10        THE COURT:  People's 3, A through L, photo board

11   of pictures of areas, I guess, that Officer Sandri was

12   looking for the defendant, I guess.

13        Any objection to 3?

14        MR. BELL:  No.

15        THE COURT:  4 is a large scale map of the

16   Edgewater Shopping Center area.   Any objection to that?

17        MR. BELL:  No.

18        THE COURT:  5 is a photo board regarding the

19   Range Rover.  Any objection to that?

20        MR. BELL:  No.

21        THE COURT:  Okay.  All of those are admitted.

22              (People's Exhibit Nos. 3, 4 and 5, previously

23              marked for Identification, received in

24              Evidence.)

25        THE COURT:  9, screwdriver found in the right

26   front mat of the Range Rover.  Any objection to that?

Kathryn M. Lezchuk, C.S.R. No. 2302

484

1          MR. BELL:  No.

2          THE COURT:  10, photocopy of an envelope holding

3     currency, the money from the console.  Any objection to

4     that?

5          MR. BELL:  No.

6          THE COURT:  Will be admitted.

7              (People's Exhibit Nos. 9 and 10, previously

8              marked for Identification, received in

9              Evidence.)

10         THE COURT:  11, photo board of jewelry, coins,

11    laptops, et cetera.  Any objection to that?

12         MR. BELL:  No.

13         THE COURT:  12 is actually a stipulation that

14    the wallet seized by the officer from the man in the trash

15    can and handed over to Sandri, so I don't think we have to

16    do anything with that.

17        13, A through G is a photo board from the witness's

18    residence, and that was Miss Chi.  Any objection to that?

19         MR. BELL:  No.

20         THE COURT:  Will be admitted.

21         THE CLERK:  I have Exhibit 12 as the envelope

22    containing the cell phone and the wallet.

23         MS. ALLHISER:  That's true.  It's not just the

24    wallet.

25         THE COURT:  Okay.  Any objection to 12?

26         MR. BELL:  No.

Kathryn M. Lezchuk, C.S.R. No. 2302

1              THE COURT:  Okay.  And that's the subject of the

2       stipulation, right?

3              MS. ALLHISER:  Yes.

4              THE COURT:  12 is admitted.

5               (People's Exhibit Nos. 11, 12 and 13,

6                previously marked for Identification, received

7                in Evidence.)

8              THE COURT:  14, A through I, a posterboard,

9       photos of Mr. Hung's house.  Any objection to that?

10              MR. BELL:  No.

11              THE COURT:  May be admitted.

12               (People's Exhibit No. 14, previously marked for

13                Identification, received in Evidence.)

14              THE COURT:  15, photocopy of Taiwanese money.

15       Any objection to that?

16              MR. BELL:  No.

17              THE COURT:  Will be admitted.

18               (People's Exhibit No. 15, previously marked for

19                Identification, received in Evidence.)

20              THE COURT:  16, $100 gift certificate to

21       Stanford from Pamela Hung's employer.  Any objection to

22       that?

23              MR. BELL:  No.

24              THE COURT:  May be admitted.

25               (People's Exhibit No. 16, previously marked for

26                Identification, received in Evidence.)

1          THE COURT:  17, photo of Ryan Bui.  Any

2    objection?

3          MR. BELL:  No.

4          THE COURT:  It's admitted.

5          (People's Exhibit No. 17, previously marked for

6           Identification, received in Evidence.)

7          THE COURT:  18, certified DMV registered owner

8    of the Range Rover, Jeni Bui.  Any objection to that?

9          MR. BELL:  No.

10          THE COURT:  It will be admitted.

11          (People's Exhibit No. 18, previously marked for

12           Identification, received in Evidence.)

13          THE COURT:  19, two black gloves inside the

14    Range Rover.  Any objection to that?

15          MR. BELL:  No.

16          THE COURT:  Admitted.

17          (People's Exhibit No. 19, previously marked for

18           Identification, received in Evidence.)

19          THE COURT:  20, inventory of currency, totalling

20    4,907.  Any objection to that?

21          MR. BELL:  No.

22          THE COURT:  21, four pages of photos of

23    currency.  Any objection to that?

24          MS. ALLHISER:  No, Your Honor.

25          MR. BELL:  I just realized I didn't hear what

26    the Court said on the total.

1           THE COURT:  I wrote down 4,907.  That's 20 for

2    identification.  I didn't add it up.  I think I was going

3    with what some witness had said.

4           MS. ALLHISER:  I thought it was 4,979, but I

5    don't want to just --

6           THE COURT:  Could be easy to do.

7           MS. ALLHISER:  4,979, Your Honor.

8           THE COURT:  Okay.

9           MS. ALLHISER:  I just showed it to Mr. Bell.

10           THE COURT:  All right.

11       21 we already covered.  That's admitted.

12           (People's Exhibit Nos. 20 and 21, previously

13            marked for Identification, received in

14            Evidence.)

15           THE COURT:  22 is the CLETS computer.  I call it

16    inquiry log.  Any objection to that?

17           MR. BELL:  No.

18           THE COURT:  23 is the CAD report.  Any objection

19    to that?

20           MR. BELL:  No.

21           THE COURT:  Both of those are admitted.

22           (People's Exhibit Nos. 22 and 23, previously

23            marked for Identification, received in

24            Evidence.)

25           THE COURT:  24 is a paper with names and

26    addresses on it.  That's the original paper.

Kathryn M. Lezchuk, C.S.R. No. 2302

488

1          MS. ALLHISER:  Yes.

2          THE COURT:  Any objection to that?

3          MS. ALLHISER:  Same as exhibit -- I'm sorry.

4          THE CLERK:  7.

5          MS. ALLHISER:  7, but this is the original.

6          MR. BELL:  No objection.

7          THE COURT:  Did you say no objection?

8          MR. BELL:  No objection.

9          THE COURT:  25 is print cards for Ms. Bui.  Any

10   objection to that?

11          MR. BELL:  No.

12          THE COURT:  And 25 is admitted.

13          MS. ALLHISER:  25 also had the latent which was

14   identified later to Jerald, J-e-r-a-l-d, Lehane,

15   L-e-h-a-n-e.

16          THE COURT:  You're right.  And a latent print

17   lift from the window of the Range Rover.

18          MS. ALLHISER:  Yes, Your Honor.

19          THE COURT:  26 for identification is a

20   photograph and negative taken by the expert of the latent

21   prints.

22          MS. ALLHISER:  That's on People's 24.

23          THE COURT:  On People's 24.  Any objection?

24          MR. BELL:  No.

25          THE COURT:  Admitted.

26          (People's Exhibit Nos. 24, 25 and 26,

Kathryn M. Lezchuk, C.S.R. No. 2302

489

1          previously marked for Identification, received

2          in Evidence.)

3          THE COURT:  27, booking photo of Ryan Bui and

4    description.  Any objection to that?

5          MR. BELL:  No.

6          THE COURT:  28, DMV print of the California

7    driver's license of Trung Thi, T-h-i.  Any objection?

8          MS. ALLHISER:  Your Honor, I have 28.  I know we

9    had both.  One is the brother, and one is Mr. Khuu.

10          THE CLERK:  28 is Mr. Khuu.

11          MS. ALLHISER:  Mr. Khuu is 28, Your Honor.

12          THE COURT:  Print of the California driver's

13    license of Mr. Khuu?

14          THE CLERK:  Yes.

15          MR. BELL:  No objection.

16          MS. ALLHISER:  And the brother, I think, is

17    separately marked.

18          THE CLERK:  Brother is marked as --

19          MS. ALLHISER:  No.  That's Bui.

20      Your Honor, you're right.  I had the original driver's

21    license.  I didn't offer a Soundex of the brother.  My

22    mistake.

23          THE COURT:  So 28 is the driver's license of

24    Mr. Khuu.

25          MS. ALLHISER:  Mr. Khuu.  27 is Bui.

26          THE COURT:  Photo of Bui.

Kathryn M. Lezchuk, C.S.R. No. 2302

490

1          MS. ALLHISER:  Yes.  Thank you.  My mistake.

2              (People's Exhibit Nos. 27 and 28, previously

3              marked for Identification, received in

4              Evidence.)

5          THE CLERK:  And Exhibit 2?

6          THE COURT:  2?

7          THE CLERK:  Yes.

8          MS. ALLHISER:  That should be the large map,

9  Your Honor, the whole city or most of the city.

10         THE COURT:  Any objection to 2?

11         MR. BELL:  No.

12         THE COURT:  2 is admitted as well.

13             (People's Exhibit No. 2, previously marked for

14             Identification, received in Evidence.)

15         THE COURT:  Okay.  I think that's all we need

16 to do except the instructions.

17         MR. BELL:  Yes, Your Honor.

18         MS. ALLHISER:  Yes.

19         THE COURT:  Do you agree?

20         MS. ALLHISER:  Yes.

21         THE COURT:  Mr. Khuu, it's actually getting a

22 little cooler.  If you want to go over you can do that, or

23 if you want, you can stay here.

24         THE DEFENDANT:  I don't want to stay.

25         MR. BELL:  You want to stay or go?

26         THE DEFENDANT:  Whatever.

Kathryn M. Lezchuk, C.S.R. No. 2302

491

1          MR. BELL:  You want to go back?

2          THE WITNESS:  (Nods head.)

3          MR. BELL:  He says he's happy to go back.

4          THE COURT:  Where you will be more comfortable.

5    Two o'clock, dressed.

6          We will adjourn to chambers and edit the instructions.

7          MR. BELL:  Thank you, Your Honor.

8          (In-chambers unreported discussion of instructions.)

9          (The following proceedings were held in open court.

10   The defendant was not present.)

11         THE COURT:  What I have done -- we'll be off

12   the record unless you go on, in case you want to put an

13   argument on.

14         (Unreported discussion of instructions.)

15         THE COURT:  We're talking about 2.06, efforts

16   to suppress evidence.  Why don't you state your position on

17   what you want to argue and why.

18         MS. ALLHISER:  Yes.  Thank you, Your Honor.

19         On 2.06, I believe that one can infer that these

20   accomplices, Bui and Khuu, did get rid of stuff; and by that

21   I mean, I think there was additional victim property that

22   was never recovered by the police.  The circumstances were

23   that these guys are in a hot chase.  They're jumping over

24   fences, Khuu in the lagoon.  Of course, the police never

25   searched the lagoon.  That's kind of an impractical

26   impossibility, and they didn't search the lagoon, and Khuu

1  ends up in the trash can.

2          THE COURT:  You missed step one.  When we were

3  off the record, you stated you expect Mr. Bell to testify --

4  testify, to argue.

5          MR. BELL:  I would like to testify.

6          THE COURT:  You expect him to argue what?

7          MS. ALLHISER:  I expect Mr. Bell to argue,

8  consistent with his opening statements, that Mr. Khuu was an

9  unwitting guy who happened to be in the Range Rover filled

10  with stolen loot for crimes that had been completed by

11  someone else, not by him.  And how do we know that?  Because

12  all of the items claimed by the people from the George Hung

13  household, the people from the Yao Chi household, they can't

14  all be accounted for by what the police found.

15          MR. BELL:  That's sounds like argument, not

16  opening statement.

17          MS. ALLHISER:  Well, that was opening statement.

18          MR. BELL:  I implied I was going to argue that.

19  I just said, Look at the missing property.  You know, you're

20  pretty close to where I'm going, but the question is, in my

21  view, whether or not this instruction is -- I suppose you

22  have a right to argue that, but I object to the instruction

23  in that there is no evidence -- direct evidence that he

24  actually, quote, attempted to conceal evidence, and

25  therefore, it showed consciousness of guilt.

26          MS. ALLHISER:  Respectfully, I thought direct

493

1   and circumstantial evidence were entitled to equal weight.

2              THE COURT:  We're talking about an inference

3   versus some kind of evidence, and there is no real --

4   Mr. Bell put it better than I could in stating the decision

5   I made before we went on the record.  There is no real

6   evidence that he either concealed or disposed of evidence.

7   I mean, nobody has said that.  It's a plausible inference

8   that you're entitled to argue, but I think I'm dignifying it

9   a little too much if I call it an effort to suppress it, so

10  I'm not going to give 2.06.

11             MR. BELL:  Thank you, Your Honor.

12             MS. ALLHISER:  Yes.

13             THE COURT:  Requested by the People, objected by

14  the defendant.

15        But you are entitled to argue it.

16             MS. ALLHISER:  Thank you, Your Honor.

17        (Continued unreported discussion.)

18             THE COURT:  Both the defense and prosecution

19  say that they can't think of any lessers to the receiving

20  stolen property.

21             MS. ALLHISER:  True.

22             MR. BELL:  Right.

23             THE COURT:  Is that also true of burglary and

24  attempted burglary?

25             MS. ALLHISER:  Yes.

26             MR. BELL:  Yes.

494

1    THE COURT:  Okay.  We can go off the record

2  again.

3    (Continued unreported discussion.)

4    THE COURT:  Okay.  I'll see you at two o'clock.

5    (Court stood in recess.)

6    ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

495

1    Afternoon session                 Tuesday, September 7, 2004

2                      ---o0o---

3              THE COURT:  Good afternoon, ladies and

4    gentlemen.

5         We now move to closing arguments.  You've heard all

6    the evidence.  As you may recall, at the beginning of the

7    trial when we talked about opening statements I told you

8    that opening statements are not evidence.  That was an

9    opportunity for the attorneys to tell you what they expected

10   or thought the evidence would show.

11        Now you have heard the evidence.  This is their

12   opportunity to argue to you to attempt to persuade you to

13   their view of what the evidence did show.  Once again, what

14   they tell you is not evidence.  You've heard that.  And it's

15   up to you, of course, ultimately to decide what the evidence

16   did show.

17        The way it works, the People have the burden of proof,

18   so they go first.  Then the defense has an opportunity to

19   argue.  Then the People get a short rebuttal argument, not

20   to repeat what's already been said but to answer any

21   arguments that they didn't anticipate or want to answer on

22   behalf of the defense.  So we start with Ms. Allhiser.

23        During the course of the closing arguments, you're

24   going to see me leafing through papers, checking things.  I

25   mean no disrespect to counsel or to their arguments.  It's

26   just something that I have to do to compare the final

496

1    version of the typed instructions and correct any typos

2    before I read them to you as soon as the arguments are over.

3         So, Ms. Allhiser, we begin with you.

4

5         CLOSING ARGUMENT ON BEHALF OF THE PEOPLE

6              MS. ALLHISER:  Doesn't take too much to get

7    into a house, particularly if nobody's home.

8         People's Exhibit 9, it's been referred to as a

9    screwdriver, but look at it.  Look at the way the end is

10   made.  Yes, it does have a flat blade, meaning a sort of

11   turning blade, but look at the way that metal shank

12   appears.  This is built to be a pry bar.  Heavy.

13        It was a two-man job the way it was done.  You don't

14   need much.  You just need a little to organize this, you

15   want to rip somebody off, a lookout, somebody going to the

16   door, Is anybody home?  Maybe ring the bell.  And when

17   there's no reaction, go to a secret, quiet place, start

18   working on the door.  And if you want somebody else's money

19   and somebody else's jewelry and laptop and digital camera

20   and Game Boy and things of this nature, it's a very

21   profitable couple of hours of work, if you want to call it

22   work.

23        The things you know about this case, and you know them

24   for sure, there is really no dispute, nobody is arguing

25   about it.  On its face, there are certain things you know

26   are true.  Now, it happened fast.  It was only a couple

497

1    hours in Foster City, but in two and a half days of

2    witnesses' testimony there are some things that are just

3    really not going to be argued by Mr. Bell.

4         One is, there were two undiscovered burglaries.  The

5    family at 361 Beach Park Boulevard, George and Pamela Hung,

6    they didn't know they had gotten ripped off until the police

7    called.  The family at 1295 Beach Park Boulevard, they

8    didn't know they had been ripped off.  That actually took a

9    while to figure out, because Mr. Yao Chi isn't the one who

10   knew or, rather, noticed the pry into the file cabinet.

11   Took him two days.

12        It was Friday, March 12th before Mr. Yao Chi called

13   the police.  He didn't know his place had been broken into.

14   In fact, interesting, it probably wasn't broken into.  What

15   he told you, that sliding door to his bedroom was left

16   unlocked.  The pry to the window screen is at the front of

17   the house in the bedroom, the one that Solomon, the son of

18   the family, says is always messy because that is the way he

19   leaves it.  Boy, that seems to be unrelated.

20        According to Yao Chi, all the burglar had to do was

21   walk around to the side of the house, go to the master

22   bedroom sliding door and open it, which is probably why Mr.

23   Yao Chi didn't see any broken glass or obvious entry by an

24   intruder.

25        In fact, Martin Ticas of the Foster City Police

26   Department, with some experience, didn't see any way the

Kathryn M. Lezchuk, C.S.R. No. 2302

1   house had been broken into.  In fact, it hadn't.  They just

2   walked in, probably through the sliding-glass door at 1295

3   Beach Park.  Neither family knew it.  It's what we call a

4   cold burglary.  Nobody was at home.

5       Mr. Bell, isn't going to say these people weren't

6   ripped off.  They were ripped off.  We know that.  Cash is

7   gone, jewelry is gone, electronics is gone.  They don't

8   belong in the Range Rover, right.

9       And I don't think Mr. Bell's going to say that Tommy

10  Hui didn't see what he told you under oath he saw.  There

11  was a driver sitting in the black Range Rover, when a man

12  walked up his walkway.  And that man rang the bell and left.

13      Three or four minutes later -- Tommy Hui had gone

14  upstairs to work on his computer.  That's when he heard the

15  metal-on-metal sound at the side sliding door, and Mr. Tommy

16  Hui saw two men, one with the pry bar with both hands, the

17  second right behind him because, see, that's the way you do

18  the job.

19      You clear it, make sure the house is empty or at least

20  they thought the house was empty, and then one guy gets in,

21  either through a nice, open, sliding-glass door or by

22  forcing his way in with the nice, heavy pry bar, People's 9,

23  and then you go in, and you proceed to take the house apart,

24  go through the wallets, go through the cabinets, look for

25  the lady's jewelry, grab the laptops, and that's what would

26  have happened at Tommy Hui's house, except he happened to be

499

1    at home.

2        So, Mr. Bell I don't think is going to suggest that

3    Tommy Hui didn't see two guys.  He saw two guys.  As he

4    looked down the 15 steps through that window sheer covering

5    that sliding-glass door, Mr. Hui saw two guys.  And when he

6    yelled at them and he cursed at them, as you can imagine

7    someone would in his situation, they both ran.  Why?

8    Because they're both in it.  They're both in on it.  This is

9    a two-man job.

10        Minutes later the black Range Rover is being chased by

11   the police.  It happens very fast.  Sharon Derris, who is

12   the dispatcher from Foster City, says she assigned the

13   entire shift of available Foster City police officers to try

14   to find the black Range Rover and the two guys.  Foster City

15   is a small town but, you know, cover it fast if you have

16   enough cops, and they do in Foster City.

17        When the two bailed out of the black Range Rover, it

18   was registered to Jeni Bui, who is the sister of Ryan Bui,

19   the other guy, and the police eventually carefully searched

20   the Range Rover, and it was loaded.  The big, old pry bar's

21   underneath the right front floorboard mat.  There's $310 in

22   currency in the center console.  In the back there is a

23   white William Sonoma bag, inside that a brown grocery bag,

24   and that was loaded with Taiwanese and U.S. money and lots

25   and lots of jewelry, and then there's the black laptop bag

26   which George Hung explained to you the laptop had been

1    separate, and here is the laptop bag.  Now it's loaded.  The

2    digital camera, the Game Boy, all that stuff has been loaded

3    in.  Loot, lots and lots of hot property.  Whoever was doing

4    this stuff was plainly up to no good.

5        Now, let's talk about the time frame.  Again, I don't

6    expect you're going to hear much argument from Mr. Bell on

7    this.  There really aren't disputed facts.  It all happened

8    in a couple of hours.  Somebody hit the Hung residence at

9    361 Beach Park Boulevard and the Chi residence at 1295

10   probably between 8:00 a.m. and 12:30.

11       Now, you have to make some deductions there because

12   the Chis didn't even know they were broken into.  The reason

13   George Hung was found so quickly and called by the police,

14   his business card was on some of that stuff.  It had his

15   name, address, phone number.  That's how they figured out to

16   call George Hung that day right away on Wednesday, March

17   10th.

18       It wasn't until the afternoon that Yao Chi described

19   he woke up from his nap, he went from -- to the metal

20   cabinet.  He was going to deposit some money in the bank.

21   He noticed the pry, and that's when he called the police.

22   You remember Solomon, the English-speaking son, was the one

23   doing all the talking on this one to Martin Ticas, but you

24   can deduce that's when the Chi residence was hit.

25       Mr. Solomon Chi -- I'm sorry, Solomon Chi, the son,

26   left for school; Mr. Yao Chi left for work.  They were both

501

1   out of the house by eight o'clock, and by 12:30 the bad guys

2   are already at 57 Williams Lane, at the residence of Tommy

3   Hui, so you can deduce logically that both of those two

4   completed burglaries were done between 8:00 a.m. and about

5   12:30.

6        The time frame at Tommy Hui's house, you can figure

7   that out logically a little bit backward, and the way you do

8   that:  We know when the phone call came in.  Sharon Derris,

9   the Foster City dispatcher, told you according to their

10  computerized records the call came in on a business line,

11  like an ordinary call, but it came in at 12:41.  She sent

12  out the information and sent the entire Foster City shift

13  looking for the black Range Rover and those two guys at

14  12:43.  That's part of her record.  And you'll see it.

15       I know you haven't seen much up until now, except for

16  photographs from a distance, but you are going to see all

17  these documents when you have a chance to sit down and

18  carefully think about this case in the jury room.  You're

19  going to see all of these records.

20       At 12:49, that's when Bill Sandri had already gotten

21  them caught.  He saw them from two blocks away.  He started

22  after them.  There were cars in between Officer Sandri and

23  the black Range Rover.  He lost sight of the black Range

24  Rover, and he figures -- Where did they go?  And he figures,

25  I'll try the Edgewater Place.

26       And he goes in there, and it's not until the bad guys

1   have gotten themselves into a dead-end situation in this

2   shopping center, which is right up against the lagoon.  The

3   black Range Rover actually was coming at Bill Sandri.

4   That's when he got the license plate.  That's when he called

5   it in, at 12:49; and when he called in the license plate, we

6   know that we've got a hot chase going, because that's the

7   point where he does the U-turn, turns on the red and blue

8   lights, and the black Range Rover, zip, takes off.

9        And he loses it again, but he catches up because these

10  guys have just gotten themselves into a dead-end, now in

11  another part of the lot.  Now they're in the dead-end at the

12  Albertsons loading zone.  Here is the water; here is the

13  building.  No way to go; and when Officer Sandri arrived,

14  two people jumped out of the black Range Rover.  One of them

15  was Hoa Khuu.  The other was Ryan Bui.

16       And, of course, now the chase is on, including the

17  swimming in the lagoon and all the rest of that stuff that

18  you heard about in some detail, and it was at one o'clock

19  that the police called in that Ryan Bui was arrested.  Mary

20  Elkington had kind of shooed him out of her lot, sort of

21  like flushing a game bird.  She kind of shooed him out of

22  her yard.

23       He had jumped the fence and essentially into the

24  waiting arms of the searching police, and this occurred at

25  about 1:00 p.m.  It's 1300 hours in military time.  You'll

26  see the entry, 1300 hours, 10-15.  That's police code for

503

1    somebody's under arrest.  10-15 means "under arrest," and

2    then at 1336 or 1:36 p.m. a second one was under arrest.

3    Now, that's the trash can.  That's when Mr. Khuu was in the

4    trash can and pulled out of the trash can.

5         I don't expect argument from Mr. Bell about what I've

6    told you about the sequence of events here that I've labeled

7    "up to no good," nor the sequence of time.  Those things are

8    probably undisputed.  Mr. Bell is simply going to say that

9    Hoa Khuu is the unluckiest person in the world.  Have you

10   ever heard the expression, wrong place, wrong time?

11   Sometimes it's true.  Not this time.  Not this time.

12        Let's talk about the crime first.  Residential

13   burglary.  Now, this is going into the residence of Yao and

14   Sharon Chi, probably through the unlocked master bedroom

15   sliding door, and stealing from them.  It's another count of

16   burglary.  That is prying and into probably the garage door

17   at the Pamela and George Hung's place, because there were

18   scrape marks on those door knobs coming from the locked

19   exterior garage door, had to get that open, but by the time

20   they're inside, inside the garage, you can walk into the

21   laundry room, and away you go, and you're inside George and

22   Pamela Hung's place and rip them off.

23        So residential burglary is very similar to a

24   common-sense understanding.  Well, you're going into

25   somebody's home, obviously without invitation, but there's a

26   phrase you'll see in the law, enter an inhabited dwelling,

1    and you might stop and think, Well, does that mean somebody

2    has to be at home?  It sounds like it, right?  Inhabited

3    dwelling.  Actually, the law says no, it doesn't matter

4    whether or not you're physically at home.  It matters if

5    this is a place where people customarily live.

6        Now, you still have the protection of your own house,

7    even if you're at work.  It's still a residential burglary,

8    even if no one was physically at home.  That's what I

9    mentioned, like a cold burglary.  Even if you're not there,

10   if this is the place you go to sleep at night,

11   this-is-where-you-have-your-food-in-the-refrigerator kind of

12   thing, that's considered an inhabited dwelling.  The

13   resident need not be at home.

14       And the other thing is, if you have seen this on TV or

15   you heard about it, you refer in the media.  Sometimes they

16   refer to burglaries as B & E.  You heard of that?  Break and

17   enter.  And it might actually be true in some states that

18   you have to actually break something for it to be called a

19   burglary.  Not in California.  You could step in through an

20   open door, slide open an unlocked door to a bedroom, climb

21   in through an open window.  It doesn't matter whether or not

22   you've been locked out.  Okay.  That's not the key.

23       The key is, Have you crossed the threshold?  Did you

24   go into a place you don't belong?  Did you enter another

25   person's castle?  You know that expression:  Every man's

26   house is his castle.  Well, your castle starts where the

1    doors and windows are.  In other words, if you want to allow

2    somebody in your house, you would open the door for them.

3    Okay.  Or give them a key.

4         But if you enter without permission, you can even walk

5    in through an open door, trusting people sometimes leave

6    their doors open, windows unlocked, and it's still a

7    burglary if somebody entered that residence, that castle,

8    and the castle could be worth $17,000 or $17,000,000.  It's

9    still your castle, right?  If you enter the threshold of the

10   castle intending to steal, that's residential burglary.  You

11   don't have to bust a window; you do not have to kick the

12   door.

13        Now, in this case it appears that they did pry open

14   the garage door to get into George and Pamra -- sorry,

15   George and Pamela Hung's house at 361 Beach Park Boulevard.

16   Probably didn't have to break, but just slide open the

17   bedroom door at Yao and Sharon Chi's, but they were

18   certainly working on that door at Tommy Hui's.  They were

19   going to have to bust their way into Tommy Hui's place.

20        So, the third crime is attempted residential

21   burglary.  We have charged Hoa Khuu as being part of this

22   crime, two-man job, part of this crime, and he's responsible

23   for what he did and what the other guy did, and what he is

24   responsible for is successfully breaking into George and

25   Pamela Hung's house and stealing from them, and successfully

26   getting into Yao and Sharon Chi's house and stealing from

506

1  them, and trying to break into Tommy Hui's.   Two completed

2  residential burglaries, one attempted residential burglary.

3  Tommy Hui interrupted the residential burglary at his place,

4  57 Williams Lane, by yelling at these guys.

5       And, of course, you have to enter with intent to

6  steal.   They weren't going in there to find a place to

7  sleep.   No.   They're not going in there by mistake.   Oh, I

8  thought it was my house.   They're going in with the intent

9  to rip off the homeowners.

10      They went into a house where they didn't belong.   Do

11 you remember when I was asking -- I think I asked the same

12 question over and over again.   I asked Pamela Hung, I asked

13 George Hung, I asked Yao Chi with the Mandarin interpreter,

14 Sharon Chi with the Mandarin interpreter.   Do you know this

15 man?   And I was pointing at him and indicating Mr. Khuu, and

16 all four of them said, I don't know him.   And then I asked

17 the question, which is sort of the lawyer's next question,

18 which is, Did he have any business being in your house or

19 taking anything from your house?   And I think it was Pamela

20 Hung who just stopped as if that was the stupidest thing she

21 had ever heard, and I believe her answer through the

22 Mandarin interpreter was, I don't even know him.   Why would

23 he be in my house?

24      Well, Hoa Khuu had no business being in any of these

25 houses or trying to enter.   The thing that is unique about

26 residential burglary is, you could go in, and let's say you

1   didn't happen to like what those people had, you could walk

2   out with your hands empty, and you would still be guilty of

3   residential burglary, because you entered with the intent to

4   steal.  It's the evil intent when you entered the place that

5   makes it burglary.  That's the law on residential burglary.

6   I've sort of done it in a lay version.  The Judge will read

7   you the exact.

8       There are two other charges.  The black Range Rover

9   was loaded with cash, jewelry, laptops, electronics and

10  stuff that belonged to the Chi family, belonged to the Hung

11  family.  Mr. Hoa Khuu had no business being in possession of

12  that property.  That's actually a separate crime under

13  California law.  Now, how it is punished is not your

14  concern.  That's something the Judge decides.  It's not as

15  if he's being charged with duplicate crimes here.  It's just

16  a form of it.

17      The burglary is the entry with evil intent.  Having

18  that stuff and driving away with it, having it in your

19  possession, that's the black Range Rover, that's actually a

20  separate crime.  That's receiving stolen property,

21  concealing it, taking it away from where it belongs, and

22  that is Counts 4 and 5.  These two defendants -- although

23  only one is on trial today, these two defendants were in

24  possession, concealing, withholding stolen property from the

25  owners, and that's George and Pamela Hung on the one side

26  and Sharon and Yao Chi on the other.

1      And how this all fits together is something you might

2    not know.  This is an aspect of California law which is not

3    probably common knowledge, and that is, the presumption of

4    recently stolen property.  This is a rule which is applied

5    to the facts.  This is the way the law works in California,

6    and what it says is, if your -- if the accused is in

7    conscious possession, meaning you know you have it,

8    conscious possession of recent stolen property -- I'm

9    talking about hot goods, all right.  If you're in conscious

10   possession of recently stolen property, then you are guilty

11   of having stolen those items, based on only -- and this is

12   the law -- slight corroboration, just a little bit to

13   support it.

14      Now, the law refers to the time, place and manner of

15   possession.  Mr. Khuu and Mr. Bui are in the black Range

16   Rover, probably within hours of the successful burglary of

17   the Chi residence and the successful burglary at the Hung

18   residence.  That property is hot.  You know that expression

19   about hot, the idea being just stolen.  All right.

20      If they knowingly possessed this hot property, and

21   they were at a time and place when, my goodness, it fits,

22   they are the ones who stole it.  Right?  There wasn't time

23   to go to a pawn broker.  There wasn't time to buy it from a

24   second-hand shop, having passed from the thief's hands into

25   somebody else's.  It was so fast and so close in this little

26   town of Foster City that you can deduce that the people that

 1   had this hot property, so hot it was burning their fingers,

 2   they're the ones who stole it.  They're the burglars.

 3        What else?  Did they have the opportunity to commit

 4   the crime?  In this particular case, sure.  They've got

 5   wheels.  They have the black Range Rover.  It's registered

 6   to Jeni Bui, but it was Ryan Bui and Hoa Khuu who were in

 7   it, so they have the opportunity, and they certainly have

 8   the means.  That's the pry bar.

 9        Do you think it was a coincidence that the pry bar was

10   underneath the right front floor board?  That it's normally

11   kept there?  No.  This is a burglary tool, this pry bar, and

12   it was stuck under the floorboard because these guys were

13   hoping and praying the cops would never catch up with them;

14   and if they did, they at least wouldn't see the pry bar.  So

15   they did the feeble effort to hide the pry bar.

16        They have the time.  They're in the right city, the

17   right place.  These distances are only a couple miles away.

18   I asked Detective Morrison, How long does it take to drive

19   from here to there?  You're talking a couple of minutes at

20   normal speeds between these locations.  Time, place and

21   definitely a means, the pry bar, getaway car.  That's the

22   black Range Rover.

23        Conduct consistent with theft.  Now, that's sort of a

24   generic term, but look at the way this whole thing came to

25   an end, the way these guys got caught.  They got caught

26   doing it again, going in for the third house, right?  By the

1    same apparent means, using the pry bar, checking first to

2    see if someone was at home.  Using a secluded entrance.  All

3    right.  They're just doing it again.

4        You know their conduct is consistent with the

5    burglaries they had just completed;  and then, of course,

6    why did they run when the police turned on the red and blue

7    lights?  They wanted to get themselves as far away in time

8    and space as they could, because that car was loaded with

9    stolen property.  They wanted to distance themselves.

10        Mr. Khuu went in under a boat; and when citizens

11    happened to see that going on and were pointing to the

12    police as if to say, he's in the water, he starts to swim in

13    the lagoon.  Now, the police officer says, You don't have to

14    swim; you can walk.  They're not running from the police

15    because the police are nasty, evil, violent people.

16        This police officer was very nice to him.  He said,

17    You don't have to swim.  You can walk in the lagoon.  And

18    when Mr. Khuu said, not once, but twice, Go ahead and

19    fucking shoot me, what does that demonstrate?  He is

20    desperate to get away.  Distancing himself.  I don't know

21    nothing about no black Range Rover is his conduct.  Why?

22    Because all the stolen property is in there.  All right.  So

23    that's how the presumption of recently stolen property

24    works.

25        If you find that Mr. Khuu and Mr. Bui knew all that

26    stolen property was in there, all you have to do is cross a

1    logical bridge.  They were there at the right time, at the

2    right place, with the means and the opportunity, and in the

3    getaway car.  The last thing they wanted to do was for the

4    cops to make the logical inference they're the burglars.

5    The law permits you, the jury of 12, to make the logical

6    inference they're the burglars.

7        Mr. Bell wants you to look away from the I's, because

8    all of this fits very neatly together, doesn't it?  It's a

9    logical, single pattern.  Mr. Bell wants you to look away

10   from it, and he wants you to be confused by the fact that

11   Mr. Hoa Khuu also had a warrant for him.  But let's talk

12   about what makes sense.

13       Put the facts together, account for all the evidence

14   that we know, and there is one conclusion and doesn't have a

15   whole lot to do with a warrant.  The logical conclusion is

16   that Khuu and Bui worked together.  In fact, they had a hit

17   list.  The piece of paper that John Elkington found in his

18   yard after Ryan Bui had been shooed out of there by Mary

19   Elkington, he didn't find it the same day.  He actually

20   found it later, but then they realized it was important, and

21   they delivered it to the police.

22       That piece of paper, you are going to finally now get

23   to see.  People's Exhibit 24.  It has a strange coloration

24   to it now, sort of a gray-blackish coloration to it, and

25   Anne-Marie Toensing explained to you it's been processed

26   chemically.  It's not just a white sheet of paper with

1   typing and writing on it.  It has a weird color to it.  Part

2   of that you will see, if you look close, shows where she

3   actually marked on it, and you will see the other exhibit

4   where she took a picture of these fingerprints which were

5   shown where she took the chemical picture at the top of the

6   page.

7        It turns out these fingerprints are not Hoa Khuu, not

8   Ryan Bui.  And there were not -- oh, wait a minute.  They

9   may be Mary Elkington's and -- but this piece of paper has

10  names, addresses and phone numbers, and look at 361 Beach

11  Park.  Line drawn through.  Check.  Job done.  Look at 1295

12  Beach Park Boulevard, same thing, line drawn through.  Job

13  done.  This was an organized approach to burglary.  Foster

14  City caught these guys at the very beginning.

15       Now, Mr. Bell is going to say, Look as hard as you

16  can.  Look for 57 Williams Lane.  It's not on the list.

17  It's not, but look at what else is on the list.  A street

18  called Biscayne is in handwriting.  Another street, Port

19  Royal, one that looks like Boothbay, other addresses on

20  Beach Park, Billinsgate Lane, Tender Lane, Cayman.  Lots of

21  things have been added in handwriting.

22       These guys had just very successfully broken into and

23  gotten some good stuff, lots of cash, laptop, lots of good

24  jewelry from two residences, and they got greedy.  They got

25  opportunistic, and they hit 57 Williams Lane on an impulse.

26  Bad impulse, bad choice on their part because Tommy Hui was

1    home, but they're expanding beyond the list.

2         So they're working together.  They have a list of

3    places to go.  They're actually expanding on that list

4    because this is, I guess, just way too easy for them in

5    Foster City, and you know the expression:  Opportunity

6    knocks.

7         Well, opportunity knocked, but in the reverse

8    direction.  It was our opportunity, society's good luck on

9    that one that they on an impulse hit 57 Williams Lane.  Bad

10   luck for them.  Tommy Hui was at home, and they tried at the

11   end of this, when they got themselves trapped, you know,

12   like a mouse in a trap almost -- they got trapped in

13   Edgewater Place.  They tried to put distance between

14   themselves.  Why?  Because of the loot.

15        Those guys knew what was in there, the loot.  It came

16   from 361 Beach Park, 1295 Beach Park, and the pry bar.

17   That's why it was hidden under the floor mat.  They're

18   hoping against hope the police would not connect them to

19   that car.  And here's the logical conclusion of what makes

20   sense for why Khuu had his brother's wallet and driver's

21   license.  That was his scam to avoid the warrant.  That part

22   of it makes sense.

23        If they hadn't been stopped, in the sense that Tommy

24   Hui was never home, okay, and let's say they had not been

25   interrupted and they had been able to finish the 57 Williams

26   Lane, but, oh, bad luck.  What if they had gotten stopped

514

1    for not making a proper stop at a stop light?  Would the

2    police have arrested them for having stuff in their back

3    seat?  No, they would not, no.  The police wouldn't have

4    seen the pry bar, but was it possible the police might have

5    said, Show me some ID?  And then he would have shown his

6    brother's driver's license, and then he would have been in

7    the clear because his brother didn't have a warrant.  See?

8    It might have worked out.

9        Mr. Bui is not here.  Hoa Khuu is here.  And he is

10   guilty as part of this crime of two completed burglaries and

11   attempting to burglarize Tommy Hui's place.  He is guilty of

12   having, receiving the stolen property from both 361 Beach

13   Park and 1295 Beach Park, and that's what makes sense.

14   That's what answers all the questions and fits, covers the

15   ground completely.  It's logical.  You get to use your brain

16   and make sense out of this.

17        Thank you, Your Honor.

18            THE COURT:  Mr. Bell.

19

20        CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

21            MR. BELL:  Good afternoon, ladies and gentlemen.

22        I have an argument to make, but first I'd like to take

23   a few minutes to talk about some of the things that

24   Ms. Allhiser raised with you, and I think, as I mention,

25   some of those things get into my argument.  You will see how

26   all of this tends to fit together.

1          First, Ms. Allhiser spent a lot of time telling you

2    what I wasn't going to say and what I was going to say.  She

3    figured part of that out from my opening statement in the

4    case and from the voir dire in the case where I asked you

5    certain questions about evidence and I mentioned other

6    things in opening statement, so it's no big secret about

7    what I might say, what I might not say, but the importance

8    of what is going to happen here in the courtroom this

9    afternoon, I submit to you, is not what I have to say, it's

10   what the evidence has to say or what even, more importantly,

11   what the evidence doesn't have to say and what the rules of

12   law are, to what His Honor has to say about those rules of

13   law which you are duty-bound to follow.

14          But this is not about what I have to say, because what

15   I have to say is not evidence, just as what Ms. Allhiser had

16   to say is not evidence.  What is evidence and what

17   conclusions that you can draw from the evidence is what's

18   important, and I submit to you that was your promise; and

19   when Mr. Khuu and I chose you as jurors in this case, we had

20   no question in our mind that you would be able to do that,

21   wanted to do that; and as I stand before you now, I have the

22   confidence that you will do that.

23          Now, let's put this in perspective for a minute.

24   There is another way of expressing what this case is about.

25   Let's look at the first three counts of the Information.

26   The Information, as His Honor has read to you by the clerk

1    at the beginning of the case, it's just a chart.  The law

2    gives us all the absolute right to have the written charges

3    preferred against us when we are taken into court for some

4    reason so that we know exactly what we are required to

5    defend against.

6         What are the charges in that Information?  First

7    count, it's a residential burglary.  Second count is, it's

8    an attempted residential burglary.  The third count, it's

9    another residential burglary.  And those three counts -- and

10   by the way, as I said before and as His Honor will tell you,

11   you have to decide each of those counts independently.  Each

12   of you have to return a verdict as to each of those three

13   counts.  And they're not -- there's a way of expressing what

14   those three counts are about.

15        This is not a what-was-it, because to that extent

16   Ms. Allhiser has it correct.  I'm not going to tell you that

17   there weren't burglaries or attempted burglary.  Somebody

18   burglarized the two residences on Beach Park, one or more

19   persons, and somebody, quite likely from the evidence,

20   attempted to burglarize 57 Williams Lane, so you don't have

21   to worry very much in the evidence about that.

22        It is your job to look at the evidence and actually

23   return verdicts on those counts and consider whether or not

24   the evidence establishes that a burglary occurred, but the

25   evidence is unequivocal from the people who lived at those

26   residences that their houses were apparently broken into.

1  People that they didn't know came in and took things that

2  belonged to them and left the house with it, and that --

3  Mr. Hui told you that he saw somebody trying to pry open his

4  back door.  Obviously, he didn't give them permission to do

5  that.

6      The reason people try to pry open people's back door

7  is to burglarize their house, so this isn't really a

8  what-was-it case, as sometimes we laywers call it.  This is

9  really a question of whodunit, so to speak, like a murder

10 mystery.  Who did it?  That is really what this is about.

11 You don't have to spend a lot of time, I submit to you,

12 talking about whether burglaries or attempted burglaries

13 were committed.  The question is, What does the evidence

14 show about the guilt or innocence of Mr. Khuu?

15     Secondly, with regard to Counts 4 and 5, those are

16 slightly different.  Those are counts that have to do with

17 possession of stolen property.  Now, the instructions will

18 tell you that there are certain requirements for that.  You

19 know, what is possession and what are the requirements of

20 proof for possession of stolen property?  This is not a

21 what-did-he-do.

22     We know that Mr. Khuu was in the car, and that the

23 property was there in the car.  The question will be, What

24 did he know?  The law will require that he knew that the

25 property was in the car, and that the property was stolen,

26 and that you will have to make that conclusion based on the

518

1    evidence beyond any reasonable doubt.  That's what the law

2    will require of you.  So that's not a what-did-he-do in the

3    sense of, Was he in the car?  Yes, he was in the car, and he

4    ran from the car.  But what did he know?  Did he know the

5    goods were in the car?  Did he know those goods were

6    stolen?

7         Let me go to another thing that Ms. Allhiser talked

8    about.  Tommy Hui.  Tommy Hui is a very truthful man of, I'm

9    sure, impeccable character.  I don't impugn his character in

10   the slightest, and he testified, in my view, virtually

11   without error, but I ask you to recall a couple of things

12   that he told you.

13        Again, when I suggest -- I say it again, I haven't

14   said it before, so I don't really mean again, but when I

15   tell you I have a recollection of the evidence, I submit to

16   you that I could be wrong.  That is my good faith belief as

17   to what it is.  You may have a different recollection of the

18   evidence and, of course, your recollection of the evidence

19   is what controls, not what I tell you it was or anything

20   else; and if you have any question in evaluating what I say

21   and what Ms. Allhiser says, it's your duty to investigate,

22   either use your own recollection or to go back and ask that

23   certain portions of the testimony be reread if you don't

24   have a clear recollection of what it was.

25        But I think Mr. Hui testified slightly differently on

26   the issue of whether he saw anybody in the black Range Rover

1    that he initially saw out in front of his house.  I believe

2    his testimony was initially on direct examination that he

3    didn't see anybody in the car, but then on

4    cross-examination, when I asked him about it, because I had

5    reason to believe that he did see someone in the car, he

6    said, Oh, yeah.  I did see somebody sitting in the driver's

7    seat of the car.  Okay.  So what is that all about, in

8    that's a discrepancy in testimony that's totally innocent.

9    There was no attempt to deceive.

10       Perhaps I'm wrong about it, perhaps he misunderstood

11    the questions when they were initially being asked, but I

12    submit that he did vary in his testimony, and part of your

13    job as a juror is to determine which of the -- if in fact he

14    did vary, which of the two things he said on the witness

15    stand, each under oath, is the correct version of what

16    happened and what he saw, but that's your job to do.  But

17    it's important to remember that he saw, as he recalled it, a

18    light-skinned person in the driver's seat of the car that he

19    saw out in front of the house.

20       Now, what did he tell you in the evidence about the

21    two people that he saw trying to pry open his rear door?

22    I'll spend a little bit more time on this.  It's actually

23    not the rear door.  He made that clear.  It's the

24    sliding-glass door on the side of his house, if I recall

25    that correctly, and not at the very rear, when he gave a

26    description of that to the Foster City Police Department.

1       And we know that from three different sources he told

2   you, yeah, he remembers they were Hispanic, Hispanic males,

3   and the dispatcher who took the call also had in her notes

4   HM, meaning Hispanic male or males, and she dispatched that

5   information to the police officer Bill Sandri, who she

6   called.  Hispanic males is what they were looking for.

7       So, now, I think that Sandri said -- and it just

8   popped into my head.  Sandri's actual testimony was what he

9   remembers hearing was possibly Hispanic males, and he also

10  said that he may have that wrong, and the dispatcher says

11  she actually dispatched two Hispanic males.  That was the

12  term that she used and Mr. Hui described the people as best

13  he could as being Hispanic males.

14      We all know from our personal experience there are

15  issues in some cases of what we call cross-racial

16  misidentification.  You know, when we're trying to identify

17  somebody of a different nationality or different racial

18  makeup, sometimes it's not as easy as if somebody from the

19  same racial group or nationality is trying to make the same

20  identification, but here it is important to remember Mr. Hui

21  was Asian.

22              MS. ALLHISER:  Objection.  There is no

23  information as to the race, national background of Mr. Hui,

24  no evidence.

25              MR. BELL:  I guess I didn't ask that question.

26  That's true, but I think the jury's observation, they can

521

1    make that observation.

2            THE COURT:  I do, too.  If all we're saying,

3    that it's Asian, I think maybe they can make that

4    determination.

5            MR. BELL:  And Mr. Khuu, Asian, and I'm

6    submitting to you there is less likelihood, is my whole

7    point, less likelihood there is going to be a problem with

8    cross-racial identification when you're talking about people

9    from essentially -- I know there are different Asian

10   groups.  I'm just submitting that as a general possibility,

11   that there's less likely to be cross-racial

12   misidentification issues in the case, and Mr. Hui told you

13   that the People at his door were Hispanic, Hispanic males.

14           Now, let me suggest there was something else that

15   Ms. Allhiser told you which I recall differently from the

16   evidence, and I ask you again to think about this carefully,

17   use your own recollection.  She told you that the evidence

18   was that Officer Sandri, and I agree with this part, called

19   in the license plate on the black Range Rover at 12:49, but

20   that he saw that license plate for the first time and called

21   it in when he was in the Albertsons shopping center -- the

22   Edgewood Place Shopping Center.

23           My recollection of what Officer Sandri told you was

24   that he saw the license plate as he approached the back of

25   the black Range Rover as it was at the intersection of

26   Edgewood Place and Port Royal.  He saw it from this position

522

1    on People's Exhibit 2, which is at the corner of Jamaica and

2    Port Royal.

3        He looked to his left, he saw the black Range Rover;

4    and as he came up behind it, he noted and called in the

5    license plate number at that point;  and then later on when

6    he saw that same vehicle in the Edgewood Place Shopping

7    Center coming back towards him, he knew it was the same car

8    because it had the same license plate that he had previously

9    seen and that he had called dispatch about, and I am going

10   to tell you that will -- I'll get to it in a minute -- will

11   make a substantial difference in terms of the time line as

12   to when he called that in.

13       Finally, just to respond briefly to what Ms. Allhiser

14   had to say in her argument; and, again, I think this is an

15   important time for me to make this point.  I am an advocate

16   in this courtroom.  I am not impartial.  I am one-hundred

17   percent, absolutely, as firmly as I can be, dedicated to the

18   case of Hoa Khuu.  Ms. Allhiser is duty-bound in this

19   courtroom to be as much as an advocate as I am on behalf of

20   the People of the State of California and to argue as

21   strongly every inference she can think to argue and every

22   reasonable and sometimes unreasonable argument counsel

23   sometimes makes on behalf of her clients, the People of the

24   State of California.

25       We're advocates in this courtroom.  That doesn't mean

26   she's right, I'm wrong.  She's the People, and I'm the

1   defendant's lawyer.  So she made some very interesting

2   arguments.  Maybe some of them have some common sense behind

3   it.  I'm simply submitting there is another version of the

4   case.  There's another way of looking at it that is also

5   reasonable, and I will make that argument to you in just a

6   few minutes.

7        But one other thing that -- I don't actually see it

8   there.  Here.  This presumption of recently stolen

9   property.  Everything technically on this chart that she

10  showed you is correct.  This is -- and you will see words

11  like these words.  I'm sorry, you won't -- well, you will,

12  actually.

13       You will hear His Honor tell you in the instructions

14  words very similar to what you see on here, and you will

15  actually get the physical instructions in the jury room so

16  you can read them for yourself.  But what Ms. Allhiser

17  didn't say is that this rule, the presumption of recently

18  stolen property, is just -- is just as governed by the rules

19  regarding the use of and the effect of circumstantial

20  evidence as any other portion of the case.

21       In other words, yes, there is an inference that you

22  are sometimes under the circumstances, if you think it's

23  reasonable, permitted to draw; that a person in possession

24  of evidence recently stolen might -- if you find that a

25  reasonable conclusion, might, if slightly corroborated by

26  the other circumstances in the case, have stolen the

1  property.  It is an inference that you can draw.

2      But if there is another reasonable inference that you

3  can draw from the same evidence in the case, that the

4  defendant is not guilty, if there's another reasonable

5  explanation, then you must vote not guilty, even though

6  those particular facts have been proved.

7      Ladies and gentlemen, this is a circumstantial

8  evidence case.  Now, big deal?  It's a deal.  It's the law.

9  It's what it is.  You know, I'm not here to say, as I've

10  told you before, and His Honor has told you and Ms. Allhiser

11  has suggested in voir dire, a person can be convicted if the

12  circumstantial evidence under the law is such to convince

13  beyond a reasonable doubt and there is no other reasonable

14  explanation permitted by the evidence.

15      But it is important to know that this is a

16  circumstantial evidence case, because there are specific

17  rules where the case is based, as it is here, on

18  circumstantial evidence.  Now, again, I'm going to look like

19  I'm reading and in some ways I am reading from something to

20  make sure I don't misstate it, but what will control what

21  you hear from the Court after we finish our arguments, the

22  instructions of the Court will control.  I don't think you

23  will find any difference -- I hope you won't find any

24  difference between what I'm saying and the Judge is saying,

25  and you will also have those instructions in the jury room

26  for yourself.

525

1          In substantial part what you're going to hear is

2     this:  That evidence is either direct or circumstantial.

3     Direct evidence is evidence that directly proves a fact.  It

4     is evidence which by itself, if found to be true,

5     establishes a fact.  Circumstantial evidence is evidence

6     that, if found to be true, proves a fact from which an

7     inference of the existence of another fact might be drawn.

8     Pretty complicated?

9          Let me give you the kind of common example they teach

10    us in law school.  It's in the law books and so on.  A man

11    is sitting at the window of his beach home.  He can see the

12    beach in the evening moonlight.  Previously while he was

13    watching the beach, he saw it raked to eliminate any

14    footprints.  As he's sitting at the window, he sees a person

15    walking down the beach.  He and his testimony about that is

16    eyewitness evidence.  It is direct evidence.  It alone, if

17    you believe that testimony, proves that a person walked down

18    the beach.  That's direct evidence.

19         What's circumstantial evidence?  Well, let's assume

20    for a minute the same man didn't actually see the man

21    walking down the beach in the moonlight.  He fell asleep.

22    Everything else is equal.  He saw the beach being raked to

23    eliminate footprints but he fell asleep; however, upon

24    waking up, he walked out to the beach and he saw footprints

25    walking along the beach in the sand.

26         Now, this is what we call circumstantial evidence.  It

526

1   is evidence of circumstances that would prove that a person

2   walked on the beach.  What we don't know, of course, in that

3   circumstantial evidence, whether it was a man or woman, what

4   the person was wearing, so on and so forth, but it has

5   important value but limited value, but it is circumstantial

6   evidence.

7        And the law will go on to say it is not necessary that

8   facts be proved by direct evidence.  They may also be proved

9   by circumstantial evidence or by a combination of direct and

10  circumstantial evidence.  Both direct and circumstantial

11  evidence are acceptable as a means of proof.  Neither is

12  entitled to any greater weight than the other.  That's the

13  rule that says, yes, you can consider it.  It's important.

14  You can consider it.  It has equal weight, equal importance.

15       However, there is a specific rule with regard to the

16  sufficiency of circumstantial evidence upon which you may

17  base a verdict of guilty.  That's the rule which His Honor

18  will give you is as follows:  However, a finding of guilt as

19  to any crime may not be based on circumstantial evidence

20  unless the proved circumstances are not only, one,

21  consistent with the theory that the defendant is guilty of

22  the crime but cannot be reconciled with any other rational

23  conclusion.  Further, each fact which is essential to

24  complete a set of circumstances necessary to establish the

25  defendant's guilt must be proved beyond a reasonable doubt.

26       In other words, before an inference essential to

527

1    establish guilt may be found to have been proved beyond a

2    reasonable doubt, each fact or circumstance on which the

3    inference necessarily rests must be proved beyond a

4    reasonable doubt.  Also, if the circumstantial evidence as

5    to any particular count permits two reasonable

6    interpretations, two reasonable interpretations, one of

7    which points to the defendant's guilt and the other to his

8    innocence, you must, it is your duty as jurors, you must --

9    I added "it is your duty as jurors."  You must adopt the

10   interpretation that points to the defendant's innocence and

11   reject that interpretation which points to his guilt.

12        If on the other hand one interpretation of this

13   evidence appears to be reasonable and the other

14   unreasonable, you must accept the reasonable interpretation

15   and reject the unreasonable.

16        Now, note, it says they each have to be reasonable.

17   The law doesn't require they be equally reasonable.  You may

18   say it's more reasonable to think under the evidence that

19   the defendant is guilty or proved guilty beyond a reasonable

20   doubt, but if it's still reasonably possible that he is

21   innocent under the law, if there's a version that the

22   circumstantial evidence will permit which is a reasonably --

23   a reasonable version, a reasonable interpretation of the

24   evidence, at least to innocence, then you must, because you

25   are duty-bound, it is your duty to accept that that points

26   to innocence.

1      Now, this is a case of circumstantial evidence, and

2   it's a case where what Mr. Khuu asks for is justice under

3   the rule of law.  I submit to you that the evidence in this

4   case permits, permits, in other words, allows, two

5   reasonable conclusions:  One, that Mr. Khuu was possibly

6   involved in the burglaries and in the knowing possession of

7   stolen property; and the other, which suggests he reasonably

8   possibly was not involved in the burglaries or the knowing

9   possession of the stolen property.

10      Does Mr. Khuu have to prove his innocence?  We know

11   that he does not have to prove his innocence.  The law does

12   not require him to offer any evidence, to take the witness

13   stand, to offer any witnesses, to do anything but to rest on

14   the state of the evidence.  So if from the state of the

15   circumstantial evidence which you have heard in this case

16   there are two possible reasonable interpretations, you must

17   adopt the one that talks about innocence, that points to his

18   innocence.

19      Now, let me give you some specifics.  Let me tell you

20   a story.  On March the 10th, 2004, Hoa Khuu got up in his

21   Oakland home.

22              MS. ALLHISER:  Your Honor --

23              THE COURT:  Yes.

24              MS. ALLHISER:  Objection.  Counsel is

25   testifying.

26              MR. BELL:  Well, I didn't take an oath.  I'm not