1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  CHRISTOPHER J. WEI, State Bar No. 78958
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5867
    Fax: (415) 703-1234
8   Email: Christopher.Wei@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14
   **HOA TRUNG KHUU,**                      C 07-6351 SI (pr)
15
                                Petitioner,  **EXHIBIT 9 (part 9)**
16
           v.
17
   **JOHN TILTON, CDCR Secretary,**
18
                                Respondent.
19

20

21

22

23

24

25

26

27

28

Exhibit 9 (part 9)                                    Khuu v. Tilton
                                                      C 07-6351 SI (pr)

# EXHIBIT 9 (part 9)

529

1    testifying.   I'm giving them a reasonable version of the

2    evidence.

3                    THE COURT:   You may proceed.

4                    MR. BELL:   Thank you.

5            On March 10th, 2004, Hoa Khuu got up in his Oakland

6    home.   His 1999 California driver's license, which is in

7    evidence, talks about an address in San Francisco, but he

8    moved to his mother's home in Oakland since.   And that

9    morning he traveled to San Francisco to see his friend, Ryan

10   Bui, and they had breakfast at McDonald's in Stonestown; and

11   as it got close to 11:30 Mr. Bui said to him:   Hoa, I'm

12   going to take a drive to Foster City, and I'm going to pick

13   up some stuff from some people I know there.   You want to go

14   along?  Hoa Khuu was unemployed, had nothing better to do.

15   He said sure.

16           They got in the car that Ryan Bui was driving, which

17   was a black Range Rover which belonged to his sister Jeni

18   Bui.   They came to Foster City, and they met in a place not

19   too far, where they were stopped by a place at the park

20   where they met some of Ryan Bui's friends who off-loaded a

21   bunch of stuff into Ryan Bui's car.   They put a bag with

22   some stuff in it, they put some electronic items in the back

23   of the car, and Ryan Bui behind the wheel started back to

24   San Francisco.

25           All of a sudden, on their way back, police lights went

26   on and Ryan Bui drove evasively to try to get away from the

1  police.  When they got behind Albertsons Market, Ryan Bui

2  bailed out; Mr. Khuu bailed out behind him.  He did have a

3  Federal warrant for his arrest.  He didn't want to be

4  discovered by the police.  He wanted to get as far away from

5  the police as he possibly could.  That's one of the reasons

6  why he carried his brother's identification.

7      Now, ladies and gentlemen, he had nothing to do with

8  any burglaries; he knew nothing about this stolen nature of

9  the items that the men had put in the back of this vehicle.

10  Ladies and gentlemen, I submit to you that there is nothing

11  in the evidence in this case that proves beyond a reasonable

12  doubt that what I just told you is untrue.

13          THE COURT:  Well, excuse me.  Excuse me.  I

14  thought you were going to argue from the evidence, counsel.

15  The objection is sustained.

16          MR. BELL:  Your Honor --

17          THE COURT:  That argument is stricken, ladies

18  and gentlemen.  You are admonished to disregard it to the

19  extent that it is not supported by the evidence.

20          MR. BELL:  There need be no evidence.

21          THE COURT:  Wait a minute.  Was there any

22  evidence that anybody met in a park and off-loaded some

23  stuff in a car?

24          MR. BELL:  There need be no evidence of that if

25  it is permitted by the evidence.

26          THE COURT:  Stricken, ladies and gentlemen.  You

1   are admonished to disregard it.

2       Counsel may argue from things that are in the

3   evidence. You may not make up fairy tales. You must decide

4   this case based on the evidence you heard in this courtroom

5   and not from some supposition and fairy tale about things

6   that you heard no evidence about.

7       You understand what I mean? Okay.

8       Proceed.

9           MR. BELL: Ladies and gentlemen, the evidence in

10  this case does not prove who entered the residence at 1295

11  Beach Park. We don't know anything about the descriptions

12  of the people who actually entered those places. They could

13  have been men or women. They could have been white or black

14  or Hispanic or Asian. They could have been native American.

15      We don't know anything about how they were dressed.

16  There were no eyewitnesses to tell us anything about that.

17  They left no identifiable fingerprints or fingerprints at

18  all. So there is no fingerprint evidence. There were no

19  eyewitnesses and no evidence other than the loot was

20  discovered in the Ryan Bui vehicle.

21      Second, let me talk to you about the black Range Rover

22  that was driven by Ryan Bui, and that Mr. Hui said he saw a

23  black Range Rover in front of his home at 57 Williams.

24  First of all, as Ms. Allhiser correctly pointed out to us,

25  because I mentioned it in opening statement, if the People's

26  evidence is that this piece of paper, this piece of

532

1    evidence, that's so persuasive as being a burglary list, why

2    wasn't 57 Williams on the burglary list?  There are a lot of

3    other addresses on there, including addresses in what

4    appears to be pen or some form of pen or pencil.  There is

5    no mention of 57 Williams Lane on this list.  So if this is

6    an organized, well-planned-out burglary, 57 Williams is not

7    on the list.

8         Secondly, Mr. Hui, as you know, because he told us, he

9    did not see any license plate connected to that vehicle.

10   Now, it is true that Sharon Derris, the dispatcher, said

11   that she thought she might have gotten a license number from

12   Mr. Hui, in attempting to reconstruct what happened.  We

13   don't have the tape of what happened.  We don't have the

14   tape of that call, but we also note, and she conceded, that

15   if she had a license number, or even a partial license

16   number, she would have -- after 14 years as a dispatcher in

17   Foster City and a darn good dispatcher, I'm sure, or she

18   wouldn't have been there 14 years, she would have dispatched

19   that license number to Officer Sandri so Officer Sandri

20   would have known precisely the vehicle to look for.

21        And, of course, she conceded that does not appear from

22   her records, and we have the dispatch log, the CAD log --

23   I'm always looking on the wrong side here, but I think it's

24   22 or 23 -- which shows what she actually did dispatch, and

25   she didn't dispatch the license number, and she conceded

26   that.  And Officer Sandri conceded he never got the license

Kathryn M. Lezchuk, C.S.R. No. 2302

1   number from the dispatch.

2       So we know from three different sources there was no

3   license number connected to the black Range Rover, and that

4   Mr. Hui in fact said he is not even certain the black Range

5   Rover was even connected to the people who came to his door

6   or that -- to his front door.  There was somebody who rang

7   his front doorbell, which he didn't see, and people who came

8   to his back door, trying to pry it open.

9       First of all, it was parked six feet in the -- six

10  feet out from the curb.  There was a light-skinned male,

11  which is all he could say about the two people that he saw,

12  trying to pry open his back door; as best as he could

13  determine, they were Hispanic males.  He also said something

14  else.  I said, Is it possible, Mr. Hui, you made a mistake

15  as to whether it was a Range Rover or some other form of

16  Land Rover vehicle?  And he said, No, no.  That's not

17  possible.  I saw a Range Rover, and I remember it

18  distinctly.  It was in gold.  I hope you remember that,

19  because I remember that clearly.  Again, your recollection

20  controls.

21      Ladies and gentlemen, if you look at the Range Rover

22  in these photographs, the writing on the back of the Range

23  Rover is not -- is not in gold.  It is in silver.  Now, big

24  point or little point?  Well, that's for you to determine.

25  Obviously if he was right, if it was in gold, it wasn't this

26  car.  That's called a gold package.  I think that's common

534

1   knowledge.  You get gold writing or silver writing; and if

2   in fact the words "Range Rover" were in gold, then it wasn't

3   this car, it was some other Range Rover that he saw in front

4   of him, if it was connected at all.

5        This is what they're talking about the circumstantial

6   evidence.  Each link has to be proved beyond a reasonable

7   doubt.  We don't even know from the testimony beyond a

8   reasonable doubt that the link in the chain, that the Range

9   Rover that he thinks he saw in front of the house, was

10  connected with the burglaries.  We don't know that.  All we

11  know is when he looked out the window he saw it there;  he

12  never saw it again.  He doesn't know when it left.  He

13  didn't see anybody run out of his house and get into it.  He

14  didn't see it driving away when he heard the noise at his

15  back door.  It was simply gone.

16       The information points -- of course, he was asked to

17  look at Mr. Khuu in the custody of officers; and while he

18  said, Yes, it's true, I cannot exclude Mr. Khuu as being one

19  of the robbers.  I could not identify him as being one of

20  the people I saw.  I cannot identify Mr. Khuu as the

21  person -- one of the persons I saw at the back door.  So we

22  don't have any identification testimony.

23       No one ever asked -- as I pointed out, I think in

24  opening statement, no one ever asked, You said you saw these

25  people in possession of a -- some sort of a tool.  Is this

26  consistent, Mr. Hui, with the tool that you saw in the hands

535

1  of the man at your back door, or is it different?  No police

2  officer asked him that; no prosecutor in this courtroom ever

3  asked him that.  Of course, I didn't ask him that either,

4  but there is no evidence that in fact the tool that the

5  prosecution says is likely to be the tool that was used to

6  pry open the door -- nobody asked the person who was there

7  at the door, Is this the tool?  Is it consistent with it?

8  Even if you can't say it's exactly, is it the same length?

9  Does it appear to be consistent with that?  Nobody ever

10 asked Mr. Hui that.

11      And as a factor, when we talked about

12 misidentification, Mr. Capodanno -- you'll recall he was

13 identified as the senior Community Service Officer, one of

14 two senior Community Service Officers for the Foster City

15 Police Department.  He is the one who went through the car,

16 took some fingerprint lifts from the car.

17      One of the fingerprint lifts is in evidence that he

18 took.  I put it in evidence myself, the People's -- I'm

19 sorry, Defendant's C, which is the fingerprint lifts; and as

20 I recall, when it was opened -- no.  That's wrong.  I'm

21 referring to the wrong exhibit.  I apologize for that.

22      When he described the vehicle, he described it as not

23 a Range Rover.  He described it as a Land Rover.  Now, if

24 here is an experienced police officer who is talking about a

25 Range Rover and describes it as a Land Rover, is it not

26 reasonably possible that Mr. Hui got it mixed up when he

Kathryn M. Lezchuk, C.S.R. No. 2302

1  said a Range Rover as opposed to a Land Rover?  These are

2  things for you to consider in the evidence.

3      Third, there was no eyewitness evidence, no scientific

4  evidence to prove that Mr. Khuu committed any crime.  There

5  is no expert testimony from tool mark experts.  We have a

6  tool mark impression, but we know that neither side

7  submitted it to the lab to see whether or not they could

8  identify that impression which was taken by Mr. Capodanno as

9  being consistent with this tool, and I don't think there is

10 any evidence of any other impressions taken by the police,

11 but of course we know that the police did see points of

12 entry and pry marks and so on.  There is no scientific

13 evidence for you upon which you can rest your verdict in

14 this case.

15     There was no handwriting evidence.  Now, we know that

16 there's all over this piece of paper kind of handwriting.

17 There were no fingerprints developed that belonged to Ryan

18 Bui.  This was something which the evidence would tend to

19 show that Mr. Bui had in his possession, not Mr. Khuu,

20 because I think -- even though it's very confusing, I think

21 you can see from the evidence that Mr. -- after initially

22 being together, Mr. Khuu went in one direction, Mr. Bui went

23 in the other direction, and this was found where Mr. Bui was

24 after he separated from Mr. Khuu.

25     The inference is this is something that was dropped by

26 Mr. Bui, because it was also a driver's license -- a

537

1  temporary driver's license found in the same location

2  belonging to Ryan Bui.  Those facts together make it seem

3  likely this belonged to Ryan Bui, that he had it in his

4  possession, not Mr. Khuu.  But there is also writing on it

5  and nobody made any attempt here to find who was the author

6  of that writing.  Those three addresses, there is no

7  scientific evidence, no fingerprint evidence.  There is no

8  tool mark impression evidence.

9       There is a lot of evidence from the various victims in

10  the case.  Just as I suggested that there would be in

11  opening statement, there were a number of items that were

12  taken from their home in very close proximity to the time

13  some goods were recovered that were not recovered by the

14  police, that were not in that vehicle.  There was a lot of

15  cash.  There is some dispute as to how much cash should be

16  there, and let me just review this.  I'm sure you remember.

17       Mr. and Mrs. Chi had a slightly different version of

18  what happened, if I have that correctly.  He told the police

19  initially, through his son, Solomon, that he had put $5,000

20  worth of cash into the cash drawer.  He was by himself when

21  he did that.  He never corrected that.  He never told the

22  police he was mistaken.  He never told the police, went on

23  to say, that was really my wife who put that money in the

24  drawer.

25       And then Mrs. Chi testified that she put money into

26  the drawer.  From the evidence, in addition to what Mr. Chi

1   put into the drawer, I submit that is a reasonable

2   interpretation as well she put 3,000 in there.  She also had

3   $1600 in there.  If you add those two together, just alone

4   from the Chi residence, in terms of U.S. currency, there

5   would have been 3,000, plus 1600, which is 4600, plus 5,000,

6   which is $9600 that would have been in that cash drawer.

7   That was missing.

8       In fact, this -- just taking that factor, there was

9   approximately -- I can't remember the exact now, but it's in

10  the evidence.  46, $4700, $4900, perhaps, in U.S. currency

11  found in the vehicle, aside from some money that was found

12  in the -- in the -- that little area of the car between the

13  driver's seat.  I don't know why I'm blanking on it, but you

14  know what I'm talking about.  There was some cash found

15  there, too, in a wad.

16      In the bag when it was inventoried, there was around

17  $4900, and I submit to you that the evidence in the Chi -- I

18  forgot.  Mrs. Chi then said, Oh, no.  Actually there wasn't

19  quite that much in there, because Mr. Chi brought money to

20  me at the airport, but of course the police were never told

21  about that.

22      The first time we hear about that in any version was

23  on the witness stand.  She just forgot to mention that.

24  When Mr. -- the police went to talk to Mr. Chi the second

25  time, he didn't say anything about it, and Mrs. Chi didn't

26  tell the police anything about it either.

539

1       So I think there is a presumption that maybe -- you

2   could infer from the evidence there was pretty close to

3   $10,000 in that drawer, and maybe she took $1100 out.  Maybe

4   Mr. Chi did bring it to her at the airport, 1100 in

5   currency, but that still leaves $8900 in cash in that

6   drawer, and only 4900 was recovered, and that leaves aside

7   the Hungs.

8       If you remember, Mr. Hung said he had cash in his

9   briefcase.  Initially, I think -- I don't want to

10  misinterpret his testimony.  I think there was some dispute

11  about that.  But clearly he told the officer, Officer Ticas,

12  I think it was, who went back to the home, that he had

13  $1,000 worth of cash U.S. currency in that briefcase that

14  had been broken open, plus $2,000 worth of Taiwanese

15  currency.  He also told the officer he had several

16  additional thousands of dollars in various wallets that were

17  in various places in the house, and all of that money was

18  gone, too.

19      Okay.  So let's take 1000 that he had in the

20  briefcase, and let's give him credit for only having an

21  additional thousand.  Now we're up to 11 or $12,000 worth of

22  cash that was missing, plus not to mention the fact that the

23  Taiwanese currency was, like, $2,000 he talked about.  And

24  there was substantially less than that in terms of Taiwanese

25  currency found in the bag.

26      They were also missing items of jewelry.  I remember

540

1    one of the witnesses specifically describing some earrings

2    and a necklace that wasn't recovered.  There were other

3    items.  I can't recall specifically what there were, but

4    there were other items.  For example, Mr. Hung said

5    initially that he and his wife, I think, both denied that

6    there was anything missing that hadn't been recovered, but

7    the officer told us, yes, that wasn't the case when they

8    came to the police department.  They did tell them that

9    there were additional items that had not been recovered.

10        So what's the reasoning behind that?  Why is that

11    important?  Ladies and gentlemen, if these were the people

12    who did the burglary, they would have recovered all of that

13    money.  In fact, it's more likely from the evidence and from

14    common sense that somebody else did the burglary and handed

15    this stuff off to Mr. Bui, pulled out a certain amount,

16    first of all, to get rid of this hot stuff and get it out of

17    Foster City as fast as possible; and, secondly, pulled out

18    some of this stuff.

19        And you can speculate on what somebody else was going

20    to do with it.  You're not supposed to speculate when there

21    is no specific evidence.  We all have common knowledge of

22    how stolen property ends up on the market.  People exchange

23    it for money, et cetera.

24        And it is also just as reasonably likely that even if

25    this is a burglary tool or was used in an attempt or a

26    burglary that somebody would want to get rid of their

1    burglary tool, along with the loot, and hand it off to
2    somebody to get it out of town as soon as possible. So it
3    is just as reasonable. The fact that there was stuff
4    missing is a large piece of evidence in favor of reasonable
5    doubt in this case.
6        Now, I suppose you could say, well, maybe these guys
7    threw it away as they ran, you know. I mean, you can
8    speculate as to anything. There is no evidence to support
9    the fact that they threw it away. No police officer, no
10   citizen was ever called to say, you know, We saw these guys
11   disposing of the evidence. Nobody ever found a pile of
12   money someplace or anything else and pieces of jewelry
13   laying around.
14       They found the cell phone. I mean, we know,
15   apparently, from the evidence that the cell phone that
16   Mr. Khuu was carrying that belonged to his mother, with the
17   pictures of his family on it, was found. Isn't it just as
18   reasonable to assume if they were disposing of other stuff
19   they would have been found or maybe it was thrown into the
20   water.
21       You know, you can speculate all kinds of things about
22   this, but I'm submitting to you that from the evidence in
23   the case, the fact that there was a substantial amount of
24   missing money and items taken from the home is an extremely
25   important piece of evidence which alone can establish
26   reasonable doubt in this case as to whether or not Mr. Khuu

542

1    and Mr. Bui were the persons who burglarized any one of the

2    three residences, either 361, 1295 or 57 Williams Lane.

3        Now, let's talk about the time line.  This is another

4    reason why the evidence in the case dramatically establishes

5    dramatically a reasonable doubt.  Let's assume for a minute

6    that Ms. Allhiser is absolutely correct.  12:45 Tommy Hui

7    called the police, and what did he tell them?  Five minutes

8    ago -- at least that's what Sharon Derris said she wrote

9    down.  Five minutes ago.  Remember, he had to go look it

10   up.  Didn't think to call 9-1-1.

11       I guess being the responsible guy he is, he didn't

12   want to disturb somebody unreasonably, so he called the main

13   number, not 9-1-1.  It's like these guys are gone, they

14   didn't get in, but he wanted the police to know about it.

15   He took the time to look it up.

16       By the time he found it, he told Sharon Derris five

17   ago -- five minutes ago some guys tried to break into my

18   house, and two minutes later, apparently, dispatch called

19   out to Officer Sandri, who was located -- I don't remember

20   exactly where he said, but it was someplace up in this area,

21   and then he took off to drive in the direction of 57

22   Williams Lane.  And he started looking for them.  Okay.

23   Then he called in the license plate, and later on there was

24   an arrest.

25       Now, look for a minute -- so, if Tommy Hui called at

26   12:41, five minutes before that would have been 12:36, that

543

1    would have been, approximately, according to his own

2    records, that these people tried to break into his house.

3    And it was 12:43 that the police started to look for the

4    Land Rover; and when Sandri got to that intersection and saw

5    a Range Rover and pulled up behind it and got the license

6    plate, it was 12:43, 12:45, in that category.

7        How much time is that between the time that the men

8    were trying to break into the back of the house and they

9    spotted the Range Rover?  Well, you can reckon it out, but

10   it's between eight or nine minutes.  Maybe even more if this

11   12:49 is accurate and if that is when Officer Sandri spotted

12   the Range Rover at the intersection of Edgewood and Port

13   Royal, okay?  That makes it even longer.  That makes it

14   almost 15 minutes.

15       Now, what do we know?  What we know from the evidence

16   is Detective Morrison, seated at counsel table, drove that

17   himself, and he told you two important factors.  One is, he

18   told you that to go from 57 Williams Lane, here, and to

19   drive Port Royal to the intersection of Edgewater and Port

20   Royal was a three-minute drive.  He also told you that the

21   most direct route -- if somebody wanted to get out of there

22   quickly, the most direct route, the quickest way out of

23   there, is to take Edgewater Boulevard, not Port Royal.

24       So, the persons who were discovered at the 57 Williams

25   Lane place would have been long gone.  They would have been

26   nowhere near Port Royal and Edgewater at the time when

544

1    Officer Sandri arrived there, because they would have been

2    trying to get away, if that was the people, or whatever.

3        It doesn't make any sense. The time line doesn't fit

4    the prosecution's theory of the case. If in fact it was

5    supposed to be Mr. Khuu and Ryan Bui who broke into that

6    house, they would have been three minutes later. You know,

7    they would have -- they wouldn't have taken ten minutes to

8    drive that street, and they would have gone the direct route

9    out of town on Edgewater.

10       So, ladies and gentlemen, the time line that the

11   prosecution brought out in its own case in this courtroom in

12   the evidence -- again, it's not what I say. It's what the

13   evidence says. It's what the law requires of you.

14       Ladies and gentlemen, sometimes you hear in these

15   cases a lot about common sense.

16       You need to take a break?

17            JUROR NO. 10:  I could.  I have allergies.

18            MR. BELL:  Let me just cite to you -- I'm almost

19   done here -- some things that I read here about things about

20   common sense and truth. A lot of times prosecutors say, oh,

21   use your common sense. Common sense is part of the

22   home-made ideology of those who have been deprived of

23   fundamental learning or of those who have been kept

24   ignorant. Common sense is judgment without reflection.

25   Common sense appears to be only another name for

26   thoughtlessness of the unthinking. Common sense is what

Kathryn M. Lezchuk, C.S.R. No. 2302

545

1    tells us that the earth is flat.

2         And what about this idea that this is a search for

3    truth?  Well, ladies and gentlemen, this is a search for

4    justice under the law.  I respect faith, but doubt is what

5    gets you an education.  Skepticism is the first step on the

6    road to truth and philosophy, and the pure and simple truth

7    is rarely pure or simple.

8         So, this is really the last time that I get a chance

9    to talk to you in the case.  The People get another chance.

10   They have the burden of proof beyond a reasonable doubt.

11   They have a right to rebut what I have said and to speak

12   after me.  I am going to want to speak to you.  I am going

13   to wish I could be jumping up, waving a flag and saying,

14   Wait, wait, wait a minute.  This is what you said, but take

15   a little chance to think about it.  I'm not going to get a

16   chance to do that, so I'm sitting at the chair with my hands

17   tied behind my back and a muzzle for my mouth.  Perhaps some

18   of you would like to see it that way, and I can't really

19   respond, so I'm going to have to ask you that you have to do

20   that.

21        That's your job as jurors, to listen to what

22   Ms. Allhiser said and give it every consideration, but also

23   listen to it critically.  Listen to it and compare it with

24   the evidence.  Listen to it and ask yourself, What would

25   Mr. Bell have said about that if he had had an opportunity

26   to respond?

546

 1      So, you don't get a second chance either when you

 2   return your verdict.  You're sort of like I am at this

 3   point.  There won't be any second chance.  You won't get a

 4   chance to call in later and say, I reconsidered what I did.

 5   I think I want to change my verdict.  You don't get that

 6   chance.  Once your verdict is cast, you come into the

 7   courtroom, you deliver your verdict, and the Court accepts

 8   it, that verdict as far as you jurors are concerned is a

 9   verdict rendered that is unchangeable.

10      So I suggest to you what you need to do when you're in

11   the jury room and considering what your verdict should be,

12   picture yourself looking at a mirror maybe 30, 60, 90 days

13   from now.  Ask yourself as you get ready to return your

14   verdict, Will I be satisfied with this verdict?  Can I look

15   myself in the eye 90 days from now and know deep in my heart

16   with an abiding conviction that I made the right decision in

17   this case, that I returned the right verdict?  Because if

18   you are -- if you cannot do that, ladies and gentlemen, I

19   submit to you you have a reasonable doubt.

20      One way I like to look at it is, if you understand

21   what I'm trying to say here, there is a blackboard in your

22   mind.  I don't know how many of you have ever played with

23   that a little bit, but you can shut your eyes and you can

24   almost see a blackboard in your mind and you can write on

25   that blackboard the words "not guilty."

26      And I submit to you that unless, when you return that

547

1  verdict, you can close your eyes and you can look at that

2  blackboard in your mind and you have erased those words "not

3  guilty," and it's no longer not guilty in your mind, you

4  have a reasonable doubt in this case.  So this is not a

5  situation where we have to judge and say, Did the People win

6  this case or did they lose this case?  Did the prosecution

7  win this case?  You know, this is not about whether the

8  People or the prosecution or the government wins the case,

9  because the government, the People of the State of

10  California always win when justice is done.

11       Ladies and gentlemen, I want you to tell Ms. Allhiser,

12  as much as I like her, as much as I respect her, that you

13  don't like her case.  I want you to tell her that, ladies

14  and gentlemen, you don't feel that she has brought enough

15  evidence into this courtroom to return a verdict of guilty

16  against Mr. Khuu, and I want you to give Mr. Khuu the

17  verdict he deserves under the law and under the evidence in

18  this case.  I want you to give Mr. Khuu the verdict that

19  your duty demands.  I submit to you that your duty is to

20  return a verdict of not guilty as to all five counts of the

21  Information.

22       Thank you.

23            THE COURT:  All right.  Let's take a five-minute

24  recess, ladies and gentlemen.  Remember the admonitions.

25  Then we will hear from Ms. Allhiser and the instructions.

26       (Brief recess.)

Kathryn M. Lezchuk, C.S.R. No. 2302

1          THE COURT:  Ms. Allhiser.

2          MS. ALLHISER:  Thank you, Your Honor.

3

4     CLOSING REBUTTAL ARGUMENT ON BEHALF OF THE PEOPLE

5          MS. ALLHISER:  Little strange to hear common

6  sense given to you as the defense's dirty words.  I did like

7  hearing about pure and simple, though.  Because that is the

8  business of prosecution, establishing pure and simple

9  truth.  And that's what your verdicts will be.  They will be

10  statements of truth.

11     What if Hoa Khuu attended a school in Foster City?

12  Well, then there would be evidence of that, wouldn't there,

13  an attendance record, a teacher, a class certificate.  If

14  that were true that would explain why he was in Foster City.

15  And, what, to accept a ride from Ryan Bui at just the wrong

16  time when there was a pry bar and all this stolen property

17  in the car.  If it was true that he had attended a school in

18  Foster City, that's something Mr. Bell could prove.

19     If Mr. Khuu was visiting a relative or a friend in

20  Foster City, that's why he was there, that relative or

21  friend could have been brought here as a witness by

22  Mr. Bell, and you could have evaluated, if it was true, that

23  Mr. Khuu was in Foster City not to burglarize houses but to

24  visit a friend.  If it was true, you could have evaluated

25  that.

26     Any sense about what he was doing in Foster City other

1    than ripping off houses?  Says he lives with his mother in

2    Oakland.  He's been in this country for 20 years.  That's

3    what he told the police.  No reason to think he would be

4    lost in Foster City, like not knowing what city he was in.

5    He's not in Foster City to work.  He has no employment in

6    Foster City.  He knows who he is with.  He is referring to

7    the other guy as Brian, which is the middle name of Ryan

8    Brian Bui.  He knows his Vietnamese name as Vee-zoo, and he

9    knows it's his car, so he is connected to Mr. Bui.

10        And if he's connected to Mr. Bui, he's not in Foster

11   City for school, for work, to visit anybody or any place

12   where evidence could be brought to court to show what he was

13   doing in Foster City, what's left?  That what appears before

14   your eyes in the evidence is in fact true.  He was one of

15   the two guys standing at Tommy Hui's door.

16        Now, interesting couple of arguments.  Tommy Hui,

17   according to Mr. Bell, is not a very good witness because he

18   was reading "Range Rover," and the letters were in gold.

19   Well, what were the lighting conditions?  Was it bright?

20   It's 12:30.  Middle of the day.  Was it bright?  Was he

21   catching the glimmer of the sun?  Now, how crazy would that

22   be as the most logical explanation?  That makes sense that

23   he wasn't actually seeing a silver "Range Rover."  He was

24   catching the glint of the light, and he was excited.

25        Does that turn the case over, whether it was gold or

26   silver, or is that trivial?  Well, it's actually trivial,

1    whether it was gold or silver, because otherwise we are

2    living in a universe where there is exactly one more black

3    Range Rover in it with two guys with pry bars and stolen

4    goods in it at exactly 12:30 in Foster City, and at 12:43

5    the entire shift of Foster City Police Department was

6    descending on 57 Williams Lane.

7        If you know Foster City real well, you have to

8    acknowledge it's a bit of a maze because of the lagoons.  It

9    turns in; it turns out.  Mr. Bell made my best argument for

10   me.  He said those guys, whoever was trying to break into

11   Tommy Hui's, should have been gone if they had taken the

12   most efficient route out of Dodge, out of Foster City, but

13   they didn't.  They were trying to use the maze to their

14   advantage.  They came out the least likely way that you'd

15   expect them to come, so that when Foster City police

16   officers look at this maze, when they're coming in from all

17   directions, that black Range Rover, which is hotter than hot

18   with the stolen property and the pry bar and such, is doing

19   its best to avoid the cops.

20       Now, could that account for a couple of minutes

21   twisting and turning and circuitous routes in Foster City?

22   Yep.  Foster City is not laid out in right angles.  That's

23   logical.  That explains a couple of minutes;  that the bad

24   guys wouldn't want to get caught.

25       Mr. Hui was looking down 15 steps from upstairs.

26   Remember, he was home sick, but he went upstairs to work on

1   his computer when he thought those guys from the Range Rover
2   were gone.  He's looking down 15 steps towards this door.
3   See the window sheer covering the door?  He was looking down
4   15 steps.  He's hearing metal on metal.  He's agitated
5   because he's thinking that's not the sound of the gardener.

6       He sees two guys, one working on something heavy
7   against his door, the other standing right behind him.  If
8   Tommy Hui had identified Hoa Khuu and said, I saw his face,
9   that would not have been believable.  That would have been
10  wishful thinking on his part.  Oh, goodness gracious, I'm
11  glad they caught somebody.

12      And that's not the way our system of law works.  It's
13  not, Goodness gracious, I'm glad they caught somebody.  He
14  caught the skin tone, the build, and that it was two men,
15  blue jeans, and not a whole lot more.  He did give Sharon
16  Derris a bit more description.  He talked about a
17  sweatshirt, talked about a dark jacket, but if he had
18  claimed to have identified the face of either the man in
19  front with the tool or the man in the back with the tool,
20  looking down 15 steps through a window sheer, that would not
21  have been a witness worthy of credit.

22      So he told you what he knew.  No more, no less.  And
23  Tommy Hui told you, when he was shown Hoa Khuu, that the
24  skin tone is right, and the build was right, and of course
25  it was a male he described as being under 40 years old.  Mr.
26  Khuu is actually 30.

552

1          Now, if Tommy Hui saw two other guys in a second Range

2     Rover, it starts getting a little fantastic, doesn't it?

3     Poor Mr. Hoa Khuu is the guy with the world's worst luck,

4     being struck by lightening on the second, because there's a

5     pry bar underneath the right front floorboard and tons of

6     stolen property.  Talk about bad luck that the police happen

7     to stop that Range Rover instead of the real bad guys in the

8     Range Rover.  Makes your brain explode if you want to go to

9     that level.  Is that possible?

10          Reality, I hope, will sink in to all of us and say,

11    No.  It's not possible.  Not within minutes in Foster City

12    that there would be a second.  It's like there's a clone out

13    there.  There wasn't.  It's these guys.

14          Mr. Hui described -- sometimes he used light-skinned,

15    sometimes he actually said dark skin in his testimony, and

16    he said possibly Hispanic.  Looking down 15 steps, through

17    the window sheer, Hispanic, Middle Eastern, Asian, Greek,

18    what skin tone was he talking about?  Obviously he didn't

19    know.  He didn't claim to know.  He was saying possibly.  He

20    was referring to the skin tone, and we are an amazingly

21    varied race, aren't we, skin tone.  It doesn't make Tommy

22    Hui wrong, but he said possibly.

23          Mr. Bell suggests that if these pry marks on the door

24    had only been examined by an expert we'd know.  I didn't

25    call them pry marks, but scratches maybe.  People's

26    Exhibit 1 for identification, there are snapshots, pretty

Kathryn M. Lezchuk, C.S.R. No. 2302

553

1    good quality, pretty sharp.  In photograph E you can barely

2    see it, and then you get better as you start going F, G, H,

3    I, J.  There is in fact no shape to the tool mark.  There is

4    no distinctive pry mark or tool mark.  What you can see is

5    an object wearing away at another object.  Look at those.

6    Please do.  I mean, look at those impressions.  Look at the

7    photographs carefully, and you tell me, what scientist in

8    the world would say that they were made by anything and have

9    a scientist have credibility.

10        Now, if it was a blood-to-blood transfer or something,

11   now we're talking DNA.  Now, perhaps, you could get an

12   identification, you know, the bloody knife was used to pry

13   the door, and there is blood on both.  Now, you have

14   scientific possibility for comparison.  There is none of

15   that here.

16        What you have is a very large, blunt object, People's

17   Exhibit 9, which is being worked away at an aluminum frame,

18   and what kind of mark does that make?  It makes a jumble.

19   No way is an examination of this tool against that aluminum

20   deformity on Mr. Hui's door going to produce an

21   identification.  Why present it?  We didn't.  Prosecution

22   didn't pretend the tool marks would be of any advantage.  In

23   fact, they're not.

24        On the other hand, is People's Exhibit 9 the kind of

25   thing that could pop a slider, a sliding-glass door?  You

26   bet it is.  It is the kind of thing that could do that job,

1    or at least they were trying.  Is it the kind of thing to

2    produce those scrape marks on the garage door at Mr. Hung's

3    house, pop the door?  Yes, it's that kind of tool.

4        How many folks drive around in black Range Rover with

5    the kind of exhibit as in People's 9 under the right

6    floorboard in Foster City on March 10th, 2004, with two guys

7    in the front seat and a ton of stolen property in the back?

8    That would be only two guys in the world, and one of them is

9    here.

10        Oh, circumstantial evidence.  Mr. Bell gave the

11    footsteps on the beach.  Think for a minute about the

12    circumstantial evidence that Tommy Hui had that the black

13    Range Rover where he saw just the driver in the front seat

14    and the man who walked up his steps and rang the bell, that

15    there were two different people there.  He has seen two

16    people, right?  That's direct evidence.

17        There's the bell ringing.  He ignores it.  He's

18    already peeked out to see the black Range Rover.  I don't

19    know those people.  You know, he hears the man ringing the

20    bell stop, walking away.  He does not look to see what

21    happened to the black Range Rover.

22        He simply went upstairs, and three or four minutes

23    later is when he heard the metal-on-metal sounds.  He goes

24    to the steps, looks down 15 steps, looking through the

25    window sheers.  He sees two men.  He yells at them, curses

26    at them, and in his words, to get the bleep out of here.

1   Rushes down there.  He's got to unlock the one lock.  He's

2   got to unlock the second lock.

3         Remember how he described opening up the sliding

4   door.  He's losing time.  He's trying to get outside because

5   he is angry.  He is running along the side of the house; and

6   by the time he gets to the gate, the two guys are gone, and

7   the black Range Rover is gone.  Circumstantial evidence.

8         Logical.  His conclusion is logical, and as you know,

9   it was the pure and simple truth.  He simply used his brain

10  and crossed the bridge from one guy in the Range Rover, one

11  guy at the bell, that guy leaves, now two at the back door.

12  I chase them.  Both of them and the Range Rover are gone.

13  Logical.  Snake eyes.  That's how you operate

14  circumstantial evidence and make a logical deduction, unless

15  there is a clone black Range Rover out there.  There is no

16  evidence of that.

17        Okay.  Now, the money thing.  I wonder if you're all

18  reaching for your calculators during that.  I started to and

19  I stopped.  You know, was it 5,000, plus 3,000, plus 1640,

20  and then the other people's money, and the money at the

21  airport and back and forth.  What does that establish?  What

22  it establishes is that the filing cabinet of Sharon and Yao

23  Chi was not a bank.  There are no withdrawal and deposit

24  slips to tell them exactly how much money was there.  You

25  can see they used this as their traveling money.

26        And the same was true of George Hung.  Remember.  He

1   described he travels a lot.  He kept Taiwanese money.  He

2   kept U.S. money in wallets.  Those wallets all over his

3   house are not banks.  There are no withdrawal and deposit

4   slips.  For these people to have been mistaken as to the

5   total amount of money that was missing in the filing cabinet

6   or from the wallets, they're not lying.  They don't know the

7   exact amount.

8        But how do we even know it's their money?  Well, we do

9   know that because it's George Hung's laptop; and you sign

10  on, it says George Hung.  Okay.  There was a gift

11  certificate for Pamela Hung.  Doesn't have her name on it,

12  but she knew exactly when she got it and what it was for.

13  And jewelry, some of it their mother's, that both ladies

14  were talking about.  They knew their jewelry.

15       And what else?  25 two-dollar bills.  This was a

16  collection, and yet when I asked the lady, How many

17  two-dollar bills?  She said, I've had them for years.

18  Something in excess of 20.  Well, there were exactly 25

19  two-dollar bills, because, of course, the police counted the

20  two-dollar bills, the ones, the fives, the tens, the 20s,

21  the 50s and 100s that were in the brown sack, the black

22  Range Rover that Mr. Hui was in.  She didn't know exactly

23  how many two-dollar bills she had collected.  How many

24  two-dollar bills are there in most households?  Not many.

25  These are not coincidences.  These are people who have been

26  solidly ripped off.  He even got her two-dollar bills.

1      Mr. Bell came up with this what-if theory.

2  Interesting.  Somebody else did the burglaries, gave all the

3  stolen property to Bui, but only part of it, and gave him

4  the pry bar.  Get rid of the evidence.  Where is the logic

5  in that?  Why get rid of your tool, which is your key to

6  everybody's house?  Why do that?  That does not make sense.

7      And, secondly, why, if you're only going to give away

8  part of the stolen property, give away cash at all?  And if

9  you are going to give away cash, you know you're the second

10  in the line of crooks, and I'm going to pass the money to

11  you, and you launder it or something, why give them

12  one-dollar bills?  Why give them two-dollar bills?  It

13  doesn't make sense.  Give them the hundreds.  If Mr. Bell's

14  theory were true that poor Ryan Bui is perhaps a criminal,

15  and in the chain of command he is like someone down the list

16  of the chain of command, that story doesn't work, because

17  Mr. Big would not give two-dollar bills to

18  Mr. Little, Ryan Bui.  He wouldn't give him the pry bar.  It

19  doesn't make sense.

20      What does make sense is that there probably are some

21  items missing.  You know, it's possible that not all the

22  money was recovered.  Why?  Because when Ryan Bui was

23  arrested on Bristol Court at 1:00 p.m. in Foster City he had

24  nothing in his pockets, zero.  Nothing.  Not a quarter.  Not

25  a dollar.  Nothing.  What does that suggest?  Is that he had

26  emptied his pockets.

1      We know he got rid of his interim driver's license and

2  the hit list, but more than that, is it crazy that these

3  guys would have stuffed some wad of money into their pockets

4  and said, I'll take this now, and stuffed it in their

5  pockets?  Yeah.  That's probably what happened.  When he was

6  going to get arrested, the last thing he wants is to be

7  found with the money.  Could it have been ditched somewhere

8  along the way?  You know what else?  Mr. Bui was shirtless.

9  When he was arrested, he wasn't even wearing a shirt.

10      So have things changed between the time that these two

11  guys were standing outside Tommy Hui's sliding door and the

12  police arrested them?  You bet they were.  There's Ryan

13  Bui.  When he's arrested on Bristol Court, he is not wearing

14  a shirt.  What happened to either this black or dark jacket

15  or the sweatshirt that Mr. Hui describes?  Why is he

16  bare-chested on March 10th, 2004?  Because he's gotten rid

17  of his identifying clothing.  That's why.  That's the

18  logical explanation; and if he had stuffed any of the loot

19  in his pockets, he's gotten rid of that, too.

20      What about Mr. Khuu?  When he's arrested, hauled out

21  of the trash can, Defense Exhibit A, this is what he's

22  wearing, what looks like a white or light-colored T-shirt

23  and a blue collared shirt.  Where is his jacket or his

24  sweatshirt?  And what does he have on him?  He has only --

25  well, he's already lost the cell phone because Kevin

26  Taliaferro found that when it spun out at Portofino and he

559

1    is running from the police officer, Bill Sandri.

2         The only other thing he has is a wallet, which is

3    People's Exhibit 12, the driver's license of his brother,

4    first name H-i-e-u.  No money at all.  Not a dollar bill.

5    Receipts, papers, business cards.  There's a receipt from a

6    jewelry company made out to his brother dated April 16th,

7    2003.  This was actually almost a year before.  He's got a

8    lot of stuff, but he's got no money.

9         Now, where is the logical inference there?  The

10   logical inference is he kept the ID because he still wanted

11   to avoid the Federal warrant, but certainly he could have

12   gotten rid of the money.

13        Pure, kind of simple.  This one is what it looks

14   like.  It literally all fits.   Guilty, five times.

15        Thank you.

16        THE COURT:  All right, ladies and gentlemen, I

17   will give you your instructions at this point.  You can sit

18   back, relax.  You don't need to take notes because you are

19   going to have them in the jury room, and you couldn't keep

20   up with me anyway.

21        Members of the jury:

22        You have heard all the evidence and arguments of the

23   attorneys, and now it is my duty to instruct you on the law

24   that applies to this case.  The law requires that I read the

25   instructions to you.  You will have these instructions in

26   written form in the jury room to refer to during your

560

1    deliberations.

2        You must base your decision on the facts and the law.

3    You have two duties to perform.  First, you must determine

4    what facts have been proved from the evidence received in

5    the trial and not from any other source.  A "fact" is

6    something proved by the evidence or by stipulation.  A

7    stipulation is an agreement between attorneys regarding the

8    facts.

9        Second, you must apply the law that I state to you to

10    the facts, as you determine them, and in this way arrive at

11    your verdict and any finding you are instructed to include

12    in your verdict.

13        You must accept and follow the law as I state it to

14    you, regardless of whether you agree with it.  If anything

15    concerning the law said by the attorneys in their arguments

16    or at any other time during the trial conflicts with my

17    instructions on the law, you must follow my instructions.

18        You must not be influenced by pity for or prejudice

19    against a defendant.  You must not be biased against a

20    defendant because he has been arrested for this offense,

21    charged with a crime, or brought to trial.  None of these

22    circumstances is evidence of guilt and you must not infer or

23    assume from any or all of them that a defendant is more

24    likely to be guilty than not guilty.  You must not be

25    influenced by sentiment, conjecture, sympathy, passion,

26    prejudice, public opinion or public feeling.  Both the

Kathryn M. Lezchuk, C.S.R. No. 2302

561

1    People and the defendant have a right to expect that you

2    will conscientiously consider and weigh the evidence, apply

3    the law, and reach a just verdict regardless of the

4    consequences.

5         Now, if any rule, direction or idea is repeated or

6    stated in different ways in these instructions, no emphasis

7    is intended and you must not draw any inference because of

8    its repetition.  Do not single out any particular sentence

9    or any individual point or instruction and ignore the

10   others.  Consider the instructions as a whole and each in

11   light of all the others.

12        The order in which the instructions are given has no

13   significance as to their relative importance.

14        Statements of counsel, stricken evidence, insinuations

15   of questions and stipulated facts.

16        Statements made by the attorneys during the trial are

17   not evidence; however, if the attorneys have stipulated or

18   agreed to a fact, you must regard that fact as proven.

19        With regard to objections.

20        If an objection was sustained to a question, do not

21   guess as to what the answer might have been.  Do not

22   speculate as to the reason for the objection.

23        With regard to questions.

24        Do not assume to be true any insinuation suggested by

25   a question asked a witness.  A question is not evidence and

26   may be considered only as it helps you understand the

1   answer.  Do not consider for any purpose any offer of

2   evidence that was rejected or any evidence that was stricken

3   by the court; treat it as though you had never heard of it.

4        Now, you must decide all questions of fact in this

5   case from the evidence received in this trial and not from

6   any other source.

7        With regard to interpreters.

8        When a witness has testified through a certified court

9   interpreter, you must accept the English interpretation of

10  that testimony, even if you would have translated the

11  foreign language differently.

12       You must not independently investigate the facts or

13  the law or consider or discuss facts as to which there is no

14  evidence.  This means, for example, that you must not on

15  your own visit the scene, conduct experiments, or consult

16  reference works or persons for additional information.

17       You must not discuss this case with any other person

18  except a fellow juror and then only after the case is

19  submitted to you for your decision and only when all twelve

20  jurors are present in the jury room.

21       Regarding your use of notes.

22       Notes are only an aid to memory and should not take

23  precedence over recollection.  A juror who does not take

24  notes should rely on his or her recollection of the evidence

25  and not be influenced by the fact that other jurors do take

26  notes.  Notes are for the note-taker's own personal use in

563

1   refreshing his or her recollection of the evidence.

2        Finally, should any discrepancy exist between a

3   juror's recollection of the evidence and a juror's notes, or

4   between one juror's recollection and that of another, you

5   may request that the reporter read back the relevant

6   testimony, which must prevail.

7        Direct and circumstantial evidence.

8        Evidence consists of the testimony of witnesses,

9   writings, material objects, or anything presented to the

10  senses and offered to prove the existence or nonexistence of

11  a fact.

12       Evidence is either direct or circumstantial.

13       Direct evidence is evidence that directly proves a

14  fact.  It is evidence which by itself, if found to be true,

15  establishes that fact.  Circumstantial evidence is evidence

16  that, if found to be true, proves a fact from which an

17  inference of the existence of another fact may be drawn.

18       An inference is a deduction of fact that may logically

19  and reasonably be drawn from another fact or group of facts

20  established by the evidence.  It is not necessary that facts

21  be proved by direct evidence.  They may also be proved by

22  circumstantial evidence or by a combination of direct and

23  circumstantial evidence.  Both direct and circumstantial

24  evidence are acceptable as a means of proof.  Neither is

25  entitled to any greater weight than the other.

26       However, a finding of guilt as to any crime may not be

Kathryn M. Lezchuk, C.S.R. No. 2302

564

1    based on circumstantial evidence unless the proved

2    circumstances are not only, one, consistent with the theory

3    that the defendant was guilty of the crime but, two, cannot

4    be reconciled with any other rational conclusion.

5        Further, each fact which is essential to complete a

6    set of circumstances necessary to establish the defendant's

7    guilt must be proved beyond a reasonable doubt.  In other

8    words, before an inference essential to establish guilt may

9    be found to have been proved beyond a reasonable doubt, each

10   fact or circumstance on which the inference necessarily

11   rests must be proved beyond a reasonable doubt.

12       Also, if the circumstantial evidence as to any

13   particular count permits two reasonable interpretations, one

14   of which points to the defendant's guilt and the other to

15   his innocence, you must adopt that interpretation that

16   points to the defendant's innocence and reject that

17   interpretation that points to his guilt.

18       If, on the other hand, one interpretation of this

19   evidence appears to you to be reasonable and the other

20   interpretation to be unreasonable, you must accept the

21   reasonable interpretation and reject the unreasonable.

22       Evidence limited as to purpose.

23       The prosecution has offered evidence that the

24   defendant, in response to police questioning at the time of

25   his arrest, stated that he was not employed at the time.

26   This evidence may be not be used by you as evidence that it

1  is more likely than not that the defendant committed the

2  offenses for which he is charged for some economic gain

3  because he was unemployed.  The law does not permit and it

4  would not be proper for you as a juror to consider evidence

5  of a person's unemployment as a motive for the commission of

6  an economic crime such as theft or burglary.  This evidence

7  is admitted for the limited purpose of showing the defendant

8  was not employed in the Foster City area and was, therefore,

9  not present in the area because of his employment there.

10  Your consideration of the evidence must be limited to that

11  purpose for which it was admitted.

12      Secondly, there was evidence that there was a Federal

13  warrant for the arrest of the defendant on March 10th, 2004,

14  which was permitted in this trial.  You are not to speculate

15  as to the reason the warrant was issued.  The fact that the

16  defendant was wanted by Federal authorities is not to be

17  used by you as a form of negative character evidence from

18  which you can conclude that it is more likely than not that

19  the defendant is guilty of the crimes charged in this case

20  because he is a bad man and wanted by the Federal

21  government.  The evidence may be considered, however, for

22  other relevant purposes.

23      For example, another instruction given by me indicates

24  that flight of a person after the commission of a crime

25  might be evidence of consciousness of guilt of that person;

26  however, such evidence as the fact that the defendant had a

1  Federal warrant for his arrest might be an explanation for

2  why the defendant fled from the police before his arrest.

3  Whether you utilize this evidence for that purpose is a

4  matter for you to decide.

5       Production of all available evidence is not required.

6       Neither side is required to call as witnesses all

7  persons who may have been present at any of the events

8  disclosed by the evidence or who may appear to have some

9  knowledge of these events.  Neither side is required to

10 produce all objects or documents mentioned or suggested by

11 the evidence.

12      Unjoined perpetrators of the same crime.

13      There has been evidence in this case indicating that a

14 person other than the defendant was or may have been

15 involved in the crime for which the defendant is on trial.

16      There may be many reasons why that person is not here

17 on trial.  Therefore, do not discuss or give any

18 consideration as to why the other person is not being

19 prosecuted in this trial or whether he has been or will be

20 prosecuted.  Your sole duty is to decide whether the People

21 have proved the guilt of the defendant that is on trial

22 today.

23      Prior consistent or inconsistent statements as

24 evidence.

25      Evidence that at some other time a witness made a

26 statement or statements that is or are consistent or

567

1    inconsistent with his testimony in this trial may be

2    considered by you not only for the purpose of testing the

3    credibility of the witness but also as evidence of the truth

4    of the facts as stated by the witness on that former

5    occasion.   If you disbelieve a witness's testimony that he

6    or she no longer remembers a certain event, that testimony

7    is inconsistent with a prior statement or statements by him

8    or her describing that event.

9         Possession of stolen property.

10        If you find that a defendant was in conscious

11   possession of recently stolen property, the fact of that

12   possession is not by itself sufficient to permit an

13   inference that the defendant is guilty of the crime of

14   burglary and/or possession of stolen property.   Before guilt

15   may be inferred, there must be corroborating evidence

16   tending to prove defendant's guilt; however, this

17   corroborating evidence need only be slight and need not by

18   itself be sufficient to warrant an inference of guilt.

19        As corroboration you may consider the attributes of

20   possession, time, place and manner, that the defendant had

21   an opportunity to commit the crime charged, the defendant's

22   conduct, and any other evidence which tends to connect the

23   defendant with the crime charged.

24        Believability of witnesses.

25        Every person who testifies under oath or affirmation

26   is a witness.   You are the sole judges of the believability

Kathryn M. Lezchuk, C.S.R. No. 2302

1   of a witness and the weight to be given the testimony of

2   each witness.

3       In determining the believability of a witness, you may

4   consider anything that has a tendency reasonably to prove or

5   disprove the testimony of a witness, including, but not

6   limited to, any of the following:

7       The extent of the opportunity or ability of the

8   witness to see or hear or otherwise become aware of any

9   matter about which the witness has testified;

10      The ability of the witness to remember or to

11  communicate any matter about which the witness has

12  testified;

13      The character and quality of that testimony;

14      The demeanor and manner of the witness while

15  testifying;

16      The existence or nonexistence of a bias, interest or

17  other motive;

18      The existence or nonexistence of any fact testified to

19  by the witness;

20      The attitude of the witness toward this action or

21  toward the giving of testimony; and

22      A statement previously made by the witness that is

23  consistent or inconsistent with his or her testimony.

24      Now, discrepancies in a witness's testimony or between

25  a witness's testimony and that of other witnesses, if there

26  were any, do not necessarily mean that any witness should be

1   discredited.  Failure of recollection is common, and

2   innocent misrecollection is not uncommon.  Two persons

3   witnessing an incident or a transaction often will see or

4   hear it differently.  You should consider whether a

5   discrepancy relates to an important matter or only to

6   something trivial.

7        A witness willfully false.

8        A witness who was willfully false in one material part

9   of his or her testimony is to be distrusted in others.  You

10  may reject the whole testify of a witness who willfully has

11  testified falsely as to a material point, unless from all

12  the evidence you believe the probability of truth favors his

13  or her testimony in other particulars.

14       Weighing conflicting testimony.

15       You are not required to decide any issue of fact in

16  accordance with the testimony of a number of witnesses,

17  which does not convince you, as against the testimony of a

18  lesser number or other evidence which you find more

19  convincing.  You may not disregard the testimony of the

20  greater number of witnesses merely from caprice, whim, or

21  prejudice, or from a desire to favor one side against the

22  other.  You must not decide an issue by the simple process

23  of counting the number of witnesses.  The final test is not

24  in the number of witnesses but in the convincing force of

25  the evidence.

26       Sufficiency of testimony of one witness.

570

1      You should give the testimony of a single witness

2  whatever weight you think it deserves.   Testimony concerning

3  any fact by one witness, which you believe, is sufficient

4  for the proof of that fact.   You should carefully review all

5  the evidence upon which the proof of that fact depends.

6      Flight after crime.

7      The flight or attempted flight of a person immediately

8  after the commission of a crime, or after he is accused of a

9  crime, is not sufficient in itself to establish his guilt

10  but is a fact which, if proved, may be considered by you in

11  the light of all the other proved facts in deciding whether

12  a defendant is guilty or not guilty.   The weight to which

13  the circumstance is entitled is a matter for you to decide.

14      Defendant not testifying.

15      The defendant in a criminal trial has a constitutional

16  right not to be compelled to testify.   You must not draw any

17  inference from the fact that a defendant does not testify.

18  Further, you must neither discuss this matter nor permit it

19  to enter into your deliberations in any way.

20      In deciding whether or not to testify, the defendant

21  may choose to rely on the state of the evidence and upon the

22  failure, if any, of the People to prove beyond a reasonable

23  doubt every essential element of the crime charged against

24  him.   No lack of testimony on defendant's part will make up

25  for a failure of proof by the People so as to support a

26  finding against him on any essential element.

Kathryn M. Lezchuk, C.S.R. No. 2302

1    Admissions.

2    An admission is a statement made by the defendant

3    which does not by itself acknowledge his guilt of the crimes

4    for which the defendant is on trial but which statement

5    tends to prove his guilt when considered with the rest of

6    the evidence.

7    You are the exclusive judges as to whether the

8    defendant made an admission and, if so, whether that

9    statement is true in whole or in part.  Evidence of an oral

10    admission of the defendant, not made in court, should be

11    viewed with caution.

12    Now, what we call the corpus delicti rule.

13    No person may be convicted of a criminal offense

14    unless there is some proof of each element of the crime

15    independent of any admission by -- made by him outside of

16    this trial.

17    The identity of the person who is alleged to have

18    committed a crime is not an element of the crime.  That

19    identity may be established by an admission.

20    Expert testimony.

21    A witness who has special knowledge, skill,

22    experience, training or education in a particular subject

23    has testified to certain opinions.  This type of witness is

24    referred to as an expert witness.  In determining what

25    weight to give to any opinion expressed by an expert

26    witness, you should consider the qualifications and

1   believability of the witness, the facts or materials upon

2   which each opinion is based, and the reasons for each

3   opinion.

4        An opinion is only as good as the facts and reasons on

5   which it is based.  If you find that any fact has not been

6   proved, or has been disproved, you must consider that in

7   determining the value of the opinion.  Likewise, you must

8   consider the strengths and weaknesses of the reasons on

9   which it is based.

10       You are not bound by an opinion.  Give each opinion

11  the weight you find it deserves.  You may disregard any

12  opinion if you find it to be unreasonable.

13       Hypothetical questions.

14       In examining an expert witness, counsel nay ask a

15  hypothetical question.  This is a question in which the

16  witness is asked to assume the truth of a set of facts and

17  to give an opinion based on that assumption.

18       In permitting this type of question, the Court does

19  not rule, and does not necessarily find that all of the

20  assumed facts have been proved.  It only determines that

21  those assumed facts are within the possible range of the

22  evidence.  It is for you to decide from all the evidence

23  whether or not the facts assumed in a hypothetical question

24  have been proved.  If you should decide that any assumption

25  in a question has not been proved, you are to determine the

26  effect of that failure of proof on the value and weight of

573

1    that expert opinion based on the assumed facts.

2        Testimony of lay witnesses, by which we mean

3    non-expert witnesses.

4        In determining the weight to be given to an opinion

5    expressed by any witness who did not testify as an expert

6    witness, you should consider his or her believability, the

7    extent of his or her opportunity to perceive the matters

8    upon which his or her opinion is based and the reasons, if

9    any, given for it.  You are not required to accept an

10   opinion but should give it the weight, if any, to which you

11   find it entitled.

12       Presumption of innocence, reasonable doubt.

13       A defendant in a criminal action is presumed to be

14   innocent until the contrary is proved, and in case of a

15   reasonable doubt whether his guilt is satisfactorily shown,

16   he is entitled to a verdict of not guilty.  This presumption

17   places upon the People the burden of proving him guilty

18   beyond a reasonable doubt.

19       Reasonable doubt is defined as follows:  It is not a

20   mere possible doubt, because everything relating to human

21   affairs is open to some possible or imaginary doubt.  It is

22   that state of case which, after the entire comparison and

23   consideration of all the evidence, leaves the minds of the

24   jurors in that condition that they cannot say they feel an

25   abiding conviction of the truth of the charge.

26       Now, we have two classifications of crimes that we

1    talk about in this case.  First of all, we call one set

2    general criminal intent crimes, and the other ones we call

3    specific intent crimes.  First general criminal intent

4    crimes.

5        In the crimes charged in Counts 4 and 5, namely,

6    receiving stolen property, there must exist a union or joint

7    operation of act or conduct and general criminal intent.

8    General criminal intent does not require an intent to

9    violate the law.  When a person intentionally does that

10   which the law declares to be a crime, he is acting with

11   general criminal intent, even though he may not know that

12   his act or conduct is unlawful.

13       Specific intent.

14       In the crimes and allegations charged in Counts 1, 2

15   and 3, namely, residential burglary, attempted residential

16   -- I'm sorry, residential burglary, that's in two counts,

17   and attempted residential burglary, which is one count,

18   there must exist a union or joint operation of act or

19   conduct and a certain specific intent in the mind of the

20   perpetrator.  Unless this specific intent exists the crime

21   to which it relates is not committed.

22       The specific intent required is included in the

23   definition of the crimes set forth in the following

24   instructions.

25       First of all, definition of burglary.

26       Defendant is accused in Counts 1, 2 and 3 -- I am

1    sorry, 1 and 3 of having committed the crime of burglary, a

2    violation of Section 459 of the Penal Code.

3         Every person who enters any building with the specific

4    intent to steal, take, and carry away the personal property

5    of another of any value and with the further specific intent

6    to deprive the owner permanently of that property is guilty

7    of the crime of burglary, in violation of Penal Code Section

8    459.

9         It does not matter whether the intent with which the

10   entry was made was thereafter carried out.

11        In order to prove this crime, each of the following

12   elements must be proved:

13        1.  A person entered a building;  and

14        2.  At the time of the entry that person had the

15   specific intent to steal and take away someone else's

16   property and intended to deprive the owner permanently of

17   that property.

18        Definition of an attempt.

19        Defendant is accused in Count 2 of having committed

20   the crime of attempted burglary, a violation of Penal Code

21   Sections 664 and 459.

22        An attempt to commit a crime consists of two elements,

23   namely, a specific intent to commit the crime, and a direct

24   but ineffectual act done toward its commission.

25        In determining whether this act was done, it is

26   necessary to distinguish between mere preparation, on the

1    one hand, and the actual commencement of the doing of the

2    criminal deed, on the other.  The mere preparation, which

3    may consist of planning the offense or of devising,

4    obtaining or arranging the means for its commission, is not

5    sufficient to constitute an attempt.  However, acts of a

6    person who intends to commit a crime will constitute an

7    attempt where those acts clearly indicate a certain,

8    unambiguous intent to commit that specific crime.  These

9    acts must be an immediate step in the present execution of

10   the criminal design, the progress of which would be

11   completed unless interrupted by some circumstance not

12   intended in the original design.

13        Degrees of burglary.

14        If you should find the defendant guilty of burglary

15   and/or attempted burglary, you must determine the degree

16   thereof and state that degree in your verdict.

17        There are two degrees of burglary.  Every burglary of

18   an inhabited dwelling house is a burglary of the first

19   degree.

20        All other kinds of burglary are of the second degree.

21        An inhabited dwelling house is a structure which is

22   currently used as a dwelling, whether occupied or not.  It

23   is inhabited although the occupants are temporarily absent.

24        Receiving stolen property defined.

25        Counsel, I found a repetition, a typographical error

26   in the sentence, the third sentence of the second paragraph,

577

1   which I have blacked out, so it currently reads as:

2         Defendant is accused in Counts 4 and 5 of having

3   committed the crime of receiving stolen property, a

4   violation of Section 496, subdivision (a) of the Penal Code.

5         Every person who buys or receives any property which

6   has been stolen or which has been obtained by theft, knowing

7   the property to be so stolen or so obtained, is guilty of

8   the crime of receiving stolen property in violation of Penal

9   Code Section 496(a).

10        In order to prove this crime, each of the following

11  elements must be proved:

12        1.   A person received property which had been stolen;

13  and,

14        2.   That person actually knew the property was stolen

15  or obtained by theft at the time he received the property.

16        Now, each count charges a distinct crime.   You must

17  decide each count separately.   The defendant may be found

18  guilty or not guilty of any or all of the crimes charged.

19  Your finding as to each count must be stated in a separate

20  verdict.

21        Next you'll be glad to hear a series of closing

22  instructions.

23        I have not intended by anything I have said or done,

24  or by any questions I may have asked, or by any ruling I may

25  have made, to intimate or suggest what you should find to be

26  the facts, or that I believe or disbelieve any witness.

578

1        If anything I have said or done has seemed to so

2    indicate, you will disregard it and form your own

3    conclusion.

4        All of these instructions are not necessarily

5    applicable.

6        The purpose of the Court's instructions is to provide

7    you with the applicable law so that you may arrive at a just

8    and lawful verdict.  Whether some instructions apply will

9    depend upon what you find to be the facts.  Disregard any

10   instruction which applies to facts determined by you not to

11   exist.  Do not conclude that because an instruction has been

12   given I am expressing an opinion as to the facts.

13       Now, the People and the defendant are entitled to the

14   individual opinion of each juror.

15       Each of you must consider the evidence for the purpose

16   of reaching a verdict if you can do so.  Each of you must

17   decide the case for yourself but should do so only after

18   discussing the evidence and instructions with the other

19   jurors.

20       Do not hesitate to change an opinion if you are

21   convinced it is wrong; however, do not decide any question

22   in a particular way because a majority of the jurors, or any

23   of them, favor that decision.

24       I always hesitate when I read this next sentence,

25   because I have always considered it an insult to jurors, but

26   I have read of a couple of cases recently where it happened,

1    so I have to read it.

2        Do not decide any issue in this case by the flip of a

3    coin or by any other chance determination.

4        Now, how jurors should approach their task.

5        The attitude and conduct of jurors at all times are

6    very important.  It is rarely helpful for a juror at the

7    beginning of deliberations to express an emphatic opinion on

8    the case or to announce a determination to stand for a

9    certain verdict.  When one does that at the outset, a sense

10    of pride may be aroused and one may hesitate to change a

11    position even if shown it is wrong.  Remember, you are not

12    partisans or advocates in this matter.  You are, rather,

13    impartial judges of the facts.

14        Do not consider penalty.

15        In your deliberations, do not discuss or consider the

16    subject of penalty or punishment.  That subject must not in

17    any way affect your verdict.

18        During deliberations, any question or request you may

19    have should be addressed to the Court on a form that will be

20    provided.

21        If there is any disagreement as to the actual

22    testimony, you have the right, if you choose to, to request

23    a readback by the reporter.  You may request a partial or

24    total readback, but any readback should be a fair

25    presentation of that evidence.  If a readback of testimony

26    is requested, the reporter will delete objections, rulings

1   and sidebar conferences so that you will hear only the

2   evidence that was actually presented.

3        Please understand that counsel must first be

4   contacted, and it may take time to provide a response or

5   readback.   Continue deliberating until you are called back

6   into the courtroom.

7        Now, the instructions which I am giving you now will

8   be given to you, be made available in written form for your

9   deliberations.   They must not be defaced in any way.

10        You will find that the instructions may be typed,

11   printed or handwritten.   Portions may have been added or

12   deleted.   You must disregard any deleted part of an

13   instruction and not speculate as to what it was or as to the

14   reason for its deletion.   You are not to be concerned with

15   the reasons for any modification.

16        Every part of the text of an instruction, whether

17   typed, printed or handwritten, is of equal importance.   You

18   are to be governed only by the instruction in its final

19   wording.

20        Admonition against disclosure of jury balloting.

21        Do not discuss -- it should say with anyone -- I'm

22   sorry, misreading a word.

23        Do not disclose to anyone outside the jury, not even

24   to me or any member of my staff, either orally or in

25   writing, as to how you may be divided numerically in your

26   balloting as to any issue, unless I specifically direct

Kathryn M. Lezchuk, C.S.R. No. 2302

581

1    otherwise.

2         You shall now shortly retire and select one of your

3    number to act as foreperson.  He or she will preside over

4    your deliberations.  In order to reach verdicts, all twelve

5    jurors must agree to the decision and to any finding you

6    have been instructed to include in your verdict.  As soon as

7    you have agreed upon a verdict, so that when polled each may

8    state truthfully that the verdicts express his or her vote,

9    have it or them dated and signed by your foreperson and then

10   return with it or them to this courtroom.  Return also any

11   unsigned verdict forms.

12        Now, of course, you will be permitted to separate at

13   the noon and evening recesses.  During your absence the

14   courtroom will be locked.  You are to return following the

15   recesses at the times announced and on the next succeeding

16   court date.  During periods of recess, you must not discuss

17   with anyone any subject connected with this trial, and you

18   must not deliberate further upon the case until all twelve

19   of you are together and reassembled in the jury room.

20        As to our alternate juror, you are still bound by the

21   admonition you are not to converse with anyone else on any

22   subject connected with this trial and you are not to form or

23   express any opinion on it until the case submitted to you,

24   which means until such time as you are substituted in for

25   one of the twelve jurors now deliberating on the case.  This

26   also means you are not to decide how you would vote if you

582

1    were deliberating with the other jurors.

2        Now, ladies and gentlemen, it's quarter to 5:00.

3        Obviously your deliberations will go on tomorrow.

4    Tomorrow I have been for a long time scheduled to handle a

5    calendar in the Central District Courthouse in San Mateo, so

6    I will not be with you tomorrow.  Judge Shelton, who is my

7    next-door neighbor here, will stand in for me and conduct

8    any proceedings that are necessary; and, of course, if there

9    are any questions asked that he wants my help on or counsel

10   want to discuss with me, I will be available by telephone.

11       Finally, ladies and gentlemen, I want to discuss very

12   briefly with you the verdict forms that you will be given

13   when you go into the jury room.

14       Basically, there are two verdict forms for each

15   count.  There is one that reads guilty.  For instance, I'm

16   looking at the first one, in no particular order, except

17   we're talking about Count 1 first.

18       It says:  We, the jury in the above-entitled cause,

19   find the defendant -- it gives the name -- guilty of

20   burglary.  And then it's paren, the address to which Count 1

21   is addressed, 361 Beach Park Boulevard, in violation of, and

22   then it tells what the Penal Code Section is, 459, as

23   charged in Count 1 of the Information.

24       And in the event this were the guilty verdict:  We

25   further find that the burglary was of the, and then you have

26   the choice of saying first or second.  Write in there the

Kathryn M. Lezchuk, C.S.R. No. 2302

583

1  degree.  If that was your verdict on that count, the

2  foreperson would date and sign that verdict form and leaving

3  the corresponding not guilty verdict of the same count

4  blank, but return it to the courtroom.  Okay?

5      And it goes through each count, guilty or not guilty,

6  refers to the address, tells you what the violation is in

7  common language and by the Penal Code Section.  So all you

8  need to do is read these, and hopefully you will not be

9  confused as to which verdict form goes with which count.

10     At this point, then, I will have the clerk swear the

11  bailiff.

12     (Whereupon the bailiff was sworn by the clerk to take

13  charge of the jury during deliberations.)

14         THE COURT:  All right.  If our twelve jurors

15  will go with Deb.  I would suggest to you at this late hour

16  maybe what you want to do is decide what time you want to

17  start tomorrow.  Tell Deb so that I can pass that on to the

18  attorneys.

19     And please remember that while you are in recess you

20  are not to discuss the case with anyone else.  Don't discuss

21  it with any other jurors until and unless all twelve of you

22  are back in the jury room so everybody has the benefit of

23  everybody's thinking.  If you think of something during the

24  evening, don't call up some other juror but write a note so

25  you can talk about it when you're all twelve in the jury

26  room.

584

1          Tomorrow you will find the instructions, the evidence,

2    and the jury verdict forms in a binder.

3          (The jurors retired to commence deliberations.)

4          THE COURT:  And, ALTJ01.XXX, if you will stand

5    by for just a second.  Did you happen to write down all the

6    phone numbers we would need to contact you?

7          ALTERNATE JUROR NO. 1:   I did.

8          THE COURT:  Would you give them to the clerk.

9          ALTERNATE JUROR NO. 1:  Yes.

10         THE COURT:  Do you have them all ready?

11         ALTERNATE JUROR NO. 1:  No.

12         THE COURT:  You can do that now.

13         All right.  ALTJ01.XXX, if we don't see you again, I

14   want to thank you on behalf of everybody involved for the

15   time and effort you have put into the case.

16         ALTERNATE JUROR NO. 1:   Okay.

17         THE COURT:  We don't know whether we will see

18   you again.  We might.  We will preserve your notes in case

19   we call you back.  If you will leave your badge here, and

20   the clerk will call you as soon as we have a verdict, a

21   resolution, so you will know you are released from any

22   further admonitions.

23         If we don't see you again, thank you so much for being

24   with us.

25         ALTERNATE JUROR NO. 1:   Thank you.

26         THE COURT:  Please leave your badge here.   Thank

Kathryn M. Lezchuk, C.S.R. No. 2302

585

1    you.

2              (Alternate juror exited the courtroom.)

3              THE COURT:  All right.  We're outside the

4    presence of any other jurors.

5         Mr. Bell, what is your client's pleasure as to a

6    finding on the prior felony in the event there is a

7    conviction?

8              MR. BELL:  I have discussed it with Mr. Khuu on

9    several occasions and again today.  He has decided he wants

10   to waive his right to a jury trial with regard to the

11   findings required as to the prior conviction, both as to the

12   five-year prior and as to the strike.

13             THE COURT:  Okay.

14        You understand that, Mr. Khuu, what he is talking

15   about?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  You understand that you have the

18   right to a jury trial as to the fact of the prior

19   conviction.  I'm not so sure about whether it is a strike.

20   I think that's a matter of law, but in any event, you have a

21   right to a jury trial as to whether you suffered that

22   conviction.  You wish to waive that right so that I will

23   decide the question of whether you suffered a prior

24   conviction after a hearing and a review of the evidence at a

25   later date?

26             THE DEFENDANT:  Yes, sir.

586

1          THE COURT:  All right.  I'll find the defendant

2   has made a knowing and intelligent, voluntary waiver of his

3   right to a jury trial on the prior, and I will accept that,

4   order it entered.

5          It would be my intention, folks, to conduct that trial

6   in the event there is a conviction --

7          I guess it would be any count, Ms. Allhiser.

8          MS. ALLHISER:  Yes, Your Honor.

9          MR. BELL:  No.  The 667 doesn't apply to 496, I

10  don't think.

11         MS. ALLHISER:  But the doubling effect would

12  apply even to a receiving stolen property.

13         THE COURT:  It would be my intention to have the

14  court trial and receive evidence on the fact of the prior

15  conviction and also to receive the -- any other briefs from

16  the defense on the issue set forth in People's Trial Motion

17  No. 1 as to whether the Federal felony conviction would be a

18  strike under the laws of the State of California, and I

19  would receive evidence, arguments, briefs and decide all

20  that at the time of sentencing.

21         MR. BELL:  That's fine, Your Honor.  Thank you.

22         THE COURT:  Time would be waived, then, for that

23  purpose, and for sentencing?

24         MR. BELL:  Yes.

25         THE COURT:  Okay.  All right, folks.  I guess

26  that's it for tonight.

Kathryn M. Lezchuk, C.S.R. No. 2302

587

1              THE BAILIFF:  9:00 a.m.

2              THE COURT:  So we need to have the defendant

3     available.  I'm always in a quandary about this.  He doesn't

4     have to be here when the jury comes back.  Indeed, counsel

5     don't have to be here when the jury comes back.  We don't

6     necessarily bring them through here.  We bring them around

7     the side hall to the jury room.  You need to be available to

8     us by telephone.

9              MR. BELL:  I will be available in Redwood City

10    all day tomorrow.  I will give Francoise my telephone

11    number.

12             THE COURT:  Are you going to be in your office?

13             MS. ALLHISER:  Yes.

14             MR. BELL:  And I am right across from the

15    courthouse anyway.

16             THE COURT:  I am giving Judge Shelton a copy of

17    the verdict forms so he will know what the issues are and

18    also my cell phone number and the courtroom I will be in at

19    Central in case for some reason my cell phone is turned off,

20    because I wouldn't want it on while I am in the courtroom.

21    So, call if there are any questions.  I will have to do what

22    is necessary, including I could come back if I had to.

23         And defendant need not be dressed, but we need him in

24    a position to be dressed in short order if we need him for a

25    question or readback or something like that.

26             TRANSPORTATION DEPUTY:  Right.

588

1          THE COURT:   Okay.   All right, folks.   Thank you.

2          MR. BELL:   Thank you, Your Honor.

3          MS. ALLHISER:   Thank you.

4               (Court stood in recess.)

5                    ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

589

P r o c e e d i n g s

Redwood City, California

Morning Session                Wednesday, September 8, 2004

    (The jury continued deliberations.)

    (The following proceedings were held before Judge

Shelton in open court, in the presence of the jury.)

        THE COURT:  Good morning, ladies and

gentlemen.

        JURORS IN UNISON:  Good morning.

        THE COURT:  For some of you, you're seeing Judge

Schwartz has changed his appearance overnight, but I'm

sitting in for him, in case you haven't been warned that

that would happen.  He's doing other duties today.

    I understand the People have a motion -- for the

record, I will note that all the jurors are present in their

proper places; the parties are all present, also in their

proper places.  Also for the record, will you both state

your appearances.

        MS. ALLHISER:  Mary Allhiser for the People.

        MR. BELL:  Frank Bell on behalf of Hoa Khuu.

        THE COURT:  Thank you.

        MS. ALLHISER:  Your Honor, I respectfully -- the

People need to correct an error.  I made the error in the

closing argument.  I have communicated this to Mr. Bell.

Mr. Bell and I have agreed to a resolution to fix the

error.  Respectfully, I now move to reopen the evidence in

Kathryn M. Lezchuk, C.S.R. No. 2302

590

1    the case, Your Honor, to permit us to file a written

2    stipulation to correct the error.

3              THE COURT:  No objection, I'll grant the motion.

4              MR. BELL:  No objection, Your Honor.

5              THE COURT:  It's granted.

6              MS. ALLHISER:  Does the Court have the original?

7              THE COURT:  Yes, I do.  I will order it filed

8    and have it sent in to the jury.

9              MS. ALLHISER:  Thank you, Your Honor.

10             THE COURT:  All right.  There is nothing else,

11   we will send the jury back to continue their work.

12             MS. ALLHISER:  Thank you, Your Honor.

13             THE COURT:  Thank you very much.  You may go

14   back.

15        (The jury retired to continue deliberations.)

16        (The jury returned the courtroom at 10:30 a.m.)

17             THE COURT:  Good morning again, ladies and

18   gentlemen.  I apologize for the delay, but I am doing double

19   duty, so I had to get through that.

20        And I understand that the jury has reached a verdict.

21   And who is your foreperson?

22        And that's TRJ03.XXXXX?

23             JUROR NO. 3:  Yes.

24             THE COURT:  And do you have the verdict form?

25             JUROR NO. 3:  (Nods head.)

26             THE COURT:  Give it to the bailiff.

1    (Pause.)

2            THE COURT:  The clerk will now read the

3    verdicts.

4            THE CLERK:  In the Superior Court of the State

5    of California, in and for the County of San Mateo, the

6    People of the State of California, plaintiff, versus Hoa

7    Trung Khuu, defendant.  Verdict.

8        We, the jury in the above-entitled cause, find the

9    defendant Hoa Trung Khuu guilty of burglary, 361 Beach Park

10   Boulevard, in violation of Penal Code Section 459, as

11   charged in Count 1 of the Information, and further find the

12   burglary was of the first degree.

13       Dated:  September 8, 2004.

14       Signed:  TRJ03.XXXXX, jury foreperson.

15       In the Superior Court of the State of California, in

16   and for the County of San Mateo, the People of the State of

17   California, plaintiff, versus Hoa Trung Khuu, defendant.

18   Verdict.

19       We, the jury in the above-entitled cause, find the

20   defendant Hoa Trung Khuu guilty of attempted burglary, 57

21   Williams Lane, in violation of Penal Code Section 664/459,

22   as charged in Count 2 of the Information, and further find

23   that the attempted burglary was of the first degree.

24       Dated:  September 8, 2004.

25       Signed:  TRJ03.XXXXX, jury foreperson.

26       In the Superior Court of the State of California, in

1  and for the County of San Mateo, the People of the State of

2  California, plaintiff, versus Hoa Trung Khuu, defendant.

3  Verdict.

4      We, the jury in the above-entitled cause, find the

5  defendant Hoa Trung Khuu guilty of burglary, 1295 Beach Park

6  Boulevard, in violation of Penal Code Section 459, as

7  charged in Count 3 of the Information, and further find that

8  burglary was of the first degree.

9      Dated:  September 8, 2004.

10     Signed:  TRJ03.XXXXX, jury foreperson.

11     In the Superior Court of the State of California, in

12  and for the County of San Mateo, the People of the State of

13  California, plaintiff, versus Hoa Trung Khuu, defendant.

14  Verdict.

15     We, the jury in the above-entitled cause, find the

16  defendant Hoa Trung Khuu guilty of receiving stolen

17  property, Pamela and George Hung, in violation of Penal Code

18  Section 496, as charged in Count 4 of the Information.

19     Dated:  September 8th, 2004.

20     Signed:  TRJ03.XXXXX, jury foreperson.

21     In the Superior Court of the State of California, in

22  and for the County of San Mateo, the People of the State of

23  California, plaintiff, versus Hoa Trung Khuu, defendant.

24  Verdict.

25     We, the jury in the above-entitled cause, find the

26  defendant Hoa Trung Khuu guilty of receiving stolen

1   property, Sharon and Yao Chi, in violation of Penal Code

2   Section 496, as charged in Count 5 of the Information.

3           Dated:   September 8, 2004.

4           Signed:   TRJ03.XXXXX, jury foreperson.

5               THE COURT:   Do the People wish the jury polled?

6               MS. ALLHISER:   I'm sorry, Your Honor?

7               THE COURT:   Do you wish to have the jury polled?

8               MS. ALLHISER:   The People have no request.

9               MR. BELL:   Your Honor, I would so request that

10  the jury be polled.

11              THE COURT:   Okay.

12      Ladies and gentlemen, the clerk will now read the

13  verdict on each of the counts; and after she has read it,

14  she will ask you whether or not the verdict reflects -- does

15  or does not reflect your ruling.   If it does not reflect

16  your ruling, stand up.   If it does reflect your ruling,

17  remain seated.

18              THE CLERK:   Do you want me to say their name?

19              THE COURT:   What I am having done, anybody who

20  stands up, they will indicate their name.   If everybody

21  remains seated, that is an indication that everybody agrees

22  with the verdict.   You all understand that, don't you?

23              JURORS IN UNISON:   (Nods head.)

24              THE CLERK:   As to Count 1, guilty verdict of

25  Penal Code Section 459, Juror No. 1, is this your true and

26  correct verdict?

594

1          THE COURT:  No.  All we need to do is read the

2    verdicts; and then if it is your true and correct verdict,

3    you should all remain seated.  If it is not, stand up.

4          THE CLERK:  Okay.  So, we, the jury in the

5    above-entitled cause, find the defendant Hoa Trung Khuu

6    guilty of burglary, in violation of Penal Code Section 459,

7    as charged in Count 1 of the Information.

8          THE COURT:  You all agree to that, that that

9    vote reflects your vote?  If you do not agree, stand up.

10          No one is standing up.

11          Next count.

12          THE CLERK:  We, the jury in the above-entitled

13    cause find the defendant Hoa Trung Khuu guilty of attempted

14    burglary, in violation of 664/459, as charged in Count 2.

15          THE COURT:  If that verdict reflects your vote,

16    remain seated.  If it does not, stand up.

17          No one is standing up.

18          THE CLERK:  We, the jury in the above-entitled

19    cause, find the defendant Hoa Trung Khuu guilty of Penal

20    Code Section 459, as charged in Count 3.

21          THE COURT:  If that verdict reflects your vote,

22    remain seated.  If it does not, stand up.

23          No one was standing.

24          THE CLERK:  We, the jury in the above-entitled

25    cause, find the defendant Hoa Trung Khuu guilty of receiving

26    stolen property, in violation of 459, as charged in Count 4.

595

1          THE COURT:  Does that verdict reflect your

2    vote?  If it does, remain seated.  If it does not, stand up,

3    please.

4          No one is standing.

5          THE CLERK:  We, the jury in the above-entitled

6    cause, find the defendant Hoa Trung Khuu guilty of receiving

7    stolen property, in violation of Penal Code 496, as charged

8    in Count 5.

9          THE COURT:  If that verdict as read reflects

10   your vote, remain seated.  If it does not, please stand.

11         No one is standing.

12         You may record the poll.

13         And before I go any further, would counsel both

14   approach the bench.

15         (Unreported discussion at the Bench.)

16         THE COURT:  The verdicts will be recorded,

17   entered, and that will be made in accord.

18         Ladies and gentlemen, we thank you for your service

19   and the time and patience you have given this matter.  We

20   appreciate it, and Judge Schwartz wished me to express his

21   appreciation for your service and for the fact that it has

22   been a pleasure in working with you for the last few days.

23         You are excused, and the admonition that Judge

24   Schwartz gave you before about not talking to anybody about

25   the case, discussing it, no longer applies.  You may speak

26   to anyone you wish to.  You may refuse to speak to anyone if

Kathryn M. Lezchuk, C.S.R. No. 2302

596

1   that's your choice.

2       The Deputy District Attorney and defense attorney

3   sometimes like to debrief juries.  If you are into that, and

4   you want to wait for that today, you can probably wait

5   outside.  If not, have a good day.

6       (The following proceedings were held in open court,

7   out of the presence of the jury.)

8           THE COURT:  All right.  We will send this matter

9   along to the Probation Department for a report, and I

10  understand there has been a time waiver, and it's been on

11  the record.

12          MR. BELL:  Yes, Your Honor.  The defendant has

13  previously waived time, and I think, as we indicated at the

14  bench, he has already waived his right to a jury trial on

15  the priors.

16      Do you want us to pick a date in open court?  I'm

17  requesting the 29th of October at nine o'clock for

18  sentencing.

19          THE COURT:  Is that an acceptable date?

20          THE CLERK:  We are not available in the morning,

21  but we are available in the afternoon on that day.

22          MR. BELL:  That would be fine.

23          THE CLERK:  At 2:00 p.m.?

24          MR. BELL:  That will be fine.

25          THE COURT:  Is that good for everybody?

26          MS. ALLHISER:  It is.  Thank you.

597

1              THE COURT:  I gather Judge Schwartz already took

2     the waiver of the plea on the priors.

3              MS. ALLHISER:  He did.

4              MR. BELL:  He did.

5              THE COURT:  All right.  Then thank you very

6     much.

7              MS. ALLHISER:  Thank you, Your Honor.

8                      (Court stood in recess.)

9                          ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Kathryn M. Lezchuk, C.S.R. No. 2302

598

P r o c e e d i n g s

Redwood City, California

1

2

3  Morning Session                    Monday, October 4, 2004

4                          ---oOo---

5            THE COURT:  People vs. Khuu.

6            MR. BELL:  Frank Bell on behalf of Mr. Khuu.  He

7  is present in custody.

8            MR. PITT:  Morley Pitt on behalf of the People,

9  and I apologize for the delay.  Ms. Allhiser asked me to

10  cover this matter, and I forgot.

11            THE COURT:  I didn't even know there was a

12  delay.  You should never confess unless you're charged with

13  something.

14            MR. PITT:  If you're innocent, you shouldn't

15  worry.

16            THE COURT:  You can save it for the next one.

17            MR. BELL:  I understand there was some concern

18  about the presently set sentencing date of August 29.

19        Ms. Allhiser and I, through your clerk, had a

20  discussion of the new date and time, and we settled on

21  November 19th, which would be three weeks and also on a

22  Friday.  I don't know whether you prefer 9:00 or 2:00, but

23  either one would work for me.

24            THE COURT:  Actually, 9:00 is better than 2:00.

25  It could be 9:00 or 4:00.

26            MR. BELL:  9:00 is better, actually, if we can

Kathryn M. Lezchuk, C.S.R. No. 2302

599

1    do it.

2                THE COURT:  Is that all right with the People?

3                MR. PITT:  That would be fine.

4                MR. BELL:  There is an issue about proving up a

5    prior.

6                THE COURT:  Okay.

7                MR. BELL:  I don't know.  I just wanted to make

8    sure that that nine o'clock would work.

9                THE COURT:  All right.  9:00 a.m. on Friday,

10   November 19th.

11               MR. BELL:  Mr. Khuu has previously waived time

12   and continues to waive time; is that correct, Mr. Khuu?

13               THE DEFENDANT:  Yes, sir.

14               THE COURT:  Okay.  And that's the day before the

15   Big Game, so wear your blue and gold tie.

16               MR. BELL:  Absolutely.  Go Bears.

17               THE COURT:  See you then.  Thank you.

18                    (Court stood in recess.)

19                         ---oOo---

20

21

22

23

24

25

26

Kathryn M. Lezchuk, C.S.R. No. 2302

600

P r o c e e d i n g s

Redwood City, California

Morning Session               Friday, October 29, 2004

---o0o---

THE COURT:  All right.  This is People vs.
Khuu.

MR. BELL:  Yes, Your Honor.  Frank Bell on
behalf of Mr. Khuu.  He is present in custody.

MS. ALLHISER:  Mary Allhiser for the People,
Your Honor.

THE COURT:  Okay.  And for the record, Mr. Bell
has given me a copy of the Choices letter with respect to
the defendant, which I will place in the file, and I'll read
it again when I get the probation report.

I have read the motion.  Anything else you want to
add, Mr. Bell?

MR. BELL:  No, Your Honor.  I'll submit it.

THE COURT:  All right.

MR. BELL:  I would like to say this:  If the
Court should decide that I'm going to continue as counsel, I
would ask the Court to consider just moving the sentencing
actually up one day to the 18th rather than the 19th, but
you haven't ruled yet, so . . . .

THE COURT:  Anything you want to say on the
motion, Ms. Allhiser?

MS. ALLHISER:  No, Your Honor.  I don't think

Kathryn M. Lezchuk, C.S.R. No. 2302

601

1   it's the People's business at all.

2           THE COURT:  Okay.  I've considered it carefully,

3   and I really do not want to experience the delay, in view of

4   what's left to do, that would be attendant upon relieving

5   Mr. Bell.  I hate to see lawyers without pay; and having

6   been in private practice myself, I understand why that's not

7   a pleasant thing to do, but given the alternatives, and

8   given the fact that the only thing left to do is appearance

9   at the sentencing, a court trial on the Federal crime, which

10  I think will be mainly a paper exercise and perhaps some

11  research by myself with regard to whether it would

12  constitute a strike under the California statutes --

13          Do you have any authority on that, Ms. Allhiser?

14          MR. BELL:  She has submitted an extensive trial

15  brief.

16          THE COURT:  I don't need to know what it is.  I

17  couldn't remember it for another 20 minutes.  Something I

18  can read?

19          MS. ALLHISER:  Yes, I think it's denominated

20  Trial Motion.

21          MR. BELL:  I've looked it over.  Just for your

22  information, I don't intend to file anything.  I think she

23  has carefully discussed all of the authorities in there, and

24  it's very complete.

25          THE COURT:  So the only thing, then, would be

26  the sentencing hearing which, obviously, is most times

602

1    orally, and a _Romero_ motion, which can be done orally.  If

2    you want to file something, I'll read it.  Under those

3    circumstances, I am going to deny the motion.

4        And we're on for, you said, November 19th.

5            MR. BELL:  Presently we're on for the 19th.  I'm

6    asking the Court, if you're available, I wonder if we can

7    move it up one day.  I have been asked to make an appearance

8    on the morning of the 19th.  If we could try it on the 18th,

9    if you're available.

10            THE COURT:  I don't think that would be a

11    problem.  Let me see here.

12        Okay.  Would it be okay to do it at 10:00 a.m.?

13            MR. BELL:  Sure.

14            THE COURT:  I've got settlement conferences that

15    day, but they'll just have to wait.

16        Oh, on second thought, since I do have settlement

17    conferences that day, let's do it at 9:00 --

18            MR. BELL:  All right.  Thank you.

19            THE COURT:  -- on the 18th.

20        Is that all right with you, Ms. Allhiser?

21            MS. ALLHISER:  Yes, Your Honor.

22            THE COURT:  Advance it one day to November 18th.

23            MR. BELL:  I'll notify Probation.

24            THE COURT:  Thank you, folks.

25                (Court stood in recess. )

26                    ---o0o---

1              P r o c e e d i n g s

2                              Redwood City, California

3    Morning Session            Thursday, November 18, 2004

4                        ---oOo---

5              THE COURT:  All right.  People vs. Khuu.

6    Appearances.

7              MR. GRANDSAERT:  Jack Grandsaert for the People.

8              MR. BELL:  Good morning, Your Honor.  Frank Bell

9    on behalf of Mr. Khuu.  He is present in custody.

10             THE COURT:  All right.  This is the time set

11   aside for the trial on the prior conviction, hearing on the

12   motions, including the <u>Romero</u> motion and the motion to

13   determine the equivalence of the prior Federal offense to a

14   serious felony offense in California, and for sentencing.

15        So why don't we take up the court trial on prior

16   conviction first.

17                  (People's Exhibit No. 29, Judgment of Federal

18                  Court;  No. 30, Plea Agreement; No. 31, Jail

19                  Property Slip and Booking Photograph of Hoa

20                  Khuu, marked for Identification only.)

21             MR. GRANDSAERT:  Thank you, Your Honor.

22        Your Honor, I have previously asked to have marked for

23   identification three exhibits I have shown to counsel.  The

24   first, Exhibit 29, is a certified copy of a judgment of the

25   Federal Court, United States v. Trung Hoa Khuu.

26             THE COURT:  I assume these are all the same

604

1    documents that were attached to the motion.

2              MR. GRANDSAERT:  Yes, Your Honor.  These are

3    certified as opposed to the photocopies.

4        Exhibit 30, being a certified copy of the plea

5    agreement.

6        And Exhibit 31, being a certified copy of a jail

7    property slip, dated March 10th, 2004, together with a

8    certified copy of a booking photo of the same date.

9              THE COURT:  I'm just checking these.  I'm sure

10   I've seen all of these before, except maybe the jail

11   property slip.  Is that just for the photo?

12             MR. GRANDSAERT:  It's for the photo and the

13   signature, Your Honor.

14             THE COURT:  And you're offering those in

15   evidence?

16             MR. GRANDSAERT:  I am.

17             THE COURT:  Any objection?

18             MR. BELL:  Your Honor, I'm going to submit it.

19             THE COURT:  All right.  The exhibits marked

20   People's 29, 30 and 31 will be admitted.

21                  (People's Exhibit Nos. 29, 30 and 31,

22                   previously marked for Identification, received

23                   in Evidence.)

24             THE COURT:  And I've compared the signatures on

25   31 and the plea agreement 30, and they appear to be the same

26   signature of the defendant.

1          MR. GRANDSAERT:  Then with that the People rest,

2     Your Honor.

3          THE COURT:  Mr. Bell.

4          MR. BELL:  We have no evidence or witnesses,

5     Your Honor.

6          THE COURT:  All right.  Is the matter submitted?

7          MR. BELL:  Yes.

8          MR. GRANDSAERT:  Yes, Your Honor.

9          THE COURT:  I find that the allegation with

10    regard to defendant's prior conviction pursuant to Penal

11    Code Section 667(a) to be true.

12         Next, the motion to determine equivalence.  I have

13    read and considered the People's request for judicial notice

14    of the record of the Federal conviction and the points and

15    authorities.

16         Any argument, Mr. Grandsaert?

17         MR. GRANDSAERT:  I have no further argument on

18    that, Your Honor.

19         THE COURT:  And Mr. Bell?

20         MR. BELL:  No, Your Honor.  I would submit it.

21         THE COURT:  I find that the defendant's prior

22    Federal offense qualifies as a serious felony in California

23    for purposes of Penal Code Section 1170.12.  I think it was

24    (c)(1) is the appropriate subsection.

25         And then on the Romero motion, the Court has read the

26    defendant's motion to strike the prior pursuant to Penal

606

1    Code Section 1385, and the People's opposition.

2         Argument, Mr. Bell?

3         MR. BELL:  Your Honor, I know that there was one

4    matter that I didn't really adequately address.  The People

5    have argued that there was a list of potential target homes

6    in the Foster City area.  I think the Court is aware of that

7    from the trial evidence.  I submit to the Court that there

8    is no evidence to connect Mr. Khuu directly to that list.  I

9    mean, he was with another person by the name of Mr. Bui.

10        There has never been any attempt to link his

11   handwriting to that list.  These were papers, according to

12   the evidence, that were most likely dropped by Mr. Bui in

13   his escape from -- from the authorities on that day.

14        I realize that I might be taking Mr. Grandsaert a

15   little bit by surprise here because he didn't try the case,

16   but I submit that the Court heard the evidence and knows

17   that what I'm arguing is essentially true.

18        So to the extent that the argument against the Romero

19   motion is based on the fact that there was this list of

20   properties discovered, I don't know that they can be

21   attributed to Mr. Khuu.  It is more attributable, I submit,

22   to Mr. Bui.

23        He has only one prior strike felony, which was --

24   which was a case in which he was a relatively minimal

25   participant.  He did participate, according to the evidence,

26   and the Court has made a finding that the prior is in fact

1    true.

2        According to the information, he played a minor role.

3    He brought some tape to a meeting of people, and he also

4    apparently stole or provided a car that was going to be

5    used.   In that there was no evidence he was ever going to

6    directly participate in any sort of robbery, and for that

7    reason, given the fact that it's his only real adult prior,

8    and his minimal role, I submit there are grounds for the

9    Court to strike that prior, and we do ask this Court to

10    strike that prior for the purposes of sentencing.

11        The Court is still left with a great number of

12    sentencing options, sentence him to custody for up to 13

13    years, even without that prior, and that's just based on the

14    People's memorandum itself.

15        So I would ask the Court -- further, I think that,

16    although it's been covered, Mr. Khuu has been in the Choices

17    Program.   He's done well there.   He has been accepted at

18    Delancey Street, is prepared to go into Delancey Street, and

19    I ask the Court to strike the priors so the Court could

20    impose a sentence which would allow him to go to Delancey

21    Street to serve a suspended sentence.   So I would submit it

22    on that.

23        One other thing I did see in the probation report.

24    It's not Mr. Khuu's fault.   I told Mr. Khuu that, given the

25    fact that he had had a trial and that he might want to

26    appeal from the result, that I would advise him not to

608

1  comment about the specifics of the offense to the probation

2  officer because his statements could be used against him

3  should he say anything incriminating.  It is true that the

4  probation officer says he expressed no remorse based on the

5  fact that he followed my advice and declined to discuss the

6  offenses; however, I think his letter to the Court is an

7  expression of remorse about his involvement in criminal

8  activities.  So I think that Mr. Khuu is remorseful, even

9  though he didn't directly discuss his involvement in these

10  offenses.

11      So that's it.  I mean it this time when I say

12  submitted.

13          THE COURT:  Well, I don't -- the probation

14  report at page 3, it doesn't say he didn't express remorse.

15  It said because he refused to talk about his role, it was

16  difficult to discern his remorse or true motivation.

17          MR. BELL:  Correct.

18          THE COURT:  Now, the other thing that I wanted

19  to refresh my recollection on, the list of houses included

20  two houses, and the defendant was convicted of participating

21  in the robberies of both those houses.

22          MR. BELL:  That is correct.

23          THE COURT:  And it included a bunch of other

24  houses that apparently, refresh me, had not.

25          MR. BELL:  To the best of anyone's knowledge,

26  they had not been the subject of any burglaries or attempted

609

1  burglaries.

2          THE COURT:  Okay.

3          MR. BELL:  The attempted burglary for which he

4  was also convicted was not on the list, was not on the list

5  of houses.

6          THE COURT:  Okay.  And then when we get to

7  credits for time served, I don't understand the credits for

8  time served here.

9          MR. GRANDSAERT:  The pre-sentence credits would

10  be 20 percent -- excuse me, would be one-third good time as

11  well, and that's what is reflected, is it not, in the

12  probation report?

13          THE COURT:  When we get there, let's look at

14  it.  I don't think it's one-third.  But math was never my

15  strong suit.

16      Okay.  Let me hear from the People on the <u>Romero</u>

17  motion.

18          MR. GRANDSAERT:  With regard to <u>Romero</u>, Your

19  Honor, and with regard to a list, the Court is correct,

20  there are two addresses on that list of which the defendant

21  was convicted.  There was also property in the vehicle that

22  corresponded to property from those two addresses.  With

23  regard to <u>Romero</u> also, Your Honor, counsel mentioned the one

24  strike.  That is, of course, true.  What is also true is the

25  defendant was sent to CYA in 1993 for another offense.

26          What is also true, and is that a lot of the cases that

Kathryn M. Lezchuk, C.S.R. No. 2302

1    counsel cites in his briefs are inapposite because they deal

2    with cases involving, quote, unquote, minor felonies as the

3    third or triggering strike.  Here we're not dealing with

4    minor felonies.  We're dealing with three convictions for

5    either residential burglary or attempted residential

6    burglary and then a list of other potential victim homes.

7         The People would submit that in this case, clearly

8    this case falls within the spirit of the three strikes law,

9    and there is no true justification for striking the strike

10   in this particular case.

11              THE COURT:  Okay.  Is that matter submitted?

12              MR. BELL:  Submitted, Your Honor.

13              MR. GRANDSAERT:  Submitted.

14              THE COURT:  I find that dismissing the

15   defendant's prior would not be in the interest of justice.

16   I find that this case does fall within the spirit of three

17   strikes legislation, and therefore, deny the motion.

18        Now, moving on to sentencing.  You waive arraignment

19   for judgment and sentence?

20              MR. BELL:  Yes, Your Honor.

21              THE COURT:  Any legal cause?

22              MR. BELL:  No legal cause.

23              THE COURT:  The Court has read and considered

24   the probation report and the People's sentencing statement.

25        Mr. Bell, do you have any additional argument?

26              MR. BELL:  Well, now that the Court has declined

1    to grant the <u>Romero</u> I would ask the Court to give him the

2    minimum two-strike sentence, which would be 13 years, which

3    would be a low term level, plus a double one year, four

4    months subordinate term for the residential burglaries, plus

5    another for the other -- the attempted residential burglary

6    and then five years for the 667(a) prior, which would -- I'm

7    referring to page 3, of course, of the People's sentencing

8    memorandum.  That would be a 13-year sentence, and he would

9    serve, obviously, a substantial period of that 13 years.

10              THE COURT:  What would be the mitigating factor?

11              MR. BELL:  Well, he -- hold on just a minute.

12    I know I had prepared for that and now it's escaping me, so

13    I need to -- there is evidence that the defendant has been

14    suffering from drug dependence -- drug and alcohol

15    dependence for a substantial period of time.

16              THE COURT:  Okay.  What was that evidence, now?

17              MR. BELL:  Well, the evidence is only that

18    presented in the probation report and from his discussion

19    with the probation officer and his letter to Your Honor.

20    And he is in fact in the Choices Program; and while it is

21    true, technically, that they accept people without drug and

22    alcohol dependence, they usually examine into the situation

23    and make sure people in their program have in fact alcohol

24    and drug dependence, and I think they have determined that

25    he is a dependent individual.

26          I believe that he played a minor role in the strike

1    offense, which the Court has determined to be a strike.

2    There is no evidence here in the trial as to other than a

3    minor role that he played here.  No one actually identified

4    him as being a person who tried to pry open the door.  He

5    was a passenger in the vehicle.

6            THE COURT:  Well, let me go back to that for a

7    second.  The one who came downstairs, who was actually at

8    home working downstairs --

9            MR. BELL:  Correct.

10           THE COURT:  -- didn't he identify the defendant

11   as one of the two people outside?  Whether he was actually

12   prying the door or not, I don't know.

13           MR. BELL:  My recollection is that he did not

14   physically identify the defendant.  He identified the person

15   as wearing clothes similar to those persons.

16           THE COURT:  Did he see two people outside?

17           MR. BELL:  He says he believed he saw two

18   people, correct.

19           THE COURT:  Okay.

20           MR. BELL:  And I submit that there is sufficient

21   mitigation in the record to justify the minimal term,

22   especially given the fact that it's going to be doubled as a

23   strike offense and that he will serve a substantial period

24   of time.

25           THE COURT:  Mr. Grandsaert, anything further on

26   that?

613

1          MR. GRANDSAERT:  Yes.  For some of the same

2    reasons submitted earlier, I would submit this is not a

3    mitigated-term case; and in the absence of mitigation, this

4    should be at least a midterm, which would be 17 years.  I

5    point out to the Court, as I'm sure the Court has already

6    read, page 9 all of the factors in mitigation which do not

7    apply to the defendant in Ms. Allhiser's briefing.  He was

8    not a minor player in this.  There were two people

9    involved.  He was one of the two; and as I understand it,

10   his consciousness of guilt reached astronomic proportions in

11   what he did after the fact in terms of running from the

12   police.

13          His CYA Commitment, his Federal offense, the fact

14   these are residential burglaries, I would submit there is

15   just simply no basis for mitigation here, and that the

16   midterm of 17 or the aggravated term based on the prior

17   record of 21 should be imposed.

18          THE COURT:  All right.  Matter submitted then --

19          MR. BELL:  Yes, Your Honor.

20          MR. GRANDSAERT:  Yes, Your Honor.

21          THE COURT:  -- on the argument?

22          The defendant is statutorily ineligible for probation

23   pursuant to the three-strikes legislation.  With regard to

24   concurrent and consecutive, the Court has considered the

25   criteria set forth in 4.425(a) and concludes that the crimes

26   and their objectives were predominantly independent of each

Kathryn M. Lezchuk, C.S.R. No. 2302

614

1    other and were committed at different times and in separate

2    places, and therefore, the Court will sentence

3    consecutively.

4        On Count 1, violation of Penal Code Section 460(a),

5    the Court imposes the mid term of four years, doubled, for a

6    total of eight years in State Prison.

7        On Count 2, second count of Penal Code Section 460(a),

8    the Court imposes one-third the midterm, one year, four

9    months, doubled, for a total of two years, eight months in

10   State Prison, consecutive.

11       On Count 3, the attempted burglary, the Court imposes

12   one-third the midterm, eight months, doubled, for a total of

13   16 months in State Prison, consecutive.

14       On Count 4, Penal Code Section 496, the Court imposes

15   the mid -- one-third the midterm of eight months, doubled,

16   for a total of 16 months in State Prison, consecutive;

17   however, that count is stayed pursuant to provisions of

18   Penal Code Section 654.

19       On Count 5, the second count of Penal Code Section

20   496, similarly the Court imposes one-third the midterm of

21   eight months, doubled, for a total of 16 months in State

22   Prison, consecutive; however, that count is also stayed

23   pursuant to provisions of Penal Code Section 654.

24       Under Penal Code Section 667(a) allegation, the Court

25   imposes five years in State Prison, consecutive.

26       The aggregate sentence is, therefore, 17 years in

615

1    State Prison.

2         Are there any objections to the Court's calculations

3    pursuant to People vs. Scott?

4                   MR. BELL:  No, Your Honor.

5                   THE COURT:  Credits for time served.

6                   MR. GRANDSAERT:  I have reviewed that, Your

7    Honor.  I agree with the Court that --

8                   THE COURT:  He gets the usual credits in jail,

9    doesn't he, local time?

10                  MR. GRANDSAERT:  Yes, which would be --

11                  THE COURT:  What is it, 20 percent State Prison

12   time?

13                  MR. GRANDSAERT:  He gets --

14                  THE COURT:  He has to serve 80 percent of his

15   State Prison sentence.

16                  MR. GRANDSAERT:  The post sentence, I believe he

17   does have to serve 80 percent, which that is something we

18   don't have to calculate, but he does get the one-third

19   here.  So 254 plus 127, I believe.

20                  THE COURT:  You agree with that, Mr. Bell?

21                  MR. BELL:  Yes.

22                  MR. GRANDSAERT:  For a total of 381.

23                  THE COURT:  127, for a total of 381.

24        254 plus 127, 381.

25                  MR. BELL:  May I be heard on one additional

26   matter?

Kathryn M. Lezchuk, C.S.R. No. 2302

1    THE COURT:  Sure.

2    MR. BELL:  As the Court will recall, I asked

3  earlier to be relieved because my fees hadn't been paid and

4  the Court ruled on that.  I'm still in that situation, so

5  I'm asking that the Court relieve me for the purposes of

6  appeal and order that counsel on appeal be appointed, and I

7  will prepare an order for that to happen so that -- I will

8  prepare a Notice of Appeal in pro per for the defendant so

9  that --

10    THE COURT:  And file it.

11    MR. BELL:  Yes, but I'm asking that the Court

12  order court-appointed counsel for him on appeal.

13    THE COURT:  Well, I don't have any problem doing

14  that, except usually that's done by the Court of Appeal.

15    MR. BELL:  I think that this Court acts

16  initially on it.  I might be incorrect about that, because I

17  haven't done it for a while.

18    THE COURT:  I never have.

19    MR. BELL:  All right.

20    THE COURT:  The usual thing would be that

21  counsel would be finished.  They'll get a new attorney for

22  the appeal, and they will do that.

23    MR. BELL:  All right.

24    THE COURT:  Yes.  If that turns out not to be

25  true, submit the order to me.

26    MR. BELL:  I'll check with the Private Defender,

Kathryn M. Lezchuk, C.S.R. No. 2302

617

1    to be sure.

2              THE COURT:   One problem being, I don't know who

3    to appoint.   I don't know who is on the list.

4              MR. BELL:   It would just be a general

5    appointment, but I may be incorrect about that, so I'll

6    double-check it.

7              THE COURT:   Let me know if you need it.

8         Pursuant to Penal Code Section 12024(b)(1) the

9    defendant is ordered to pay a restitution fine to the State

10   Restitution Fund in the sum of $10,000.   The Court has

11   determined the amount of the restitution fine pursuant to

12   the formula set forth in Penal Code Section 1202.4(b)(2).

13   The Director of Corrections may collect this restitution

14   fine from the defendant's earnings in State Prison.

15        Pursuant to Penal Code Section 1202.45 the Court will

16   impose an additional restitution fine -- or parole

17   revocation fine, I think is the more appropriate term, in

18   the sum of $10,000.   Payment of this fine is suspended and

19   will remain suspended unless the defendant's parole is

20   revoked.

21        Defendant's ordered to pay a $20 court security fee,

22   which may be collected by the Director of Corrections.

23        Pursuant to Penal Code Section 3000(b)(1) the

24   defendant will be on parole for a period of three years

25   following his release from prison.

26        Mr. Khuu, you have the right to appeal from this

618

1    sentence.  If you wish to appeal, you must file a written

2    Notice of Appeal with the clerk of this court within 60 days

3    from today's date, and Mr. Bell has already agreed to take

4    care of that for you.

5        If you appeal and are unable to hire an attorney, the

6    Appellate Court will appoint a lawyer to represent you on

7    the appeal at no cost to you, and you will also have a right

8    to a free transcript of the record of the necessary

9    proceedings in this court.  It's important that you

10   understand that your written Notice of Appeal must be filed

11   timely.

12       Defendant is remanded to the custody of the Sheriff,

13   and the Sheriff is ordered to deliver him to the Director of

14   the Department of Corrections forthwith.

15              MR. BELL:  Thank you, Your Honor.

16              MR. GRANDSAERT:  One more thing, if we could.

17   That is, the victim's insurance company sent us a notice

18   yesterday, one of the victims, of the restitution amount

19   that is paid to the victims.  They are asking for

20   restitution to the victim in subrogation of that.

21       I have shown counsel the paperwork involved.  It

22   involves $1,060 payable to the Triple A State Automobile

23   Association with regard to the victims Sharon and Yao Chi.

24   Yao, Y-a-o.  Chi, C-h-i, is the last name.

25       Would the Court consider ordering restitution to the

26   victims?

Kathryn M. Lezchuk, C.S.R. No. 2302

619

1          THE COURT:  I think there's a case that says I
2     cannot do that.
3          MR. GRANDSAERT:  To the victims, not to the
4     insurance company, to the victims, and that subrogation will
5     take effect as a matter of law, I think.
6          MR. BELL:  The only concern I have is, you
7     ordered a rather substantial restitution fine already.  I
8     wonder if the Court in its discretion should not order
9     restitution, given the fact you ordered a restitution fine
10    of $10,000.  I don't know what the law is with regard to
11    that.
12         THE COURT:  It's that I'm supposed to award
13    both, and everybody always says $200 plus ten percent.  All
14    probation reports say that.  There is now a formula set
15    forth in the code that I'm supposed to follow, $200 times
16    the number of counts, times the number of years, so that's
17    where that comes from.
18         All right.  The restitution amount --
19         MR. GRANDSAERT:  $1,060, payable to Sharon or
20    Yao Chi.
21         THE COURT:  And that will be the Order.
22         That may be collected from his earnings at State
23    Prison; and if he has a dispute about the amount, he is
24    entitled to a hearing before the court to determine that.
25         MR. BELL:  Okay.  Thank you, Your Honor.
26         MR. GRANDSAERT:  Thank you, Your Honor.

Kathryn M. Lezchuk, C.S.R. No. 2302

620

1          THE COURT:  All right.  Thank you.

2              (Court stood in recess.)

3                  ---oOo---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1              SUPERIOR COURT, STATE OF CALIFORNIA

2                 COUNTY OF SAN MATEO

3

4  THE PEOPLE OF THE STATE OF     )
    CALIFORNIA,                 )

5                      )
            PLAINTIFF,    )

6                     )
      VS.              )      NO. SC056446A

7                     )   Reporter's Certificate
    HOA TRUNG KHUU,          )

8                     )
          DEFENDANT.    )

9  _____)

10

11  STATE OF CALIFORNIA  )
                   )   SS.

12  COUNTY OF SAN MATEO  )

13

14     I, Kathryn Lezchuk, Certified Shorthand Reporter and

15  Official Reporter of the Superior Court of the State of

16  California, County of San Mateo, do hereby certify that the

17  foregoing, Volume 3, pages 397 through 620, comprise a full,

18  true and correct computer-aided transcription of the

19  proceedings held in the matter of the above-entitled cause.

20     Dated this 2nd day of January, 2005.

21

22

23

24                    _____/S/_____
                    Kathryn M. Lezchuk, C.S.R. No. 2302

25                    Official Reporter, Superior Court

26